UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SANDRA M.,

                                        Plaintiff,

v.                                                      3:22-cv-00485-TWD

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

APPEARANCES:                                    OF COUNSEL:

LAW OFFICES OF KENNETH HILLER, PLLC             JUSTIN M. GOLDSTEIN, ESQ.
  *Counsel for Plaintiff*                       KENNETH R. HILLER, ESQ.
6000 North Bailey Avenue - Suite 1A
Amherst, NY 14226

SOCIAL SECURITY ADMINISTRATION                  JASON P. PECK, ESQ.
OFFICE OF THE GENERAL COUNSEL
  *Counsel for Defendant*
6401 Security Boulevard
Baltimore, MD 21235


**THÉRÈSE WILEY DANCKS,** United States Magistrate Judge

### DECISION AND ORDER

Sandra M. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of a final decision of the Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").  (Dkt. No. 1.)  This case has proceeded in accordance with General Order 18 of this

Court which sets forth the procedures to be followed when appealing a denial of Social Security

benefits.  Both parties filed briefs, which the Court treats as motions under Federal Rule of Civil

Procedure 12(c) in accordance with General Order 18.  (Dkt. Nos. 12, 14.)  Oral argument was

not heard.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this

case by a Magistrate Judge.  (Dkt. No. 6.)  For the reasons discussed below, the Commissioner's

decision denying Plaintiff benefits is affirmed.

## I.    BACKGROUND

Plaintiff was born in 1967 and has a high school education.  (Administrative Transcript at

21, 234, 240.)[1]  She last worked in 2016 as a "temporary laborer" for various businesses.  *Id.* at

240.  She was also a cashier and worked in customer service for a coffee/donut shop.  *Id.*  On

October 5, 2020, Plaintiff filed for DIB and SSI.  *Id.* at 211.[2]  She alleged disability beginning

January 1, 2017, due to arthritis in both knees, depression, high blood pressure, "thyroid issue,"

arthritis in the right shoulder, right foot numbness, and lower back pain.  *Id.* at 73.  Her

applications were initially denied on February 26, 2021, and again upon reconsideration on

March 18, 2021.  *Id.* at 13, 116, 133.

At Plaintiff's request, Administrative Law Judge ("ALJ") Jennifer Gale Smith conducted

a telephone hearing on August 10, 2021.  *Id.* at 13.  The ALJ heard the testimony of Plaintiff,

represented by a non-attorney representative, and the testimony of vocational expert ("VE")

Warren Maxim.  *Id.* at 27-47.

---

[1]  The Administrative Transcript is found at Dkt. No. 10.  Citations to the Administrative
Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein
will be used rather than the page numbers the Court's CM/ECF electronic filing system assigns.
Citations not made to the Administrative Transcript will use page numbers assigned by the
Court's CM/ECF electronic filing system.

[2]  The Court notes while Plaintiff's application is dated October 5, 2020, the Plaintiff's brief, the
Defendant's brief, and the ALJ's decision state Plaintiff applied for DIB and SSI on October 1,
2020. (Dkt. No. 10 at 18; Dkt. No. 12 at 1; Dkt. No. 14 at 3.)

On August 20, 2021, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act. *Id.* at 10. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 11, 2022. *Id.* at 1. Plaintiff timely commenced this action on May 10, 2022. (Dkt. No. 1.)

## II.   RELEVANT LEGAL STANDARDS

### A.   Standard of Review

In reviewing a final decision of the Commissioner, a court must first determine whether the correct legal standards were applied, and if so, whether substantial evidence supports the decision. *Atwater v. Astrue*, 512 F. App'x 67, 69 (2d Cir. 2013). "Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks and citation omitted). Accordingly, a reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986-87 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (internal quotation marks and citation omitted). If the ALJ's finding as to any fact is supported by substantial evidence, it is conclusive. 42 U.S.C. Sec 405(g); *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). Furthermore, where evidence is deemed susceptible to more than

one rational interpretation, the ALJ's conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's findings must be sustained "even where substantial evidence may support the plaintiff's positions and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  A reviewing court cannot substitute its interpretation of the administrative record in place of the Commissioner's if the record contains substantial support for the ALJ's decision.  *See Rutherford*, 685 F.2d at 62.

When inadequacies in the ALJ's decision frustrate meaningful review of the substantial evidence inquiry, remand may be appropriate.  *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019); *Pratts v. Chater*, 94 F.3d, 34, 39 (2d Cir. 1996).  Remand may also be appropriate where the ALJ has failed to develop the record, adequately appraise the weight or persuasive value of witness testimony, or explain his reasonings.  *See Klemens v. Berryhill*, 703 F. App'x 35, 35-38 (2d Cir. 2017); *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999); *Estrella*, 925 F.3d at 98; *Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008); *Pratts*, 94 F.3d at 39.

B.      **Standard for Benefits**[3]

To be considered disabled, a plaintiff seeking disability benefits must establish he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he should be hired if he applied for work.

42 U.S.C. § (d)(2)(A).

The Social Security Administration regulations outline a five-step process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

---

[3]  While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so "decisions under these sections are cited interchangeably."  *Donato v. Sec'y of Health of Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess*, 537 F.3d at 120); 20

C.F.R. § § 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).  "If at any step a finding of disability or

non-disability can be made, the SSA will not handle the claim further."  *Barnhart v. Thomas*, 540

U.S. 20, 24 (2003).

The claimant bears the burden of proof regarding the first four steps.  *Kohler v. Astrue*,

546 F.3d 260, 265 (2d Cir. 2008).  If the claimant meets his or her burden of proof, the burden

shifts to the Commissioner at the fifth step to prove the claimant is capable of working.  *Id.*

### C.      Standard for ALJ Evaluation of Opinion Evidence

According to the regulations regarding the evaluation of medical evidence, the

Commissioner will not "give any specific evidentiary weight to medical opinions; this includes

giving controlling weight to any medical opinion."  *Revisions to Rules Regarding the Evaluation*

*of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68

(Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must

consider all medical opinions and "evaluate their persuasiveness" based on the following five

factors: supportability; consistency; relationship with the claimant; specialization; and "other

factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

While the ALJ is not allowed to rely on the perceived hierarchy of medical sources, defer

to specific medical opinions, or assign "weight" to a medical opinion, the ALJ must still

"articulate how [she] considered the medical opinions" and "how persuasive [she] find[s] all of

the medical opinions."  *Id.* §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most

important factors for determining the persuasiveness of medical opinions are consistency and

supportability," which are the "same factors" forming the foundation of the treating source rule.

*Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion.  20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2).  With respect to supportability, the regulations provide "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).  As to the consistency factor, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(2), 416.920c(c)(2).

An ALJ must "'articulate how [she] considered the medical opinions' and 'how persuasive [she] find[s] all of the medical opinions.'" *Brian O. v. Comm'r of Soc. Sec.*, No. 1:19-CV-983 (ATB), 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § § 404.1520c(a)-(b)(1), 416.920c(a)-(b)(1)).  Furthermore, while an ALJ is specifically required to "explain how [she] considered the supportability and consistency factors," an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

## III.   THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims.  (T. at 15-22.)  At step one, the ALJ found Plaintiff had not

engaged in substantial gainful activity since the application date. *Id.* at 15. Proceeding to step two, the ALJ determined Plaintiff had the following severe impairments: degenerative disc disease with radiculopathy, bilateral primary arthritis of the knees, idiopathic peripheral neuropathy, and obesity.[4] *Id.* At step three of the sequential evaluation, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id.* at 17-18.

Thereafter, the ALJ determined Plaintiff had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 C.F.R. 416.967(b) except she should not work at unprotected heights or in close proximity to dangerous machinery or moving mechanical parts of equipment. She should not balance as defined in the Selected Characteristics of Occupations, kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. She can occasionally stoop and climb ramps and stairs.

*Id.* at 18.

In making the RFC determination, the ALJ considered all of Plaintiff's symptoms and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. [§] 416.29 and [Social Security Ruling] 16-3p." *Id.* The ALJ further stated she considered medical opinion evidence and prior administrative medical findings ("PAMFs") pursuant to 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920(c). *Id.* The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her allegations concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence as a whole and were not persuasive to the extent they were inconsistent with the RFC. *Id.* at 19.

---

[4] The ALJ found Plaintiff's depressive disorder to be non-severe because it did not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities. (T. at 16.)

Proceeding to step four of the sequential evaluation, the ALJ determined Plaintiff was incapable of performing any past relevant work based on the testimony of the impartial VE who stated the requirements of the past relevant work exceeded Plaintiff's RFC.  *Id.* at 21.  At step five, the ALJ concluded Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  *Id.*  Accordingly, the ALJ determined Plaintiff was not disabled, as defined by the Social Security Act, from October 1, 2020, through the date of her decision.  *Id.* at 22.

## IV.    DISCUSSION

Plaintiff argues the ALJ failed to identify substantial evidence supporting the RFC and erred in her evaluation of the medical opinions.  (Dkt. No. 12 at 1, 8-25.)  Specifically, Plaintiff claims the ALJ did not properly apply the supportability and consistency factors to the opinions of record.  *Id*. at 8-25.  Defendant asserts the ALJ's decision denying benefits applies the correct legal standards and is supported by substantial evidence.  (Dkt. No. 14 at 6-21.)

The RFC is an assessment of "the most [Plaintiff] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ is responsible for determining Plaintiff's RFC based on a review of relevant medical and non-medical evidence, including any statement about what Plaintiff can still do, provided by any medical sources.  *Id.* §§ 404.1527(d), 404.1545(a)(3), 404.1546(c); 416.927(d), 416.945(a)(3), 416.946(c).  Thus, the ALJ is tasked with the responsibility of reviewing all the evidence, resolving inconsistencies, and making a determination consistent with the evidence as a whole.  *Camarata v. Colvin*, No. 6:14-CV-0578 (MAD/ATB), 2015 WL 4598811, at *9 (N.D.N.Y. July 29, 2015).  Although the ALJ has the responsibility to determine the RFC based on all the evidence in the record, the burden is on Plaintiff to demonstrate functional limitations that preclude any substantial gainful activity.  20

C.F.R. §§ 404.1512(a), 404.1545(a), 404.1546(c), 416.945(a), 416.946(c).  For reasons discussed herein, substantial evidence supports the ALJ's RFC.

A.      **The ALJ Reasonably Found Dr. Padmaraju's and Dr. Chen's Opinions to be Persuasive**

Plaintiff contends the ALJ erred in her evaluation of the opinions of Drs. Padmaraju and Chen because she "provided only a conclusory application of the supportability factor and no application of the consistency factor."  (Dkt. No. 12 at 24-25.)  The Court disagrees.

Dr. Padmaraju, a state agency consultant, reviewed Plaintiff's then-current medical records on February 24, 2021.  (T. at 72-87.)  Upon review, Dr. Padmaraju opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently.  *Id.* at 82.  Dr. Padmaraju noted Plaintiff could stand, walk, and sit with normal breaks for about six hours in an eight-hour workday.  *Id.* at 82-83.  Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds.  *Id.* at 83.  Plaintiff had no manipulative, visual, communicative, or environmental limitations.  *Id.*  Dr. Padmaraju's PAMF was affirmed on reconsideration by state agency medical consultant, Dr. Chen, on March 15, 2021.  *Id.* at 90-103.

Here, the ALJ reasonably found the opinions of Drs. Padmaraju and Chen to be persuasive in determining Plaintiff had the RFC to perform a reduced range of light work.  *Id.* at 20.  First, the ALJ considered the PAMFs and other medical opinions in the record and explained how she applied the supportability and consistency factors to these opinions.  *Id.* at 20-21.  The ALJ noted Dr. Padmaraju's and Dr. Chen's PAMFs were persuasive because they were based upon a review of relevant medical evidence and opinions and were supported by the findings set forth in the report and the objective findings cited in the report.  *Id.* at 20.  The reviewers' familiarity with the Agency's policies and evidentiary requirements also contributed to the

persuasiveness of their opinions.  *Id.*  The fact that the purpose of the review was to render a

medical opinion on disability using the Agency's disability evaluation criteria lent support to the

persuasiveness of their opinions as well.  *Id.*

Plaintiff argues the ALJ failed to make any findings relating to the consistency factor

because she failed to identify specific evidence inconsistent with the opinion of treating

physician, Dr. Khan.  (Dkt. No. 12 at 17, 22-25.)[5]  However, the ALJ applied both the

consistency and supportability factors when she referred to direct language and reasoning from

Drs. Padmaraju and Chen and explicitly noted their opinions were "supported by the findings set

forth in the report and the objective findings cited in the report."  (T. at 20.)  This language is

sufficient to demonstrate the ALJ considered the supportability and consistency of the opinions.

*See Donna N. v. Comm'r of Soc. Sec.*, No. 5:21-cv-01264, 2023 WL 2742076, at \*9 (N.D.N.Y.

Mar. 31, 2023) (ALJ properly considered the supportability factor by explaining the doctors are

mental health experts and are well versed in Agency standards and evidentiary requirements and

by stating their opinions are based upon reviews of relevant medical evidence and supported by

detailed explanations); *Justin S. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1575 (ATB), 2022 WL

306445, at \*10 (N.D.N.Y. Feb. 2, 2022) (ALJ properly gave persuasive value to a medical

opinion by noting it was supported with detailed explanation, was consistent with the record as a

whole, and by noting the doctor was a mental health expert well versed in agency standards and

evidentiary requirements).  Thus, such as here, where an ALJ's analysis "affords an adequate

---

[5]  Even if the Court found the ALJ failed to explain how she considered the consistency of Dr.
Padmaraju and Dr. Chen's opinions, "the ALJ's decision could still be affirmed if 'a searching
review of the record' assures us 'that the substance of the [regulation] was not traversed.'"
*Wayne P. v. Kijakazi*, No. 8:22-CV-653 (ATB), 2023 WL 3949877, at \*9 (N.D.N.Y. June 12,
2023) (quoting *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at \*2 (2d Cir. June 17,
2022)) (alteration in original).  As set forth in the analysis, a review of the record assures the
Court the substance of the regulations was not traversed.  *Id.*

basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, . . . remand is not necessary merely because an explicit function-by-function analysis was not performed." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d. Cir. 2013).

Moreover, Drs. Padmaraju and Chen did in fact cite to multiple sources throughout the medical record to support their findings regarding Plaintiff's RFC and to demonstrate their opinions' consistency with the record.  For example, Drs. Padmaraju and Chen noted on August 20, 2020, Plaintiff denied any other focal or lateralizing symptoms.  (T. at 84, 103, 415-16.)  Her blood pressure was 130/72 and her strength was well intact throughout with no asymmetry.  *Id.* at 84, 103, 416.  Her tone was normal with no drift, and sensory sensation was reduced in a stocking distribution near the right ankle.  *Id.* at 84, 103, 416.  Plaintiff's deep tendon reflexes were +2 in the upper extremities and hypoactive in the lower extremities.  *Id.* at 84, 103, 416.  Her finger-to-nose coordination revealed no dysmetria and her gait was steady.  *Id.* at 84, 103, 416.  A February 17, 2021, right-knee x-ray showed no acute fracture or dislocation and a lumbosacral spine x-ray only showed degenerative disc disease.  *Id.* at 84, 103, 405.  Drs. Padmaraju and Chen concluded the "[i]maging of [Plaintiff's] knees did not show severe [degenerative joint disease]. . . ."  *Id.* at 84, 102-03.  Therefore, Dr. Padmaraju's and Dr. Chen's opinions were supported by and consistent with the record.

Contrary to Plaintiff's assertion, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because these consultants are qualified experts in the field of Social Security disability.  *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by

medical evidence in the record."); *Little v. Colvin*, No. 5:14-CV-0063 (MAD), 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (internal quotation marks and citations omitted); *see also Reed v. Comm'r of Soc. Sec.*, No. 5:16-CV-1134, 2018 WL 1183382, at *5 (N.D.N.Y. Mar. 6, 2018) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability."); *Barber v. Comm'r of Soc. Sec.*, No. 6:15-CV-0338 (GTS/WBC), 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) ("It is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence.").  Here, the ALJ properly relied on the opinions of Drs. Padmaraju and Chen because they were supported by and consistent with the record.

As such, the Court finds the ALJ properly addressed the "most important" factors of consistency and supportability regarding the opinions of Drs. Padmaraju and Chen and rejects Plaintiff's contention the ALJ only did a conclusory application of the supportability factor that does not meet the required legal standard.  *See* 20 C.F.R. §§ 404.1520c(c)93), (4); 416.920c(c)(3), (4).  The Court also finds the ALJ did not err in relying on the medical opinion evidence rendered by Drs. Padmaraju and Chen.  Further, for the reasons set forth above, these opinions constitute substantial evidence and remand is not warranted.

### B.    The ALJ Reasonably Found Dr. Jenouri's Opinion to be Partially Persuasive

Dr. Jenouri performed a consultative examination of Plaintiff on February 17, 2021.  (T. at 400-03.)  Plaintiff reported a history of osteoarthritis in both knees, as well as routine lower

back pain. *Id*. at 400. Plaintiff described her low back pain and bilateral knee pain as sharp, with an intensity of 8 out of 10. *Id*. She further stated the pain occurred frequently and "precipitated with activity." *Id*. Plaintiff reported she cooks, cleans, and showers five times a week, and dresses herself every day. *Id*. She also reported she does laundry and goes grocery shopping once a week. *Id*. Additionally, Plaintiff noted she watches TV and listens to the radio in her spare time. *Id*. Dr. Jenouri opined Plaintiff had mild to moderate limitations walking and standing for long periods, and for bending, stairclimbing, lifting, and carrying. *Id.* at 403.

Here, the ALJ reasonably found the opinion of Dr. Jenouri to be partially persuasive. The ALJ stated while Dr. Jenouri's opinion was rendered after a thorough examination of Plaintiff by a physician with extensive program and professional expertise, Plaintiff's high level of daily activities suggested she may have lesser limitations than Dr. Jenouri opined. *Id.* at 20, 400-01.

Plaintiff argues the ALJ did not apply the supportability and consistency factors to Dr. Jenouri's opinion and the ALJ did not give Dr. Jenouri's opinion the appropriate amount of weight. (Dkt. No. 12 at 22-24.) However, the Court finds the ALJ appropriately applied the supportability and consistency factors to Dr. Jenouri's opinion.[6] Initially, the ALJ applied the supportability factor when she noted Dr. Jenouri's opinion was "rendered after a thorough examination of the claimant by a physician with extensive program and professional expertise." (T. at 20.) Dr. Jenouri's opinion was supported by his own examination. *Id.* at 20, 400-02. As noted above, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because these consultants are qualified experts in the field of Social Security disability as long as their opinions are supported by and consistent with the

---

[6] Again, even if the Court found the ALJ failed to explain how she considered the consistency or supportability of Dr. Jenouri's opinion, a review of the record assures the Court the substance of the regulations was not traversed. *See Wayne P.*, 2023 WL 3949877, at *9.

record.  *See Frye ex rel. A.O.*, 485 F. App'x at 487; *Little*, 2015 WL 1399586, at *9; *see also Reed*, 2018 WL 1183382, at *5; *Barber*, 2016 WL 4411337, at *7.  The ALJ also applied the consistency factor when she found Dr. Jenouri's opinion to be only partially persuasive because it was inconsistent with Plaintiff's high level of daily activities.  (T. at 20.)

Dr. Jenouri found Plaintiff had some limitations such as positive straight leg raises, her gait was a "waddle," walking on her heels and toes was difficult, and "her squat was 50%."  *Id.* at 401.  However, Plaintiff had a normal stance, used no assistive devices, needed no help changing for the exam or getting on and off the exam table, and was able to rise from the chair without difficulty.  *Id.*  Dr. Jenouri further observed Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and there was full rotary movement bilaterally.  *Id.* at 401-02.  There was no scoliosis, kyphosis, or abnormality in Plaintiff's thoracic spine.  *Id.*  Plaintiff's lumbar spine showed extension 30 degrees; flexion 90 degrees; lateral flexion left 30 degrees and right 30 degrees; and rotation right 30 degrees and left 30 degrees.  *Id.* at 402.  Dr. Jenouri also found Plaintiff had full (5/5) strength in the upper and lower extremities, as well as a full grip strength bilaterally.  *Id.*  Dr. Jenouri diagnosed Plaintiff with osteoarthritis, low back pain, bilateral knee pain, and hypertension and found Plaintiff had mild to moderate restrictions walking and standing for long periods, and for bending, stair climbing, lifting, and carrying.  *Id.* at 402-03.

The ALJ properly found Dr. Jenouri's opinion on Plaintiff's mild to moderate restrictions to be inconsistent with and not supported by Plaintiff's high level of daily activities.  20 C.F.R. §§ 404.1429(c)(4); 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence.").  Plaintiff testified she tries to do housework but has to pace it towards the end of

the day; she goes grocery shopping with her partner once a week; and she helps put the groceries

away. (T. at 35-36). Plaintiff also testified she watches TV during the day to pass the time and

has a dog who she lets outside but does not walk. *Id.* at 35-37. Plaintiff stated "[i]f there's

things that have to be done, like, in the bedroom or in the bathroom and things, I try and do

them." *Id.* at 37. Further, Plaintiff reported to Dr. Jenouri she cooks, cleans, and showers five

times a week; she dresses herself every day; she does laundry and goes grocery shopping once a

week; and listens to the radio. *Id.* at 400.

Courts have upheld ALJs partially discrediting medical opinions that are contradicted by

Plaintiff's daily activities. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (the

claimant's daily activities undermined his supposed disabling limitations); *Brown v. Berryhill*,

No. 6:17-cv-06584 (MAT), 2018 WL 1827662, at \*4 (W.D.N.Y. Apr. 16, 2018) (ALJ properly

discredited opinion that the claimant had disabling mental limitations because it was inconsistent

with the claimant's activities of daily living, which included cooking, cleaning, doing laundry,

and shopping); *see also Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014) (ALJ appropriately

found physician's "restrictive assessment" was inconsistent with, among other things, the

plaintiff's "testimony regarding her daily functioning"). Moreover, "[a]n ALJ may credit some

portion of a consultative opinion, while properly declining to credit those conclusions that are

not supported by [the consultative examiner's] own examination findings or are inconsistent with

other evidence of record." *Mark H. v. Comm'r of Soc. Sec.*, 18-CV-1347 (ATB), 2020 WL

1434115, at \*8 (N.D.N.Y. Mar. 23, 2020) (citing *Cruz v. Colvin*, No. 3:13-cv-723 (MAD/TWD),

2014 WL 4826684, \*14 (N.D.N.Y. Sept. 29, 2014)). "Although [an] ALJ's conclusion may not

perfectly correspond with any of the opinions of medical sources cited in [her] decision, [she is]

entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with

the record as a whole." *Quinn v. Colvin*, 199 F. Supp. 3d 692, 712 (W.D.N.Y. 2016) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).

Additionally, "there is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations." *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013); *see also Walker v. Colvin*, 15-CV-0465 (CFH), 2016 WL 4768806, at *10 (N.D.N.Y. Sept 13, 2016) ("[A]n ALJ may properly 'credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported' . . . . This is true even when the ALJ relies on a consultative medical examiner's examination findings, but rejects consultative examiner's medical source statement[.]") (citations omitted.)  Therefore, the ALJ did not err in assigning partial persuasive value to Dr. Jenouri's opinion based on Plaintiff's high level of daily activities.  *See Rachael V. v. Comm'r of Soc. Sec.*, No. 18-1346 (TWD), 2020 WL 1304076, at *6 (N.D.N.Y. March 19, 2020) (upholding the finding that an opinion of marked mental limitations was not consistent with the claimant's ability to maintain relationships with her boyfriend and family, attend to self-care, prepare simple meals, do some cleaning and shopping, and drive); *Williams v. Colvin*, No. 14-CV-947S, 2017 WL 3404759, at *7 (W.D.N.Y. Aug. 9, 2017) (upholding the ALJ's decision to discount a doctor's opinion because it was contradicted by claimant's ability to perform daily activities, claimant's symptoms, and the objective medical record); *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (holding the ALJ appropriately declined to adopt the doctor's limitations where the claimant engaged in moderately complex tasks, including helping with the care of her grandchildren, using computers, and other daily activities).

In sum, the Court finds the ALJ did not err in relying, in part, on the medical opinion evidence rendered by Dr. Jenouri.  Further, for the reasons set forth above, this opinion constitutes substantial evidence and remand is not warranted.

### C.    The ALJ Reasonably Found Dr. Khan's Opinion to be Unpersuasive

Dr. Khan saw Plaintiff on two occasions: December 1, 2020, and January 14, 2021.  (T. at 762-75.)  Dr. Khan subsequently answered a questionnaire provided to him by Plaintiff's counsel on June 25, 2021.  *Id.* at 803.  Dr. Khan opined Plaintiff can walk one city block without rest or severe pain; she can sit for 20 minutes at one time and for about two hours in an eight-hour workday; she can stand for 10 minutes at one time; and she can stand/walk for less than two hours in an eight-hour workday.  *Id.* at 801.  Dr. Khan checked off yes when asked if Plaintiff requires a job that permits shifting positions at will between sitting, standing, and walking.  *Id.* He also indicated on the form Plaintiff would require unscheduled breaks lasting five minutes every hour and checked yes when asked if Plaintiff must use a cane or other assistive device when engaging in occasional standing and walking.  *Id.* at 802.  He opined Plaintiff can lift and carry 10 pounds rarely and less than 10 pounds occasionally.  *Id.*  Dr. Khan indicated Plaintiff can occasionally look down, turn her head right or left, look up, and hold her head in a static position, but she can never twist, stoop, crouch, or climb ladders or stairs.  *Id.* at 802-03.  He further opined Plaintiff can occasionally use her hands to grasp, turn, and twist objects, but cannot use her fingers for fine manipulation or her arms for reaching overhead.  *Id.*  Finally, Dr. Khan concluded Plaintiff would be absent from work about four days per month, and her pain or other symptoms would be severe enough to interfere with her attention and concentration frequently.  *Id.* at 803.

The ALJ found this opinion to be unpersuasive because Dr. Kahn's opinions regarding how often Plaintiff would be off task during work and absent from work were speculative and the manipulative restrictions were not supported by Dr. Jenouri's testing. *Id.* at 21. The ALJ further found Dr. Kahn's opinion was inconsistent with the assessments of the other physicians who rendered an opinion on Plaintiff's abilities and limitations, and it was not supported by the objective evidence of record, including Plaintiff's high level of daily activities. *Id.*

Here, for the reasons discussed below, the ALJ reasonably found the opinion of Dr. Khan to be unpersuasive because it was inconsistent with and unsupported by the medical evidence and opinions in Plaintiff's record. *Id.*

          **1.**     **Dr. Khan's Opinion Regarding Plaintiff Being Off Task and Absent is Speculative.**

The ALJ found Dr. Khan's opinion to be unpersuasive in part because Dr. Khan's findings regarding Plaintiff being off task and absent were speculative and not supported by the medical evidence or other opinions in Plaintiff's record. *Id.* at 21, 803. Plaintiff claims the limitations are not speculative and argues "the ALJ asked the [VE] questions regarding employer tolerances for off task time and absences without any opinion or piece of evidence indicating Plaintiff would not be off task or absent any amount as a result of her impairments." (Dkt. No. 12 at 9-17.) Plaintiff further claims the ALJ improperly determined Plaintiff would be able to meet the attendance and concentration standards of the positions identified by the VE and substituted her own opinion for the opinion of a doctor. *Id.* Finally, Plaintiff asserts the ALJ failed to identify any evidence in the record that would "override" Dr. Khan's assessment of nonexertional limitations resulting from pain. *Id.* at 11.

The Court finds Plaintiff's contentions unavailing. It is well within the ALJ's discretion to reject a medical opinion when there is a lack of evidence supporting the limitations and when

objective medical evidence in the record provides substantial evidence to support the ALJ's finding.  *See, e.g.*, *Melanie W. v. Comm'r of Soc. Sec.*, No. 5:19-CV-724 (ATB), 2020 WL 2079432, at *8 (N.D.N.Y. Apr. 30, 2020) (finding it "within the ALJ's discretion to reject [a provider's] estimates of absenteeism and time off-task" when there was a "lack of evidence supporting such extreme limitations"); (*O' Connor v. Comm'r of Soc. Sec.*, No. 5:11-CV-01425, 2013 WL 1180963, at *5 (N.D.N.Y. Mar. 20, 2013) (ALJ properly rejected physician's opinion regarding plaintiff's absenteeism rate of four days a month, despite some evidence to the contrary, where "objective medical evidence in the record provid[ed] substantial evidence to support the ALJ's finding that [the opinion] is speculative.").  Dr. Khan cited to no objective medical evidence when opining Plaintiff would have good and bad days, she would be absent four days per month, and her symptoms would be severe enough to frequently interfere with her attention and concentration.  (T. at 803.)  Moreover, Dr. Khan's findings were not supported by Drs. Padmaraju and Chen's conclusions.  After reviewing Plaintiff's medical records, Dr. Padmaraju concluded, and Dr. Chen affirmed, Plaintiff could stand, walk, and sit with normal breaks for a total of 6 hours in an 8-hour workday.  *Id.* at 82, 101.  The ALJ did not err in taking issue with Dr. Kahn's lack of supporting explanations and citations and the lack of support from other medical opinions.  *See Robert O. v. Comm'r of Soc. Sec.*, No. 3:20-CV-1612 (TWD), 2022 WL 593554, at *13 (N.D.N.Y. Feb. 28, 2022) (The ALJ did not err in concluding medical opinions on check-box forms lacked supporting explanations "or references to specific clinical or diagnostic findings to support the proposed limitations.") (internal quotation marks and citation omitted).

Furthermore, the ALJ is not required to tether an RFC assessment to a medical opinion, nor is an ALJ's RFC determination fatally flawed merely because it was formulated absent a

medical opinion.  As stated in the regulations, and contrary to Plaintiff's assertion, an RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  It is the responsibility of the ALJ to determine Plaintiff's RFC based on all the evidence in the record including, but not limited to, statements provided by medical sources.  *Id.* §§ 404.1527(d), 404.1545(a)(3), 404.1546(c), 416.927(d), 416.945(a)(3), 416.946(c).  The Second Circuit has held where "the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity . . . a medical source statement or formal medical opinion is not necessarily required."  *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal quotation marks and citations omitted); *see Matta*, 508 F. App'x at 56 ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

Moreover, Plaintiff's assertion the ALJ erred by failing "to identify any evidence in the record that would override Dr. Kahn's assessment of nonexertional limitations" is unconvincing. (Dkt. No. 12 at 11.)  Failing to override is not the standard the ALJ needs to meet to properly find Dr. Khan's opinion to be unpersuasive.  The reviewing court only needs to find there was substantial evidence in the record to support the ALJ's decision in order to uphold it.  42 U.S.C. § 405(g); *Rivera*, 923 F.2d at 967 (2d Cir. 1991).  Therefore, the Court finds the ALJ properly concluded Dr. Khan's opinion regarding Plaintiff being off task and absent was speculative.

### 2. Dr. Khan's Opinion Regarding Plaintiff's Manipulative Restrictions is Unsupported by Other Medical Opinions and Evidence in the Record.

The ALJ found Dr. Khan's opinion regarding Plaintiff's manipulative restrictions was unsupported by the testing done by Dr. Jenouri.  (T. at 21.)  Plaintiff contends the ALJ has to do

more than compare Dr. Khan's findings to just one other opinion.  (Dkt. No. 12 at 14.)  However, other opinions within the record did not support Dr. Khan's findings.  For example, Dr. Padmaraju found, and Dr. Chen affirmed, Plaintiff had no manipulative limitations based on their examination of Plaintiff's medical records and the objective medical evidence therein.  (T. at 83, 102.)

Moreover, during his examination of Plaintiff in January 2020, treating physician Dr. Cummings found full strength symmetrically in the upper and lower extremities, with no cogwheeling, paratonia, pronator drift, atrophy, and no fasciculations in the feet.  *Id.* at 468. Plaintiff had normal reflexes; intact vibration and proprioception in her hands and feet; no asymmetry to pinprick in the dermatomes of the lower extremities; no tinel's sign at the lateral or medial ankles; and subjective decreased pinprick in portions of the dorsum and sole of the right foot.  *Id.* at 468-69.  Plaintiff's finger-to-nose testing was intact; her gait was without spasticity, truncal, or appendicular ataxia; and she did not have bradykinesia, nor a shuffling or magnetic gait.  *Id.* at 469.  Plaintiff could walk on her heels and tiptoes and there was no tremor when her arms were at rest, when held in posture, or with intention.  *Id.*

Additionally, Dr. Rasheed, a treating neurology specialist, saw Plaintiff for numbness and paresthesia in the lower extremities in July 2020.  *Id.* at 314-16.  Dr. Rasheed found Plaintiff's neck to be supple, with good range of the motion of the cervical spine and good neck and shoulder strength.  *Id.* at 315.  He reported no drift, normal tone of the muscle groups bilaterally, and full strength throughout.  *Id.*  Dr. Rasheed concluded he suspected the development of early neuropathy and found the pattern of sensory change to be inconsistent with radicular sensory loss, despite Plaintiff having evidence of lumbar degenerative joint disease.  *Id.*

Plaintiff visited Family Nurse Practitioner ("FNP") Alentyev in August 2020 for lower extremity numbness and tingling.  *Id*. at 415-16.  FNP Alentyev found Plaintiff's neck and shoulder strength to be good; intact strength throughout with no asymmetry; and normal tone with no drift.  *Id.* at 416.  Plaintiff's deep tendon reflexes were +2 in the upper extremities and hypoactive in the lower extremities.  *Id.*  Her finger-to-nose coordination revealed no dysmetria and her gait was steady.  *Id.*  FNP Alentyev concluded Plaintiff's condition appeared to be "a combination of all the peripheral neuropathy with lumbar radiculopathy."  *Id.*  He prescribed Plaintiff amitriptyline for her symptoms.  *Id.*

Dr. Rasheed examined Plaintiff again in January 2021.  *Id.* at 413-14.  He noted no dysmetria from the finger-to-nose testing, her motor tone and power were good, and her reflexes were +1 and symmetric.  *Id.* at 414.  Dr. Rasheed concluded Plaintiff had idiopathic mixed small or large fiber sensory neuropathy and right L4-5 radiculopathy.  *Id.*  However, he found Plaintiff had done well from a neuropathy standpoint.  *Id.*

Dr. Khan's notes from his two appointments with Plaintiff do not support his subsequent findings regarding the functional ability of Plaintiff's hands, fingers, and arms on the questionnaire.  When Dr. Khan saw Plaintiff in December 2020, he noted no issues with Plaintiff's hands or fingers.  *Id.* at 772.  Plaintiff's deep tendon reflexes were normal, with the exception of her ankles.  *Id.* at 773.  In January 2021, Dr. Khan again noted no issues with Plaintiff's hands or fingers.  *Id.* at 767-68.  Plaintiff was negative for gait problems, dizziness, and numbness, and had a supple neck.  *Id.*  When Dr. Khan filled out the Medical Source Statement questionnaire, he indicated Plaintiff could only occasionally use her hands to grasp, turn, and twist objects, and could never use her fingers for fine manipulations or her arms for reaching, including reaching overhead.  *Id.* at 802-03.  There is a lack of objective medical

evidence in Dr. Khan's two earlier visits with Plaintiff consistent with or supportive of his conclusion regarding Plaintiff's capabilities with her hands, fingers, and arms.  Therefore, the Court finds substantial evidence supports the ALJ's conclusion that Dr. Khan's opinion regarding Plaintiff's manipulative restrictions was unsupported by his own exams, as well as other medical opinions and evidence in the record.

>    **3.     Dr. Khan's Opinion Regarding Plaintiff's Abilities and Limitations is Inconsistent with Other Medical Opinions and Evidence in the Record.**

The ALJ found Dr. Khan's medical opinion to be inconsistent with the assessments of other physicians who rendered an opinion on Plaintiff's abilities and limitations.  (T. at 21.) Plaintiff argues, however, substantial evidence supports Dr. Khan's opinion and the ALJ completely failed to apply the consistency factor to his opinion.  (Dkt. No. 12 at 11-13.)  The Court disagrees.  The ALJ properly found Dr. Khan's opinion to be inconsistent with the assessments of other physicians and the objective medical evidence of record.

As noted, Plaintiff saw Dr. Khan on two occasions: once in December 2020, and once in January 2021.  (T. at 762, 772.)  In December 2020, Plaintiff saw Dr. Kahn for chronic low back pain and joint pain.  *Id.* at 772.  Plaintiff reported the low back pain going down her leg was bothering her the most and she was having difficulty walking as a result.  *Id.*  She wanted to try epidural steroid injections.  *Id.*  Plaintiff noted she had had an MRI earlier in the year which showed spinal stenosis and lumbar disc bulging.  *Id.*  Plaintiff stated this was a chronic problem, but the current episode had started more than one month ago and occurred intermittently.  *Id.* Plaintiff reported the pain was present in her lumbar spine, had a deep sharp quality, and radiated to the right foot.  *Id.*  Plaintiff rated the severity of the pain 3/10, but also said the pain was moderate and the same all the time.  *Id.*  She reported the pain was exacerbated by daily activities

and lifting, and was associated with headaches, leg pain, numbness, and tingling, but no stiffness. *Id.*

Dr. Khan reviewed Plaintiff's systems and found Plaintiff positive for back pain, tingling, numbness, and headaches, but negative for a gait problem. *Id.* Dr. Khan reported Plaintiff was not in acute distress, had a normal appearance, and was obese. *Id.* at 773. Her neck was supple, and her gait was intact. *Id.* He noted tenderness, pain, spasms, and a decreased range of motion in the lumbar back. *Id.* Plaintiff's deep tendon reflexes were normal, with the exception of her ankles which had a DTR of "1+," and there was decreased sensation in the right L5 dermatome. *Id.* Dr. Khan diagnosed Plaintiff with chronic lumbar radiculopathy and ordered an L5/S1 epidural steroid injection. *Id.* at 774.

In January 2021, Dr. Kahn saw Plaintiff for a lumbar epidural steroid injection. *Id.* at 762. Plaintiff had chronic low back pain radiating down her legs, more on the right side than the left. *Id.* at 763. After reviewing the February 2020 MRI, Dr. Khan reported spinal stenosis and lumbar disc bulging. *Id.* Dr. Khan opined Plaintiff's pain was interfering with her walking and, as a result, she was experiencing poor quality of life due to back and leg pain. *Id.* Plaintiff was positive for back pain, but negative for gait problem, dizziness, and numbness. *Id.* at 767. Plaintiff was not in acute distress, her neck was supple, and she exhibited decreased range of motion and tenderness in her lumbar back. *Id.* at 768. After the administration of the lumbar epidural steroid injection, Dr. Khan stated Plaintiff had intractable low back pain that was unresponsive to conservative management, was severe, and adversely affected Plaintiff's quality of life and activities of daily living. *Id.* at 771.

Dr. Khan's conclusion that Plaintiff had intractable low back pain that was unresponsive to conservative management is inconsistent with Plaintiff's January 2021 exam with Dr.

Rasheed, where she reported an improvement in the neuropathic symptoms since she started

taking the amitriptyline, with the burning dyesthetic sensation and paresthesia having improved

significantly.  *Id.* at 413, 771.  It is also inconsistent with Dr. Tang's exam of Plaintiff in March

2021, where she reported no musculoskeletal issues or back pain.  *Id.* at 519-21.  Dr. Tang also

noted Plaintiff's bilateral leg neuropathy was doing well on amitriptyline.  *Id.* at 650.

Dr. Khan's opinion on Plaintiff's back pain reflected in the questionnaire is inconsistent

with and unsupported by Dr. Khan's findings in December 2020 and January 2021.  *Id.* at 762,

773.  In December 2020, Dr. Khan reported Plaintiff was not in acute distress, her neck was

supple, and her gait was intact.  *Id.* at 772.  Plaintiff described the low back pain as a 3/10,

moderate, and constant.  *Id.*  Low back pain at a "moderate" level of 3/10 is arguably not

consistent with intractable low back pain.  *Id.*  Furthermore, in January 2021, Dr. Khan reported

Plaintiff was not in acute distress, and her neck was supple.  *Id.* at 763.  While Plaintiff did have

a decreased range of motion and tenderness in the lumbar back in both December 2020 and

January 2021, the visits as a whole are not consistent with and do not support Dr. Khan's

conclusion Plaintiff had intractable low back pain that was unresponsive to conservative

management.  *Id.*  at 773, 768.  Dr. Khan's findings at these visits do not support his subsequent

conclusion Plaintiff could only occasionally look down, turn her head right or left, look up, and

hold her head in a static position.  *Id.* at 802.  Therefore, the Court finds substantial evidence

supports the ALJ's conclusion Dr. Khan's opinion regarding Plaintiff's abilities and limitations

is inconsistent with other medical opinions and evidence within the record.

### 4.     Dr. Khan's Opinion is Inconsistent with and Unsupported by Plaintiff's High Level of Daily Activities.

The ALJ concluded Dr. Khan's opinion was not supported by the objective evidence of

the record including Plaintiff's high level of daily activities.  *Id.* at 21.  In response, Plaintiff

argues there was substantial evidence supporting Dr. Khan's opinion, and the ALJ failed to apply the supportability factor at all.  (Dkt. No. 12 at 11-13.)  Additionally, Plaintiff claims the ALJ failed to identify Plaintiff's high level of daily activities when concluding Dr. Khan's medical opinion is not consistent with her level of daily activities.  *Id.* at 17.  However, after making this claim, Plaintiff then proceeds to note how the ALJ did identify the level of daily activities, stating the ALJ referred to testimony where Plaintiff "asserted that she spends her days doing housework and that she has to pace herself.  She asserted that she can pick up five pounds or a gallon of milk and that she requires an ankle brace when her ankle really bothers her."  (Dkt. No. 12 at 17; T. at 18, 38.)  The ALJ also noted Plaintiff "admitted that she cooks and cleans five days per week. She does laundry and shops once per week.  She showers five days per week. She dresses every day.  She watches television and listens to the radio."  (T. at 20.)  The ALJ concluded "these activities require many of the same functions that the claimant alleges she is unable to perform in a work setting."  *Id.*  Plaintiff categorizes these daily activities as "very basic and limited" and argues it is unclear how they are akin to light work and inconsistent with Dr. Khan's opinion.  (Dkt. No. 12 at 18.)

Under the regulations, the ALJ is required to consider evidence of Plaintiff's daily activities when evaluating the medical opinion evidence as well as the intensity, persistence, and limiting effects of Plaintiff's symptoms.  *See* C.F.R. §§ 404.1520c(c)(2); 404.1529(c)(3)(i); *Vellone v. Saul*, No. 1:20-CV-261 (RA) (KHP), 2021 WL 319354, at *11 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021); SSR 16-3p, 2017 WL 5180304 at &7-8.  These considerations, as well as evidence of Plaintiff's daily activities, inform the ALJ's RFC determination.  *See* 20 C.F.R. §§ 404.1545(a)(3), (e).

The ALJ properly considered Plaintiff's daily activities when forming the RFC.  *See Cichocki*, 729 F.3d at 178 (ALJ properly considered the plaintiff's varied daily activities in formulating the RFC).  Plaintiff reported to Dr. Jenouri she cooked and cleaned five times a week; did laundry and went grocery shopping once a week; showered five times a week; dressed herself every day; and watched TV and listened to the radio.  (T. at 400.)  The ALJ further noted Plaintiff's treating provider recommended she engage in moderate to vigorous exercise three to four days per week.  *Id.* at 19, 330, 340, 368, 379, 435, 445, 475, 494, 502, 514, 543, 549, 559, 570, 607, 624, 632, 645.  This is relevant because it indicates her treating physician believed her to be capable of doing exertional activities.

Moreover, even if Plaintiff had moderate limitations, such limitations have been found to be consistent with an RFC for a full range of light work.  *See*, *e.g.*, *Harris v. Comm'r of Soc. Sec.*, No. 09-CV-1112 (NAM/VEB), 2011 WL 3652286, at *5 (N.D.N.Y. July 27, 2011), *report and recommendation adopted*, 2011 WL 3652201 (N.D.N.Y. Aug. 17, 2011) (finding "slight to moderate limitations in activities that require lifting, carrying, and reaching . . . . is consistent with the ALJ's conclusion that Plaintiff could perform light work") (internal quotation marks and citations omitted); *Vargas v. Astrue*, No. 10 Civ. 6306(PKC), 2011 WL 2946371, at *12 (S.D.N.Y. July 20, 2011) (finding "moderate limitations for lifting, carrying, handling objects and climbing stairs" consistent with RFC for full range of light work); *Nelson v. Colvin*, No. 12-CV-1810 (JS), 2014 WL 1342964, at *12 (S.D.N.Y. Mar. 31, 2014) ("the ALJ's determination that Plaintiff could perform 'light work' is supported by [doctor's] assessment of 'mild to moderate limitation for sitting, standing, walking, bending, and lifting weight on a continued basis'") (citation omitted); *Hazlewood v. Comm'r of Soc. Sec.*, No. 6:12-CV-798, 2013 WL 4039419, at *7 (N.D.N.Y. Aug. 6, 2013) (doctor's opinion plaintiff had "mild to moderate

limitations in walking, pushing, and pulling" supported the "ALJ's determination that plaintiff could physically perform light work"); *Carroll v .Colvin*, No. 13-CV-456S, 2014 WL 2945797, at *4 (W.D.N.Y. 2014) ("several courts have upheld an ALJ's decision that the claimant could perform light . . . work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing").  Therefore, the Court finds the ALJ properly considered Plaintiff's daily activities when determining the RFC.

> ### D.     The ALJ Properly Considered and Weighed the Medical Opinions

Finally, Plaintiff contends it was an error for the ALJ to rely solely on the medical opinions of the consulting examiner because an inconsistent finding from a consultative examiner is not sufficient on its own to reject the opinion of the treating physician.  (Dkt. No. 12 at 18.)  Plaintiff's argument is misplaced.

As set forth above, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because these consultants are qualified experts in the field of Social Security disability.  *See Frye ex rel. A.O.*, 485 F. App'x at 487; *Little*, 2015 WL 1399586, at *9; *see also Reed*, 2018 WL 1183382, at *5; *Barber*, 2016 WL 4411337, at *7. Indeed, the Second Circuit has upheld giving more weight to a well-supported medical opinion from a consultative examiner, such as Dr. Jenouri, or well-supported PAMFs from non-examining state agency doctors, such as Drs. Padmaraju and Chen, and less weight to an unsupported assessment from a treating source, such as Dr. Khan.  *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The report of a consultative physician may constitute . . . substantial evidence."); *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) (finding that opinion of state agency physician provided substantial evidence to support ALJ's RFC finding).

Moreover, an ALJ is free to "choose between properly submitted medical opinions." *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).  She is also entitled to weigh all the evidence available to make an RFC finding consistent with the record as a whole and need not perfectly correspond with any of the opinions of the medical sources.  *See Matta*, 508 F. App'x at 56. Here, the ALJ resolved conflicts between the various medical opinions by finding persuasive those portions of the medical opinions deemed most consistent with Plaintiff's treatment record and activities.  (T. at 20-21).  In doing so, the ALJ appropriately evaluated the conflicting medical evidence and made an RFC finding consistent with the overall record.  *Id.* at 21-22. Therefore, the Court finds the ALJ properly considered and weighed the medical opinions.

## V.     CONCLUSION

Considering the foregoing, the Court finds the ALJ applied the correct legal standards and substantial evidence supports her decision.  Remand is therefore not warranted.

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED** that the Commissioner's decision denying Plaintiff benefits is **AFFIRMED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED** and the Clerk of Court is directed to enter judgment and close the case.

Dated:  August 3, 2023
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

82 FR 5844-01, 2017 WL 168819(F.R.)

RULES and REGULATIONS

SOCIAL SECURITY ADMINISTRATION

20 CFR Parts 404 and 416

[Docket No. SSA-2012-0035]

RIN 0960-AH51

Revisions to Rules Regarding the Evaluation of Medical Evidence

Wednesday, January 18, 2017

AGENCY: Social Security Administration.

**\*5844**  ACTION: Final rules.

SUMMARY: We are revising our medical evidence rules. The revisions include redefining several key terms related to evidence, revising our rules about acceptable medical sources (AMS), revising how we consider and articulate our consideration of medical opinions and prior administrative medical findings, revising our rules about medical consultants (MC) and psychological consultants (PC), revising our rules about treating sources, and reorganizing our evidence regulations for ease of use. These revisions conform our rules to the requirements of the Bipartisan Budget Act of 2015 (BBA), reflect changes in the national healthcare workforce and in the manner that individuals receive medical care, and emphasize the need for objective medical evidence in disability and blindness claims. We expect that these changes will simplify our rules to make them easier to understand and apply, and allow us to continue to make accurate and consistent disability determinations and decisions.
DATES: These final rules are effective on March 27, 2017.

FOR FURTHER INFORMATION CONTACT: Dan O'Brien, Office of Disability Policy, Social Security Administration, 6401 Security Boulevard, Baltimore, Maryland 21235-6401, (410) 597-1632. For information on eligibility or filing for benefits, call our national toll-free number, 1-800-772-1213, or TTY 1-800-325-0778, or visit our Internet site, Social Security Online, at www.socialsecurity.gov.

SUPPLEMENTARY INFORMATION:

**Background**

We are revising and making final the rules regarding the evaluation of medical evidence that we proposed in a notice of proposed rulemaking (NPRM) published in the Federal Register on September 9, 2016 (81 FR 62560). In the preamble to the NPRM, we discussed the revisions we proposed and the bases for the proposals. To the extent that we are adopting those revisions as we proposed them, we are not repeating that information here. Interested readers may refer to the preamble to the NPRM, available at http://www.regulations.gov by searching for document number SSA-2012-0035-0001.

To help clarify which regulation sections we refer to in this preamble, we refer to the regulation sections in effect on the date of publication as the "current" regulation sections. We refer to the regulation sections that we proposed as the "proposed" regulation sections. We refer to the regulation sections that will be in effect as of the effective date of these final rules as the "final" regulation sections. The current, proposed, and final regulation sections refer to regulation sections in Title 20 of the Code of Federal Regulations.

Based on our adjudicative experience, legal precedents,[FN1] recommendations from the Administrative Conference of the United States (ACUS), and public comments we received on the NPRM, we are revising our rules to ensure that they reflect modern healthcare delivery and are easier to understand and use. We expect that these changes will help us continue to ensure

a high level of accuracy in our determinations and decisions. We also are revising related rules about who can be an MC and a PC in conformity with requirements in the BBA.

1.  As we explained in the preamble to our NPRM, courts in most circuits typically remand claims to us for further adjudication when they find we erred by not giving controlling weight to treating source opinions; however, the Ninth Circuit uses a "credit-as-true" rule, which sometimes results in it ordering us to award benefits instead of remanding cases. 81 FR 62560, 62573.

The following list summarizes the differences in these final rules from what we proposed in the NPRM:

1. We revised the definitions of "signs" and "laboratory findings" to clarify that "one or more" signs, "one or more" laboratory findings, or both constitute objective medical evidence in final 404.1502 and 416.902.

2. We revised the proposed regulatory text for AMS optometrists in final 404.1502 and 416.902 to refer to the scope of practice in the State in which the optometrist practices.

3. We revised the proposed regulatory text for AMS audiologists in final 404.1502 and 416.902 to state that licensed audiologists are AMSs for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only.

4. We recognized physician assistants as AMSs for claims filed on or after March 27, 2017, in final 404.1502 and 416.902.

5. We revised the title and definition of the category of "evidence from nonmedical sources" in final 404.1513 and 416.913. We changed the title from "statements from nonmedical sources" as proposed to "evidence from nonmedical sources" for clarity. We revised the definition for brevity and to explain that we may receive evidence from nonmedical sources either directly from the nonmedical source or indirectly, such as from forms and our administrative records.

6. We clarified that a statement(s) about whether or not an individual has a severe impairment(s) is a statement on an issue reserved to the Commissioner in final 404.1520b(c)(3) and 416.920b(c)(3).

7. We revised final 404.1520c(a)-(b) and 416.920c(a)-(b) to clarify that, while we consider all evidence we receive, we have specific articulation requirements about how we consider medical opinions and prior administrative medical findings.

8. For claims filed on or after March 27, 2017, we are revising our rules to state that our adjudicators will articulate how they consider medical opinions from all medical sources, regardless of whether or not the medical source is an AMS, in final 404.1520c and 416.920c.

9. We revised the factors for considering medical opinions and prior administrative medical findings in final 404.1520c and 416.920c to both emphasize that there is not an inherent persuasiveness to evidence from MCs, PCs, or CE sources over an individual's own medical source(s), and vice versa, and to highlight that we continue to consider a medical source's longstanding treatment relationship with the individual.

10. We added regulatory text in final 404.1520c(d) and 416.920c(d) for claims filed on or after March 27, 2017, that there is no requirement to articulate how we considered evidence from nonmedical sources about an individual's functional abilities and limitations using the rules for considering and articulating our consideration of medical opinions found in final 404.1520c and 416.920c.

11. We clarified the section headings and introductory text in final 404.1520c, 404.1527, 416.920c, and 416.927 about the implementation process.

12. We added regulatory text in final 404.1527(f) and 416.927(f) for claims filed before March 27, 2017, about how we consider and articulate our consideration of opinions from medical sources who are not AMSs, and from nonmedical sources. We are adding our current policies found in SSR 06-03p, which explains how we consider and when we articulate our consideration of opinions from medical sources who are not AMSs and from nonmedical sources **\*5845** under our current rules, into the final rules for these claims.

13. We revised the criteria for which audiologists may perform audiometric testing in sections 2.00B and 102.00B of the Listings [FN2] to be consistent with our revision to recognize licensed audiologists as AMSs. We now state that audiometric testing must be performed by, or under the direct supervision of, a licensed audiologist or otolaryngologist.

<sup>2</sup>     Part 404 Subpart P Appendix 1.

14. We did not adopt our proposal to recognize independently practicing psychologists with master's-level education as qualified to be PCs. Instead, we will continue to follow our current policies about who is qualified to be a PC, which generally require a doctorate-level education degree, in final 404.1616 and 416.1016.

15. We made a number of nonsubstantive revisions relating to the revisions listed above, as part of our effort to reorganize our regulations for ease of use, to use consistent terminology throughout our rules, to reflect revisions to regulatory text made by other rules since publication of the NPRM, and for clarity.

Because of these revisions, these final rules retain only two programmatic distinctions between AMSs and medical sources who are not AMSs in our regulations for claims filed on or after March 27, 2017. First, we need objective medical evidence from an AMS to establish the existence of a medically determinable impairment(s) at step 2 of the sequential evaluation process. [FN3] Second, in a few instances, we need specific evidence from an AMS to establish that an individual's impairment meets a Listing.[FN4]

<sup>3</sup>     See 42 U.S.C. 423(d)(3) and 1382c(a)(3)(D).

<sup>4</sup>     See, for example, our rules for xeroderma pigmentosum in Listings 8.07A and 108.07A.

**Effect on Certain Social Security Rulings (SSR)**

We will also rescind the following SSRs that are otherwise inconsistent with or duplicative of these final rules:

• SSR 96-2p: Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions.[FN5]

<sup>5</sup>     61 FR 34490 (July 2, 1996).

• SSR 96-5p: Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.[FN6]

<sup>6</sup>     61 FR 34471 (July 2, 1996).

• SSR 96-6p: Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence.[FN7]

7       61 FR 34466 (July 2, 1996).

• SSR 06-03p: Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies. [FN8]

In addition, because we will rescind SSR 96-6p, we will publish a new SSR that will discuss certain aspects of how administrative law judges (ALJ) and the Appeals Council (AC) must obtain evidence sufficient to make a finding of medical equivalence.

**Public Comments**

We received 383 comments on the NPRM, which are available for public viewing at http://www.regulations.gov. These comments were from:

• Individual citizens and claimant representatives;

• Members of Congress;

• Various professional organizations, such as the American Speech-Language Hearing Association (ASHA), American Psychological Association Practice Organization, American Academy of Family Physicians, American Academy of Pediatrics, American Optometric Association, and the American Association for Justice;

• National groups representing claimant representatives, such as the National Organization of Social Security Claimants' Representatives, the National Coalition of Social Security and SSI Advocates, and the National Association of Disability Representatives;

• Advocacy groups, such as the Consortium for Citizens with Disabilities, The Arc, the Community Legal Services of Philadelphia, and the North Carolina Coalition to End Homelessness; and

• Organizations representing our employees and employees of State agencies, such as the National Council of Disability Determination Directors, National Association of Disability Examiners, and the Association of Administrative Law Judges.

While we received several public comments in support of our proposed rules, we received many public comments that opposed our proposed revisions and that suggested alternative solutions to the policy changes we proposed. Among the most common concerns that the public comments raised were that:

• We should recognize additional medical sources as AMSs;

• The NPRM appeared to favor evidence from MCs, PCs, and consultative examination (CE) providers over evidence from an individual's own medical sources;

• We should continue to value or emphasize the individual's relationship with a treating source, including giving controlling weight to the medical source statements of treating sources in certain situations; and

• We should provide written analysis about medical opinions from all of an individual's own medical sources, regardless of whether the medical source is an AMS.

We carefully considered the comments. We strive to have clear and fair rules because our adjudicative process is non-adversarial. [FN9] To help maintain the fairness of our rules and our administrative review process, we have made several revisions in these final rules.

9 Current 404.900(b) and 416.1400(b).

We discuss below the significant comments we received. Because some of the comments were long, we have condensed, summarized, and paraphrased them. We have tried to summarize the commenters' views accurately, and to respond to the significant issues raised by the commenters that were within the scope of the NPRM.

### Sections 404.1502 and 416.902—Definitions for This Subpart

Comment: We received several comments about our proposal to recognize Advanced Practice Registered Nurses (APRN) as acceptable medical sources (AMS). While most of these commenters supported our proposal, a few commenters said that APRN qualifications were not equivalent to those of physicians, who are AMSs. Another commenter asked us to specify in the regulatory text that APRNs include Nurse Practitioners (NP) to reduce confusion.

Response: We agree with the comments that supported our proposal to recognize APRNs as AMSs for purposes of our programs. Although APRNs are not physicians, including APRNs as AMSs reflects the modern primary healthcare delivery system, including how healthcare is delivered in many rural areas.[FN10] In addition, the Institute of Medicine recommended Federal agencies recognize the advanced level of care provided by APRNs.[FN11]

10 Agency for Healthcare Research and Quality, available at http://www.ahrq.gov/research/findings/factsheets/primary/ pcwork3/index.html.

11 Committee on the Robert Wood Johnson Foundation Initiative on the Future of Nursing, at the Institute of Medicine; Institute of Medicine: The Future of Nursing: Leading Change, Advancing Health (2011), available at http://www.nationalacademies.org/hmd/Reports/2010/The-Future-of-Nursing-Leading-Change-Advancing-Health/ Report-Brief-Scope-of-Practice.aspx.

**\*5846** Furthermore, State licensure requirements for APRNs are rigorous. To receive APRN licensure, all States require these medical sources to be registered nurses and to have earned advanced nursing educational degrees. In addition, nearly all States require APRNs to obtain and maintain national certification by a standard advanced nursing credentialing agency, [FN12] and this certification requires extensive education and training.[FN13] Despite minor variability in names and licensure requirements, a growing number of States are adopting the Consensus Model for APRN Regulation from the American Association of Nurse Practitioners, which defines the standards for licensure, accreditation, certification, education, and practice. [FN14]

12 In a very few States, the advanced nursing credentialing is optional. These are: (1) California for Nurse Practitioners, see Cal.C.Reg. 16.8.1482, available at http://www.rn.ca.gov/pdfs/regulations/bp2834-r.pdf; (2) Indiana for Nurse Practitioners and Clinical Nurse Specialists, see Indiana's Administrative Code 848 IAC 4-1-4 and -5, available at http://www.in.gov/pla/files/ISBN.2011_EDITION.pdf; (3) New York, see Education Law Article 139 § 6910 for Nurse Practitioners and Clinical Nurse Specialists, available at http://www.op.nysed.gov/prof/nurse/article139.htm, and Article 140 § 79-5.2 for Midwives, available at http://www.op.nysed.gov/prof/midwife/part79-5.htm; and 4) Oregon for Clinical Nurse Specialists, see Oregon Rules 851-054-0040, available at http://arcweb.sos.state.or.us/pages/rules/ oars_800/oar_851/851_054.html.

13   See, for example, the American Academy of Nurse Practitioners Certification Program, available at http://www.aanpcert.org/ptistore/control/certs/qualifications.

14   See National Council of State Boards of Nursing Campaign for Consensus, available at https://www.ncsbn.org/738.htm, and the Consensus Model for APRN Regulation: Licensure, Accreditation, Certification & Education, available at http://www.aacn.nche.edu/education-resources/APRNReport.pdf.

While we appreciate the suggestion to specify in our rules that APRNs include NPs, we did not adopt it. As we stated in the preamble to the NPRM,[FN15] APRNs include four types of medical sources: Certified Nurse Midwife, NP, Certified Registered Nurse Anesthetist, and Clinical Nurse Specialist. Although the majority of States use the APRN title, a minority of States use other similar titles, such as Advanced Practice Nurse and Advanced Registered Nurse Practitioner. We will maintain a current list of State-specific AMS titles in our subregulatory instructions to help our adjudicators identify the appropriate titles for APRNs.

15   81 FR at 62568.

Comment: Several commenters supported our proposal to include audiologists as AMSs. One commenter also supported the addition of audiologists as providers who could perform the otologic examination in order to establish the medically determinable impairment that causes hearing loss. Another commenter asked us to recognize that audiologists' scope of practice includes impairments of balance disturbance.

Response: We agree with these commenters. We included audiologists as AMSs and allow use of licensed audiologist-performed otologic examinations under Listings 2.00 and 102.00 in these final rules.

We also revised the final regulatory text to recognize that audiologists' scope of practice generally includes evaluation, examination, and treatment of certain balance impairments that result from the audio-vestibular system. However, some impairments involving balance involve several different body systems that are outside the scope of practice for audiologists, such as those involving muscles, bones, joints, vision, nerves, heart, and blood vessels. Therefore, we revised final 404.1502 and 416.902 to state that licensed audiologists are AMSs for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only.

Comment: Two commenters asked us to recognize audiologists as AMSs if they did not have State licensure but did have certification from the American Board of Audiology (ABA) or a Certificate of Clinical Competence in Audiology (CCC-A) from ASHA.

Response: We did not accept this comment because our existing practice has been to rely on State professional education and licensure requirements that are largely consistent with each other when we have expanded the AMS list.[FN16] While we appreciate the background provided by the commenter, we do not find it contained persuasive rationale about why we should be able to use evidence from these unlicensed sources to help establish the existence of hearing loss, auditory processing disorders, or balance disorders. Moreover, an audiologist without a valid State license will not qualify as a medical source under final sections 404.1502(d) and 416.902(i).

16   The only exception has been for speech-language pathologists who meet certain certification requirements. See current 404.1513(a)(5) and 416.913(a)(5).

Comment: The American Optometric Association suggested that we modify our AMS definition of optometrists to refer to the scope of practice as authorized by State licensure. By simply stating that doctors of optometry can serve as an AMS according to their State's scope of practice laws, we would not need to go through the rulemaking process to change our regulations if a State chooses to change its scope of practice laws in the future.

Response: We agree with this comment, and we revised the final regulatory text about optometrists as AMSs. Specifically, we revised the proposed regulatory text for AMS optometrists in final 404.1502 and 416.902 to read, "Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices."

Comment: We received comments from several commenters, including the American Association of Physician Assistants, recommending that we add physician assistants (PA) to the AMS list. These commenters supported this recommendation by stating that PAs receive extensive medical education (approximately 27 months), have at least 2,000 hours of supervised clinical practice, are recognized as primary care providers, and must pass the Physician Assistant National Certifying Examination (PANCE).

Response: We are adopting this comment and recognizing PAs as AMSs. We agree that health care delivery continues to change and that PAs have an important and growing role as primary and specialty health care providers in many different health care settings. We agree that PAs receive extensive medical education, clinical experience, and pass the rigorous PANCE. Almost all States now require PAs to have at least a masters-level education, with the master's education level set to become the universal requirement in the near future.[FN17]

17    See the Accreditation Standards for Physician Assistant Education, Fourth Edition, available at: http://www.arc-pa.org/wp-content/uploads/2016/10/Standards-4th-Ed-March-2016.pdf.

Consistent with our implementation process discussed more fully in the NPRM and below, we will recognize PAs as AMSs for claims filed on or after March 27, 2017, as we are doing for APRNs and audiologists.

Comment: We received many other public comments on the criteria we should use to add AMSs and whether we should add other medical sources, such as licensed clinical social workers (LCSW), to the AMS list. Most of these commenters supported recognizing LCSWs as AMSs, and they suggested we also add a wide variety of other medical sources and nonmedical sources, **\*5847**  including licensed marriage and family therapists (LMFT), registered nurses (RN), licensed professional counselors (LPC), physical therapists (PT), chiropractors, and even healthcare professionals without medical licensure.

Response: We value these comments, and we will continue to monitor licensure requirements for the medical sources the commenters suggested that we add. At this time, however, we have decided to add only APRNs, audiologists, and PAs as AMSs. Upon investigation of licensing requirements for other medical sources, we did not find a similar level of consistency or rigor in terms of education, training, certification, and scope of practice.

Many of the comments that asked us to expand the AMS list to these additional medical sources said we should recognize these medical sources as AMSs so we could begin to consider their evidence in our adjudicative process. However, as we stated in the NPRM, we currently consider all relevant evidence we receive from all medical sources regardless of AMS status. However, as we noted above, we need objective medical evidence from an AMS to establish that an individual has a medically determinable impairment, as required by the Social Security Act (Act).

Additionally, many comments focused upon the prevalence of these sources in the healthcare system, particularly for individuals who have mental impairments, are poor, or are experiencing homelessness. Comments that did address licensing requirements, training, and education for these medical sources did not demonstrate that they have sufficiently consistent and rigorous national licensing requirements for education, training, certification, and scope of practice that is equivalent to the current and final list of AMSs.

For RNs, licensure typically can be obtained with education at or below the bachelor's degree level.[FN18] This is contrast to the current and new AMSs, for whom more rigorous education, training, and credentialing requirements are necessary.

18 See Bureau of Labor Statistics Occupational Outlook Handbook: "Registered Nurses", available at http://www.bls.gov/ooh/Healthcare/Registered-nurses.htm, and American Nurses Association, available at http://www.nursingworld.org/EspeciallyForYou/What-is-Nursing/Tools-You-Need/RegisteredNurseLicensing.html.

For LCSWs, LPCs, LMFTs, PTs, and chiropractors, States significantly vary on titles, the required hours of experience for licensure, and the scope of practice, such as clinical and non-clinical practice. Our current and new AMSs have licensure requirements that are more nationally consistent, which is essential for us to administer a national disability program.[FN19]

19 For example, all physicians, optometrists, and podiatrists have doctorate degrees.

As to the comments that asked us to recognize nonmedical sources as AMSs, our rules require an AMS to be a "medical source" as defined in 404.1502 and 416.902. Therefore, we did not adopt those suggestions.

Although we will not recognize the additional suggested medical sources as AMSs at this time, we will continue to consider evidence from these medical sources under these final rules when we evaluate the severity of an individual's impairment(s) and its effect on the individual.

Comment: One commenter agreed with our proposed definition of "medical source" in proposed 404.1502 and 416.902. The commenter said including licensure and certification requirements as specified by State or Federal law would help to ensure that medical sources who provide evidence to us are qualified and practicing lawfully. Another commenter asked us to recognize an entire medical practice as a medical source instead of its individual providers because some individuals receive treatment from multiple medical sources employed by the same medical practice.

Response: We agree with the first comment, and we are adopting our proposed definition of "medical source" in these final rules. However, we did not adopt the second comment because a medical source is an individual, not an entity, under our current rules. [FN20] Although we request evidence from medical practices, an entire practice itself is not capable of evaluating, examining, or treating an individual's impairments. A medical practice would not be able to perform a consultative examination at our request, or provide a medical opinion about an individual's functional abilities or limitations. Ultimately, individual medical practitioners and not their employing entities perform these functions. For these reasons, we did not adopt the recommendation to recognize an entire medical practice as a medical source.

20 See, for example, current 404.1513(d) and 416.913(d).

Comment: Several commenters opposed our proposal to remove the term "treating source" from our regulations. One commenter opposed our proposal to recognize all of the medical sources that an individual identifies as his or her medical source instead of using the term "treating source" for AMSs as defined in our current rules.

Response: While we acknowledge the importance of the relationship between an individual and his or her own medical sources, we are adopting our proposed regulatory text in these final rules. As part of our revisions to align our rules with how individuals now receive healthcare, it is appropriate to remove the distinction between a "treating source"—who must be an AMS—and the other medical sources from whom an individual may choose to receive evaluation, examination, or treatment. This will allow us to select an individual's own medical source, regardless of AMS status, to be a preferred source to conduct a consultative examination (CE) if the medical source meets our other requirements for CE sources in final 404.1519h and 416.919h.

Comment: One commenter requested that we specify that licensed mental health care providers who are working within the scope of practice permitted by law are a type of healthcare worker, and therefore a medical source. Another commenter was concerned that the proposed regulatory definition of nonmedical source would cause confusion when a licensed mental healthcare provider works at a homeless shelter or social service agency instead of a medical practice.

Response: We agree that the definition of medical source includes licensed mental health care providers working within the scope of practice permitted by law. The definition of medical source in final 404.1502 and 416.902 is sufficiently broad to include licensed mental health care providers without the need to amend the regulatory definition. We do not consider the employer of a source to determine whether a source is a medical source. Instead, we look to whether the source meets the definition of a medical source. Part of our final definition of a "medical source" is that the source is working within the licensed scope of his or her practice. Therefore, when an individual is licensed as a healthcare worker by a State and is working within the scope of his or her practice under State or Federal law, we will consider the source to be a medical source.

Comment: Some commenters raised concern about the language in proposed sections 404.1502 and 416.902 that define "objective medical evidence" as "signs, laboratory findings, or both." The commenters indicated that the proposed language appeared to state a new requirement that would make it "extremely difficult" to establish the existence of mental impairments and  **\*5848**  impairments related to migraine headaches. The commenters suggested that we also consider a person's diagnosis, statement of symptoms, and medical source opinions to establish the existence of an impairment. One commenter thought the exclusion of symptoms from "objective medical evidence" conflicted with our recent final rules "Revised Medical Criteria for Evaluating Mental Disorders." [FN21] Those final rules include references to symptoms of mental impairments in the introductory text and criteria of the mental disorders listings.

21        81 FR 66137 (Sept. 26, 2016).

Response: We understand the commenter's concerns that we should not disadvantage individuals with mental and headache-related impairments, and these clarifications of our current policy will not change how we establish these medically determinable impairments.

The proposed definition of objective medical evidence in proposed 404.1502(f) and 416.902(k) is consistent with our current rules. We currently define objective medical evidence as signs and laboratory findings.[FN22] To clarify our current policy, we redefine objective medical evidence as signs, laboratory findings, or both to make clear that signs alone or laboratory findings alone are objective medical evidence.

22        Current 404.1512(b)(1)(i) and 416.912(b)(1)(i), as defined in current 404.1528(b)-(c) and 416.928(b)-(c).

Our current rules require objective medical evidence consisting of signs or laboratory findings to establish impairments, including mental and headache-related impairments.[FN23] Current 404.1508 and 416.908 states that "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." Thus, even under our current rules, mental and headache-related impairments must be established by objective medical evidence. These final rules merely clarify this current policy.

23        See current 404.1508 and 416.908, as published on August 20, 1980 at 45 FR 55584, pp. 55586 and 55623.

Another current policy that we are clarifying in the definition of "signs" in these final rules is that one or more medically demonstrable phenomena that indicate specific psychological abnormalities that can be observed, apart from your statements, such as abnormalities of behavior, mood, thought, memory, orientation, development, or perception, can be "signs" that establish a medically determinable impairment. Additionally, psychological test results are laboratory findings that may establish medically determinable cognitive impairments.

Once we establish the existence of an impairment, we use evidence from all sources to determine the severity of the impairment and make the appropriate findings in the sequential evaluation process, such as whether an impairment meets the criteria of a Listing. This includes statements of symptoms, diagnoses, prognoses, and medical opinions.

Our recent final rules "Revised Medical Criteria for Evaluating Mental Disorders" discuss an individual's symptoms in the context of our assessments of the severity of a mental impairment and whether the mental impairment satisfies the listing criteria. However, we make these assessments after we determine that objective medical evidence establishes the existence of the mental impairment. Under our current rules, the proposed rules, and these final rules, an individual's statement of his or her symptoms cannot establish the existence of an impairment.

### Sections 404.1504 and 416.904—Decisions by Other Governmental Agencies and Nongovernmental Entities

Comment: While a few commenters agreed with our proposal not to provide analysis about decisions by other governmental agencies and nongovernmental entities in our decisions and determinations, other commenters disagreed that those decisions are inherently neither valuable nor persuasive. Some commenters stated these decisions are important evidence that we should always discuss because the rules or purposes of other disability programs are similar to our programs, while other commenters said we should discuss the decisions because they may be more or less probative to our decisionmaking due to the different standards used. Some commenters suggested we provide additional training to our adjudicators about the standards used by other governmental agencies and nongovernmental entities. Other commenters asserted that the Department of Veterans Affairs (VA) 100% disability ratings and Individual Unemployability (IU) ratings are highly probative to our decisionmaking by pointing to our own research showing veterans are substantially more likely to be found disabled than the general population of applicants. A few commenters said we should adopt a VA 100% disability rating or have a rebuttable presumption that someone with a VA disability rating is entitled to disability under the Act.

Response: While we acknowledge the commenters' concerns, we are adopting our proposal in these final rules.

As we stated in the notice of proposed rulemaking (NPRM), there are four reasons why we are not requiring our adjudicators to explain their consideration of these decisions—(1) the Act's purpose and specific eligibility requirements for disability and blindness differ significantly from the purpose and eligibility requirements of other programs; (2) the other agency or entity's decision may not be in the record or may not include any explanation of how the decision was made, or what standards applied in making the decision; (3) our adjudicators generally do not have a detailed understanding of the rules other agencies or entities apply to make their decisions; and (4) over time Federal courts have interpreted and applied our rules and Social Security Ruling (SSR) 06-03p differently in different jurisdictions.[FN24]

24    81 FR at 62564-65.

Although we are not requiring adjudicators to provide written analysis about how they consider the decisions from other governmental agencies and nongovernmental entities, we do agree with the commenters that underlying evidence that other governmental agencies and nongovernmental entities use to support their decisions may be probative of whether an individual is disabled or blind under the Act. In sections 404.1504 and 416.904 of the proposed rules, we provided that we would consider in our determination or decision the relevant supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in a claim. We clarify in final 404.1504 and 416.904 that we will consider all of the supporting evidence underlying the decision from another government agency or nongovernmental entity decision that we receive as evidence in accordance with final 404.1513(a)(1)-(4) and 416.913(a)(1)-(4).

We are not adopting the suggestion that we should train our adjudicators on the various standards of other governmental agencies and nongovernmental entities that make disability or blindness decisions. Even with increased training, the actual decision reached under different standards is inherently neither valuable nor persuasive to determine whether an individual is disabled or blind under the requirements in the Act, for the  **\*5849**  reasons we discussed in the preamble to the NPRM.[FN25]

25    Id.

Furthermore, while we did not rely on the research cited in a few comments to propose these rules, upon review of that research, [FN26] we disagree with the commenters' summary of it. Specifically, our researchers studied the interaction of our rules and the VA's disability standards, focusing upon VA 100% disability ratings and IU ratings. They concluded VA and SSA disability programs serve different purposes for populations that overlap. While individuals with a VA rating of 100% or IU have a slightly higher allowance rate under our programs than members of the general population, nearly one-third are denied benefits based on our rules for evaluating medical (or medical-vocational) considerations. This data also supports our conclusion that these ratings alone are neither inherently valuable nor persuasive in our disability evaluation because they give us little substantive information to consider. Fortunately, the VA and the Department of Defense (DoD) share medical records electronically with us, and our adjudicators obtain the medical evidence documenting DoD and VA treatment and evaluations to evaluate these claims.

26 Social Security Bulletin, Vol. 74, No. 3, 2014, p. 25. Veterans Who Apply for Social Security Disabled-Worker Benefits After Receiving a Department of Veterans Affairs Rating of "Total Disability" for Service-Connected Impairments: Characteristics and Outcomes. (by L. Scott Muller, Nancy Early, and Justin Ronca), available at https://www.ssa.gov/policy/docs/ssb/v74n3/v74n3p1.pdf.

Comment: Two commenters asked whether individuals and their representatives would need to submit evidence of a disability, blindness, or employability decision by another governmental agency or nongovernmental entity to us because our rules would state these decisions are inherently neither valuable nor persuasive to us.

Response: We appreciate the opportunity to clarify this matter. Under current and final 404.1512(a) and 416.912(a), an individual must inform us about or submit all evidence known to him or her that relates to whether or not he or she is blind or disabled. Similarly, under current 404.1740(b)(1) and 416.1540(b)(1), an appointed representative must act with reasonable promptness to help obtain the information or evidence that the individual must submit under our regulations, and forward the information or evidence to us for consideration as soon as practicable. A disability, blindness, or employability decision by another government agency or nongovernmental entity may not relate to whether or not an individual is blind or disabled under our rules. Nevertheless, as explained above, our adjudicators will consider the relevant supporting evidence underlying the other governmental agency or nongovernmental entity's decision. When an individual informs us about another government agency's or nongovernmental entity's decision, we will identify and consider, or will assist in developing, the supporting evidence that the other agency or entity used to make its decision. We may also use that evidence to expedite processing of claims for Wounded Warriors and for veterans with a 100% disability compensation rating, as we do under our current procedures.[FN27]

27 See Information for Wounded Warriors and Veterans Who Have a Compensation Rating of 100% Permanent & Total (P&T), available at https://www.ssa.gov/people/veterans.

### Sections 404.1512 and 416.912—Responsibility for Evidence

Comment: We received one comment about the regulatory text in proposed 404.1512(a)(2) and 416.912(a)(2). The commenter asked us to revise this rule to require our adjudicators to develop evidence from the time before an individual's date last insured [FN28] through the date of our determination or decision, even when this date last insured occurs many years earlier. The commenter also suggested that proposed 404.1512(a)(2) and 416.912(a)(2) could be inconsistent with the Act's requirement in 42 U.S.C. 423(d)(5)(A) that an individual has the burden to provide us with evidence sufficient to determine that he or she is under a disability.

28 In order to be entitled to disability insurance benefits under title II of the Act, an individual must have, among other things, enough earnings in employment covered by Social Security to be insured for disability. See section 223(c)(1) of the Act, 42 U.S.C. 423(c)(1), and current 404.130 and 404.315(a). An individual's date last insured is the last date

the individual is insured for purposes of establishing a period of disability or becoming entitled to disability insurance benefits, as determined under current 404.130.

Response: We did not adopt this comment because the regulatory text in proposed 404.1512(a)(2) and 416.912(a)(2) is identical to the current text in 404.1513(e) and 416.913(e). We proposed this language verbatim for proposed 404.1512(a)(2) and 416.912(a)(2) as part of our effort to reorganize our rules. We did not propose any substantive revision. An individual does have the burden to prove he or she is disabled, and this regulatory text is consistent with that requirement of the Act. Our current policies about how to develop a claim with a date last insured in the past are found in our subregulatory instructions.[FN29]

29    See POMS DI 25501.320 Date Last Insured (DLI) and the Established Onset Date (EOD), available at https:// secure.ssa.gov/apps10/poms.nsf/lnx/0425501320.

Comment: A few commenters asked us increase the 10 to 20 calendar day timeframe for medical sources to respond to our initial request for evidence in proposed 404.1512(b)(1)(i) and 416.912(b)(1)(i). Some commenters suggested different periods between 20 to 30 calendar days as a more reasonable time for medical sources to respond, and they suggested that a longer timeframe would reduce our costs associated with for consultative examinations (CE). Another commenter suggested we include five additional days for mailing time.

Response: While we appreciate these comments, we did not adopt them. When we develop evidence in a claim, we make every reasonable effort to get evidence from an individual's own medical sources. Under our current rules in 404.1512(d)(1) and 416.912(d)(1), this requirement includes giving medical sources 10 to 20 calendar days to respond to our initial request for evidence before we make a follow-up attempt. After the follow-up attempt, our regulations provide for an additional 10 days, for a minimum of at least 20 to 30 days in total. In our experience, our current rules provide an adequate amount of time to submit records because most medical sources provide the requested evidence within this period. Our current rules in 404.1512(e) and 416.912(e) generally require us to wait until after this period to request a CE, and the final rules in 404.1512(b) (2) and 416.912(b)(2) retain this requirement.

With the increasing use of electronic health records and electronic records transfer, we receive an increasing amount of medical evidence the same day that we request it. We are committed to expanding our electronic transfer capacity for medical records through ongoing expansion of the use of Health Information Technology. The expanded use of Health Information Technology means that we do not have an administrative need to make the change to the rules that the commenters suggested.

**Sections 404.1513 and 416.913—Categories of Evidence**

Comment: One commenter disagreed with our proposal to exclude "symptoms, diagnosis, and prognosis" **\*5850** from the definition of "medical opinion" and instead categorize these as "other medical evidence." The commenter expressed concern that most medical sources, unless prompted to fill out a functional questionnaire, do not specifically address functional abilities and limitations in their notes; rather, medical sources normally include symptoms, diagnoses, and prognoses. This commenter indicated that as a result, unrepresented individuals would be disadvantaged because they may not know to ask medical sources to complete the functional questionnaires. The commenter also said some medical sources refuse to fill out such forms or perhaps charge extra for completing the forms, which is outside the individual's control. This commenter asserted that without a form or letter from a medical source, we are more likely to schedule a consultative examination (CE) and to disregard the medical source's evidence in the hearing decision.

Response: We understand the concerns expressed in these comments; however, we did not adopt the recommendation to retain "symptoms, diagnosis, and prognosis" in the definition of "medical opinions." Diagnoses and prognoses do not describe how an individual functions. It is also not appropriate to categorize symptoms as medical opinions because they are subjective statements made by the individual, not by a medical source, about his or her condition.

As for the commenter's concerns about the effect of these final rules on unrepresented individuals, our current practice is consistent with the Act's requirements that we make every reasonable effort to obtain evidence from all of an individual's medical sources.[FN30] We make every reasonable effort to develop evidence about an individual's complete medical history from the individual's own medical sources prior to evaluating medical evidence obtained from any other source on a consultative basis, regardless of whether the individual is represented or not.[FN31] Regardless of an individual's financial situation, diagnoses and prognoses do not describe how an individual functions and symptoms are subjective statements made by the individual, not a medical source, about his or her impairments.

[30] 42 U.S.C. 423(d)(5)(B) and 1382c(a)(1)(H)(i).

[31] See, for example, POMS DI 22505.006 Requesting Evidence—General, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505006.

Comment: One commenter supported the clarification in the proposed rules that all medical sources, not just acceptable medical sources (AMS), can provide evidence that we will categorize as being evidence from medical sources.

Response: We appreciate this comment, and we are adopting the clarification in these final rules.

Comment: A few commenters opposed our proposed category of evidence that we called "statements from nonmedical sources" in proposed 404.1513(a)(4) and 416.913(a)(4) because they wanted us to consider evidence from unlicensed staff who are part of social service agencies and public mental health systems separately from evidence from individuals, family members, and neighbors. Another commenter stated the proposed rule would threaten the functional assessment by eliminating the need for the adjudicator to explain how he or she considers functional evidence, particularly offered by nonmedical sources. A few commenters asserted this revision would disadvantage child claimants who have functional evidence from nonmedical sources, such as educators.

Response: We want to reassure these commenters that this proposal to use one category of evidence for these nonmedical sources, which we are adopting in these final rules, will not disadvantage individuals in our programs. We proposed the single category of evidence, which we renamed in these final rules as "evidence from nonmedical sources," to reflect that there are no policy differences in how we consider this type of evidence. We agree that evidence from nonmedical sources who are part of social service agencies and public mental health systems may be valuable, and we consider this evidence. However, this evidence is not inherently more or less valuable than evidence from any other kind of nonmedical source, such as individuals, family members, and neighbors.

Sometimes, the individual, family members, and other nonmedical sources of evidence can provide helpful longitudinal evidence about how an impairment affects a person's functional abilities and limitations on a daily basis. In claims for child disability, we often receive functional evidence from nonmedical sources, such as testimony, evaluations, and reports from parents, teachers, special education coordinators, counselors, early intervention team members, developmental center workers, day care center workers, social workers, and public and private social welfare agency personnel. Depending on the unique evidence in each claim, it may be appropriate for an adjudicator to provide written analysis about how he or she considered evidence from nonmedical sources, particularly in claims for child disability.

Because we consider all evidence we receive, we are not adopting the suggestion to use separate categories of evidence for different kinds of nonmedical sources or for rules about which nonmedical sources' evidence is inherently more valuable than others' evidence.

Our adjudicators will continue to assess an individual's ability to function under these final rules using all evidence we receive from all sources, including nonmedical sources. Having one category of evidence instead of two for nonmedical sources will not affect our rules for assessing an individual's functional abilities.

In response to these and other public comments, both the title and definition of this category of evidence is different from that which we proposed. We decided to simplify, shorten, and clarify that this category of evidence includes any evidence from any nonmedical source that we receive, and that we may receive it in any manner.

For example, this category of evidence includes data from our administrative records about an individual's earnings history and information resulting from data matching with other government agencies that relates to any issue in a claim, such as birthdates and marriage history.

We list and define the categories of evidence in final 404.1513(a)(1)-(5) and 416.913(a)(1)-(5). The following chart displays the categories:

| Category of evidence | Source | Summary of definition |
|---|---|---|
| Part V | | |
| Objective medical evidence | Medical sources | Signs, laboratory findings, or both. |
| Medical opinion | Medical sources | A statement about what an individual can still do despite his or her impairment(s) and whether the individual has one or more impairment-related limitations or restrictions in one or more specified abilities. |
| Other medical evidence | Medical sources | All other evidence from medical sources that is not objective medical evidence or a medical opinion. |
| Evidence from nonmedical sources | Nonmedical sources | All evidence from nonmedical sources. |
| Prior administrative medical finding | MCs and PCs | A finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC or PC at a prior administrative level in the current claim. |

**\*5851  Sections 404.1519h and 416.9191h—Your Medical Source**

Comment: Many commenters supported our proposal to broaden the preference for consultative examination (CE) sources from "treating sources" to any of an individual's own medical sources who are otherwise qualified to perform the CE.

Response: We agree with these comments. In order to perform a CE, an individual's medical source must be qualified, equipped and willing to perform the examination or tests for the designated payment and send in timely, complete reports. This aligns with the current requirements for all CE providers and does not significantly change our current process. If these standards are met, it is our preference to use an individual's own medical source to perform a CE.

**Sections 404.1520b and 416.920b—How We Consider Evidence**

Comment: One commenter opposed proposed 404.1520b(c)(2) and 416.920b(c)(2), under which we would not provide written analysis about disability examiner findings at subsequent adjudicative levels of appeal, as we do for prior administrative medical findings.

Response: Because this is our current policy, we did not adopt this comment. At each level of the administrative process, we conduct a new review of the evidence whenever we issue a new determination or decision. While some disability examiners now make some administrative medical findings at the initial and reconsideration levels under temporary legal authority, this authority is scheduled to end pursuant to the Bipartisan Budget Act of 2015 (BBA) section 832.[FN32]

32      See Modifications to the Disability Determination Procedures; Extension of Testing of Some Disability Redesign Features, 81 FR 58544 (August 25, 2016).

Comment: A few commenters suggested that we continue the current practice of not giving any special significance to opinions on issues reserved to the Commissioner instead of adopting our proposal in 404.1520b(c)(3) and 416.920b(c)(3) that we not provide any analysis about how we consider statements on issues reserved to the Commissioner. These commenters also stated that the final rule should clarify that adjudicators will consider the context of a medical source's use of terms in our laws and regulations, such as "moderate," "marked," and "sedentary." One commenter noted that the diagnostic term "intellectual disability" uses the word "disability" but is not a statement on an issue reserved to the Commissioner. These commenters cautioned against adjudicators dismissing medical opinions as issues reserved for the Commissioner simply because they use the same terms in our laws and regulations. The commenters suggested we include an example in our rules. Another commenter said we should not include "statements that you are or are not . . . able to perform regular or continuing work" as an example of a statement on an issue reserved to the Commissioner in proposed 404.1520b(c)(3) and 416.920b(c)(3) because it is probative about an individual's residual functional capacity (RFC).[FN33]

33      See current 404.1545 and 416.945.

Response: We agree that adjudicators should consider the context of a source's use of a term in our laws and regulations to determine if it qualifies as a statement on an issue reserved to the Commissioner or another kind of evidence, such as a medical opinion. We frequently receive documents from medical sources that contain different categories of evidence, such as a treatment note that includes a laboratory finding, a medical opinion, and a statement on an issue reserved to the Commissioner. When we receive a document from a medical source that contains multiple categories of evidence, we will consider each kind of evidence according to its applicable rules. We will not consider an entire document to be a statement on an issue to the Commissioner simply because the document contains a statement on an issue that is reserved to the Commissioner. However, we are not revising our rules to add text about considering context or to provide examples because we intend to further clarify and provide examples, as appropriate, in our subregulatory instructions.

We are not adopting the suggestion to require adjudicators to assign weight to a statement on an issue reserved to the Commissioner. Because we are responsible for making the determination or decision about whether an individual meets the statutory definition of disability, these statements are neither valuable nor persuasive for us. Therefore, our adjudicators will continue to review all evidence and consider the context of a source's use of terms in our regulations, but they are not required to articulate how they considered statements on an issue reserved to the Commissioner.

We are also not revising our rules to omit the phrase "statements that you are or are not . . . able to perform regular or continuing work" from final 404.1520b(c)(3) and 416.920b(c)(3). We are responsible for assessing an individual's RFC, including how our programmatic terms apply to evidence we receive.

Comment: One commenter asked us to state that when an administrative law judge (ALJ) asks a medical expert about whether an impairment(s) medically equals an impairment(s) in the Listings, that is a medical opinion and not a statement on an issue reserved to the Commissioner.

Response: Because we are not revising this current policy in these final rules, we are not adopting the comment. When a medical expert, or any other medical source, opines about whether an individual's impairment(s) medically equals an impairment(s) in

the Listings, we consider that statement to be a statement on an issue reserved to the Commissioner under our current policy. **\*5852** For example, if we receive a medical report that contains a medical opinion and a statement on an issue reserved to the Commissioner, we will articulate how we considered the medical opinion according to its rules but not articulate how we considered the statement on an issue reserved to the Commissioner.

In addition, we will issue a new Social Security Ruling that will discuss certain aspects of how ALJs and the AC must obtain evidence sufficient to make a finding of medical equivalence.

Comment: One commenter opposed our terminology of a statement on an issue reserved to the Commissioner because it is "reserved for the ALJ, not the Commissioner."

Response: We did not adopt this comment. Whenever an adjudicator at any level of our administrative process makes a disability or blindness determination or decision, he or she is acting pursuant to authority delegated by the Commissioner.[FN34] Our adjudicators do not have authority independent of the authority given to them pursuant to a lawful delegation of authority.

34    See 42 U.S.C. 902(a)(7) and current 404.1503(c) and 416.903(c).

**Sections 404.1520c and 416.920c—How We Consider and Articulate Medical Opinions and Prior Administrative Medical Findings for Claims Filed on or After March 27, 2017**

*Prior Administrative Medical Findings*
Comment: Two commenters had concerns about our policies for considering prior administrative findings, such as the severity of an individual's symptoms, failure to follow prescribed treatment, and drug addiction and alcoholism. The commenters stated that medical evidence should be provided solely by medical professionals and suggested that prior administrative medical findings are not made by medical sources.

Response: The three categories of evidence from medical sources and prior administrative medical findings must be made by medical sources. Prior administrative medical findings are made by medical sources who are State or Federal agency medical consultants or psychological consultants. This is our current policy in current 404.1527(e)(1) and 416.927(e)(1). Our rules in current 404.1527(e)(2) and 416.927(e)(2) require us to consider and articulate our consideration of prior administrative medical findings using the same factors we use to consider medical opinions.

Under section 221(h) of the Act, as amended by the Bipartisan Budget Act of 2015 (BBA) section 832, we are now required to make "every reasonable effort" to ensure that a qualified physician (in cases involving a physical impairment) or a qualified psychiatrist or psychologist (in cases involving a mental impairment) has completed the medical review of the case and any applicable residual functional capacity (RFC) assessment. In final 404.1520c, 404.1527, 416.920c, and 416.927, we explain in detail how will we consider and articulate our consideration of prior administrative medical findings.

Comment: One commenter asked us to consider opinions from the Appeals Council's (AC) Medical Support Staff (MSS) as prior administrative medical findings.

Response: Although our current policies allow adjudicators at the hearings and AC levels of review to obtain medical expert evidence, including MSS opinions at the AC, we did not adopt this comment for two reasons. First, expert medical opinions obtained at the same level of adjudication could not be a prior administrative medical finding. Second, medical expert evidence obtained at the hearings or AC levels does not amount to our own medical findings; instead, our adjudicators at these levels are responsible for determining whether an individual is disabled. They must consider expert medical opinions obtained at the same level under the standard for evaluating medical opinions.

Comment: A few commenters asked how our rules for considering prior administrative medical findings would apply to claims we decided previously, considering the legal principle of res judicata, which means an issue definitively settled by a prior determination or decision.

Response: We appreciate this comment, and we have revised the final rules to address this question. These final rules do not affect our current policies about res judicata. Prior administrative medical findings are evidence in the current claim. To help clarify this point, we have revised the prior administrative medical findings evidence category's definition in final 404.1513(a)(5) and 416.913(a)(5) to specify that this is a category of evidence in the current claim.

Comment: One commenter asserted that allowing administrative law judges (ALJ) to consider prior administrative medical findings means that individuals at the hearings level do not get a new and independent review of their claims. Another commenter raised concern that requiring State agency adjudicators to provide written analysis about the persuasiveness of the prior administrative medical findings from the initial level of review appeared to conflict with the principles of getting a new and independent review.

Response: We did not make any specific changes based on these comments. A new decision means that adjudicators at subsequent levels of the administrative review process (i.e., reconsideration, hearing, and AC) do not need to defer to the findings or conclusions of prior adjudicators. Instead, they make new findings and conclusions. Currently, adjudicators at all levels of the administrative review process consider prior administrative medical findings as part of conducting a new and independent review when they issue a determination or decision.[FN35] Based on our experience administering our programs, we have found that our adjudicators reasonably consider prior administrative medical findings as part of the evidence in the claim and do not automatically favor or disfavor this evidence simply because the medical source is a medical consultant (MC) or a psychological consultant (PC).

35    See current 20 404.1512(b)(vii), 404.1527(e)(1)(i) and (iii), 416.912(b)(vii), and 416.927(e)(1)(i) and (iii).

### Treating Source Rule

Comment: Multiple commenters asked us to retain the current treating source rule, while some commenters agreed with our proposal to eliminate it. Those who wanted us to retain the treating source rule said that evidence from a treating source has special intrinsic value due to the nature of the medical source's relationship with the claimant. They also said that the current rules contain an appropriate inherent hierarchy to give the most weight to treating sources, then to examining sources like CE sources, and the least weight to nonexamining sources, such as MCs and PCs. One commenter said without this hierarchy, our adjudicators would have a more difficult time evaluating evidence.

One organization that represents claimant representatives noted that if we do not keep the treating source rule, the treatment relationship should be a more important factor for consideration of medical opinions and prior administrative medical findings than the factors of supportability and consistency. Another commenter disagreed with our reasons for revising the factors for considering medical opinions and prior administrative medical findings.

 **\*5853**   The commenters who supported changing our rules agreed with our proposal to consider the supportability and consistency factors as the most important factors in assessing persuasiveness. These commenters said that this approach better reflects the actual state of health care today and allows adjudicators to focus more on the content of the evidence than on the source.

Response: While we understand the perspectives presented in these comments, we are not retaining the treating source rule in final 404.1520c and 416.920c for claims filed on or after March 27, 2017. Since we first adopted the current treating source rule in 1991, the healthcare delivery system has changed in significant ways that require us to revise our policies in order to reflect this reality. Many individuals receive health care from multiple medical sources, such as from coordinated and managed

care organizations, instead of from one treating AMS.[FN36] These individuals less frequently develop a sustained relationship with one treating physician. Indeed, many of the medical sources from whom an individual may seek evaluation, examination, or treatment do not qualify to be "treating sources" as defined in current 404.1502 and 416.902 because they are not AMSs. These final rules recognize these fundamental changes in healthcare delivery and revise our rules accordingly.

36      Kaiser Commission on Medicaid and the Uninsured, Improving Access to Adult Primary Care in Medicaid: Exploring the Potential Role of Nurse Practitioners and Physician Assistants, available at http://kaiserfamilyfoundation.files.wordpress.com/2013/01/8167.pdf; Administrative Conference of the United States, SSA Disability Benefits Programs: Assessing the Efficacy of the Treating Physician Rule, pp. 25-37 (April 3, 2013), available at http://www.acus.gov/sites/default/files/documents/Treating_Physician_Rule_Final_Report_4-3-2013_0.pdf.

Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential standard to us.[FN37]

37      81 FR at 62572.

In addition, our experience adjudicating claims using the treating source rule since 1991 has shown us that the two most important factors for determining the persuasiveness of medical opinions are consistency and supportability. The extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation—supportability—and the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim—consistency—are also more objective measures that will foster the fairness and efficiency in our administrative process that these rules are designed to ensure. These same factors also form the foundation of the current treating source rule, and we believe that it is appropriate to continue to keep these factors as the most important ones we consider in our evaluation of medical opinions and prior administrative medical findings. Because we currently consider all medical opinions and opinions using these factors, we disagree that considering these factors as the most important factors will make evaluating evidence more difficult.

Furthermore, to reflect modern healthcare delivery, we will articulate in our determinations and decisions how we consider medical opinions from all of an individual's medical sources, not just those who may qualify as "treating sources" as we do under current 404.1527(c)(2) and 416.927(c)(2).

Moreover, these final rules in 404.1520c(c)(3) and 416.920c(c)(3) retain the relationship between the medical source and the claimant as one of the factors we consider as we evaluate the persuasiveness of a medical opinion. These final rules also continue to allow an adjudicator to consider an individual's own medical source's medical opinion to be the most persuasive medical opinion if it is both supported by relevant objective medical evidence and the source's explanation, and is consistent with other evidence, as described in final 404.1520c and 416.920c.

Finally, our current rules do not create an automatic hierarchy for treating sources, examining sources, then nonexamining sources to which we must mechanically adhere. For example, adjudicators can currently find a treating source's medical opinion is not well-supported or is inconsistent with the other evidence and give it little weight, while also finding a medical opinion from an examining source, such as a consultative examiner, or nonexamining source, such a medical or psychological consultant, is supported and consistent and entitled to great weight. These final rules help eliminate confusion about a hierarchy of medical sources and instead focus adjudication more on the persuasiveness of the content of the evidence.

Comment: Instead of ending the treating source rule, some commenters asked us to reflect modern healthcare delivery by requiring our adjudicators to provide written analysis about how they consider medical opinions from any medical source from whom an individual chooses to receive evaluation, examination, or treatment, regardless of whether the medical source is an AMS.

Response: We carefully considered these comments, and we are adopting them. We agree that our rules need to reflect modern healthcare delivery, and that is a main reason we are ending the treating source rule. We further agree that our rules should reflect that individuals' own medical sources may not be AMSs. Therefore, these final rules state that we will consider and articulate our consideration of all medical opinions, regardless of AMS status, consistent with the standard we set forth for AMSs in proposed 404.1520c and 416.920c.

Under proposed sections 404.1520c(b)(4) and 416.920c(b)(4), we said that we would articulate how we consider the medical opinion(s) from a medical source who is not an AMS only if we found it to be well-supported and consistent with the record and more valuable and persuasive than the medical opinion(s) and prior administrative medical findings from all of the AMSs in the individual's case record. We are not adopting proposed 404.1520c(b)(4) and 416.920c(b)(4) in these final rules in order to ensure that our rules on articulation reflect the realities of the current healthcare delivery system.

Comment: A few commenters opposed our proposal to end the treating source rule because they said the proposed rules would create arbitrary and inconsistent decisionmaking.

Response: We disagree with these comments because these final rules require our adjudicators to consider all of the factors in final 404.1520c and 416.920c for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors for all of a medical source's medical opinions or prior administrative medical findings.

These final rules improve upon our current rules in several ways. For example, we will require our adjudicators to articulate how they consider medical opinions from all medical sources, regardless of AMS status, to reflect the changing nature of  **5854** healthcare delivery. Therefore, we expect these final rules will enhance the quality and consistency of our decisionmaking, and they will provide individuals with a better understanding of our determinations and decisions.

Comment: Some commenters suggested that instead of changing the treating source rule, we should provide our adjudicators with additional training about it, and increase our quality control measures, so that there are fewer appeals and remands about this issue.

Response: We agree with the comments to provide training and quality control measures to ensure policy compliance with our rules, but we are adopting our proposal to end the treating source rule for claims filed on or after March 27, 2017. The suggestion that we not end the treating source rule would neither align our policies with the current state of medical practice, nor would we expect it to result in substantially fewer appeals and remands about this issue.

To account for the changes in the way healthcare is currently delivered, we are adopting rules that focus more on the content of medical opinions and less on weighing treating relationships against each other. This approach is more consistent with current healthcare practice.

Additionally, we provide extensive training on our rules, and we will provide adjudicators with appropriate training on these final rules. In part because of our extensive training efforts, the work of our adjudicators is policy compliant and highly accurate. For example, in fiscal year 2015, the accuracy rate of our initial determinations was nearly 98 percent, and the overall rate at which the AC has agreed with hearing decisions has increased in recent years. We are committed to ensuring our disability adjudicators remain policy compliant; therefore, we will continue our existing ongoing efforts to train adjudicators on best practices for applying our policies, including the policies in these final rules.

Comment: A few commenters said that we should not adopt our proposed rules because the process of training our adjudicators and adapting our computer systems to comply with them will be difficult, time-consuming, and expensive.

Response: We are not adopting this comment. We believe that the changes we made to our rules will be beneficial to the administration of our programs because they will make our rules easier to understand and apply and will allow us to continue to make accurate and consistent decisions, while acknowledging the changing healthcare landscape. We agree that providing comprehensive training and updating our software to reflect the revisions in these final rules are critical, and we are confident that we will be able to provide the necessary training and software changes in a timely manner. Among our existing employees are dedicated teams that provide in-house training and software enhancements for all of our regulatory revisions. We are currently training our employees and are updating our systems to be ready for when these final rules become effective. We will also undertake quality control monitoring to ensure the training and software updates are effective and working as we intend.

Comment: One commenter requested that we clarify what "consistency" means when considering medical opinions and prior administrative findings. The commenter also recommended that we consider the consistency and treatment relationship with the claimant factors equally. The commenter explained, "Given the brevity of some of these treatment relationships, medical sources may reasonably come to different conclusions about the claimant's impairments and functioning."

Response: While we acknowledge that determining the consistency of medical opinions may be challenging in certain claims, we did not adopt this suggestion. Our adjudicators now use the consistency factor when they consider medical opinions and medical findings from MCs and PCs. Consistent with that approach, proposed and final 404.1520c and 416.920c explain that the more consistent a medical opinion or prior administrative medical finding is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion or prior administrative medical finding is.

Moreover, our use of the word "consistent" in the regulations is the same as the plain language and common definition of "consistent." This includes consideration of factors such as whether the evidence conflicts with other evidence from other medical sources and whether it contains an internal conflict with evidence from the same medical source. We acknowledge that the symptom severity of some impairments may fluctuate over time, and we will consider the evidence in the claim that may reflect on this as part of the consistency factor as well. Thus, the appropriate level of articulation will necessarily depend on the unique circumstances of each claim.

The supportability and consistency factors provide a more balanced and objective framework for considering medical opinions than focusing upon the factors of consistency and the medical source's relationship with the individual. A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, will not be persuasive regardless of who made the medical opinion.

Our final rules provide an appropriate framework to evaluate situations when multiple medical sources provide medical opinions that are not consistent. Our adjudicators will consider all of the factors when they determine how persuasive they find a medical opinion, and these factors are based on the current factors in our rules.

Comment: One commenter said the proposed rules did not contain sufficient guidance about when we would explain how we would consider opinions from sources who are not AMSs in claims with a filing date before the effective date of these final rules. The commenter expressed concern that more claims would be remanded if we did not include more policies from Social Security Ruling (SSR) 06-03p, which we are rescinding, into these final rules. A few other commenters asked us to retain the policies in SSR 06-03p about considering and providing written analysis about opinions from sources who are not AMSs for all claims.

Response: We agree with this comment, and we revised the final regulatory text about claims filed both before and after the effective date of these rules, March 27, 2017, to ensure we have provided clear and comprehensive guidance to our adjudicators and the public.

Under SSR 06-03p, we consider opinions from medical sources who are not AMSs and from nonmedical sources using the same factors we use to evaluate medical opinions from AMSs. We state that an adjudicator generally should explain the weight given to opinions from these sources, or otherwise ensure that the discussion of the evidence in the determination or decision allows an individual or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from one of these sources is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the determination or decision if the determination is less than fully **\*5855** favorable under our current rules. In these final rules, we have included these policies from SSR 06-03p into final 404.1527 and 416.927 for claims filed before March 27, 2017.

In the NPRM,[FN38] we did not propose a rule that would have required our adjudicators to articulate how they considered evidence from nonmedical sources because these sections only discuss medical opinions, which come from medical sources. In response to the comment asking us to include guidance about how we will consider and provide articulation about how we considered evidence from nonmedical sources, we have made two changes. First, for claims filed before March 27, 2017, we have added a new paragraph, sections 404.1527(f) and 416.927(f), which explains how we will consider, and articulate our consideration of, opinions from medical sources who are not AMSs and from nonmedical sources. Second, we are also including regulatory text about evidence from nonmedical sources for claims filed on or after March 27, 2017. For these claims, new sections 404.1520c(d) and 416.920c(d) state that, "We are not required to articulate how we considered evidence from nonmedical sources using the requirements in" sections 404.1520c(a)-(c) and 416.920c(a)-(c) of the rules. This change clarifies our original intent.

<sup>38</sup>    81 FR at 62583-84 and 62592-93.

Specifically, aside from where our regulations elsewhere may require an adjudicator to articulate how we consider evidence from nonmedical sources, such as when we evaluate symptoms,[FN39] there is no requirement for us to articulate how we considered evidence from nonmedical sources about an individual's functional limitations and abilities using the rules in final 404.1520c and 416.920c.

<sup>39</sup>    See current 404.1529 and 416.929.

Comment: We received a comment from ACUS asking us to revise the preamble and our rules to reflect that the ACUS Assembly voted to adopt two of its principal recommendations from the ACUS Final Report [FN40] in the ACUS Conference Recommendations.[FN41] Another commenter asked us to disregard the ACUS Final Report and ACUS Conference Report because, he asserted, ACUS is unfamiliar with the realities that individuals face in daily life.

<sup>40</sup>    Administrative Conference of the United States, SSA Disability Benefits Programs: Assessing the Efficacy of the Treating Physician Rule (April 3, 2013), available at http://www.acus.gov/sites/default/files/documents/Treating_Physician_Rule_Final_Report_4-3-2013_0.pdf.

<sup>41</sup>    Conference Recommendation 2013-1, Improving Consistency in Social Security Disability Adjudications. 78 FR 41352 (July 10, 2013), also available at https://acus.gov/recommendation/improving-consistency-social-security-disability-adjudications.

Response: We value the expertise ACUS provides to help improve Federal agencies' administrative processes, and specifically in this rulemaking process,[FN42] and we appreciate ACUS' continued interest in helping us improve the ways we administer our programs. At this time, we are adopting most of the ACUS Conference Recommendations that relate to the treating source rule in these final rules.

42      ACUS is "an independent federal agency dedicated to improving the administrative process through consensus-driven applied research, providing nonpartisan expert advice and recommendations for improvement of federal agency procedures." About the Administrative Conference of the United States (ACUS), available at http://www.acus.gov/about-administrative-conference-united-states-acus.

The first ACUS recommendation encourages us to use "notice-and-comment rulemaking to eliminate the controlling weight aspect of the treating source rule in favor of a more flexible approach based on specific regulatory factors" that are in our current rules. This recommendation also said that our adjudicators should articulate the bases for the weight given to medical opinions "in all cases."

We base the factors we will use to evaluate medical opinions in these final rules, which are based on notice-and-comment rulemaking, on the factors in our current rules. In response to ACUS's recommendation that our adjudicators should articulate the reasons for the weight given to medical opinions in all cases, we have revised final 404.1520c(b) and 416.920c(b) to state that we will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in an individual's case record. We also provide specific articulation requirements for medical opinions from all medical sources, regardless of whether the medical source is an AMS.

The second ACUS recommendation asked us to both: (1) Recognize nurse practitioners (NP), physician assistants (PA), and licensed clinical social workers (LCSW) as AMSs consistent with their respective State law-based licensure and scope of practice, and (2) issue a policy statement that clarifies the value and weight to be afforded to opinions from NPs, PAs, and LCSWs.

As stated above, we are recognizing PAs and ARNPs, which includes NPs, as AMSs in these final rules. At this time, we are not recognizing LCSWs as AMSs, for the reasons we discussed previously.

With respect to ACUS's recommendation that we assign an inherent value to medical opinions from these medical sources, we will explain how we considered the medical opinions from these medical sources because we are not adopting our proposal to base the articulation requirements on whether the medical source is an AMS.

Comment: One commenter asked us to retain the treating source rule for child claims because pediatricians still have important treating relationships with child claimants. Another commenter asked us to give controlling weight to teacher assessments in child claims.

Response: While we are not adopting these comments, we agree that pediatricians have a valuable role in many child claims. Final sections 404.1520c(c) and 416.920c(c) explain that we will continue to consider the medical source's area of specialty and a medical source's relationship with an individual, including a child, as part of our evaluation of medical opinions. However, a treating pediatrician's relationship with a child patient is not sufficiently different from a treating doctor's relationship with an adult patient to warrant having a separate rule for evaluating medical opinions from treating pediatricians. Because we are moving away from applying the treating source rule for all medical sources, we are not expanding the treating source rule to give controlling weight to nonmedical sources like teachers.

Comment: One commenter suggested that instead of revising our rules about treating sources, we make additional efforts to develop evidence from treating sources, such as sending them functional questionnaires and asking them for medical opinions.

Response: We did not adopt this comment because our current practice is consistent with the Act's requirements that we make every reasonable effort to obtain evidence from all of an individual's medical sources.[FN43]

43      42 U.S.C. 423(d)(5)(B) and 1382c(a)(1)(H)(i).

Comment: One commenter asked us to replace "consider" with "evaluate" and asserted that "consider" is a vague term.

Response: We did not adopt this comment because the use of the term "consider" is consistent with our current rules,[FN44] and it is easily distinguishable from the articulation requirements. Adoption of the term "evaluate" could imply a need to provide written analysis, which is not what we intend. Therefore, we have **\*5856** continued to use the term "consider" in these final rules.

44      See, for example, 404.1520b and 416.920b.

Comment: One commenter offered an alternative approach to ending the treating source rule. The alternative approach would continue to give controlling weight to treating physician opinions in most circumstances, significantly limit how persuasive we could find a CE source's opinions, and limit the role of MCs and PCs to identifying when additional medical evidence is needed to adjudicate a claim.

Response: We are not adopting this suggestion because it is not consistent with section 221(h) of the Act, as amended by BBA section 832. As we noted earlier in the preamble, under section 221(h) of the Act, we are now required to make "every reasonable effort" to ensure that a qualified physician (in cases involving a physical impairment) or a qualified psychiatrist or psychologist (in cases involving a mental impairment) has completed the medical review of the case and any applicable residual functional capacity (RFC) assessment, not just identify when additional medical evidence is needed to adjudicate a claim.

Furthermore, the suggestion would not bring our rules into alignment with the modern healthcare delivery. Our rules focus on the content of the medical opinions in evidence, rather than on the source of the evidence. The commenter's proposal would require us to adopt the opinions of either a treating physician or a consultative examiner to determine if the claimant meets our statutory definition of disability. This would confer upon these other sources the authority to make the determination or decision that we are required to make, and would be an abdication of our statutory responsibility to determine whether the person meets the statutory definition of disability.

Comment: A few commenters said we should never consider evidence from our MCs and PCs to be more persuasive than evidence from an individual's own medical source because MCs and PCs are unqualified and misrepresent the evidence they review.

Response: We did not adopt this comment because we maintain strict requirements for who may serve as a qualified MC or PC.[FN45] MCs and PCs have valuable experience in our adjudicative processes, and their review of all of the evidence we receive provides them with a comprehensive perspective that other medical sources, including an individual's own medical sources, may not have.

45      See current 404.1616 and 416.1016, as revised by final 404.1616 and 416.1016 to accommodate section 221(h) of the Act, as amended by BBA section 832.

Comment: One commenter said we provided no evidence to support the NPRM's statement that individuals less frequently develop a sustained relationship with one treating physician now than when they did when we published the treating source rule in 1991.

Response: In the preamble to the NPRM, we provided a list of sources of evidence in footnote 119, which refers readers to the ACUS Final Report.[FN46] Examples of sources that ACUS cites in section III.A. of its Final Report include:

46     Administrative Conference of the United States, SSA Disability Benefits Programs: Assessing the Efficacy of the Treating Physician Rule (April 3, 2013), available at http://www.acus.gov/sites/default/files/documents/ Treating_Physician_Rule_Final_Report_4-3-2013_0.pdf.

• Sharyn J. Potter & John B. McKinlay, From a Relationship to Encounter: An Examination of Longitudinal and Lateral Dimensions in the Doctor-Patient Relationship, 61 SOC. SCI. & MED. 465, 466-470 (2005). These authors described the "longitudinal changes to doctor-patient relationship in latter decades of 20th century as corporatist model of health care took hold, due largely to 'exponential growth of managed health care in the 1980s and 1990s [that] drastically changed the roles of both physicians and patients.' " [FN47]

47     Id. at 26, footnote 205.

• John W. Saultz & Waleed Albedaiwi, Interpersonal Continuity of Care and Patient Satisfaction: A Critical Review, 2 ANNALS OF FAM. MED. 445, 445 (Sept./Oct. 2004). This article reports that, "'Changes in the American healthcare system during the past decade have made it increasingly difficult to establish such long-term trusting relationships between physicians and patients. Some authors have questioned whether a personal model of care is feasible, as health plans increasingly have required provider changes for economic reasons.' " [FN48]

48     Id. at 26, footnote 206.

• Paul Nutting et al., Continuity of Primary Care: To Whom Does it Matter and When?, 1 ANNALS OF FAM. MED. 149, 154 (Nov. 2003) This article states, " 'The current organizational and financial restructuring of the health care system creates strong pressures against continuity with employers changing plans, and plans changing providers. Forced disruption in continuity of care is common, particularly for those with a managed care type of insurance.' " [FN49]

49     Id. at 28, footnote 220.

There are other similar sources of evidence establishing that individuals less frequently develop a sustained relationship with one treating physician now on pages 25-28 of the ACUS Final Report, including in the footnotes.

Comment: Some commenters opined that increasing complexity in cases and voluminous files provide insufficient reasons for moving away from the treating source rule.

Response: The increasing complexity in cases and voluminous files were not reasons that we provided in support of moving away from the treating source rule. We are moving away from the treating source rule to align our policies more closely with the ways that people receive healthcare today.

Instead, the increasing complexity of cases and voluminous files were reasons we provided in support of our proposed rules about how we would articulate our consideration of medical opinions. As explained elsewhere in this preamble, we received comments raising concern with certain aspects of the proposed articulation requirements. As a result, we revised the final rules in several ways, such as to require adjudicators to articulate how they considered medical opinions from all medical sources, rather than only from AMSs, in final 404.1520c and 416.920c.

As we explained in the preamble to the NPRM,[FN50] it is not administratively feasible for us to articulate how we considered all of the factors for all of the medical opinions and prior administrative medical findings in all claims. As we noted earlier in the preamble, our goal in these final rules is to continue to ensure that our adjudicative process is both fair and efficient. We

have an obligation to treat each claimant as an individual and to decide his or her claim fairly. We also have an obligation to all individuals to provide them with timely, accurate determinations and decisions.

50      81 FR at 62574.

Our experience since 1991 using the treating source rule shows that the articulation requirement in the current rule, which requires adjudicators to address each opinion, rather than addressing the opinions on a source-level, does not always foster those two goals. Accordingly, we believe it is appropriate to revise the articulation requirement in our current rules. We believe that the changes we have made from the NPRM address the concerns raised by the commenters, while still allowing us to ensure that our administrative process is both fair and efficient.

 **\*5857**  Comment: A few commenters disagreed with how we characterized some of the legal precedents we cited as in the preamble to the NPRM, such as Black & Decker Disability Plan v. Nord.[FN51] These commenters asserted that Black & Decker reflected positively on the 1991 treating source rule regulations, and that many courts support the treating source rule's deferential standard.

51      538 U.S. 822 (2003).

Response: We included Black & Decker in the preamble to the NPRM [FN52] because the opinion notes that, "the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks. And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.' " [FN53]

52      81 FR 62572.

53      538 U.S. at 832.

Although the Black & Decker court was referring to medical consultants contracted under ERISA plans, the concerns about short treatment relationships and lack of specialization are equally applicable in the context of disability adjudication under our rules. Notably, ACUS agrees with our interpretation of the discussions in these opinions.[FN54] Additionally, setting aside the Court's decision in Black and Decker, the other rationale we provided in the NPRM for revising our policy on how we consider treating source and other medical source opinions remains compelling.

54      See ACUS Final Report at 43.

Comment: Some commenters, including the authors of a law review article mentioned in section VI.D.5. of the NPRM preamble, [FN55] submitted comments stating we had inaccurately presented parts of the content of that article and their position on the treating physician rule.

55      Richard E. Levy & Robert L. Glicksman, Agency-Specific Precedents, 89 TEX. L. REV. 499, 546 (2011).

Response: We appreciate the commenters' concerns and their interest in our programs and this rulemaking proceeding. We regret the mischaracterization of the authors' position in their article. We note that the other rationale discussed in the NPRM and these final rules remains compelling.

*Articulation Requirements*

Comment: A few commenters expressed concern with the factors that we proposed to consider when evaluating medical opinions and prior administrative medical findings. One commenter indicated that we should not elevate consistency above the other factors. Another commenter thought that the consistency factor would automatically make a longitudinal record subject to being found inconsistent. Other commenters said we should continue to use our existing factors, or first consider the factor of a longstanding treatment relationship, to evaluate the persuasiveness of medical opinions and prior administrative medical findings. Some commenters were concerned with our proposal to add "understanding our policy" and "familiarity with the record" to our list of factors because they may appear to favor evidence from our MCs and PCs over an individual's own medical sources.

Response: We agree, in part, with these comments. We are adopting our proposal to consider supportability and consistency as the two most important factors when we evaluate the persuasiveness of medical opinions and prior administrative medical findings. Our experience adjudicating claims demonstrates that these factors are more objective measures than the relationship with the claimant factor and are the same factors we look to as part of the current treating source rule. While we agree that there is no hierarchy to the remaining factors, we did not revise our rules to include this language in the regulatory text. Instead, we agree with the comments that we should revise the regulatory text to eliminate any appearance that inherently we favor evidence from MCs or PCs over evidence from an individual's own medical sources, and vice versa. Therefore, we made several revisions to the regulatory text in final 404.1520c and 416.920c.

We revised the issues within the "relationship with the claimant" factor to read: length of the treatment relationship, examining relationship, frequency of examinations, purpose of the treatment relationship, and extent of the treatment relationship. This underscores our recognition that an individual's own medical source may have a unique perspective of an individual's impairments based on the issues listed, such as a long treatment relationship. We will consider the unique evidence in each claim that tend to support or weaken how persuasive we find these issues.

Similarly, under both our current rules and the proposed rules, we may consider a medical source's familiarity with the entire record and his or her understanding of our policy. In our proposed rules, we proposed to separately list "understanding our policy" and "familiarity with the record" as individual factors instead of examples of "other factors" as in the current rules. Some commenters were concerned that this change favored our MCs and PCs, who often review all evidence in a claim and are trained in our policies. This was not our intent, and we proposed to reorganize the factors to clarify, not change, our policy on this point. Therefore, we agree with the comments that it would be best to list these issues within "other factors."

We also recognize that new evidence submitted after an MC or PC provided a prior administrative medical finding may affect how persuasive that finding is at subsequent levels of adjudication. We are adding in final 404.1520c(c)(5) and 416.920c(c)(5) that when we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

Additionally, we recognize that evidence from a medical source who has a longstanding treatment relationship with an individual may contain some inconsistencies over time due to fluctuations in the severity of an individual's impairments. Our adjudicators will consider this possibility as part of evaluation of the consistency factor, as they do so under our current rules. We will also include this issue within our training to our adjudicators.

Comment: Some commenters were concerned that, by moving away from assigning a specific weight to opinions and prior administrative medical findings, we would add subjectivity into the decisionmaking process and said we would only require our adjudicators to think about the evidence but not provide written analysis. Other commenters suggested that by requiring articulation on only two factors—supportability and consistency—our decisions would not sufficiently inform the individual or a reviewing Federal court of the decisionmaker's reasoning, which would lead to more appeals to and remands from the courts.

Response: While we understand the concerns in these comments, we are adopting our proposal to look to the **\*5858** persuasiveness of medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017. Our current regulations do not specify which weight, other than controlling weight in a specific situation, we should assign to medical opinions. As a result, our adjudicators have used a wide variety of terms, such as significant, great, more, little, and less. The current rules have led to adjudicative challenges and varying court interpretations, including a doctrine by some courts that supplants the judgment of our decisionmakers and credits as true a medical opinion in some cases.

By moving away from assigning a specific weight to medical opinions, we are clarifying both how we use the terms "weigh" and "weight" in final 404.1520c(a), 404.1527, 416.920c(a), and 416.927 and also clarifying that adjudicators should focus on how persuasive they find medical opinions and prior administrative medical findings in final 404.1520c and 416.920c. Our intent in these rules is to make it clear that it is never appropriate under our rules to "credit-as-true" any medical opinion.

We are also stating in final 404.1520c(b) and 416.920c(b) what minimum level of articulation we will provide in our determinations and decisions to provide sufficient rationale for a reviewing adjudicator or court. In light of the level of articulation we expect from our adjudicators, we do not believe that these final rules will result in an increase in appeals or remands from the courts.

Comment: We received various comments regarding our proposal in sections 404.1520c(b) and 416.920c(b) about when we would articulate how we considered medical opinions from medical sources who are not AMSs. A few commenters supported our proposal. However, several other commenters, including Members of Congress, expressed concern with the proposed changes. Some commenters said the changes would result in less transparency because adjudicators would have "too much individual discretion to dismiss key evidence without providing a rationale." Other commenters said that our proposed rules would not allow reviewing courts to determine whether substantial evidence supports our decisions.

Response: We partially adopted these comments, and we appreciate the perspective of the commenters who expressed concern with the proposed rules. We are committed to having a transparent, fair, and balanced adjudicative process that ensures that every entitled individual receives the disability benefits or payments and that every individual understands why he or she is not entitled to benefits. We agree with the majority of commenters that we should articulate how we consider medical opinions from any of an individual's own medical sources, regardless of whether that source is an AMS.

Therefore, we revised final 404.1520c(c) and 416.920c(c) to require our adjudicators to articulate how they consider medical opinions from all medical sources, regardless of AMS status. This revision helps align our rules with current medical practice and recognizes that individuals may obtain evaluation, examination, or treatment from medical sources who are not AMSs.

To account for this change, we are not adopting proposed 404.1520c(b)(4) and 416.920c(b)(4) in these final rules, which would have stated standards about when we would articulate how we considered medical opinions from medical sources who are not AMSs. We also revised final 404.1520c(a)-(b) and 416.920c(a)-(b) to clarify that there is a difference between considering evidence and articulating how we consider evidence. We consider all evidence we receive, but we have a reasonable articulation standard for determinations and decisions that does not require written analysis about how we considered each piece of evidence.

We expect that the articulation requirements in these final rules will allow a subsequent reviewer or a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review our final decision.

Comment: One commenter asked for clarification about what we meant by "medical source" in proposed 404.1520c(b)(1) and 416.920c(b)(1), particularly when an entity provides us with evidence. The commenter asked if we were referring to the same health care provider, the same clinic, the same medical group, or the same hospital.

Response: Under both our current and these final rules, only an individual, not an entity, can be a medical source. When an entity provides us with evidence from multiple medical sources, we will evaluate each medical source's evidence separately instead of considering the evidence as coming from one source.

Comment: One commenter agreed with our proposal to require an adjudicator to discuss other relevant factors when we find two medical sources' medical opinion(s) or prior administrative medical finding(s) equally persuasive. Another comment asserted that the NPRM did not provide much guidance as to when medical opinions are both equally well-supported and consistent with the record.

Response: We agree with the first commenter that this requirement provides an appropriate standard about when an adjudicator has discretion to discuss the other relevant factors. Because the content of evidence, including medical opinions and prior administrative medical findings, varies with each unique claim, it would not be appropriate to set out a detailed rule for when this situation may occur. We expect that each adjudicator will use his or her discretion to determine when this situation occurs.

The final rules include sufficient guidance to adjudicators in determining when this situation exists. Under final sections 404.1520c(b)(3) and 416.920c(b)(3), the medical opinions or prior administrative medical findings must be "both equally well-supported" under sections 404.1520c(c)(1) or 416.920c(c)(1) "and consistent with the record" under sections 404.1520c(c)(2) or 416.920c(c)(2). In addition, the opinions or prior administrative medical findings must not be "exactly the same." Under these circumstances, we will articulate how we considered the other most persuasive factors in sections 404.1520c(c)(3)-(c)(5) or 416.920c(c)(3)-(c)(5) for those medical opinions or prior administrative medical findings in the determination or decision.

Comment: One commenter thought we would no longer provide rationale about why we did not adopt a medical opinion from an individual's doctor. A few commenters believed that the proposed rule would reduce our articulation burden and would increase inconsistency in how we evaluate individuals.

Response: While we understand some commenters were concerned about these issues, these final rules continue the requirement in current 404.1527 and 416.927 to articulate how we consider medical opinions from an individual's own doctor. In fact, these final rules enhance the current requirements in several ways, such as requiring articulation about medical opinions from all of an individual's medical sources, making consistency and supportability the most important factors, and clarification of the factors themselves. These improvements will increase the consistency in how we evaluate claims, and we also expect them to reduce remands.

 **5859**  Comment: One commenter asked us to adopt the medical opinions of highly-specialized doctors without considering the other factors.

Response: After careful consideration, we are not adopting this comment. The specialization of the medical source who provides a medical opinion or prior administrative medical finding is one of the factors we consider when we evaluate how persuasive a medical opinion or prior administrative medical finding is. Under our current rules in 404.1527(c) and 416.927(c), we consider several factors when we decide what "weight" to give to a medical opinion, and we do not consider the specialization of the medical source in isolation. Evaluating the persuasiveness of a medical opinion requires consideration of several factors and in context of all of the evidence in the claim.

Comment: One commenter asked us to add a factor for considering medical opinions that would inquire about whether the individual is indigent, because such individuals cannot afford psychotherapy.

Response: We are not adopting this comment because the factors for considering medical opinions and prior administrative medical findings relate to the persuasiveness of the evidence presented, not to the financial status of the individual. We will consider and explain how we considered medical opinions of an individual's medical sources regardless of whether the medical evaluation, examination, or treatment occurred in a free or low cost health clinic for indigent individuals.

Comment: One commenter asked whether we intended to make two separate findings about the value and persuasiveness of medical opinions, or whether we intended to require one finding. The commenter opposed requiring two separate findings for each medical opinion because that would increase the articulation burden on our adjudicators.

Response: We appreciate the question and the opportunity to clarify that we are not requiring two separate findings. Our adjudicators need only explain how persuasive they found a medical opinion or prior administrative medical finding in their determinations or decisions. As we state in final 404.1520c(b) and 416.920c(b), "[w]e will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record." There is no requirement that our adjudicators provide a second analysis about how valuable a medical opinion or prior administrative medical finding is.

Comment: A few commenters said that our proposed rules about how we would articulate how we considered medical opinions, and that we would not articulate our consideration of disability examiner findings, statements on issues to the Commissioner, and decisions by other governmental agencies and nongovernmental entities, violated due process and 42 U.S.C. 405(b), which requires us to include in a determination or decision that is not fully favorable to an individual, a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the reason(s) upon which we based the determination or decision. Some of these commenters said reviewing courts would increase the number of remands because they would be unable to review our adjudicators' rationale.

Response: Our current rules, the proposed rules, and these final rules are consistent with and further the goals of 42 U.S.C. 405(b) and the principles of due process. The statute does not require us to explain how we consider every piece of evidence we receive. Instead, section 405(b) requires us to include in a determination that is not fully favorable to an individual, a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the reason(s) upon which we based the determination or decision. The intent of the statute was not to impose a burdensome articulation requirement.[FN56] Rather, the intent was to remedy a prior concern that individuals were receiving notices that their claims for disability benefits had been denied without any personalized articulation of the evidence.[FN57]

---

[56]   See section 305 of the Social Security Disability Amendments of 1980, Public Law 96-265, 94 Stat. 441, 457. In amending section 405(b), Congress intended for the required personalized denial notice to be "brief, informal, and not technical," H.R. Conf. Rep. 96-944, at 58 (1980), and did not intend for it to be a voluminous document, S. Rep. 96-408 at 57 (1979).

[57]   See H.R. Conf. Rep. 96-944, at 58 (1980) (noting that under the law at the time, "[t]here is no statutory provision setting a specific amount of information to explain the decision made on a claim for benefits."); S. Rep. 96-408 at 56 (1979) (noting that under the law at the time, "[n]otices to claimants regarding the Secretary's decision on their claim for disability benefits provides little guidance as to the causes for a denial.")

We will articulate how we considered the medical opinions from all medical sources and prior administrative medical findings in a claim. This articulation will include the supportability and consistency factors, which generally includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical findings is with other evidence in the claim. Therefore, the final rules are consistent with the intent of the statute that we provide a statement of the case, setting forth a discussion of the evidence, and stating the reasons upon which we based the determination.

As to the comments that these rules do not provide due process, these final rules do not violate the Due Process Clause of the Fifth Amendment to the Constitution. The final rules do not categorize individuals based on their characteristics or deprive an individual of a protected property interest. The rules also ensure that our procedures are fair and provide individuals with appropriate procedural protections. Nothing in constitutional principles of equal protection is inconsistent with these final rules.

Comment: We received a few comments raising concern about the interactions between the proposed rules and some Federal statutes, and the interactions between the proposed rules and judicial review. A few commenters said our proposed rules were in conflict with 42 U.S.C. 405(g). One commenter said our proposed rules were in conflict with 42 U.S.C. 404(a). One commenter said our proposed rules violated the Ninth Circuit's "credit-as-true doctrine." Another commenter said the treating source rule provides for uniformity between Federal courts and us and minimizes delays to claimants by limiting unnecessary court reviews. A few commenters said courts would continue to defer to evidence from a claimant's own medical sources regardless of the content of our rules.

Response: We do not agree with these comments. 42 U.S.C. 404(a) and 405(g) do not directly apply to the proposed or final regulatory sections. 42 U.S.C. 404(a) addresses how we assess underpayments and overpayments, and nothing in these final rules address these issues. Similarly, 42 U.S.C. 405(g) addresses procedures for individuals to appeal their decisions to Federal court, and these final rules do not affect these rights.

Federal courts are bound to uphold our decisions when they are supported by substantial evidence and when we have applied the appropriate legal standards in our decisions. While a court has the authority to review the validity of our regulations, the fact that some courts previously have adopted a credit as true rule does not mean that we are required to adopt such a rule in **\*5860** our regulations.[FN58] Those courts that have adopted the credit as true rule have not done so based on any specific requirement of the Act, and the statute does not mandate that we apply such a rule.

58    See National Cable and Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 982 (2005).

In our view, the credit as true rule supplants the legitimate decisionmaking authority of our adjudicators, who make determinations or decisions based on authority delegated by the Commissioner. The credit as true rule is neither required by the Act nor by principles of due process. It is also inconsistent with the general rule that, when a court finds an error in an administrative agency's decision, the proper course of action in all but rare instances is to remand the case to the agency for further proceedings. Accordingly, we decline to adopt the credit as true rule here.

We expect that courts will defer to these regulations, which we adopted through notice and comment rulemaking procedures pursuant to the Commissioner's exceptionally broad rulemaking authority under the Act. The rules are essential for our administration of a massive and complex nationwide disability program where the need for efficiency is self-evident. The rules are neither arbitrary nor capricious, nor do they exceed the bounds of reasonableness. Under these circumstances, we are confident that our rules are valid.[FN59]

59    See 5 U.S.C. 553 and E.O. 12866, as supplemented by E.O. 13563.

Comment: A few commenters asked us to require MCs and PCs to identify what medical evidence they reviewed and disclose the amount of time spent reviewing each claimant's file to enable later decisionmakers to assess the supportability and consistency factors more effectively. These commenters also asked us to instruct our adjudicators to consider the completeness of the record at the time of review and the time spent reviewing the record when evaluating prior administrative medical findings.

Response: While we agree that the specific evidence an MC or PC reviewed is probative, we did not accept this comment because MCs and PCs are required to evaluate all of the evidence in the claim file at the time they make their medical findings under our rules. Consistent with 42 U.S.C. 405(b), our current rules also require that when we make an initial determination, our written notice will explain in simple and clear language what we have determined and the reasons for and the effect of our determination. When we make a determination of disability that is in whole or in part unfavorable to an individual, our rules also require our written notice to "contain in understandable language a statement of the case setting forth the evidence

on which our determination is based." [FN60] Adjudicators at subsequent levels of appeal can also determine what evidence already existed in the claim file when the MC or PC made his or her medical findings by reviewing data in the claims folder.

60      Current 404.904 and 416.1404.

We also did not adopt the suggestion to measure and document MC and PC review time to help subsequent adjudicators consider supportability and consistency of their adjudicative findings because review time does not provide information about supporting evidence or consistency of the evidence.

**Sections 404.1521 and 416.921—Establishing That You Have a Medically Determinable Impairment**

Comment: One commenter asked us to align our requirements for establishing an impairment with the International Classification of Functioning (ICF) used by the World Health Organization.[FN61] The ICF is a framework for describing and organizing information on functioning and disability. The commenter suggested that if we were to align our requirements for establishing an impairment with the ICF, medical sources who provide evidence to us could use a standardized language and conceptual basis for the definition and measurement of health and disability.

61      See World Health Organization, International Classification of Functioning, Disability and Health (ICF), http://www.who.int/classifications/icf/en/.

Response: While we are always looking for ways to improve how we adjudicate disability claims, we are not adopting the comment at this time. It is unclear how the ICF would be helpful in our adjudication of disability claims because the ICF's definition of disability differs from the requirements in the Act. The Act defines disability as "the inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." [FN62]

62      42 U.S.C. 423(d)(1)(A) and 1382c(a)(3)(A).

In contrast, the ICF views "disability and functioning as outcomes of interactions between health conditions (diseases, disorders and injuries) and contextual factors." [FN63] Included in these contextual factors "are external environmental factors (for example, social attitudes, architectural characteristics, legal and social structures, as well as climate, terrain, and so forth); and internal personal factors, which include gender, age, coping styles, social background, education, profession, past and current experience, overall behaviour pattern, character and other factors that influence how disability is experienced by the individual." [FN64] Therefore, an individual could have a "disability" as contemplated by the ICF without meeting the Act's definition of disability.

63      World Health Organization, Towards a Common Language for Functioning, Disability and Health—ICF, p. 10, 2002.

64      Id.

**Sections 404.1522 and 416.922—What We Mean by an Impairment(s) That Is Not Severe**

Comment: One commenter stated that, "controlling law on the statutory interpretation of 'severe' is that it should have the 'minimalist effect' on the activities of daily living."

Response: We did not adopt this comment because we proposed to move the current definition from current 404.1521(a) and 416.921(a) into proposed 404.1522(a) and 416.922(a) as part of the effort to reorganize our regulations for ease of use, not to change the current definition. The definition of "non-severe" impairment in our regulations has been the same since 1985,

[FN65] and it has been substantially the same since we first defined the term in 1980.[FN66] The U.S. Supreme Court upheld the regulatory definition in Bowen v. Yuckert.[FN67]

65    See 50 FR 8726, 8728 (March 5, 1985).

66    See 45 FR 55566, 55588 (August 20, 1980).

67    482 U.S. 137 (1987).

### Sections 404.1523 and 416.923—Multiple Impairments

Comment: One commenter opposed proposed 404.1523 and 416.923, which explains how we consider an individual's multiple impairments, because he said we would not consider all impairments in combination.

Response: We decided to adopt these proposed revisions as part of our effort to make our rules easier to understand and use. These sections combine content from current 404.1522, 404.1523, 416.922, and 416.923 without any substantive change in language. These current sections discuss related issues- our policies for considering claims involving multiple impairments.

**\*5861** Under the final rules, as under the current rules, we will consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity when we determine whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility. If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process. Since our final rules require us to consider the combined effect of an individual's impairments, we are adopting the text as proposed in final 404.1523 and 416.923.

### Sections 404.1527 and 416.927—Evaluating Opinion Evidence for Claims Filed Before March 27, 2017

Comment: One commenter suggested that the phrase "typical for your condition(s)," as part of the definition of "treating source" in proposed 404.1527 and 416.927, which will be applied to claims filed before March 27, 2017, should include the population of indigent individuals who cannot afford psychotherapy as frequently as those who can afford to pay for more frequent sessions.

Response: We are not adopting this comment. The definition of "treating source" in proposed 404.1527 and 416.927, including the words "typical for your condition(s)," comes from our current definition of treating source in current 404.1502 and 416.902. We will continue to apply our current rules for evaluating evidence from a treating source, including this definition, to claims filed before March 27, 2017. We moved this definition to proposed 404.1527 and 416.927 to locate together more of the rules that we will use for claims filed before March 27, 2017.

For claims filed on or after March 27, 2017, the rules for considering medical opinions will not use the term "treating source" or the phrase "typical for your condition(s)."

### Sections 404.1616 and 416.1016—Medical Consultants and Psychological Consultants

Comment: Several commenters opposed our proposal to recognize master's level psychologists licensed for independent practice as psychological consultants (PC) in proposed 404.1616 and 416.1016. These commenters said we should continue to follow our current rules in 404.1616(e) and 416.1016(e) because they recognize the most qualified licensed psychologists, who are doctorate-level clinical psychologists, to be PCs. These commenters said we should maintain a higher level of qualifications for a psychologist to be a PC than we require a psychologist to be an acceptable medical source (AMS).

Response: We agree with these commenters and are not adopting our proposal to revise the qualifications to be a PC in these final rules. Instead, we will continue to follow our current requirements about who can be a PC in final 404.1616 and 416.1016.

Our rules only authorize us to recognize a psychologist to be a PC if he or she: (1) Is licensed or certified as a psychologist at the independent practice level of psychology by the State in which he or she practices; and (2)(i) Possesses a doctorate degree in psychology from a program in clinical psychology of an educational institution accredited by an organization recognized by the Council on Post-Secondary Accreditation; or (ii) Is listed in a national register of health service providers in psychology which we deem appropriate; and (3) Possesses 2 years of supervised clinical experience as a psychologist in health service, at least 1 year of which is post-masters degree.

Comment: One commenter said our proposed use of the term "every reasonable effort," relating to a medical consultant (MC) or PC completing the medical portion of the case review and any applicable RFC assessment, in proposed 404.1616, 404.1617, 416.1016, and 416.1017, was too broad.

Response: We did not adopt this comment because the term "every reasonable effort" as used in the NPRM and in the final rules is not new. In fact, it has appeared in section 221(h) of the Act since 1984, and Congress retained the phrase when it amended section 221(h) through the Bipartisan Budget Act of 2015 (BBA) section 832 in 2015. We have adopted the proposed procedural rules we will use to make "every reasonable effort" to have qualified physicians, psychologists, and psychiatrists review claims to final rules 404.1617 and 416.1017.

Comment: Some commenters opposed our proposal to limit MCs to only licensed physicians. The commenters stated that speech-language pathologists were uniquely qualified to assess the level of functional impairment and ability related to communication disorders. One of these commenters asked us to require that speech-language pathologists review all claims related to communication disorders at the initial and reconsideration levels as medical advisors.

Response: We agree that speech-language pathologists are highly qualified to assess level of functional impairment and ability related to communication disorders; therefore, we have retained them as AMSs. However, section 221(h) of the Act, as amended by BBA section 832, states that we must make every reasonable effort to ensure that a qualified physician (in cases involving a physical impairment) or a qualified psychologist or psychiatrist (in cases involving a mental impairment) completes the medical portion of the case review. A speech-language pathologist is not a "qualified physician" and therefore section 221(h) of the Act does not authorize us to recognize them as MCs or PCs.

To help retain the expertise of non-physician AMSs like speech-language pathologists, we created the role of a medical advisor in our subregulatory instructions.[FN68] These medical sources can review the evidence in the claim and provide case analysis that the adjudicative team will consider as evidence from a medical source in accordance with final 404.1513(a), 404.1520b, 404.1520c, 404.1527, 416.913(a), 416.920b, 416.920c, and 416.927, as appropriate. However, we are not adopting the suggestion to require Speech-Language Pathologist medical advisor input in every claim involving communication disorders at this time. The adjudicative team will use its professional judgment to determine whether to consult with a medical advisor(s) and how to consider medical advisor input on any case.

---

68    See POMS DI 24501.001 The Disability Determination Services (DDS) Disability Examiner (DE), Medical Consultant (MC), and Psychological Consultant (PC) Team, and the Role of the Medical Advisor (MA), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501001.

Comment: One commenter asked us to revise our rules to state that an MC who is a pediatrician must evaluate any child claim involving a physical impairment and cited section 1614(a)(3)(I) of the Act, which mandates that we make reasonable efforts to have a qualified pediatrician or other appropriate specialist evaluate a child's case. Another commenter asked us to allow licensed physicians such as development/behavioral pediatricians, child neurologists, and some primary care providers to act as

PCs in a child claim involving a mental impairment because there is a shortage of child psychologists and psychiatrists. Another commenter opposed our rules that authorize psychiatrists to review physical impairments.

Response: While we appreciate the commenters' concerns, we did not adopt **\*5862** them because our current rules are already sufficient and consistent with the Act. Consistent with the Act's requirements in section 1614(a)(3)(I), our current rules already state that we will make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the child's impairment(s) evaluates the case of the child.[FN69] The Act does not require us to have only a pediatrician be an MC in child claims involving a physical impairment(s).

69      Current 416.903(f).

Section 221(h) of the Act, as amended by BBA section 832, states that when there is evidence indicating the existence of a mental impairment in a claim, we may not make an initial determination until we have made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity (RFC) assessment. If we make every reasonable effort to obtain the services of a licensed psychiatrist or qualified psychologist to review a claim involving a mental impairment, but the professional services are not obtained, a physician who is not a psychiatrist will review the mental impairment claim.[FN70]

70      Current 404.1617(c) and 416.1017(c).

Historically, we have not regulated which specialty of MC or PC must review cases involving specific impairments because each Disability Determination Service (DDS) has unique staffing considerations. Due to the continually changing nature of the medical profession, any future guidance we may issue about which medical specialties may review claims involving specific impairments would be best placed in our subregulatory instructions.

Comment: A few commenters wanted us to recognize optometrists and podiatrists as MCs. They said that BBA section 832's requirement that a licensed physician review claims involving physical impairments still authorized us to have optometrists and podiatrists as MCs.

Response: We recognize the specialized expertise that these medical sources can bring to claims, which is why we authorized them to be MCs prior to BBA section 832's effective date. However, neither optometrists nor podiatrists are qualified physicians, as is required by section 221(h) of the Act, as amended by BBA section 832. To retain access to their expertise, we created the medical advisor role in our subregulatory instructions so that DDSs may continue to request their expert analysis on claims.

**Other Comments**

Comment: Several commenters opposed the proposed policy changes in the NPRM that were inconsistent with the following Social Security Rulings (SSR): 96-2p, 96-5p, and 96-6p. Therefore, those commenters opposed rescinding the same SSRs.

Response: We explained in detail above and (as appropriate) in the preamble to our proposed rules, our reasons for adopting the policies in these final rules. Because the policies we are adopting in these final rules are inconsistent with those SSRs, we are rescinding them.

Comment: Some commenters disagreed with our proposed implementation process. These commenters said it would be difficult for adjudicators to follow different rules based on the filing date of the claim. One commenter said all claims should follow the new policies on the effective date, or in the alternative, fewer of the current policies should apply to claims filed before the effective date. The commenter also said that we should apply the proposed new policies about decisions from other governmental agencies and nongovernmental entities and about statements on issues reserved to the Commissioner to all claims.

Response: We carefully considered these comments and decided to implement these final rules consistent with our proposed implementation process. We are aware that individuals who filed claims before the effective date of these final rules may have requested evidence, including medical opinions from "treating sources," based on our current policies. We are also cognizant that some of our existing rules may have engendered reliance interests that we need to consider. We proposed to implement some of these rules differently from our usual practice in recognition of these factors, which we believe still apply. However, to help adjudicators identify which rules they should follow, we revised the titles and introductory text in final 404.1520c, 404.1527, 416.920c, and 416.927.

Comment: A commenter stated that some of the changes proposed in the NPRM were not evidence-based or supported by "current data." The commenter also raised concern about the speed and accuracy of disability determinations that we would make under the proposed rules, although the commenter did not specify which policies were of concern.

Response: We appreciate and agree with the commenter's desire for evidence-based policies, and for efficient, fair, and policy-compliant disability determinations. We have explained at length in the preamble the reasons and the support for the policy changes. The primary reason that we are updating our rules is to reflect the current ways in which people receive medical treatment. As we implement these final rules, we will continue our current internal procedures for monitoring the quality and quantity of determinations to ensure that adjudicators continue to apply our rules timely and accurately.

Comment: One commenter asserted that we are required to include an analysis under the Regulatory Flexibility Act because the proposals would have a significant economic impact on a substantial number of small entities, such as law firms and non-profit organizations.

Response: We did not adopt this comment because we are only required to perform a Regulatory Flexibility Act analysis if small entities will be subject to the proposed rule. The comment did not explain how these final rules may have a significant economic impact on a substantial number of small entities. "Congress 'did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy." [FN71] Only individuals may receive disability or blindness benefits under titles II and XVI of the Act. An individual who applies for disability or blindness benefits may enter into an agreement with an individual representative to help him or her with the claim, which may include a fee for services provided.[FN72] However, our current regulations do not recognize any entities as representatives.[FN73] Therefore, as authorized by the Regulatory Flexibility Act,[FN74] we correctly certified below that these final rules will not have a significant economic impact on a substantial number of small entities because they affect individuals only.

71    Cement Kiln Recycling Coalition v. Environmental Protection Agency, 255 F.3d 855, 869 (D.C. Cir. 2001) (quoting Mid-Texas Electrical Cooperative, Inc. v. Federal Energy Regulatory Commission, 773 F.3d 327, 343 (D.C. Cir. 1985)).

72    See current 404.1720 and 416.1520.

73    See current 404.1705 and 416.1505.

74    5 U.S.C. 605(b).

Comment: Several commenters stated that the proposed rules would not make our decisions more accurate or decrease the time it takes for us to adjudicate a claim. These commenters also asserted that the proposed rules would create more appeals and delays.

*5863  Response: We disagree that these rules will make our decisions less accurate or will increase the time it takes for us to adjudicate a claim. These final rules clarify some existing policies and revise others for increased transparency and balance. As we discussed at length above, we expect that the changes we are adopting in these final rules will further the fair and timely administration of our programs. We have made a number of changes to the proposed rules to address concerns raised by commenters about aspects of the proposed rules, and to enhance our goal of ensuring that we adjudicate claims fairly, accurately, and in a timely manner.

**Executive Order 12866, as Supplemented by Executive Order 13563**

We consulted with the Office of Management and Budget (OMB) and determined that these final rules meet the criteria for a significant regulatory action under Executive Order 12866, as supplemented by Executive Order 13563. Therefore, OMB reviewed these final rules.

**Regulatory Flexibility Act**

We certify that these final rules will not have a significant economic impact on a substantial number of small entities because they affect individuals only. Therefore, a regulatory flexibility analysis is not required under the Regulatory Flexibility Act, as amended.

**Paperwork Reduction Act**

These final rules do not create any new or affect any existing collections and, therefore, do not require OMB approval under the Paperwork Reduction Act.

(Catalog of Federal Domestic Assistance Program Nos. 96.001, Social Security—Disability Insurance; 96.002, Social Security—Retirement Insurance; and 96.004, Social Security—Survivors Insurance)

**List of Subjects**

*20 CFR Part 404*

Administrative practice and procedure, Blind, Disability benefits, Old-Age, Survivors, and Disability Insurance, Reporting and recordkeeping requirements, Social Security.

*20 CFR Part 416*

Administrative practice and procedure, Reporting and recordkeeping requirements, Supplemental Security Income (SSI).

Carolyn W. Colvin,

Acting Commissioner of Social Security.

For the reasons set out in the preamble, we are amending part 404 subparts J, P, and Q, and part 416 subparts I, J, and N as set forth below:

**PART 404—FEDERAL OLD-AGE, SURVIVORS AND DISABILITY INSURANCE (1950-)**

**Subpart J—Determinations, Administrative Review Process, and Reopening of Determinations and Decisions**
1. The authority citation for subpart J of part 404 continues to read as follows:

Authority: Secs. 201(j), 204(f), 205(a)-(b), (d)-(h), and (j), 221, 223(i), 225, and 702(a)(5) of the Social Security Act (42 U.S.C. 401(j), 404(f), 405(a)-(b), (d)-(h), and (j), 421, 423(i), 425, and 902(a)(5)); sec. 5, Pub. L. 97-455, 96 Stat. 2500 (42 U.S.C. 405 note); secs. 5, 6(c)-(e), and 15, Pub. L. 98-460, 98 Stat. 1802 (42 U.S.C. 421 note); sec. 202, Pub. L. 108-203, 118 Stat. 509 (42 U.S.C. 902 note).
 20 CFR § 404.906
2. In § 404.906(b)(2), revise the fourth sentence to read as follows:

20 CFR § 404.906

**§ 404.906 Testing modifications to the disability determination procedures.**

* * * * *

(b) * * *

(2) * * * However, before an initial determination is made in any case where there is evidence which indicates the existence of a mental impairment, the decisionmaker will make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment pursuant to our existing procedures (see § 404.1617). * * *

* * * * *20 CFR § 404.942

3. In § 404.942, revise paragraph (f)(1) to read as follows:

20 CFR § 404.942

**§ 404.942 Prehearing proceedings and decisions by attorney advisors.**

* * * * *

(f) * * *

(1) Authorize an attorney advisor to exercise the functions performed by an administrative law judge under §§ 404.1513a, 404.1520a, 404.1526, and 404.1546.

* * * * *

**Subpart P—Determining Disability and Blindness**

4. The authority citation for subpart P of part 404 is revised to read as follows:

Authority: Secs. 202, 205(a)-(b) and (d)-(h), 216(i), 221(a) and (h)-(j), 222(c), 223, 225, and 702(a)(5) of the Social Security Act (42 U.S.C. 402, 405(a)-(b) and (d)-(h), 416(i), 421(a) and (h)-(j), 422(c), 423, 425, and 902(a)(5)); sec. 211(b), Pub. L. 104-193, 110 Stat. 2105, 2189; sec. 202, Pub. L. 108-203, 118 Stat. 509 (42 U.S.C. 902 note).

20 CFR § 404.1502

5. Revise § 404.1502 to read as follows:

20 CFR § 404.1502

**§ 404.1502 Definitions for this subpart.**

As used in the subpart—

Acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only (with respect to claims filed (see § 404.614) on or after March 27, 2017);

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 404.614) on or after March 27, 2017); or

(8) Licensed Physician Assistant for impairments within his or her licensed  **5864**  scope of practice (only with respect to claims filed (see § 404.614) on or after March 27, 2017).

Commissioner means the Commissioner of Social Security or his or her authorized designee.

Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests.

Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

Nonmedical source means a source of evidence who is not a medical source. This includes, but is not limited to:

(1) You;

(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);

(3) Public and private social welfare agency personnel; and

(4) Family members, caregivers, friends, neighbors, employers, and clergy.

Objective medical evidence means signs, laboratory findings, or both.

Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

State agency means an agency of a State designated by that State to carry out the disability or blindness determination function.

Symptoms means your own description of your physical or mental impairment.

We or us means, as appropriate, either the Social Security Administration or the State agency making the disability or blindness determination.

You or your means, as appropriate, the person who applies for benefits or for a period of disability, the person for whom an application is filed, or the person who is receiving benefits based on disability or blindness.

 20 CFR § 404.1503

**§ 404.1503 [Amended]**

20 CFR § 404.1503

6. In § 404.1503, remove paragraph (e).

 20 CFR § 404.1504

7. Revise § 404.1504 to read as follows:

 20 CFR § 404.1504

**§ 404.1504 Decisions by other governmental agencies and nongovernmental entities.**

Other governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs, the Department of Defense, the Department of Labor, the Office of Personnel Management, State agencies, and private insurers— make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through(4).

 20 CFR § 404.1508

**§ 404.1508 [Removed and reserved]**

20 CFR § 404.1508

8. Remove and reserve § 404.1508.

 20 CFR § 404.1512

9. Revise § 404.1512 to read as follows:

 20 CFR § 404.1512

**§ 404.1512 Responsibility for evidence.**

(a) Your responsibility.

(1) General. In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled (see § 404.1513). This duty is ongoing and requires you to disclose any additional related evidence about which you become aware. This duty applies at each level of the administrative review process, including the Appeals Council level if the evidence relates to the period on or before the date of the administrative law judge hearing decision. We will consider only impairment(s) you say you have or about which we receive evidence. When you submit evidence received from another source, you must submit that evidence in its entirety, unless you previously submitted the same evidence to us or we instruct you otherwise. If we ask you, you must inform us about:

(i) Your medical source(s);

(ii) Your age;

(iii) Your education and training;

(iv) Your work experience;

(v) Your daily activities both before and after the date you say that you became disabled;

(vi) Your efforts to work; and

(vii) Any other factors showing how your impairment(s) affects your ability to work. In §§ 404.1560 through 404.1569, we discuss in more detail the evidence we need when we consider vocational factors.

(2) Completeness. The evidence in your case record must be complete and detailed enough to allow us to make a determination or decision about whether you are disabled or blind. It must allow us to determine—

(i) The nature and severity of your impairment(s) for any period in question;

(ii) Whether the duration requirement described in § 404.1509 is met; and

(iii) Your residual functional capacity to do work-related physical and mental activities, when the evaluation steps described in § 404.1520(e) or (f)(1) apply.

(b) Our responsibility.

(1) Development. Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports.

(i) Every reasonable effort means that we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence, and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one **\*5865** follow-up request to obtain the medical evidence necessary to make a determination. The medical source or entity that maintains your medical source's evidence will have a minimum of 10 calendar days from the date of our follow-up request to reply, unless our experience with that source indicates that a longer period is advisable in a particular case.

(ii) Complete medical history means the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application. If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier. If applicable, we will develop your complete medical history for the 12-month period prior to the month you were last insured for disability insurance benefits (see § 404.130), the month ending the 7-year period you may have to establish your disability and you are applying for widow's or widower's benefits based on disability (see § 404.335(c)(1)), or the month you attain age 22 and you are applying for child's benefits based on disability (see § 404.350).

(2) Obtaining a consultative examination. We may ask you to attend one or more consultative examinations at our expense. See §§ 404.1517 through 404.1519t for the rules governing the consultative examination process. Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. We may order a consultative examination while awaiting receipt of medical source evidence in some instances, such as when we

know a source is not productive, is uncooperative, or is unable to provide certain tests or procedures. We will not evaluate this evidence until we have made every reasonable effort to obtain evidence from your medical sources.

(3) Other work. In order to determine under § 404.1520(g) that you are able to adjust to other work, we must provide evidence about the existence of work in the national economy that you can do (see §§ 404.1560 through 404.1569a), given your residual functional capacity (which we have already assessed, as described in § 404.1520(e)), age, education, and work experience.

20 CFR § 404.1513

10. Revise § 404.1513 to read as follows:

20 CFR § 404.1513

## § 404.1513 Categories of evidence.

(a) What we mean by evidence. Subject to the provisions of paragraph (b), evidence is anything you or anyone else submits to us or that we obtain that relates to your claim. We consider evidence under §§ 404.1520b, 404.1520c (or under § 404.1527 for claims filed (see § 404.614) before March 27, 2017). We evaluate evidence we receive according to the rules pertaining to the relevant category of evidence. The categories of evidence are:

(1) Objective medical evidence. Objective medical evidence is medical signs, laboratory findings, or both, as defined in § 404.1502(f).

(2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:

(i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes. (For claims filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition of medical opinion.)

(3) Other medical evidence. Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis. (For claims filed (see § 404.614) before March 27, 2017, other medical evidence does not include a diagnosis, prognosis, or a statement that reflects a judgment(s) about the nature and severity of your impairment(s)).

(4) Evidence from nonmedical sources. Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim. We may receive evidence from nonmedical sources either directly from the nonmedical source or indirectly, such as from forms we receive and our administrative records.

(5) Prior administrative medical finding. A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 404.900) in your current claim based on their review of the evidence in your case record, such as:

(i) The existence and severity of your impairment(s);

(ii) The existence and severity of your symptoms;

(iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;

(iv) Your residual functional capacity;

(v) Whether your impairment(s) meets the duration requirement; and

(vi) How failure to follow prescribed treatment (see § 404.1530) and drug addiction and alcoholism (see § 404.1535) relate to your claim.

(b) Exceptions for privileged communications.

(1) The privileged communications listed in paragraphs (b)(1)(i) and (b)(1)(ii) of this section are not evidence, and we will neither consider nor provide any analysis about them in your determination or decision. This exception for privileged communications applies equally whether your representative is an attorney or a non-attorney.

(i) Oral or written communications between you and your representative that are subject to the attorney-client privilege, unless you voluntarily disclose the communication to us.

(ii) Your representative's analysis of your claim, unless he or she voluntarily discloses it to us. This analysis means information that is subject to the attorney work product doctrine, but it does not include medical evidence, medical opinions, or any other factual matter that we may consider in determining whether or not you are entitled to benefits (see paragraph (b)(2) of this section).

(2) The attorney-client privilege generally protects confidential communications between an attorney and his or her client that are related to providing or obtaining legal advice. The attorney work product doctrine generally protects an attorney's analyses, theories, mental impressions, and notes. In the context of your **\*5866** disability claim, neither the attorney-client privilege nor the attorney work product doctrine allow you to withhold factual information, medical opinions, or other medical evidence that we may consider in determining whether or not you are entitled to benefits. For example, if you tell your representative about the medical sources you have seen, your representative cannot refuse to disclose the identity of those medical sources to us based on the attorney-client privilege. As another example, if your representative asks a medical source to complete an opinion form related to your impairment(s), symptoms, or limitations, your representative cannot withhold the completed opinion form from us based on the attorney work product doctrine. The attorney work product doctrine would not protect the source's opinions on the completed form, regardless of whether or not your representative used the form in his or her analysis of your claim or made handwritten notes on the face of the report.

20 CFR § 404.1513a

11. Add § 404.1513a to read as follows:

20 CFR § 404.1513a

### § 404.1513a Evidence from our Federal or State agency medical or psychological consultants.

The following rules apply to our Federal or State agency medical or psychological consultants that we consult in connection with administrative law judge hearings and Appeals Council reviews:

(a) In claims adjudicated by the State agency, a State agency medical or psychological consultant may make the determination of disability together with a State agency disability examiner or provide medical evidence to a State agency disability examiner

when the disability examiner makes the initial or reconsideration determination alone (see § 404.1615(c)). The following rules apply:

(1) When a State agency medical or psychological consultant makes the determination together with a State agency disability examiner at the initial or reconsideration level of the administrative review process as provided in § 404.1615(c)(1), he or she will consider the evidence in your case record and make administrative findings about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative medical findings are based on the evidence in your case but are not in themselves evidence at the level of the administrative review process at which they are made. See § 404.1513(a)(5).

(2) When a State agency disability examiner makes the initial determination alone as provided in § 404.1615(c)(3), he or she may obtain medical evidence from a State agency medical or psychological consultant about one or more of the medical issues listed in paragraph (a)(1) of this section. In these cases, the State agency disability examiner will consider the medical evidence of the State agency medical or psychological consultant under §§ 404.1520b, 404.1520c, and 404.1527.

(3) When a State agency disability examiner makes a reconsideration determination alone as provided in § 404.1615(c)(3), he or she will consider prior administrative medical findings made by a State agency medical or psychological consultant at the initial level of the administrative review process, and any medical evidence provided by such consultants at the initial and reconsideration levels, about one or more of the medical issues listed in paragraph (a)(1)(i) of this section under §§ 404.1520b, 404.1520c, and 404.1527.

(b) Administrative law judges are responsible for reviewing the evidence and making administrative findings of fact and conclusions of law. They will consider prior administrative medical findings and medical evidence from our Federal or State agency medical or psychological consultants as follows:

(1) Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.

(2) Administrative law judges may also ask for medical evidence from expert medical sources. Administrative law judges will consider this evidence under §§ 404.1520b, 404.1520c, and 404.1527, as appropriate.

(c) When the Appeals Council makes a decision, it will consider prior administrative medical findings according to the same rules for considering prior administrative medical findings as administrative law judges follow under paragraph (b) of this section.

20 CFR § 404.1518

12. Revise § 404.1518 (c) to read as follows:

20 CFR § 404.1518

**§ 404.1518 If you do not appear at a consultative examination.**

* * * * *

(c) Objections by your medical source(s). If any of your medical sources tell you that you should not take the examination or test, you should tell us at once. In many cases, we may be able to get the information we need in another way. Your medical source(s) may agree to another type of examination for the same purpose.

20 CFR § 404.1519g

13. Revise § 404.1519g (a) to read as follows:

20 CFR § 404.1519g

**§ 404.1519g Who we will select to perform a consultative examination.**

(a) We will purchase a consultative examination only from a qualified medical source. The medical source may be your own medical source or another medical source. If you are a child, the medical source we choose may be a pediatrician.

\* \* \* \* \*20 CFR § 404.1519h

14. Revise § 404.1519h to read as follows:

20 CFR § 404.1519h

### § 404.1519h Your medical source.

When, in our judgment, your medical source is qualified, equipped, and willing to perform the additional examination or test(s) for the fee schedule payment, and generally furnishes complete and timely reports, your medical source will be the preferred source for the purchased examination or test(s).

20 CFR § 404.1519i

15. Revise § 404.1519i to read as follows:

20 CFR § 404.1519i

### § 404.1519i Other sources for consultative examinations.

We will use a different medical source than your medical source for a purchased examination or test in situations including, but not limited to, the following:

(a) Your medical source prefers not to perform such an examination or does not have the equipment to provide the specific data needed;

(b) There are conflicts or inconsistencies in your file that cannot be resolved by going back to your medical source;

(c) You prefer a source other than your medical source and have a good reason for your preference;

(d) We know from prior experience that your medical source may not be a productive source, such as when he or she has consistently failed to provide complete or timely reports; or

(e) Your medical source is not a qualified medical source as defined in § 404.1519g.

20 CFR § 404.1519n

16. Revise § 404.1519n(c)(6) to read as follows:

20 CFR § 404.1519n

### § 404.1519n Informing the medical source of examination scheduling, report content, and signature requirements.

**\*5867** \* \* \* \* \*

(c) \* \* \*

(6) A medical opinion. Although we will ordinarily request a medical opinion as part of the consultative examination process, the absence of a medical opinion in a consultative examination report will not make the report incomplete. See § 404.1513(a)(3); and

\* \* \* \* \*20 CFR § 404.1520a

17. In § 404.1520a, revise the second sentence of paragraph (b)(1) and paragraph (d)(1) to read as follows:

20 CFR § 404.1520a

### § 404.1520a Evaluation of mental impairments.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* See § 404.1521 for more information about what is needed to show a medically determinable impairment. \* \* \*
\* \* \* \* \*

(d) * * *

(1) If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1522).

 * * * * *20 CFR § 404.1520b

18. Revise § 404.1520b to read as follows:

 20 CFR § 404.1520b

## § 404.1520b How we consider evidence.

After we review all of the evidence relevant to your claim, we make findings about what the evidence shows.

(a) Complete and consistent evidence. If all of the evidence we receive, including all medical opinion(s), is consistent and there is sufficient evidence for us to determine whether you are disabled, we will make our determination or decision based on that evidence.

(b) Incomplete or inconsistent evidence. In some situations, we may not be able to make our determination or decision because the evidence in your case record is insufficient or inconsistent. We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision. We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques. If the evidence in your case record is insufficient or inconsistent, we may need to take the additional actions in paragraphs (b)(1) through (4) of this section.

(1) If any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have.

(2) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

(i) We may recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return;

(ii) We may request additional existing evidence;

(iii) We may ask you to undergo a consultative examination at our expense (see §§ 404.1517 through 404.1519t); or

(iv) We may ask you or others for more information.

(3) When there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have.

(c) Evidence that is inherently neither valuable nor persuasive. Paragraphs (c)(1) through (c)(3) apply in claims filed (see § 404.614) on or after March 27, 2017. Because the evidence listed in paragraphs (c)(1) through (c)(3) of this section is inherently

neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c:

(1) Decisions by other governmental agencies and nongovernmental entities. See § 404.1504.

(2) Disability examiner findings. Findings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether you are disabled.

(3) Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:

(i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii) Statements about whether or not you have a severe impairment(s);

(iii) Statements about whether or not your impairment(s) meets the duration requirement (see § 404.1509);

(iv) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;

(v) Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels in Part 404, Subpart P, Appendix 2, Rule 200.00 instead of descriptions about your functional abilities and limitations (see § 404.1545);

(vi) Statements about whether or not your residual functional capacity prevents you from doing past relevant work (see § 404.1560);

(vii) Statements that you do or do not meet the requirements of a medical-vocational rule in Part 404, Subpart P, Appendix 2; and

(viii) Statements about whether or not your disability continues or ends when we conduct a continuing disability review (see § 404.1594).

20 CFR § 404.1520c

19. Add § 404.1520c to read as follows:

20 CFR § 404.1520c

### § 404.1520c How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017.

For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply. For claims filed before March 27, 2017, the rules in § 404.1527 apply.

(a) How we consider medical opinions and prior administrative medical findings. We will not defer or give any specific evidentiary weight, including **\*5868** controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

(b) How we articulate our consideration of medical opinions and prior administrative medical findings. We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record. Our articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

(c) Factors. We will consider the following factors when we consider the medical opinion(s) and prior administrative medical finding(s) in your case:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

(d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section.
 20 CFR § 404.1521
20. Revise § 404.1521 to read as follows:
 20 CFR § 404.1521

## § 404.1521 Establishing that you have a medically determinable impairment(s).

If you are not doing substantial gainful activity, we will then determine whether you have a medically determinable physical or mental impairment(s) (see § 404.1520(a)(4)(ii)). Your impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an  **5869**  acceptable medical source. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s). After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.
 20 CFR § 404.1522
21. Revise § 404.1522 to read as follows:
 20 CFR § 404.1522

## § 404.1522 What we mean by an impairment(s) that is not severe.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 CFR § 404.1523

22. Revise § 404.1523 to read as follows:

20 CFR § 404.1523

## § 404.1523 Multiple impairments.

(a) Unrelated severe impairments. We cannot combine two or more unrelated severe impairments to meet the 12-month duration test. If you have a severe impairment(s) and then develop another unrelated severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months.

(b) Concurrent impairments. If you have two or more concurrent impairments that, when considered in combination, are severe, we must determine whether the combined effect of your impairments can be expected to continue to be severe for 12 months. If one or more of your impairments improves or is expected to improve within 12 months, so that the combined effect of your remaining impairments is no longer severe, we will find that you do not meet the 12-month duration test.

(c) Combined effect. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

20 CFR § 404.1525

23. In § 404.1525, revise the last sentence in paragraph (c)(2) to read as follow

20 CFR § 404.1525

## § 404.1525 Listing of Impairments in appendix 1.

* * * * *

(c) * * *

(2) * * * Even if we do not include specific criteria for establishing a diagnosis or confirming the existence of your impairment, you must still show that you have a severe medically determinable impairment(s), as defined in § 404.1521.

* * * * *20 CFR § 404.1526

24. In § 404.1526, revise paragraphs (d) and (e) to read as follows:

20 CFR § 404.1526

## § 404.1526 Medical equivalence.

* * * * *

(d) Who is a designated medical or psychological consultant? A medical or psychological consultant designated by the Commissioner includes any medical or psychological consultant employed or engaged to make medical judgments by the Social Security Administration, the Railroad Retirement Board, or a State agency authorized to make disability determinations. See § 404.1616 of this part for the necessary qualifications for medical consultants and psychological consultants and the limitations on what medical consultants who are not physicians can evaluate.

(e) Who is responsible for determining medical equivalence?

(1) In cases where the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner (see § 404.1616 of this part) has the overall responsibility for determining medical equivalence.

(2) For cases in the disability hearing process or otherwise decided by a disability hearing officer, the responsibility for determining medical equivalence rests with either the disability hearing officer or, if the disability hearing officer's reconsideration determination is changed under § 404.918 of this part, with the Associate Commissioner for Disability Policy or his or her delegate.

(3) For cases at the administrative law judge or Appeals Council level, the responsibility for deciding medical equivalence rests with the administrative law judge or Appeals Council.

20 CFR § 404.1527

25. Revise § 404.1527 to read as follows:

20 CFR § 404.1527

**§ 404.1527 Evaluating opinion evidence for claims filed before March 27, 2017.**

For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.

(a) Definitions.

(1) Medical opinions. Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

(2) Treating source. Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

(b) How we consider medical opinions. In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive. See § 404.1520b.

(c) How we weigh medical opinions. Regardless of its source, we will  **\*5870**  evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's

medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's medical opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions. We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.

(5) Specialization. We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the medical opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

(d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(1) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

(e) Evidence from our Federal or State agency medical or psychological consultants. The rules in § 404.1513a apply except that when an administrative law judge gives controlling weight to a treating source's medical opinion, the administrative law judge is not required to explain in the decision the weight he or she gave to the prior administrative medical findings in the claim.

(f) Opinions from medical sources who are not acceptable medical sources and from nonmedical sources.

(1) Consideration. Opinions from medical sources who are not acceptable medical sources and from nonmedical sources may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources. Although we will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the  **5871**  particular facts in each case. Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

(2) Articulation. The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.
 20 CFR § 404.1528

### § 404.1528 [Removed and Reserved]
20 CFR § 404.1528
26. Remove and reserve § 404.1528.
 20 CFR § 404.1529

27. In § 404.1529, revise paragraph (a), the second and third sentences of paragraph (c)(1), the introductory text of paragraph (c)(3), and the third sentence of paragraph (c)(4) to read as follows:
 20 CFR § 404.1529

### § 404.1529 How we evaluate symptoms, including pain.
(a) General. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce

the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \* In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions as explained in § 404.1520c. \* \* \*

\* \* \* \* \*

(3) Consideration of other evidence. Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons. Section 404.1520c explains in detail how we consider medical opinions and prior administrative medical findings about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

\* \* \* \* \*

(4) \* \* \* We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you. \* \* \*

\* \* \* \* \*20 CFR § 404.1530

28. Revise § 404.1530(a) to read as follows:

20 CFR § 404.1530

### § 404.1530 Need to follow prescribed treatment.

(a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.

\* \* \* \* \*20 CFR § 404.1579

29. Amend § 404.1579 by revising the second sentence of paragraph (b)(1) and the second sentence of paragraph (b)(4) to read as follows:

20 CFR § 404.1579

### § 404.1579 How we will determine whether your disability continues or ends.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s). \* \* \*

\* \* \* \* \*

(4) * * * We will consider all evidence you submit and that we obtain from your medical sources and nonmedical sources. * * *
 * * * * *20 CFR § 404.1594

30. Amend § 404.1594 by revising the second sentence of paragraph (b)(1), the sixth sentence in Example 1, the second sentence of paragraph (b)(6), and the fourth sentence of paragraph (c)(3)(v) to read as follows:

 20 CFR § 404.1594

**§ 404.1594 How we will determine whether your disability continues or ends.**

* * * * *

(b) * * *

(1) * * * A determination that there has been a decrease in medical severity **\*5872**  must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s).

Example 1: * * * When we reviewed your claim, your medical source, who has treated you, reported that he or she had seen you regularly every 2 to 3 months for the past 2 years. * * *
 * * * * *

(6) * * * We will consider all evidence you submit and that we obtain from your medical sources and nonmedical sources. * * *
 * * * * *

(c) * * *

(3) * * *

(v) * * * If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence, and the results of consultative examinations). * * *
 * * * * *20 CFR Pt. 404, Subpt. P, App. 1

31. Amend Appendix 1 to subpart P of part 404as follows:

a. Revise the second, third, and fourth sentences of 2.00B.1.a;

b. Revise 2.00B.1.b;

c. Revise 2.00B.1.c;

d. Revise the fourth sentence of 7.00H;

e. Revise the second sentence of 8.00C.3;

f. Revise the first sentence 8.00E.3.a;

g. Revise 12.00C.1;

h. Revise the fourth sentence of 14.00H;

i. Revise the second, third, and fourth sentences of 102.00B.1.a;

j. Revise 102.00B.1.b;

k. Revise 102.00B.1.c;

l. Revise the fourth sentence of 107.00G;

m. Revise the second sentence of 108.00C.3.;

n. Revise the first sentence 108.00E.3.a;

o. Revise 112.00.C.1;

p. Revise the fourth sentence of 114.00H.

The revisions read as follows:

**Appendix 1** to Subpart **P of Part 404**—
2.00 * * *

B. * * *

1. * * *

a. * * * We generally require both an otologic examination and audiometric testing to establish that you have a medically determinable impairment that causes your hearing loss. You should have this audiometric testing within 2 months of the otologic examination. Once we have evidence that you have a medically determinable impairment, we can use the results of later audiometric testing to assess the severity of your hearing loss without another otologic examination. * * *

b. The otologic examination must be performed by a licensed physician (medical or osteopathic doctor) or audiologist. It must include your medical history, your description of how your hearing loss affects you, and the physician's or audiologist's description of the appearance of the external ears (pinnae and external ear canals), evaluation of the tympanic membranes, and assessment of any middle ear abnormalities.

c. Audiometric testing must be performed by, or under the direct supervision of, a licensed audiologist or an otolaryngologist.
 * * * * *
7.00 * * *

H. * * * (See sections 404.1521, 404.1529, 416.921, and 416.929 of this chapter.) * * *
 * * * * *
8.00 * * *

C. * * *

3. * * * We assess the impact of symptoms as explained in §§ 404.1521, 404.1529, 416.921, and 416.929 of this chapter. * * *
 * * * * *
E. * * *

3. * * *

a. General. We need documentation from an acceptable medical source to establish that you have a medically determinable impairment.* * *

12.00 * * *

C. * * *

1. General. We need objective medical evidence from an acceptable medical source to establish that you have a medically determinable mental disorder. We also need evidence to assess the severity of your mental disorder and its effects on your ability to function in a work setting. We will determine the extent and kinds of evidence we need from medical and nonmedical sources based on the individual facts about your disorder. For additional evidence requirements for intellectual disorder (12.05), see 12.00H. For our basic rules on evidence, see §§ 404.1512, 404.1513, 404.1520b, 416.912, 416.913, and 416.920b of this chapter. For our rules on evaluating medical opinions, see §§ 404.1520c, 404.1527, 416.920c, and 416.927 of this chapter. For our rules on evidence about your symptoms, see §§ 404.1529 and 416.929 of this chapter.

 * * * * *

14.00 * * *

H. * * * See §§ 404.1521, 404.1529, 416.921, and 416.929. * * *

 * * * * *

102.00 * * *

B. * * *

1. * * *

a. * * * We generally require both an otologic examination and audiometric testing to establish that you have a medically determinable impairment that causes your hearing loss. You should have this audiometric testing within 2 months of the otologic examination. Once we have evidence that you have a medically determinable impairment, we can use the results of later audiometric testing to assess the severity of your hearing loss without another otologic examination. * * *

b. The otologic examination must be performed by a licensed physician (medical or osteopathic doctor) or audiologist. It must include your medical history, your description of how your hearing loss affects you, and the physician's or audiologist's description of the appearance of the external ears (pinnae and external ear canals), evaluation of the tympanic membranes, and assessment of any middle ear abnormalities.

c. Audiometric testing must be performed by, or under the direct supervision of, a licensed audiologist or an otolaryngologist.

 * * * * *

107.00 * * *

G. * * * (See sections 416.921 and 416.929 of this chapter.) * * *

 * * * * *

108.00 * * *

C. * * *

3. * * * We assess the impact of symptoms as explained in §§ 416.921 and 416.929 of this chapter.

 * * * * *

E. * * *

3. * * *

a. General. We need documentation from an acceptable medical source to establish that you have a medically determinable impairment.* * *

* * * * *

112.00 * * *

C. * * *

1. General. We need objective medical evidence from an acceptable medical source to establish that you have a medically determinable mental disorder. We also need evidence to assess the severity of your mental disorder and its effects on your ability to function age-appropriately. We will determine the extent and kinds of evidence we need from medical and nonmedical sources based on the individual facts about your disorder. For additional evidence requirements for intellectual disorder (112.05), see 112.00H. For our basic rules on evidence, see §§ 416.912, 416.913, and 416.920b of this chapter. For our rules on evaluating medical opinions, see §§ 416.1520c and 416.927 of this chapter. For our rules on evidence about your symptoms, see § 416.929 of this chapter.

* * * * *

114.00 * * *

H. * * * See §§ 416.921 and 416.929. * * *

* * * * *

### Subpart Q—Determinations of Disability

32. The authority citation for subpart Q of part 404 continues to read as follows:

Authority: Secs. 205(a), 221, and 702(a)(5) of the Social Security Act (42 U.S.C. 405(a), 421, and 902(a)(5)).

20 CFR § 404.1615

### § 404.1615 [Amended]

20 CFR § 404.1615

33. In § 404.1615, remove paragraph (d) and redesignate paragraphs (e) through (g) as paragraphs (d) through (f).

20 CFR § 404.1616

**\*5873**  34. Revise § 404.1616 to read as follows:

20 CFR § 404.1616

### § 404.1616 Medical consultants and psychological consultants.

(a) What is a medical consultant? A medical consultant is a member of a team that makes disability determinations in a State agency (see § 404.1615), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves. The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim.

(b) What qualifications must a medical consultant have? A medical consultant is a licensed physician, as defined in § 404.1502(a)(1).

(c) What is a psychological consultant? A psychological consultant is a member of a team that makes disability determinations in a State agency (see § 404.1615), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves. The psychological consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all mental impairment(s) in a claim. When we are unable to obtain the services of a qualified psychiatrist or psychologist despite making every reasonable effort (see § 404.1617) in a claim involving a mental impairment(s), a medical consultant will evaluate the mental impairment(s).

(d) What qualifications must a psychological consultant have? A psychological consultant can be either a licensed psychiatrist or psychologist. We will only consider a psychologist qualified to be a psychological consultant if he or she:

(1) Is licensed or certified as a psychologist at the independent practice level of psychology by the State in which he or she practices; and

(2)(i) Possesses a doctorate degree in psychology from a program in clinical psychology of an educational institution accredited by an organization recognized by the Council on Post-Secondary Accreditation; or

(ii) Is listed in a national register of health service providers in psychology which the Commissioner of Social Security deems appropriate; and

(3) Possesses 2 years of supervised clinical experience as a psychologist in health service, at least 1 year of which is post-masters degree.

(e) Cases involving both physical and mental impairments. In a case where there is evidence of both physical and mental impairments, the medical consultant will evaluate the physical impairments in accordance with paragraph (a) of this section, and the psychological consultant will evaluate the mental impairment(s) in accordance with paragraph (c) of this section.

20 CFR § 404.1617

35. In § 404.1617, revise the section heading and paragraph (a) to read as follows:

20 CFR § 404.1617

### § 404.1617 Reasonable efforts to obtain review by a physician, psychiatrist, and psychologist.

(a) When the evidence of record indicates the existence of a physical impairment, the State agency must make every reasonable effort to ensure that a medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment. When the evidence of record indicates the existence of a mental impairment, the State agency must make every reasonable effort to ensure that a psychological consultant completes the medical portion of the case review and any applicable residual functional capacity assessment. The State agency must determine if additional physicians, psychiatrists, and psychologists are needed to make the necessary reviews. When it does not have sufficient resources to make the necessary reviews, the State agency must attempt to obtain the resources needed. If the State agency is unable to obtain additional physicians, psychiatrists, and psychologists because of low salary rates or fee schedules, it should attempt to raise the State agency's levels of compensation to meet the prevailing rates for these services. If these efforts are unsuccessful, the State agency will seek assistance from us. We will assist the State agency as necessary. We will also monitor the State agency's efforts and where the State agency is unable to obtain the necessary services, we will make every reasonable effort to provide the services using Federal resources.

* * * * *

### PART 416—SUPPLEMENTAL SECURITY INCOME FOR THE AGED, BLIND, AND DISABLED

### Subpart I—Determining Disability and Blindness

36. The authority citation for subpart I of part 416 continues to read as follows:

Authority: Secs. 221(m), 702(a)(5), 1611, 1614, 1619, 1631(a), (c), (d)(1), and (p), and 1633 of the Social Security Act (42 U.S.C. 421(m), 902(a)(5), 1382, 1382c, 1382h, 1383(a), (c), (d)(1), and (p), and 1383b); secs. 4(c) and 5, 6(c)-(e), 14(a), and 15, Pub. L. 98-460, 98 Stat. 1794, 1801, 1802, and 1808 (42 U.S.C. 421 note, 423 note, and 1382h note).

20 CFR § 416.902

37. Revise § 416.902 to read as follows:

20 CFR § 416.902

### § 416.902 Definitions for this subpart.

As used in the subpart—

(a) Acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only (with respect to claims filed (see § 416.325) on or after March 27, 2017);

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 416.325) on or after March 27, 2017); or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 416.325) on or after March 27, 2017).

(b) Adult means a person who is age 18 or older.

 **5874**  (c) Child means a person who has not attained age 18.

(d) Commissioner means the Commissioner of Social Security or his or her authorized designee.

(e) Disability redetermination means a redetermination of your eligibility based on disability using the rules for new applicants appropriate to your age, except the rules pertaining to performance of substantial gainful activity. For individuals who are working and for whom a disability redetermination is required, we will apply the rules in §§ 416.260 through 416.269. In conducting a disability redetermination, we will not use the rules for determining whether disability continues set forth in § 416.994 or § 416.994a. (See § 416.987.)

(f) Impairment(s) means a medically determinable physical or mental impairment or a combination of medically determinable physical or mental impairments.

(g) Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests),

electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests.

(h) Marked and severe functional limitations, when used as a phrase, means the standard of disability in the Social Security Act for children claiming SSI benefits based on disability. It is a level of severity that meets, medically equals, or functionally equals the listings. (See §§ 416.906, 416.924, and 416.926a.) The words "marked" and "severe" are also separate terms used throughout this subpart to describe measures of functional limitations; the term "marked" is also used in the listings. (See §§ 416.924 and 416.926a.) The meaning of the words "marked" and "severe" when used as part of the phrase marked and severe functional limitations is not the same as the meaning of the separate terms "marked" and "severe" used elsewhere in 404 and 416. (See §§ 416.924(c) and 416.926a(e).)

(i) Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

(j) Nonmedical source means a source of evidence who is not a medical source. This includes, but is not limited to:

(1) You;

(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);

(3) Public and private social welfare agency personnel; and

(4) Family members, caregivers, friends, neighbors, employers, and clergy.

(k) Objective medical evidence means signs, laboratory findings, or both.

(l) Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception and must also be shown by observable facts that can be medically described and evaluated.

(m) State agency means an agency of a State designated by that State to carry out the disability or blindness determination function.

(n) Symptoms means your own description of your physical or mental impairment.

(o) The listings means the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter. When we refer to an impairment(s) that "meets, medically equals, or functionally equals the listings," we mean that the impairment(s) meets or medically equals the severity of any listing in appendix 1 of subpart P of part 404 of this chapter, as explained in §§ 416.925 and 416.926, or that it functionally equals the severity of the listings, as explained in § 416.926a.

(p) We or us means, as appropriate, either the Social Security Administration or the State agency making the disability or blindness determination.

(q) You, your, me, my and I mean, as appropriate, the person who applies for benefits, the person for whom an application is filed, or the person who is receiving benefits based on disability or blindness.

20 CFR § 416.903

38. In § 416.903, remove paragraph (e), redesignate paragraph (f) as paragraph (e), and revise the newly redesignated paragraph (e) to read as follows:

20 CFR § 416.903

### § 416.903 Who makes disability and blindness determinations.

* * * * *

(e) Determinations for childhood impairments. In making a determination under title XVI with respect to the disability of a child, we will make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the child's impairment(s) evaluates the case of the child.

20 CFR § 416.904

39. Revise § 416.904 to read as follows:

20 CFR § 416.904

### § 416.904 Decisions by other governmental agencies and nongovernmental ties.

Other governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs, the Department of Defense, the Department of Labor, the Office of Personnel Management, State agencies, and private insurers—make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed (see § 416.325) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 416.913(a)(1) through (4).

20 CFR § 416.908

### § 416.908 [Removed and reserved].

20 CFR § 416.908

40. Remove and reserve § 416.908.

20 CFR § 416.912

41. Revise § 416.912 to read as follows:

20 CFR § 416.912

### § 416.912 Responsibility for evidence.

(a) Your responsibility.

(1) General. In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled (see § 416.913). This duty is ongoing and requires you to disclose any additional related evidence about   **\*5875**   which you become aware. This duty applies at each level of the administrative review process, including the Appeals Council level if the evidence relates to the period on or before the date of the administrative law judge hearing decision. We will consider only impairment(s) you say you have or about which we receive evidence. When you submit evidence received from another source, you must submit that evidence in its entirety, unless you previously submitted the same evidence to us or we instruct you otherwise. If we ask you, you must inform us about:

(i) Your medical source(s);

(ii) Your age;

(iii) Your education and training;

(iv) Your work experience;

(v) Your daily activities both before and after the date you say that you became disabled;

(vi) Your efforts to work; and

(vii) Any other factors showing how your impairment(s) affects your ability to work, or, if you are a child, your functioning. In §§ 416.960 through 416.969, we discuss in more detail the evidence we need when we consider vocational factors.

(2) Completeness. The evidence in your case record must be complete and detailed enough to allow us to make a determination or decision about whether you are disabled or blind. It must allow us to determine—

(i) The nature and severity of your impairment(s) for any period in question;

(ii) Whether the duration requirement described in § 416.909 is met; and

(iii) Your residual functional capacity to do work-related physical and mental activities, when the evaluation steps described in §§ 416.920(e) or (f)(1) apply, or, if you are a child, how you typically function compared to children your age who do not have impairments.

(3) Statutory blindness. If you are applying for benefits on the basis of statutory blindness, we will require an examination by a physician skilled in diseases of the eye or by an optometrist, whichever you may select.

(b) Our responsibility.

(1) Development. Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports.

(i) Every reasonable effort means that we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence, and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination. The medical source or entity that maintains your medical source's evidence will have a minimum of 10 calendar days from the date of our follow-up request to reply, unless our experience with that source indicates that a longer period is advisable in a particular case.

(ii) Complete medical history means the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application. If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier.

(2) Obtaining a consultative examination. We may ask you to attend one or more consultative examinations at our expense. See §§ 416.917 through 416.919t for the rules governing the consultative examination process. Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources. We may order a consultative examination while awaiting receipt of medical source evidence in some instances, such as when we

know a source is not productive, is uncooperative, or is unable to provide certain tests or procedures. We will not evaluate this evidence until we have made every reasonable effort to obtain evidence from your medical sources.

(3) Other work. In order to determine under § 416.920(g) that you are able to adjust to other work, we must provide evidence about the existence of work in the national economy that you can do (see §§ 416.960 through 416.969a), given your residual functional capacity (which we have already assessed, as described in § 416.920(e)), age, education, and work experience.

 20 CFR § 416.913

42. Revise § 416.913 to read as follows:

 20 CFR § 416.913

### § 416.913 Categories of evidence.

(a) What we mean by evidence. Subject to the provisions of paragraph (b), evidence is anything you or anyone else submits to us or that we obtain that relates to your claim. We consider evidence under §§ 416.920b, 416.920c (or under § 416.927 for claims filed (see § 416.325) before March 27, 2017). We evaluate evidence we receive according to the rules pertaining to the relevant category of evidence. The categories of evidence are:

(1) Objective medical evidence. Objective medical evidence is medical signs, laboratory findings, or both, as defined in § 416.902(k).

(2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and (a)(2)(ii)(A) through (F) of this section. (For claims filed (see § 416.325) before March 27, 2017, see § 416.927(a) for the definition of medical opinion.)

(i) Medical opinions in adult claims are about impairment-related limitations and restrictions in:

(A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

(ii) Medical opinions in child claims are about impairment-related limitations and restrictions in your abilities in the six domains of functioning:

(A) Acquiring and using information (see § 416.926a(g));

(B) Attending and completing tasks (see § 416.926a(h));

(C) Interacting and relating with others (see § 416.926a(i));

(D) Moving about and manipulating objects (see § 416.926a(j));

(E) Caring for yourself (see § 416.926a(k)); and

**\*5876** (F) Health and physical well-being (see § 416.926a(l)).

(3) Other medical evidence. Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis. (For claims filed (see § 416.325) before March 27, 2017, other medical evidence does not include a diagnosis, prognosis, or a statement that reflects a judgment(s) about the nature and severity of your impairment(s)).

(4) Evidence from nonmedical sources. Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim. We may receive evidence from nonmedical sources either directly from the nonmedical source or indirectly, such as from forms we receive and our administrative records.

(5) Prior administrative medical finding. A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as:

(i) The existence and severity of your impairment(s);

(ii) The existence and severity of your symptoms;

(iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;

(iv) If you are a child, statements about whether your impairment(s) functionally equals the listings in Part 404, Subpart P, Appendix 1;

(v) If you are an adult, your residual functional capacity;

(vi) Whether your impairment(s) meets the duration requirement; and

(vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.

(b) Exceptions for privileged communications.

(1) The privileged communications listed in paragraphs (b)(1)(i) and (b)(1)(ii) of this section are not evidence, and we will neither consider nor provide any analysis about them in your determination or decision. This exception for privileged communications applies equally whether your representative is an attorney or a non-attorney.

(i) Oral or written communications between you and your representative that are subject to the attorney-client privilege, unless you voluntarily disclose the communication to us.

(ii) Your representative's analysis of your claim, unless he or she voluntarily discloses it to us. This analysis means information that is subject to the attorney work product doctrine, but it does not include medical evidence, medical opinions, or any other factual matter that we may consider in determining whether or not you are entitled to benefits (see paragraph (b)(2) of this section).

(2) The attorney-client privilege generally protects confidential communications between an attorney and his or her client that are related to providing or obtaining legal advice. The attorney work product doctrine generally protects an attorney's analyses, theories, mental impressions, and notes. In the context of your disability claim, neither the attorney-client privilege nor the attorney work product doctrine allow you to withhold factual information, medical opinions, or other medical evidence that we may consider in determining whether or not you are entitled to benefits. For example, if you tell your representative about the medical sources you have seen, your representative cannot refuse to disclose the identity of those medical sources to us based on the attorney-client privilege. As another example, if your representative asks a medical source to complete an opinion form related to your impairment(s), symptoms, or limitations, your representative cannot withhold the completed opinion form from us based on the attorney work product doctrine. The attorney work product doctrine would not protect the source's opinions on the completed form, regardless of whether or not your representative used the form in his or her analysis of your claim or made handwritten notes on the face of the report.

20 CFR § 416.913a

43. Add § 416.913a to read as follows:

20 CFR § 416.913a

**§ 416.913a Evidence from our Federal or State agency medical or psychological consultants.**

The following rules apply to our Federal or State agency medical or psychological consultants that we consult in connection with administrative law judge hearings and Appeals Council reviews:

(a) In claims adjudicated by the State agency, a State agency medical or psychological consultant may make the determination of disability together with a State agency disability examiner or provide medical evidence to a State agency disability examiner when the disability examiner makes the initial or reconsideration determination alone (see § 416.1015(c) of this part). The following rules apply:

(1) When a State agency medical or psychological consultant makes the determination together with a State agency disability examiner at the initial or reconsideration level of the administrative review process as provided in § 416.1015(c)(1), he or she will consider the evidence in your case record and make administrative findings about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative medical findings are based on the evidence in your case but are not in themselves evidence at the level of the administrative review process at which they are made. See § 416.913(a)(5).

(2) When a State agency disability examiner makes the initial determination alone as provided in § 416.1015(c)(3), he or she may obtain medical evidence from a State agency medical or psychological consultant about one or more of the medical issues listed in paragraph (a)(1) of this section. In these cases, the State agency disability examiner will consider the medical evidence of the State agency medical or psychological consultant under §§ 416.920b, 416.920c, and 416.927.

(3) When a State agency disability examiner makes a reconsideration determination alone as provided in § 416.1015(c)(3), he or she will consider prior administrative medical findings made by a State agency medical or psychological consultant at the initial level of the administrative review process, and any medical evidence provided by such consultants at the initial and reconsideration levels, about one or more of the medical issues listed in paragraph (a)(1)(i) of this section under §§ 416.920b, 416.920c, and 416.927.

(b) Administrative law judges are responsible for reviewing the evidence and making administrative findings of fact and conclusions of law. They will consider prior administrative medical findings and medical evidence from our Federal or State agency medical or psychological consultants as follows:

**\*5877** (1) Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.

(2) Administrative law judges may also ask for medical evidence from expert medical sources. Administrative law judges will consider this evidence under §§ 416.920b, 416.920c, and 416.927, as appropriate.

(c) When the Appeals Council makes a decision, it will consider prior administrative medical findings according to the same rules for considering prior administrative medical findings as administrative law judges follow under paragraph (b) of this section.

20 CFR § 416.918

44. Revise § 416.918 paragraph (c) to read as follows:

20 CFR § 416.918

### § 416.918 If you do not appear at a consultative examination.

* * * * *

(c) Objections by your medical source(s). If any of your medical sources tell you that you should not take the examination or test, you should tell us at once. In many cases, we may be able to get the information we need in another way. Your medical source(s) may agree to another type of examination for the same purpose.

20 CFR § 416.919g

45. Revise § 416.919g(a) to read as follows:

20 CFR § 416.919g

### § 416.919g Who we will select to perform a consultative examination.

(a) We will purchase a consultative examination only from a qualified medical source. The medical source may be your own medical source or another medical source. If you are a child, the medical source we choose may be a pediatrician.

* * * * *20 CFR § 416.919h

46. Revise § 416.919h to read as follows:

20 CFR § 416.919h

### § 416.919h Your medical source.

When, in our judgment, your medical source is qualified, equipped, and willing to perform the additional examination or test(s) for the fee schedule payment, and generally furnishes complete and timely reports, your medical source will be the preferred source for the purchased examination or test(s).

20 CFR § 416.919i

47. Revise § 416.919i to read as follows:

20 CFR § 416.919i

### § 416.919i Other sources for consultative examinations.

We will use a different medical source than your medical source for a purchased examination or test in situations including, but not limited to, the following:

(a) Your medical source prefers not to perform such an examination or does not have the equipment to provide the specific data needed;

(b) There are conflicts or inconsistencies in your file that cannot be resolved by going back to your medical source;

(c) You prefer a source other than your medical source and have a good reason for your preference;

(d) We know from prior experience that your medical source may not be a productive source, such as when he or she has consistently failed to provide complete or timely reports; or

(e) Your medical source is not a qualified medical source as defined in § 416.919g.

20 CFR § 416.919n

48. Revise § 416.919n paragraph (c)(6) to read as follows:

20 CFR § 416.919n

**§ 416.919n Informing the medical source of examination scheduling, report content, and signature requirements.**

* * * * *

(c) * * *

(6) A medical opinion. Although we will ordinarily request a medical opinion as part of the consultative examination process, the absence of a medical opinion in a consultative examination report will not make the report incomplete. See § 416.913(a)(3); and

* * * * *20 CFR § 416.920a

49. In § 416.920a, revise the second sentence of paragraphs (b)(1) and (d)(1) to read as follows:

20 CFR § 416.920a

**§ 416.920a Evaluation of mental impairments.**

* * * * *

(b) * * *

(1) * * * See § 416.921 for more information about what is needed to show a medically determinable impairment. * * *

* * * * *

(d) * * *

(1) If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 416.922).

* * * * *20 CFR § 416.920b

50. Revise § 416.920b to read as follows:

20 CFR § 416.920b

**§ 416.920b How we consider evidence.**

After we review all of the evidence relevant to your claim, we make findings about what the evidence shows.

(a) Complete and consistent evidence. If all of the evidence we receive, including all medical opinion(s), is consistent and there is sufficient evidence for us to determine whether you are disabled, we will make our determination or decision based on that evidence.

(b) Incomplete or inconsistent evidence. In some situations, we may not be able to make our determination or decision because the evidence in your case record is insufficient or inconsistent. We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision. We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques. If the evidence in your case record is insufficient or inconsistent, we may need to take the additional actions in paragraphs (b)(1) through (4) of this section.

(1) If any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have.

(2) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency.

We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

(i) We may recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return;

 **\*5878**  (ii) We may request additional existing evidence;

(iii) We may ask you to undergo a consultative examination at our expense (see §§ 416.917 through 416.919t); or

(iv) We may ask you or others for more information.

(3) When there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have.

(c) Evidence that is inherently neither valuable nor persuasive. Paragraphs (c)(1) through (c)(3) apply in claims filed (see § 416.325) on or after March 27, 2017. Because the evidence listed in paragraphs ((c)(1)-(c)(3) of this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under § 416.920c:

(1) Decisions by other governmental agencies and nongovernmental entities. See § 416.904.

(2) Disability examiner findings. Findings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether you are disabled.

(3) Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(ix) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:

(i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii) Statements about whether or not you have a severe impairment(s);

(iii) Statements about whether or not your impairment(s) meets the duration requirement (see § 416.909);

(iv) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;

(v) If you are a child, statements about whether or not your impairment(s) functionally equals the listings in Part 404 Subpart P Appendix 1 (see § 416.926a);

(vi) If you are an adult, statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels in Part 404, Subpart P, Appendix 2, Rule 200.00 instead of descriptions about your functional abilities and limitations (see § 416.945);

(vii) If you are an adult, statements about whether or not your residual functional capacity prevents you from doing past relevant work (see § 416.960);

(viii) If you are an adult, statements that you do or do not meet the requirements of a medical-vocational rule in Part 404, Subpart P, Appendix 2; and

(ix) Statements about whether or not your disability continues or ends when we conduct a continuing disability review (see § 416.994).

20 CFR § 416.920c

51. Add § 416.920c to read as follows:

20 CFR § 416.920c

**§ 416.920c How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017.**

For claims filed (see § 416.325) on or after March 27, 2017, the rules in this section apply. For claims filed before March 27, 2017, the rules in § 416.927 apply.

(a) How we consider medical opinions and prior administrative medical findings. We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

(b) How we articulate our consideration of medical opinions and prior administrative medical findings. We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record. Our articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same,

we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

(c) Factors. We will consider the following factors when we consider the medical opinion(s) and prior administrative medical finding(s) in your case:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior **\*5879** administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

(d) Evidence from nonmedical sources. We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c) in this section.

20 CFR § 416.921

52. Revise § 416.921 to read as follows:

20 CFR § 416.921

### § 416.921 Establishing that you have a medically determinable impairment(s).

If you are not doing substantial gainful activity, we will then determine whether you have a medically determinable physical or mental impairment(s) (see § 416.920(a)(4)(ii)). Your impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s). After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.

20 CFR § 416.922

53. Revise § 416.922 to read as follows:

20 CFR § 416.922

### § 416.922 What we mean by an impairment(s) that is not severe in an adult.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 CFR § 416.923

54. Revise § 416.923 to read as follows:

20 CFR § 416.923

### § 416.923 Multiple impairments.

(a) Unrelated severe impairments. We cannot combine two or more unrelated severe impairments to meet the 12-month duration test. If you have a severe impairment(s) and then develop another unrelated severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months.

(b) Concurrent impairments. If you have two or more concurrent impairments that, when considered in combination, are severe, we must determine whether the combined effect of your impairments can be expected to continue to be severe for 12 months. If one or more of your impairments improves or is expected to improve within 12 months, so that the combined effect of your remaining impairments is no longer severe, we will find that you do not meet the 12-month duration test.

(c) Combined effect. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see §§ 416.920 and 416.924).

20 CFR § 416.924a

55. In § 416.924a, revise paragraph (a) introductory text, the last sentence of paragraph (a)(1)(i), the last sentence of (a)(1)(iii), and the section heading of paragraph (a)(2) to read as follows:

20 CFR § 416.924a

### § 416.924a Considerations in determining disability for children.

(a) Basic considerations. We consider all evidence in your case record (see § 416.913). The evidence in your case record may include information from medical sources (such as your pediatrician or other physician; psychologist; qualified speech-language pathologist; and physical, occupational, and rehabilitation therapists) and nonmedical sources (such as your parents, teachers, and other people who know you).

**\*5880**  (1) * * *

(i) * * * (See § 416.920c.)
 * * * * *

(iii) * * * When a medical source has accepted and relied on such information to reach a diagnosis, we may consider this information to be a sign, as defined in § 416.902(l).

(2) Statements from nonmedical sources. * * *
 * * * * *20 CFR § 416.924b

56. Amend § 416.924b by revising the first sentence of paragraph (b)(3) to read as follows:

20 CFR § 416.924b

### § 416.924b Age as a factor of evaluation in the sequential evaluation process for children.
* * * * *
(b) * * *

(3) Notwithstanding the provisions in paragraph (b)(1) of this section, we will not compute a corrected chronological age if the medical evidence shows that your medical source has already considered your prematurity in his or her assessment of your development. * * *

20 CFR § 416.925

57. In § 416.925, revise the last sentence in paragraph (c)(2) to read as follows:

20 CFR § 416.925

### § 416.925 Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter.
* * * * *
(c) * * *

(2) * * * Even if we do not include specific criteria for establishing a diagnosis or confirming the existence of your impairment, you must still show that you have a severe medically determinable impairment(s), as defined in §§ 416.921 and 416.924(c).
 * * * * *20 CFR § 416.926

58. In § 416.926, revise paragraphs (d) and (e) to read as follows:

20 CFR § 416.926

### § 416.926 Medical equivalence for adults and children.
* * * * *
(d) Who is a designated medical or psychological consultant? A medical or psychological consultant designated by the Commissioner includes any medical or psychological consultant employed or engaged to make medical judgments by the Social Security Administration, the Railroad Retirement Board, or a State agency authorized to make disability determinations. See §

416.1016 of this part for the necessary qualifications for medical consultants and psychological consultants and the limitations on what medical consultants who are not physicians can evaluate.

(e) Who is responsible for determining medical equivalence?

(1) In cases where the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner (see § 416.1016 of this part) has the overall responsibility for determining medical equivalence.

(2) For cases in the disability hearing process or otherwise decided by a disability hearing officer, the responsibility for determining medical equivalence rests with either the disability hearing officer or, if the disability hearing officer's reconsideration determination is changed under § 416.1418 of this part, with the Associate Commissioner for Disability Policy or his or her delegate.

(3) For cases at the administrative law judge or Appeals Council level, the responsibility for deciding medical equivalence rests with the administrative law judge or Appeals Council.
 20 CFR § 416.926a
59. Amend § 416.926a by revising the second sentence of paragraph (b)(3) to read as follows:
 20 CFR § 416.926a

### § 416.926a Functional equivalence for children.
* * * * *
(b) * * *

(3) * * * We will ask for information from your medical sources who can give us medical evidence, including medical opinions, about your limitations and restrictions. * * *
 * * * * *20 CFR § 416.927
60. Revise § 416.927 to read as follows:
 20 CFR § 416.927

### § 416.927 Evaluating opinion evidence for claims filed before March 27, 2017.
For claims filed (see § 416.325) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 416.920c apply.

(a) Definitions.

(1) Medical opinions. Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

(2) Treating source. Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

(b) How we consider medical opinions. In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive. See § 416.920b.

(c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and  **\*5881**  (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's medical opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions. We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.

(5) Specialization. We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the medical opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

(d) Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(1) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity (see §§ 416.945 and 416.946), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

(e) Evidence from our Federal or State agency medical or psychological consultants. The rules in § 416.913a apply except that when an administrative law judge gives controlling weight to a treating source's medical opinion, the administrative law judge is not required to explain in the decision the weight he or she gave to the prior administrative medical findings in the claim.

(f) Opinions from medical sources who are not acceptable medical sources and from nonmedical sources.

(1) Consideration. Opinions from medical sources who are not acceptable medical sources and from nonmedical sources may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources. Although we will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case. Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

(2) Articulation. The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the

adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the **\*5882** initial and reconsideration levels, if the determination is less than fully favorable.

20 CFR § 416.928

## § § 416.928 [Removed and Reserved]

20 CFR § 416.928

61. Remove and reserve § 416.928.

20 CFR § 416.929

62. In § 416.929, revise paragraph (a), the second and third sentences of paragraph (c)(1), the introductory text of paragraph (c)(3), and the third sentence of paragraph (c)(4) to read as follows:

20 CFR § 416.929

## § 416.929 How we evaluate symptoms, including pain.

(a) General. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work (or, if you are a child, your functioning). However, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work (or if you are a child, your functioning).

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \* In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions as explained in § 416.920c. \* \* \*

\* \* \* \* \*

(3) Consideration of other evidence. Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons. If you are a child, we will also consider all of the evidence presented, including evidence submitted by your medical sources (such as physicians, psychologists, and therapists) and nonmedical sources (such as educational agencies and personnel, parents and other relatives, and social welfare agencies). Section 416.920c explains in detail how we consider medical opinions and prior administrative medical findings about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include:

* * * * *

(4) * * * We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you. * * *

* * * * *20 CFR § 416.930

63. Revise § 416.930(a) to read as follows:

 20 CFR § 416.930

**§ 416.930 Need to follow prescribed treatment.**

(a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.

* * * * *20 CFR § 416.993

64. Amend § 416.993 by revising the seventh and ninth sentences of paragraph (b) to read as follows:

 20 CFR § 416.993

**§ 416.993 Medical evidence in continuing disability review cases.**

* * * * *

(b) * * * See § 416.912(b)(1)(i) concerning what we mean by every reasonable effort. * * * See § 416.912(b)(1)(ii).

* * * * *20 CFR § 416.994

65. Amend § 416.994 by revising the last sentence in paragraph (b)(1)(i), the sixth sentence in example 1, the second sentence of paragraph (b)(1)(vi), and the fourth sentence of (b)(2)(iv)(E) to read as follows:

 20 CFR § 416.994

**§ 416.994 How we will determine whether your disability continues or ends.**

* * * * *

(b) * * *

(1) * * *

(i) * * * A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with your impairment(s).

Example 1: * * * When we reviewed your claim your medical source who has treated you reported that he or she had seen you regularly every 2 to 3 months for the past 2 years. * * *

 * * * * *

(vi) * * * We will consider all evidence you submit and that we obtain from your medical sources and nonmedical sources. * * *

 * * * * *

(2) * * *

(iv) * * *

(E) * * * If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence, and the results of consultative examinations). * * *

 20 CFR § 416.994a

66. Amend § 416.994a by revising the second sentence of paragraph (a)(2), the first sentence in paragraph (c)(2), the fourth sentence of paragraph (d), and paragraph (i)(1) to read as follows:

 20 CFR § 416.994a

**§ 416.994a  How we will determine whether your disability continues or ends, and whether you are and have been receiving treatment that is medically necessary and available, disabled children.**

**\*5883**  (a) * * *

(2) * * * We will consider all evidence you submit and that we obtain from your medical and nonmedical sources. * * *

* * * * *

(c) * * *

(2) The terms symptoms, signs, and laboratory findings are defined in § 416.902. * * *

(d) * * * If not, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable determination or decision (e.g., school records, medical evidence, and the results of consultative examinations). * * *

* * * * *

(i) * * *

(1) What we mean by treatment that is medically necessary. Treatment that is medically necessary means treatment that is expected to improve or restore your functioning and that was prescribed by your medical source. If you do not have a medical source, we will decide whether there is treatment that is medically necessary that could have been prescribed by a medical source. The treatment may include (but is not limited to)—

* * * * *

**Subpart J—Determinations of Disability**

67. The authority citation for subpart J of part 416 continues to read as follows:

Authority: Secs. 702(a)(5), 1614, 1631, and 1633 of the Social Security Act (42 U.S.C. 902(a)(5), 1382c, 1383, and 1383b).
20 CFR § 416.1015

**§ 416.1015 [Amended]**
20 CFR § 416.1015
68. Revise § 416.1015 by removing paragraph (d) and redesignating paragraphs (e) through (h) as paragraphs (d) through (g).
20 CFR § 416.1016
69. Revise § 416.1016 to read as follows:
20 CFR § 416.1016

**§ 416.1016 Medical consultants and psychological consultants.**
(a) What is a medical consultant? A medical consultant is a member of a team that makes disability determinations in a State agency (see § 416.1015), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves. The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim.

(b) What qualifications must a medical consultant have? A medical consultant is a licensed physician, as defined in § 416.902(a)(1).

(c) What is a psychological consultant? A psychological consultant is a member of a team that makes disability determinations in a State agency (see § 416.1015), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves. The psychological consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all mental impairment(s) in a claim. When we are unable to obtain the

services of a qualified psychiatrist or psychologist despite making every reasonable effort (see § 416.1017) in a claim involving a mental impairment(s), a medical consultant will evaluate the mental impairment(s).

(d) What qualifications must a psychological consultant have? A psychological consultant can be either a licensed psychiatrist or psychologist. We will only consider a psychologist qualified to be a psychological consultant if he or she:

(1) Is licensed or certified as a psychologist at the independent practice level of psychology by the State in which he or she practices; and

(2)(i) Possesses a doctorate degree in psychology from a program in clinical psychology of an educational institution accredited by an organization recognized by the Council on Post-Secondary Accreditation; or

(ii) Is listed in a national register of health service providers in psychology which the Commissioner of Social Security deems appropriate; and

(3) Possesses 2 years of supervised clinical experience as a psychologist in health service, at least 1 year of which is post-masters degree.

(e) Cases involving both physical and mental impairments. In a case where there is evidence of both physical and mental impairments, the medical consultant will evaluate the physical impairments in accordance with paragraph (a) of this section, and the psychological consultant will evaluate the mental impairment(s) in accordance with paragraph (c) of this section.

 20 CFR § 416.1017

70. Revise § 416.1017(a) to read as follows:

 20 CFR § 416.1017

### § 416.1017 Reasonable efforts to obtain review by a qualified psychiatrist or psychologist.

(a) When the evidence of record indicates the existence of a physical impairment, the State agency must make every reasonable effort to ensure that a medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment. When the evidence of record indicates the existence of a mental impairment, the State agency must make every reasonable effort to ensure that a psychological consultant completes the medical portion of the case review and any applicable residual functional capacity assessment. The State agency must determine if additional physicians, psychiatrists, and psychologists are needed to make the necessary reviews. When it does not have sufficient resources to make the necessary reviews, the State agency must attempt to obtain the resources needed. If the State agency is unable to obtain additional physicians, psychiatrists, and psychologists because of low salary rates or fee schedules, it should attempt to raise the State agency's levels of compensation to meet the prevailing rates for these services. If these efforts are unsuccessful, the State agency will seek assistance from us. We will assist the State agency as necessary. We will also monitor the State agency's efforts and where the State agency is unable to obtain the necessary services, we will make every reasonable effort to provide the services using Federal resources.

 * * * * *

### Subpart N—Determinations, Administrative Review Process, and Reopening of Determinations and Decisions

71. The authority for subpart N continues to read as follows:

Authority: Secs. 702(a)(5), 1631, and 1633 of the Social Security Act (42 U.S.C. 902(a)(5), 1383, and 1383b); sec. 202, Pub. L. 108-203, 118 Stat. 509 (42 U.S.C. 902 note).

 20 CFR § 416.1406

72. In § 416.1406(b)(2), revise the fourth sentence to read as follows:

 20 CFR § 416.1406

### § 416.1406 Testing modifications to the disability determination procedures.

* * * * *

(b) * * *

(2) * * * However, before an initial determination is made in any case where there is evidence which indicates the existence of a mental impairment, the decisionmaker will make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of **\*5884** the case review and any applicable residual functional capacity assessment pursuant to our existing procedures (see § 416.1017). * * *

 * * * * *20 CFR § 416.1442

73. In § 416.1442, revise paragraph (f)(1) to read as follows:

 20 CFR § 416.1442

**§ 416.1442 Prehearing proceedings and decisions by attorney advisors.**

* * * * *

(f) * * *

(1) Authorize an attorney advisor to exercise the functions performed by an administrative law judge under §§ 416.913a, 416.920a, 416.926, and 416.946.

 * * * * *

[FR Doc. 2017-00455 Filed 1-17-17; 8:45 am]

BILLING CODE 4191-02-P

---

**End of Document**                                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3077009
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

BRIAN O., Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

1:19-CV-983 (ATB)
|
Signed 06/10/2020

**Attorneys and Law Firms**

JOSEPHINE GOTTESMAN, ESQ., for Plaintiff.

KEVIN M. PARRINGTON, Special Asst. U.S. Attorney, for
Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, U.S. Magistrate Judge

**\*1**  This matter was referred to me, for all proceedings and
entry of a final judgment, pursuant to the Social Security Pilot
Program, N.D.N.Y. General Order No. 18, and in accordance
with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P.
73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.
(Dkt. Nos. 4, 7).

**I. PROCEDURAL HISTORY**
On April 5, 2018, plaintiff filed an application for Disability
Insurance Benefits ("DIB"), alleging disability beginning
January 2, 2018. (Administrative Transcript ("T") 71,
111-12). Plaintiff's application was denied initially on July
16, 2018. (T. 74-77). Plaintiff requested a hearing, which
was held before Administrative Law Judge ("ALJ") Sandra
R. DiMaggio Wallis on December 4, 2018. (T. 26-53, 86).
At the hearing, the ALJ heard testimony from plaintiff,
as well as vocational expert ("VE") Renee B. Jubrey. (T.
26-53). On March 11, 2019, the ALJ issued an order denying
plaintiff's claim. (T. 10-22). The ALJ's decision became the
Commissioner's final decision when the Appeals Council
denied plaintiff's request for review on June 11, 2019. (T.
1-3).

**II. GENERALLY APPLICABLE LAW**

**A. Disability Standard**
To be considered disabled, a plaintiff seeking disability
insurance benefits or SSI disability benefits must establish
that he is "unable to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of
not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A).
In addition, the plaintiff's

> physical or mental impairment or
> impairments [must be] of such severity
> that he is not only unable to
> do his previous work but cannot,
> considering his age, education, and
> work experience, engage in any other
> kind of substantial gainful work
> which exists in the national economy,
> regardless of whether such work exists
> in the immediate area in which he
> lives, or whether a specific job vacancy
> exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20
C.F.R. sections 404.1520 and 416.920, to evaluate disability
insurance and SSI disability claims.

> First, the [Commissioner] considers
> whether the claimant is currently
> engaged in substantial gainful activity.
> If he is not, the [Commissioner]
> next considers whether the claimant
> has a "severe impairment" which
> significantly limits his physical or
> mental ability to do basic work
> activities. If the claimant suffers such
> an impairment, the third inquiry is
> whether, based solely on medical
> evidence, the claimant has an
> impairment which meets or equals
> the criteria of an impairment listed
> in Appendix 1 of the regulations. If

the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

**\*2** *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**
In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec. 6, 2010).

**III. FACTS**
Plaintiff was born on October 4, 1967, making him 51 years old on the date of the administrative hearing. (T. 32). He lived at home with his wife and her two daughters. (T. 32, 41). Plaintiff previously obtained some education at the college level, and worked as a truck driver until January 2, 2018. (T. 32-33).

According to the plaintiff, various medical conditions prevented him from continuing to work full-time. The pain and physical limitations in his foot, back, and shoulder precluded his ability to perform the job duties of a truck driver. (T. 34-35). Due to his pain, plaintiff had to move around constantly; he could only stand for approximately ten minutes at a time, and sit for five to ten minutes. (T. 36). It was "very difficult" for plaintiff to climb stairs. (T. 37). Plaintiff had trouble sleeping through the night, and took naps during the day. (T. 37, 39). Household chores were difficult to perform; he could not vacuum, take out the trash, or do the laundry. (T. 38, 41). His doctor limited him from lifting over 15 pounds of weight. (T. 35). On a typical day, plaintiff usually watched television, played games on his phone, and socialized on Facebook. (T. 38-39). He drove, but very little. (T. 40). Plaintiff was a volunteer offensive line coach for a local semi-professional football team. (T. 41-42).

**\*3** Plaintiff testified that he tried to obtain "medicine" for his pain, but was directed to treat with pain management. (T. 35). He declined steroid injections, and ultimately obtained his medical marijuana license from a physician in New York City. (*Id.*). The medical marijuana helped a "little bit." (*Id.*). He also used a hot tub, which alleviated his pain for a short duration. (T. 35-36). Laying down also helped, until he attempted to get up. (T. 36).

## IV. THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since his disability onset date. (T. 13). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine, status post laminectomy surgeries (two); degenerative joint disease, bilateral shoulders; and posttraumatic arthritis, left ankle and foot. (*Id.*). At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 15).

At step four, the ALJ found that plaintiff had the RFC for light work, as defined in 20 C.F.R. §§ 404.1567(b), except the work could not require climbing ladders, ropes or scaffolds, and no more than occasional kneeling, crouching, crawling or climbing of ramps and stairs. (T. 15). Plaintiff was further limited to working in an environment that allowed him to avoid exposure to unprotected heights, hazardous machinery, and vibration. (*Id.*).

Next, the ALJ found that plaintiff had no past relevant work. (T. 20). However, at step five, using the Medical Vocational Guidelines as a "framework," and the VE's testimony, the ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T. 21-22). Thus, the ALJ found that plaintiff was not disabled. (T. 22).

## V. ISSUES IN CONTENTION

Plaintiff raises three arguments:

1. The ALJ's RFC finding was not supported by substantial evidence. (Plaintiff's Brief ("Pl.'s Br.") at 20-23) (Dkt. No. 13).

2. The ALJ did not correctly evaluate plaintiff's credibility. (Pl.'s Br. at 23-27).

3. The ALJ did not correctly evaluate the medical and non-medical evidence of record. (Pl.'s Br. at 27-28).

The Commissioner contends that the ALJ sufficiently evaluated the evidence of record, and that her decision was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 19-19) (Dkt. No. 14). For the reasons set forth below, the court concludes that the ALJ's RFC determination was not supported by substantial evidence. As a result, the ALJ's analysis at step five and the ultimate finding that plaintiff was not disabled were tainted. Accordingly, the court orders a remand for further administrative proceedings to adequately develop and assess the medical evidence as necessary, in order to determine an RFC that is properly supported.

## DISCUSSION

## VI. RFC/EVALUATING MEDICAL EVIDENCE

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

**\*4** In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307

F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a

medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

**\*5** Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B. Application

Plaintiff's first and most persuasive argument contends that the ALJ's RFC for modified light work is not supported by substantial evidence. In order to perform the work described by the ALJ, plaintiff would be required to, among other things, stand and walk for up to 6 hours a day, and sit for up to 2 hours. *See* 20 C.F.R. §§ 416.967(b), 404.1567(b); *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) ("[l]ight work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours"). Plaintiff argues that the record fails to support plaintiff's ability to fulfill such exertional requirements. The court agrees.

In rendering her RFC determination, the ALJ relied on a medical opinion prepared by consultative examiner Trevor Litchmore, M.D. (T. 345). On July 9, 2018, Dr. Litchmore performed a physical examination of the plaintiff. Among his various findings, Dr. Litchmore observed plaintiff to have a normal gait and stance, with the ability to walk on his heels and toes without difficulty. (T. 346). Plaintiff required no assistance changing for the exam or getting on and off the examination table. (*Id.*). He was able to rise from the chair without difficulty. (*Id.*). Dr. Litchmore found plaintiff to have some limited range of motion in his cervical and lumbar spine, but full range of motion in his shoulders, elbows, forearms, and wrists. (T. 347). Plaintiff's joints were stable and nontender. (*Id.*). He exhibited full strength in the upper and lower extremities, with no evident muscle atrophy. (*Id.*). Plaintiff retained the ability to unzip a zipper, untie a shoelace, and unbutton a button. (*Id.*). Dr. Litchmore noted plaintiff's full grip strength. (*Id.*).

Based on his physical examination of the plaintiff, Dr. Litchmore opined that plaintiff would have "limitation in terms of activities that require repetitive twisting and turning motion of both hands in the context of his carpal tunnel syndrome." (T. 348). He also stated that plaintiff would have "limitation as it relates to lifting and carrying heavy objects in the context of his chronic back and neck pain." (*Id.*). Last, Dr. Litchmore stated that plaintiff would have "limitation in terms of walking up and down ramps and stairs, climbing, or [sic] within the context of his chronic neck and back pain." (*Id.*).

In evaluating Dr. Litchmore's opinion, the ALJ found "unusual" the absence of findings or complaints about plaintiff's left ankle and foot injury, which was "described in very different terms by [plaintiff's treating orthopedist], who followed him for this condition over the period in question[.]" (T. 17). Nevertheless, the ALJ found the absence of any specific sitting, standing, or walking limitations in Dr. Litchmore's opinion to be consistent with plaintiff's ability to perform the exertional requirements of light work. (T. 19).

 **\*6** The record otherwise lacks any formal medical opinions, including from plaintiff's treating physicians. However, the ALJ considered some of the "more casual" assessments found in the administrative record. For example, the ALJ considered a comment by plaintiff's treating orthopedist, Dr. Perkins, that "[plaintiff] can do sedentary duties ... he should not lift heavy or continuously." (T. 19). The ALJ found Dr. Perkins assessment "somewhat persuasive but only to the extent that [plaintiff] would be limited in his ability to lift." (*Id.*).

The ALJ further considered a statement, prepared in the context of plaintiff's workers' compensation claim, by independent medical examiner Dr. Chiarmonte. In March 2018 Dr. Chiarmonte opined that plaintiff could work "with restrictions of no lifting over 15-20 pounds, limited sitting, [and] no repetitive use of bilateral shoulders and right elbow." (T. 218). After acknowledging that Dr. Chiarmonte's opinion was the only examiner's [1] opinion that placed any defined, relevant functional limitations on plaintiff's capacity for work, the ALJ found it consistent with the other opinions of record that did not "explicitly place[ ]" limitations on plaintiff's ability to stand or walk. (T. 19).

[1]    The state agency's medical consultant determined that plaintiff was capable of a full range of medium work, including the ability to lift and carry 50 pounds on occasion, 25 pounds frequently, and stand and walk for a total of six hours in an eight

hour day. (T. 16, 65). The ALJ rejected the agency's determination, finding that the evidence before her was persuasive of a more restrictive residual functional capacity. (T. 16).

The Second Circuit has made clear that where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required[.]" *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations omitted). However, under such circumstances an "RFC assessment will be sufficient only when the record is 'clear' and contains 'some useful assessment of the claimant's limitations from a medical source.' " *Johnson v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 286, 293 (W.D.N.Y. 2018) (quoting *Muhammad v. Colvin*, No. 6:16-CV-06369, 2017 WL 4837583, at \*4 (W.D.N.Y. Oct. 26, 2017)); *see also Martin v. Comm'r of Soc. Sec.*, No. 6:18-CV-06365, 2020 WL 1322572, at \*5 (W.D.N.Y. Mar. 20, 2020) (acknowledging the *Monroe* decision, but nevertheless ordering remand because the record was "devoid of any assessment of plaintiff's exertional limitations," and contained no "useful discussion of such limitations.").

In this case, the record lacks a useful assessment of plaintiff's limitations, particularly with respect to his ability to fulfill the exertional requirements of light work. Other than the opinion rendered at the state agency level, which the ALJ implicitly found less than persuasive, there is no evidence that discusses plaintiff's ability to stand or walk during the course of an eight-hour workday. Dr. Litchmore's failure [2] to discuss plaintiff's limitations in these functional abilities, or lack thereof, does not constitute substantial evidence that plaintiff could perform them without restriction. *See Frank v. Comm'r of Soc. Sec.*, No. 5:17-CV-103, 2019 WL 430887, at \*7 (D. Vt. Feb. 4, 2019) ("[T]he absence of evidence indicating that plaintiff can [perform a relevant functional ability] does not constitute substantial support for the ALJ's RFC determination."); *Rodgers v. Colvin*, No. 16-CV-6739, 2018 WL 446220, at \*3 (W.D.N.Y. Jan. 17, 2018) (where consultative examiner did not address relevant functional abilities, the ALJ could not assume there were no limitations); *Jermyn v. Colvin*, No. 13-CV-5093, 2015 WL 1298997, at \*20 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ was not permitted to construe the silence in the record as to Plaintiff's functional capacity as indicating support for his determination as to Plaintiff's limitations."). It was improper for the ALJ to conclude that Plaintiff's only limitations were those vaguely identified in the consultative examiner's opinion.

2

Although Dr. Litchmore vaguely assessed that plaintiff would have "limitations" for walking up and down ramps and stairs, he otherwise failed to discuss plaintiff's capacity for sitting, standing, or walking. (T. 348). The court also notes a typographical error in the last sentence of Dr. Litchmore's medical source statement, presumably omitting a final function in which he opined plaintiff endured some degree of limitation. (*Id.*).

**\*7** Moreover, it is not "clear" from the record that plaintiff could perform the walking or standing exertions required in order to perform light work.[3] Plaintiff maintained, at both the state agency level and at his administrative hearing, that his ability to stand or walk for long periods of time was significantly limited by his back pain, as well as his left foot condition. (T. 36, 150). His treating physicians often observed him to walk with an "abnormal" or "antalgic" gait. (T. 242, 245, 248, 251, 518, 522, 539). On several occasions, plaintiff displayed steppage due to left foot drop, as well as left lower extremity weakness. (T. 245, 248-49, 522, 571). His left leg exhibited muscle atrophy. (T. 242, 248). On September 27, 2018, plaintiff sought a second opinion for his left foot and ankle. (T. 517). At that time, orthopedic surgeon Dr. Kelmanovich recommended at CT scan and possible future arthrodesis[4] at the transverse tarsal joint. (T. 519). On November 30, 2018, plaintiff presented to the emergency department complaining of numbness in his right foot and ankle, and an inability to walk due to significant back pain. (T. 570). On December 5, 2018, Dr. Perkins acknowledged plaintiff's chronic, worsening symptoms of back pain, and scheduled plaintiff for a lumbar fusion at various levels. (T. 580). Based on this medical evidence, this is not the type of case where plaintiff's impairments "were so minimal that the ALJ could permissibly make a common sense judgment as to Plaintiff's [physical RFC]." *Johnson v. Berryhill*, No. 1:16-CV-974, 2018 WL 3688313, at \*4 (W.D.N.Y. Aug. 2, 2018); *see also Zayas v. Colvin*, No. 15-CV-6312, 2016 WL 1761959, at \*4 (W.D.N.Y. May 2, 2016) ("Depending on the circumstances, like when the medical evidence shows only minor physical impairments, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment").

3

The court recognizes that light work can alternatively involve "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Nevertheless, there is even less support in the

record that plaintiff could perform such activities in the course of gainful employment. The only assessment regarding plaintiff's ability to sit came from workers' compensation examiner Dr. Chiarmonte, who opined that plaintiff could work under circumstances including "limited sitting." (T. 218). Moreover, plaintiff's capacity for pushing and pulling is called into question by Dr. Litchmore's vague opinion that plaintiff would have "limitation" for activities involving repetitive twisting and turning motions with the hands (T. 348), and Dr. Chairmonte's opinion that plaintiff must avoid repetitive use of his shoulders and right elbow. (T. 218).

4

Arthrodesis is the surgical immobilization of a joint so that the bones grow solidly together. *See https://www.merriam-webster.com/dictionary/arthrodesis.*

In sum, the ALJ attempted to craft an RFC primarily supported by her lay interpretation of plaintiff's imaging studies, "irregularities" among the physical examination findings of plaintiff's various treating providers, a lack of any recommendation for aggressive treatment,[5] and the absence of any opinion regarding plaintiff's capacity for standing and walking throughout the course of an eight-hour work day. Because the evidence considered by the ALJ failed to discuss, or even identify, plaintiff's capacity for standing and walking, the record did support not the ALJ's RFC determination. *Johnson v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d at 293; *see also Quinto v. Berryhill*, No. 3:17-CV-24, 2017 WL 6017931, at \*12 (D. Conn. Dec. 1, 2017) ("[W]here the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual capacities ... the Commissioner may not make the connection himself.") (citations omitted). On remand, the ALJ should further develop the record by obtaining medical opinion evidence specific to plaintiff's physical limitations, in order to determine whether plaintiff can fulfill the exertional requirements for light work.

5

Arguably, the recommended spinal fusion and arthrodesis constitute aggressive treatment.

**VII. REMAINING ARGUMENTS**
Plaintiff has identified additional reasons why he contends the ALJ's decision was not supported by substantial evidence. However, because the court has already determined, for the

reasons previously discussed, that remand of this matter for further administrative proceedings is necessary, the Court declines to reach these issues. *See Bell v. Colvin*, No. 5:15-CV-01160 (LEK), 2016 WL 7017395, at *10 (N.D.N.Y. Dec. 1, 2016) (declining to reach arguments "devoted to the question whether substantial evidence supports various determinations made by [the] ALJ" where the court had already determined remand was warranted); *Morales v. Colvin*, No. 13-CV-06844, 2015 WL 2137776, at *28 (S.D.N.Y. Feb. 10, 2015) (the court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand").

**\*8  WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper evaluation of the medical and other evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Memorandum-Decision and Order, and it is

**ORDERED**, that the Clerk enter judgment for **PLAINTIFF**.

**All Citations**

Slip Copy, 2020 WL 3077009

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4598811
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond Paul CAMARATA, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of
the Social Security Administration, Defendant.

No. 6:14–cv–00578 (MAD/ATB).
|
Signed July 29, 2015.

**Attorneys and Law Firms**

The Dehaan Law Firm P.C., John W. Dehaan, Esq., of
Counsel, Hauppauge, NY, for Plaintiff.

Social Security Administration, Office of Regional General
Counsel, Region II, Sixtina Fernandez, Esq., of Counsel, New
York, NY, for Defendant.

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** On November 15, 2011, Plaintiff Raymond
Paul Camarata (hereinafter "Plaintiff") protectively filed
applications for Supplemental Security Income ("SSI") and
Social Security Disability Insurance Benefits ("DIB"). See
Dkt. No. 7–2 at 14. Plaintiff alleges that he has suffered from a
"disability" within the meaning of the Social Security Act (the
"Act") since November 7, 2011, due to "depression, anxiety
disorder with panic attacks, attention deficit hyperactivity
disorder ("ADHD"), borderline intellectual functioning, and
a history of alcohol dependence." Dkt. No. 1 at ¶ 4.

Defendant, the Commissioner of the Social Security
Administration (hereinafter "Commissioner") denied
Plaintiff's applications on March 16, 2012. See Dkt. No. 7–
4 at 6, 10. In response, Plaintiff made a timely request for
a hearing in front of an Administrative Law Judge ("ALJ"),
which took place by video before ALJ William M. Manico
on December 18, 2012. See Dkt. No. 7–2 at 33–62; Dkt. No.
7–4 at 22. ALJ Manico issued an unfavorable decision on

December 28, 2012, finding that Plaintiff's conditions do not
qualify him as "disabled" under the Act and that Plaintiff is
therefore not entitled to DIB benefits under §§ 216(i) and
223(d) or SSI benefits under § 1614. See Dkt. No. 7–2 at 14;
Dkt. No. 7–4 at 6, 10. Plaintiff appealed the ALJ's decision
to the Appeals Council, which denied review. See Dkt. No.
1 at ¶ 11.

On May 15, 2014, Plaintiff commenced this action pursuant
to 42 U .S.C. §§ 405(g) and 1383(c)(3), seeking review of
the Commissioner's unfavorable decision. See Dkt. No. 1 at
¶¶ 1, 6. The case was referred to United States Magistrate
Judge Andrew T. Baxter for a Report–Recommendation,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).
On June 6, 2015, Magistrate Judge Baxter recommended
that the Commissioner's decision be affirmed and Plaintiff's
complaint dismissed. See Dkt. No. 11 at 25.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Baxter's Report–Recommendation, which
were submitted within the required fourteen day time period
on June 16, 2015. See Dkt. No. 12.

### II. DISCUSSION

When a party files specific objections to a magistrate judge's
Report–Recommendation, the district court makes a "*de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1). However, when a party
files "[g]eneral or conclusory objections or objections that
merely recite the same arguments [that he presented] to the
magistrate judge," the court reviews those recommendations
for clear error. *O'Diah v. Mawhir*, No. 9:08–CV–322, 2011
WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and
footnote omitted). After the appropriate review, "the court
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b) (1).

**\*2** Here, Plaintiff's objections to the Report–
Recommendation generally repeat the same arguments raised
in his initial brief. See Dkt. No. 9 at 22, 30; Dkt. No. 11 at
9; Dkt. No. 12 at 2, 6. First, Plaintiff objects to Magistrate
Judge Baxter's finding that ALJ Monico properly evaluated
the medical opinion evidence contained in the Administrative
Transcript. See Dkt. No. 12 at 2. In particular, Plaintiff claims
that ALJ Monico failed to give sufficient weight to the RFC

evaluation of nurse practitioner, Linda Talerico (hereinafter "Talerico"), and registered nurse, Donna Saville (hereinafter "Saville") and that he made various factual errors. *See* Dkt. No. 9 at 24; Dkt. No. 12 at 3.

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c) (3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Schaal v. Apfel,* 134 F.3d 496, 500–01 (2d Cir.1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citations and quotations omitted).

If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and it is not permitted for the courts to substitute their analysis of the evidence. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982) (stating that the court "would be derelict in our duties if we simply paid lip service to this rule, while shaping [the Court's] holding to conform to our own interpretation of the evidence"). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

Upon review, Magistrate Judge Baxter concluded that "the ALJ gave extensive consideration to the Medical Source Statement prepared by Talerico and Saville" but that he assigned it "little weight" primarily due to "inconsistency with the other medical evidence." *See* Dkt. No. 11 at 13, 15. Further, he found that any factual errors contained in the Administrative Transcript were "minor" and "harmless" because correcting them would "not have changed the outcome of the hearing." *Id.* at 12. As such, Magistrate Judge Baxter determined that ALJ Monico properly analyzed the medical opinion evidence and that the decision to deny Plaintiff benefits was supported by substantial evidence.

**\*3** Next, Plaintiff objects to Magistrate Judge Baxter's finding that the Appeals Council properly considered the "new" evidence Plaintiff presented after ALJ Monico issued his unfavorable decision. *See* Dkt. No. 12 at 6. The evidence in question is the Medical Source Statement prepared by Talerico and Saville that was originally presented to ALJ Monico, which had since been signed by Dr. Vidya Patil, a supervising, board-certified psychiatrist who worked at the same facility as the nurses. *See* Dkt. No. 9 at 30.

The Appeals Council is required to consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *see also Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b).

To obtain a review of additional evidence, the claimant must establish that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart,* 470 F.Supp.2d 194, 204 (E.D.N.Y.2007) (citing *Lisa v. Sec'y of Health & Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991)). Evidence is material if there is "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id.* If the Appeals Council fails to consider new, material evidence, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Sears v. Colvin,* No. 12–CV–570, 2013 WL 6506496, *5 (N.D.N.Y. Dec. 12, 2013) (quoting *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009)).

Upon review, Magistrate Judge Baxter found that the Appeals Council properly considered the Medical Source Statement, now signed by Dr. Patil, before concluding that "neither the contentions nor the additional evidence provide a basis for changing the Administrative Law Judge's decision." *See* Dkt. No. 11 at 21–25. In coming to this conclusion, Magistrate Judge Baxter rejected Plaintiff's argument that the Appeals Council improperly failed to apply the treating physician rule to the Medical Source Statement. *See* Dkt. No. 11 at 22.

The treating physician rule states that "[w]hile the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must ... give

controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence." *Martin v. Astrue,* 337 Fed. Appx. 87, 89 (2d Cir.2009). The Appeals Council, like an ALJ, is required to apply the treating physician rule where relevant. *See Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999).

**\*4** When an ALJ or Appeals Council refuses to assign a treating physician's opinion controlling weight, a number of factors must be considered to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c).

In the present matter, the Court finds that Magistrate Judge Baxter correctly determined that (1) the treating physician rule did not apply to the Medical Source Statement signed by Dr. Patil, and (2) even if the Appeals Council *had* applied the treating physician rule, the outcome of the decision would have been the same. *See* Dkt. No. 11 at 22, 24. The fact that Dr. Patil is the supervising psychiatrist at the facility where Plaintiff received treatment does not, on its own, mandate application of the treating physician rule. The courts have recognized that, "[w]hen a treating physician signs a report prepared by a nurse practitioner ... the report should be evaluated under the treating physician rule unless evidence indicates that the report does not reflect the doctor's views." *Djuzo v. Comm'r of Soc. Sec.,* No. 5:13–cv–272, 2014 WL 5823104, \*4 & n. 10 (N.D.N.Y. Nov.7, 2014) (collecting cases). Here, however, the record contains no evidence of a doctor-patient relationship between Plaintiff and Dr. Patil. In fact, Dr. Patil's name does not appear in any of Plaintiff's treatment notes or medical records despite receiving treatment at his facility from between February 2012 and January 2013. In fact, at the hearing, Dr. Patil was not mentioned once by either Plaintiff or his representative. Absent any evidence of any sort of ongoing relationship, the Appeals Council's consideration of the new evidence was sufficient. *See Health v. Colvin,* No. 5:14–cv–223, 2015 WL 1959710, \*8 (N.D.N.Y. Apr.29, 2015).

Accordingly, the Court affirm's the Commissioner's decision.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above reasons, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that the Commissioner's decision is **AFFIRMED** and Plaintiff's complaint **DISMISSED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*5** This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

### I. *PROCEDURAL HISTORY*

On November 14, 2011, plaintiff protectively filed applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging disability beginning November 7, 2011. (Administrative Transcript ("T") at 13, 164–72). The applications were denied initially on March 16, 2011. (T. 13, 68–69). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on December 18, 2012. (T. 32–61). On December 28, 2012, ALJ William M. Manico found plaintiff was not disabled. (T. 13–27). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 8, 2014. (T. 1–5).

## II. *GENERALLY APPLICABLE LAW*

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

**\*6** *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue,* 708 F.3d at 417; *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir.2012); 42 U.S.C. § 405(g). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir.2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "—even more so than the 'clearly erroneous standard.' " *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen,* 859 F.2d

255, 258 (2d Cir.1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart,* 343 F.Supp.2d 218, 224 (S.D.N.Y.2004); *Fuller v. Astrue,* No. 09–CV–6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec.6, 2010).

### III. *FACTS*

As of the date of the administrative hearing on December 18, 2012, plaintiff was 42 years old. (T. 166). He is married, with no children. (T. 167, 371). Plaintiff attended special education classes in high school, and graduated with a regular diploma. (T. 34, 272). He attended two years at Mohawk Valley Community College and obtained a chef's certificate. (T. 50–51). In 1992, plaintiff enlisted in the United States Army, but was honorably discharged after being diagnosed with schizophreniform disorder [1] after a paranoid episode during basic training. (T. 273).

[1] "Like schizophrenia, schizophreniform disorder is a type of psychosis in which a person cannot tell what is real from what is imagined. Although schizophrenia is a lifelong illness, schizophreniform disorder involves symptoms that are present for less than six months. When symptoms persist longer than six months, the diagnosis is typically changed to schizophrenia." http:// www.webmd.com/schizop hrenia/guide/mental-health-schizophreniform-disorder

Plaintiff's longest employment occurred between 2002 and 2010, when he was employed first as a janitor and then as a cook for a group home operated by the House of the Good Shepherd. (T. 39, 241, 256). He was terminated from this position after calling in sick too often. (T. 39). Plaintiff's most recent employment prior to his disability onset date was as a deli worker. (T. 241). He left this position after believing that co-workers were talking about him and "targeting" him with

inappropriate behavior. (T. 45–46). After his alleged onset date, plaintiff worked briefly in a bakery before quitting after a dispute with the owner. (T. 37, 255).

\*7 Plaintiff acknowledged that he could generally care for himself, although back problems prevented him from performing some household chores, or he sometimes required assistance from his wife. (T. 211). Plaintiff testified that he avoided crowds, such as in grocery stores and shopping malls, but was able to drive himself, pay bills, and handle his own finances. (T. 47, 214). When he went shopping, he generally had his wife or mother with him. (T. 46, 215). Plaintiff primarily socialized with his wife, parents, and in-laws. (T. 215).

Plaintiff first received psychiatric treatment while in the military in 1992, and was hospitalized in 1993 for anxiety and depression. (T. 40, 278). Between 1998 and 2012, plaintiff received intermittent psychiatric treatment, including medication and counseling. (T. 281–362, 371, 393–418, 446–71). Plaintiff attributes the gaps in his treatment record, which included breaks of up to two years, to his financial difficulties. (Pl.'s Br. at 27). In 2011, plaintiff underwent testing in four areas: Intelligence Assessment, Achievement Assessment, Attention Assessment, and Personality Assessment. (T. 338–43). Based on his test scores, plaintiff was found to have a full scale IQ score of 73 [2], with a GAF [3] score of 55, and was diagnosed with generalized anxiety disorder, panic disorder, cognitive disorder NOS (auditory processing, auditory working memory), and borderline intellectual functioning. (T. 343–44). In 2012, plaintiff began treatment with Mental Health Connections and was diagnosed with panic disorder without agoraphobia. (T. 365–69). As part of this program, plaintiff received counseling two to four times per month, and was prescribed medication. (T. 407, 424).

[2] Plaintiff's verbal score was 80, performance score was 75, and working memory score was 74. (T. 387).

[3] The GAF Scale (DSM IV Axis V) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms." *Kohler v. Astrue,* 546 F.3d 260, 262 n. 1 (2d Cir.2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM IV"),* at 32 (4th ed.2000)).

Camarata v. Colvin, Not Reported in F.Supp.3d (2015)

2015 WL 4598811

GAF is a 100 point scale, and 41–50 indicates "serious symptoms," 51–60 indicates "moderate symptoms," and 61–70 indicates "some mild symptoms." DSM–IV–TR at 32–34.

Plaintiff also received treatment for alcoholism, and attended counseling and Alcoholics Anonymous meetings on a regular basis. (T. 387). Plaintiff enrolled in residential rehabilitation centers on two separate occasions, but withdrew from the programs after a short period of time. (T.40–42). During his testimony, plaintiff attributed his alcoholism to his anxiety, and used alcohol as a coping mechanism. (T. 42–44).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 15–25). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. *THE ALJ'S DECISION*

After finding that plaintiff met his insured status through December 31, 2015, and that plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 7, 2011, the ALJ found that plaintiff had the following severe impairments at step two of the sequential evaluation: depression, anxiety disorder with panic attacks, borderline intellectual functioning, and alcoholism. (T. 15). The ALJ found that although plaintiff had been treated for back pain and was diagnosed with hyperlipidemia and high cholesterol, these conditions were not "severe impairments." (T. 15).

 **\*8** At step three of the disability analysis, the ALJ found that plaintiff did not have a Listed Impairment. (T. 17–18). In making this determination, the ALJ considered whether plaintiff's mental impairments, singly or in combination, met or medically equaled the criteria of Listing 12.02 (organic mental disorders); Listing 12.04 (depressive syndrome); Listing 12.06 (anxiety disorders); and 12.09 (substance abuse disorders). (T. 17). The ALJ found that plaintiff had moderate restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulty with concentration, persistence and pace in the workplace. (*Id.*). The ALJ considered plaintiff's psychiatric hospitalizations in 1992 and 1993, but did not assign either of them any significance in light of the remoteness of these hospitalizations from the onset date of November 7, 2011. (*Id.*).

The ALJ found at step four of the analysis that plaintiff had the RFC to perform the full range of work at all exertional levels, but with certain nonexertional limitations. (T. 19). Specifically, the ALJ concluded that: plaintiff retained the mental RFC to perform unskilled work involving short, simple instructions where interactions with others are routine, superficial, incidental to the work performed, and less than occasional in frequency; plaintiff should not perform fast-paced production work; and plaintiff should not do jobs that involve interacting with the public. (*Id.*).

In making the RFC determination, the ALJ stated that he considered all the plaintiff's symptoms, and the extent that those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence in accordance with 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96–4p and 96–7p." (T. 19). The ALJ also considered opinion evidence in accordance with 20 C.F.R. 404.1527 and 416.927 and SSRs 96–2p, 96–5p, 96–6p, and 06–3p, and gave "significant weight" to the reports by consultative psychologist Dr. David Mahony and state agency psychologist Dr. D. Mangold. (T. 19). The ALJ gave "little weight" to the mental health evaluations submitted by plaintiff, affording them "some weight" to the extent that they were consistent with plaintiff's documented social and intellectual limitations. (T. 22–24).

After considering the evidence, the ALJ found that plaintiff was not fully credible with respect to the intensity, persistence, and limiting effects of his symptoms. (T. 21). In making the credibility determination, considered the plaintiff's testimony in addition to the medical evidence. (T. 19–24).

At step four, the ALJ also determined that plaintiff's RFC would prevent him from performing his past relevant work as a cook. (T. 25). At step five, the ALJ relied upon the testimony of a vocational expert to conclude that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and determined that plaintiff was not disabled, based upon his age, education, and prior work experience. (T. 26.).

## V. *ISSUES IN CONTENTION*

 **\*9** Plaintiff raises the following arguments:

 1. The ALJ improperly weighed the medical evidence. (Pl.'s Br. at 16–23) (Dkt. No. 9).

2. New and material evidence submitted to the Appeals Council mandates remand to the ALJ. (Pl's Br. at 24–25).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. (Def.'s Br. at 5–13). (Dkt. No. 10). For the following reasons, this court agrees with the defendant and will recommend dismissing the complaint.

### *DISCUSSION*

## VI. *RFC*

### A. Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue,* No. 3:11–CV–1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan.23, 2013) (citing *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (citing *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone,* 70 F.Supp.2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d Cir.1984); *LaPorta v. Bowen,* 737 F.Supp. at 183; *Sullivan v. Secretary of HHS,* 666 F.Supp. 456, 460 (W.D.N.Y.1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue,* No. 5:09–CV–1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *7).

An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999). However, it is the province of the ALJ

to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue,* 266 F. App'x 66, 67 (2d Cir.2008) (citing *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002)). A conclusory statement of disability is not binding on the ALJ if that opinion is inconsistent with substantial evidence in the record. *Michels v. Astrue,* 297 F. App'x 74, 76 (2d Cir.2008) (citing *inter alia Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000)); *Veino,* 312 F.3d at 588. *See* 20 C.F.R. § 404.1527(e) (1) (a statement by a medical source that a claimant is "disabled" does not mean that the Commissioner will make that determination). The term "disabled" is a legal not a medical definition. *Id.*

### B. Application

**\*10** The ALJ found that plaintiff had the ability to perform work at all exertional levels, but that due to nonexertional limitations, that plaintiff should not perform fast-paced production work and should avoid jobs that involve interacting with the public. (T. 19). The ALJ determined that plaintiff had the RFC to perform unskilled work involving simple instructions where interactions with others are routine, superficial, incidental to the work performed, and less than occasional in frequency. (*Id.*).

### 1. Talerico/Saville Medical Source Statement

Plaintiff argues that, in making the RFC determination, the ALJ failed to give sufficient weight to the RFC evaluation ("Medical Source Statement") completed by plaintiff's most recent treating sources at Mental Health Connections–Linda Talerico, a nurse practitioner, and Donna Saville, a registered nurse. (Pl's Br. at 19–23). Plaintiff further argues that the ALJ gave too much weight to the opinions of consultative examiner Dr. Mahony and state agency consultant Dr. Mangold. (Pl's Br. at 19–20). This court does not agree. [4]

[4]    Plaintiff's counsel also points out minor errors in the ALJ decision, which plaintiff contends raise "serious questions as to the thoroughness of the ALJ's review of the evidence." These include a miscite of the C.F.R., a reference to a male therapist as "she," and a statement that plaintiff drove to an examination "on his own" when he was actually accompanied by his wife. (Pl.'s Br. at 18, 23). Plaintiff also contends that the ALJ incorrectly stated that plaintiff "lives with his wife" when plaintiff was actually separated from his wife at

the time of the hearing. Because correction of any of these errors would not have changed the outcome of the hearing, this court will consider them harmless. I also note that there is no evidence in the record that plaintiff's separation was ever brought to the ALJ's attention, even though plaintiff mentioned his wife during the hearing. (T. 60).

The ALJ gave several reasons for discounting, but not completely disregarding, the RFC evaluations by Talerico and Saville. (T. 22–24). First, the ALJ found that the extreme and marked limitations described in the Talerico/Saville reports were not consistent with plaintiff's own testimony or his documented ability to do multiple tasks, including driving, caring for himself, working for extended periods, and socializing with family. (T. 22). The ALJ also noted that both nurses' findings exceeded their primary area of practice.[5] (*Id.*). Finally, the ALJ noted that Talerico and Saville were not accepted medical sources under the Social Security Regulations. (T. 23).

[5]     Plaintiff notes that Nurse Practitioner Talerico has a specialization in psychiatry as part of her New York State license. http:// www.nysed.gov/ coms/op001/opsc2a?profcd 40 & plicno 401291 & namechk TAL Because the ALJ gave other reasons for discounting the Medical Source Statement primarily the inconsistency with the other medical evidence this court concludes that this error was harmless.

Despite plaintiff's contention that the ALJ disregarded Talerico/Saville's opinions with a "cursory dismissal" because they were not physicians, the record demonstrates that the ALJ considered the Talerico and Saville reports appropriately under the regulations. (T. 22–24) While neither Talerico nor Saville is an "acceptable medical source" for purposes of "establishing" the existence of an impairment, their opinions may be considered for purposes of showing the severity or the limiting effects of the plaintiff's impairment. 20 C.F.R. § 404.1513(d). The opinions of nurse practitioners and similar medical professionals must be considered by an ALJ because their information may be based on special knowledge of the individual and may provide insight into the severity of the impairment and how it affects the individual's ability to function. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d); *see also* SSR 06–03p, 2006 WL 2329939, at *2.[6]

[6]     SSR 06–3p states that these "other sources" are important because "with the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources' ... have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists. Opinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." 2006 WL 2329939, at *3.

The record shows that the ALJ gave extensive consideration to the Medical Source Statement prepared by Talerico and Saville. (T. 22–24). The ALJ reviewed plaintiff's testimony, work history, and the other medical evidence (including mental health progress reports prepared by Talerico) to determine the appropriate weight to give the Talerico/Saville Medical Source Statement. (*Id.*). At the end of this analysis, the ALJ found nothing to support the opinion that plaintiff had "extreme limitations" in functioning in a work setting at a consistent pace and "marked limitations" in understanding and remembering instructions, maintaining attention and concentration, and managing stress. He assigned the Talerico/ Saville opinion "little weight" but gave it "some weight" to the extent it was consistent with the RFC and the other medical evidence. (T. 24).

**\*11** The ALJ's conclusion is supported by the record. In addition to the lack of any other medical findings which express concerns about extreme or marked limitations in any functional areas, the conclusions in the November 20, 2012 Medical Source Statement are not corroborated by any of the regular progress reports prepared by Talerico and reviewed by the ALJ. (T. 394–418). For example, the earliest report, dated April 6, 2012, described plaintiff as initially emotional and avoiding eye contact; but as the interview progressed the plaintiff's behavior changed and he became more participative. (T. 401). The April 13, 2012 report notes that plaintiff "just got out of work a little while ago and now he is making much more sense regarding his paranoia." (T. 398). On June 29, 2012, Talerico described plaintiff as "calm" and "a different man since I first met him." (T. 394). In the most recent report provided to the ALJ, dated September 17, 2012, Talerico reported that "Today, he looks pretty much the best I have seen him over the past few months. He continued to report some mood swings, but nothing that he has in the past ... There is no evidence of auditory or

2015 WL 4598811

visual hallucinations, psychosis, paranoia, or delusions ." (T. 407). Plaintiff has offered no explanation for the disparity between improvements described in the April–September 2012 progress reports and the far more negative outlook in the November 2012 Medical Source Statement.

Plaintiff's contention that the ALJ ignored the Medical Source Statement because Talerico and Saville "are not physicians" (Pl's. Br. at 27) is contradicted by the scope of the ALJ's analysis of the Medical Source Statement. (T. 22–24). While he assigned it little weight, the ALJ did not disregard the Talerico/Saville opinion completely. Moreover, the ALJ considered and gave "some weight" to the 2011 evaluations of a different registered nurse practitioner, Michelle Chambrone, and a counselor assistant, Joanne McNary, finding that the moderate limitations described in their report were consistent with the medical evidence in the record. (T. 24, 336–37). It is clear from the ALJ's decision that the primary factor in affording the Talerico/Saville findings "little weight" was inconsistency with the other medical evidence, rather than any bias against the professional qualifications of non-physicians.

### 2. Mahony/Mangold Opinions

Plaintiff also objects to the "significant weight" assigned to the opinions of consultative examiner Dr. David Mahony and state agency consultant Dr. Mangold. The report of a consultative examiner may serve as substantial evidence upon which the ALJ may base his decision. *Herb v. Colvin,* No. 14–CV–156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin,* No. 13–CV–543A, 2014 WL 3866452, at *7 (W.D.N.Y. Aug.6, 2014) (Rep't–Rec.)); *Simmons v. Comm'r of Soc. Sec.,* No. 13–CV–5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur,* 722 F.2d at 1039). In addition to the plaintiff's own physicians and other medical sources, the ALJ may also rely upon a "medical advisor" who is a non-examining state agency "medical consultant." *See Walker v. Astrue,* No. 08–CV–828, 2010 WL 2629832 at *6–7 (W.D.N.Y. June 10, 2010). This court concludes that the ALJ's analysis of Dr. Mahony and Dr. Mangold's opinion was supported by substantial evidence, and that plaintiff's challenges to the weight assigned those opinions are unpersuasive.

**\*12** Dr. Mahony's diagnosis of panic disorder without agoraphobia was consistent with prior diagnoses, including that of Nurse Practitioner Talerico (T. 374, 401). In contrast to the Talerico/Saville Medical Source Statement, the ALJ found that Mahony's conclusions about the severity of that diagnosis were consistent with the other medical evidence. (T. 22). Dr.

Mahony opined that plaintiff could follow and understand simple instructions, and perform simple tasks independently. (T. 22, 373). Mahony found that plaintiff had mild difficulty maintaining attention and concentration; maintaining a regular schedule; learning new tasks; performing complex tasks; and making appropriate decisions. (T. 22, 373). Plaintiff also had moderate difficulty relating with others and dealing with stress due to anxiety. (*Id.*).

Plaintiff's primary contention is that the consultative examination was inadequate, thus calling into question the legitimacy of Dr. Mahony's conclusions. (Pl.'s Br. at 25). Plaintiff asserts that Dr. Mahony's consultative exam lasted "for all of 10 minutes-a fact that was brought to the Appeals Council's attention." (*Id.*). Citing 40 C.F.R. § 404.1519(n)(a)(1), plaintiff argues that such a short psychiatric consultative exam is insufficient as a matter of law.

Procedurally, plaintiff's objection to the perceived length of Dr. Mahony's examination is defective, because it was never raised before the ALJ. *Courtney v. Colvin,* No. 06:12–CV–1157 (GLS), 2013 WL 5218455, at *2, FN 4 (N.D.N.Y. Sept. 16, 2013) (rejecting challenge to consultative exam's compliance with minimum scheduling intervals where issue was not raised before ALJ); *Carvey v. Astrue,* No. 06–CV–737, 2009 WL 3199215 at *14 (N.D.N.Y. Sept. 30, 2009) ("failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal").

However, even if the court were to excuse the delay in raising this issue, plaintiff's contention lacks merit. Plaintiff's argument is entirely based upon his own recollection (as related to plaintiff's representative during the administrative process) that Dr. Mahony's exam "[f]elt like about a 10 minute appt." [7] (T. 265). Plaintiff fails to cite any evidence in the record to substantiate this claim.

[7]   40 C.F.R. § 404.1519n(a) provides that the minimum scheduling intervals are "time set aside for the individual, not the actual duration of the consultative examination."

Dr. Mahony's report contained all of the required elements for a consultative exam in accordance with the Social Security regulations. (T.371–374). The report identified plaintiff's chief complaint; provided a detailed description of plaintiff's medical history relative to the complaint; described pertinent "positive" and "negative" detailed findings based on plaintiff's history, examination and related tests; provided

Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 128 of 356
Camarata v. Colvin, Not Reported in F.Supp.3d (2015)
2015 WL 4598811

the results of the attention and memory tests performed during the exam; gave a diagnosis and prognosis for plaintiff's impairments; described plaintiff's current abilities; and offered the physician's comments on plaintiff's condition. 20 C.F.R. § 404.1519n(c)(1)-(6). Since there is no evidence that shows otherwise, and Dr. Mahony submitted all the required information in his report, this Court concludes that his examination of plaintiff was legally sufficient. *Amberg v. Astrue,* No. 08–CV–967 (LEK), 2010 WL 2595218, at *5 (N.D.N.Y. May 24, 2010) (rejecting plaintiff's allegation that exam was insufficient length when consultative report contained all necessary elements).

 **\*13** Plaintiff also challenges the weight assigned to Dr. Mangold's report, asserting that the state agency psychologist did not have all of plaintiff's medical records when he issued his report, and never examined plaintiff. (Pl's Br. at 25– 26). This Court rejects both arguments. In evaluating Dr. Mangold's opinion, the ALJ noted that Dr. Mangold requested certain records but did not receive them. [8] (T. 18, 387). The ALJ decided that Dr. Mangold's opinion was still entitled to "significant weight" because it was consistent with plaintiff's testimony, the available medical evidence, plaintiff's work history, and test results. [9] (T. 22). Unlike *Pratts v. Chater,* 94 F.3d 34, 38 (2d Cir.1996), cited by plaintiff, where a non-examining physician's report was the sole evidence relied upon by an ALJ, in this case the ALJ gave significant weight to Dr. Mangold's report precisely because it was consistent with the other medical opinion evidence, including that of Dr. Mahony, Dr. Lopez–Williams (who administered plaintiff's IQ tests), Nurse Practitioner Chambrone, and counselor McNary. (T. 24).

[8]  The ALJ specifically noted that records were not received from Mental Health Connections, which would have included notes by Talerico and Saville. Since Dr. Mangold's review occurred in March 2012 and the first progress report by Talerico is dated April 6, 2012, there were likely few records responsive to this request.

[9]  Plaintiff alleges that the ALJ inappropriately put "great stock" in plaintiff's GAF test scores. While the ALJ cites plaintiff's test results in the context of other medical evidence, such consideration is appropriate, and there is no indication that the ALJ gave them undue weight.

Plaintiff has not identified any deficiencies in Dr. Mahoney's or Dr. Mangold's conclusions beyond their inconsistency with the Talerico/Saville opinion. Therefore, this court concludes that the ALJ's determination was based upon substantial evidence and recommends that plaintiff's challenge to the ALJ's RFC assessment be dismissed.

## VII. *New Evidence Submitted to Appeals Council*

### A. Legal Standards

**1. New and Material Evidence**
The regulations provide that the Appeals Council considers new and material evidence if it relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.976(b) (1). *See Jenkins v. Colvin,* No. 1:13–CV–1035, 2015 WL 729691, at *5 (N.D.N.Y. Feb. 19, 2015) (citation omitted). If the Appeals Council finds that the evidence is new and material, it will review the case if it finds that the ALJ's decision is contrary to the weight of the current record evidence. *Id.* (citing 20 C.F.R. § 404.970(b). Even if the Appeals Council finds that the evidence is not new and material and declines to review the ALJ's decision, the evidence in question becomes part of the record for review by the court. *Id.* (citing *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). If the Appeals Council denies review after reviewing the new evidence, the Commissioner's decision includes the Appeals Council's conclusion that the ALJ's findings remain correct despite the new evidence. *Id.*

**2. Treating Physician Rule**
As defined in the regulations, a "treating source" is a patient's own physician, psychologist, or other acceptable medical source who provides or has provided a patient with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship. 20 C.F.R. §§ 404.1502, 416.902. An ongoing treatment relationship is established by medical evidence showing that a patient has seen the source with a frequency consistent with accepted medical practice. *Id.*

 **\*14** While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c) (2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight.

*Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.*

The treating physician rule applies to the Appeals Council. *See, e.g., Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (the Appeals Council has an obligation to explain the weight it gave to the opinions of the plaintiff's treating doctors); *Barnwell v. Colvin,* No. 13 Civ. 3683, 2014 WL 4678259 at *15 (S.D.N.Y. Sept. 19, 2014) (when considering additional evidence from treating sources, the Appeals Council was required to comply with regulations applicable to the assessment of opinions from treating sources.); *Knepple–Hodyno v. Astrue,* No. 11–CV–443, 2012 WL 3930442 at *9 (E.D.N.Y. Sept. 10, 2012) ("When new materials are submitted from treating physicians, the Appeals Council is 'obligated to provide an explanation for [its] decision not to afford controlling weight to an assessment apparently provided by Plaintiff's treating physician.' "); *Longbardi v. Astrue,* No. 07 Civ. 5952, 2009 WL 50140 at *25 (S.D.N.Y.Jan.7, 2009) ("Failure to provide explicit 'good reasons' for not crediting a treating source's opinion is a ground for remand.") (citing *Snell,* 177 F.3d at 133).

### B. Application

After the ALJ rendered his decision on December 28, 2012, plaintiff submitted additional material to the Appeals Council for consideration. (T. 261). This submission included the Medical Source Statement prepared by Talerico/Saville and previously considered by the ALJ, but with the addition of the signature of Dr. Vidya Patil, dated January 20, 2013. (T. 444). Dr. Patil is the supervising, board-certified psychiatrist at Mental Health Connections, the facility where both Talerico and Saville work. (Pl's Br. at 30). In the accompanying brief to the Appeals Council dated February 18, 2013, plaintiff's representative described Dr. Patil as plaintiff's "treating and supervising doctor." (T. 261).

The Appeals Council considered the new evidence, including the Medical Source Statement, now signed by Dr. Patil, but concluded without discussion that "neither the contentions nor the additional evidence provide a basis for changing the Administrative Law Judge's decision." (T. 2). Plaintiff contends that the Medical Source Statement, which is identical to the one considered by the ALJ, is a "new" opinion by a treating psychiatrist which is relevant to the time period in question and probative of the issue of disability. (Pl.'s Br. at 30). Therefore, plaintiff argues, remand is required in order for the Commissioner to properly consider this new evidence.

This court disagrees and recommends that the request for remand be denied.

**\*15** Evidence is new when it is not duplicative or repetitive, and it is material when it affects the ALJ's findings or conclusions and relates to the time period on or before the date of the ALJ's decision. *Pike v. Barnhart,* No. 05–CV–1249, 2008 WL 4107172, at *8 (N.D.N.Y. Aug. 28, 2008). The Medical Source Statement, completed in November 2012, relates to the time period before the ALJ opinion, but it is identical to the report that the ALJ already considered and assigned little weight. (T. 22–24, 420–421, 443–444). The only difference is that it has been signed by Dr. Patil. (T. 444). Plaintiff argues that this signature is significant, because it means that the Medical Source Statement must be handled in accordance with the treating physician rule. (Pl.'s Br. at 30). "When a treating physician signs a report prepared by a nurse practitioner ... the report should be evaluated under the treating physician rule unless evidence indicates that the report does not reflect the doctor's views." *Djuzo v. Comm'r of Soc. Sec.,* No. 5:13–CV–272 (GLS/ESH), 2014 WL 5823104, at *4 & n. 10 (N.D.N.Y. Nov.7, 2014) (collecting cases).

This court concludes that application of the treating physician rule would be inappropriate, and that the Appeals Council's consideration of the additional evidence was proper. The record evidence compels the conclusion that Dr. Patil is not the plaintiff's treating physician. *See Snell,* 177 F.3d at 133 (treating physician rule did not apply to doctor who wrote letter to Appeals Council on behalf of plaintiff, where record did not show any direct treatment history with plaintiff). The fact that Dr. Patil is the supervising psychiatrist at the facility where plaintiff received treatment does not, on its own, mandate application of the treating physician rule. *Courtney,* No. 06:12–CV–1157; 2013 WL 5218455 at *2. The rationale for giving the opinion of a treating physician extra weight is based upon the unique position "resulting from the continuity of treatment he provides and the doctor/patient relationship he develops [that] place him in a unique position to make a complete and accurate diagnosis of his patient." *Petrie v. Astrue,* 412 F. App'x 401, 407 (2d Cir.2011) (quoting *Mongeur,* 722 F.2d at 1039).

The record contains no evidence of a doctor-patient relationship between plaintiff and Dr. Patil. For example, Dr. Patil's name does not appear in any of plaintiff's treatment notes or medical records from Mental Health Connections despite receiving treatment there between February 2012

and January 2013. (T. 394–418). There is likewise no evidence that any of plaintiff's progress reports were provided to Dr. Patil. (*Id.*) A July 3, 2012 letter to an insurance company regarding plaintiff's condition is signed by Francis Voorhees, Primary Therapist, and Linda Talerico, Nurse Practitioner, with no indication that it was reviewed or endorsed by Dr. Patil. (T. 404). At the ALJ hearing and in his application for benefits, plaintiff identified Linda Talerico as the individual who prescribed his medication, and Donna Saville as his counselor. (T. 5859, 252). When questioned during the hearing about plaintiff's treatment at Mental Health Connections, neither plaintiff or his representative mentioned Dr. Patil. (T. 58).

**\*16** A physician who does not have an "ongoing treatment relationship" with a plaintiff does not qualify as a treating physician. *See Patterson v. Astrue,* No. 5:11–CV–1143 (MAD/DEP), 2013 WL 638617, \*8 (N.D.N.Y.2013); 20 C.F.R. §§ 404.1502, 416.902. Given the lack of any evidence of a treating relationship with Dr. Patil, this court finds that the Appeals Council's consideration of the plaintiff's additional evidence was adequate. *Heath v. Colvin,* No. 5:14–CV–223, 2015 WL 1959710, \*8 (N.D.N.Y. April 29, 2015) (treating physician rule inapplicable where plaintiff had never met doctor who co-signed Medical Source Statement).

This case, in which the alleged treating physician merely signed a Medical Source Statement already considered by the ALJ, is clearly distinguishable from the cases which have been remanded for the Appeals Council's failure to apply the treating physician rule. *See, e.g., Snell,* 177 F.3d at 133 (remanding where Appeals Council failed to explain its reasoning for rejecting opinions of physicians who had treated plaintiff on multiple occasions); *Djuzo,* 2014 WL 5823104, \*4 (remanding where Appeals Council failed to properly evaluate new Medical Source Statement provided by plaintiff's long-standing treating physician); *Seifried v. Comm'r of Soc. Sec.,* No. 6:13–CV–347 (LEK/TWD), 2014 WL 4828191, at \*6 (N.D.N.Y. Sept.29, 2014) (remanding where Appeals Council failed to give reasons for rejecting new report by doctor already recognized by ALJ as treating physician). However, even if the treating physician rule were applicable, this court would still recommend that the request for remand be denied, because application of the correct legal standard would not change the outcome. *Zabala v. Astrue,* 595 F.3d 402, 409 (2d Cir.2009).

Where there is other substantial evidence in the record that conflicts with a treating physician's opinion, that opinion will

not be afforded controlling weight, and "the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell,* 177 F.3d at 133. The ALJ evaluated the identical Medical Source Statement before it was signed by Dr. Patil, and concluded that its findings of extreme and marked limitations conflicted with all of the other medical evidence in the record, including that from Mental Health Connections. As a result, the ALJ assigned it little weight. (T. 22–24). During this process, the ALJ applied factors similar to those relating to the treating physician rule: the length of plaintiff's treatment relationship and the frequency of examinations; the nature and extent of the treating relationship; the medical evidence in support of the opinion; the consistency of the opinion with the record as a whole; whether the opinion is from a specialist; and other factors that tend to support or contradict the opinion. (*Id.*). After making this evaluation of the Medical Source Statement, the ALJ gave significant weight to other medical opinions, which found only moderate and mild limitations. (T. 24). Beyond the imprimatur of a physician's signature, plaintiff has offered no evidence that would cast doubt upon the outcome of further administrative proceedings. Because application of the treating physician rule would inevitably lead to the same conclusion by the ALJ and the Appeals Council, there is no need to require agency reconsideration. *Havas v. Bowen,* 804 F.2d 783, 787 (2d Cir.1986).

**\*17 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the Commissioner's decision be **AFFIRMED,** and the plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed June 3, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4598811

**Camarata v. Colvin, Not Reported in F.Supp.3d (2015)**

2015 WL 4598811

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 2742076
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

DONNA N., Plaintiff

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:21-cv-01264
|
Signed March 31, 2023

**Attorneys and Law Firms**

Howard D. Olinsky, Olinsky Law Group, Syracuse, NY, for
Plaintiff.

Jason P. Peck, Jessica Richards, Social Security
Administration Office of the General Counsel, Baltimore,
MD, for Defendant.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**\*1** Plaintiff Donna N. ("plaintiff" or "claimant") brings this
action pursuant to the Social Security Act, 42 U.S.C. § 405(g),
for review of a final determination by the Commissioner of
Social Security ("Commissioner" or "defendant") denying
her application for disability insurance benefits. Plaintiff
alleges that the Administrative Law Judge's ("ALJ") decision
denying her application for benefits was not supported by
substantial evidence and contrary to the applicable legal
standards. Pursuant to Northern District of New York General
Order No. 8, the Court proceeds as if both parties had
accompanied their briefs with a motion for judgment on the
pleadings.

**I. PROCEDURAL HISTORY**
On September 11, 2019, Plaintiff filed for Title II Disability
Insurance Benefits ("DIB"), alleging disability beginning
June 1, 2019 due to bipolar disorder, depression, post-
traumatic stress disorder (PTSD), and problems with
comprehension, concentration, memory, and cholesterol.
Administrative Record (T) at 79-81. The Agency denied her
claim initially on January 27, 2020, and on reconsideration
on July 29, 2020. T 79, 116. After hearings held January
25, 2021 (T 44) and March 3, 2021 (T 33), ALJ Elizabeth

W. Koennecke issued an unfavorable decision dated March
16, 2021 (T 10-22). On September 21, 2021, the Appeals
Council denied review (T 1), making the ALJ's decision the
final Agency decision. This action followed. This Court has
jurisdiction under 42 U.S.C. § 405(g).

**II. LEGAL STANDARDS**

**A. Standard of Review**

"District courts review a Commissioner's final decision
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), and 'may
only set aside a determination by the Commissioner if it
is based on legal error or not supported by substantial
evidence in the record.' " *Hill v. Comm'r of Soc. Sec.,
No. 1:19-CV-5096 (ALC), 2020 WL 5768726, at \*5
(S.D.N.Y. Sept. 28, 2020)*(quoting *Cole v. Colvin*, 12-
cv-8597, 2014 WL 1224568, at "\*2 (S.D.N.Y. Mar. 24,
2014). "Accordingly, [a court] must 'conduct a plenary
review of the administrative record to determine if there is
substantial evidence, considering the record as a whole, to
support the Commissioner's decision and if the correct legal
standards have been applied.' " *Rucker v. Kijakazi*, 48 F.4th
86, 91 (2d Cir. 2022)(quoting *Estrella v. Berryhill*, 925 F.3d
90, 95 (2d Cir. 2019)). A court "will overturn a SSA decision
only if the ALJ applies an incorrect legal standard, or if the
ALJ's ruling is not supported by substantial evidence." *Id.*
(citation omitted). "The substantial evidence standard is 'not
high.' " *Id.* (quoting *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d
Cir. 2022) (quotation marks omitted). "It is 'such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion.' " *Id.* (quoting *Burgess v. Astrue*, 537
F.3d 117, 127 (2d Cir. 2008) (quotation marks omitted)).
Properly applied, this standard is highly deferential to the
presiding ALJ, "who has seen the hearing up close." *Biestek
v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

**\*2** "[O]nce an ALJ finds facts, [the Court] can reject
those facts 'only if a reasonable factfinder would *have to
conclude otherwise.*' " *Brault v. Soc. Sec. Admin. Comm'r,
683 F.3d 443, 448 (2d Cir. 2012)* (emphasis in original). The
Court must not re-weigh evidence, assess the reliability of
witnesses, or otherwise substitute its judgment for the ALJ's.
*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

Where the record supports disparate findings and provides
adequate support for both the Plaintiff's and the
Commissioner's positions, a reviewing court must accept

the ALJ's factual determinations. *See Quinones v. Chater,* 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982)); *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990). "However, this 'deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law.' " *Kenneth H. v. Commr. of Soc. Sec.,* 6:21-CV-324, 2022 WL 2954364, at *3 (N.D.N.Y. July 26, 2022)(quoting *Byam v. Barnhart,* 336 F.3d 172, 179 (2d Cir. 2003)). "Thus, 'where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards,' the decision should not be affirmed." *Id.* (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)). "This is so regardless of whether or not the decision is otherwise supported by 'substantial evidence.' " *Id.* (citing *Johnson,* 817 F.2d at 986).

Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately " 'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.' " *Vargas v. Sullivan,* 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir. 1983)).

### B. Determination of Disability

To obtain DIB, the claimant must prove that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1). The Commissioner evaluates disability claims using the five-step sequential process in 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proof at steps one through four, which includes establishing her residual functional capacity ("RFC") *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009). A plaintiff's RFC is defined as "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" *Pardee v. Astrue,* 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and] symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Id.* (citing 20

C.F.R. § 404.1545(a)). If the claimant reaches step five, the Commissioner must produce evidence that the claimant could perform a significant number of jobs given her age, education, work experience, and RFC. *Id.* Generally, the Commissioner can rely on vocational expert testimony for that purpose. *Biestek,* 139 S. Ct. at 1148, 1152; *Dumas v. Schweiker,* 712 F.2d 1545, 1553-54 & n.4 (2d Cir. 1983).

## III. FACTUAL

### A. Age, Education, and Work Experience

**\*3** Plaintiff was 60 years old on the alleged onset date and 61 years old on the date last insured. T 22, 80. She has a high school education. T 282. She reported working in manufacturing/assembly and inspection in the past. T 282.

### B. Opinion Evidence

On October 16, 2019, psychiatrist James Donovan, M.D. completed a Medical Source Statement citing Plaintiff's diagnosis of bipolar disorder. T 611. Plaintiff did have a good response to Lamictal, though her condition was labeled chronic. T 611. Dr. Donovan's last exam occurred on July 15, 2019, where he observed variable mood. T 611. Dr. Donovan wrote a note concerning ability to function in a work setting that appears to read: "limited[,] does not do well with pressure [and/] or stress." T 612. Concerning activities of daily living: "limited, depends on husband for transport etc." T 612. Dr. Donovan affirmed that Plaintiff was limited in the areas of understanding/memory, sustained concentration/persistence, social interaction, and adaption. T 612-13.

On October 29, 2019, Dr. Donovan completed a second Medical Source Statement citing Plaintiff's diagnosis of bipolar disorder mixed episode with a guarded prognosis. T 616. He affirmed signs/symptoms including decreased energy, feeling of guilt/worthlessness, poverty of content of speech, generalized persistent anxiety, mood disturbance, emotional lability, flight of ideas, persistent disturbance of mood or affect, and easy distractibility. T 616. Dr. Donovan opined that Plaintiff was unable to meet competitive standards (defined as "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting") in the abilities to i) complete a normal workday and workweek without interruptions from psychologically based symptoms; ii) perform at a consistent pace without an unreasonable number and length of rest periods; iii) deal with normal work stress; and iv) travel in unfamiliar place. T 617. He

opined that Plaintiff was seriously limited but not precluded (defined as "ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances") in the abilities to i) maintain regular attendance and be punctual within customary, usually strict tolerances, ii) sustain an ordinary routine without special supervision, iii) work in coordination with or proximity to others without being unduly distracted, iv) accept instructions and respond appropriately to criticism from supervisors, and v) maintain socially appropriate behavior. T 617. Dr. Donovan explained: "uncomfortable in [illegible] situations, not good under stress, needs stress reduction, breaks." T 617.

On December 2, 2019, Jeanne Shapiro, Ph.D. conducted a psychological consultative examination at the request of the Agency. T 627. Plaintiff discussed childhood sexual trauma, which resulted in recurrent distressing memories and trust issues. T 628. She also discussed nervousness from a 2011 car accident. T 628. Plaintiff denied symptoms indicative of panic disorder. T 628. Plaintiff discussed difficulty with comprehension and anger management. T 628. Plaintiff was cooperative and responsive to questioning with adequate relating, social skills, and overall presentation. T 629. She had normal posture, appropriate eye contact, and a lethargic motor behavior. *Id.* Her speech was fluent, and her expressive and receptive language was adequate. *Id.* Her thought processes were coherent and goal directed without any evidence of delusions, hallucinations, or disordered thinking. *Id.* Plaintiff reported feeling "so-so," and she had a sad mood with a constricted affect. *Id.* She was oriented x3 with intact attention and concentration. *Id.* Plaintiff's recent and remote memory skills were intact. T 630. Her intellectual functioning was estimated to be in the deficient range. *Id.* She had poor insight and judgment. *Id.* Dr. Shapiro observed lethargic motor behavior, constricted affect that was somewhat reduced in intensity compared to her thoughts/speech, and poor insight and judgment. T 629-30. Dr. Shapiro opined that Plaintiff had moderate-to-marked limitation in the abilities to i) understand, remember, or apply complex directions and instructions due to cognitive deficits, ii) interact adequately with supervisors, coworkers, and the public, iii) sustain concentration and perform a task at a consistent pace depending upon her level of anxiety, and iv) regulate emotions, control behavior, and maintain well-being. T 630. Dr. Shapiro further opined that Plaintiff has moderate limitation in the ability to sustain an ordinary routine and regular attendance at work and mild-to-moderate limitation in the ability to be aware of normal hazards and take appropriate precautions, especially if reading is required to do so. T 630.

**\*4** On December 2, 2019, Kalyani Ganesh, M.D. conducted a physical consultative examination at the request of the Agency. T 621. Plaintiff was in no acute distress, had a normal gait, and could walk on her heels and toes without difficulty. T 622. Her stance was normal, and she had a full squat. *Id.* She could get on and off the examination table without assistance and could rise from a chair without difficulty. *Id.* She had full range of motion in her cervical and lumbar spine with the exception that her lumbar spine flexion was limited to 60 degrees. T 623. She had full range of motion in her hips, knees, and ankles with stable joints and no tenderness. *Id.* Plaintiff had no sensory deficits and full strength in all her extremities. *Id.* Dr. Ganesh ordered an x-ray of Plaintiff's lumbar spine, which showed moderate degenerative changes at the T10-L2 levels and mild degenerative changes at the L2-S1 level. T 625. Dr. Ganesh opined that Plaintiff had no gross limitations. T 623.

On January 28, 2020, S. Naroditsky, M.D. reviewed the record at the request of the Agency and opined limitations consistent with light work with postural limitations. T 88-89.

On January 31, 2020, H. Ferrin, Ph.D. reviewed the record at the request of the Agency and opined that Plaintiff was able to i) understand and remember detailed instructions and work procedures, ii) perform repetitive tasks on a sustained basis in settings without tight productivity requirements, iii) respond in an appropriate manner to co-workers and supervisors but would have difficulty functioning in a setting that involved significant contact with the general public, and iv) adapt to basic changes and make routine work-like decisions. T 93.

On July 27, 2020, J. Ochoa, Psy.D. reviewed the record at the request of the Agency and essentially affirmed Dr. Ferrin's opinion. T 113.

On July 29, 2020, T. Schmidt-DeYoung, M.D. reviewed the record at the request of the Agency and opined limitations consistent with light work with slightly different postural limitations. T 106-10.

### C. Clinical Evidence

Dr. Donovan's records indicate that in 2018, prior to Plaintiff's alleged onset date, her mood remained stable on Zoloft and Lamictal. T 339-41. She reported "once in a while she gets a little testy," but not enough to want to change her medications. T 339. Her mental status examination was normal. *Id.* In December 2018, she felt increasingly emotional and agitated.

T 338. Dr. Donovan increased her Zoloft medication and added Nuedexta at that visit. *Id.*

In March 2019, Plaintiff fell off a stool at work and landed on her right knee. T 343. She reported that when she put pressure on the knee, her pain increased, and over-the-counter medications provided only minimal relief for her symptoms. *Id.* On examination, she had a normal range of motion and no swelling in her right knee, but there was some tenderness. T 344. An x-ray showed a possible avulsion fracture, but a CT scan was recommended to confirm. T 342, 344-45. She was advised to keep her leg immobile and follow up with orthopedics for a CT scan. T 345. She met with orthopedist Matthew Scuderi, M.D., the next day. T 475. Plaintiff reported she had no pain when walking but she had tenderness on her knee with palpation. *Id.* On examination, Plaintiff had full range of motion and only mild discomfort in her right knee. *Id.* Dr. Scuderi recommended a wait-and-see approach given the benign examination. *Id.*

Three weeks later, in April 2019, Plaintiff had "dramatically improved." T 481. She reported not missing any work due to her injury. *Id.* On examination, her knee was stable, and her range of motion was well preserved with only mild crepitus. *Id.* Dr. Scuderi continued her on over-the-counter medication management. *Id.* Plaintiff also presented to Dr. Donovan that month in a positive mood. T 633. She described doing moderately well with some difficulties shutting her mind off at night. *Id.* Her mental status examination showed tight associations but was otherwise normal. *Id.* Dr. Donovan instructed her to start melatonin to help with sleep and continue with Zoloft and Lamictal. *Id.*

 **\*5** In June 2019, her alleged onset date, Plaintiff met with Dr. Scuderi again and reported pain with squatting and kneeling. T 487. She reported Tylenol controlled her pain and she "actually fe[lt] mildly improved." *Id.* Her right knee was stable, and she had a well-preserved range of motion with mild crepitus. *Id.* There was no provocative positioning on examination, and she had a negative McMurray's test. *Id.* Dr. Scuderi offered a corticosteroid injection, but based on her improvement, Plaintiff decided to hold off at that time. T 488. He continued her on over-the-counter medication management. *Id.* A month later, Plaintiff reported intermittent soreness and that she remained fairly active. T 494. Her exam saw mild right knee crepitus with normal motion. T 494. Dr. Scuderi assessed right knee baseline chondrosis with moderate exacerbation. T 494. She elected to proceed with the injection. *Id.* Dr. Scuderi administered Depo Medrol. T 495.

Plaintiff was to progress activities to tolerance, exercising caution with deep weighted squats and lunging. T 495. Plaintiff was allowed to return to work. T 495.

On July 15, 2019, Plaintiff saw Dr. Donovan for medication review. T 634. Plaintiff expressed frustration with her job and plan to start a new job. T 634. She stated she had a new job lined up in a plastic packaging factory. *Id.* Plaintiff took Lamictal twice a day and Zoloft three times a day. T 634. Plaintiff was happy with her medications. T 634. Her mental status examination showed tight associations and exuberant mood. *Id.* Dr. Donovan noted that Plaintiff had a euthymic mood, although "way too exuberant at times," but not to a manic degree. T 634.

On November 1, 2019, Plaintiff saw Stephanie Clapper, M.D. of CNY Family Care for complaints including low back pain radiating into the left hip. T 649. Heat helped temporarily with use of Tylenol, but certain movements worsened pain to such a degree that it would take her breath away. T 649. Exam noted left lumbar spasm and tenderness, but full strength in her lower extremities. T 651. Dr. Clapper recommended Plaintiff use moist heat, gentle stretching, and take Tylenol or ibuprofen for the pain. T 652. She indicated that if the pain did not improve, she would prescribe Plaintiff a muscle relaxer and refer her to physical therapy. *Id.* Dr. Clapper advised: "Do not do any activities that are causing more discomfort but okay to do gentle walking if comfortable." T 652. Plaintiff was also to continue medication for depression/bipolar. T 652.

On November 26, 2019, Plaintiff returned to Dr. Donovan's office. T 635. Dr. Donovan noted: "She is reporting that her moods are pretty stable. She does have flashbacks to an accident 11 years ago. Apparently on this thruway some car was coming at them and she started crying[.] [S]he keeps getting flashbacks to this. It makes her particularly nervous [on the] thruway riding in a car driven by someone." T 635. Exam noted some kind of suspicious paranoid thoughts. T 635. Her thought processes remained logical and sensible with uncompromised judgment and insight. *Id.*

Plaintiff returned to Dr. Clapper's office in February 2020 for back pain. T 656. She reported low back pain lasting for the past two weeks. *Id.* On examination, Plaintiff had some point tenderness in the lower right thoracic musculature that worsened with movement or twisting. T 658. She started taking a muscle relaxer for the spasms. *Id.* Dr. Clapper advised her against heavy lifting, pulling, or pushing at that time. *Id.*

2023 WL 2742076

She recommended Plaintiff start physical therapy if the pain did not improve. *Id.*

On February 11, 2020, Dr. Donovan's office issued a letter stating that his practice was closing due to Dr. Donovan's hospitalization. T 647.

On February 12, 2020, Plaintiff saw Amy Russell, PA of CNY Family Care concerning her back pain. T 656. Pain did not radiate down the leg, but there was some pain behind the right arm. T 656. On exam, PA Russell noted, "[p]oint tenderness right lower thoracic musculature, pain worsens with movement of right arm and twisting motion." T 658. She prescribed cyclobenzaprine for back spasms. T 658.

 **\*6** In May 2020, Plaintiff had her annual physical examination with Dr. Clapper. T 671. Plaintiff had no pain, was exercising sporadically, had no medication side effects, and did not follow her recommended diet. *Id.* Plaintiff had a full range of motion in all her extremities with normal muscle strength. T 673. She was alert and oriented x3. *Id.*

On May 15, 2020, Plaintiff saw psychiatrist Miranda Mohabir, M.D. T 660. Plaintiff explained that she had been in treatment since 1985 and on medication since 1994. T 660. She had seen Dr. Donovan for about seven years. T 660. She had always had good and bad days. T 660. Plaintiff had a history of hypomania lasting from a few hours to two days, though she was mostly depressed. T 660. She historically and currently felt slightly paranoid, thinking people were talking about her. T 660. Plaintiff noted childhood sexual abuse resulting in removal to foster care at age 14. T 660. Plaintiff noted that she worked most of her life, but could not work at her last job due to depression. T 661. Dr. Mohabir diagnosed bipolar II disorder, mostly depressed. T 661. She increased Zoloft and prescribed Lamictal and trazodone. T 661.

In July 2020, Plaintiff requested that Dr. Clapper take over prescribing her psychiatric medications. T 728. In November 2020, Dr. Clapper commented that Plaintiff's mental health symptoms were stable on medication. T 685.

### D. Hearing Testimony
At the January 2021 hearing, Plaintiff testified to the following: She left her last job due to having some issues with her ability to read paperwork, sitting at her station and crying for no reason. T 52. She struggled to remember what paperwork she had been asked to retrieve from a cabinet.

T 52. Presently, she could not fill out doctor's office forms without help and she would "fly off the handle" at times. T 54. She testified that it did not take much for her to have an emotional outburst, which could occur as much as twice a week. T 55. Plaintiff reported seeing a counselor named Allan. T 56. When asked if he had any problems with her knees, Plaintiff responded that if she stood for a long period of time she could "hardly walk." T 56. When asked about any symptoms that would prevent her from working a full-time job, Plaintiff stated: "I can't comprehend what they want me to do. Every job I've had, I've had to have help doing the job." T 56. With regard to her back symptoms, she stated: "It bothers me to the point where I have to go and sit for a little bit because it hurts so bad. And if I bend over a lot, that would bother me. And doing everyday chores bothers me." T 57. When asked by the ALJ what treatment Plaintiff had for her knee, she responded that she had physical therapy approximately 6 years previous, that she was "trying to do a little bit of exercise at home," but she had not had surgery or any additional shots. T 58. When asked what treatment she's had for her back complaints, Plaintiff said she has had none but was "just taking Tylenol." T 58.

On March 3, 2021, the ALJ held a supplemental hearing at which time impartial vocational expert Kim Bates, C.R.C., testified. T 33-42. Bates opined that under the ALJ's RFC Plaintiff could not perform her past relevant work, but that Plaintiff could perform the requirements of representative occupations such as garment sorter, office helper, and mail clerk all of which are considered light, unskilled work, and that she could perform the representative occupation of laundry worker, which is considered medium, unskilled work. *Id.* Bates further stated that a sufficient number of jobs in each of these classifications existed in the national economy. *Id.*; *see also* T 10, 20-22.

### IV. THE ALJ'S DECISION
 **\*7** The ALJ engaged in the five-step analysis required by 20 C.F.R. § 416.920(a) to determine whether the claimant qualified for disability benefits. The ALJ found that Plaintiff met the insured status requirements through December 31, 2020 and did not engage in substantial gainful activity between the alleged onset date and date last insured (June 1, 2019 to December 31, 2020). T 12-13. The ALJ found Plaintiff had the following severe impairment: a mental impairment variously characterized as depression and/or PTSD. T 13. The ALJ found that no combination of impairments met or equaled a listing. T 14. The ALJ found

2023 WL 2742076

that Plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, except:

> The claimant can perform simple tasks, but not at a production rate pace or to strict quota requirements. She is limited to simple instructions and simple work-related decisions. The claimant is limited to only occasional interaction with supervisors, coworkers, or the public. She should not perform teamwork or tandem tasks. The claimant is limited to a static work environment, with only occasional changes in the work setting.

T 16. The ALJ determined that Plaintiff was unable to perform her past relevant work. T 20. However, the ALJ also determined that Plaintiff was able to perform other work as a garment sorter, office helper, mail clerk, and laundry worker. T 21.

## V. DISCUSSION

Plaintiff presents two issues on appeal:

1. The ALJ failed to support with substantial evidence her evaluation of the mental opinion evidence in accordance with regulation; and

2. The ALJ failed to support with substantial evidence her evaluation of the physical opinion evidence in accordance with regulation.

On the first issue, Plaintiff argues:

> The ALJ's analysis of Dr. Ferrin's and Dr. Ochoa's non-examining opinions was flawed and did not duly consider the primary factors of supportability and consistency. Dr. Shapiro's and Dr. Donovan's opinions duly considered Plaintiff's ability to deal with stressors and the bipolar nature of Plaintiff's condition, and the ALJ's analysis of all four opinions did not suitably

undermine the persuasive value of Dr. Shapiro's and Dr. Donovan's opinions.

Pl. Br. 7. On the second issue, Plaintiff argues that "[t]he ALJ failed to consider the important factor of supportability in considering Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions. *Id.*, 13. Based on these reasons, Plaintiff argues, remand is required. The Commissioner opposes both arguments and contends that the ALJ's determination should be affirmed. *See generally*, Def. Br.

## Assessing Medical Opinions

Under the new regulations applicable to Plaintiff's claim, the Commissioner will no longer give specific evidentiary weight to medical opinions. *Elizabeth P. v. Comm'r of Soc. Sec.*, No. 3:20-CV-891 (CFH), 2022 WL 507367, at *4 (N.D.N.Y. Feb. 18, 2022); *see Wanda N. v. Comm'r of Soc. Sec.*, No. 6:21-CV-00358, 2022 WL 4376484, at *6 (N.D.N.Y. Sept. 22, 2022); *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 WL 860506, at *4 (N.D.N.Y. Mar. 8, 2021). "Rather, the Commissioner must consider all medical opinions and 'evaluate their persuasiveness' based on: supportability; consistency; relationship with the claimant (which includes the length of treatment relationship, frequency of examinations, purpose and extent of the treatment relationship, and examining relationship); specialization; and 'other factors.' " *Elizabeth P.*, 2022 WL 507367, at *4 (quoting 20 C.F.R. § 404.1520c(a)-(c)).

"The regulations explain that when 'evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings,' the " 'most important factors ... are supportability ... and consistency.' " *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022) (summary order)(footnote omitted)(quoting 20 C.F.R. § 404.1520c(a)); *see Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021)("At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency of each of the medical opinions, 'pointing to specific evidence in the record supporting those findings.' ")(citing *Jacqueline L. v. Commissioner*, No. 6:19-CV-6786, 2021 WL 243099, at *6 (W.D.N.Y. January 26, 2021)). " 'Supportability' means '[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to

2023 WL 2742076

support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.' " *Celia A. B. v. Commr. of Soc. Sec.*, 5:21-CV-112 (CFH), 2022 WL 4225540, at *4 (N.D.N.Y. Sept. 13, 2022)(quoting 20 C.F.R. § 404.1520c(c)(1)); *see Andrea G. v. Commr. of Soc. Sec.*, 5:20-CV-01253 (TWD), 2022 WL 204400, at *4 (N.D.N.Y. Jan. 24, 2022) ("Under the supportability factor, the more a medical opinion or prior administrative medical finding is reinforced by 'relevant ... objective medical evidence and supporting explanations,' the 'more persuasive' it will be.") (quoting 20 C.F.R. § 404.1520c(c)(1), and citing *Carmen M. v. Comm'r of the Soc. Sec. Admin*, No. 20-CV-06532-MJR, 2021 WL 5410550, at *4 (W.D.N.Y. Nov. 19, 2021) ("The supportability factor asks how well a medical source supported their opinion(s) with objective medical evidence and supporting explanations.")). " 'Consistency' means '[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.' " *Celia A. B.*, 2022 WL 4225540, at *4 (quoting 20 C.F.R. § 404.1520c(c)(2)).

**\*8** As Judge Hummel recently explained:

"If the ALJ fails adequately to explain the supportability and consistency factors, or bases [his or] her explanation upon a misreading of the record, remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-CV-4630 (LJL/BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (citation and quotation marks omitted). ...

"[T]he ALJ's conclusion [need] not perfectly correspond with any of the opinions of medical sources cited in his [or her] decision, [and] he [or she] [i]s entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). The Court "defer[s] to the Commissioner's resolution of conflicting evidence[.]" *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) (citation and quotation marks omitted). Therefore, even if a plaintiff disagrees with the ALJ's assessment of opinion evidence and can point to evidence in the record to support his or her position, "whether there is substantial evidence supporting the [plaintiff's] view is not the question [ ]; rather, [the Court] must decide whether substantial evidence supports

the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (emphasis omitted). The ALJ must not "ignore evidence or cherry pick only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence" but "[t]he Court will not reweigh the evidence that was before the ALJ." *April B. v. Saul*, No. 8:18-CV-682 (DJS), 2019 WL 4736243, at *6 (N.D.N.Y. Sept. 27, 2019) (citations and internal quotation marks omitted).

"It is well settled that, under both the old and new regulations concerning the evaluation of medical evidence, an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims." *Amber H. v. Saul*, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *5 (N.D.N.Y. May 24, 2021). "[A]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the reviewing court] to glean the rationale of an ALJ's decision." *Renalda R. v. Comm'r of Soc. Sec.*, 20-CV-0915 (TWD), 2021 WL 4458821, at *5 (N.D.N.Y. Sept. 29, 2021) (citations and quotation marks omitted).

*Elizabeth P.*, 2022 WL 507367, at *4. However, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96-8p, at *7 (July 2, 1996). The failure to do so is grounds for remand. *Herrera v. Comm'r of Soc. Sec.*, No. 20-CV-6211 (PKC), 2022 WL 4643044, at *7 (E.D.N.Y. Sept. 30, 2022).

### Opinions Related to Plaintiff's Mental Limitations Drs. Ferrin and Ochoa

The ALJ found the prior administrative medical findings from Drs. Ferrin and Ochoa persuasive. T 18-19. The ALJ noted that Dr. Ferrin found that Plaintiff is moderately limited in her ability to maintain concentration, interact with the public, respond to changes, and complete a normal workday or workweek without interruption from psychological symptoms. T 18-19. The ALJ noted that Dr. Ochoa concurred with Dr. Ferrin's assessment, and that Dr. Ochoa wrote that Plaintiff retains the ability to perform repetitive tasks on a sustained basis, in settings without tight productivity requirements. T 19. The ALJ also noted that Dr. Ochoa opined that Plaintiff is able to adapt to basic changes and make routine work-related decisions. T 19. The ALJ wrote:

Donna N. v. Commissioner of Social Security, Slip Copy (2023)
Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 139 of 356

2023 WL 2742076

**\*9** Dr. Ferrin and Dr. Ochoa are mental health experts. Their opinions are based upon reviews of relevant medical evidence, and are supported by detailed explanations. Additional factors adding to the persuasiveness of the doctors' assessments are their familiarity with the Agency's disability program policies and evidentiary requirements, and the fact that the explicit purpose of their reviews was to render a medical opinion on disability using said criteria. No records were submitted at the hearing level which would militate against their opinions. For these reasons, although I have adopted slightly greater restrictions in social interaction, I find the assessments of Dr. Ferrin and Dr. Ochoa to be persuasive accounts of the claimant's functioning.

T 19.

Plaintiff argues that "[t]he non-examining opinions merely state conclusions about what Plaintiff can allegedly do without connecting such estimation to any evidence. There is a brief parroting of Dr. Shapiro's and Dr. Donovan's opinions, with which the non-examining opinions appeared to disagree, but there was no statement of why Plaintiff could perform in accordance with the non-examining opinions and not do more than that." Pl. Br. at 9 (citing T 93, 113). Moreover, Plaintiff maintains:

> The non-examining reports declined to mention Dr. Shapiro's observation of lethargic motor behavior (T 629), and they indicated that Dr. Donovan did not submit any treatment records (T 113) despite the record containing Dr. Donovan's records showing sub-manic behavior (T 634), discussion of flashbacks and paranoid thoughts (T 635). Dr. Donovan's note predating the alleged onset date noted episodes

of hyperemotionality and agitation including throwing of a radio. T 338.

Pl. Br. 9-10.

As the Commissioner argues, however, Dr. Ferrin noted that Plaintiff was never psychiatrically hospitalized and only saw her former psychiatrist, Dr. Donovan, every three months. T 92. He explained that Plaintiff's symptoms and limitations in Dr. Donovan's second treating source opinion seemed inconsistent with the generally unremarkable mental status examination contained in the first opinion. *Id.* Dr. Ferrin noted that Plaintiff had a variable mood on mental status examination, which was improved with medication, but her mental status was otherwise normal. *Id.* Further, Dr. Ferrin noted Plaintiff's report that she could drive independently seemed to contradict Dr. Donovan's opinion that Plaintiff could not travel to unfamiliar places. *Id.* Dr. Ferrin noted there were no additional treatment records from Dr. Donovan at the time of his review. *Id.*

Dr. Ferrin further discussed the symptoms Plaintiff reported at the consultative examination with Dr. Shapiro. T 92-93. He discussed the mental status examination, which showed a constricted affect and sadness; poor insight and judgment; intact attention and concentration; and intellectual functioning estimated to be in the deficit range. *Id.* However, Dr. Ferrin also noted that Plaintiff's report to Dr. Shapiro that she could not comprehend how to manage money contradicted her earlier statement in the function report. T 93.

Dr. Ochoa similarly considered this evidence, Dr. Ferrin's findings, and the new evidence submitted at the reconsideration level. T 112-13. The new evidence included treatment notes from Dr. Donovan illustrating Plaintiff's stability on mediation and unremarkable mental status examinations. T 113. Dr. Ochoa affirmed Dr. Ferrin's findings. *Id.*

The ALJ properly considered the supportability factor by explaining that Drs. Ferrin and Ochoa "are mental health experts, and are well versed in Agency standards and evidentiary requirements. Their assessments are consistent with the record as a whole and unrebutted." T 16. The ALJ also stated that their opinions "are based upon reviews of relevant medical evidence, and are supported by detailed explanations." T 19.

**\*10** The ALJ also explained that Drs. Ferrin's and Ochoa's findings were consistent with the relevant medical evidence available for review as well as the records submitted after their reviews. *See* T 18-19; 20 C.F.R. § 404.1520(c)(2) (the more consistent the prior administrative medical findings are with the evidence from other medical sources and nonmedical sources, the more persuasive). The ALJ discussed these mental health treatment notes in the decision. T 18. As the Commissioner argues, Dr. Donovan's treatment records from the relevant period, not specifically referenced by Dr. Ochoa, showed essentially unremarkable examinations with some discussion of sleeping difficulties, which resolved, and some paranoid thoughts relating to a car accident 11 years prior. T 113, 633-35. The ALJ also acknowledged the treatment notes depicting Plaintiff as cooperative and displaying appropriate mood and affect. T 18 (citing T 487, 494, 651). The ALJ noted that in November of 2020, Plaintiff reported feeling "okay" despite some continuing symptoms. T 18 (citing Tr. 681). Dr. Clapper noted Plaintiff's mental health was stable on her medications, but she should follow up with her new counselor and start exercising to improve her mood. T 685. Accordingly, the ALJ appropriately determined the prior administrative medical findings were consistent with the record as a whole. Thus, the ALJ properly considered the two most important factors in the persuasiveness assessment.

Plaintiff also assigns error because Drs. Ferrin and Ochoa did not provide a sufficient rationale for their findings. Pl. Br. 9-10. However, as the Commissioner argues, Plaintiff fails to cite regulatory authority that Drs. Ferrin and Ochoa needed to explain not only why Plaintiff remained capable of performing the activities cited, but also why she could "not do more than that." Def. Br. 9. Moreover, Drs. Ferrin and Ochoa discussed the mostly unremarkable objective findings, while simultaneously noting Plaintiff did occasionally experience symptoms. T 92-93, 112-13. Further, they explained how evidence contradicted some of the opined limitations from Drs. Donovan and Shapiro. *Id.* They then provided findings regarding what Plaintiff could still do. *Id.* Accordingly, their prior administrative medical findings both identified supportive evidence and provided supportive explanations consistent with the record.

Plaintiff also argues that that Dr. Donovan's treatment records were not sufficiently discussed. Pl. Br. 9-10. The Commissioner argues that Plaintiff cites to no regulatory authority that every record needed to be cited by the state agency psychologists, and that an ALJ is not required to discuss every treatment record. Def. Br. 10 (citing

*Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (ALJ not required to mention all the evidence presented to him or explain why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability)). Moreover, as the Commissioner contends, Dr. Ochoa reviewed Dr. Donovan's treatment records, which were submitted at the reconsideration level. T 113. Dr. Ochoa specifically cited to the July 2019 note identified in Plaintiff's brief. T 113, 634. As the Commissioner points out, at that appointment Plaintiff presented as excited because she was set to start a new job and she was happy. T 634. Dr. Donovan reported her mood "although way too exuberant at times, but [was] not in a manic direction, normal." *Id.* While Dr. Ochoa did not explicitly discuss the other two treatment records from December 2018 and November 2019 that Plaintiff cites, Plaintiff experienced difficulties in December 2018, six months prior to her alleged onset date, and Dr. Ochoa noted that later records, as well as some earlier records, depicted a stable mood. T 113; *see* T 339-41, 633-5.

Additionally, as the Commissioner argues, Plaintiff fails to explain how a treatment record prior to her alleged onset date could render the prior administrative medical findings inaccurate. Further, in November 2019, Plaintiff merely reported that on her way to the appointment she had a flashback to a car accident 11 years ago. T 635. Dr. Donovan noted she had "some kind of suspicious paranoid thoughts" in relation to this but her mental status was otherwise normal. *Id.* Plaintiff offers no explanation of how this treatment note demonstrated error in Dr. Ochoa's findings.

Plaintiff alleges the discussions by Drs. Ferrin and Ochoa regarding her ability to handle money was flawed. Pl. Br. 10. But the Court agrees with the Commissioner that Plaintiff fails to illustrate error in this regard. Drs. Ferrin and Ochoa acknowledged that Plaintiff reported to Dr. Shapiro that she could not comprehend how to handle money. T 93, 113, 630. However, they accurately noted that the record contained contradictory evidence on this matter. T 93, 113. Plaintiff self-reported in her function report she could pay bills and count change, although she could not handle a savings account. Tr. 300. She noted that her condition did not affect her abilities in this area. *Id.* While her husband reported Plaintiff could not comprehend any of the tasks related to money and he took care of it all, T 291, Dr. Donovan reported Plaintiff could handle her own benefits, if awarded, and her fund of information, ability to perform calculations, etc. were all within normal limits. T 611-12. Thus, Drs. Ferrin and Ochoa

accurately noted conflicting evidence. Therefore, Plaintiff fails to illustrate any inaccuracy in their discussion.

**\*11** It is also important to note that, while the ALJ found the prior administrative medical findings persuasive, she included some additional, more restrictive, limitations in the RFC. As the Commissioner points out, the Second Circuit recently reiterated its holding that "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013); *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Thus, the ALJ permissibly limited Plaintiff to simple work and only occasional interaction with coworkers and supervisors, which reflected some of the limitations from Dr. Donovan's opinion. T 16.

### Dr. Shapiro

The ALJ found Dr. Shapiro's opinion less persuasive. T 19. The ALJ noted Dr. Shapiro based her opinion on the examination findings, although she only examined Plaintiff once. T 19; 20 C.F.R. § 404.1520c(c)(1). However, the ALJ explained that Dr. Shapiro's testing results demonstrated Plaintiff's attention and concentration were intact, which provided poor support for her opined limitation of marked difficulties in concentration. T 19. Additionally, the ALJ explained Dr. Shapiro's opinion that Plaintiff would have difficulties sustaining regular workplace attendance was speculative and not supported by any evidence. *Id.*

As the Commissioner points out, an opinion is more persuasive when both supported by objective evidence provided by the opining source and consistent with the evidence from other medical and non-medical sources. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). The Court finds that the ALJ properly explained that the overall record did not support Dr. Shapiro's opinion for marked-level limitations in any area of work-related mental functioning. *See* T 19. The ALJ noted that there were only a few examinations illustrating remarkable objective findings, T 19 (citing T 487, 494, 634-35, 651 716, 720), and that Plaintiff's adequate range of daily activities indicated that Dr. Shapiro underestimated Plaintiff's capabilities. T 19 (citing T 297-98, 300, 621, 630)). Additionally, the ALJ explained that alleged reading difficulties were not reflected in the clinical record or Dr. Shapiro's objective findings and appeared to be based solely

on the Plaintiff's self-reports. T 19. Plaintiff argues that the ALJ erred in the assessment of Dr. Shapiro's opinion but, as the Commissioner points out, Plaintiff makes no attempt to show the evidence supported each opined limitation or the severity of the limitations opined by Dr. Shapiro. *See* Pl. Br. 10-11.

The Court also agrees with the following arguments by the Commissioner:

[T]he ALJ did not discount the entirety of Dr. Shapiro's opinion. In fact, the RFC assessment for simple tasks; simple work-related decisions; occasional interaction with supervisors, coworkers, and the public; occasional changes; and no production pace or quotas accounted for many of Dr. Shapiro's opinions. (Tr. 16). Plaintiff merely cites to Dr. Shapiro's examination findings illustrating lethargic motor behavior, a constricted affect that was reduced in intensity compared to thoughts/speech, and sad appearance as "sufficient support" for Dr. Shapiro's opinion. (Pl. Br. 10 (Tr. 629-30)). Yet she fails to identify what limitations these findings allegedly supported.

Similarly, Plaintiff alleges that her activities of daily living did not contradict Dr. Shapiro's opinion. (Pl. Br. 10-11). Again, the ALJ did not reject Dr. Shapiro's opinion, instead she explained that Plaintiff's daily activities demonstrated Plaintiff was not as limited as Dr. Shapiro opined. (Tr. 19). Significantly, Plaintiff independently took care of her mother-in-law and the household pets. (Tr. 289, 297). She remained able to cook multi-course meals with some help from her mother-in-law and husband when she had little motivation. (Tr. 59, 290, 298). She reported her mother-in-law did the dishes because it made her mother-in-law feel helpful. (Tr. 59). However, she could perform the other household chores without prompting or assistance. (Tr. 290, 298-99). The ALJ only found these activities did not support marked limitations in Plaintiff's capabilities, and Plaintiff fails to show error in that conclusion. (Tr. 19).

**\*12** Def. Br. 13-14.

Plaintiff also relies on her self-reports to Drs. Shapiro and Mohabir to support her assertion that her bipolar impairment fluctuates so her ability to perform her activities of daily living was not representative of her functioning. Pl. Br. 10. However, as the Commissioner points out, noting a fluctuation of symptoms does not speak to the *severity* of those symptoms, and the majority of objective evidence illustrated Plaintiff's normal mental functioning throughout

2023 WL 2742076

the relevant period. Further, Plaintiff was gainfully employed while presumably experiencing those fluctuations in 2018 and early 2019, *see* T 338-39, 633, and was diagnosed with bipolar disorder in 1985 yet had a lengthy work history subsequent to her diagnosis. *See* T 54, 247. An RFC reflects the most an individual can do, and the ALJ determined that Plaintiff's assessed marked limitations did not reflect the most Plaintiff could do. *See* T 16, 19. Thus, as the Commissioner argues, Plaintiff's reported fluctuations in her symptoms did not alone support Dr. Shapiro's opined limitations.

In the end, Plaintiff fails to demonstrate any error in the ALJ's assessment of Dr. Shapiro's opinion.

### Dr. Donovan

Dr. Donovan submitted two opinion forms, one on October 16, 2019, and the second on October 27, 2019. T 611-13, 616-20. In the October 16th opinion, Dr. Donovan reported he had been treating Plaintiff since 2011 for her bipolar disorder. T 611. He further reported Plaintiff had a "good" response to Lamictal. *Id.* Dr. Donovan reiterated the mental status examination findings from their last session three months earlier, in July 2019, which showed a variable mood, but it was otherwise normal. T 611-12. Dr. Donovan opined Plaintiff had difficulties with pressure and stress. T 612. Further, he opined she was "limited" in her functioning but failed to identify specific limitations as instructed on the form. T 612-13. The ALJ found this opinion limited in persuasiveness because it was vague and slightly contradictory. T 19. Nevertheless, the ALJ found some limitation in each of the four paragraph B criteria at step three—the four areas listed in Dr. Donovan's opinion—and the RFC included limitations reflecting her functioning in these areas. T 15-16, 612-13. Accordingly, the ALJ implicitly included any limitations provided in Dr. Donovan's October 16th opinion.

Regarding the October 27th opinion, the ALJ wrote:

> Dr. Donovan reported that the claimant is unable to meet competitive standards concerning stress tolerance, consistent performance, and the ability to complete a normal work schedule without interruption. Dr. Donovan asserted that the claimant is seriously

limited, but not precluded from performing 11 other work-related activities, such as accepting criticism and maintaining socially appropriate behavior (Ex. B8F, p. 3). Dr. Donovan opined that the claimant would likely be off-task more than 20% of a typical workday. He predicted that her workplace attendance would be variable (Ex. B8F, p. 4). Dr. Donovan's opinion is somewhat persuasive, as he has treated the claimant, affording him knowledge of her condition. Accordingly, the undersigned has limited the claimant to simple, routine work with limited social contact to address his concerns. Yet the record as a whole does not support the more extreme limitations Dr. Donovan identified. Dr. Donovan's own office notes from 2019 describe the claimant as fully oriented, logical and sensible. Dr. Donovan stated that the claimant's memory and judgment were intact, while her attention and concentration were good (Ex. B11F, pp. 2, 3). Furthermore, there are no testing results to support Dr. Donovan's estimates of time spent off-task and likely workplace attendance. Although the claimant may have sometimes cancelled medical office visits, the record shows that she has generally been able to attend her scheduled appointments without difficulty, including the two consultative examinations, the disability hearings, and routine follow-up examinations with her care providers. The overall record indicates that the claimant retains greater abilities than Dr. Donovan describes.

**\*13** T 19-20.

Plaintiff contends, *inter alia*, that the ALJ did not specially address that Dr. Donovan's opinion regarding Plaintiff's limitations was based on stress, and allegedly ignored

Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 143 of 356

Social Security Ruling (SSR) 85-15. Pl. Br. 13.[1] The Commissioner counters that the ALJ limited Plaintiff to simple tasks; no work at a production rate pace or with strict quota requirements; simple instructions and simple work-related decisions; only occasional interaction with supervisors, coworkers, or the public with no teamwork or tandem tasks; and a static work environment, with only occasional changes in the work setting. Def. Br. 17. Each of these limitations, the Commissioner contends, reduced the number of stressors Plaintiff would need to process in a work environment, and thus the ALJ provided for a lower stress work environment which accounted for Dr. Donovan's opinion that Plaintiff could not function under "normal work stress." *Id.* Furthermore, the Commissioner argues, SSR 85-15 does not govern the assessment of medical opinions and the overall RFC assessment, and ALJ relied on vocational expert testimony not the Medical-Vocational Rules. *Id.*

[1]  See *Titles II & XVI: Capability to Do Other Work- The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15 (S.S.A. 1985).

"When a claimant suffers from significant stress, the ALJ must address how that stress might affect the claimant's ability to perform the specific job or jobs that otherwise fit [her] RFC profile. Indeed, '[b]ecause stress is 'highly individualized,' an ALJ must 'make specific findings about the nature of [a claimant's] stress, the circumstances that trigger it, and how those factors affect [her] ability to work.' " *David H. v. Comm'r of Soc. Sec.*, No. 20-CV-6194-LJV, 2021 WL 2809550, at *1 (W.D.N.Y. July 6, 2021)(quoting *Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006)) (explaining that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job[,] ... [and a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment") (citing SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)). " 'Although a particular job may appear to involve little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments.' " *Id.* (quoting *Welch v. Chater*, 923 F. Supp. 17, 21 (W.D.N.Y. 1996)).

The Commissioner's own regulations illustrate and explain the issue:

[a] claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [F]or example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons.

**\*14** SSR 85-15, 1985 WL 56857, at *6 (emphasis in original). So when stress affects a claimant's ability to function, the ALJ must address any limitations explicitly and uniquely for that claimant. *Stadler*, 464 F. Supp. 2d at 189.

*Id.*

"Plaintiff correctly states the standard laid out in SSR 85-15 which has been recently reiterated by the Second Circuit: 'the Social Security Administration has itself emphasized the importance of crafting an individualized assessment of non-exertional impairments, such as difficulties interacting with others.' " *Celia A. B.*, 2022 WL 4225540, at *11 (quoting *Rucker v. Kijakazi*, No. 21-621-CV, 2022 WL 4074410, at *4 (2d Cir. Sept. 6, 2022)) (citing SSR 85-15, 1985 WL 56857, at *6 ("The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances.... Any impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.")).

"Although an ALJ need not recite every piece of evidence supporting his or her decision, the ALJ must explain his or her decision to a sufficient degree that the Court can glean the rationale." *Celia A. B.*, 2022 WL 4225540, at *11. While the ALJ referenced that Dr. Donovan's second report indicated that Plaintiff would be unable to meet competitive standards concerning stress tolerance, consistent performance, and the ability to complete a normal work schedule without interruption, the ALJ does not specifically discuss Dr. Donovan's stress limitation or treatment records that support the opinion when arriving at the RFC. Thus, the Court is unable to glean the ALJ's rationale for excluding

a specific stress related limitation from Plaintiff's RFC. *See id.* ("As the ALJ did not discuss the stress limitation in Dr. Spinks' opinion, or Dr. Gandy's stress limitation and the treatment records that seem to support the opinion, the Court cannot glean the ALJ's rationale in excluding a stress related limitation from plaintiff's RFC."); *David H*, 2021 WL 2809550, at *2 ("The failure to address [Plaintiff's] stress leaves significant gaps in the ALJ's decision and raises significant questions about whether [Plaintiff] could perform the jobs that the ALJ found [her] able to perform."); *see, e.g., id.* ("For example, although the ALJ found that David had a moderate limitation in interacting with others and acknowledged that David reported social isolation and paranoia, the ALJ did not make any specific findings about how David's stress affected that behavior or what circumstances triggered it.")(cleaned up)(citing *Stadler*, 464 F. Supp. 2d at 189); *cf. Rucker*, 2022 WL 4074410, at *4 (explaining that in the context of SSR 85-15, "the Commissioner argues that any omission as to social interactions was harmless error, since the jobs identified by the vocational expert were consistent with additional restrictions.... We do not agree that the omission was harmless. [T]he Commissioner's logic is circular. The premise of [the plaintiff's] argument is that her social limitations prevent her from being employed in any workplace. To assume that the level '8' jobs would not burden her, because they involve a very low level of human interaction, begs the question of whether that low level is itself sufficient.").

**\*15** Further, despite that "courts have held that reasoning levels of two and three are compatible with unskilled, simple, and low stress work," *Celia A. B.*, 2022 WL 4225540, at *12, "the ALJ did not ask about, and the vocational expert ("VE") did not address, the mental demands of the jobs that the VE identified, how stressful those jobs are, or how [ ] stress limitations might affect the performance of those jobs." *David H*, 2021 WL 2809550, at *2 (cleaned up). Because the assessed extreme limitations caused by Plaintiff's stress might well affect her ability to perform the work that the ALJ found she could do, the ALJ's decision that Plaintiff could perform the jobs identified by the VE is not supported by substantial evidence. *See id.* at *2-3 (By not addressing the mental demands of the jobs the VE identified, how stressful those jobs are, or how marked stress limitations might affect the performance of those jobs, "the ALJ not only failed to address [the plaintiff's] stress and what might cause it, he failed even to consider how that stress might impact his RFC. For that reason, and because the marked limitations caused by [plaintiff's] stress might well affect his ability to

perform the work that the ALJ found he could do, the ALJ erred and his error was not harmless.")(citing *Welch*, 923 F. Supp. at 20-21)("Even if this Court were to accept the ALJ's general conclusion that [the] plaintiff has the residual functional capacity to perform simple, low-stress work, this Court is still unable to determine whether she can perform her past relevant job as a cleaner without any knowledge regarding the demands of that job. Here, the ALJ needed to probe into the stress level of [the] plaintiff's past relevant work as a cleaner in order to determine if, in fact, she currently is capable of performing that job.")(citation omitted)).

"Although it is possible ... the ALJ could determine that plaintiff can perform the same jobs as previously identified, even considering the impact of her stress, such a conclusion is best left to the ALJ." *Celia A. B.*, 2022 WL 4225540, at *13 (citing *McGill v. Berryhill*, No. 16-CV-4970 (RRM/PK), 2018 WL 1368047, at *11 (E.D.N.Y. Mar. 16, 2018)) ("[I]n his decision, the ALJ does not address whether such a low-stress limitation is warranted.... To determine whether the RFC should include a low-stress limitation, the Court would need to weigh the evidence in the record, a task that is fundamentally the ALJ's responsibility."). Accordingly, remand for further proceedings is warranted on this ground. *See Celia A. B.*, 2022 WL 4225540, at *13 (Remaining for further proceedings because "[t]he ALJ did not reconcile ... opinions with her RFC determination, and it is not evident whether plaintiff's stress is accommodated by a pace limitation or whether greater restrictions are required."); *David H.*, 2021 WL 2809550, at *3 (Remanding for further proceedings because "merely limiting [the plaintiff] to simple work and only occasional interaction with others without explicitly addressing his marked stress limitations is legally insufficient to account for [the plaintiff's] stress."); *see also Stadler*, 464 F. Supp. 2d at 189 (requiring an ALJ "make specific findings about the nature of [a claimant's] stress, the circumstances that trigger it, and how those factors affect his ability to work") (citing SSR 85-15, 1985 WL 56857, at *6); *Burke v. Berryhill*, 2018 WL 1940260, at *4 (Apr. 25, 2018) (finding that the ALJ erred by giving "great weight" to a physician's opinion that the claimant had "moderate[ ] to marked[ ]" limitations in appropriately dealing with stress but limiting the claimant to "unskilled work involving only simple, routine[,] and repetitive tasks" without "perform[ing] the requisite individualized assessment of [the claimant's] limitations in dealing with stress"); *Booker v. Colvin*, 2015 WL 4603958, at *12 (July 30, 2015) (remanding where the ALJ limited the claimant to a "low-stress" environment without making "specific findings concerning the nature of

[the claimant's] stress, the circumstances that trigger it, and how those factors affect his ability to work"); *Haymond v. Colvin*, 2014 WL 2048172, at *9 (W.D.N.Y. May 19, 2014) (finding that the RFC's "restricting [the p]laintiff to unskilled work in a 'low stress, low contact' environment[ ] did not adequately take into account the functional limitations caused by her various severe mental impairments on her ability to deal with everyday stressors").

**Opinions Related to Plaintiff's Physical Limitations**

Plaintiff contends that the ALJ failed to support with substantial evidence her evaluation of the physical opinion evidence. In this regard, Plaintiff contends that the ALJ "rejected the opinions of Dr. Naroditsky and Dr. Schmidt-DeYoung simply stating, 'neither doctor ever examined the claimant.' " Pl. Br. 12 (quoting T 14). Plaintiff further contends that the ALJ "neglected to discuss Dr. Naroditsky's support for his opinion," and that the ALJ "failed to consider the important factor of supportability in considering Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions." *Id.* 12, 13. The Commissioner counters that the ALJ examined the medical records as a whole in determining that Plaintiff's physical impairments (including a history of knee pain, a history of low back pain, and obesity) were not severe medically determinable impairments, and "then considered the prior administrative medical findings from the state agency physicians and the opinion from Dr. Ganesh, the internal medicine consultative examiner, when assessing any alleged limitations resulting from Plaintiff's physical impairments." Def. Br. 18-20 (citing T 13-14).

**\*16** The ALJ noted that neither Dr. Naroditsky nor Dr. Schmidt-DeYoung examined Plaintiff, T 14, and therefore,

as the Commissioner argues, they could not provide any independent objective findings to support their findings. Def. Br. 20 (citing 20 C.F.R. § 404.1520c(c)(1)). Furthermore, the ALJ's decision indicates that she did not reject Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions simply because they did not examine Plaintiff, but rather because the record as a whole did not support ongoing physical limitations from Plaintiff's history of knee pain, low back pain, or obesity. *See* T 13-14. In addition, the ALJ noted that Dr. Ganesh "performed a thorough evaluation of the claimant's condition" yet identified no restriction limiting Plaintiff to a reduced range of light work as opined by Drs. Naroditsky and Schmidt-DeYoung. T. 14.

For these reasons, and for the reasons discussed at pages 18-23 of the Commissioner's brief, the Court finds that the ALJ adequately addressed the persuasiveness of Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions including the supportability and consistency thereof. Accordingly, Plaintiff's motion on this ground is denied.

**VI. CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Dkt. No. 10, is **DENIED**, and Plaintiff's motion for judgment on the pleadings, Dkt. No. 9, is **GRANTED in part and DENIED in part**. The decision of the Commissioner is **VACATED**, and the matter is **REMANDED** for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2742076

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 306445
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

JUSTIN S., [1] Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only his first name and last initial.

5:20-CV-1575(ATB)
|
Signed 02/02/2022

**Attorneys and Law Firms**

JUSTIN M. GOLDSTEIN, ESQ., for Plaintiff.

CANDACE LAWRENCE, Special Asst. U.S. Attorney for Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on or about January 27, 2017, alleging disability beginning October 1, 2016. (Administrative Transcript ("T") at 71, 159-65). His application was denied initially on May 23, 2017. (T. 71, 91-102). At the request of the plaintiff, Administrative Law Judge ("ALJ") Kenneth

Theurer conducted a hearing on October 19, 2018, at which plaintiff and vocational expert ("VE") Lavonne Brent gave testimony. (T. 33-70). Immediately after the hearing, plaintiff moved to amend his alleged onset date to February 1, 2018. (T. 174). In a decision dated November 8, 2018, the ALJ found that plaintiff was not disabled (T. 10-24), and the Appeals Council denied plaintiff's request for review on June 25, 2019 (T. 1-6). Plaintiff commenced an action challenging the decision in the Northern District of New York. *Justin S. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1055 (ATB). The parties stipulated to a remand, and a stipulation and order of remand was entered by this court on April 30, 2020. (T. 855-65). In the interim, plaintiff filed a subsequent claim for disability benefits and the state agency found him disabled as of November 9, 2018. (T. 766, 859).

On June 25, 2020, the Appeals Council issued a detailed remand order, identifying the deficiencies in the November 8, 2018 decision and instructing the ALJ to take certain actions on remand. (T. 857-63). Because plaintiff was subsequently awarded benefits, the determination on remand was limited to the alleged period of disability from February 1, 2018 to November 8, 2018. ALJ Theurer once again presided over the matter, and conducted a supplemental hearing at which he procured testimony from medical expert Laura E. Hopper, Ph.D. (T. 805-22). A vocational expert appeared but did not testify. (*Id.*). On December 17, 2020, ALJ Theurer issued a decision finding that plaintiff was not disabled during the relevant period. (T. 766-84).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*2 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. Id.

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Brault v. Soc. Sec. Admin, Comm'r, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. Id. However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " Brault, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. Id. See also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. See, e.g., Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." Cruz v. Barnhart, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); Fuller v. Astrue, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

**III. FACTS**

**\*3** Plaintiff was 30 years old on the date of the October 19, 2018 administrative hearing. He lived in a mobile home with his wife and two young children. (T. 39). Plaintiff had an eleventh grade education, with some additional training through BOCES. (*Id.*). He had a driver's license and could operate a vehicle. (*Id.*).

At the time of the hearing, plaintiff was "on leave" from his part-time job as a overnight dry food stocker at Walmart, due to back issues. (T. 40). He had worked for Walmart in various capacities since 2007, however testified that he had been fired, and rehired, by the company three times. (T. 40, 49–51). He formerly had a job coach. (T. 55-56). After a suicide attempt in August 2016, he was hospitalized for a little over a week. (T. 43, 52–53). Plaintiff was also in a motor vehicle accident around the same time. (T. 52). He stopped working full-time for Walmart in 2017, because his schizophrenia was "getting too bad" and he "couldn't handle it." (T. 42). Plaintiff testified that his depression, schizophrenia, and back condition prevented him from working. (T. 43). He could not handle social interactions at work, and referenced having had "plenty of breakdowns" on the job. (T. 49). Plaintiff took medication for his psychiatric symptoms, including an anti-psychotic injectable. (T. 51–52).

Plaintiff testified that he slept most days and played games on his phone. (T. 46–48). He took care of his young children when his wife was at her part-time job. (T. 46–47). Once a month plaintiff went to the grocery store by himself, which was "sometimes" difficult for him. (T. 57).

At the December 2, 2020 supplemental hearing, Dr. Laura Hopper testified as to her review of the medical records in evidence, relative to the February 1, 2018 through November 8, 2018 period of alleged disability. (T. 814–22). There is a substantial amount of other medical evidence in the administrative record, which the parties have summarized in their briefs. Rather than reciting this evidence at the outset, I will discuss the relevant material in my analysis of plaintiff's claims.

## IV. THE ALJ'S DECISION

In his December 17, 2020 decision, the ALJ first found that plaintiff had not engaged in substantial gainful activity from February 1, 2018 through November 8, 2018. (T. 769). Next, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; depression; and schizophrenia. (*Id.*). At the third step, the ALJ determined that plaintiff's impairments did not meet

or medically equal the criteria of any listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (T. 769-70).

At step four, the ALJ found that plaintiff had the residual functional capacity to perform light work, except that plaintiff had the following additional limitations:

> he could sit for up to six hours, and stand or walk for approximately six hours, in an eight-hour day, with normal breaks; he could occasionally climb ramps or stairs; he was unable to climb ladders, ropes or scaffolds; and, he could perform occasional balancing, stooping, kneeling, crouching, and crawling. The [plaintiff] retained the ability to: understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/ concentration for simple tasks; and regularly attend to a routine and maintain a schedule. He could relate to and interact with others to the extent necessary to carry out simple tasks, but needed to avoid work requiring more complex interaction or joint effort to achieve work goals. The [plaintiff] could tolerate no more than occasional contact with coworkers and supervisors, and he needed to have no more than incidental contact with the public. The [plaintiff] could handle reasonable levels of simple work-related stress, in that he could make occasional simple decisions, directly related to the completion of his tasks, in a stable, unchanging work environment. [2]

**\*4** (T. 771-72).

[2]  The ALJ defined incidental as "more than never and less than occasional; simply put, the job should not involve direct interaction with the public, but

the person does not need to be isolated away from the public." (T. 772).

Next, the ALJ determined that plaintiff had no past relevant work, was a younger individual, and had a limited education. (T. 777). However, relying on the testimony of VE Brent, who appeared at the October 19, 2018 administrative hearing, the ALJ found that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (T. 777-79). Accordingly, the ALJ determined that plaintiff was not disabled from February 1, 2018 through November 8, 2018. (T. 779).

## V. ISSUES IN CONTENTION

Plaintiff argues that the ALJ failed to follow the remand order issued by the Appeals Council in (1) ordering a new medical expert opinion instead of recontacting prior examining and treating sources, and (2) improperly evaluating the medical opinions of record. (Plaintiff's Brief ("Pl.'s Br.") at 10–25) (Dkt. No. 12). Defendant argues that the ALJ's actions were not inconsistent with the Appeals Council's remand instructions, and that the ALJ properly evaluated the opinion evidence, resulting in an RFC that was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 10–25) (Dkt. No. 15). For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## DISCUSSION

## VI. MANDATE RULE

### A. Legal Standards

There are two "branches" of the law-of-the-case doctrine. One branch is a nonbinding doctrine that "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). "The doctrine's second branch is the nondiscretionary 'mandate rule,' which flows from the hierarchical decision-making systems it concerns." *Frank K. v. Comm'r of Soc. Sec.*, 371 F. Supp. 3d 163, 170 (D. Vt. 2019) (citing *In re Coudert Bros. LLP*, 809 F.3d 94, 101 n.2 (2d Cir. 2015)). Under the mandate rule, "where a case has been decided by an appellate court and remanded, the court

to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014).

There is an "administrative version" of the mandate rule contained in the applicable SSA regulations, which provides that, upon remand, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.1477(b). Accordingly, reviewing courts have found that failure to comply with the Appeals Council's remand order may be grounds for remand. *See Dommes v. Colvin*, No. 3:15-CV-977 (GTS), 2016 WL 7104900, at *4-5 (N.D.N.Y. Dec. 6, 2016) (remanding for calculation of benefits based on ALJ's failure to comply with District Court order and Appeals Council's remand order to follow treating physician rule); *Mortise v. Astrue*, 713 F. Supp. 2d 111, 123-24 (N.D.N.Y. 2010) (remanding based on the ALJ's failure to comply with the Appeals Council's remand order to follow the treating physician rule); *Gorman v. Astrue*, No. 08-CV-0251(NAM), 2009 WL 4884469, at *10 (N.D.N.Y. Dec. 10, 2009) (ALJ's failure to comply with the Appeals Council's remand order was error worthy of remand).

**\*5** However, where an issue is not " 'precluded by remand order or the judgment of the court in the prior judicial review, that issue may be decided differently ... on remand if the Commissioner applies the correct legal standard and substantial evidence in the record as a whole supports the decision.' " *Gusky v. Astrue*, 954 F. Supp. 2d 180, 190 (W.D.N.Y. 2013) (quoting *Thompson v. Astrue*, 583 F. Supp. 2d 472, 475 (S.D.N.Y. 2008)) (quoting *Lucas v. Astrue*, No. 07-2143, 2008 WL 474286, at *4 (D. Kan. Jan. 29, 2008)). *See also Marvin v. Colvin*, No. 3:15-CV-74(GLS/CFH), 2016 WL 2968051, at *2 (N.D.N.Y. May 20, 2016) (in the absence of limiting instructions or court findings, the Commissioner may revisit on remand any issues relating to the application for benefits) (citing *Thompson*, 583 F. Supp. 2d at 475).

### B. Application

Plaintiff argues that the ALJ's request for a medical expert's opinion was inconsistent with the Appeals Council's remand order. (Pl.'s Br. at 12). Although plaintiff concedes that the remand order did not *prevent* the ALJ from obtaining a new medical opinion, he contends that the ALJ was "first required to request clarification from the authors of the existing medical opinions, which was not done." (*Id.*). For the

following reasons, the court disagrees that the ALJ's actions impermissibly exceeded the scope of the June 2020 remand order.

In its remand order, the Appeals Council first identified the deficiencies contained in ALJ Theurer's November 8, 2018 decision. This included the ALJ's insufficient evaluation of NP Dowling's opinion, along with his failure to consider NP Dowling's documented clinical findings in weighing the opinion. (T. 859–60). The Appeals Council also found that the ALJ failed to adequately consider the requisite regulatory factors, such as consistency with the record as a whole, in affording Dr. Noia's opinion "great weight." (T. 860). The Appeals Council concluded that "Further evaluation of opinion evidence and the [plaintiff's] maximum [RFC] is needed." (*Id.*).

The remaining, relevant portions of the Appeals Council's remand order state as follows:

Upon remand, the [ALJ] will:

• Give further consideration to the [plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations [ ]. In so doing, evaluate the treating and non-treating source opinions ... and explain the weight given to such opinion evidence. *As appropriate, the [ALJ] may request the treating and non-treating sources provide additional evidence and/or further clarification of their opinions and medical source statements about what the [plaintiff] can still do despite the impairments [ ].*

...

*In compliance with the above, the [ALJ] will offer the [plaintiff] the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision[.]*

(*Id.*) (emphasis added).

At base, the remand order required the ALJ to give further consideration to plaintiff's RFC, and cite to specific evidence of record in support of his assessed limitations. The ALJ was also specifically instructed to re-evaluate the existing opinion evidence of record, and explain the weight afforded to each. However, the court is not persuaded that the language of the remand order required the ALJ to recontact these sources before "taking any further action needed

to complete the administrative record" – i.e. request an updated medical opinion. The Appeals Council's order clearly gave the ALJ discretion to recontact the existing medical sources as he deemed necessary to properly evaluate the opinion evidence and plaintiff's RFC, as evidenced by use of the terms "as appropriate," and "may." *See James C. v. Comm'r of Soc. Sec.,* No. 5:19-CV-1206 (TWD), 2020 WL 6445907, at *7 (N.D.N.Y. Nov. 3, 2020) ([T]he Appeals Council's remand order qualifies its directions to the ALJ through the use of terms such as '[i]f necessary,' and 'if warranted.' [ ] Therefore, the bulk of the Appeals Council's directions merely call for [the ALJ] to exercise her discretion regarding evaluation of the opinion and other evidence and the development of the record, so long as she complied with the applicable regulations.").

**\*6** Plaintiff specifically argues that the ALJ should have recontacted NP Dowling, in light of the ALJ's reasoning that "Nurse Dowling offered little explanation in support of his conclusions." (Pl.'s Br. at 13). However, the ALJ also noted that NP Dowling was not an acceptable medical source, and that his restrictive limitations were markedly inconsistent with his treatment records during the relevant period of alleged disability. (T. 776). In any event, the court finds no error in the ALJ's discretionary decision to not recontact NP Dowling, who was not an acceptable medical source under the applicable regulations, and instead seek a opinion from an acceptable medical source, Dr. Hopper. *See Curley v. Comm'r of Soc. Sec. Admin.,* 808 F. App'x 41, 44 (2d Cir. 2020) (rejecting argument that ALJ should have obtained medical opinion from plaintiff's treating provider where plaintiff's "only treating provider during the relevant time period was a nurse practitioner and thus was not an acceptable medical source for such an opinion" under the applicable regulations).

Moreover, and as the Commissioner points out, it was not unreasonable nor improper for the ALJ to request an updated medical opinion, considering that NP Dowling's opinion was the only one rendered during the applicable period of disability. *See* 20 C.F.R. §§ 404.1527(e); 404.1513a(b) (2) ("Administrative law judges may also ask for medical evidence from expert medical sources. Administrative law judges will consider this evidence under [the medical-opinion-evaluation regulation applicable to the claimant's DIB or SSI claim based on the application filing date] as appropriate."); *Cur v. Comm'r of Soc. Sec.,* No. 19-CV-01039, 2020 WL 6488741, at *6 (W.D.N.Y. Nov. 4, 2020)("An ALJ may properly request and consider the opinion of a medical advisor on the nature and severity of a claimant's alleged

impairments."). Obtaining an opinion from Dr. Hopper was not inconsistent with the Appeals Council's remand order, which explicitly authorized the ALJ to "take any further action needed to complete the administrative record." (T. 860). Accordingly, remand is not warranted on the basis that the ALJ failed to comply with the Appeals Council's instructions, and the court will proceed to determine whether the ALJ properly weighed the opinion evidence before him on remand.

## VII. RFC EVALUATION/TREATING PHYSICIAN

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

#### 2. Weight of the Evidence/Treating Physician

*7 In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

A treating source's opinion on the nature and severity of a claimant's impairments is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" of the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). This is known as the "treating physician rule." In *Estrella v. Berryhill*, the court emphasizes the importance of a treating source's opinion in cases concerning mental impairments, as "cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence[.]" *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (quoting *Garrison v. Colvin*, 759 F. 3d 995, 1017 (9th Cir. 2014)).

If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion

with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Estrella*, 925 F.3d at 96. It is impossible to conclude that the error is harmless unless a "searching review of the record ... assures us that the substance of the treating physician rule was not traversed[.]" *Id.*

### B. Application

The remainder of plaintiff's contentions challenge the ALJ's re-evaluation of the mental opinion evidence of record, particularly the ALJ's failure to afford controlling weight to NP Dowling's opinion, and the resulting RFC. In addition to NP Dowling's September 4, 2018 Medical Source Statement ("MSS") (T. 760–762), the record contains the May 23, 2017 opinion of state agency consultant Hillary Tzetzo, M.D. (T. 76–77); the May 17, 2017 consultative examination report of Dennis M. Noia, Ph.D. (T. 341–44); and the August 6, 2020 medical statement of Laura Hopper, Ph.D. (T. 1008–10), along with Dr. Hopper's testimony from the supplemental administrative hearing (T. 814–21).

In his MSS, NP Dowling indicated that he treated plaintiff "initially" on August 29, 2016, and that plaintiff was "currently ... seen every [four to eight] weeks and receives [long-acting injectable] anti-psychotic medication every eight weeks." (T. 760). NP Dowling identified plaintiff's diagnosis of paranoid schizophrenia, along with several of his associated symptoms including blunt, flat, or inappropriate affect; poverty of content of speech; difficulty thinking or concentrating; pathological dependence; paranoia; thinking disturbances; delusions; illogical thinking; and oddities of thought, perception, speech or behavior. (T. 760). With respect to plaintiff's functional limitations, NP Dowling opined that plaintiff was either unable to meet competitive standards, or had no useful ability to function, in the majority of the listed mental abilities and aptitudes needed to do unskilled work. (T. 761). He did not provide an explanation, or support for, these restrictive limitations, despite being prompted to do so. (*Id.*). NP Dowling found plaintiff to be similarly limited in the listed mental abilities and aptitudes needed to do particular types of jobs, and commented that plaintiff's "persistent ideas of reference and persecutory delusions preclude most situations involving contact with co-

workers and supervisors." (T. 762). Last, NP Dowling opined that plaintiff's mental impairment and/or treatment would cause him to be absent from work more than four days per month. (*Id.*).

**\*8** The ALJ explicitly discussed NP Dowling's MSS in his decision, noting the previously stated restrictive limitations. (T. 776). The ALJ afforded NP Dowling's opinion "some evidentiary weight," to the extent it was consistent with objective findings of record, including observations of constricted affect and psychomotor retardation. (*Id.*). However, the ALJ cited several reasons for rejecting portions of the MSS as it related to the relevant period of alleged disability. At the outset, the ALJ recognized that although NP Dowling had treated plaintiff, he was not an acceptable medical source, and therefore not a treating source entitled to controlling weight. (*Id.*). This was not an improper consideration. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("In Genier's case, many of the key medical opinions cited ... were those of a physician's assistant and a nurse practitioner – and not a physician. As such, the ALJ was free to discount the assessments accordingly in favor of the objective findings of other medical doctors."). However, at the same time it is well recognized that "although a nurse practitioner's opinion is not entitled to the same weight as a treating physician, these opinions are entitled to some extra consideration, when the nurse practitioner has a treating relationship with the patient." *Beckers v. Colvin*, 38 F. Supp. 3d 362, 371 (W.D.N.Y. 2014) (quotation omitted); *see also Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (finding that the ALJ was not required to give controlling weight to the plaintiff's nurse practitioner, but should have given her opinion some consideration where the nurse practitioner was the only medical professional available to the plaintiff for long stretches of time). In this case, the ALJ did not outright reject NP Dowling's opinion solely because he was not an acceptable medical source, but proceeded with his evaluation of the MSS.

Specifically, the ALJ considered that NP Dowling's opinion was inconsistent with plaintiff's treatment history as it pertained to the relevant period of disability. (T. 776). *See, e.g., Ross v. Colvin*, No. 6:13-CV-00755 (NAM), 2014 WL 5410327, at \*17 (N.D.N.Y. Oct. 21, 2014) (nurse practitioner's opinion was "entitled to lesser weight" because it was "inconsistent with the record as a whole"). He also observed that NP Dowling's own treatment records documented a generally "positive response to mental health treatment," and did not support the restrictive limitations

Justin S. v. Commissioner of Social Security, Slip Copy (2022)
Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 153 of 356
2022 WL 306445

identified. (T. 776). To plaintiff's point, the ALJ could have engaged in a more in-depth analysis of the specific treatment records he believed to undermine NP Dowling's opinion. However, the ALJ did engage in this analysis, to some extent, elsewhere in his decision (T. 774), and the evidence of record allows the court to glean the ALJ's rationale on this issue.

In particular, the record reflects that in November 2017, plaintiff began receiving injections of the anti-psychotic medication, Aristada. (T. 425–26). As of February 13, 2018, he had received his third dose of the drug, and a "mini-mental status" examination performed by NP Dowling revealed that plaintiff's affect was "much more spontaneous and congruent," and that although plaintiff was "dressed inappropriately" for the weather, his mood was improved and he displayed little depression or anxiety. (T. 417). Plaintiff's "thinking appear[ed] spontaneous," and although his "insight remain[ed] limited," he exhibited "No psychomotor retardation or agitations," and "den[ied] paranoid ideas or hallucinations." (Id.). NP Dowling noted that plaintiff's "posture and gait [were] unremarkable," and his "speech [ ] spontaneous[.]" (T. 418). Plaintiff spoke "clearly." (Id.). Plaintiff was noted to be taking his medications as prescribed, with no reported side effects. (Id.).

Plaintiff presented for therapy and/or medical management visits on an approximate monthly basis throughout the relevant period of alleged disability, with consistently similar mental examination results. On March 13, 2018, he denied hearing voices, and reported less paranoia. (T. 412). On April 30, 2018, plaintiff presented for his next injection. (T. 407). He was alert and oriented, reporting paranoia and a lack of energy. (Id.). He denied hallucinations. (Id.).

On May 15, 2018, plaintiff reported that his marital relationship was "going good," and he was sleeping eight to nine hours a day and had more energy. (T. 402). He displayed an improved mood, little depression or anxiety, and denied paranoid ideas or hallucinations. (Id.). Plaintiff returned for another injection on June 15, 2018. (T. 400). He was alert and oriented and denied hallucinations, but mentioned an increase in symptoms when he "forgets to come in." (Id.). It was noted that plaintiff was not reliable to scheduled appointments, and "could experience more effective symptom control ... through regular attendance to medication appointments." (T. 397). Nevertheless, plaintiff reported feeling "better on the injection than when he was off the medication." (T. 398).

*9 On July 26, 2016, plaintiff presented for his next injection. (T. 395). He was alert and oriented, and reported visual hallucinations that generally began before his next dose of medication was due. (Id.). On August 15, 2018, he was reported to have some obsessive worries about either himself or others having a car accident. However, plaintiff was able to handle a verbal exercise addressing these worries, "indicating further improvement." (T. 390). Plaintiff clarified that he no longer had paranoid thoughts that people were going to kill him. (Id.). His affect was spontaneous and congruent, mood improved, and he displayed little depression or anxiety. (Id.). His insight remained limited, but thinking was spontaneous, and he denied paranoid ideas or hallucinations. (Id.). Plaintiff's speech was spontaneous and he spoke quite clearly. (Id.).

Plaintiff received his next injection on September 7, 2018, and was noted to be alert and oriented, tolerating the procedure without incident. (T. 1320-21). On September 25, 2018, plaintiff was noted to be "more verbal in sessions," but "still difficult to engage at times." (T. 1318). Plaintiff reported that his daughter was his greatest accomplishment in life, and that she put him in a better mood. (Id.).

On October 19, 2018, plaintiff received his next injection. (T. 1309–10). He inquired about medication for attention deficit hyperactivity disorder, and reported difficulty with concentration and attention, especially when driving. (T. 1312). He also reported being nervous for a disability hearing, and hearing voices telling him to "hit [his] lawyer." (T. 1312). Nevertheless, his mini-mental status exam revealed an improved mood with little depression or anxiety, spontaneous thinking with limited insight, the absence of paranoid ideas or hallucinations, and spontaneous and clear speech. (Id.).

In sum, although NP Dowling's treatment records indicate some ongoing mental health symptoms, a review of the medical record shows that the ALJ's evaluation of the nurse practitioner's opinion was supported by substantial evidence. The parties do not dispute that plaintiff had a "severe" mental impairment that diminished his capacity for daily functioning. However, the ALJ found that NP Dowling's treatment notes did not support the extreme limitations identified in his MSS. This was a proper basis for the ALJ to discount the opinion of a treating source opinion, and as noted above, there was "more than a mere scintilla" of evidence that supported the ALJ's finding in this regard. Richardson v. Perales, 402 U.S. 389, 401 (1971); see also Domm v. Colvin, 579 F. App'x 27, 28 (2d Cir. 2014) (ALJ may discount the opinion of a treating

physician when the opinion is internally inconsistent with his own treatment notes, other medical evidence in the record, and the plaintiff's testimony).

As for the remaining opinion evidence of record, the ALJ appropriately discussed his reasons for the weight afforded to each. Of particular relevance was the medical statement prepared by Dr. Hopper, the only acceptable medical source who issued an opinion specific to the relevant period of alleged disability. Upon review of plaintiff's medical records, Dr. Hopper indicated that plaintiff had no limitations understanding, remembering, or carrying out simple instructions; or with the ability to make judgments on simple work related decisions. (T. 1008). She opined that plaintiff had mild limitations for understanding and remembering complex instructions, carrying out complex instructions, and in his ability to make judgements on complex work-related decisions. (*Id.*). She opined that there was no indication of difficulties interacting with others, and that plaintiff exhibited "mild concentration difficulties." (T. 1009). Dr. Hopper cited to specific treatment records in evidence as support for her assessment. (T. 1008-09).

**\*10** Dr. Hopper was apparently provided an expanded record after she prepared her medical statement, prior to the supplemental hearing. (T. 816). At the hearing, she assessed plaintiff to have somewhat greater mental limitations. Dr. Hopper noted that objective findings concerning cognitive slowing and perceived paranoia set forth in the expanded record supported greater, but no more than moderate, limitations in interacting with others; the ability to concentrate, persist or maintain pace; and adapting or managing oneself. (T. 817–20). She opined that plaintiff retained a mild impairment for understanding, remembering, and applying information. (T. 820).

The ALJ afforded Dr. Hopper's opinion "substantial evidentiary weight," finding it to be more consistent with the overall record. (T. 775). The ALJ recognized Dr. Hopper's testimony that certain breakthrough symptoms commonly occurred as plaintiff's next injection date approached. (T. 776). However, he also noted Dr. Hopper's testimony that plaintiff's symptoms were reduced significantly once he received the medication, indicating a moderate degree of impairment. (*Id.*). He found Dr. Hopper's opinion to be supported with detailed explanation, and her hearing testimony consistent with the record as a whole. (*Id.*). Last, the ALJ considered that Dr. Hopper was a mental health

expert well versed in agency standards and evidentiary requirements. (*Id.*).

Plaintiff argues that the ALJ erred in giving more weight to the opinion of a non-examining agency consultant than to those of the treating and/or examining sources. However, the regulations permit the opinions of non-examining consultants like Dr. Hopper's to override the opinions of examining sources, when the former are more consistent with and supported by the evidence than the latter. *See Hancock v. Barnhart*, 308 Fed. App'x 520, 521 (2d Cir. 2009) (opinion of non-examining medical expert may be given more weight than opinion of treating physician and may constitute substantial evidence in support of ALJ determination); *see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations ... accord less deference to treating physicians whose opinions are not supported by other evidence ... and ... permit the opinions of non-examining sources to override treating sources' opinions provided they are supported by evidence in the record." (citation omitted)); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources.").

Here, the ALJ explained his decision to give greater weight to Dr. Hopper's opinion than that of NP Dowling, and the ALJ's conclusion that Dr. Hopper's opinion was more consistent with, and supported by, the medical evidence of record is in itself supported by substantial evidence. Primarily supporting the ALJ's evaluation of Dr. Hopper's opinion are NP Dowling's own treatment records from the relevant period of alleged disability. These treatment records generally reflected that plaintiff's affect was more spontaneous and congruent, his mood was improved with little depression or anxiety, his thinking was spontaneous, he denied paranoid ideas or hallucinations, and although his insight remained limited, he exhibited no psychomotor retardation or agitation. (T. 390, 403, 412–13, 417–18, 1304, 1312). Other treatment notes from the relevant period reflect NP Dowling's examination findings, including that plaintiff denied depression, hallucinations, mood changes or schizophrenia (T. 553, 556, 563, 566, 573); was euthymic, alert, and fully oriented (T. 554, 557, 564, 567); had clear and coherent speech with logical thought processes (T. 364, 367, 370, 373); and denied symptoms such as anxiety, confusion, depression, memory loss, nervousness, racing thoughts, or sleep disturbance (T. 366, 369, 372).

**\*11**  Moreover, the ALJ did not solely rely on Dr. Hopper's opinion, as the plaintiff suggests. In determining plaintiff's mental RFC, the ALJ conducted a comprehensive analysis of the record as a whole. For example, the ALJ considered the opinion of Dr. Noia, who upon mental examination assessed plaintiff to have no more than mild impairments. (T. 341–44, 776). The ALJ afforded Dr. Noia's opinion "some evidentiary weight," because he had the benefit of examining the plaintiff and due to his benign examination findings. (T. 776). However, the ALJ also noted that Dr. Noia only examined plaintiff once, and that his opinion predated the period at issue. (*Id.*). Notably, the ALJ determined that the record as a whole supported *greater* limitations than those set forth by Dr. Noia, and assessed the same in his RFC determination. Substantial evidence supports the ALJ's evaluation of Dr. Noia's opinion, and there was no error in the ALJ assessing an RFC more restrictive than the opinion of the consulting examiner. *See McLeod v. Berryhill*, No. 1:17-CV-00262, 2018 WL 4327814, at \*3 (W.D.N.Y. Sept. 11, 2018) (consultative examiner's opinion supported RFC finding, noting that " 'the fact that the ALJ's RFC assessment did not perfectly match [an examining medical source]'s opinion, and was in fact more restrictive than that opinion, is not grounds for remand.' ") (quotation omitted); *Baker v. Berryhill*, No. 1:15-CV-00943, 2018 WL 1173782, at \*2 (W.D.N.Y. Mar. 6, 2018) ("Where an ALJ makes an RFC assessment that is more restrictive than the medical opinions of record, it is generally not a basis for remand." (internal quotation marks and citations omitted)).

The ALJ also considered the opinion of state agency medical consultant Dr. Tzetzo, who similarly assessed plaintiff to have, at most, mild limitations in mental functioning. (T. 76–77). The ALJ afforded Dr. Tzetzo's opinion some evidentiary weight, but recognized several reasons for rejecting portions of her opinion. He noted that Dr. Tzetzo did not have an opportunity to personally examine the plaintiff, and that her opinion predated the period at issue. (T. 777). The ALJ also cited to evidence in the record suggesting that, contrary to Dr. Tzetzo's opinion, plaintiff had problems interacting with others, along with signs of "cognitive slowing." (*Id.*). Accordingly, the ALJ concluded that greater limitations than those opined by Dr. Tzetzo were appropriate to adequately portray plaintiff's mental functioning abilities during the period at issue. (*Id.*).

Thus, contrary to plaintiff's argument, the ALJ appropriately evaluated the medical opinions of record to reach an RFC determination that was supported by substantial evidence, including the medical opinions of record, plaintiff's treatment records during the period of alleged disability, and plaintiff's testimony as to his own activities. "In other words, although the ALJ rejected some portions of the treating [provider's] opinions, the RFC is nonetheless consistent with the record as a whole." *Amanda S. v. Saul*, No. 5:18-CV-00473 (NAM), 2019 WL 3927452, at \*11 (N.D.N.Y. Aug. 20, 2019) (citing *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013)) (upholding ALJ's RFC determination where he "rejected" physician's opinion but relied on physician's findings and treatment notes).

Finally, the court is not persuaded by plaintiff's argument that the mental RFC determination does not account for the moderate limitations recognized by the ALJ in his evaluation of the medical evidence. At the outset, the Second Circuit has held that moderate limitations in work related functioning do not significantly limit, and thus prevent, a plaintiff from performing unskilled work. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("None of the clinicians who examined [plaintiff] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations."); *Whipple v. Astrue*, 479 Fed. App'x 367, 370 (2d Cir. 2012) (consultative examiners' findings that plaintiff's depression caused moderate limitations in social functioning ultimately supported the ALJ's determination that plaintiff was capable of performing work that involved simple tasks and allowed for a low-stress environment); *see also Wells v. Colvin*, 87 F. Supp. 3d 421, 435–36 (W.D.N.Y. 2015) (finding that moderate limitations, even in the basic mental functions of unskilled work, are not inconsistent with the ability to perform unskilled work).

**\*12**  Moreover, this is not a case in which the ALJ simply accounted for plaintiff's moderate limitations by generally limiting him to "simple, routine work." *See, e.g.*, *Karabinas v. Colvin*, 16 F. Supp. 3d 206, 215 (W.D.N.Y. 2014) ("When making findings about a claimant's RFC, an ALJ many not avoid conducting the 'detailed assessment' referenced in SSR 96-p 'by merely indicating that the claimant can perform, simple, unskilled work.' "). Instead, the ALJ set forth a detailed RFC accounting for plaintiff's limitations in understanding and memory, concentration and attention, attendance, social interaction, and the ability to handle work related stress. (T. 772). Thus, the court finds no basis for remand based on the ALJ's implementation of plaintiff's mental functional limitation into his RFC determination.

2022 WL 306445

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

**All Citations**

Slip Copy, 2022 WL 306445

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3949877
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

WAYNE P., Plaintiff,

v.

Kilolo KIJAKAZI, Defendant.

8:22-CV-653 (ATB)
|
Signed June 12, 2023

**Attorneys and Law Firms**

MARK A. SCHNEIDER, ESQ., for Plaintiff.

GEOFFREY M. PETERS, Special Asst. U.S. Attorney, for
Defendant.

### MEMORANDUM-DECISION and ORDER

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1** This matter was referred to me, for all proceedings and
entry of a final judgment, pursuant to the Social Security Pilot
Program, N.D.N.Y. General Order No. 18, and in accordance
with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P.
73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.
(Dkt. Nos. 4, 5).

### I. PROCEDURAL HISTORY

On March 29, 2019, plaintiff protectively filed an application
for Supplemental Security Income ("SSI"), alleging disability
beginning January 1, 2017. (Administrative Transcript ("T.")
64). Plaintiff's application was denied initially on July 23,
2019 (T. 64), and upon reconsideration on January 28,
2020 (T. 96). On October 1, 2020, Administrative Law
Judge ("ALJ") Andrew J. Soltes, Jr. conducted a hearing
during which plaintiff and vocational expert ("VE") Sharon
Morra testified. (T. 33-63). Plaintiff was represented by non-
attorney representative Kayla Hebert during the hearing.
(T. 43). On November 30, 2020, the ALJ issued an order
denying plaintiff's claim. (T. 10-22). This decision became
the Commissioner's final decision when the Appeals Council
denied plaintiff's request for review on June 14, 2022. (T. 1-3).

### II. GENERALLY APPLICABLE LAW

### A. Disability Standards

To be considered disabled, a plaintiff seeking DIB or
Supplemental Security Income benefits must establish that
she is "unable to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment which can be expected to result in death, or which
has lasted or can be expected to last for a continuous period of
not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A).
In addition, the plaintiff's

> physical or mental impairment or
> impairments [must be] of such severity
> that he is not only unable to
> do his previous work but cannot,
> considering his age, education, and
> work experience, engage in any other
> kind of substantial gainful work
> which exists in the national economy,
> regardless of whether such work exists
> in the immediate area in which he
> lives, or whether a specific job vacancy
> exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20
C.F.R. sections 404.1520 and 416.920, to evaluate disability
insurance and SSI disability claims.

> First, the [Commissioner] considers
> whether the claimant is currently
> engaged in substantial gainful activity.
> If he is not, the [Commissioner]
> next considers whether the claimant
> has a "severe impairment" which
> significantly limits his physical or
> mental ability to do basic work
> activities. If the claimant suffers such
> an impairment, the third inquiry is
> whether, based solely on medical
> evidence, the claimant has an
> impairment which meets or equals
> the criteria of an impairment listed
> in Appendix 1 of the regulations. If

the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

**\*2** In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " *Brault*, 683 F.3d at 448. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony[.]"). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec. 6, 2010).

**III. FACTS**

Plaintiff was thirty-seven years old on the date of the administrative hearing. (T. 41). He lived with his girlfriend, his girlfriend's daughter, and two roommates. (T. 41). He did not have a valid driver license or vehicle, at the time of the hearing. (T. 46-47). One of his roommates drove him to appointments. (T. 47). His highest level of education was the completion of the tenth grade, in special education. (*Id.*).

In 2005, plaintiff worked for a big-box store as a stocker for a little less than a year, and then worked for six months as a seasonal work farmer in 2006. (T. 44-45). Plaintiff had various short-term job placements through staffing agencies from 2006 to 2008 and in 2018. (T. 43-44). In 2018, plaintiff worked at a warehouse for about a week but stopped working because of his "social phobia." (T. 43). Plaintiff testified he is unable to work because he "get[s] paranoid and really nervous around people." (T. 48). He testified he only leaves the house to go shopping about once a month. (T. 49-50).

Plaintiff has been seeing a therapist, once every three to four weeks, for approximately one and a half years. (T. 51-52). He testified that his condition has stayed "about the same" during treatment, and that he currently takes medication for anxiety and depression. (*Id.*). He testified that he uses an inhaler for Chronic Obstructive Pulmonary Disease ("COPD"). (T. 53). Because of his COPD, plaintiff is out of breath after ten minutes of walking and has trouble lifting objects heavier than fifteen pounds. (T. 53). Plaintiff testified that he currently smokes a pack of cigarettes a day. (T. 54). He testified that he has no difficulty standing but has limitations sitting because of Attention-Deficit/Hyperactivity Disorder ("ADHD"). (T. 53-54).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 10-22). Rather than reciting this evidence at the outset, the court will discuss

the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. THE ALJ'S DECISION

The ALJ first determined at step two of the sequential evaluation, that plaintiff had not engaged in substantial gainful activity since his application date of March 29, 2019. (T. 12). Next, the ALJ found that plaintiff has the following severe impairments: chronic obstructive pulmonary disease, attention deficit hyperactivity disorder, persistent depressive disorder, social anxiety disorder, and posttraumatic stress disorder. (*Id.*). At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of any listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (*Id.*).

**\*3** At step four, the ALJ found that plaintiff had

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [plaintiff] must avoid concentrated exposure to dust, fumes, gases, and other pulmonary irritants; must avoid extreme temperatures; [plaintiff] can perform unskilled, low stress occupations, where [sic] are defined as those consisting of simple, routine tasks and entailing no more than basic work-related decisions; [plaintiff] can occasionally interact with supervisors and coworkers, but can never interact with the public; and [plaintiff] can tolerate rare changes in the workplace setting.

(T. 15).

In making the RFC determination, the ALJ stated that he considered all of the plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. [§] 416.929" and Social Security Ruling ("SSR") 16-3p. (*Id.*). The ALJ further noted that he considered "the medical opinion(s) and

prior administrative medical finding(s)" pursuant to 20 C.F.R. [§] 416.920c. (*Id.*). After considering plaintiff's statements regarding his symptoms, along with the other evidence of record, the ALJ concluded plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully consistent with the evidence." (T. 16). The ALJ then noted that plaintiff has no past relevant work and a limited education. (T. 21). Ultimately, the ALJ then determined there were jobs existing in significant numbers in the national economy that someone with plaintiff's age, education, work experience, and residual functional capacity could perform. (T. 21). Accordingly, the ALJ ruled that plaintiff was not disabled from the application date of March 29, 2019, through the date of the ALJ's decision. (T. 22).

## V. ISSUES IN CONTENTION

Plaintiff raises four arguments:

1. The ALJ failed to properly evaluate the medical opinions and "erroneously gave controlling weight to the Commissioner's non-examining consultants and to his own medical knowledge." (Plaintiff's Brief ("Pl.'s Br.") at 15-21) (Dkt. No. 9).

2. The ALJ's step three determination regarding mental health listed impairments was not supported by substantial evidence. (Pl.'s Br. at 21-22).

3. The ALJ erred by not finding plaintiff would be off task for at least 10% of the time, when the ALJ also found moderate limitations in the paragraph B functional areas. (Pl.'s Br. at 22-23).

4. The ALJ's RFC assessment was not supported by substantial evidence due to the ALJ's failure to incorporate a restriction that plaintiff could not be exposed to any pulmonary irritants. (Pl.'s Br. at 23-24).

Defendant contends that the Commissioner's determination should be affirmed because it was supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 2-14) (Dkt. No. 10). For the reasons stated below, this court agrees with the defendant and finds the ALJ's decision was supported by substantial evidence.

## DISCUSSION

## VI. LISTED IMPAIRMENT

### A. Legal Standard

**\*4** "Plaintiff has the burden of proof at step three to show that [his] impairments meet or medically equal a Listing." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citing *Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006)). "To meet a Listing, [p]laintiff must show that [his] medically determinable impairment satisfies all of the specified criteria in a Listing." *Rockwood*, 614 F. Supp. 2d at 272 (citing 20 C.F.R. § 404.1525(d)). "If a claimant's impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Rockwood*, 614 F. Supp. 2d at 272 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Additionally, a court may be able to uphold an ALJ's finding that a plaintiff does not meet a Listing even where the decision lacks an express rationale for that finding if the determination is supported by substantial evidence. *Rockwood*, 614 F. Supp. 2d at 273 (citing *Berry*, 675 F.2d at 468).

### B. Analysis

Plaintiff argues that he was "presumptively disabled" because his mental health conditions met or equaled Listings 12.04, 12.06, and 12.15. (Pl.'s Br. at 21-22). The ALJ found that plaintiff's severe mental impairments included attention deficit hyperactivity disorder, persistent depressive disorder, social anxiety disorder, and posttraumatic stress disorder ("PTSD"). (T. 12). However, the ALJ concluded that plaintiff did not meet the requirements of paragraphs B or C of the mental health listings, his impairments did not meet the listings criteria. (T. 14-15). For the following reasons, the court concludes that the ALJ's listing determination at step three was supported by substantial evidence.

The ALJ specifically addressed listings 12.04 and 12.06 in his step three analysis. To meet listing 12.04 (Depressive, Bipolar and Related Disorders), a plaintiff must establish the criteria of paragraphs A and B or the criteria of paragraphs A and C. 20 C.F.R. § 404, Subpart P, App. 1, Listing 12.04. The paragraph A criteria requires medical documentation of either a depressive disorder or bipolar disorder, while paragraph B requires extreme limitation of one area or a marked limitation of two areas of mental functioning, which include (1) understanding, remembering or applying information, (2) interacting with others, (3) concentrating, persisting or maintaining pace, and (4) adapting or managing oneself. *Id.* Paragraph C requires a medically documented history of the existence of the disorder over a period of at least two years, with evidence of both (a) medical treatment, mental

health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (b) marginal adjustment, that is, minimal capacity to adapt to changes in environment or to demands that are not already part of daily life. *Id.*

A plaintiff's burden for meeting listing 12.06 (Anxiety and Obsessive Compulsive Disorders) is similar, requiring the claimant to establish the criteria of paragraphs A and B or the criteria of paragraphs A and C. 20 C.F.R. § 404, Subpart P, App. 1, Listing 12.06. Paragraph A entails medical documentation of an anxiety disorder; panic disorder or agoraphobia; or obsessive-compulsive disorder. *Id.* Paragraph B again requires an extreme limitation of one area or a marked limitation of two areas of mental functioning. *Id.* The "serious and persistent" criteria for paragraph C are also identical to those under listing 12.04. *Id.*

In his decision, the ALJ explicitly discussed each of the paragraph B criteria, and cited evidence in the record supporting each consideration. (T. 12-21). In particular, the ALJ relied on a report from a consultative examiner who examined plaintiff and discussed plaintiff's activities of daily living. (T. 13 (citing T. 428-32)). He also considered the findings from two state agency consultants who reviewed plaintiff's then-existing medical records. (T. 13 (citing T. 70-71, 85-86, 538-39, 589-91)).

**\*5** Ultimately, the ALJ found that plaintiff has no more than moderate limitations in understanding, remembering or applying information; in interacting with others; in adapting and managing oneself, and concentrating, persisting or maintaining pace. (T. 13-14). In support of these findings, the ALJ noted consultative examiner Dr. Hartman's opinion that plaintiff's attention, concentration, and memory were only mildly impaired. (T. 13). The ALJ also noted Dr. Hartman's observation that plaintiff was "cooperative, but quite anxious" upon examination, and that his speech was clear and fluent. (*Id.*). The ALJ further noted Dr. Hartman's observation that plaintiff was well groomed and "reported that he can dress, bathe, and groom himself, cook, clean, and manage his money." (T. 14 (citing 428-32)). The ALJ considered that plaintiff had no close friends other than his girlfriend and immediate family when determining he would have moderate difficulties in interacting with others. (T. 13). The ALJ therefore concluded that plaintiff's mental impairments did not cause at least two marked limitations or one extreme limitation, and that the paragraph B criteria of Listings 12.04 and 12.06 were not satisfied. (T. 14-15). The

ALJ also reasonably concluded that the evidence failed to establish the presence of paragraph C criteria, based on the record evidence. (*Id.*).

To the extent plaintiff argues that other opinions in the record might have supported a finding of disability, the ALJ adequately explained why he rejected those opinions, as further discussed below. Accordingly, the ALJ was not required to adopt their restrictive limitations in his listing analysis. *See, e.g.*, *Daniel E. v. Kijakazi*, No. 6:20-CV-1270 (DEP), 2022 WL 602533, at \*8 (N.D.N.Y. Mar. 1, 2022) ("[T]he mere fact that Dr. Stang opined that plaintiff meets the criteria of the mental Listings does not obligate an ALJ to find that the plaintiff meets a Listing. The ALJ both provided a detailed explanation regarding why he found plaintiff did not meet or equal a mental listing and appropriately explained his reasons for not relying on Dr. Stang's opinion in general.").

Plaintiff argues that a finding of disability was also appropriate because the record establishes that he met or equaled the criteria of listing 12.15 (Trauma-and Stressor-Related Disorders). The ALJ did not explicitly consider listing 12.15 in his decision; however, any error the ALJ committed by not explicitly discussing listing 12.15 is harmless. This listing has the exact same paragraph B requirements as listings 12.04 and 12.06. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B), *with* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.15(B). Thus, because the ALJ clearly found that plaintiff's mental impairments did not meet the criteria for listings 12.04 and 12.06, he implicitly determined that plaintiff's impairments did not meet the criteria for listing 12.15. *See, e.g.*, *Cote v. Berryhill*, No. 3:17-CV-1843, 2018 WL 4092068, at \*12-13 (D. Conn. Aug. 28, 2018) ("Each of the listings that were considered by the ALJ (Listings 12.02 and 12.06) has the same paragraph B criteria as the listings plaintiff argues should have been considered (Listings 12.08 and 12.10)[;] ... [a]s a result, the ALJ did not err in failing to explicitly consider Listings 12.08 and 12.10[;] [t]he ALJ assessed the paragraph B criteria for Listings 12.02 and 12.06, which are the same for Listings 12.08 and 12.10, and the ALJ's assessment of that criteria is supported by substantial evidence."); *Sweet v. Comm'r of Soc. Sec.*, No. 6:15-CV-0156 (GTS/WBC), 2016 WL 11478205 at \*3 (N.D.N.Y. July 6, 2016) ("Any error the ALJ may have made in failing to specifically discuss Listing 12.04 was harmless because the criteria outlined in 12.04(B) is identical to the paragraph (B) criteria of Listing 12.02 and 12.04 and the criteria in 12.04(C) is identical to the (C) criteria of 12.02(C) [;] [t]herefore, because the ALJ's determination that the record

did not support a finding that [p]laintiff met the paragraph (B) and (C) criteria of Listings 12.02 and 12.06, the same reasoning, when applied to Listing 12.04, would reach the result that [p]laintiff did not meet Listing 12.04"); *Rye v. Colvin*, No. 2:14-CV-170, 2016 WL 632242 at \*5-6 (D. Vt. Feb. 17, 2016) ("Because the ALJ assessed the paragraph B criteria for Listing 12.04, and that criteria is the same for Listing 12.08, and because the ALJ's assessment of that criteria is supported by substantial evidence, the ALJ did not err in failing to explicitly consider Listing 12.08 at step three").

**\*6** For the reasons stated above, the court finds that the ALJ properly considered plaintiff's impairments in conjunction with the Listings and reasonably concluded that his impairments did not meet or medically equal a listing singly or in combination. Remand is not required based on the ALJ's step-three findings because they are supported by substantial evidence.

## VII. RFC/EVALUATING MEDICAL EVIDENCE

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at \*2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at \*2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at \*12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at \*8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606

F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff can perform and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel,* 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d Cir. 1984)); *LaPorta v. Bowen,* 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.,* 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill,* No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Evaluation of Medical Opinion Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

*7 Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853. An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that

"[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

### B. Summary of Medical Opinion Evidence
In this case, the ALJ considered both treating source and consulting opinions related to plaintiff's mental limitations. Plaintiff has challenged the ALJ's evaluation of these opinions. A summary of the relevant opinion evidence and the ALJ's findings are set out below.

### 1. Dr. Hartman

Dr. Hartman performed a consultative psychiatric evaluation of plaintiff on May 31, 2019. (T. 428). Upon examination, he observed plaintiff's posture and motor behavior was normal and his eye contact was appropriate. (T. 430). He observed plaintiff's attention and concentration "appeared to be mildly impaired[,]" his judgment was fair to poor, and his insight was poor. (T. 430). He also observed "[plaintiff] could do the counting without difficulty, but he made errors in the calculations and serial 7s." (T. 430). Based upon his psychiatric evaluation, Dr. Hartman opined that plaintiff is

> able to understand, remember, or apply
> simple directions and instructions. He
> is able to maintain personal hygiene

and maintain awareness of hazards. He has moderate difficulties using reason and judgment. He has moderate difficulty sustaining an ordinary routine. He has marked difficult interacting adequately with others. He has marked difficulty sustaining concentration. He has marked difficulty regulating his emotions and marked to extreme difficulty understanding, remembering, and applying complex directions.

(T. 431). The ALJ found this opinion to be "unpersuasive because his clinical observations do not support a finding of marked or extreme limitations." (T. 19). The ALJ also found the opinion unpersuasive because the medical evidence since the protective filing date was "not consistent with the limitations that Dr. Hartman assessed." (T. 19).

### 2. S. Hennessey, PhD

Dr. Hennessey is a DDS consultant who reviewed plaintiff's file on July 23, 2019. (T. 74-77). Dr. Hennessey opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, but had no limitations with respect to understanding, remembering, and carrying out short and simple instructions. (T. 74). He also opined plaintiff would be moderately limited in his ability to interact with the general public and to "complete a normal workday and workweek without interruptions ... [and] to perform at a consistent pace without an unreasonable number and length of rest periods." (T. 75). However, he also stated that the opinion of the consultative examiner (Dr. Hartman) that plaintiff had marked difficulties in social interaction and sustained concentration was "considered and evaluated as not persuasive, because the [plaintiff] was noted to display only mildly impaired attention/concentration during the assessment, with fluent speech and appropriate eye contact." (T. 77). Dr. Hennessey opined plaintiff was moderately limited in his "ability to respond appropriately to changes in the work setting" and "to set realistic goals or make plans independently of others." (T. 75). The ALJ found Dr. Hennessey's opinion "generally persuasive because his findings are largely consistent with the medical evidence concerning [plaintiff's] mental health issues." (T. 20).

### 3. M. Marks, PhD

**\*8** Dr. Marks is a disability determination services ("DDS") consultant who reviewed plaintiff's file on January 28, 2020. (T. 89-93). Based on his review, Dr. Marks opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, but had no limitations in following short and simple instructions. (T. 89-90). He also opined plaintiff would be moderately limited in his ability to interact with the general public and to "complete a normal workday and workweek without interruptions ... [and] to perform at a consistent pace without an unreasonable number and length of rest periods." (T. 90). However, he also opined plaintiff would still "be able to maintain adequate attention and concentration to perform simple work routines." (T. 92). He opined plaintiff was moderately limited in his "ability to respond appropriately to changes in the work setting" and "to set realistic goals or make plans independently of others." (T. 91). The ALJ found Dr. Marks' opinion "generally persuasive because his findings are largely consistent with the medical evidence concerning [plaintiff's] mental health issues." (T. 20).

### 4. NPP Jennifer Kanaly

NPP Kanaly is a psychiatric nurse practitioner who has treated plaintiff since March 6, 2019. (T. 551; Pl.'s Br. at 2 n.1). NPP Kanaly opined, on September 22, 2020, plaintiff would be unable to meet competitive standards or has no useful abilities to function with respect to nearly all mental abilities and aptitudes. (T. 634-35). She stated that plaintiff would be extremely limited in his ability to understand information, remember information, apply information, interact with others, concentrate, persist, maintain pace, adapt in the workplace, and manage himself in the workplace. (T. 636). She also opined plaintiff would be off task for at least twenty-five percent of the day and would be absent from work thirty days per month. (T. 637). The ALJ found NPP Kanaly's opinion "wholly unpersuasive because her findings are not remotely consistent with [plaintiff's] mental health treatment records, which show that [plaintiff's] condition significantly improved with continued therapy and medication management." (T. 20).

### C. Analysis

**1. Evaluation of Medical Evidence**

Plaintiff argues the ALJ erred by giving "controlling weight" to the Commissioner's non-examining consultants and to his own medical knowledge. (Pl.'s Br. at 15-21). He specifically argues that the ALJ failed to properly evaluate the medical opinions of Dr. Marks, Dr. Hennessey, Dr. Hartman, and NPP Kanaly. (*Id.*). At the outset, the court notes that the ALJ did not give "controlling weight" to consultative examiners Drs. Marks and Hennessey, as the prevailing regulations no longer require an ALJ to weigh the various medical opinions. The ALJ did, however, find the opinions of both Drs. Marks and Hennessey generally persuasive. (T. 20).

The ALJ's decision in this case reflects his consideration of the relevant regulatory factors in weighing the state agency consultants' medical opinions. (T. 19-20). For example, with respect to supportability, the ALJ properly noted that Drs. Marks and Hennessey "based their findings purely on a review of [plaintiff's] file." (T. 20). Moreover, each of these sources provided a detailed, multi-page explanation in conjunction with their opinions, in which they cited to objective evidence throughout the record. (T. 76-77, 91-93). The ALJ also considered the consistency factor with respect to their opinions, noting that Drs. Marks and Hennessey's findings were "largely consistent with the medical evidence concerning [plaintiff's] mental health issues." (T. 20).

The ALJ also adequately considered the regulatory factors with respect to Dr. Hartman's opinion. With respect to supportability, the ALJ found the consultative examiner's opinion "unpersuasive because his clinical observations do not support a finding of marked or extreme limitations[.]" (T. 19). To this end, Dr. Hartman observed that plaintiff only "appeared to be mildly impaired" in attention and concentration, but ultimately opined plaintiff would have "marked difficulty sustaining concentration" and "rule[d] out attention deficit hyperactivity disorder." (T. 430-31). Dr. Hartman also observed that plaintiff had "coherent and goal directed" thought process and "fair to poor" judgment but then opined plaintiff would have "moderate difficulties using reason and judgment." (T. 430-31).

**\*9** With respect to consistency, the ALJ determined that "the medical evidence since the protective filing date of March 29, 2019 is not consistent with the limitations assessed" by Dr. Hartman. (T. 19). Specifically, the ALJ noted that despite Dr. Hartman's restrictive opinions, plaintiff's "mental

health treatment records since [the consultative examination] show that [plaintiff's] condition significantly improved with therapy and psychotropic medications." (T. 19). Dr. Hartman examined plaintiff on May 31, 2019, and plaintiff's mental health treatment records extend until September 15, 2020. (T. 428, 670). The ALJ summarized and explicitly considered plaintiff's mental health treatment records from March 28, 2019, through May 5, 2020. (T. 16-19). During that period, plaintiff generally reported that he was "doing good" or improving. (*Id.*). On August 19, 2020, plaintiff stated he was "starting to feel a little better" and "doing ok." (T. 653). Arguably, plaintiff's mental health started to downtrend within a few months prior to the ALJ issuing his disability determination hearing. On August 31, 2020, he stated there was minimal improvement, he was anxious, and described irritability. (T. 659). On September 15, 2020, plaintiff stated he was not "feeling the greatest. [He was] angry and irritable" and his symptoms were getting worse. (T. 665).

Furthermore, the ALJ's analysis of NPP Kanaly's opinion was not so deficient as to warrant remand. Admittedly, the ALJ considered the consistency of NPP Kanaly's opinion with the record as a whole; however, he did not address the supportability factor as it related to her opinion. The ALJ found NPP Kanaly's opinion "wholly unpersuasive because her findings are not remotely consistent with [plaintiff's] mental health treatment records, which show that [plaintiff's] condition significantly improved with continued therapy and medication management." (T. 20). The ALJ further noted plaintiff's "condition significantly improved with continued therapy and medication management." (T. 20).

The ALJ's failure to explain how he considered the supportability of the NPP Kanaly's opinion was procedural error. Nevertheless, the ALJ's decision could still be affirmed if " 'a searching review of the record' assures us 'that the substance of the [regulation] was not traversed.' " *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (citations omitted). Here, the court finds the substance of the regulation was not traversed because NPP Kanaly did not support the restrictive limitations she assessed with any explanation or citation to objective evidence in the record. In particular, NPP Kanaly did not explain what findings supported her rather extreme opinion that plaintiff would miss thirty days per month of work, or her determination that plaintiff would be off task for at least twenty-five percent of the day. (T. 637). She also failed to explain which impairments would cause plaintiff's absences and off task behavior. (*Id.*). NPP Kanaly rated all

of the categories of mental abilities to do unskilled work as "unable to meet competitive standards" or "no useful ability to function" without explaining what findings or impairments supported her determinations. (T. 634).

Plaintiff further argues the ALJ erred by not considering the other factors for evaluating medical opinions, under 20 C.F.R. § 404.1520I, including relationship with the plaintiff and specialization. The ALJ was not required to explain how he considered these factors, however, because an ALJ's duty to articulate consideration of them is triggered when he or she "find[s] that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same[.]" 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). In this case, there were no two opinions that triggered this requirement. In any event, the court is still able to ascertain the ALJ considered these factors. With respect to Drs. Marks and Hennessey, the ALJ noted that they were DDS consultants who only reviewed plaintiff's file. (T. 20). With respect to Dr. Hartman, the ALJ noted that Dr. Hartman was a consultative examiner who conducted a psychiatric evaluation of plaintiff. (T. 19). With respect to NPP Kanaly, the ALJ explicitly acknowledged NPP Kanaly's treating relationship with the plaintiff and also noted she was an NPP. (T. 16, 20). Therefore, it is clear the ALJ considered the relationship with the plaintiff and specialization when evaluating the medical opinions.

 *10  Plaintiff also argues that the "ALJ cherry picked the notes that [plaintiff's] limitations were improving with treatment and medication." (Pl.'s Br. at 20). Plaintiff argues the "notes show that NPP Kanaly was regularly adjusting his medications and that he was having side effects from his medications." (Id.). First, the ALJ explicitly noted when the medication was increased, decreased, or changed in his summary of the appointments. (T. 16-19). Second, an ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. See, e.g., Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). Therefore, the ALJ was not required to explicitly analyze plaintiff's side effects to his medications.

Here, the ALJ did not pick out a few isolated instances of improvement but pointed to the results of almost every relevant mental examination status, which were largely normal. (T. 16 (citing T. 392-94, 396-98, 569-71, 577-580, 582-588, 608-11, 617-19, 621-23, 625-27, 629-31)). Additionally, the ALJ specifically analyzed the most egregious treatment record, occurring on July 25, 2019, in his decision. (T. 17). However, the majority of the notes not analyzed by the ALJ were similar in nature to the notes analyzed in the decision. (T. 565, 573-75, 605-07, 653-664). There were only two notes not explicitly analyzed by the ALJ where plaintiff's mental health appeared to deteriorate. The December 4, 2019 note where plaintiff had a setback does not rise to the level of cherry-picking because the setback was quickly followed by a positive treatment after plaintiff requested an increase in medication. (T. 612-15, 617-19). On August 4, 2020, plaintiff stopped taking his medication and "fe[lt] more aggravated now" and "worse." (T. 641). On August 12, 2020, after resuming medication, plaintiff stated there was minimal improvement again. (T. 647-51).

Additionally, the court does not find the ALJ rejected medical opinions in favor of his own judgment. (Pl.'s Br. at 20). The ALJ properly relied on the state agency consultants' opinions along with plaintiff's objective medical evidence to support his RFC finding. When the stage agency consultants, NPP Kanaly, and Dr. Hartman reached differing conclusions, this created a conflict in the record. "Because it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution, the ALJ will weigh all of the evidence and see whether it can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent." Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012) (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

Although "the opinion of a non-examining state agency consultant is ordinarily not a sufficient substitute for the opinion of the claimant's treating provider," Vecchitto v. Saul, No. 3:19-CV-726, 2020 WL 4696791, at *6 (D. Conn. Aug. 13, 2020), courts have repeatedly held that "an ALJ is entitled to rely upon the opinions of both examining and non-examining State Agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." Christina K. v. Comm'r of Soc. Sec., No. 20-CV-1244, 2022 WL 409576, at *4 (W.D.N.Y. Feb. 10, 2022) (emphasis added). In this case, the ALJ's written decision "makes it clear that he considered [Drs. Marks and Hennessey's] opinions as just one part of a larger analysis of plaintiff's treatment." Jonathan M. v. Comm'r of Soc. Sec., No. 3:21-CV-1076, 2022 WL 18831465, at

*6 (N.D.N.Y. Nov. 9, 2022). For example, the ALJ did not discount NPP Kanaly and/or Dr. Hartman's findings wholly on the basis of these opinions, but looked to their consistency with the record as a whole and the degree of support provided for their opinions. Moreover, Dr. Marks analyzed plaintiff's record on reconsideration in early 2020 and had access, not only to Dr. Hartman's report, but also to more recent medical records, including those of NPP Kanaly. *See id.* (distinguishing plaintiff's disability case from those cases in which "the ALJ tries to rely too heavily on the opinion of a non-examining State Agency consultant who reviewed the file early in the disability development process[,]" and rendered their opinion prior to that of the consultative examiner). Accordingly, the ALJ's assessment of the medical evidence of record is not a basis for remand in this instance.

## 2. RFC Mental Limitations

**\*11** Plaintiff also argues that the ALJ erred by not incorporating all of plaintiff's mental limitations in the RFC. (Pl.'s Br. at 22). However, plaintiff does not identify any specific limitations that the ALJ failed to include. (*Id.*). The ALJ restricted plaintiff to only "perform[ing] unskilled, low stress occupations ... consisting of simple, routine tasks and entailing no more basic work-related decisions." (T. 15). This demonstrates that the ALJ considered plaintiff's moderate difficulties in understanding, remembering, or applying information when determining his RFC. (T. 13). The ALJ also limited plaintiff to only occasional interactions with supervisors/coworkers and no interaction with the public. (T. 15). This demonstrates the ALJ considered plaintiff's moderate difficulties in interacting with others. (T. 13). Finally, the ALJ restricted plaintiff to only rare changes in the workplace setting. (T. 15). This demonstrates the ALJ considered plaintiff's moderate difficulties in adapting or managing oneself. (T. 14).

To the extent that the ALJ did not include any limitations regarding concentrating, persisting, or maintaining pace in plaintiff's RFC, the ALJ did note that NPP Kanaly observed plaintiff had a normal attention span on multiple occasions and was attentive during some sessions. (T. 16-19). Additionally, the ALJ noted that NPP Kanaly detected no signs of attentional or hyperactive difficulties in one of their sessions. (T. 18). It is clear based on these observations that the ALJ considered plaintiff's moderate difficulties

in concentrating, persisting, or maintaining pace when determining plaintiff's RFC. (T. 14).

Moreover, even assuming that the ALJ should have adopted some of Dr. Hartman's marked limitations, "courts within the Second Circuit have repeatedly held that marked limitations in mental functioning, including a marked limitation in the ability to deal with stress, do not mandate a finding of disability, but can be addressed with additional limitations to a plaintiff's RFC, such as limiting plaintiff to simple, routine and repetitive tasks in a work environment free of fast-paced production requirements." *Kya M. v. Comm'r of Soc. Sec.,* 506 F. Supp. 3d 159, 166 (W.D.N.Y. 2020) (cleaned up). Here, the ALJ specifically tailored the RFC in consideration of plaintiff's mental limitations. Plaintiff has failed to satisfy his burden of introducing evidence demonstrating that he was otherwise unable to perform work commensurate with the ALJ's RFC finding. *See Reynolds v. Colvin,* 570 F. App'x 45, 47 (2d Cir. 2014) ("A lack of supporting evidence on a matter where the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits."); *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir. 1983) ("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."). Accordingly, the court does not find any error in the ALJ's incorporation of plaintiff's mental limitations in his RFC.

## 3. Off Task Behavior

Plaintiff argues the ALJ erred by not finding plaintiff would be off task more than ten percent of the workday, when the ALJ also found plaintiff would have moderate limitations in all paragraph B criteria areas. (Pl.'s Br. at 22-23). NPP Kanaly opined that plaintiff would be off task more than twenty-five percent of the day and would need to be absent from work thirty days per month because of his impairments. (T. 637). However, the ALJ also noted that NPP Kanaly found plaintiff had a normal attention span in multiple appointments and did not always exhibit ADHD. (T. 18-19). For the reasons discussed above, plaintiff properly found NPP Kanaly's opinion wholly unpersuasive. In particular, NPP Kanaly's opinion that plaintiff's impairments would virtually prevent him from attending work at all in a given month is belied by her own treatment notes.

The ALJ also noted Dr. Hartman determined plaintiff's attention, concentration, and memory were only mildly impaired. (T. 16).

**\*12** A mere finding of a "moderate" limitation, without other evidence in the record to support a need to be off task as a result of an individual's mental impairment, need not be interpreted as denoting disabling impairment of functioning. Rather, as has been noted many times in this district, a moderate limitation is not inconsistent with the ability to perform unskilled work. *See Katherine Marie S. v. Comm'r of Soc. Sec.*, [No.] 18-CV-0233, 2019 WL 1427456, at \*9 (N.D.N.Y. Mar. 29, 2019) (Dancks, M.J.) (stating that "courts within the Second Circuit have routinely held that individuals suffering from 'moderate' difficulties with memory, concentration, and handling stress could reasonably be found to have the residual functional capacity to perform 'simple, routine and repetitive tasks' ") (internal alterations omitted)

*Maria A. R. v. Kijakazi*, No. 6:21-CV-0290 (DEP), 2022 WL 2954376, at \*10 (N.D.N.Y July 26, 2022) (finding no error where the ALJ did not find an off task limitation, when there was only one source who opined a need for plaintiff to be off task and substantial evidence supported the exclusion of an off task limitation).

Plaintiff cites *Jennifer E. v. Commissioner*, where this court found the ALJ substituted his lay opinion for that of the treating provider. (Pl.'s Br. at 22-23). However, *Jennifer E.* was decided under the treating physician rule where treating providers were given controlling weight "so long as [their opinion was] 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " *Jennifer E. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0321 (ATB), 2020 WL 2059823, at \*4 (N.D.N.Y Apr. 29, 2020) (citing *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015)); *Sue-Anne O. M. v. Saul*, No. 3:20-CV-00301, 2021 WL 6551096, at \*9 n.14 (D. Conn. Sept. 22, 2021) ("These cases ... refer to the weighing of evidence, a requirement under the old regulations, and are not persuasive under the new regulations, which no longer require the weighing of evidence"). Moreover, in *Jennifer E.*, there were multiple opinions finding plaintiff would be off task more than thirty percent of the week. *Jennifer E.*, 2020 WL 2059823, at \*10. Here, NPP Kanaly is the only opinion in the record finding plaintiff would be off task, and the degree to which she opined that plaintiff would be off task and/or absent does not find

adequate support in the record. (T. 637). Thus, this court finds the ALJ did not err by not including an off-task limitation.

### 4. Pulmonary Irritants

Plaintiff finally argues that the ALJ erred by limiting plaintiff to avoid concentrated exposure to pulmonary irritants instead of avoiding all exposure to pulmonary irritants. (Pl.'s Br. at 23-24). The ALJ found the severity of plaintiff's chronic obstructive pulmonary disease did not meet the listing for a chronic respiratory disorder because plaintiff did "not have a FVC of 1.75 or less or a FEV of 1.4 or less." (T. 12). The ALJ noted plaintiff's pulmonary function test on May 31, 2019, showed plaintiff had a FVC of 3.26 and a FEV of 1.63. (T. 12). Consultative examiner Dr. Wassef opined plaintiff "should not be exposed to extremes in temperature, secondhand smoke, perfumes, chemicals, or any type of respiratory irritants." [1] (T. 437). The RFC included the limitation, plaintiff "must avoid concentrated exposure to dust, fumes, gases, and other pulmonary irritants." (T. 15).

[1]  The ALJ incorrectly noted that "Dr. Wassef assessed that [plaintiff] should not be exposed to temperature extremes, secondhand smoke, perfumes, chemicals, or any type of respiratory irritants." (T. 19).

Plaintiff cites *Cassandra H. v. Comm'r. of Soc. Sec.*, No. 8:19-CV-226 (ATB), 2020 WL 1169404, at \*1 (N.D.N.Y Mar. 10, 2020) to support his argument. (Pl.'s Br. at 23). In *Cassandra H.*, this court did not decide whether the ALJ erred by only limiting plaintiff to concentrated exposure as opposed to any exposure. *Cassandra H.*, 2020 WL 1169404, at \*15. Instead, the court held "even if the ALJ erred in determining that plaintiff should avoid only 'concentrated' exposure, all but one of the jobs listed by the VE did not involve any exposure to pulmonary irritants [and] ... [a]ny error would have been harmless." *Cassandra H.*, 2020 WL 1169404, at \*15. Similarly, in this case, the jobs cited by the VE do not expose workers to pulmonary irritants. *See* DICOT 729.687-010 Assembler, Electrical Accessories I, 1991 WL 679733; DICOT 922.687-086 Returned-goods Sorter, 1991 WL 688139; DICOT 559.687-074, Inspector and Hand Packager, 1991 WL 683797. Thus, this court finds even if the ALJ erred, it was harmless error.

**\*13  WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED,** and plaintiff's complaint its **DISMISSED**, and it is

**ORDERED**, that the Clerk enter **JUDGMENT FOR DEFENDANT.**

**All Citations**

Slip Copy, 2023 WL 3949877

---

**End of Document**                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Loucks v. Kijakazi, Not Reported in Fed. Rptr. (2022)

2022 WL 2189293

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Dana Marie M. v. Commissioner of Social Security,
N.D.N.Y.,  June 28, 2022

2022 WL 2189293
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Glenda LOUCKS, Plaintiff-Appellant,

v.

Kilolo KIJAKAZI, Acting Commissioner

of Social Security, Defendant-Appellee. [*]

> [*]  The Clerk of Court is respectfully directed to
> amend the caption accordingly.

21-1749
|
June 17, 2022

Appeal from a judgment of the United States District Court
for the Western District of New York (Bush, *M.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **REVERSED** and the case is
**REMANDED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Peter A. Gorton, Lachman
& Gorton, Endicott, NY.

FOR DEFENDANT-APPELLEE: Ariella Zoltan (Maria
Fragassi Santangelo, Ellen E. Sovern, on the brief), for Trini
E. Ross, United States Attorney for the Western District of
New York, Buffalo, NY.

PRESENT: ROSEMARY S. POOLER, MICHAEL H.
PARK, EUNICE C. LEE, Circuit Judges.

## SUMMARY ORDER

**\*1**  Plaintiff Glenda Loucks applied on May 1, 2017
for disability insurance benefits ("DIB") and supplemental
security income ("SSI"). In her application, Loucks reported
various mental illnesses including depression, anxiety, and
substance abuse, and various physical ailments including

irritable bowel syndrome ("IBS") and Celiac disease. The
Administrative Law Judge ("ALJ") denied Loucks's DIB
and SSI claims, concluding that Loucks had "the residual
functional capacity to perform medium work" and that "there
are jobs that exist in significant numbers in the national
economy that the claimant can perform." Admin. R. on
Appeal at 20, 26. The district court affirmed the ALJ's
decision concluding that the ALJ's findings were supported
by substantial evidence and that the ALJ complied with
the relevant regulatory procedures. We assume the parties'
familiarity with the underlying facts, the procedural history
of the case, and the issues on appeal.

"On an appeal from the denial of disability benefits, we focus
on the administrative ruling rather than the district court's
opinion." Schillo v. Kijakazi, 31 F.4th 64, 74 (2d Cir. 2022)
(quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).
"We conduct a plenary review of the administrative record
to determine if there is substantial evidence, considering the
record as a whole, to support the Commissioner's decision
and if the correct legal standards have been applied." *Id.*
(quoting Estrella, 925 F.3d at 95). Substantial evidence is "a
very deferential standard of review," and it is "such relevant
evidence as a reasonable mind might accept as adequate
to support a conclusion." *Id.* (cleaned up). "Although we
do not require that every conflict in a record be reconciled
by the ALJ ... we do require that the crucial factors in
any determination be set forth with sufficient specificity to
enable us to decide whether the determination is supported by
substantial evidence." Estrella, 925 F.3d at 95 (cleaned up).

For claims, like this one, filed after March 27, 2017, the
agency applies 20 C.F.R. § 404.1520c rather than 20 C.F.R. §
404.1527. These new regulations no longer apply the treating-
physician rule, which gave deference to the opinion of the
treating physician. Instead, the agency "will not defer or give
any specific evidentiary weight, including controlling weight,
to any medical opinion(s) or prior administrative medical
finding(s)." *Id.* § 404.1520c(a). The regulations explain that
when "evaluat[ing] the persuasiveness of medical opinions
and prior administrative medical findings," the "most
important factors ... are supportability ... and consistency." [1]
*Id.* The regulations further require the agency to "explain how
[it] considered the supportability and consistency factors for
a medical source's medical opinions or prior administrative
medical findings in [its] determination or decision." *Id.* §
404.1520c(b)(2).

Loucks v. Kijakazi, Not Reported in Fed. Rptr. (2022)

2022 WL 2189293

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 170 of 356

[1] Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). Consistency means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

**\*2** Here, the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record. Although Dr. L. Hoffman's opinion was the only one that the ALJ found persuasive, the ALJ did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was. *See* Admin. R. on Appeal at 24 ("I find this determination somewhat persuasive as it is generally consistent with the evidence of record."). Similarly, the ALJ did not address the consistency of Dr. Amanda Slowik's opinion except to say that "it [was] inconsistent with the evidence of record during the relevant period." Admin. R. on Appeal at 24.

Despite the ALJ's procedural error, we could affirm if " 'a searching review of the record' assures us 'that the substance of the [regulation] was not traversed.' " *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). Here, however, we cannot conclude that the ALJ's procedural error was harmless. The ALJ did not address the fact that all the opinion evidence in the record, including portions of Dr. Hoffman's opinion, indicated that Loucks would have medium or marked limitations for staying on task and for attendance. Nor did the ALJ adequately address the fact that Loucks's treatment notes and other record evidence consistently showed that she had serious psychological symptoms year after year. For instance, she repeatedly reported that she lacked motivation to complete basic daily living activities and that her depression and anxiety caused her to stay in bed and only get up as needed to use the bathroom or eat. She also consistently had significant struggles with disorganized thoughts, oral communication, controlling her anger, obsessive compulsions, and social anxiety.

Instead, the ALJ focused on the fact that Loucks's mental status examinations were largely normal. These examinations, however, analyze the patient's mental state only at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time. *See Estrella*, 925 F.3d at 98 ("[A] one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."). The ALJ also noted that Loucks improved with treatment, that such treatment was of a limited nature, and that she was not entirely compliant with treatment. But the ALJ selectively relied on portions of the record that showed improvement without even addressing the weight of the evidence supporting the fact that Loucks continued to have serious psychiatric symptoms even after years of treatment and steadily increasing medication. *See id.* at 97 ("Cycles of improvement and debilitating symptoms of mental illness are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." (cleaned up)). Moreover, the treatment notes indicated that Loucks's lack of compliance was due at least in part to her mental illnesses and related limitations. And although the ALJ noted that Loucks reported engaging in some limited and sporadic part-time work and that she engaged in some daily living activities such as reading and playing games on her phone, these activities did not show that Loucks could hold down a steady job for an extended period of time. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[T]here is no evidence that [claimant] engaged in any of these activities for sustained periods comparable to those required to hold a ... job." (cleaned up)).

When the ALJ has committed procedural error, we generally remand with instructions to reconsider the disability claim consistent with the procedural mandates of the governing regulations. *See, e.g.*, *Estrella*, 925 F.3d at 98. But "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). In light of the consistency of the medical opinions concerning Loucks's significant work-related limitations and the record evidence showing that Loucks had ongoing serious psychiatric symptoms, we conclude that record "compel[s] but one conclusion"—that Loucks is disabled. *Id.*

**\*3** Accordingly, we reverse the judgment of the district court and remand the matter to the ALJ for calculation of benefits.

**Loucks v. Kijakazi, Not Reported in Fed. Rptr. (2022)**

2022 WL 2189293

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 2189293

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1399586
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Venus M. LITTLE, Plaintiff,
v.
Carolyn W. COLVIN, Defendant.

No. 5:14–cv–63 (MAD).
|
Signed March 26, 2015.

**Attorneys and Law Firms**

Olinsky Law Group, Howard D. Olinsky, Esq., of Counsel,
Syracuse, NY, for Plaintiff.

Social Security Administration, Office of Regional General
Counsel, Lauren E. Myers, Esq., of Counsel, New York, NY,
for Defendant.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff commenced this action on January 22, 2014,
pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), seeking
review of a decision by the Commissioner of Social
Security denying Plaintiff's application for Social Security
Disability ("SSD") Insurance benefits and Supplemental
Security Income ("SSI"). See Dkt. No. 1.

On November 30, 2010, Plaintiff filed an application for SSD
and SSI, alleging a disability onset date of August 12, 2008.
See Dkt. No. 9, Administrative Record ("T."); see also Dkt.
No. 1 at 1. The application was denied on July 5, 2011. T.
at 15. Plaintiff then requested a hearing and appeared with
her counsel before Administrative Law Judge ("ALJ") John P.
Ramos on September 13, 2012. See id. at 34–68. On October
30, 2012, ALJ Ramos issued a decision denying Plaintiff's
application. See id. at 18–26. Plaintiff subsequently requested
review by the Appeals Council and was denied such review
on December 24, 2013, making the ALJ's decision the final
decision of the Commissioner of Social Security. See id. at 1–
7.

Presently before the Court are Plaintiff's motion to remand for
further administrative proceedings, and Defendant's motion
for judgment on the pleadings. See Dkt. Nos. 11, 12.

**II. BACKGROUND**

Plaintiff was born on December 1, 1957, and was fifty four
years old at the time of the hearings, held on September 13,
2012. T. at 35, 38. Before August 12, 2008, Plaintiff reported
work as a head cook. Id. at 39. Plaintiff testified that her job as
a cook required her to lift between twenty-to-fifty pounds, and
to prepare for the job she received a year of special training.
Id. at 42. She further testified that she has "suffered from neck
[and shoulder] problems since 2008." Id.

Plaintiff was admitted to the hospital on October 29, 2009,
where she presented to the emergency room with "flu-like
symptoms. She had a three-day history of fevers, body aches,
and prodrome consistent with influenza. She was admitted
and started on antibiotics for pneumonia." Id. at 298. After
Plaintiff experienced respiratory failure, she "remained in the
intensive care unit for over one month." Id. at 312. Upon her
recovery, Plaintiff was discharged on December 3, 2009. Id.
at 312.

On February 19, 2010, Plaintiff presented to Dennis Noia,
P.h.D. ("Dr.Noia") for a consultative psychiatric examination.
Id. at 359–62. According to the medical source statement,
Plaintiff was "capable of understanding and following simple
instructions and directions. She appears to be capable of
performing simple and some complex tasks with supervision
and independently." Id. at 360–61. The statement also notes
that Plaintiff can manage a routine and maintain a schedule,
learn new tasks, make appropriate decisions, and "appears
to be able to relate to and interact moderately well with
others." Id. at 362. However, "[s]he appears to be having some
difficulty dealing with stress." Id. Finally, Dr. Noia noted that
his examination is consistent with Plaintiff's allegations. Id.

**\*2** On the same day, Plaintiff presented to Kalyani Ganesh,
M.D. ("Dr.Ganesh") for a consultative examination. Id. 363–
66. Dr. Ganesh's medical source statement notes that Plaintiff
had "[n]o gross limitation noted to sitting, standing or
walking. No limitation to the use of upper extremities except
mild to moderate limitation to overhead activity." Id. at 366.
Dr. Ganesh also noted Plaintiff's reported activities of daily
living, stating that "[s]he can cook a couple of times a week,

2015 WL 1399586

clean once a week, do laundry once a month, shower twice a week, and dress twice a week." *Id.* at 364. Although Plaintiff reported bilateral shoulder pain brought on by lifting and overhead activity, no limitation to Plaintiff's ability to lift and carry objects was noted, and Dr. Ganesh's report further stated that Plaintiff has full range of motion in her "shoulders, elbows, forearms, and wrists bilaterally." *Id.* at 363, 365.

After relocating from Syracuse to Tennessee, Plaintiff reported numbness, tingling, and stabbing pain in her shoulders on August 24, 2010. *Id.* at 414. On September 29, 2010, Plaintiff was diagnosed with cervical radiculopathy and referred to a pain clinic. *Id.* at 397. On October 8, 2010, Plaintiff underwent an MRI, which showed that she had "[d]egenerative changes most significantly affecting the C5–C6 level." *Id.* at 391.

On December 3, 2010, Plaintiff was diagnosed with "[m]ajor depressive disorder, recurrent, severe with psychotic features" by Laura Mathews ("Mathews"), a Licensed Clinical Social Worker ("LCSW"). *Id.* at 422. Another LCSW, Jamie Green ("Green"), also worked with Plaintiff on at least two occasions. *Id.* at 424–25. A functional capacity assessment completed on December 14, 2010 found moderate limitations on Plaintiff's activities of daily living, interpersonal functioning, concentration, task performance and pace, and ability to adapt to change. *Id.* at 426–28. The assessment also determined that Plaintiff has a severe and persistent mental illness, and has a Global Assessment Function score of 50. [1] *Id.* at 428.

[1]    According to Plaintiff's brief, "a score of 41–50 indicates an individual has 'serious symptoms ... [o]r any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).' *Diagnostic and Statistical Manual of Mental Disorders* ('DSM–IV–TR') 34 (4th ed.2000)." Dkt. No. 11 at 9.

On February 19, 2011, Plaintiff presented to Theodore Schuman, M.D. ("Dr.Schuman") for "an all systems evaluation of allegations of rheumatoid arthritis, diabetes mellitus, hepatitis B, depression, [and] hepatitis C." *Id.* at 455; *see also id.* at 455–62. In his medical assessment, Dr. Schuman opined that Plaintiff could occasionally "lift and/or carry (including upward pulling) for up to 1/3 of an 8–hour workday a maximum of 10 pounds," and she could frequently "lift and/or carry from 1/3rd to 2/3rds of an 8–hour workday a maximum of less than 10 pounds." *Id.* at 461. Dr. Schuman

further opined that Plaintiff could "stand and/or walk (with normal breaks) for a total of about 6–hours in an 8–hour workday," and could sit with no restrictions. *Id.* at 462.

On March 10, 2011, Frank Kupstas, P.h.D ("Dr.Kupstas") completed a psychiatric review of Plaintiff. *See id.* at 467–81. Dr. Kupstas found that Plaintiff had mild difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. *Id.* at 477. He gave great weight to the psychological evaluation performed by Dr. Noia, and did not give any weight to the diagnoses performed by Mathews on December 3, 2010, because a LCSW is a "non-acceptable source." *Id.* at 479.

**\*3** On March 31, 2011, Marvin H. Cohn, M.D. ("Dr.Cohn") determined Plaintiff's residual functional capacity ("RFC") based on the existing medical records. *See id.* at 481–90. He found that Plaintiff could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, could stand or walk with normal breaks for about six hours in an eight-hour workday, and could sit with normal breaks for about six hours in an eight-hour workday. *Id.* at 482. Further, Dr. Cohn found that Plaintiff's "statements about her symptoms and functional limitations are partially credible [because] the severity alleged [is] not completely consistent with the objective findings from the evidence in file." *Id.* at 489. Consequently, Dr. Cohn opined that restrictions in the 2011 consultative examination by Dr. Schuman are not consistent with Dr. Schuman's own findings during that examination, specifically that Plaintiff "has a [history] of arthritic pain, but [Plaintiff] has full [range of motion] in all major weight bearing joints and is slightly limited with the usages of her hands." *Id.* at 487.

On June 29, 2011, Saul Juliao, M.D. ("Dr.Juliao") completed a second RFC assessment. *See id.* at 509–17. Similar to Dr. Cohn, Dr. Juliao found that Plaintiff could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, could stand or walk with normal breaks for about six hours in an eight-hour workday, and could sit with normal breaks for about six hours in an eight-hour workday. *Id.* at 510. Dr. Juliao, like Dr. Cohn, opined that Plaintiff's "statements about her symptoms and functional limitations are partially credible [because] the severity alleged [is] not completely consistent with the objective findings from the evidence in file." *Id.* at 514. Finally, Dr. Juliao commented on Dr. Schuman's examination, stating that Dr. Schuman's "restrictions are not consistent with his own findings. [Plaintiff] has a history of

2015 WL 1399586

arthritic pain, but [Plaintiff] has [f]ull [range of motion] in all major weight bearing joints." *Id.* at 515.

On March 21, 2012, Plaintiff presented for intake at Syracuse Community Health Center. *See id.* at 554–55. She was diagnosed with Anxiety and Depressive disorders, and Nicole DeFurio ("DeFurio"), a LCSW, stated that Plaintiff had a flat mood, was despondent, and had a tearful affect. *Id.* at 555. However, DeFurio also found that Plaintiff's "[e]ye contact and physical appearance were good. Plaintiff's insight and judgment were appropriate." *Id.*

## III. DISCUSSION

### A. Legal Standards

**1. Five-step analysis**

For purposes of SSI, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(c)(3)(A). There is a five-step analysis for evaluating disability claims:

> **\*4** "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to

perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (citations omitted). The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step. *Id.*

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Court must examine the Administrative Record to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Schaal v. Apfel,* 134 F.3d 496, 500–01 (2d Cir.1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### *2. Credibility determination*

**\*5** "The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.... If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.... The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."

*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (quotations and citations omitted).

If a plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including the following: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms. 20 C.F.R. § 416.929(c)(3) (i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether the plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. *See* SSR 96–7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, \*2 (Soc. Sec. Admin. July 2, 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the record. *Id.* at \*5.

"After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." *Saxon v. Astrue,* 781 F.Supp.2d 92, 105 (N.D.N.Y.2011) (citing, *inter alia,* 20 C.F.R. §§ 404.1529(c) (4), 416.929(c) (4)). An ALJ rejecting subjective testimony " 'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.' " *Melchior v. Apfel,* 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *See Howe–Andrews v. Astrue,* No. CV–05–4539, 2007 WL 1839891, \*10 (E.D.N.Y. June 27, 2007). With regard to the sufficiency of credibility determinations, the Commissioner has stated that

> **\*6** [i]t is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96–7p, 1996 WL 374186, at \*2.

**B. The ALJ's Decision**

At the first step of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 12, 2008, Plaintiff's alleged onset date. T. at 20. At step two, the ALJ concluded that Plaintiff had the following severe impairments: rheumatoid arthritis, depression, and chronic obstructive pulmonary disease ("COPD"). *Id.* At the third step of the analysis, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Then the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § § 404.1567(b) and 416.967(b) with the following limitations:

[S]he retains the ability to grasp, hold and turn, raise and lower objects, but should avoid frequent overhead lifting with either arm; and should avoid frequent exposure to respiratory irritants or extremes of temperature. She retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress in that she can make decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

*Id.* at 21–22. At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. *Id.* at 26. At the fifth and final step of the analysis, relying on the Medical–Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Therefore, the ALJ made a determination that Plaintiff was not disabled, as defined by the Social Security Act. *Id.* at 27.

### C. Analysis

#### 1. The ALJ did not err by not requesting a treating physician medical source statement

**\*7** The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion is contradicted by other substantial evidence in the record, such as the opinions of other medical experts. *See Williams v. Comm'r of Soc. Sec.,* 236 Fed. Appx. 641, 643–44 (2d Cir.2007); *see also Veino v. Barnhart,* 312 F.3d 578,

588 (2d Cir.2002) (citing 20 C.F.R. § 404 .1527(d)(2)).” Although the final responsibility for deciding issues relating to disability is reserved to the Commissioner, *see* 20 C.F.R. § 404.1527(e)(1), an ALJ must give controlling weight to a treating physician's opinion on the nature and severity of the claimant's impairment when the opinion is well-supported by medical findings and not inconsistent with other substantial evidence.” *Martin v. Astrue,* 337 Fed. Appx. 87, 89 (2d Cir.2009) (other citation omitted).

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c).

Although the ALJ need not explicitly consider each of the factors listed in 20 C.F.R. § 404.1527(c), it must be clear from the ALJ's decision that a proper analysis was undertaken. *See Petrie v. Astrue,* 412 Fed. Appx. 401, 406 (2d Cir.2011) (“[W]here ‘the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability’ ”) (quotation omitted); *Hudson v. Colvin,* No. 5:12–CV–0044, 2013 WL 1500199, \*10 n.25 (N.D.N.Y. Mar. 21, 2013) (“While [the ALJ] could have discussed the factors listed in the regulations in more detail, this does not amount to reversible error because the rationale for his decision is clear and his ultimate determination is supported by substantial evidence”), *report and recommendation adopted,* 2013 WL 1499956 (N.D.N.Y. Apr. 10, 2013). Failure “to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.” *Sanders v. Comm'r of Soc. Sec.,* 506 Fed. Appx. 74, 77 (2d Cir.2012) (citations omitted).

Plaintiff argues that the ALJ erred by failing to request a treating source statement. Dkt. No. 11 at 14. First, he cites a Northern District case for the proposition that the treating physician rule requires that an ALJ develop the record by “obtaining information from a claimant's treating physician.” *Id.* at 15; *Boswell v. Astrue,* No. 09–CV–0533, 2010 WL 3825622, \*4 (N.D.N.Y. Sept. 7, 2010). Plaintiff then cites

a second Northern District case that puts "an affirmative obligation [on the ALJ] to make reasonable efforts to obtain from a claimant's treating physicians any necessary reports, including an assessment of his or her RFC." Dkt. No. 11 at 15; *Lawton v. Astrue,* No. 1:08–CV–0137, 2009 WL 2867905, *16 (N.D.N.Y. Sept. 2, 2009). The Court finds that neither of these cases are sufficiently similar to the current case to support Plaintiff's proposition.

**\*8** In *Boswell,* "[t]he ALJ discounted [the treating physician's] opinions, in part, because he found the [treating physician's] sit, stand, and walk limitations to be unsupported by the record." *Boswell,* 2010 WL 3825622 at \*4. Further, the ALJ made no attempt to obtain the treating physician's treatment notes, when "it is certainly possible, and even likely, that supporting evidence for [the treating physician's] sit, stand, and walk limitations would be found in his treatment notes." *Id.* Here, the ALJ did not discount a treating physician's opinion based on a lack of supporting evidence, because no treating physician opinion was included in the record. Further, the ALJ did contact Syracuse Community Health Center and requested "[a]ll records from [October 27, 2009] to present." T. at 558. This is sufficient to find that *Boswell* does not support Plaintiff's proposition.

In *Lawton,* the administrative record before the ALJ "contain[ed] neither a physical RFC assessment nor a medical source statement pertaining to plaintiff's physical capabilities, let alone one from a treating source." *Lawton,* 2009 WL 2867905 at \*16. Based on this "critical void[,]" the ALJ was required to "take measures to complete the record and fill the perceived gaps." *Id* . (citation omitted). As pointed out by Defendant, "the [current] record before the ALJ contained 19 medical exhibits and included Plaintiff's treatment notes through August 2012, only about one month before the hearing." Dkt. No. 12 at 9; *see also* T. at 525–57. Therefore, unlike in *Lawton,* there was no gap in the record before the ALJ that required him to take further action, especially considering that he had already contacted Syracuse Community Health Center and requested Plaintiff's records. T. at 558.

Defendant argues that the ALJ developed the record appropriately, and that he did not err by not requesting a treating source statement. Dkt. No. 12 at 8. Defendant cites *Pellam v. Astrue,* arguing that "where [a] consultative examiner's opinion largely supported ALJ's RFC assessment, and the record contained all treatment notes, [the] ALJ had no further obligation to supplement the record by

acquiring a medical source statement from one of the treating physicians." *Id.* (citing *Pellam v. Astrue,* 508 Fed. Appx. 87, 89–90 (2d Cir.2013)). In *Pellam,* the ALJ "had all of the treatment notes from Pellam's treating physicians." *Pellam,* 508 Fed. Appx. at 18. In the current case, it is not clear whether the ALJ considered treatment notes from Syracuse Community Health Center, because the ALJ does not reference these treatment notes in his decision. However, a review of the record reveals that the only person who diagnosed Plaintiff at Syracuse Community Health Center was Nicole DeFurio on March 31, 2012. T. at 596–97. This diagnosis only covered Plaintiff's mental state. *Id.*

Defendant also references *Tankisi v. Commissioner of Social Security.* Dkt. No. 12 at 8. According to *Tankisi,* a record is not incomplete due to the lack of a treating medical source statement. *Tankisi v. Comm'r of Soc. Sec.,* 521 Fed. Appx. 29, 33–34 (2d Cir.2013). Further, remand is not required "when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.*

**\*9** The record contains Syracuse Community Health Center records regarding Plaintiff, and the most recent records are from October 2, 2012. T. at 559. Given the numerous medical exhibits and treatment notes in the record that end less than a month before the ALJ rendered his decision, the Court finds that the record contains sufficient evidence from which the ALJ could assess Plaintiff's RFC. Therefore, as in *Tankisi,* the ALJ's failure to obtain an opinion from a treating physician at Syracuse Community Health Center does not require remand.

Based on the foregoing, the Court finds that the record contained sufficient evidence for the ALJ to assess Plaintiff's RFC.

### 2. The RFC is supported by substantial evidence

#### a. Physical medical opinion evidence

Plaintiff contends that the ALJ did not evaluate the medical opinion evidence based on "factors such as the examining relationship, whether the opinion comes from a specialist, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole." Dkt. No. 11 at 18. Specifically, Plaintiff points to Dr. Schuman's ten pound lifting restriction, and argues that Dr. Schuman's examining relationship with Plaintiff meant that more weight should have been given to

the ten pound restriction. *Id.* Plaintiff also argues that as Dr. Ganesh's opinion contained no reference to a limitation on lifting. *Id.* at 19.

Defendant argues that, as "the ALJ noted, [Dr. Ganesh's] opinion is consistent with a light range of work[,]" and therefore, "it is [ ] clear that the ALJ gave weight to Dr. Ganesh's opinion." Dkt. No. 12 at 10–11. Defendant also asserts that "Dr. Schuman's opinion was generally consistent with [the ALJ's] RFC" and "the ALJ noted a 20 pound lifting restriction is more consistent with the other evidence." *Id.* at 11–12. Finally, Defendant claims that the ALJ was justified "in not accepting Dr. Schuman's assessment that Plaintiff could lift only 10 pounds because the regulations allow the ALJ to give a medical opinion less weight where the opinion is not consistent with other evidence in the record." *Id.* at 12–13.

"State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole." *Cobb v. Comm'r of Soc. Sec.,* No. 5:13–cv–591, 2014 WL 4437566, *6 (N.D.N.Y. Sept. 9, 2014)* (quoting *Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, *9 (S.D.N.Y. Jan. 22, 2004)).* As Dr. Cohn's and Dr. Juliao's opinions "may constitute substantial evidence[,]" the ALJ may validly rely on them as long as their opinions are "consistent with the record as a whole." *Id.* According to the ALJ, "only Dr. Schuman limit[ed] the claimant to less than 20 pounds." T. at 24. Therefore, the ALJ validly relied on evidence consistent with the record when he decided to give little weight to Dr. Schuman's ten pound lifting restriction. *See* 20 C.F.R. § 404.1527(c)(4); *see also* 20 C.F.R. § 416.927(c)(4).

**\*10** The Court finds no merit in Plaintiff's argument regarding Dr. Ganesh. Dr. Ganesh opined that Plaintiff had "[n]o limitation to the use of upper extremities except mild to moderate limitation to overhead activity." T. at 366. As Defendant correctly notes, Dr. Ganesh's opinion is consistent with a light RFC, as the ALJ explained in his decision. *Id.* at 24.

Finally, the Court finds that the ALJ followed the appropriate regulatory factors when affording weight to the medical source statements. As Defendant correctly contends, the Court requires "no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear." Dkt. No. 12 at 13 (quoting *Atwater v.*

*Astrue,* 512 Fed. Appx. 67, 70 (2d Cir.2013)). The ALJ's decision indicates that the various medical opinions are indicative of a light work RFC, and he properly explained his decision to afford less weight to those statements that dictated a lower RFC. T. at 24.

### b. Mental medical opinion evidence
In support of her argument for remand, Plaintiff cites *Dutcher v. Comm'r of Soc. Sec.,* where the court found that the ALJ erred in stating "that she cannot accord the opinion of [two LCSW's] controlling weight because they are not acceptable medical sources, but she failed to properly explain the weight she did assign." *Dutcher v. Comm'r of Soc. Sec.,* No. 3:13–CV–611, 2014 WL 2510557, *6 (N.D.N.Y. June 4, 2014).* The court in *Dutcher* ordered remand "so that the ALJ may render a decision regarding Plaintiff's RFC after properly evaluating all of the medical opinion evidence." *Id.*

Defendant argues that the RFC determination is supported by substantial evidence, asserting that "the ALJ's decision is sufficiently specific to make clear to subsequent reviewers the weight given to the opinions and the reason for that weight." Dkt. No. 12 at 9. Defendant further argues that the Second Circuit has not required that all evidence be mentioned in detail, as long as "the evidence of record permits us to glean the rationale of an ALJ's decision." *Id.* at 9–10 (citing *Cichocki v. Astrue,* 729 F.3d 172, 178 (2d Cir.2013)).

On December 14, 2010, LCSWs Green and Mathews, after having met with Plaintiff, indicated that Plaintiff had a current GAF of 50. [2] *See* T. at 428. On that form, however, LCSW Green left blank the sections concerning Plaintiff's highest and lowest GAF within the last year, and only indicated her current GAF. *See id.* The evaluations by LCSWs Green and Mathews were made after the period at issue here. Further, the records indicate that these assessments related only to Plaintiff's current condition upon admission and follow up treatment and, therefore, it was not error for the ALJ to not expressly discuss this evidence. *See Vandermark v. Colvin,* No. 3:13–cv–1467, 2015 WL 1097391, *5 (N.D .Y. Mar. 11, 2015)* (finding that the ALJ did not err by failing to discuss the opinions of a staff psychiatrist and a LCSW, since the evaluations were made "after the period at issue" and did not provide an opinion as to the plaintiff's condition during the relevant time frame).

[2]     GAF refers to a person's overall level of functioning and is assessed using a scale that

provides ratings in ten ranges, with higher scores reflecting greater functioning. *See Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV–TR") 27 (4th ed. Text Revision 2000). The GAF scale was removed for the fifth edition of the DSM, which was published in 2013, because of the GAF's "conceptual lack of clarity" and "questionable psychometrics in routine practice." *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–V–TR") 16 (5th ed.2013). In addition, before the DSM–V abandoned the GAF scale, the SSA declined to endorse GAF scores for "use in the Social Security and SSI disability programs" because GAF scores have no "direct correlation to the severity requirements in [the SSA's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury,* 65 Fed.Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000); *see also Santiago v. Colvin,* No. 12 Civ. 7052, 2014 WL 718424, *20 n.10 (S.D.N.Y. Feb. 25, 2014) (citation omitted) ("The [SSA] Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the [regulations] that the ALJ considers [to determine whether the claimant has a per se disability]"); *Corporan v. Colvin,* No. 12–CV–6704, 2015 WL 321832, *12 n.9 (S.D.N.Y. Jan. 23, 2015) (citations omitted).

**\*11** Additionally, the ALJ did mention Plaintiff's treatment at Centerstone, where she was treated by LCSWs Green and Mathews. The ALJ further took into consideration the LCSWs' opinion that Plaintiff was experiencing "symptoms of sadness and isolation." *See* T. at 479; *id.* at 23. As the ALJ noted, Dr. Kupstas' psychiatric evaluation found that Plaintiff had no more than moderate limitations in concentration, persistence, or pace. *Id.* at 479. Further, Dr. Noia noted that Plaintiff had intact attention and concentration, but did express symptoms of depression. *See id.* at 361. Dr. Noia further expressed his belief that Plaintiff appeared capable of understanding and following simple instructions and directions, performing simple and some complex tasks with supervision and independently, maintaining attention and concentration for tasks, regularly attending to a routine and maintaining a schedule, learning new tasks, and making appropriate decisions. *See id.* at 23, 361–62. Dr. Noia indicated that Plaintiff could relate moderately well with others and had some difficulty dealing with stress. *See id.* at 23, 362. It is clear that substantial evidence supported the

ALJ's decision and that it was not error to not address the opinions of LCSWs Green and Mathews in more detail.

Moreover, in *Dutcher,* the court found that remand was warranted for several reasons. First, the court noted that the ALJ incorrectly accorded "little weight" to the plaintiff's treating physician, having based this determination on a misapplication of the record. *See Dutcher,* 2014 WL 2510557, at *4. The court found that the determination as to the treating physician alone warranted remand. *See id.* Further, the court found that this error was compounded by the fact that the ALJ gave great weight to the opinion of a consulting physician, who treated the plaintiff only once, and was not a specialist in the relevant field, unlike the plaintiff's treating physician. *See id.* at *5. Unlike *Dutcher,* the ALJ's decision in the present matter does not include such compound errors that would warrant remand.

Accordingly, the Court agrees with Defendant that "where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he mention every piece of evidence in detail." Dkt. No. 12 at 10 (citing *Cichoki v. Astrue,* 729 F.3d 172, 178 (2d Cir.2013)). Based on the foregoing, the Court denies Plaintiff's motion for remand on this ground.

### 3. The ALJ properly considered Plaintiff's credibility

Plaintiff correctly sets out that when the ALJ finds that a claimant's allegations concerning the intensity and persistence of symptoms are not credible, he must consider the factors enumerated in 20 C.F.R. § 416.929(c)(1)-(3). Dkt. No. 11 at 19. Plaintiff also asserts that "the ALJ's brief summarization of a few select findings, combined with a vague conclusory rejection of Plaintiff's assertions does not provide adequate explanation for his credibility finding." *Id.* at 20.

**\*12** Defendant alleges that contrary to Plaintiff's assertion, the ALJ performed the required analysis. Dkt. No. 12 at 14. Specifically, Defendant claims that the ALJ discussed Plaintiff's daily activities, symptoms, medication, other treatment, and objective medical findings. *Id.* at 1415.

While the ALJ did not consider all of the factors in a single paragraph, the decision shows that he evaluated all of the relevant characteristics under 20 C.F.R. § 416.929. The ALJ stated that Plaintiff has no restriction on her activities of daily living, noting that during the week she cooks, cleans, showers twice, dresses twice, and every month she does laundry. T. at

Case 3:22-cv-00485-TWD    Document 15    Filed 08/03/23    Page 180 of 356
Little v. Colvin, Not Reported in F.Supp.3d (2015)
2015 WL 1399586

21. He also noted that Plaintiff "took a bus to the [February 2010] examination ." *Id.* at 22. The ALJ then chronicled Plaintiff's subjective symptoms starting at her alleged onset of disability date. *Id.* at 22–25. The ALJ "acknowledge[d] that the claimant has been diagnosed with depression, and in the most recent treatment notes indicate[s] she has been prescribed Celexa." *Id.* at 24. Further, the ALJ noted that "the claimant received a steroid injection in November 2010 ... [and] had tried multiple medications for pain and reported that none had helped." *Id.* at 23. Based on these factors and the objective medical evidence, the ALJ found that "while the claimant has impairments that are reasonably expected to produce the type of pain or discomfort she alleges, her complaints suggest a greater severity of symptoms than can be shown by the objective medical evidence alone." *Id.* at 24–25.

Contrary to Plaintiff's assertion, the ALJ's decision makes clear that he considered the relevant factors under 20 C.F.R. § 416.929 when making his determination. His credibility determination was based on "the treatment records, the consultative examiner's evaluation, and the opinion of the state agency reviewer," and the ALJ found that these sources were "consistent with all credible record evidence." *Id.* at 26. Then, the ALJ determined that Plaintiff's "specific allegations are not credible when compared with the record." *Id.*

Based on the foregoing, the Court finds that the ALJ properly evaluated Plaintiff's credibility and followed the two-step process mandated by 20 C.F.R. § 416.929.

### 4. The ALJ's reliance on the Medical–Vocational Guidelines was proper

An ALJ may determine whether a plaintiff's mental impairments "significantly diminish" his or her work capacity by determining whether the plaintiff can meet the basic mental demands of competitive, remunerative, and unskilled work as stated in SSR 85–15. The ruling states that these basic demands include the ability, on a sustained basis, to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.* A substantial loss of the ability to meet any of these demands would severely limit the potential occupational base at any exertional level and would, thus, "significantly diminish" the plaintiff's work capacity. *See Sipe v. Astrue,* No. 5:09–cv–1353, 2012 WL 2571268, *8 (N.D.N.Y. July 3, 2012). Such a substantial loss would prohibit the use of the Grids and necessitate the use of a vocational expert to

determine whether there would be any jobs left in the national economy that the plaintiff could perform. *See id.*

**\*13** Plaintiff argues that the ALJ's limitation of "simple tasks" and "consistent job duties" is not compatible with SSR 85–15. Dkt. No. 11 at 21. Plaintiff further argues that "a substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base[,]" and therefore the ALJ should have "obtained vocational expert testimony to determine the extent to which Plaintiff's non-exertional limitations erode the occupational base, and whether there are jobs that exist in the national economy which Plaintiff can perform." *Id.* at 22.

On the other hand, Defendant contends that, because "[t]he ALJ found that the additional limitations did not significantly erode the occupational base[ ] of unskilled sedentary work[,]" Plaintiff's non-exertional limitations do not preclude application of the Medical–Vocational Guidelines, specifically Medical–Vocational Rule 202.14. Dkt. No. 12 at 15–16. Further Defendant asserts that Plaintiff did not object to the remainder of the ALJ's non-exertional findings, and these findings alone are consistent with unskilled work. *Id.* at 16. Therefore, Defendant argues that usage of the Medical–Vocational Guidelines was appropriate. *Id.* at 16.

Dr. Kupstas' report indicates that Plaintiff "is able to perform [activities of daily living] independently" and that her symptoms "due to a mental impairment are credible and [her] limitations [are] no more than moderate in [concentration, persistence, or pace.]" T. at 479. Plaintiff's restrictions, according to the ALJ, are consistent with this report. *See id.* at 21–22. Further, ALJ Ramos' reference to "simple tasks in a position with consistent job duties that [do] not require the claimant to supervise or manage the work of others" has been upheld by the Northern District on two earlier occasions because "[t]hese findings mirror the Ruling's parameters of mental capacity for unskilled sedentary work." *Id.* at 21–22; *see Miley v. Colvin,* No. 3:13–cv–566, 2014 WL 4966144, *11 (N.D.N.Y. Sept. 30, 2014); *see also Bliss v. Colvin,* No. 3:13–cv–1086, 2015 WL 457643, *4 (N.D.N.Y. Feb. 3, 2015). While the ALJ approved Plaintiff for light work in the current case, non-exertional limitations are relevant to the skill level required, not exertional requirements. SSR 85–15 at 4. Therefore, although the ALJ limited Plaintiff to "unskilled light work[,]" the difference between sedentary jobs in *Miley* and *Colvin* and light jobs in the current case is not material to the Court's decision. T. at 26.

Based on the foregoing, the Court affirms the ALJ's decision to rely on the Medical–Vocational Guidelines to determine whether Plaintiff was disabled as defined by the Social Security Act.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

 **\*14** **ORDERS** that Plaintiff's motion to remand for further administrative proceedings is DENIED; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1399586

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 182 of 356

Reed v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)

2018 WL 1183382

2018 WL 1183382
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Star N. REED, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:16-CV-1134 (WBC)
|
Signed 03/06/2018

**Attorneys and Law Firms**

OLINSKY LAW GROUP, OF COUNSEL: HOWARD D. OLINSKY, ESQ., 300 S. State St., Ste. 420, Syracuse, NY 13202, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN. OFFICE OF REG'L GEN. COUNSEL—REGION II, OF COUNSEL: KRISTINA D. COHN, ESQ., 26 Federal Plaza–Room 3904, New York, NY 10278, Counsel for Defendant.

### MEMORANDUM-DECISION and ORDER

William B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 13.).

Currently before the Court, in this Social Security action filed by Star N. Reed ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 9, 10.) For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Factual Background
Plaintiff was born in 1981. (T. 73.) She has a college degree. (T. 182.) Generally, Plaintiff's alleged disability consists of ulcerative colitis. (T. 181.) Her alleged disability onset date

is September 12, 2012. (T. 73.) Her date last insured is June 30, 2015. (*Id.*) She previously worked as a sales promotion representative, social service aide, nursery school attendant, front desk receptionist, and waitress. (T. 182.)

### B. Procedural History
On February 6, 2013, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 73.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On November 25, 2014, Plaintiff appeared before the ALJ, Cynthia R. Hoover. (T. 27-72.) On March 9, 2015, ALJ Hoover issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 11-26.) On July 21, 2016, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 2-6.) Thereafter, Plaintiff timely sought judicial review in this Court.

### C. The ALJ's Decision
Generally, in her decision, the ALJ made the following five findings of fact and conclusions of law. (T. 16-22.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 12, 2012. (T. 16.) Second, the ALJ found that Plaintiff had the severe impairment of inflammatory bowel disease/ulcerative colitis. (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 17.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of medium work. (T. 18.) [1] Fifth, the ALJ determined that Plaintiff was capable of performing her past relevant work. (T. 21.)

[1]   Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

Reed v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)

2018 WL 1183382

### A. Plaintiff's Arguments

**\*2** Plaintiff makes two separate arguments in support of her motion for judgment on the pleadings. First, Plaintiff argues the ALJ's RFC determination was not supported by substantial evidence because she failed to follow the treating physician rule. (Dkt. No. 9 at 10-14 [Pl.'s Mem. of Law].) Second, and lastly, Plaintiff argues the ALJ's credibility determination was not supported by substantial evidence. (*Id.* at 14-16.)

### B. Defendant's Arguments

In response, Defendant makes two arguments. First, Defendant argues the ALJ properly evaluated the medical evidence in the record in determining Plaintiff's RFC. (Dkt. No. 10 at 5-9 [Def.'s Mem. of Law].) Second, and lastly, Defendant argues the ALJ correctly found that Plaintiff's subjective complaints were not entirely credible. (*Id.* at 9-10.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

2018 WL 1183382

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

## IV. ANALYSIS

### A. Medical Opinion Evidence and RFC Determination

The RFC is an assessment of "the most [Plaintiff] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) [2]. The ALJ is responsible for assessing Plaintiff's RFC based on a review of relevant medical and non-medical evidence, including any statement about what Plaintiff can still do, provided by any medical sources. *Id.* at §§ 404.1527(d), 404.1545(a)(3), 404.1546(c).

[2]  Effective March 27, 2017, many of the Regulation cited herein have been amended, as have SSRs cited herein. Nonetheless, because Plaintiff's social security application was filed before the new regulations and SSRs went into effect, the Court reviews the ALJ's decision under the earlier regulations and SSRs.

The Second Circuit has long recognized the treating physician rule set out in 20 C.F.R. § 404.1527(c). " '[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " " *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008)).

There are situations where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: '(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek,* 802 F.3d at 375 (quoting *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013)). However, "[w]here an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.,* No. 3:15-CV-1196, 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017), report and recommendation adopted by 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017) (citing *Atwater v. Astrue,* 512 Fed.Appx. 67, 70 (2d Cir. 2013)). After considering these factors, "the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating

physician's opinion.' " *Greek,* 802 F.3d at 375 (quoting *Burgess,* 537 F.3d at 129). "The failure to provide 'good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.' " *Greek,* 802 F.3d at 375 (quoting *Burgess,* 537 F.3d at 129-130).

The record contains medical treatment notations and a medical source statement from treating provider, Frank Nemec, M.D. (T. 263-298.) The record also contains two RFC assessments completed by non-examining State agency medical examiners, Judy Panke, M.D. and Robert Hughes, M.D. (T. 78-81, 84-91.)

According to Dr. Nemec's treatment notations, he treated Plaintiff for her ulcerative colitis eight times between April 2010 and November 2014. On April 9, 2010, Plaintiff was three months pregnant and complained of a "flare up." (T. 283.) Plaintiff's treatment history, as outlined in Dr. Nemec's notations, indicated she was diagnosed in 2001 with colitis and started treatment with his office in 2006. (*Id.*) Plaintiff's history stated she was treated with the medication Asacol, intermittent prednisone therapy and 6 mercaptopurine ("6 MP") a day, but had been off prednisone since 2006 and "had been doing well." (*Id.*) Plaintiff's history also indicated Plaintiff was advised to stop the medication 6 MP prior to conception, that she had stopped 6 MP in April, lab results were mostly normal, and Plaintiff recently changed jobs. (*Id.*) In April 2010, Plaintiff complained of having ten bowel movements a day. (*Id.*) Dr. Nemec advised Plaintiff to increase her medication, Asacol, to twelve times per day and to start another medication, Rowasa. (T. 284.) Dr. Nemec ordered labs and Plaintiff was advised to follow up in three weeks. (T. 285.)

 *4  On May 11, 2010, Plaintiff followed up with Dr. Nemec. (T. 278.) She reported her bowel movements decreased to one to three a day since increasing her medication, she was no longer on Rowasa, but was still taking twelve Asacol a day. (*Id.*) Dr. Nemec noted that Plaintiff symptoms were "much better" and decreased her Asacol to nine times a day. (T. 279.) He advised Plaintiff to follow up in six weeks. (*Id.*)

Plaintiff next sought treatment for a flare up six months later on November 16, 2010. (T. 275.) Notations at that time indicated Plaintiff had recently had a baby and wanted to "restart" Asacol. (*Id.*) Notations further indicated Plaintiff was having over ten bowel movements a day with bleeding. (*Id.*) Dr. Nemec prescribed Rowasa, ordered labs, and advised Plaintiff to follow up in three weeks. (T. 276.) Of note, the

Reed v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)

2018 WL 1183382

treatment notations dated April, May, and November 2010, outlined above, were completed two years before Plaintiff's alleged onset date of September 12, 2012.

Plaintiff did not seek treatment again until October 23, 2012. (T. 263.) Notations at that time indicated Plaintiff recently had a second child and was experiencing a flare up with over ten bowel movements a day. (*Id.*) Notations indicated Plaintiff was previously on Asacol and wanted to restart the medication. (*Id.*) Dr. Nemec ordered labs, prescribed Asacol four times a day, and advised follow up in two months. (T. 264.)

Plaintiff sought treatment approximately six months later on May 6, 2013. (T. 265.) At that time she complained of bleeding and "some urgency" with bowel movements. (T. 265.) Notations further contained complaints of abdominal pain, swelling, diarrhea, gas, and cramps. (T. 266.) Dr. Nemec ordered labs and started Plaintiff on a new medication, Lialda four times a day. (*Id.*)

Plaintiff did not seek treatment again until approximately eleven months later in May 2, 2014. (T. 271.) Notations indicated Plaintiff complained of five bowel movements a day and pain primarily in her left lower quadrant. (T. 271.) Dr. Nemec ordered an elective colonoscopy and labs. (T. 272.) Dr. Nemec's notations did not indicate any change in Plaintiff's medication management. (*Id.*) On April 30, 2014, Plaintiff had a normal colonoscopy. (T. 267-270.) Plaintiff saw Dr. Nemec on November 19, 2014; however, it appears that treatment notations were not updated since her May 2, 2014 office visit. (*Compare* T. 287 *with* T. 271.) Dr. Nemec ordered labs, started Plaintiff on Rowasa, and advised her to follow up in two weeks. (T. 288.)

Dr. Nemec completed a "Crohn's & Colitis Medical Source Statement" form in November of 2014. (T. 290-293.) Dr. Nemec stated that Plaintiff suffered from ulcerative colitis with symptoms including diarrhea, abdominal pain and cramping, vomiting, and fatigue. (T. 290.) He wrote that during "flares" Plaintiff would be "incapacitated," but the frequency of flares was "indeterminate." (*Id.*) He indicated that Plaintiff's last colonoscopy and lab results were within normal limits. (*Id.*) Dr. Nemec wrote that different prescription medication had been prescribed to Plaintiff with "little to no success." (T. 291.) He checked that box "no" indicating Plaintiff's impairment did not last, or could not be expected to last, at least twelve months. (*Id.*) Dr. Nemec indicated that Plaintiff's impairment did not result in

functional limitations in walking, sitting, standing, lifting, or performing postural activities. (T. 291-292.) He checked the box "yes" indicating Plaintiff would "sometimes need to take unscheduled restroom breaks during a workday" and wrote Plaintiff would have five to seven bowel movements a day, with urgency. (T. 291-292.) Dr. Nemec checked the box indicating Plaintiff would be absent "[m]ore than four days per month" and wrote "depends if [Plaintiff] is in flare [and] [t]ime varies at that time." (T. 292.)

**\*5** Dr. Hughes reviewed Plaintiff's record on May 8, 2013. He opined Plaintiff could perform the requirements of medium work. (T. 78-79.) In making his determination, Dr. Hughes noted he relied on Plaintiff's alleged activities of daily living and Dr. Nemec's October 2012 treatment notation. (T. 79.) Dr. Panek reviewed Plaintiff's record on October 3, 2013. She opined Plaintiff could perform the requirements of medium work. (T. 88-89.) Dr. Panek relied on Dr. Nemec's October 2012 notation in making her determination. (T. 89.)

In assessing the medical opinion evidence in the record, the ALJ afforded Dr. Nemec's opinion "no weight." (T. 20.) The ALJ reasoned that Dr. Nemec's opinion was not supported by, or consistent with, the objective medical evidence; documented complaints; course of treatment; or the record as a whole. (*Id.*) The ALJ afforded the opinions of Drs. Panek and Hughes "great weight." (*Id.*)

Plaintiff asserts the ALJ erred in her assessment of Dr. Nemec's opinion on many grounds. First, Plaintiff makes the general argument that a treating source, such as Dr. Nemec, is entitled to more weight than the opinion of a non-treating source. (Dkt. No. 9 at 10-11 [Pl.'s Mem. of Law].) It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e). The Regulations "recognize that the Commissioner's consultants are highly trained physicians with expertise in evaluation of medical issues in disability claims who's "opinions may constitute substantial evidence in support of residual functional capacity findings." *Lewis v. Colvin*, 122 F. Supp. 3d 1, at 7 (N.D.N.Y. 2015) (citing *Delgrosso v. Colvin*, 2015 WL 3915944, at \*4 (N.D.N.Y. June 25, 2015)); *see also Heagney-O'Hara v. Comm'r of Soc. Sec.*, 646 Fed.Appx. 123, 126 (2d Cir. 2016); *see also Monette v. Colvin*, 654 Fed.Appx. 516 (2d Cir. 2016); *see also Snyder v. Colvin*, 667 Fed.Appx. 319 (2d Cir. 2016). Therefore, the ALJ did not commit legal

Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 186 of 356

Reed v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)

2018 WL 1183382

error in affording more weight to the non-examining medical consultants than a treating source.

Second, Plaintiff makes the conclusory assertion that the Dr. Nemec's opinion is consistent with the evidence in the record and the ALJ improperly substituted her own lay opinion for that of the treating source. (Dkt. No. 9 at 11-12 [Pl.'s Mem. of Law].) However, under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record. *See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012); see also Wojciechowski v. Colvin, 967 F.Supp.2d 602, 605 (N.D.N.Y. 2013)* (Commissioner's findings must be sustained if supported by substantial evidence even if substantial evidence supported the plaintiff's position); *see also Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)* (reviewing courts must afford the Commissioner's determination considerable deference and cannot substitute own judgment even if it might justifiably have reached a different result upon a *de novo* review). Plaintiff failed to show that no reasonable fact finder could have reached the ALJ's conclusion.

Plaintiff further asserts the ALJ did not cite evidence to support her conclusion that medication controlled Plaintiff's symptoms. (Dkt. No. 9 at 12 [Pl.'s Mem. of Law].) However, it is clear from the ALJ's decision that she relied on the very limited treatment notations provided by Dr. Nemec to support her determination. The ALJ stated treatment notations indicated Plaintiff's complaints of flare ups coincided with her pregnancies and/or restrictions from medication while breastfeeding. (T. 20.) The ALJ noted that when taking medication her symptoms were relatively controlled. (*Id.*) Indeed, treatment notations from October 2012 indicated Plaintiff had a flare up starting in her third trimester of her second pregnancy and she wished to restart Asacol which she had run out of. (T. 263.) Plaintiff did not seek treatment until seven months later at which time Dr. Nemec prescribed a new medication and noted she would resume a previous medication, 6 MP, once she was no longer breastfeeding. (T. 266.) [3] Plaintiff did not seek treatment until eleven months later at which time her medication was not changed. (T. 271.) The history portion of treatment notations indicated Plaintiff was treated with Asacol, intermittent prednisone therapy and 6 MP a day, she had been off prednisone since July of 2006 and had been "doing well." (T. 265, 271, 275, 278, 283,

287.) Therefore, substantial evidence in the record supported the ALJ's conclusion that Plaintiff's symptoms improved on medication. Further, the ALJ did not substitute her own lay opinion for that of Dr. Nemec. The ALJ relied not only on his treatment notations, she also relied on the medical opinions of Drs. Hughes and Panek.

[3]      Notations also indicated Plaintiff was advised to stop taking the medication 6 MP prior to conception. (T. 283.)

 **\*6**  Plaintiff further argues the ALJ erred in her conclusion that Plaintiff's need to use the rest room was not supported by objective findings, because the need to use a restroom cannot be confirmed by objective testing and observations. (Dkt. No. 9 at 13 [Pl.'s Mem. of Law].) The Second Circuit has reasoned that a treating source's opinion, which is based primarily on a plaintiff's subjective complaints, rather than the treating source's medical observations, can be afforded less weight. *See Rivera v. Colvin, 592 Fed.Appx. 32, 33 (2d Cir. 2015)* (affirming ALJ's determination that VA finding of 70% disability "relied heavily on [plaintiff's] subjective complaints rather than objective medical evidence."); *Polynice v. Colvin, 576 Fed.Appx. 28, 31 (2d Cir. 2014)* ("Much of what [plaintiff] labels medical opinion was nor more than a doctor's recording of [plaintiff's] own reports of pain."); *Roma v. Astrue, 468 Fed.Appx. 16, 19 (2d Cir. 2012)* (affirming ALJ's decision to give less weight to a doctor's opinion because it was based largely upon the subjective statements of a plaintiff, who the ALJ had reasonably found to be less than fully credible). Further, lack of supporting objective evidence was just one of many factors the ALJ considered in assessing Dr. Nemec's opinion. As stated herein, the ALJ also considered Plaintiff's course of treatment and the record as a whole which was limited and largely coincided with her pregnancies and restrictions in taking medication. (T. 20.)

Plaintiff does not assert that she is unable to perform the exertional and non-exertional demands of medium work. Indeed, all of the medical source opinions in the record support the ALJ's conclusion that Plaintiff could perform medium work as outlined in 20 C.F.R. § 404.1567(c). Plaintiff contends she could not perform substantial gainful work activity because she required ready access to a restroom multiple times a day. To be sure, the medical record contained complaints of multiple bowel movements up to ten a day when Plaintiff was experiencing a flare up. However, as outlined by the ALJ, the medical record indicated Plaintiff's flare ups occurred when Plaintiff was off medication, her symptoms improved while on medication, and overall

Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 187 of 356

Reed v. Commissioner of Social Security, Not Reported in Fed. Supp. (2018)
2018 WL 1183382

objective findings were normal. Further, there were long periods of time in which Plaintiff did not seek medical attention for her condition. "In the event of such a conflict, we defer to the Commissioner's resolution of conflicting evidence, and reject the ALJ's findings only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-2672-CV, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018) (citation omitted).

Overall, the ALJ provided good reasons for affording Dr. Nemec's opinion less than controlling weight. Further, substantial evidence supported the ALJ's determination and therefore the ALJ's RFC determination is upheld.

**B. Credibility Determination**

In determining whether a plaintiff is disabled, the ALJ must also make a determination as to the credibility of the plaintiff's allegations. "An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 205 (N.D.N.Y. 2012) (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)).

The Second Circuit recognizes that "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," and that "[i]f there is substantial evidence in the record to support the Commissioner's findings, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Schlichting*, 11 F. Supp. 3d at 206 (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Due to the fact that the ALJ has the benefit of directly observing a plaintiff's demeanor and "other indicia of credibility," the ALJ's credibility assessment is generally entitled to deference. *Weather v. Astrue*, 32 F. Supp. 3d 363, 381 (N.D.N.Y. 2012) (citing *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999)).

 **\*7** The ALJ must employ a two-step analysis to evaluate the plaintiff's reported symptoms. *See* 20 C.F.R. § 404.1529. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms

alleged." 20 C.F.R. § 404.1529(a). Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the plaintiff's daily activities; (2) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the plaintiff takes or has taken to relieve her pain or other symptoms; (5) other treatment the plaintiff receives or has received to relieve her pain or other symptoms; (6) any measures that the plaintiff takes or has taken to relieve her pain or other symptoms; and (7) any other factors concerning plaintiff's functional limitations and restrictions due to her pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ determined that Plaintiff's medically determinable impairment could reasonably be expected to cause "some" of her alleged symptoms; however, she determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. (T. 18.)

In making her determination the ALJ noted that despite Plaintiff's impairment she continued to work until 2010 and possibly 2012. (T. 19.) The ALJ remarked that Plaintiff ceased working after her second child was born. (*Id.*) Plaintiff argues that the ALJ "clearly misunderstood" testimony when she determined Plaintiff quit her last job because she was having a baby. (Dkt. No. 9 at 15 [Pl.'s Mem. of Law].)

At the hearing the ALJ questioned Plaintiff why she left her last place of employment and Plaintiff testified "because of health issues." (T. 42.) However, when further questioned by the ALJ, Plaintiff appeared to acknowledge she left the job because she anticipated her child being born. (*Id.*) [4] Any error the ALJ may have made in her interpretation of Plaintiff's testimony was harmless because Plaintiff's reasoning for leaving her last job was only one factor considered by the ALJ. Further, in making her credibility determination the ALJ relied heavily on the medical evidence in the record. The ALJ held that, "more importantly [than Plaintiff's reasons for leaving her employment], the alleged frequency and severity of symptoms and limitations [were] not supported by the record." (T. 19.) The ALJ then provided specific citations to the medical record documenting Plaintiff's complaints,

2018 WL 1183382

medications, and treatment, which the ALJ concluded did not support Plaintiff's allegations. (*Id.*)

4
    Q: Okay. And then your last job was at the preschool. And why did you leave that job?
      A: Was that the one at Child's Play in—
      Q: Was that your last job in 2010?
      A: —yeah. I worked there from—it was, I think, March or April 2009 through August of 2010 and because of health issues.
      Q: Wasn't that when your son was born?
      A: He was born, right after—about a month after. Mm-hmm.
      Q: Because you had told someone in the record that you left that job in anticipation of your first child?
      A: Mm-hmm.
      Q: Okay.
(T. 42.)

Plaintiff further asserts the ALJ ignored evidence that Plaintiff receives assistance in caring for her children. (Dkt. No. 9 at 15-16 [Pl.'s Mem. of Law].) Contrary to Plaintiff's assertion, the ALJ did not "ignore" this evidence. The ALJ noted that Plaintiff cared for her children with the help of her husband and parents. (T. 20.) The ALJ also noted other activities, such as personal care and the ability to do light chores and go out alone, which she concluded were not as restricting given the limitations alleged. (*Id.*) Overall, the ALJ's credibility analysis was proper and supported by substantial evidence in the record. Because the ALJ adequately explained her reasons for her finding and these reasons were supported by substantial evidence, the ALJ's credibility determination is upheld. *See Wright v. Berryhill*, 687 Fed.Appx. 45 (2d Cir. 2017) ("Given the sharply limited scope of our review, we see no basis for disturbing the ALJ's credibility determination.").

**\*8** Overall, the ALJ properly adhered to the treating physician rule and her RFC determination, including her credibility determination, was supported by substantial evidence. Therefore, the ALJ's determination is upheld.

**ACCORDINGLY**, it is

    **ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is **DENIED**; and it is further

    **ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 10) is **GRANTED**; and it is further

    **ORDERED** that Defendant's unfavorable determination is **AFFIRMED**; and it is further

    **ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1183382

---

End of Document
      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4411337

2016 WL 4411337
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel BARBER, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

6:15-CV-0338 (GTS/WBC)
|
Signed 07/22/2016

**Attorneys and Law Firms**

OFFICE OF PETER ANTONOWICZ, 148 W. Dominick St., OF COUNSEL: PETER W. ANTONOWICZ, ESQ., Rome, NY 13440, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, 26 Federal Plaza – Room 3904, OF COUNSEL: KAREN CALLAHAN, ESQ., New York, NY 10278, Counsel for Defendant.

**REPORT and RECOMMENDATION**

William B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 15.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Daniel Barber ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 13, 14.) For the reasons set forth below, it is recommended that Plaintiff's motion be denied and Defendant's motion be granted.

**I. RELEVANT BACKGROUND**

**A. Factual Background**

Plaintiff was born on December 24, 1993. (T. 133.) He completed the 8 th grade. (T. 160.) Generally, Plaintiff's alleged disability consists of autism, attention deficit disorder

("ADD"), learning disability, and asthma. (T. 159.) His alleged disability onset date is December 24, 1993. (T. 65.)

**B. Procedural History**

On January 20, 2012, Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (T. 65.) Plaintiff's application was initially denied, after which he timely requested a hearing before an Administrative Law Judge ("the ALJ"). On July 10, 2013, Plaintiff appeared before the ALJ, James G. Myles. (T. 28-64.) On August 12, 2013, ALJ Myles issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 10-27.) On January 26, 2015, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-6.) Thereafter, Plaintiff timely sought judicial review in this Court.

**C. The ALJ's Decision**

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 15-24.) First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 20, 2012. (T. 15.) Second, the ALJ found that Plaintiff had the severe impairments of asthma, obesity, organic mental disorders and autism, and other pervasive developmental disorders. (Id.) Third, the ALJ found that Plaintiff did not meet an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 15-17.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work with additional non-exertional impairments. (T. 17.) [1] The ALJ determined Plaintiff should have no concentrated exposure to pulmonary irritants and hazards; he was limited to routine, unskilled work and required only occasional interpersonal contact, with no team or work with the public as part of his critical job duties; and he must have no output or quota/piece work. (Id.) Fifth, the ALJ determined that Plaintiff had no past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 23-24.)

[1]     Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work. 20 C.F.R. § 416.967(c).

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4411337

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

**\*2** Plaintiff makes four separate arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues the ALJ failed to find that Plaintiff's condition met the requirements of Listing 12.10. (Dkt. No. 13 at 12-18 [Pl.'s Mem. of Law].) Second, Plaintiff argues the ALJ improperly assessed Plaintiff's credibility. (*Id.* at 18-20.) Third, Plaintiff argues the ALJ "disregarded and violated" the Regulations when employing a consultative examiner. (*Id.* at 20-22.) Fourth, and lastly, Plaintiff argues the ALJ failed to afford controlling weight to Plaintiff's treating physician and failed to properly analyze the medical evidence. (*Id.* at 22-26.)

### B. Defendant's Arguments

In response, Defendant makes five arguments. First, Defendant argues the record did not support a finding that Listing 12.10 was met or equaled. (Dkt. No. 14 at 7-9 [Def.'s Mem. of Law].) Second, Defendant argues that the ALJ properly assessed Plaintiff credibility. (*Id.* at 9-16.) Third, Defendant argues the ALJ properly developed the record in obtaining a consultative examiner. (*Id.* at 16-18.) Fourth, Defendant argues the ALJ appropriately evaluated and weighed the medical opinion evidence in the record. (Id. at 18-21.) Fifth, and lastly, Defendant argues the that vocational expert ("VE") testimony provided substantial evidence to support the ALJ's step five determination. (*Id.* at 21.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal

principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

**\*3** The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 191 of 356

Barber v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 4411337

mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

## IV. ANALYSIS

### A. Listing 12.10

At step three of the sequential process the ALJ must determine whether Plaintiff's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.926) ("the Listings"). If Plaintiff's impairments or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement, Plaintiff is disabled. *Id.* at §§ 404.1509, 416.909. If Plaintiff does not meet or equal a Listing, the analysis proceeds to the next step.

To match an impairment listed in Appendix 1, Plaintiff's impairment "must meet all of the specified medical criteria" of a listing. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (citing 20 C.F.R. § 404 Subpt. P, App. 1). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* An impairment may also be "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Listing 12.10 encompasses autistic disorder and other pervasive developmental disorders. 20 C.F.R. § 404 Subpt. P, App. 1, § 12.10. The Listing is met when the criteria of both Paragraph A and Paragraph B are satisfied. For autistic disorders, Paragraph A requires all of the following: qualitative deficits in reciprocal social interaction; qualitative deficits in verbal and nonverbal communication and in imaginative activity; and markedly restricted repertoire of activities and interests. *Id.* at § 12.10A. Paragraph B criteria must also be met and requires two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.* at § 12.10B.

**\*4** The ALJ determined that Plaintiff did not meet the criteria of Listing 12.10. (T. 16.) The ALJ's analysis focused on the Paragraph B criteria of the Listing. (*Id.*) The ALJ determined that Plaintiff had mild restriction in activities of daily living, mild difficulties in social functioning, and moderate difficulties regarding concentration, persistence or pace. (*Id.*) The ALJ determined Plaintiff had no episodes of decompensation. (*Id.*)

Plaintiff first contends the ALJ erred in his step three evaluation because he did not specifically address the criteria outlined in Paragraph A. (Dkt. No. 13 at 13 [Pl.'s Mem. of Law].) To be sure, the ALJ's determination did not discuss the Paragraph A criteria of Listing 12.10. (T. 16.) However, the criteria of Paragraph A *and* B must be established to satisfy the Listing. Therefore, any error to specifically address Paragraph A criteria would be harmless if the ALJ properly assessed the Paragraph B criteria and properly concluded Plaintiff did not meet that criteria.[2]

2
    Of note, Paragraph A specially requires "qualitative deficits in verbal and nonverbal communication and in imaginative activity." The

> record indicated that Plaintiff did not show any difficulties with creativity and imagination and this area was an area of strength. (T. 243.)

Further, Plaintiff argues the non-examining State agency medical examiner, M. Totin, Psychology, opined that Plaintiff met the Paragraph A criteria. (Dkt. No. 13 at 13 [Pl.'s Mem. of Law].) Dr. Totin indicated that Listings 12.02 and 12.10 were considered (T. 277); however, Dr. Totin opined Plaintiff's autism did not satisfy the Paragraph A or B criteria of Listing 12.10 (T. 286). Therefore, Plaintiff's argument fails.

In addition, at step three "absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). Further, "[a]n ALJ is not required to discuss in depth every piece of evidence contained in the record, so long [as] the evidence of record permits the Court to glean the rationale of an ALJ's decision." *LaRock ex. rel. M.K. v. Astrue*, No. 10–CV–1019, 2011 WL 1882292, *7 (N.D.N.Y. Apr. 29, 2011) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (internal quotation marks omitted)).

To be sure, the ALJ could have been more precise in his step three analysis; however, the ALJ's step three analysis, and the analysis in the remaining steps, provided sufficient reasoning and substantial evidence to support his step three determination. For example, in his step three analysis, the ALJ relied exclusively on Plaintiff's written testimony provided in his Function Report "Exhibit 4E" (T. 185-194) and did not discuss the medical evidence supplied by David Stang, Psy.D., that Plaintiff met the Listing (T. 318-321). (T. 16.) However, the ALJ did address Dr. Stang's opinion in his step four analysis, and reasoned that although Plaintiff appeared to have deficits in social functioning and concentration, they did not rise to the level opined by Dr. Stang. (T. 22.)

Overall, substantial evidence supported the ALJ's determination that Plaintiff did not meet a Listing. The ALJ specifically relied on Plaintiff's testimony in his step three analysis and based on Plaintiff's testimony he did not have any marked limitations in functioning as required by the Listing. Further, the ALJ's analysis at step four makes clear that the ALJ also relied on the medical opinions of the State agency consultative examiners and Plaintiff's provider Andy Lopez-Williams, M.D. in making his determination. For the reasons set forth in greater detail herein, the ALJ properly weighed the medical opinion evidence in the record. Therefore, the ALJ did not err in his step three determination because Plaintiff's impairment did not satisfy the Paragraph B criteria of Listing 12.10 based on Plaintiff's testimony and the medical evidence in the record which established that Plaintiff did not have marked limitations in functioning.

### B. Credibility

**\*5** A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. § 416.929; SSR 96–7p. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a); SSR 96–7p. Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vii); SSR 96-7p.

2016 WL 4411337

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms; however, his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (T. 18.) The ALJ stated elsewhere in his decision that Plaintiff was "somewhat credible," but was capable of performing some work. (T. 21.) In making his credibility determination, the ALJ relied on Plaintiff's testimony and the objective medical evidence in the record. (T. 18-23.)

Plaintiff argues the ALJ committed legal error in his credibility analysis because Plaintiff's allegations were consistent and the ALJ failed to follow SSR 96-7p which directs that "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." (Dkt. No. 13 at 19-20 [Pl.'s Mem. of Law].)[3] Defendant counters that the ALJ properly assessed Plaintiff's credibility based on testimony and medical evidence. (Dkt. No. 14 at 9-16 [Def.'s Mem. of Law].) For the reasons stated herein, and further outlined in Defendant's brief, the ALJ's credibility determination was proper and conducted in accordance with the Regulations and SSR 96-7p.

[3]    Of note, effective March 28, 2016 SSR 96-7p was superseded by SSR 16-3p.

Although Plaintiff's allegations regarding his symptoms may have been consistent, the ALJ must still evaluate those symptoms in accordance with the factors outlined in the Regulations. In making his credibility determination, the ALJ considered Plaintiff's activities of daily living. (T. 16, 18, 21.) 20 C.F.R. § 416.929(c)(3)(i). The ALJ also discussed Plaintiff's symptoms and restrictions due to symptoms as reported by medical sources. (T. 18-20); 20 C.F.R. § 416.929(c)(3)(ii), (vii). Where an ALJ's reasoning and adherence to the Regulations is clear, he is not required to explicitly go through each and every factor of the Regulation. Atwater v. Astrue, 512 Fed.Appx. 67, 70 (2d Cir. 2013) (plaintiff challenged ALJ's failure to review explicitly each factor provided for in 20 C.F.R. § 404.1527(c), the Court held that "no such slavish recitation of each and every factor [was required] where the ALJ's reasoning and adherence to the regulation [was] clear"). Therefore, contrary to Plaintiff's assertions, the ALJ's credibility determination was made in accordance with the Regulations and it is recommended that the ALJ's credibility determination be upheld.

## C. Consultative Examiner

\*6 Plaintiff argues the ALJ committed legal error because he failed to follow the Regulations when he hired a consultative examiner from an outside source without first seeking the consultative exam from Plaintiff's treating provider. (Dkt. No. 13 at 20-22 [Pl.'s Mem. of Law].)

During the course of an application for Social Security Disability benefits the Commissioner may purchase a consultative examination. 20 C.F.R. § 404.1519a. The purchase of a consultative exam is done at the discretion of the Commissioner. Id. at § 404.1519a(a) ("If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination.") (emphasis added). Generally, an exam is ordered if information cannot be obtained from treating medical sources, to help the Commissioner resolve inconsistencies in the record, or to fill in any gaps in the record. Id. at § 404.1519a(b)(1)-(4). A consultative examination can only be performed by a "qualified medical source" who is licensed in the State and has "the training and experience to perform the type of examination or test [the Commissioner] will request." Id. at 404.1519g.

The Regulation at 20 C.F.R. § 404.1519h states:

> [w]hen in our judgment [plaintiff's] treating source is qualified, equipped, and willing to perform the additional examination or tests for the fee schedule payment, and generally furnishes complete and timely reports, [plaintiff's] treating source will be the preferred source to do the purchased examination. Even if only a supplemental test is required, [plaintiff's] treating source is ordinarily the preferred source.

The Regulations state that a treating source will not be used in such cases where the treating source "prefers not to perform such examinations or does not have the equipment," there are conflicts or inconsistencies the treating source cannot resolve, plaintiff prefers to use a different source, or the treating source may not be a "productive source." 20 C.F.R. § 404.1519i. The Regulations also state that "[t]he medical sources who perform consultative examinations will have a good understanding of [the Social Security Administration's]

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 194 of 356

Barber v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 4411337

disability programs and their evidentiary requirements." *Id.* at 404.1519n.

First, the ALJ has discretion to order a consultative examination to further develop the evidentiary record. *Cox v. Astrue*, 993 F. Supp. 2d 169, 177 (N.D.N.Y. 2012); *see Serianni v. Astrue*, No. 6:07–CV–250, 2010 WL 786305, *5 (N.D.N.Y. Mar. 1, 2010); 20 C.F.R. § 404.1519a.

Second, the ALJ has discretion in seeking a consultative examination from a plaintiff's treating source; "[w]hen *in our judgment* your treating source is qualified, equipped, and willing to perform the additional examination or tests for the fee schedule payment, and generally furnishes complete and timely reports, your treating source will be the preferred source to do the purchased examination." 20 C.F.R. § 404.1519a(a).

Therefore, an ALJ's failure to seek a consultative examination, or a consultative examiner from a treating source, does not constitute legal error because under the Regulations the ALJ is not obligated to order a consultative examiner, nor is he obligated to order a consultative examination from a treating source.

Here, ALJ did not abuse his discretion in not ordering a consultative examination from Plaintiff's treating provider. Of note, Plaintiff does not assert in his brief exactly who the ALJ should have contacted. To be sure, Plaintiff received treatment from a pediatrician, Lawrence Glantz; however, Dr. Glantz provided treatment for Plaintiff's everyday ailments, asthma and ADHD, but not his autism. Plaintiff received treatment from Dr. Lopez-Williams for autism; however, Dr. Lopez-Williams provided testing results and treatment notations and Plaintiff voluntarily ended treatment with Dr. Lopez-Williams. (T. 313.) Plaintiff underwent a consultative examination by Dr. Stang at his attorney's request; however, Dr. Stang was not a treating source because he conducted a one-time evaluation.

**\*7** The ALJ acted within his discretion in ordering a consultative exam, the ALJ did not fail to adhere to the Regulations in requesting an examination from a source that was not a treating source; and further, any procedural error would be harmless. Plaintiff was represented by counsel and afforded the opportunity to provide all of his records from treating providers and Dr. Stang. Therefore, any error in seeking a consultative examiner from a treating provider would be harmless, because Plaintiff supplied a

thorough medical record, complete with a functional capacity evaluation. *Fink v. Barnhart*, 123 Fed.Appx. 146, at 148 (6 th Cir. 2005) (holding that the ALJ was not obligated to order consultative examination conducted by plaintiff's treating source and further any error would be harmless because plaintiff's medical record was complete).

### D. Treating Source, Dr. Lopez-Williams

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 416.927(c)(2)(i)-(iv). The ALJ is required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

Plaintiff argues the ALJ erred in his treatment of medical evidence supplied by Dr. Lopez-William because the ALJ failed to assign the evidence specific weight. (Dkt. No. 13 at 22 [Pl.'s Mem. of Law].) Plaintiff further argues the ALJ erred in affording "great weight" to the opinions of the State agency medical consultants. (*Id.* at 24-25.) Lastly, Plaintiff argues the ALJ improperly assessed the opinion of Dr. Stang. (*Id.* at 25-26.)

First, an ALJ need not assign a specific weight to an opinion, so long as the court is able to discern the ALJ's reasoning. *See Curtis ex rel. B.C. v. Colvin*, No. 5:11-CV-1001, 2013 WL 3327957, at *5 (N.D.N.Y. July 2, 2013). Here, the ALJ afforded "some weight" to the opinion provided by Dr. Stang and "great weight" to the opinions provided by the State agency consultative examiners, Rehan Khan, Dennis Noia, M.D., and M. Totin, Psy.D. (T. 22-23.) The ALJ did not provide a specific weight to the opinion of Dr. Lopez-William; however, the ALJ thoroughly discussed

Case 3:22-cv-00485-TWD Document 15 Filed 08/03/23 Page 195 of 356

Barber v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 4411337

his treatment observations and testing results. (T. 18, 21.) Plaintiff contends that failure to discuss the weight accorded to the report is reversible error; however, Plaintiff provides no support for his argument. The ALJ did not commit reversible error in failing to afford evidence supplied by Dr. Lopez-William's specific weight because the ALJ's decision accurately summarized the evidence in his determination and the ALJ's overall RFC determination was supported by substantial evidence in the record, included evidence supplied by Dr. Lopez-William.

It is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion may constitute substantial evidence. *See* 20 C.F.R. §§ 416.912(b) (6), 416.913(c), 416.927(e); *Baszto v. Astrue,* 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability."). Therefore, affording a non-treating source more weight than a treating source does not require automatic remand.

 **\*8** The ALJ's RFC determination was supported by substantial evidence in the record. The ALJ's determination, that Plaintiff could perform routine, unskilled work, with only occasional interpersonal contact, with no team or work with public, and no output or quota/piece work (T. 17), was supported by the opinions of Drs. Noia, Totin, also by the opinion of Drs. Lopez-Williams, and to a lesser extent, Dr. Stang.

Dr. Noia opined that based on his examination of Plaintiff, he was capable of understanding and following simple instructions and directions; and performing simple and some complex tasks with supervision and independently. (T. 275.) Dr. Noia opined Plaintiff would have some difficulty maintaining attention and concentration for tasks and would have difficulty at times in attending to a routine and maintaining a schedule. (*Id.*) He determined Plaintiff was capable of learning new tasks. (*Id.*) He opined Plaintiff was capable of making some appropriate decisions, relating to and interacting moderately well with others, and dealing with stress. (T. 276.)

On April 24, 2012, Dr. Totin reviewed Plaintiff's medical record. (T. 291-294.) Dr. Totin opined Plaintiff was not significantly limited in the area of understanding and memory. (T. 291.) He opined Plaintiff was not significantly limited in

his ability to: perform short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and make simple work-related decisions. (*Id.*) Dr. Totin opined that Plaintiff had moderate limitations in his ability to sustain an ordinary routine without special supervision and in his ability to work in coordination with or proximity to others without being distracted by them. (*Id.*)

Therefore, the ALJ's determination that Plaintiff could perform routine, unskilled work was supported by Drs. Noia and Totin's opinions that Plaintiff was able to perform this type of work. Further, the ALJ's determination that Plaintiff could perform unskilled work was supported by Dr. Lopez-William's opinion that Plaintiff's overall intellectual abilities were within the average range (T. 245), his ability to sustain attention, concentrate, and exert mental control was in the average range (T. 240-241, 245), and his abilities with verbal comprehension, perceptual reasoning, and working memory were in the average range (T. 245). Dr. Lopez-Williams stated that Plaintiff's "processing speed" was a weakness and that Plaintiff tended to act impulsively when the task was faster paced (T. 245), which was consistent with the ALJ's RFC limiting Plaintiff to no output or quota type work (T. 17).

The ALJ's determination that Plaintiff had social limitations was supported by the opinions of Drs. Noia and Totin, as well as Dr. Lopez-Williams. Dr. Noia observed that Plaintiff was cooperative and his manner of relating, social skills and overall presentation was "moderately" adequate. (T. 274.) Dr. Noia opined Plaintiff was capable of relating and interacting "moderately well" with others. (T. 277.) Dr. Totin opined Plaintiff was moderately limited in his ability to: interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 292.) He opined Plaintiff was not significantly limited in his ability to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*) Dr. Lopez-Williams opined Plaintiff had no difficulty in recognizing or understanding the perspectives, thoughts, or beliefs of others. (T. 241.) Dr. Lopez-Williams indicated Plaintiff showed deficits in his ability to understand the appropriate use of language in social situations. (*Id.*) He opined that Plaintiff had "intense and restricted areas of interest" which could

Barber v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 4411337

"impede his social functioning." (T. 246.) Therefore, the ALJ's RFC determination limiting Plaintiff to only occasional interpersonal contact, no team work or work with the public, was supported by the opinions of Drs. Noia, Totin, and Lopez-Williams.

 **\*9** The ALJ properly afforded the opinion of Dr. Stang "some weight." (T. 22.) The ALJ reasoned that Dr. Stang's opinion was "speculative and not based on the evidence presented in the record and at the hearing." (*Id.*) The ALJ further reasoned that Dr. Stang's opinion was questionable because it was conducted at the request of Plaintiff's attorney, it was based on a one time exam, and Plaintiff's mother was a crucial factor in formulating the opinion. (*Id.*) In his discussion of Dr. Stang's opinion, the ALJ provided specific examples of medical evidence in the record which did not support the opinion. For example, the ALJ stated that Dr. Stang's opinion that Plaintiff had deficits in social functioning and concentration were not supported by objective testing conducted by Dr. Lopez-Williams, Plaintiff's demeanor during the hearing and Plaintiff's testimony. (*Id.*) The ALJ's reasoning for the weight he afforded Dr. Stang's opinion was proper under the Regulations. 20 C.F.R. § 416.927(c)(1)-(4).

Overall, for the reasons stated herein, the ALJ properly weighed the medical opinion evidence in the record, the ALJ properly adhered to the Regulations in making his step four determination, and his RFC determination was supported by substantial evidence.

**ACCORDINGLY**, based on the findings above, it is **RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4411337

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Berryhill, Not Reported in Fed. Supp. (2018)

2018 WL 1827662

2018 WL 1827662
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Marie E. BROWN, Plaintiff,

v.

Nancy A. BERRYHILL, Acting
Commissioner of Social Security, Defendant.

6:17-cv-06584-MAT
|
Signed 04/16/2018

**Attorneys and Law Firms**

Brandi Christine Smith, Kenneth R. Hiller, Law Offices of
Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY,
Kristina Danielle Cohn, Social Security Administration
Office of General Counsel, New York, NY, for Defendant.

**DECISION AND ORDER**

HON. MICHAEL A. TELESCA, United States District Judge

**I. INTRODUCTION**

 **\*1**  Represented by counsel, Marie E. Brown ("Plaintiff")
has brought this action pursuant to Titles II and XVI of
the Social Security Act ("the Act"), seeking review of
the final decision of the Acting Commissioner of Social
Security ("Defendant" or "the Commissioner") denying
her applications for disability insurance benefits ("DIB")
and supplemental security income ("SSI"). This Court has
jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).
Presently before the Court are the parties' competing motions
for judgment on the pleadings pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure. For the reasons set forth
below, Plaintiff's motion is denied and Defendant's motion is
granted.

**II. PROCEDURAL BACKGROUND**

On March 19, 2014, Plaintiff protectively filed applications
for DIB and SSI, alleging disability beginning March
19, 2014 due to severe depression with psychotic
episodes, impulse control disorder, and anxiety disorder.
Administrative Transcript ("T.") 52, 144-56, 171. Plaintiff's
applications were initially denied and she timely requested

a hearing, which was held before administrative law judge
("ALJ") Barry E. Ryan on July 26, 2016. T. 73-78, 80-82,
35-51.

On September 26, 2016, the ALJ issued an unfavorable
decision. T. 10-20. Plaintiff timely requested review by the
Appeals Council. T. 142-43. Plaintiff's request for review was
denied by the Appeals Council on June 23, 2017, making the
ALJ's decision the final decision of the Commissioner. T. 1-6.
Plaintiff then timely commenced this action.

**III. THE ALJ'S DECISION**

The ALJ applied the five-step sequential evaluation
promulgated by the Commissioner for adjudicating disability
claims. See 20 C.F.R. § 404.1520(a). Initially, the ALJ found
that Plaintiff met the insured status requirements of the Act
through December 31, 2015. T. 12. At step one, the ALJ found
that Plaintiff had not engaged in substantial gainful activity
from March 19, 2014, the alleged onset date. Id.

At step two, the ALJ determined that Plaintiff had the
severe impairments of depression, generalized anxiety
disorder, and bipolar disorder. Id. At step three, the ALJ
considered Plaintiff's impairments and found that, singly or in
combination, they did not meet or medically equal the severity
of a listed impairment. T. 13. In particular, the ALJ considered
Listings 12.04 and 12.06 in reaching this determination. T.
13-14.

Prior to proceeding to step four, the ALJ determined that
Plaintiff had the residual functional capacity ("RFC") to:
occasionally lift or carry fifty pounds; frequently lift or
carry twenty-five pounds; sit for six hours in an eight-hour
workday; stand for six hours in an eight-hour workday;
walk for six-hours in an eight hour workday; understand
and follow simple instructions and directions; perform simple
tasks with supervision and independently; maintain attention
and concentration for simple tasks; regularly attend to a
routine and maintain a schedule; relate to and interact with
others to the extent necessary to carry out simple tasks,
but only occasionally perform work requiring more complex
interaction or joint efforts to achieve work goals; have
occasional interaction with supervisors, co-workers, and the
public; perform in a low-stress work environment, defined as
requiring only occasional decision-making and changes in the
work setting. T. 15.

 **\*2**  At step four, the ALJ determined that Plaintiff was
incapable of performing any past relevant work. T. 18. At step

**Brown v. Berryhill, Not Reported in Fed. Supp. (2018)**
Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 198 of 356

2018 WL 1827662

five, the ALJ relied on the testimony of a vocational expert to find that, taking into account Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of laundry laborer, industrial cleaner, and mail clerk. T. 18-20. The ALJ accordingly found that Plaintiff was not disabled as defined in the Act. T. 20.

## IV. DISCUSSION

### A. Scope of Review

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. *See* 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). Although the reviewing court must scrutinize the whole record and examine evidence that supports or detracts from both sides, *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted), "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003).

In this case, Plaintiff's sole argument is that the ALJ failed to properly consider the opinions of her treating mental health counselor ("MHC") Jaclynn Sardone. For the reasons discussed below, the Court finds this argument without merit.

### B. Consideration of MHC Sardone's Opinions

MHC Sardone treated Plaintiff beginning in February 2014. T. 314. On March 24, 2014, MHC Sardone completed a Monroe County Department of Human Services Psychological Assessment for Determination of Employability related to Plaintiff. T. 372-76. MHC Sardone opined that Plaintiff was very limited (defined as unable to function 25% or more of the time) in her abilities to maintain attention and concentration for rote tasks and perform low stress and simple tasks. T. 374. MHC Sardone stated that she had insufficient data to assess Plaintiff's abilities to follow, understand, and remember simple instructions and directions; perform simple and complex tasks independently; and regularly attend to a routine and maintain a schedule. *Id.*

On May 7, 2014, MHC Sardone completed a Mental Residual Functional Capacity Questionnaire related to Plaintiff, which was cosigned by Dr. Kashinath Patil. T. 314-319. MHC Sardone diagnosed Plaintiff with major depressive disorder, anxiety not otherwise specified, and impulse disorder. T. 314. She stated that Plaintiff needed weekly psychotherapy to reduce the symptoms of depression and to support her in learning to how to cope with anger. *Id.* Plaintiff was not on any medications at that time. *Id.* MHC Sardone opined that Plaintiff's prognosis was fair if she attended therapy. *Id.*

With respect to Plaintiff's functional limitations, MHC Sardone opined that Plaintiff: had no useful ability to function with respect to her abilities to in complete a normal workday and workweek without interruptions from psychologically-based symptoms, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, deal with normal work stress, interact appropriately with the general public, and maintain socially appropriate behavior; was unable to meet competitive standards with respect to her abilities to work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them, and deal with the stress of semiskilled and skilled work; was seriously limited in her abilities to carry out short and simple instructions, maintain attention for a two-hour segment, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others; had a limited by satisfactory ability to sustain an ordinary routine without special supervision; and had limitations in her abilities to maintain regular attendance and be punctual within customary tolerances and adhere to basic standards of neatness. T. 316-17.

**\*3** On March 12, 2015, MHC Sardone completed another Psychological Assessment for Determination of Employability related to Plaintiff. T. 364-68. Plaintiff's present complaints were depression, anger, and anxiety, and her current medication was Prozac. T. 364-65. MHC Sardone opined that Plaintiff was very limited in her abilities to follow, understand, and remember simple instructions; perform simple and complex tasks independently; maintain attention and concentration for rote tasks; regularly attend to a routine and maintain a schedule; maintain basic standards

of hygiene and grooming; and perform low stress and simple tasks. T. 366.

On October 1, 2015, MHC Sardone completed a third Psychological Assessment for Determination of Employability related to Plaintiff. T. 368-70. MHC Sardone opined that Plaintiff was very limited in her abilities to follow, understand, and remember simple instructions; perform simple and complex tasks independently; maintain attention and concentration for rote tasks; regularly attend to a routine and maintain a schedule; maintain basic standards of hygiene and grooming; and perform low stress and simple tasks. T. 370. She further opined that Plaintiff had an inability to be near people without being violent. *Id.*

In his decision, the ALJ considered MHC Sardone's opinions and ultimately afforded them "less weight." T. 17. The ALJ explained that the opinions were inconsistent with MHC Sardone's own treatment notes, which "generally highlighted a cooperative attitude, appropriate behavior, calm motor activity, appropriate speech, logical thought processes, goal directed thought content, an appropriate affect[,] and intact memory." T. 17. The ALJ also noted that the severe restrictions set forth in MHC Sardone's opinions were inconsistent with Plaintiff's self-reported activities of daily living, which included providing extensive childcare, attending appointments, maintaining personal care, driving occasionally, shopping, cleaning, and cooking. *Id.*

The Court finds that the ALJ adequately explained the reasons why he afforded less weight to MHC Sardone's opinions. Mental health counselors are "not an acceptable treating source as defined by the Commissioner." *Esteves v. Barnhart,* 492 F. Supp. 2d 275, 281 (W.D.N.Y. 2007). As such, they are considered " 'other sources' whose opinions can be considered to evaluate the severity of [an] impairment[ ] and how it affects [a claimant's] ability to work." *Acevedo v. Astrue,* No. 11 CIV. 8853 JMF JLC, 2012 WL 4377323, at *11 (S.D.N.Y. Sept. 4, 2012) (quotation omitted and alterations in original). An ALJ may reject the opinion of a mental health counselor where it is inconsistent with the claimant's treatment records. *Bulavinetz v. Astrue,* 663 F. Supp. 2d 208, 212 (W.D.N.Y. 2009).

There is ample support in this case for the ALJ's conclusion that MHC Sardone's opinions were inconsistent with her own treatment records. As the ALJ explained, MHC Sardone's treatment records consistently noted that Plaintiff was well-groomed, fully-oriented and cooperative, had good attention and concentration and intact memory, and that her thoughts were logical. *See, e.g.,* T. 286-87, 309-11, 326-36, 340, 345-46, 349-50, 352-55, 358, 362, 417, 423. Moreover, MHC Sardone's treatment notes show that Plaintiff's condition improved when she was compliant with her medication and treatment. For example, on April 9, 2015, MHC Sardone noted that Plaintiff was "taking [her] medication as prescribed" and that she was "less anxious and depressed." T. 349. Similarly, on July 16, 2015, MHC Sardone noted that Plaintiff had made progress and was able to express her anger in a "healthy mature way." T. 353. On November 5, 2015, Plaintiff reported to MHC Sardone that since her medication had been increased, she had been experiencing less mental health symptoms, including reduced worrying and sadness, fewer conflicts with others, and increased socialization. T. 417. However, MHC Sardone's opinions do not reflect this documented improvement in Plaintiff's functioning. This further supports the ALJ's conclusion that MHC Sardone's opinions were inconsistent with her own treatment records.

**\*4** The ALJ also correctly noted that the extreme limitations opined to by MHC Sardone were inconsistent with Plaintiff's self-reported activities of daily living. Plaintiff told psychiatric consultative examiner Dr. Kristina Luna that she was able to care for her three children, who were two, nine, and ten at the time of the hearing. T. 49, 278. Plaintiff also told Dr. Luna that she was able to cook, clean, do laundry, and shop. T. 278. The ALJ appropriately concluded that these activities of daily living were inconsistent with the totally disabling limitations identified by MHC Sardone. *See Poupore v. Astrue,* 566 F.3d 303, 307 (2nd Cir. 2009)(claimant's ability to care for one-year-old child, vacuum, wash dishes, occasionally drive, and watch television, read, and use the computer was inconsistent with allegations of totally disability).

Plaintiff's argument that the ALJ erred in crediting the opinions of consultative examiner Dr. Luna and state agency psychological consultant Dr. Inman-Dundon is unavailing. It is well-established that the opinions of consultative examiners and non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir. 1993). In this case, the ALJ explained in detail why he found Dr. Luna and Dr. Inman-Dundon's opinions to be consistent with the record as a whole, and why he did not find MHC Sardone's opinions persuasive.

**Brown v. Berryhill, Not Reported in Fed. Supp. (2018)**

2018 WL 1827662

For the reasons discussed above, the Court finds no error in the ALJ's consideration of the medical opinions of record. As such, there is no basis for reversal of the Commissioner's determination or for remand of this matter.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Docket No. 9) is denied and the Commissioner's motion for judgment on the pleadings (Docket No. 10) is granted. Plaintiff's complaint is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1827662

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:22-cv-00485-TWD  Document 15  Filed 08/03/23  Page 201 of 356

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1434115

2020 WL 1434115
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

MARK H., Plaintiff,
v.
COMM'R OF SOC. SEC., Defendant.

5:18-CV-1347 (ATB)
|
Signed 03/23/2020

**Attorneys and Law Firms**

OF COUNSEL: PETER L. WALTON, ESQ., CONBOY, MCKAY, BACHMAN & KENDALL, LLP, Counsel for Plaintiff, 407 Sherman Street, Watertown, NY 13601-9990.

OF COUNSEL: KATHRYN S. POLLACK, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL, REGION II, Counsel for Defendant, 26 Federal Plaza - Room 3904, New York, NY 10278.

**DECISION and ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** Currently before the Court, is this Social Security action filed by Mark H. ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. § 405(g). This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 3, 5). The parties have filed briefs (Dkt. Nos. 7, 10) addressing the administrative record of the proceedings before the Commissioner (Dkt. No. 6). [1]

[1] The Administrative Transcript is found at Dkt. No. 6. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

**I. RELEVANT BACKGROUND**

**A. Factual Background**

Plaintiff was born in 1957, making him 57 years old as of the alleged onset date and 60 years old on the date of the ALJ's decision. Plaintiff reported completing the twelfth grade. He had no past relevant work for the purposes of determining disability. At the initial level, Plaintiff alleged disability due to a stroke, colon cancer (Stage 3, in remission), high blood pressure, high cholesterol, sleep apnea, and migraines. (T. 171.)

**B. Procedural History**

Plaintiff applied for disability insurance benefits on May 28, 2015, alleging disability beginning on April 18, 2015. Plaintiff's application was initially denied on September 2, 2015, after which he timely requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at a hearing before ALJ John P. Ramos, on October 10, 2017. (T. 23-43.) On December 1, 2017, the ALJ issued a written decision finding that Plaintiff was not disabled under the Social Security Act. (T. 7-22.) On September 18, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-4.)

**C. The ALJ's Decision**

**\*2** In his decision (T. 12-17), the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2020. (T. 12.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since April 18, 2015, the alleged onset date. (Id.) The ALJ concluded that Plaintiff had severe impairments including degenerative disc disease of the lumbar and cervical spine. (Id.) The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 13.) Specifically, the ALJ considered Listing 1.04 (disorders of the spine). (Id.) The ALJ found that Plaintiff had the RFC to perform the full range of medium work. (Id.) The ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (T. 17.) The ALJ therefore found that Plaintiff was not disabled. (Id.)

**D. Issues in Contention**

2020 WL 1434115

In his brief, Plaintiff argues that the ALJ failed to properly weigh the medical opinions of consultative examiner Rita Figueroa, M.D.; orthopedic providers Howard Huang, M.D., Steven Fish, M.D., and Michael Mcelheran, P.A.; primary care provider Edmund Roache, Jr., M.D.; and physical therapist Jeffrey Auerbach, D.P.T. (Dkt. No. 7, at 10-13.) Plaintiff also contends that the ALJ failed to properly evaluate his subjective statements and symptoms including pain. (*Id.* at 14-16.) Finally, Plaintiff maintains that the RFC for the full range of medium work is not supported by substantial evidence. (*Id.* at 16-18.)

Defendant argues that the ALJ properly determined Plaintiff's RFC, which was supported by substantial evidence including the opinion of Dr. Figueroa; Plaintiff's treatment history, particularly his improved functioning following physical therapy; and Plaintiff's extensive daily activities. (Dkt. No. 10, at 7-8.) Defendant also maintains that the ALJ properly evaluated the medical evidence in determining the RFC, reasonably weighing and resolving the conflicting opinions of the various providers who examined or treated Plaintiff. (*Id.* at 8-17.) Finally, Defendant argues that the ALJ properly evaluated Plaintiff's subjective statements. (*Id.* at 17-21.) The Court agrees with the Defendant and will affirm the decision of the Commissioner.

## II. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *42 U.S.C. § 405(g)*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See, e.g., Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

 **\*3**  The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *20 C.F.R. §§ 404.1520, 416.920*. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD    Document 15    Filed 08/03/23    Page 203 of 356

2020 WL 1434115

perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson*, 540 U.S. 20, 24 (2003).

## III. DISCUSSION

### A. The ALJ's Analysis of the Opinion Evidence and RFC Determination are Supported by Substantial Evidence

#### 1. Applicable Law

##### a. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, 11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. § 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions that a plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta*, 737 F. Supp. at 183; *Sullivan v. Sec'y of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 09-CV-1120 (DNH/GHL), 2010 WL 3825629, *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

**\*4** Medium work involves, inter alia, "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "The distinction between medium work and light or sedentary work is the ability to lift and carry greater weight." *Torres v. Comm'r of Soc. Sec.*, 6:12-CV-231 (GLS/ATB), 2013 WL 103573, at *5 (N.D.N.Y. Jan. 8, 2013), *Report-Recommendation adopted*, 2013 WL 103595 (N.D.N.Y. Jan. 8, 2013). A person who can perform medium work is also presumed to be able to perform light and sedentary work. 20 C.F.R. § 404.1567(c). Light work includes jobs that require "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls." 20 C.F.R. § 404.1567(b). Sedentary work involves sitting, but "a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

##### b. Consideration of Opinion Evidence

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c). " "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, "... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record,

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD    Document 15    Filed 08/03/23    Page 204 of 356

2020 WL 1434115

such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

In deciding how much weight to afford the opinion of a treating physician, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek*, 802 F.3d at 375 (quoting *Selian*, 708 F.3d at 418). However, where the ALJ's reasoning and adherence to the regulation is clear, and it is obvious that the "substance of the treating physician rule was not traversed," no "slavish recitation of each and every factor" of 20 C.F.R. § 404.1527(c) is required. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran,* 362 F.3d at 31-32). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 404.1527(c)(1)-(6).

In assessing a claimant's RFC, an ALJ is entitled to rely on opinions from both examining and non-examining medical consultants because they are qualified experts in the field of social security disability. 20 C.F.R. § 404.1527(e); *Cobb v. Comm'r of Soc. Sec.*, 5:13-CV-0591 (LEK/TWD), 2014 WL 4437566, at *6 (N.D.N.Y. Sept. 9, 2014) ("[T]he report of a consultative examiner may constitute substantial evidence to support an ALJ's decision.") (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)); *Heaman v. Berryhill*, 765 F. App'x 498, 500 (2d Cir. 2019) (rejecting plaintiff's argument that the ALJ's RFC determination was not supported by substantial evidence because the ALJ relied on the opinions of the consultative examiner and the medical expert, which contradicted the opinions of treating sources, but were otherwise supported by the record).

### 2. Relevant Evidence

#### a. Dr. Figueroa's Consultative Opinion

**\*5** In July 2015, Dr. Figueroa examined Plaintiff, who reported that he stopped driving because of blurry vision and that he experienced migraines once per week with medication. (T. 249.) Plaintiff cooked and cleaned when needed, did laundry a couple of times per week, went shopping occasionally, and showered, bathed, and dressed every day. (T. 250.) Dr. Figueroa observed that Plaintiff was in no acute distress, had a normal gait and stance, could perform a full squat, could walk on his heels and toes without difficulty, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 250-51.) Plaintiff had full range of motion in the cervical and lumber spine, with some limitations--negative straight leg raising bilaterally, physiologic and equal deep tendon reflexes in the upper and lower extremities, no sensory deficits, full strength in the upper and lower extremities, intact hand and finger dexterity, and full grip strength bilaterally. (T. 251-52.) Dr. Figueroa diagnosed stroke, colon cancer, sleep apnea, migraines, and visual loss. She opined that Plaintiff might have a mild limitation for activities requiring fine visual acuity, with "[n]o other limitations seen...." (T. 252.)

The ALJ afforded significant weight to Dr. Figueroa's opinion "to the extent that her findings are supported by the record as a whole" because she had an opportunity to examine Plaintiff and had professional, as well as program expertise. (T. 16.) The ALJ noted there was no evidence that Plaintiff had significant vision issues and, as such, Dr. Figueroa's "equivocal limitation regarding visual acuity is rejected." (*Id.*) The ALJ concluded that, because Dr. Figueroa identified no other physical limitations, her opinion was consistent with Plaintiff's ability to perform medium work. (*Id.*)

#### b. Treating Opinions

Plaintiff's primary care provider since 2005, Dr. Roache, prepared a Medical Source Statement in August 2015. (T. 258-60.) Dr. Roache diagnosed Plaintiff's mechanical back pain and colon cancer, and noted symptoms including severe chronic low back pain and very poor balance. (T. 258.) Dr. Roache opined that Plaintiff could stand/walk and sit up to two hours each during an eight-hour working day, and that he needed a job permitting shifting positions at will. (T. 259.) The primary care physician found that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; could occasionally stoop, crouch/squat, and climb stairs; and could never climb ladders. (T. 259.) Dr. Roache noted that Plaintiff's pain or other symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks. (T. 260.) He was found capable of performing low stress jobs, with expected absences of more than four days per month.

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1434115

(*Id.*) Dr. Roache stated that Plaintiff's limitations had been present since January 2015. (*Id.*)

In August 2016, Dr. Roache provided another Medical Source Statement indicating that he had treated Plaintiff every three months for 20 years. Plaintiff's conditions included back pain, colon cancer, and multiple strokes, with symptoms of bilateral leg pain, poor balance, and poor vision. (T. 418.) Dr. Roache also noted that Plaintiff was unable to tandem walk or see outer visual fields, and that he needed a cane or other assistive device while engaging in occasional standing/walking. (*Id.*) He opined that Plaintiff could stand/walk and sit up to two hours each; needed to shift positions at will; could frequently lift and carry up to ten pounds and occasionally lift and carry 20 pounds; could rarely twist, occasionally stoop and climb stairs; could never crouch/squat or climb ladders; and could use his hands, fingers, and arms each for only 20 percent of a working day. (T. 419.) Dr. Roache found that Plaintiff's pain or other symptoms were frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks. (T. 420.) Plaintiff was incapable of even low stress jobs, with expected absences of more than four days per month. (*Id.*) Dr. Roache noted that Plaintiff's limitations had been present since 2010. (*Id.*)

**\*6** The ALJ afforded less weight to Dr. Roache's assessments because he had a "lesser" specialty, and his findings were unsupported by the overall record. (T. 15-16.) The ALJ also noted that "Dr. Roache assessed extreme exertional limitations, yet the medical record documents that the claimant was restored to 90% functionality following physical therapy[,]" and that "Dr. Roache's limitations are inconsistent with both the objective medical evidence of record and the claimant's activities of daily living." (T. 16.)

In January 2016, Dr. Roache referred Plaintiff to North Country Orthopaedic Group because of shoulder pain following a fall. (T. 295.) Plaintiff stated he had no neck pain. (*Id.*) Edward Powell, M.D. administered a Kenalog/Lidocaine injection into Plaintiff's right shoulder, which he tolerated well. (*Id.*)

In April 2017, orthopedic provider, physician assistant ("PA") Mcelheran saw Plaintiff regarding "ongoing difficulties with his neck and back." (T. 468-70.) Plaintiff "had numerous questions about Disability and SSI," but the PA advised that "obviously that is not something we do through our office." (T. 468.) In a treatment note co-signed by Dr. Huang, the PA noted that Plaintiff "should probably limit his activities

and not lift more than 10 pounds, avoid walking any long distances[, and] [a]void bending and stooping." (*Id.*) They opined that Plaintiff "could work if he can follow those types of restrictions." (*Id.*)

In June 2017, PA Mcelheran saw Plaintiff again regarding "his chronic neck and back pain" which had only mildly improved with physical therapy. (T. 476.) A treatment, note co-signed by Dr. Fish, stated that there were no clear surgical options for Plaintiff, and that he was not interested in pain management or epidurals at that time despite the failure of more conservative treatment. (T. 476.) They recommended that Plaintiff not lift more than ten pounds, not walk more than two blocks, and avoid bending or stooping, noting that he understood that "these are general restrictions fit for somebody with degenerative changes in his lumbar and cervical spine[ ]...." (T. 476.)

In July 2017, PA Mcelheran and Dr. Huang noted Plaintiff's complaints of worsening troubles with his back and with normal day to day activities. (T. 480-82.) Plaintiff reported that physical therapy had "failed to improve his symptoms[,]" and stated that he was now willing to "give a try at epidurals." (T. 480.) The orthopedic providers declined to complete disability paperwork requested by Plaintiff's lawyer. They again recommended that Plaintiff not lift more than ten pounds, not walk more than two blocks, and avoid bending or stooping, but quite clearly referred to these as "generalized limitations." (T. 480-82.)

The ALJ considered the assessments of PA Mcelheran, apparently adopted by Dr. Huang or Dr. Fish, and afforded them limited weight "because they provided generalized limitations and their findings are inconsistent with both the reported physical therapy results and the claimant's activities of daily living." (T. 14-15.) The ALJ cited physical therapist ("PT") Auerbach's reports (discussed further below) that Plaintiff had experienced signficant improvement with respect to pain and functioning in his back and neck/shoulder. (T. 15, 475, 479.)

### 3. Analysis

Plaintiff contends that the ALJ failed to properly weigh the medical opinions, and the RFC for the full range of medium work was not supported by substantial evidence. (Dkt. No. 7, at 10-13, 16-18.) The Court finds these arguments unpersuasive for the following reasons.

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1434115

**\*7** In considering the medical opinion evidence, the ALJ reasonably explained the weight given to the opinions of treating providers. Dr. Roache's found very restrictive limitations in August 2015 and August 2016 that were inconsistent, not only with Dr. Figueroa's examination of Plaintiff in July 2015, but also with the reported physical therapy results and Plaintiff's activities of daily living. (T. 15-16.) In June 2017, the physical therapist reported to the North Country Orthopaedic Group that Plaintiff's back, and neck shoulder pain had been reduced from 6/10 to 1/10, that his back function improved from 60% to 90% and that his neck/shoulder function had improved from 40% to 90%. (T. 15, 479.) Although not an "accepted medical source under Social Security Regulations," "a physical therapist is an 'other source' whose opinion the ALJ may consider regarding the severity of a claimant's impairment and how it affects the claimant's ability to work." *Sixberry v. Colvin*, 7:12-CV-1231 (GTS), 2013 WL 5310209, at \*8-9 (N.D.N.Y. Sept. 20, 2013) (opinions of physical therapists are "important and should be evaluated on key issues such as impairment severity and functional effects") (citations omitted). *See also Acevedo v. Colvin*, 20 F. Supp. 3d 377, 389 (W.D.N.Y. 2014) ("the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence.") (citing Social Security Ruling 06-03p, 2006 WL 2329939, at \*6 (S.S.A. Aug. 9, 2006)); *Ortiz v. Saul*, 1:19-CV-00942, 2020 WL 1150213, at \*7 (S.D.N.Y. Mar. 10, 2020).

The ALJ relied on Plaintiff's testimony that he lived with his elderly mother and "gives her medicine, prepares her food and performs household chores such as laundry, cleaning, and everything else that needs to be done." (T. 14, 29, 33-34.) That level of activity is difficult to reconcile with the severe limitations that Dr. Roache endorsed. *See, e.g., Herrington v. Berryhill*, 3:18-CV-315, 2019 WL 1091385, at \*7 (D. Conn. Mar. 8, 2019) (activities of daily living, including childcare, are an appropriate factor for an ALJ to consider when assessing claimant's claimed symptoms and limitations) (collecting cases); *Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (affirming an ALJ's decision not to give controlling weight to the more restrictive opinion of a treating physician based on the opinion of a consultative examiner that plaintiff could perform sedentary work with additional limitations, and the evidence that plaintiff was capable of various activities of daily living, including childcare).

It is also worth noting that, on January 2016, between the dates of his two Medical Source Statements, Dr. Roache referred Plaintiff to the orthopedic specialists, not because of chronic back and neck problems, but because of a shoulder issue following a fall. (T. 295.) Plaintiff advised the examining orthopedist, "Dr. Roache has taken him out of work because he says he has a backache and he has been applying for SSI disability." (*Id.*)

The ALJ also afforded limited weight to the opinions of the orthopedic treatment providers because they were not supported by Dr. Figueroa's findings, the reported physical therapy results, and Plaintiff's daily activities. The ALJ also noted that PA Mcelheran recommended restrictions that were generally appropriate for someone with degenerative changes in the lumbar and cervical spine, but made clear that the orthopedic providers would not complete a detailed functional assessment for the Plaintiff. (T. 14-15, 476, 480.)

As noted, just a few months before Dr. Roache's first Medical Source Statement, Dr. Figueroa examined Plaintiff and opined that he had no physical limitations, other than one relating to his vision. That opinion supports the conclusion of the ALJ that Plaintiff was able to perform the exertional requirements for medium work. *See, e.g., Heburn v. Astrue*, 6:05-CV-1429 (LEK/DEP), 2009 WL 174941, at \*8 (N.D.N.Y. Jan. 23, 2009) (the ALJ's medium work RFC "draws support from the findings of [a consultative examiner] who ... opined that plaintiff has only a mild degree of limitation and lifting, carrying, pushing, and pulling, with no gross limitation noted in sitting, standing, walking, climbing, or bending); *Sherrill B. v. Comm'r of Soc. Sec.*, 5:17-CV-754 (ATB), 2018 WL 4150881, at \*6–8 (N.D.N.Y. Aug. 30, 2018) (findings of consultative examiner--that, despite a limited range of motion in her cervical and lumbar spine, plaintiff had no gross limitations with regard to sitting, standing, or walking and "mild" limitations with regard to lifting, carrying, pushing, and pulling--was consistent with an RFC for medium work). The ALJ reasonably afforded significant weight to Dr. Figueroa's opinion based on her opportunity to examine Plaintiff, professional expertise, and program expertise while noting there was no evidence that Plaintiff had significant vision issues. (T. 16.)

**\*8** Dr. Figueroa's opinion conflicted with the Medical Source Statements of Dr. Roach and was somewhat inconsistent with the opinions of Plaintiff's treating orthopedic providers. It is the role of the ALJ to analyze and reconcile such conflicts in the medical opinion evidence.

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1434115

*See, e.g., Bliss v. Colvin*, 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). The ALJ's RFC analysis included a detailed consideration of the evidence including Plaintiff's symptoms, daily activities (including household chores and caring for his mother), and treatment records, as well as Dr. Figueroa's consultative opinion. (T. 13-16, 29, 33-34, 39, 249-53.) That information constitutes substantial evidence supporting the RFC determination for medium work. *See, e.g., Alston v. Colvin*, 14-CV-0244, 2015 WL 5178158, at *14 (E.D.N.Y. Sept. 3, 2015) (finding the RFC for a full range of medium work was supported by substantial evidence where the ALJ's conclusion was reasonable and based on a thorough review of the record).

Plaintiff argues that Dr. Figueroa's July 2015 report included no review of the underlying medical reports and that the consultative examiner failed to identify Plaintiff's degenerative disc disease of the neck and back or order x-rays of his back and neck. (Dkt. No. 7, at 11.) The other medical opinion evidence was not generated until after Dr. Figueroa's examination of the Plaintiff and was not available to her, although it was fully considered by the ALJ. Dr. Roache did not refer Plaintiff to an orthopedic specialist until January 2016, and that referral related to a shoulder injury, and not degenerative lumbar or cervical disc disease. Moreover, it appears from the consultative examiner's report that the Plaintiff did not include chronic back and neck pain among his complaints to her. (T. 249-50.) Dr. Figueroa did perform a musculoskeletal examination of the Plaintiff and found only minor limitations with respect to the range of motion of his cervical and lumbar spine. The orthopedic specialists did not order diagnostic imaging of his lumbar or cervical spine until the Spring of 2017, and the ALJ considered and discussed the results of those tests. (T. 154, 466-67, 471-74.)

Plaintiff maintains that the ALJ actually rejected Dr. Figueroa's opinion, despite purporting to afford it significant weight, because he rejected the only limitation found by the consultative examiner and classified Plaintiff's degenerative disc disease of the neck and back as "severe." (*Id.*) Plaintiff's later medical records from the Center for Sight support the ALJ's decision to discount Dr. Figueroa's opinion that Plaintiff had mild limitation for activities requiring fine visual acuity. (T. 251-52.). In January 2016, his treating provider noted that

poor vision affected his ability to drive safely, enjoy outdoor activities, read large and small print, recognize faces, use a computer, watch television, and work. (T. 305.) However, by April 2016 following cataract surgery, Plaintiff described his vision as "good" and stated it seemed to be fairly stable. (T. 297, 317-19.) " 'Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.' " *Quinn v. Colvin*, 199 F. Supp. 3d 692, 712 (W.D.N.Y. 2016) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).

An ALJ's finding that an impairment is "severe" is a legal determination that the impairment significantly limits his ability to do basic work activities. A consultative examiner's *medical* determination that a claimant does not have a particular limitation is not necessarily incompatible with an ALJ's *legal* determination that such a limitation is "severe." The ALJ determined that Plaintiff could perform medium work, but not work at all exertional levels. Based on subsequent medical evidence, the ALJ could properly make an RFC determination that may have been somewhat more limited than Dr. Figueroa's findings of no physical impairments might suggest. *See, e.g., Beckles v. Comm'r of Soc. Sec.*, 18-CV-321P, 2019 WL 4140936, at *3, 5 (W.D.N.Y. Aug. 30, 2019) (the ALJ did not err by including greater limitations in her RFC determination than those opined by consultative examiner, upon whose opinion the ALJ partially relied) (collecting cases); *Cruz v. Colvin*, 3:13-CV-723 (MAD/TWD), 2014 WL 4826684, at *14 (N.D.N.Y. Sept. 29, 2014) (An ALJ may credit some portion of a consultative opinion, while properly declining to credit those conclusions that are not supported by CE's own examination findings or are inconsistent with other evidence of record).

*9 Plaintiff argues that the ALJ neglected to address Plaintiff's lifting, standing, walking, and sitting abilities in determining his RFC, and failed to cite to any specific evidence to support the conclusion he is capable of lifting the weight corresponding to medium work. (Dkt. No. 7, at 17-18.) As noted above, the opinion of Dr. Figueroa provided substantial evidence to support an RFC of medium work, which is distinguished from other exertional categories primarily by the ability to lift and carry greater weight. The ALJ's determination that Plaintiff could perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) also implicitly included the findings that Plaintiff could perform the other exertional requirements, including

Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 208 of 356

2020 WL 1434115

the sitting, standing, and walking requirements of light or sedentary work that is subsumed in medium work. (T. 13-16.) Dr. Figueroa's opinion, supported by the results of Plaintiff's physical therapy, and his daily activities constitutes substantial evidence that Plaintiff could perform the other requirements of medium work RFC, including the implicit sitting, standing, and walking components. (T. 16.) *See, e.g., Dixie v. Commissioner of Social Sec.*, 5:05-CV-345 (NAM/GJD), 2008 WL 2433705, at * 12 (N.D.N.Y. June 12, 2008) (the ALJ's decision to reject the treating physician's opinion regarding plaintiff's ability to walk, stand, and sit is supported by substantial evidence, including the consultative examiner's finding that plaintiff had "[n]o gross limitation to sitting, standing, walking, climbing, bending, or the use of the right upper extremity"); *Schmitt v. Commissioner of Social Sec.*, 5:11-CV-796 (LEK/ATB), 2012 WL 4853506, at *9 (N.D.N.Y. July 24, 2012) (in relying on the opinion of consultative examiner that the plaintiff, inter alia, had no gross limitation sitting, standing, or walking, the ALJ made an appropriate function-by-function RFC supported by substantial evidence) *Report-Recommendation adopted*, 2012 WL 4853067 (N.D.N.Y. Oct 11, 2012).

For the reasons above, the Court finds the ALJ's consideration of the opinion evidence and Plaintiff's RFC are supported by substantial evidence. Remand is therefore not required on these bases.

**B. The ALJ Properly Evaluated Plaintiff's Symptoms**

**1. Applicable Law--Evaluation of Symptoms**

In evaluating a claimant's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must " 'carefully consider' " all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.' " *Del Carmen Fernandez v. Berryhill*, 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p)). SSR 16-3p provides that the evaluation of symptoms involves a two-step process.[2] 2017 WL 5180304, at *2. The Social Security Administration ("SSA") "will first consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce

an individual's symptoms." *Id.* at *3. "[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [SSA will then] evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities ..." *Id.* If SSA cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, it will "carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms." *Id.* at *6.

2    The Court notes that the standard for evaluating subjective symptoms has not changed in the regulations. Rather, use of the term "credibility" has been eliminated and SSR 16-3p makes it clear that the subjective symptom evaluation is not an evaluation of the claimant's character. 2017 WL 5180304. SSR 16-3p became applicable on March 28, 2016, prior to the ALJ's December 2017 decision in this case. *Id.*

In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, factors to be considered include: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *7-8.

**2. Analysis**

**\*10** The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record[.]" (T. 14.) In so doing, the ALJ noted that Plaintiff engaged in a wide variety of activities of daily living including providing care for his elderly mother and using public transportation. (*Id.*) Plaintiff argues that the ALJ failed to properly evaluate his subjective statements and symptoms including pain. (Dkt. No. 7, at 14-16.)

**Mark H. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)**

2020 WL 1434115

The Court's review of the record supports the ALJ's finding that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the evidence of record, which did "not support a finding of disability." (T. 14.) In weighing the evidence, the ALJ discussed the results of Plaintiff's lumbar and cervical MRIs, the orthopedic treatment notes, and physical therapy reports-- the most recent of which indicated substantial improvement in Plaintiff's pain and functioning of his back and neck/shoulder. (T. 14-16, 468, 471-76, 479.) The ALJ acknowledged Plaintiff had "severe" degenerative disc disease of the lumbar and cervical spine, but based on his review of the evidence, did not find that such evidence supported Plaintiff's statements about the extent of his limitations. (T. 12-16.)

Plaintiff contends that the "ALJ's credibility determination was based in part on his conclusions that plaintiff can perform numerous life activities, without acknowledging the differences between the demands of activities in the home and those of a job outside of the home." (Dkt. No. 7, at 15-16.) However, substantial evidence supports the ALJ's finding that, based on his admitted daily activities, Plaintiff retained the ability "to lift greater amounts and sit, stand and walk for longer periods than those to which he testified." (T. 14.) For example, Plaintiff testified at the administrative hearing that he gives his mother her medicine, prepares food for her, and does laundry and cleaning, noting that she does not do much

around the home. (T. 29, 33-34, 39.) He further reported to Dr. Figueroa that he cooked and cleaned when needed, did laundry a couple of times per week, and shopped occasionally. (T. 250.)

The Court finds that the ALJ properly considered the evidence before him, and that substantial evidence supports his evaluation of Plaintiff's symptoms, making remand on this issue unwarranted. It is not the role of a court to "re-weigh evidence" because "a reviewing court 'defers to the Commissioner's resolution of conflicting evidence' where that resolution is supported by substantial evidence. *Lewis v. Colvin*, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

**ACCORDINGLY**, it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**, and further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED,** and that judgment be entered for the **DEFENDANT.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1434115

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4826684
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jacqueline CRUZ, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 3:13–cv–723 (MAD/TWD).
|
Signed Sept. 29, 2014.

**Attorneys and Law Firms**

Lachman & Gorton, Peter A. Gorton, Esq., of Counsel, Endicott, NY, for Plaintiff.

Social Security Administration, Office of General Counsel, Elizabeth D. Rothstein, Esq., of Counsel, New York, NY, for Defendant.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Elizabeth Rothstein, Esq., Special Assistant United States Attorney, of Counsel, Albany, NY, for Defendant.

Office Of General Counsel, Social Security Administration, Stephen P. Conte, Esq., Chief Counsel, Region II, New York, NY.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff Jacqueline Cruz brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the Commissioner of Social Security's ("Commissioner") decision to deny her application for disability insurance benefits and supplemental security income under the Social Security Act. Before the Court are the parties' cross-motions for judgment on the pleadings. *See* Dkt. Nos. 13, 14. This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks for a Report and Recommendation pursuant to 28 U.S.C. 636(b) and Local Rule 72.3(d), familiarity with which is assumed.

In the September 8, 2014 Report and Recommendation, Magistrate Judge Dancks found that: the Administrative Law Judge's ("ALJ") finding that Plaintiff's scoliosis, back pain, and migraines/headaches were not severe impairments was conducted under the correct legal standard and was supported by substantial evidence; the ALJ's residual functional capacity assessment was conducted under the correct legal standards and was supported by substantial evidence; the ALJ's rejection of Plaintiff's treating physicians' opinions was conducted under the correct legal standards and was supported by substantial evidence; the ALJ's assessment of Plaintiff's credibility was conducted under the correct legal standards and was supported by substantial evidence; and the ALJ did not err by not using a vocational expert to determine whether Plaintiff could perform other work in the national economy. *See* Dkt. No. 15. In objecting to the Report and Recommendation, Plaintiff has repeated the same arguments raised before Magistrate Judge Dancks in her motion for judgment on the pleadings. *See* Dkt. No. 16.

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Schaal v. Apfel,* 134 F.3d 496, 500–01 (2d Cir.1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citations and quotations omitted).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

2014 WL 4826684

**\*2** In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). Pursuant to 28 U.S.C. § 636(b) (1)(C), this Court engages in a *de novo* review of any part of a Magistrate Judge's Report and Recommendation to which a party specifically objects. Failure to timely object to any portion of a Magistrate Judge's Report and Recommendation operates as a waiver of further judicial review of those matters. *See Roland v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (quoting *Small v. Sec 'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989)). "To the extent, ... that [a] party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Watson v. Astrue,* No. 08 Civ. 1523, 2010 WL 1645060, *1 (S.D.N.Y. Apr. 22, 2010) (citing, *inter alia, Ortiz v. Barkley,* 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) (observing that "[r]eviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition") (citation and internal quotation marks omitted)). Furthermore, it is improper for an objecting party to attempt to relitigate the matter by "submitting papers to [the] district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge." *Petty v. Colvin,* No. 12 Civ. 1644, 2014 WL 2465109, *1 (S.D.N.Y. June 2, 2014) (citing *Pu v. Charles H. Greenthal Mgmt. Corp.,* 08 Civ. 10084, 2010 WL 774335, *1 (S.D.N.Y. Mar.9, 2010)).

In the present matter, Plaintiff has "submitt[ed] papers to [the] district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge." *Petty v. Colvin,* No. 12 Civ. 1644, 2014 WL 2465109, *1 (S.D.N.Y. June 2, 2014) (citing *Pu v. Charles H. Greenthal Mgmt. Corp.,* 08 Civ. 10084, 2010 WL 774335, *1 (S.D.N.Y. Mar.9, 2010)). As such, the Court reviews Plaintiff's Report and Recommendation for clear error. *See Dahl v. Cmm'r of Soc. Sec.,* No. 12–cv–302, 2013 WL 5493677, *1 & n. 4 (N.D.N.Y. Oct.1, 2013).

Having carefully reviewed Magistrate Judge Dancks' thorough Report and Recommendation, the parties' submissions, and the applicable law, the Court finds no clear error. Magistrate Judge Dancks' Report and Recommendation contains a careful analysis of the Commissioner's determination to deny Plaintiff benefits and explains that the challenged determination was based on correct legal principles and is supported by substantial evidence in the record.

Accordingly the Court hereby

**ORDERS** that Magistrate Judge Dancks' September 8, 2014 Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**\*3 ORDERS** that the decision denying benefits is **AFFIRMED;** and the Court further

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED;** and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED;** and the Court further

**ORDERS** that the Clerk of Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral argument was not heard. For the reasons discussed below, it is recommended that the decision of the Commissioner be affirmed and the Complaint (Dkt. No. 1) be dismissed.

### I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is presently 26 years old. (T. at 32. [1] ) She completed 11th grade and, at the time of her hearing on December 20, 2011, she was attending classes two days per week to obtain her GED. (T. at 34, 43.) She worked as an assembler at a Felchar Manufacturing and as a home attendant for elderly clients at Southern Tier Independence Center. (T. at 34– 35.) Plaintiff alleges disability due to hearing loss, migraine headaches, low back pain, and hip pain. (T. at 37–40, 140–41.)

[1]    The abbreviation "T" refers to the Administrative Transcript. (Dkt. No. 9.)

Plaintiff's application for disability insurance benefits and SSI is dated August 9, 2010. (T. at 110.) The application was denied on October 25, 2010. (T. at 58.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (T. at 64.) The hearing was held on December 20, 2011. (T. at 29.) On January 5, 2012, the ALJ issued a decision finding that Plaintiff was not disabled. (T. at 11.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on May 31, 2013. (T. at 1.) Plaintiff commenced this action on June 21, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a) (3)(A) (2006). In addition, the plaintiff's

*4  physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy

exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a) (2012)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920 (2012). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities." [20 C.F.R .] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

Thomas, 540 U.S. at 24–25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir.2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. Id.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue,* 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986.

**\*5** A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010); *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

### III. THE ALJ'S DECISION

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since July 1, 2010, her alleged onset date. (T. at 16.) At step two, the ALJ found that Plaintiff's profound right-sided hearing loss was a "severe" impairment. (T. at 16–19.) At step three, the ALJ found that Plaintiff's hearing impairment, although severe, did not individually or in combination meet or equal any of the criteria of a section of the Listing of Impairments ("Listings"), set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. at 19.) Prior to proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and concluded that she retained the ability to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and walk for a total of six hours; sit for a total of six hours; she should wear protective noise protection when exposed to greater than 75 decibels ("dB") continuously, and her instructions and interface with others should be given so that she could see the speaker's face. (T. at 19–22.) At step four, the ALJ concluded that Plaintiff did not have past relevant work. (T. at 22.) At step five, the ALJ concluded that Plaintiff was not disabled because jobs existed in significant numbers in the national economy that Plaintiff could perform. (T. 22–24.) Thus, the ALJ denied Plaintiff's claim for disability benefits. (T. at 24.)

### IV. THE PARTIES' CONTENTIONS

**\*6** Plaintiff claims that the ALJ erred by: (1) failing to find Plaintiff's scoliosis, back pain, and migraines/headaches as severe impairments; (2) failing to properly establish Plaintiff's RFC which includes a failure to follow the treating physician rule and a failure to properly assess Plaintiff's credibility; and (3) failing to obtain the testimony of a vocational expert. (Dkt. No. 13.)

Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence and thus should be affirmed. (Dkt. No. 14.)

### V. DISCUSSION

#### A. Severity of Impairments

At the second step of the evaluation, the medical severity of a claimant's impairments is considered. 20 C.F.R. §§ 404.1520(a)(4) (ii), 416.920(a)(4)(ii) (2012). A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities". *Id.* at §§ 404.1520(c), 404.1521, 416.920(c), 416.921. "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* at §§ 404.1521(b), 416.921(b). These include walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. *Id.; see also Ianni v. Barnhart,* Civ. No. 02–74A, 2005 WL 3220220, *11 (W.D.N.Y. Nov.18, 2005); *Camacho v. Apfel,* Civ. No. 97–6151, 1998 WL 813409, at *6 (E.D.N.Y. July 22, 1998). The claimant-plaintiff bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c) (2012). The claimant-plaintiff must demonstrate "that the impairment has caused functional limitations that precluded him from engaging in any substantial gainful activity for one year or more." *Perez v. Astrue,* 907 F.Supp.2d 266, 272 (N.D.N.Y.2012) (citing *Rivera v. Harris,* 623 F.2d 212, 215 (2d Cir.1980)).

A finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work. *Id.* at 271; SSR 85–28, 1985 WL 56858, at *2 (1985).

Plaintiff maintains that the ALJ failed to properly assess her scoliosis, back pain, and headaches/migraines as severe impairments. (Dkt. No. 13 at 6–7. [2] ) Plaintiff also claims the ALJ failed to develop the record regarding her tinnitus, and how it may affect her migraines. *Id.* at 8–9. Defendant asserts that Plaintiff did not meet her burden to show that any of these claimed impairments caused functional limitations that significantly limited or precluded her from engaging in basic work activities. (Dkt. No. 14 at 7.) The Court agrees with Defendant.

[2]     Page numbers in docket entries refer to the page numbers assigned by the Court's electronic filing system.

### 1. Headaches/Migraines

Initially, when Plaintiff filed her application for disability benefits, she alleged that her ability to work was limited only by hearing loss. (T. at 144.) In a function report completed in connection with her application, she detailed her daily activities and alleged functional limitations stemming only from hearing loss. (T. at 135–42.) Neither migraines, headaches, scoliosis, or low back pain were mentioned or listed. (T. at 135–44.) Yet when asked at the hearing what was her most significant medical condition keeping her from working full time, she listed migraines, followed by back and hip pain, followed by her hearing loss. (T. at 38–40.) While

she listed treatment for headaches in a report completed in connection with her appeal, and alleged difficulty caring for her personal needs when she had headaches, she nevertheless acknowledged that her daily activities had not changed and she continued to work 12 hours per week. (T. at 166–72.)

**\*7** The ALJ considered the evidence pertaining to Plaintiff's headaches and found that her impairment did not cause more than a minimal limitation in her ability to perform basic work activities, and therefore was nonsevere. (T. at 17–18.) The ALJ noted that Plaintiff had only sought treatment for her headaches on six occasions between August 17, 2010, and August 19, 2011. (T. at 17–18, 231–32, 305, 307–08, 314–15, 317, 406.) On September 22, 2010, Plaintiff reported to neurologist Dr. Rasheed that she had been experiencing headaches off and on over the last year and a half, but Dr. Rasheed's neurologic examination was unremarkable. (T. at 17–18, 307–08.) When Plaintiff returned to Dr. Rasheed on January 13, 2011, she reported no significant change in her headache frequency, and her neurologic examination was again within normal limits. (T. at 18, 305.) Plaintiff reported that Imitrex was working well, and she had run out of Topamax six weeks prior but had not called the office to request a refill. (T. at 305.) Dr. Rasheed prescribed a trial of Elavil. (T. at 305.) When Plaintiff presented to primary care physician Dr. Galu on March 3, 2011, for evaluation of chest pain, Dr. Galu noted in the subjective portion of the note that she was "overall in good health except for migraine headaches." (T. at 317.) In the assessment and plan portion of the encounter note, Dr. Galu noted "Migraine headache: She has not had any in the last month or so." *Id.*

Plaintiff argues that Dr. Galu's treatment note contained an error, or that the ALJ misread the treatment note, and that Plaintiff instead had ongoing headaches as alleged in the headache log that she completed for Dr. Rasheed. (Dkt. No. 13 at 5–6; T. at 197–222.) This contention is pure speculation. There is no indication that Dr. Galu misunderstood Plaintiff. Moreover, Plaintiff did not mention headaches at all during her following visit with Dr. Galu three weeks later on March 24, 2011. (T. at 316 .) Plaintiff did not complain of headaches until three months later, when she returned to primary care physician Dr. Talati on July 26, 2011. (T. at 314–15.) On that date, Plaintiff presented primarily with complaints of back pain, and with regard to headaches, Dr. Talati only advised Plaintiff to take Tylenol and referred her to Dr. Rasheed. (T. at 315.) In addition, when Plaintiff sought treatment for a flare up of low back pain on July 17, 2011, she reported a past medical history of migraines, but under the

neurologic systems review, the report indicates "no headache or dizziness." (T. at 337–38.)

On August 19, 2011, Plaintiff complained to Dr. Rasheed of some worsening of her headaches, but she acknowledged that she had not been taking Elavil as prescribed, and her neurologic examination on that date continued to be unremarkable. (T. at 406–07.) Dr. Rasheed again prescribed a course of Elavil. (T. at 406.) An August 26, 2011, brain CT scan was also negative. (T. at 408–09.)

**\*8** Dr. Rasheed opined that "sometimes" Plaintiff's headaches "may" prevent her from working. (T. at 524–25.) This is a rather ambiguous, conclusory opinion. Since Plaintiff must demonstrate "that the impairment has caused functional limitations that preclude [ ... her] from engaging in any substantial gainful activity for one year or more," the ALJ correctly found that Plaintiff's migraine headaches were not severe. *Perez,* 907 F.Supp.2d at 272 (citation omitted). Furthermore, the ALJ properly considered the opinion of Dr. Rasheed according it only little weight, after considering the infrequency of Dr. Rasheed's treatment and the lack of support for his assessment. *See* T. at 18; 20 C.F.R. §§ 404.1527(d), 416.927(d).[3] The ALJ noted that Dr. Rasheed had only examined Plaintiff for headaches on three occasions between August 22, 2010, and August 19, 2011, and his treatment notes did not support his assessed limitations. (T. at 18, 305, 307–08, 406.) During Dr. Rasheed's August 19, 2011, examination, Plaintiff denied any issues of focal extremity numbness, weakness, paresthesias, diplopia, circumoral numbness, or vertigo, and she had not passed out due to headaches. (T. at 406.) Plaintiff did not take Elavil as prescribed, and Dr. Rasheed again prescribed that medication. (T. at 406.) The record does not document any additional treatment by Dr. Rasheed between his last examination on August 19, 2011, and the completion of his report on December 8, 2011. (T. at 525.) Notably, during a September 23, 2011, visit to primary care physician Dr. Talati, Plaintiff did not even complain of headaches. (T. at 477–78.) As stated above, the Court finds substantial evidence supports the ALJ's determination that Plaintiff's migraine headaches were not severe.

[3]   Now 20 C.F.R. §§ 404.1527(c) and 416.927(c) per amendments effective March 26, 2012.

Plaintiff asserts that based upon the December 5, 2011, hearing evaluation by Dr. Wanamaker, the ALJ should have explored the "potential connection" between Plaintiff's

complaints of tinnitus and migraines. (Dkt. No. 13 at 8–9; T. at 526–27.) However, the ALJ considered Dr. Wanamaker's evaluation which revealed profound sensorineural hearing loss on the right and hearing within normal limits on the left, as well as an inability to understand speech on the right and an excellent word comprehension score of 100 percent on the left. (T. at 20, 526–28.) Plaintiff complained of some left-sided tinnitus, which she thought overlapped with her headaches, and Dr. Wanamaker referred her to another doctor, Dr. Malak, for a second opinion regarding her complaints. (T. at 526–27 .) However, there is no evidence in the record that she ever saw Dr. Malak. Dr. Wanamaker also counseled Plaintiff on tinnitus and tinnitus management, and advised her to be careful about noise protection on the left, but he did not recommend wearing a hearing aid on the left because her hearing on that side was normal. (T. at 20, 527.) The record does not establish any further complaints, treatment, or limitations stemming from Plaintiff's tinnitus or connection between tinnitus and headaches, and Plaintiff does not allege that she received any further evaluation for tinnitus. (Dkt. No. 13 at 8–9.)

**\*9** Accordingly, the ALJ was not obligated to further develop the record regarding the Plaintiff's tinnitus. *See Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information ....") (quoting *Perez v. Chater,* 77 F.3d 41, 48 (2d Cir.1996).

Plaintiff also argues that the ALJ used an improper legal standard at step two of the analysis when referring to whether her headaches prevented her from working. (Dkt. No. 13 at 9.) The ALJ noted under Medical Policy 09–036, "[m]igraine headaches ... will rarely prevent a person from working for a continuous 12 months ." (T. at 18.) Plaintiff notes that the issue at step two is not whether the Plaintiff is disabled, but rather whether the evidence establishes a slight abnormality or combination of abnormalities which have "no more than a minimal effect on an individual's ability to work" such that the impairment or combination of impairments would be nonsevere. *See* Dkt. No. 13 at 9 (citing SSR 85–28, 1985 SSR LEXIS 19, at \*6–7, 1985 WL 56858, at \*2 (1985); 20 C.F.R. § 404.1521). Plaintiff's argument that the ALJ applied a higher standard than required at step two is without merit. As noted above, Plaintiff bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c) (2012). Since a plaintiff, to show that an

2014 WL 4826684

impairment is severe, must demonstrate "that the impairment has caused functional limitations that precluded him from engaging in any substantial gainful activity for one year or more," *Perez,* 907 F.Supp.2d at 272 (citation omitted), the ALJ did not apply an improper legal standard at step two regarding Plaintiff's migraine headaches.

### 2. Scoliosis/Back Pain

Plaintiff also argues that the ALJ erred in finding that her back pain was not severe. (Dkt. No. 13 at 10–11.) For the reasons that follow, the Court finds that the ALJ properly considered the evidence during the relevant time period, and it supports the finding that Plaintiff's low back impairment was not severe.

Plaintiff initially claims that the ALJ did not address "numerous findings of tenderness in the lumbosacral and thoracic areas." (Dkt. No. 13 at 10; T. at 233, 235, 237, 239, 261.) However, this evidence pre-dates the relevant period. Other medical evidence from the relevant time period shows that she had one emergency department visit on July 17, 2011, for back pain. (T. at 337–39.) While she complained of being "unable to walk because of pain," the physical exam revealed "mild tenderness to palpation of the left lower extremity at the knee, also mild restriction of movement." *Id.* at 338. She was discharged that day with pain medication. *Id.* at 339.

Following that emergency department visit, Plaintiff presented to orthopedist Dr. Van Gorder on August 11, 2011, complaining of discomfort in her low back and down her left leg since bending over about one month prior. (T. at 493.) Examination revealed curvature of the spine and a little bit of weakness to dorsiflexion of the left foot, but leg strength was satisfactory, there was not much discomfort with flexion and extension of the spine, there were no spasms, focal neurologic deficits, atrophy, or swelling, and deep tendon reflexes and sensation were intact. (T. at 493.)

*10 After reviewing radiographs, Dr. Van Gorder concluded that Plaintiff had a transitional S1 with a probable pseudoarthrosis left side, mild scoliosis. (T. at 322, 493.) The July 17, 2011, lumbar spine X-rays revealed no significant radiographic change when compared with March 20, 2009, X-rays. (T. at 322.) Dr. Van Gorder ordered an MRI to rule out an occult herniation and to further evaluate the pseudoarthrosis at L5–S1. *Id.; see also* T. at 522. The subsequent lumbar spine MRI of August 20, 2011, was essentially unremarkable, showing no evidence of spinal stenosis, foraminal stenosis, or disc herniation. (T. at 523.) In addition, Dr. Rasheed's

physical examination on August 19, 2011, also showed good motor tone and power, a normal gait with good associated movements, and normal sensation and reflexes. (T. at 406.)

When Plaintiff returned to Dr. Van Gorder on September 1, 2011, he noted that the MRI was negative for disc compression, but did reveal abnormalities at L5–S1, which he intended to further evaluate. (T. at 492.) Examination on that date revealed a slight leg length discrepancy and quad weakness on the left side, but less weakness with dorsiflexion of the left foot. *Id.* There are no further office visit notes from Dr. Van Gorder.

On September 23, 2011, Plaintiff reported to primary care physician Dr. Talati that her low back pain was only two to three out of ten in intensity, and she denied any weakness, tingling, or numbness. (T. at 477.) Dr. Talati advised Plaintiff to decrease ibuprofen, and she noted that Plaintiff would continue with physical therapy, which was helping her. (T. at 477.)

Also during the relevant time period, Plaintiff underwent a nerve conduction study of her left lower extremity ordered by Dr. Van Gorder and performed by Dr. Rasheed. (T. at 519–20.) In addition to the study being normal, she denied weakness in the lower extremities. *Id.* at 519. A neurologic exam did not reveal any motor weakness, her reflexes were symmetrical, and there was no radicular distribution sensory loss. *Id.*

Accordingly, the medical evidence concerning Plaintiff's low back does not reach a severe level because there has been no showing of functional limitations precluding substantial gainful activity for one year or more. *Perez,* 907 F.Supp. at 272. An impairment is severe if it causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the disability claim rises above the de minimis level, then further analysis is warranted. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Here, the ALJ's decision addressed the medical evidence of Plaintiff's low back condition and appropriately determined that Plaintiff's back pain/scoliosis condition was nonsevere. *See* T. at 17. However, since the ALJ found that Plaintiff's hearing loss was a severe condition, he properly continued with the five step analysis.

### B. Residual Functional Capacity

A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2012). Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. *Pardee v. Astrue,* 631 F.Supp.2d 200, 210 (N.D.N.Y.2009) (citing *Melville v. Apfel,* 198 F.3d 45, 42 (2d Cir.1999) (quotations omitted)).

**\*11**  It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. 404.1546(c) (2012). In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. 20 C.F.R. § 404.1545(a) (2012). Age, education, past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel.* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999). Physical abilities are determined by evaluation of exertional and nonexertional limitations. Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle. 20 C.F.R. § 404.1569a(b) (2013).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2010). Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel,* 62 F.Supp.2d 648, 658 (N.D.N.Y.1999).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.,* 307 F.Supp.2d 430, 440 (N.D.N.Y.2004) (citation omitted). In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient. *Roat v. Barnhart,* 717 F.Supp.2d 241, 267 (N.D.N.Y.2010) (citation omitted). RFC is then used to determine the particular types of work a claimant may be able to perform. *Whittaker,* 717 F.Supp.2d at 440.

Plaintiff contends that the ALJ's RFC finding is unsupported by substantial evidence. (Dkt. No. 13 at 13.) She argues that the ALJ violated the treating physician rule by asserting there is no medical basis for the ALJ to disregard the opinions

of Dr. Van Gorder and Dr. Rasheed. *Id.* at 13–17. Plaintiff also argues that the ALJ's disregard of the opinion of Dr. Wiesner, the consultative examiner, was error. *Id.* at 16. Finally, Plaintiff claims that the ALJ's failure to consider Plaintiff's headaches/migraines in determining her RFC was error and that his assessment of her credibility is not supported by substantial evidence. *Id.* at 17–18.

### 1. Medical Opinions

#### a. Treating Physician Rule

The medical opinions of a claimant's treating physician are generally given more weight than those of other medical professionals. "If ... a treating source's opinion ... is well-supported by medically clinical and laboratory techniques and is not inconsistent with other substantial evidence ... [it] will [be] give[n] controlling weight." 20 C.F.R. § 404.1527(c)(2) (2012). Medically acceptable techniques include consideration of a patient's report of complaints, or the patient's history, as essential diagnostic tools. *Green–Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir.2003). Generally, the longer a treating physician has treated the claimant and the more times the claimant has been seen by the treating source, the more weight the Commissioner will give to the physician's medical opinion. *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir.2008) (citing 20 C.F.R. § 404.1527(c)(2) (I)).

**\*12**  An opinion from a treating source that the claimant is disabled cannot itself be determinative. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999). However, a lack of specific clinical findings in the treating physician's report is not, by itself, a reason to justify an ALJ's failure to credit the physician's opinion. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998) (citing *Schaal v. Apfel,* 134 F.3d 496 (2d Cir.1998)).

"An ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (citation omitted). This analysis must be conducted to determine what weight to afford any medical opinion. 20 C.F.R. § 404.1527(c). This is necessary because the ALJ is required to evaluate every medical opinion received. *Id.; see also Zabala v. Astrue,* 595 F.3d 402 (2d Cir.2010) (finding that the ALJ failed to satisfy the treating physician rule when he discounted a report because it was incomplete and unsigned). These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of

treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6) (2012).

Generally, the opinion of the treating physician will not be afforded controlling weight when the treating physician issued opinions that were not consistent with those of other medical experts and or other substantial evidence in the record. *Halloran,* 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2); *Snell,* 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion ... that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). Other findings, including the ultimate finding of whether the claimant is disabled, are reserved to the Commissioner. *Snell,* 177 F.3d at 133.

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2) (2012). This is necessary to assist the court's review of the Commissioner's decision and it "let[s] claimants understand the disposition of their cases." *Halloran,* 362 F.3d at 33 (citing *Snell,* 177 F.3d at 134). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell,* 177 F.3d at 133; *Halloran,* 362 F.3d at 32–33. However, remand is unnecessary where application of the correct legal standard could lead to only one conclusion. *Schaal,* 134 F.3d at 504.

### b. Thomas Van Gorder, M.D.

**\*13** Dr. Van Gorder noted in his November 23, 2011, report that his assessment pertained only to the period August 11, 2011, to September 1, 2011. (T. at 491.) The ALJ correctly noted that Dr. Van Gorder only began treating Plaintiff on August 11, 2011, and he treated her on only one other occasion, September 1, 2011. (T. at 22, 492–93.) The ALJ also noted that Dr. Van Gorder's restrictive assessment including that Plaintiff could not lift any weight and could not stand for two hours was not consistent with the objective studies, including the lumbar spine MRI, X-rays, and EMG/nerve conduction studies, which were all essentially within normal limits other than showing Plaintiff's mild scoliosis. (T. at 17, 22, 322, 404–05, 490, 492, 523.) The ALJ further noted that Dr. Van Gorder's two physical examinations revealed minimal clinical findings, including a little bit of quad or left foot

dorsiflexion weakness and slight leg length discrepancy, but no spasms, focal neurologic deficits, atrophy, or swelling; and deep tendon reflexes and sensation were intact. (T. at 22, 492–93.)

The Court finds the ALJ's determination to afford minimal weight to Dr. Van Gorder's opinion was supported by substantial evidence. The determination shows that the ALJ considered the length of the treatment relationship between Plaintiff and Dr. Van Gorder, the frequency of examinations, the diagnostic test results as related to the opinion, and the findings of Dr. Van Gorder on examination of Plaintiff. The ALJ properly considered Dr. Van Gorder's opinion and gave good reasons for the weight he assigned it.

### c. Aamir Rasheed, M.D.

Likewise, the ALJ properly gave little weight to the opinion of Dr. Rasheed. (T. at 18, 524–25.) Dr. Rasheed saw Plaintiff on only three occasions for Plaintiff's headaches and/or migraines, and both his treatment notes and the other evidence of record fail to support the assessed limitations stemming from Plaintiff's headaches. (T. at 18, 305, 307–08, 406). Also contrary to Plaintiff's contention that the ALJ did not consider Plaintiff's headaches/migraines in determining her RFC, the ALJ explicitly considered the evidence pertaining to alleged functional limitations stemming from Plaintiff's headaches. (T. at 18.)

As noted above, Dr. Rasheed opined in a non-specific and conclusory fashion that "sometimes" Plaintiff's headaches "may" prevent her from working. (T. at 524–25.) After considering the infrequency of Dr. Rasheed's treatment and the lack of support for his assessment, the ALJ appropriately considered the opinion of Dr. Rasheed according it only little weight. (T at 18.) The ALJ noted that Dr. Rasheed had only examined Plaintiff for headaches on three occasions between August 22, 2010, and August 19, 2011, and his treatment notes did not support his vague limitations. (T. at 18, 305, 307–08, 406.) During Dr. Rasheed's August 19, 2011, examination, Plaintiff denied any issues of focal extremity numbness, weakness, paresthesias, diplopia, circumoral numbness, or vertigo, and she had not passed out due to headaches. (T. at 406.) Plaintiff did not take Elavil as prescribed, and Dr. Rasheed again prescribed that medication. *Id.* The record does not document any additional treatment by Dr. Rasheed for headaches between his last examination on August 19, 2011, and the completion of his report on December 8, 2011. (T. at 404–09, 524–25. [4]) In that interim,

Plaintiff did not complain of headaches during a September 23, 2011, visit to primary care physician Dr. Talati, nor did she complain of headaches to Dr. Van Gorder on September 1, 2011. (T. at 477, 492.)

4    Dr. Rasheed did perform a nerve conduction study of Plaintiff's left lower extremity on October 5, 2011, which was normal.

### d. Lawrence Wiesner, D.O.

**\*14** Plaintiff also claims that the ALJ did not properly credit the opinion of consultative examiner Dr. Wiesner. (Dkt. No. 13 at 16; *see also* T. at 470–476.) Dr. Wiesner opined that Plaintiff was only mildly restricted by her low back pain; that she could lift 20 pounds comfortably and frequently, but would be restricted from continuous repetitive lifting, pushing, and pulling of any weight greater than 20 pounds; and that she was otherwise unrestricted with regard to her upper extremities. (T. at 472, 474.) The Court finds that the ALJ properly credited this portion of Dr. Wiesner's evaluation, as it was supported by his own examination findings and was consistent with the other evidence of record. *See* T. at 21, 471–72; 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4). For the reasons discussed below, the ALJ properly declined to credit Dr. Wiesner's additional conclusions that Plaintiff could stand and walk for about two hours and sit for less than two hours during an eight-hour day, and that she needed the opportunity to shift at will from sitting or standing/walking. (T. at 21, 473–76.)

The ALJ noted that these conclusions were not supported by Dr. Wiesner's own examination findings, and were inconsistent with the other evidence of record, including the treatment record. *See* T. 21–22, 322, 471–72, 477–82, 492–93, 522–23; *Pellam v. Astrue,* 508 Fed. Appx. 87, 89–90 (2d Cir. Jan.28, 2013) (finding no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations; and even though ALJ justifiably did not credit all of the consultative examiner's findings, the consultative examiner's opinion largely supported the ALJ's RFC determination). Dr. Wiesner's examination revealed slightly reduced (4/5) muscle strength in the left lower extremity and full (5/5) strength in the right; symmetric deep tendon reflexes and intact sensation in lower extremities; and Plaintiff ambulated unrestricted without any limp, lurch, or antalgia. (T. at 471–72.) Examination of Plaintiff's upper extremities was unremarkable, revealing no restrictions and intact muscle strength. (T. at 471.)

Plaintiff also briefly asserts that the ALJ substituted his own medical opinion for that of the examining physicians. (Dkt. No. 13 at 15.) An "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (citing *McBrayer v. Sec'y of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir.1983)). However, the ALJ's RFC finding need not track any one medical opinion. *See Matta v. Astrue,* 508 Fed. Appx. 53, 56 (2d Cir.2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole) (citing *Richardson v. Perales,* 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.")). The ALJ is responsible for determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416 .927(e)(2), 416.946(c). In determining the RFC, the ALJ must make a decision based on all of the relevant evidence, including a claimant's medical record, statements by physicians, and a claimant's description of her limitations. *See* 20 C.F.R. §§ 404 .1545(a), 416.945(a). Here, the ALJ did not substitute his own medical opinion for the opinions of the examining physicians. The substantial evidence of record supports the ALJ's decision that Plaintiff's impairments, singly or in combination, did not preclude her from performing a range of light work.

### 2. Plaintiff's Credibility

**\*15** The Court reviews an ALJ's findings of fact under a substantial evidence standard. "It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984) (citation omitted). In making a credibility determination, the hearing officer is required to take the claimant's reports of pain and other limitations into account. To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. 20 C.F.R. § 404.1529 (2012); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010); (SSR 96–7p), 1996 WL 374186, at \*5 (S.S.A.1996). The ALJ is required to consider all of the evidence of record in making his credibility assessment. *Genier,* 606 F.3d at 50 (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce

Cruz v. Colvin, Not Reported in F.Supp.3d (2014)
Case 3:22-cv-00485-TWD    Document 15    Filed 08/03/23    Page 220 of 356
2014 WL 4826684

the claimant's pain or other symptoms. SSR 96–7p. This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms. *Id.* If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities. An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled. *Id.*

Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to the consider extent to which the claimant's symptoms can reasonably be accepted as consistent with other objective medical evidence and other evidence. *Genier,* 606 F.3d at 49; *see also Poupore v. Astrue,* 566 F.3d 303, 307 (2d Cir.2009) (finding that claimant's subjective complaints of pain were insufficient to establish disability because they were unsupported by objective medical evidence tending to support a conclusion that he has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *see also* SSR 96–7p ("One strong indication of the credibility of an individual's statements is their consistency," both internally and with other information in the case record."). This includes evaluation of the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. *Genier,* 606 F.3d at 49.

The ALJ must consider all evidence of record, including statements the claimant or others make about his impairments, his restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during administrative proceedings. *Genier,* 606 F.3d at 49 (citing 20 C .F.R. § 404.1512(b)(3)). A claimant's symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone. SSR 96–7p. When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3) (2012).

**\*16** "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' " *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (quoting *Gallardo v. Apfel,* Civ. No. 96–9435, 1999 WL 185253, at \*5 (S.D.N.Y. Mar.25, 1999) (citing *Aponte v. Sec'y, Dept. of Health & Human Servs.,* 728 F.2d 599 (1984); *Ferraris v. Heckler,* 728 F.2d 582 (1984))). "A finding that a [claimant] is not credible must ... be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988) (citation omitted) (finding that failure to make credibility findings regarding claimant's critical testimony undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not disabled). "Further, whatever findings the ALJ makes must be consistent with the medical and other evidence." *Id.* at 261 (citation omitted) ("[A]n ALJ must assess subjective evidence in light of objective medical facts and diagnoses.").

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier,* 606 F.3d at 49 (citing *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982)). An ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence. *Murphy v. Barnhart,* Civ. No. 00–9621, 2003 U.S. Dist. LEXIS 6988, at \*29–30, 2003 WL 470572 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel,* 65 F.Supp.2d 140, 147 (E.D.N.Y.1999); *Bomeisl v. Apfel,* Civ. No. 96–9718, 1998 U.S. Dist. LEXIS 11595, at \*19, 1998 WL 430547 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility ... and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.")).

A review of the decision reveals that the ALJ considered the relevant factors and provided specific reasons for his credibility finding, which is supported by the evidence in the record. *See* T. at 16–21; 20 C.F.R. §§ 404.1529, 416.929; SSR 96–7p. The Plaintiff's allegations were not fully supported by the objective medical evidence as reviewed above. By the time of the administrative hearing, Plaintiff had tried physical therapy, which she reported was helpful, and she was currently taking only one medication. (T. at 20–21, 41, 410– 68, 477.) *See also* 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c) (3)(v). The ALJ properly noted that Plaintiff had maintained extensive activities of daily living. *See* T. at 20–21; 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c) (3)(I). Plaintiff was able to care for her personal needs and those of her young child, perform household chores, do laundry, cook, shop, manage her money, visit with family, and she had a driver's license and could use public transportation. (T. at 20–21, 33, 42– 45, 135–40.) In addition, even though it was at less than substantial gainful activity levels, Plaintiff had worked on a continuous basis throughout the relevant period, including as a home attendant for 12 hours per week assisting an elderly woman with her daily activities and accompanying her to appointments. (T. at 20–21, 34–37, 120–21, 123–27, 144–45, 158–60, 170.) Plaintiff also testified that she was attending an English language GED class. (T. at 21, 42–43, 45–46, 48.)

**\*17** In light of the foregoing, it was reasonable for the ALJ to find Plaintiff's subjective allegations not credible to the disabling extent alleged. (T. at 19–21.) The ALJ determines issues of credibility, and deference should be given his judgment because he heard Plaintiff's testimony and observed her demeanor. *See Garrison v. Comm'r of Social Sec.,* 2010 WL 2776978, *5–7 (N.D.N.Y.2010).* The ALJ is entitled to rely on the medical record and evaluation of Plaintiff's credibility in determining whether she experienced disabling symptomatology. *See Dumas v. Schweiker,* 712 F.2d at 1553 (citations omitted). In finding that Plaintiff could perform a range of light work, the ALJ applied the appropriate standard by properly considered Plaintiff's subjective complaints, and his determination is based upon substantial evidence.

### C. Vocational Expert

Generally, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the "grids"). *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)). The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience. *Id.* "Based on these considerations the grids

indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Id.*

Where a claimant is able to demonstrate that his or her impairments prevent a return to past relevant work, the burden then shifts to the Commissioner at Step Five to prove that a job exists in the national economy which the claimant is capable of performing. *See Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); 20 C.F.R. §§ 404.1560(c), 416.960(c) (2012). Work exists in the national economy when it exists in significant numbers either in the region where the claimant lives or in several other regions in the country. 20 C.F.R. §§ 404.1566(a), 416.966(a). In making this determination, the ALJ may apply the grids or consult a vocational expert. *See Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2. If the claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he or she is disabled. *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996).

However, if a claimant suffers from nonexertional impairments that "significantly limit the range of work permitted by exertional limitations," the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform. *Id.* at 39 (quoting *Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986)); 20 C.F.R. §§ 404.1566(e), 416.966(e). The vocational expert may testify as to the existence of jobs in the national economy, and as to the claimant's ability to perform any of those jobs, given his functional limitations. *See Colon v. Comm'r of Soc. Sec.,* No. 6: 00–CV–0556, 2004 WL 1144059, at *6 (N.D.N.Y. Mar.22, 2004) (Sharpe, J.).

**\*18** "Exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999) (finding the ALJ erred in applying the grids to deny benefits in a case where it was undisputed that the claimant suffered from nonexertional impairments). "The Grids are inapplicable in cases where the claimant exhibits a significant nonexertional impairment." *Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir.2013). This is where the nonexertional impairment has more than a negligible impact on a claimant's ability to perform the full range of work. *Id.* (citing *Zabala v. Astrue,* 595 F.3d 402, 411 (2d Cir.2010)). An impairment is non-negligible when it so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity. *Id.* (finding that the ALJ erred by not determining

whether claimant's reaching limitation was negligible or precluded reliance on the grids.)

If a claimant has nonexertional limitations that significantly limit the range of work permitted by his exertional limitations, the ALJ is required to consult with a vocational expert. *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir.2010) (citing *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.986) (citations omitted)). A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments such as pain. *Rosa,* 168 F.3d at 78 n. 2 (citing *Soblewski v. Apfel,* 985 F.Supp. 300, 310 (E.D.N.Y.1997); 20 C.F.R. § 404.1569a(c)). The existence of nonexertional limitations does not automatically preclude reliance on the grids, or require that the ALJ consult a vocational expert. *Id.* Where the claimant's nonexertional limitations did not result in an additional loss of work capacity, an ALJ's use of the grids is permissible. *Id.* at 411.

Here, Plaintiff has a severe nonexertional limitation in the form of profound hearing loss in her right ear. (T. at 16.) *See also* SSR 85–15, 1985 WL 56857 (impairments of hearing loss are non-exertional). The ALJ noted that Plaintiff's hearing loss was a significant non-exertional limitation. (T. at 23.) The ALJ also concluded that Plaintiff needed to wear noise protection when exposed to greater than 75dB continuously and her instructions and interface with others should be given so that Plaintiff could see the speaker's face. (T. at 19, 23.) Because he did not call a vocational expert, the Plaintiff argues that the ALJ failed to consider to what extent the need for face-to-face communication erodes the base of available jobs and thus he should have called a vocational expert. (Dkt. No. 13 at 12.)

The Court does not agree and finds that the ALJ's reliance on the grids was appropriate under the circumstances presented here. "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. *Bapp,* 802 F.2d at 605.

**\*19** Here, the ALJ concluded, based upon the evidence of record, that the Plaintiff retained the ability to hear and understand simple oral instructions, communicate simple information, and perform simple unskilled work. (T. at 19, 23.) *See also* SSR 96–9p; SSRP85–15. This determination was supported by substantial evidence of record. Specifically, the physician with whom she treated for her hearing loss did not give an opinion that she had a diminished work capacity due to her hearing loss. *See* T. at 526–27. Rather, Dr. Wanamaker found that although Plaintiff had profound sensorineural hearing loss on the right side, her hearing was within normal limits on the left such that she did not need a hearing aid on that side. *Id.* He also found she had an "excellent word comprehension score of 100% on the left." (T. at 526.) Dr. Wiesner and Dr. Van Gorder found that she only had a mild impairment regarding concentration. (T. at 475, 490.) The ALJ specifically noted that evidence of record showed Plaintiff's speech could be understood, and she functioned without hearing aids. (T. at 23, 526–27.) Additionally, Plaintiff worked part time during the relevant period as a home attendant assisting an elderly woman with her daily activities. (T. at 34–37, 120–21, 123–27, 144, 158–60, 170.) The record is devoid of any incident where Plaintiff's hearing loss affected her ability to work and the ALJ is entitled to rely on what the record does not say. *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). Thus, substantial evidence supports that Plaintiff's hearing loss does not constitute a significant diminishment of her capacities so that her nonexertional impairment precluded the ALJ from using the grids. As such, the ALJ's reliance on the grids was not error.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that the decision of the Commissioner be affirmed.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: September 5, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4826684

2014 WL 4826684

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4768806

KeyCite Yellow Flag - Negative Treatment

Distinguished by Rhondalee T. v. Berryhill, N.D.N.Y., March 8, 2019

2016 WL 4768806
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph WALKER, Plaintiff,
v.
Carolyn W. COLVIN, Commissioner
of Social Security, Defendant.

No. 3:15-CV-465(CFH)
|
Signed 09/13/2016

**Attorneys and Law Firms**

Lachman, Gorton Law Firm, P.O. Box 89, 1500 East Main
Street, OF COUNSEL: PETER A. GORTON, ESQ., Endicott,
New York 13761-0089, Attorneys for Plaintiff,

Social Security Administration, Office of Regional General
Counsel, Region II, 26 Federal Plaza, Rm. 3904, OF
COUNSEL: GRAHAM MORRISON, ESQ., New York, New
York 10278, Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*1 Plaintiff Joseph Walker brings this action pursuant
to 42 U.S.C. § 405(g) seeking review of a decision by
the Commissioner of Social Security ("Commissioner" or
"defendant") denying his applications for supplemental
security income benefits ("SSI") and disability insurance
benefits. Dkt. No. 1 ("Compl."). Plaintiff moves for a
finding of disability, and the Commissioner cross moves
for a judgment on the pleadings. Dkt. Nos. 11, 13.
For the following reasons, the matter is remanded
to the Commissioner for proceedings consistent with this
Memorandum-Decision and Order.

**I. Background**

Plaintiff, born on November 20, 1997, dropped out of high
school after the ninth grade, where he was enrolled in special

education classes. T at 48. Plaintiff does not have a GED,
certificates, or licenses, and has limited reading ability. Id.
Plaintiff is married, and has five children who, at the time
of the hearing, ranged in age from five to thirteen. Id. at
63-64. Plaintiff last job worked as a part-time short-order
cook in December 2010. Id. at 49. Previous to that, he
worked full time as a short-order cook at various diners
and also held employment that involved "test[ing] computer
boards on a computer." Id. at 50, 55. Plaintiff protectively[1]
filed a Title II application for a period of disability and
disability insurance benefits and a Title XVI application for
supplemental security income on December 6, 2011. T[2] at
82-96. Plaintiff alleged a disability onset date of February 1,
2010. These applications were denied on January 27, 2012. Id.
T at 1-7. Plaintiff requested a hearing before an administrative
law judge ("ALJ"), and a hearing was held on September
5, 2013, and vocational expert testimony was taken on
December 12, 2013.[3] Id. at 8, 44-70, 73-81. On January 14,
2014, ALJ Elizabeth W. Koennecke issued her decision where
in she concluded that plaintiff was not disabled. Id. at 13-24.
Plaintiff's timely request for review by the Appeals Council
was denied, making the ALJ's findings the final determination
of the Commissioner. Id. at 1-6. This action followed. Dkt.
No. 1 ("Compl.").

[1]     "When used in conjunction with an 'application'
        for benefits, the term 'protective filing' indicates
        that a written statement, 'such as a letter,' has
        been filed with the Social Security Administration,
        indicating the claimant's intent to file a claim for
        benefits. See 20 C.F.R. §§ 404.630, 416.340. Allen
        v. Comm'r of Soc. Sec., No. 5:14-CV-1576 (DNH/
        ATB), 2016 WL 996381, at *1 (N.D.N.Y. Feb.
        22, 2016), report and recommendation adopted
        sub nom., 2016 WL 1020858 (N.D.N.Y. Mar. 14,
        2016).

[2]     References to "T" stand for pages in the
        administrative transcript and reflect the pagination
        on the lower right hand corner of the pages, rather
        than the pagination at the header generated by CM/
        ECF.

[3]     A hearing was originally scheduled for June 10,
        2013, but that hearing was postponed to allow
        plaintiff an opportunity to obtain representation. T
        at 30-42.

**Walker v. Corvin, Not Reported in Fed. Supp. (2016)**

2016 WL 4768806

## II. Discussion

### A. Standard of Review

**\*2** In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review .... [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would *have to conclude* otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, if the correct legal standards were applied and the ALJ's finding is supported by supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted); Venio v. Barnhart, 213 F.3d 578, 586 (2d Cir. 2002).

### B. Determination of Disability [4]

[4] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")),

are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

"Every individual who is under a disability shall be entitled to a disability ... benefit ...." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 W L 399458, at \*3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.

> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.

> **\*3** Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the

Walker v. Corvin, Not Reported in Fed. Supp. (2016)
2016 WL 4768806

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 226 of 356

claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support f or the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31. If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analy sis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

### C. ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through September 30, 2012, and has not engaged in substantial gainful activity since February 1, 2010, the alleged onset date. T at 16. The ALJ found at step 2 of the sequential evaluation that during the period in question plaintiff had the severe impairment of degenerative joint disease of the right ankle with recurrent

right ankle sprain. Id. At step 3, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of Listing 1.02A. Id. at 18. The ALJ then concluded that plaintiff retained the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), because the claimant is able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour work day. The claimant is able to occasionally climb stairs, squat, and kneel, but the claimant cannot climb ladders. The claimant is limited to unskilled work but can perform all of the basic mental demands required of unskilled work.

**\*4** Id. At step 4, the ALJ concluded that plaintiff was unable to perform his past relevant work. Id. at 21. The ALJ, after hearing testimony from vocational expert ("V.E.") David Festa, and considering plaintiff's age, education, work experience, and RFC, concluded that jobs existed in significant numbers in the national economy that plaintiff could perform. Id. at 22. These jobs included the titles of: final assembler (DOT # 713.687-018), waxer (DOT # 779.687-038), and lens inserter (DOT # 713.687-026). [5] Id. Therefore, the ALJ concluded that plaintiff "has not been under a disability, as defined under the Social Security Act, from March 1, 2011, through the date of the decision." Id. at 23.

[5] "The Dictionary of Occupational Titles, published by the United States Department of Labor, is a comprehensive listing of job titles in the United States. Detailed descriptions of requirements for each job include assessments of exertional level and reasoning ability necessary for satisfactory performance of the work." Thomas v. Astrue, No. 3:11-CV-589, 2012 WL 5364275, at *3 n.7 (N.D.N.Y. Sept. 19, 2012).

Walker v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 227 of 356

### D. The Parties' Arguments

Plaintiff argues that the ALJ committed reversible error insofar as (1) the Commissioner did not sustain her burden of demonstrating that there are a significant number of jobs in the national economy that plaintiff could perform within his RFC; (2) the conclusion that plaintiff had the ability to perform sedentary work was unsupported by the record, and (3) her credibility assessment erroneously considered his conservative treatment history. Defendant argues (1) the Commissioner may properly "rely on the VE's testimony regarding the number of positions available in a broader occupational group, which is available in the DOT," (2) the ALJ properly concluded that medical evidence, including Dr. Wiesner's opinions, did not support a finding that plaintiff could stand/walk for less than two hours in an eight-hour work day, and (3) the ALJ properly assessed plaintiff's credibility. Dkt. No. 12 at 7, 9-11.

### 1. Step Five Determination

As noted, although the claimant bears burden at steps one through four of the sequential evaluation, it is the Commissioner's burden to prove that there are jobs that exist in significant numbers in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g); DeChirico, 134 F.3d at 1180. Plaintiff contends that the Commissioner did not meet this burden because the jobs numbers the ALJ relied on for the VE's suggested positions of final assembler, waxer, and lens inserter were numbers for occupational classifications that included as many as 1,500 additional DOT titles such that the VE testified he had no way to determine how many of those 218,740 or 419,840 jobs were available for either the lens inserter, final assembler, or waxer titles. Dkt. No. 11 at 8-9. Defendant contends that the ALJ properly relied on the VE's proposed job titles because an ALJ "may rely on a VE's testimony regarding the number of positions available in a broader occupational group which is available in the DOT ... even where a claimant can perform just one DOT code job, out of many, in the broader occupational category." Dkt. No. 12 at 7 (citing Fox v. Commissioner of Soc. Sec., 6:02-CV-1160 (FJS/RFT), 2009 WL 367628 (N.D.N.Y. Feb. 13, 2009)).

Under the Social Security Regulations, "[w]ork exists in the national economy where there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities

and vocational qualifications." 20 C.F.R. §§ 404.1566(b), 416.966(b). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 416.966(a). "Courts have generally held that what constitutes a 'significant' number is fairly minimal." Fox, 2009 WL 367628, at *20. However, requiring proof of a "significant" number of jobs "assures that individuals are not denied benefits on the basis of '[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] lives.' " Peterson Moore v. Colvin, 14-CV-583-JTC, 2016 WL 1357606, at *5 (W.D.N.Y. Apr. 6, 2016)(quoting 20 C.F.R. § 416.966(b)); Titles II and XVI: Basic Disability Evaluation Guides, SSR 82-53, 1982 W L 31374, at *3 (1982) (noting that requiring work in significant numbers is meant "to emphasize that ... a type(s) of job which exists only in very limited numbers or in relatively few geographic locations may not be said to 'exist in the national economy.' "). A vocational expert may "testify as to the existence of jobs in the national economy and as to the claimant's ability to perform any of those jobs, given her functional limitations," but the testimony "is useful only if it addresses whether the particular claimant, with her limitations and capabilities, can realistically perform a particular job." Marvin v. Colvin, No. 3:12-CV-1779 (GLS), 2014 W L 1293509, at *10 (N.D.N.Y. Mar. 31, 2014) (citations omitted).

**\*5** Several cases within this Circuit, and specifically within this District have addressed the exact question raised by plaintiff – whether a VE's testimony amounts to substantial evidence where it identifies the job numbers set forth in a general DOT occupational group, but does not identify the number of jobs attributable to the specific job titles the VE identified – suffices to meet the Commissioner's burden at step five.[6] For the reasons that follow, the undersigned concludes that, in this case, it does not.

6
    As plaintiff points out, some of these cases involve the same vocational expert, David Festa, or the same Administrative Law Judge, Elizabeth Koennecke. Dkt. No. 11 at 8-9.

In Marvin v. Colvin, the plaintiff[7] argued that the Commissioner failed to meet the step five burden because the job numbers to which the VE testified "pertained to a broad range of positions, including jobs that Marvin cannot perform based on her RFC." 2014 WL 1293509, at *10. The ALJ addressed the plaintiff's concerns within her decision, concluding that:

Walker v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 228 of 356

(1) "the use of government statistics and the testimony of a [VE] to prove the existence of significant numbers of jobs which a claimant can perform is administratively noticed, and therefore deemed as valid and sufficient from an evidentiary standpoint"; (2) "the claimant is found not disabled within the framework of Medical–Vocational Rules, which take administrative notice of the existence in significant numbers in the national economy of unskilled, entry level jobs within the sedentary, light, and medium occupational categories"; and (3) "[p]roving significant numbers of existing jobs does not necessarily require proof of the exact number of existing jobs."

*Id.* at *10, n.11. The Court disagreed with the ALJ's reasoning, concluding that "the VE's testimony was hardly clear as to the number of jobs available to Marvin in the local or national economy." *Id.* Thus, the Court determined that the Commissioner failed to meet her burden at step five, and remanded for further proceedings. *Id.*

[7]     The plaintiff in <u>Marvin v. Colvin</u> was represented by the same counsel who represents plaintiff in the case currently before the undersigned, Peter A. Gorton, Esq. <u>Marvin,</u> 2014 WL 12933509, at *1.

In <u>Rosa v. Colvin,</u> also a case involving the same VE who testified in the case herein, the plaintiff raised an identical argument in response to the ALJ's reliance on the VE's job numbers. <u>Rosa v. Colvin,</u> No. 3:12-CV-0170 (LEK/TWD), 2013 WL 1292145, at *9 (N.D.N.Y. Mar. 27, 2013).[8] In <u>Rosa,</u> the VE testified that the plaintiff could perform the jobs of lens inserter and final assembler but that job numbers represent all the occupations in the same standardized occupational code provided by the Bureau of Labor Statistics and New York State Department of Labor, rather than the number of lens inserter and final assembler jobs. *Id.* at *4. The VE, in response to cross examination by the plaintiff's attorney, testified that "he did not have the specific numbers such as a breakdown job analysis for the lens inserter and final assembler jobs." *Id.* at *5. The Court determined that because the VE cited to a "broad category of jobs that Plaintiff would not be able to perform because of his functional limitations" and "could not say how many lens inserter and final assembler positions existed," the VE's testimony "was hardly clear as to the number of jobs available to Plaintiff in the local or national economy[,]" and, thus, his testimony did not constitute substantial evidence. *Id.* (citing <u>Johnston v. Barnhart,</u> 378 F. Supp. 2d 274, 283 (W.D.N.Y.

2005) and <u>Kennedy v. Astrue,</u> 343 Fed.Appx. 719, 722 (2d Cir. 2009)).

[8]     The plaintiff in <u>Rosa v. Colvin</u> was represented by the same attorney who represents plaintiff in the case currently before the undersigned, Peter A. Gorton, Esq. <u>Rosa,</u> 2013 WL 1292145, at *1.

*6 Nearly identical arguments have been raised and Courts have remanded on that ground in additional cases within this District and others. <u>Snow v. Colvin,</u> 3:15-CV-694 (FJS), 2016 WL 2992145 (N.D.N.Y. May 20, 2016)[9] (remanding after concluding that the Commissioner did not meet her step five burden where the vocational expert's proposed job numbers were "not specific to the job titles, but instead are representative of broad occupation groups which include hundreds of other job titles – many of which are not available to the Plaintiff due to his limitations," and where the vocational expert "knew of no other way to determine how many individual jobs would be available to Plaintiff other than a labor market survey," the vocational expert "made no attempt to adjust the broad national numbers to approximate how many positions exist for the specific job titles discussed."); <u>Peterson Moore,</u> 2016 W L 1357606 (remanding to Commissioner after concluding that Commissioner did not meet her step five burden where the VE testified to broad ranges of positions, but "could not even provide a 'ballpark estimate' of the number of jobs she testified that plaintiff could perform" and "the ALJ failed to make any inquiry into the foundation and reliability of the job numbers provided by the VE.").

[9]     The plaintiff in <u>Marvin v. Colvin</u> was represented by the same counsel who represents plaintiff in the case currently before the undersigned, Peter A. Gorton, Esq. <u>Snow,</u> 2016 WL 2992145, at *1.

However, as the Commissioner recognizes, not every case in which a similar argument was raised has resulted in remand. First, in <u>Fox,</u> the VE – the same VE as testified in the case at bar – testified that the plaintiff could perform jobs that were within the broad occupational group of "protective service workers," but when considering the VE's testimony and the plaintiff's functional limitations, the plaintiff could perform only one title within that group, a surveillance system monitor. <u>Fox,</u> 2009 WL 367628, at *17. The VE was unable to identify the number of jobs available for the surveillance system monitor title. *Id.* Thus, the plaintiff argued that the Commissioner could not demonstrate that there were jobs that existed in significant numbers in the national economy,

Walker v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

and failed to meet the step-five burden. Id. The VE could not testify as to the specific number of jobs available as a surveillance system monitor, but noted that "surveys conducted by the Department of Labor and the State showed 132,980 Protective Service Occupation jobs in the national economy and 200 in the Central New York region. Based upon his best estimate, however, the VE testified that the number of surveillance system monitor jobs was 'a small percentage lower.' " Id. at *20 (internal record citations omitted). The Court concluded that the Commissioner met the step five burden because: (1) what constitutes a 'significant' number of jobs is "fairly minimal"; and (2) "the number of jobs identified by the VE, even if diminished by a small percentage in his estimation, constitutes a significant number of jobs, which the ALJ properly relied upon in finding that work existed in the national and regional economy that Plaintiff could perform ...." Id.

Similarly, in Vandermark v. Colvin, [10] cross examination revealed that the VE's job-incidence numbers "did not reflect the actual number of positions available for each specific DOT job code." 3:13-CV-1467 (GLS/ESH), 2015 W L 1097391, at *10 (N.D.N.Y. Mar. 11, 2015). When asked how he arrived at the job numbers he provided on direct examination, the VE testified that

> he derived them as a product of his own judgment formed after consulting several sources, a publication identified in the transcript as "employment stats quarterly," a computer program titled "Job Browser Pro," unidentified "source documents" from the Department of Labor and the state's Employment Security Office and collaborative efforts with other vocational experts to come up with a reasonable number. He then made adjustments twice a year, having recently lowered his numbers based on current high unemployment rates. He could not recite or recalculate that formula, however, during the administrative hearing.

*7 Id. (footnotes and citations to administrative transcript omitted). In Brault v. Soc. Sec. Admin., 683 F.3d 443, 446 (2d

Cir. 2012) acknowledged that because the DOT codes do not report the number of available jobs in the national economy, VEs "must obtain additional information to assess whether positions exist for the occupations disability claimants can still perform." Id. at *12. There, the Court acknowledged that "vocational experts' methods for associating SOC or similarly based employment numbers to DOT-based job types have been challenged," but "left for another day in a closer case" "the extent to which administrative law judges must test vocational experts' testimonies." Id. (quoting Brault, 683 F.3d at 450). Brault "emphasized ... that the deferential substantial-evidence standard is extremely flexible, and gives reviewing federal courts freedom to take a case-specific, comprehensive view of administrative proceedings, weighing all evidence to determine whether it is substantial." Id. at *14 (citing Brault, 683 F.3d at 449). Finally, Brault observed "the marked absence of any applicable regulation or decision requiring a vocational expert to identify with greater specificity the source of his figures or provide supporting documentation," and concluded that the ALJ "did not need to find specific numbers of jobs – all he was required to do was find that 'substantial' positions exist." Id. at *13 (quoting Brault, 683 F.3d at 450).

[10]   The plaintiff in Vandermark v. Colvin was represented by the same counsel who represents plaintiff in the case currently before the undersigned, Peter A. Gorton, Esq. Vandermark, 2016 WL 1097391, at *1.

Vandermark also noted that "Brault was a focal point" in Kennedy v. Astrue, 343 Fed.Appx. 719, 722 (2d Cir. 2009) (summary order), wherein the VE testified that the data on which she relied in reaching her conclusion on job titles the plaintiff could perform "also encompassed approximately 59 other DOT titles." In Kennedy, the Second Circuit noted that,

> viewed in context, it is apparent that the expert arrived at her estimated figures for charge-account clerk positions by discounting from the total numbers for all 60 DOT titles. Thus, the expert's testimony on this point did not introduce any meaningful uncertainty as to the number of charge account clerk positions available in the local or national economy.

2016 WL 4768806

Id. at *14. The Court in Vandermark ultimately affirmed the Commissioner's determination, concluding that the VE's testimony, which "accounted for the fact that the statistical groups on which he relied included more jobs than a person with Vandermark's limitations can perform" and "adjusted those incident number accordingly" by reducing reported incidence numbers by a certain percentage to " 'factor out specific jobs.' " Id. at *17. The Court concluded that, although the VE's "adjustments were not made through application of formal theory or use of mechanical or technological aids," the VE's "panoptic experience permitted him to form a reliable opinion based on judgment, instinct and effort." Id.

Here, the VE testified that the number of jobs for each job title "are the total number of jobs for all the separate DOT titles within the ... standard occupational ... [c]lassification" and that there are approximately 1,500 different DOT titles within that standard occupational classification for which lens inserter and final assembler, and 550 separate DOT titles in the standard occupational classification for waxer. Id. at 78-79. The VE confirmed that he had "no way of accurately extrapolating" the number of jobs that would be available out of the 218,740 jobs in the standard occupational classification for the titles of final assembler or lens inserter or the number of jobs available out of the 419,840 jobs in the standard occupational classification for the waxer title. Id. at 80.

The undersigned finds that the Commissioner did not meet her step five burden of demonstrating that there are a substantial number of jobs that exist in the national economy that the plaintiff can perform. The undersigned recognizes that the ALJ, absent a rule or regulation otherwise, need not demonstrate the exact number of jobs available for specific titles or the source for her figures, so long as he or she demonstrates that the job titles are available to plaintiff in "significant" numbers. Brault, 683 F.3d at 449; Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 407 at n.13 (D. Conn. 2012). However, unlike in some of the cases discussed herein, where the reviewing Court affirmed the Commissioner's decision, the VE in this case did not reduce the overall numbers to account for jobs within that classification that plaintiff could not perform nor provide an estimation of the numbers of jobs available in the proposed titles. Kennedy, 343 Fed.Appx. at 722 (affirming the Commissioner's decision where the VE "discounted from the total numbers for all 60 DOT titles" to reach an estimate number of jobs available in specific titles); Vandermark, 2015 WL 1097391, at *10 (affirming the Commissioner's decision where VE reduced job numbers to factor out jobs the plaintiff could not perform); Fox, 2009

WL 367628, at *3 (affirming the Commissioner's decision the VE testified that, based on his best estimate, the number of surveillance system monitor jobs in the Central New York was a "small percentage lower" than the 200 jobs in the protective service occupation); Dugan v. Soc. Sec. Admin. Com'r, 501 Fed.Appx. 24 (2d Cir. 2012) (affirming the Commissioner's decision where the VE testified that there were 225 positions in one job title and 375 positions in another title within the state).

*8 To be clear, the Court's concern is not with a lack of formal methodology in reaching job numbers, as was the concern in many of the cases reviewed above; rather, the concern lies in the lack of any attempt to demonstrate that the identified jobs titles were available to plaintiff. The VE acknowledged that the numbers he provided applied to the entire categories of jobs, which included over 550 jobs titles for one general classification, and over 1500 job titles for the classification. T at 78-80. These classifications would necessarily include job titles that plaintiff is not capable of performing under the ALJ's RFC. This general testimony amounts to "incidence testimony based on broad occupational groupings without accounting for the fact that such groupings include more jobs that [sic] a particular claimant can perform, without adjusting those incident numbers accordingly or when they otherwise inject meaningful uncertainty as to how adjustments are made." Vandermark, 2015 WL 1097391, at *16. Had the VE been able to provide a reduction in the overall numbers of the job titles to provide more certainty that there are jobs available in the national economy that plaintiff could perform in the distinct job titles identified, the Court may not have found fault with such testimony. See Wheeler v. Comm'r of Soc. Sec., No. 3:15-CV-105, 2016 W L 958595, at *12 (N.D.N.Y. Mar. 7, 2016) ("[G]enerally, the courts have determined that a VE's experience allows him or her to form a reliable opinion on whether significant numbers of jobs exist in the national economy.") (citing Blake v. Colvin, No. 2:14-CV-52, 2015 WL 3454736, at *9 (D. Vt. May 29, 2015)). However, the VE here was unable to provide such an estimate.

Although the ALJ acknowledged the concerns raised by plaintiff's counsel during cross-examination, the ALJ attested that the Com missioner met her burden because: (1) "reliance on the DOT and testimony of a vocational expert as valid methods to prove the existence of significant numbers of jobs that a claimant can perform is administratively noticed, and therefore deemed valid and sufficient from an evidentiary standpoint," (2) "[p]roving significant numbers of existing jobs does not necessarily require proof of the exact

Walker v. Corvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

number of existing jobs" and the Commissioner's "burden is satisfied by proof of numbers which, although somewhat approximate, can be reasonably deemed significant, even with allowances for part-time jobs, jobs that do not exactly match the claimant's functional or vocational parameters, and other reductions." T at 22-23. The Court disagrees with the ALJ's reasoning because, although the DOT has been deemed "valid" and courts have determined that exact numbers of existing jobs is not required, there still must be a demonstration that there are jobs that exist in significant numbers in the national economy. See Marvin, 2014 WL 1293509, at *10. The Court is not holding the Commissioner to an "impossible burden" nor is it concluding that an *exact* number is required, T at 23; rather, it is holding the Commissioner to the standard set forth within the regulations – to demonstrate that jobs existed in significant numbers that plaintiff was capable of performing. Requiring at least an estimate of jobs in specific titles, where that estimate is either based on sources/literature or the VE's experience/consultation is consistent with the regulations and "assures that individuals are not denied benefits on the basis of '[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] lives.' " Peterson Moore, 2016 W L 1357606, at *5 (quoting 20 C.F.R. § 416.966(b)); see Robinson v. Astrue, No. 08-CV-4747 (RJD), 2009 W L 4722256, at *2 (E.D.N.Y. Dec. 9, 2009) ("while the Social Security Act does not specify any precise formula for determining whether a particular number of jobs is sufficiently 'significant,' a number of courts have suggested that [200 local jobs and 3,000 national jobs] would not qualify as sufficiently significant.").

Thus, the Court finds that VE's testimony, adopted by the ALJ, did not provide a "fair estimate of the jobs available" that plaintiff can perform. Jones-Reid, 934 F. Supp. 2d at 407 n.13. Accordingly, it is determined that the Commissioner failed to meet her burden at step five, and remand is necessary to further address whether jobs exist in significant numbers in the national economy that plaintiff can perform.

## 2. RFC: Sedentary Work

Plaintiff argues that the ALJ's RFC, insofar as it concludes that he has the ability to perform sedentary work, is unsupported by the record. Dkt. No. 11 at 9. Plaintiff contends that "[t]here is only one medical opinion of record (from Dr. Wiesner), and it does not support the ability to do sedentary work" as it demonstrates that plaintiff cannot stand

for more than one hour in an eight-hour work day. Id. [11] The Commissioner argues that the ALJ's conclusion that plaintiff could perform sedentary work was proper, as the ALJ properly rejected Dr. Wiesner's conclusions regarding plaintiff's standing limitations. [12] Dkt. No. 12 at 8.

[11] Plaintiff's brief mentions the other proposed limitations that Dr. Wiesner indicated in the questionnaire, but sets forth arguments only regarding plaintiff's ability to stand. Dkt. No. 11 at 10-11.

[12] The Commissioner also suggests that the opined standing limitations set forth in Dr. Wiesner's questionnaire, as he failed to answer whether plaintiff would need to alternate between sitting and standing, "likely" indicate that "Dr. Wiesner's opinion was addressing Plaintiff's ability to stand *continuously* ...." Dkt. No. 12 at 9. Although this may have been Dr. Wiesner's intention, the Court has no way of confirming such, and declines to do so as reaching such a conclusion merely from the fact that Dr. Wiesner left one question unanswered would require undue speculation.

**\*9** Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.11567(a).

Lawrence Wiesner, D.O., performed an orthopedic independent medical examination on June 28, 2013. T at 370. Dr. Wiesner reviewed plaintiff's medical records, noting "an MRI of the ankle with a chronic fracture fragment near the lateral malleolus. A torn anterior talofibular ligament, moderately severe localized, irregular ankle joint chondral

Walker v. Corvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

degeneration, four loose bodies, and a segmental longitudinal split tear and degeneration and tenosynovities involving peroneus brevis tendon." Id. at 371. Dr. Wiesner's impression was "[c]hronic right ankle pain with degenerative changes and chronically torn ligaments." Id. Dr. Wiesner concluded that plaintiff was "moderately to significantly limited with regard to his right ankle" and "is unable to lift, push, pull, or carry items greater than 20 pounds and not repetitively due to increased stress in the ankle." Id. Plaintiff "should not climb ladders[,]" and "would have difficult squatting and kneeling due to increased stress on his ankle." Id.

Also on June 28, 2013, Dr. Wiesner completed a "questionnaire." T at 376. Dr. Wiesner indicated that plaintiff suffered "[r]ecurrant sprains right ankle." [13] Id. Dr. Wiesner provided that plaintiff would need more than one ten-minute rest period per hour. Id. He opined that plaintiff's pain would have a moderate – "a limitation of function ... of 20% or greater but not precluding function" – impact on his concentration, and ability to sustain work pace. Id. Dr. Wiesner indicated that plaintiff would be off task 30% of the time. Id. The side effects of plaintiff's medication were difficulty concentrating and fatigue. Id. at 377. Dr. Wiesner provided that plaintiff could sit for six hours in an eight-hour work day, and stand or walk for one hour in an eight-hour work day. Id. Dr. Wiesner did not answer whether plaintiff needed to alternate between sitting and standing or estimate how frequently plaintiff should change positions. Id.

13    The Questionnaire is handwritten, and the remainder of Dr. Weisner's answer to question 1 is illegible. T at 376.

Although it appears that the ALJ made several requests, there are no medical source statements in the administrative transcript from any of plaintiff's treating providers. T at 20, 21. [14] The ALJ gave "significant weight" to Dr. Wiesner's findings in the Orthopedic IME "due to his examination of the claimant and the relative consistency of these opinions with the longitudinal medical evidence in the record." Id. However, the ALJ accorded "reduced weight to Dr. Wiesner's hand-written answers to the questionnaire created by the claimant's representative, because the opinions are not consistent with the overall medical evidence, including clinical findings." Id. at 20-21. The ALJ concluded that the opinions in the questionnaire "that the claimant needs more than one ten minute rest period per hour, has difficulty with concentration, work place, and staying on-task, and stand/walk for one hour in an eight-hour workday contradict Dr. Wiesner's own report,

in which he did not identify these limitations." Id. at 21. The ALJ further determined that the answers in Dr. Weisner's questionnaire "also contradict consistent clinical findings of good ambulation with the assistance of a brace as well as consistent medical recommendations to increase exercise ...." Id.

14    "[T]he lack of a medical source statement from a treating physician, will not, by itself, necessarily render the record incomplete." Beach v. Commissioner of Soc. Sec., 7:13-CV-323 (GLS), 2014 WL 859167, at *3 (N.D.N.Y. Mar. 5, 2014) (citing 20 C.F.R. 404.1513(b)(6)); Pellam v. Astrue, 508 Fed.Appx. 87, 90 (2d Cir. 2013).

*10    The ALJ reviewed medical records from Dr. Kiran Talati, MD, a physician at Lourdes Hospital. T at 20, 318-21, 347-50. She observed that Dr. Talati noted that plaintiff "had trace edema and minimal tenderness in the ankle" and "recommended that the claimant increase his exercise activity." Id. at 20. The ALJ also referenced records from Dr. Kamlesh S. Desai of Orthopedic Associates, who, in October 2011, "noted that, despite swelling and a limited range of motion, the claimant had satisfactory gait and full weight-bearing in the lower right extremity; he also noted that the claimant ambulated satisfactorily with the support of a brace." T at 21. The ALJ also noted a May 2012 visit where Dr. Desai "noted that the claimant had tenderness of the right ankle with stable ligaments; he recommended conservative treatment, including the intermittent use of a brace." Id. Finally, the ALJ referenced treatment notes from nurse practitioner Scott Rosman, who "stated that the claimant reported ankle pain but had not received orthopedic care in four or five months," and, at one visit wherein plaintiff requested he complete disability paperwork, NP Rosman "noted that plaintiff was "wearing sandals today and reports he is working side jobs mowing lawn[s] ... I find it hard to prove total disability," would complete the disability paperwork to the best of his ability, and suggested that plaintiff also have Dr. Desai complete the paperwork. Id. at 20.

Plaintiff asserts that the ALJ must accept Dr. Wiesner's statement of plaintiff's limitations because there is no other medical opinion in the record regarding plaintiff's abilities. Dkt. No. 11 at 10. The undersigned concludes that the ALJ did not commit reversible error in assigning significant weight to Dr. Wiesner's orthopedic independent medical examination but reduced weight to his questionnaire answers. T at 20-21. "There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's

Walker v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

limitations...." Pellam v. Astrue, 508 Fed.Appx. 87, 89-90 (2d Cir. 2013). Indeed, an ALJ may properly "credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported." Viteritti v. Colvin, No. 14-6760 (DRH), 2016 WL 4385917, at *11 (E.D.N.Y. Aug. 17, 2016) (citing Pellam, 508 Fed.Appx. at 89). This is true even where the ALJ relies on a consultative examiner's examination findings, but rejects the consultative examiner's medical source statement setting forth "moderate to severe limitations." Pellam, 208 Fed.Appx. at 90.

Although Dr. Wiesner's questionnaire sets forth very restrictive limits on plaintiff's ability to stand or walk, this limitation is contradicted by other record evidence even absent another medical source statement in the record. Further, during Dr. Wiesner's physical examination of plaintiff, Dr. Wiesner identified certain physical limitations, such as a limited ability to carry items over twenty pounds, climb ladders, squat, or kneel, but did not identify any limitations with standing. T at 371. Although there is no opinion regarding plaintiff's physical abilities or limitations from any treating provider, treatment notes provide insight into plaintiff's condition and amount to substantial evidence in support of the ALJ's RFC. In August 2013, NP Rosman noted that plaintiff reported working side jobs mowing lawns and observed that plaintiff was wearing sandals. Id. at 401. NP Rosman also noted that he "f[ou]nd it hard to prove total disability[.]" Id. In October 2011, Dr. Desai noted that plaintiff had a satisfactory gait, had full weight bearing ability in his lower extremity, and successfully ambulated with a brace. Id. at 335. In May 2012, Dr. Desai observed that plaintiff was "not using any brace for the ankle." Id. at 333. Further, medical professionals recommended that plaintiff exercise in order to lose weight and reduce the stress on his ankle. Id. at 319, 333-34. Further, plaintiff testified at the hearing that he performed activities of daily living that are inconsistent with his argument that he is unable to perform sedentary work: he performs some childcare duties for his five children, including watching his children while his wife goes to the grocery store; he sometimes goes to the grocery store with his wife; he cooks dinner for his family one to two nights per week; he prepares meals for himself; he occasionally vacuums; he takes out the trash; and he puts away a few dishes. Id. at 63-67.

**\*11** As the Second Circuit has made clear, " 'under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record.' " McAllister v. Colvin, 3:14-CV-01488 (TWD), 2016 WL 1122059, at *12 (N.D.N.Y. Mar. 22, 2016) (citing Brault, 683 F.3d at 448). Here, "the record demonstrates that the [ALJ] carefully reviewed the entire record ...and declined to adopt those [limitations] that were unsupported." See Cosme v. Colvin, 15-CV-6121P, 2016 WL 4154280, *12 (W.D.N.Y. Aug. 5, 2016). The undersigned finds that the ALJ's conclusion that plaintiff had the RFC to perform sedentary work, including standing or walking for a maximum total of two hours in an eight-hour work day, is supported by substantial evidence as the objective medical evidence and plaintiff's testimony do not support Dr. Wiesner's questionnaire answer indicating that plaintiff is unable to stand for more than a total of one hour in an eight-hour day, must take more than one ten-minute rest per hour, and would be off task more than thirty percent of the time. T at 376. Thus, reconsideration of this matter on remand is not required.

### 3. Credibility

Plaintiff argues that the ALJ erred in relying on his history of conservative treatment in assessing his credibility. Dkt. No. 11 at 12. Defendant does not address this exact argument, but instead contends that the ALJ's credibility assessment was proper insofar as plaintiff's complaints of pain were "not entirely credible." Dkt. No. 12 at 10-11.

Once an ALJ determines that the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce the [symptoms] alleged," he or she "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Meadors v. Astrue, 370 Fed.Appx. 179, 183 (2d Cir. 2010) (internal quotation marks and citations omitted). In making this assessment, the ALJ is to "consider the entire case record and give specific reasons for the weight given to the [claimant's] statements." SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2,1996). In addition to the objective medical evidence, the ALJ must consider: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side effects of any

Walker v. Colvin, Not Reported in Fed. Supp. (2016)

2016 WL 4768806

medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." F.S. v. Astrue, No. 1:10-CV-444, 2012 W L 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3) (i)-(vi)).

"[A] plaintiff may be deemed less credible 'if the level or frequency of treatment is inconsistent with the level of complaints.' " Phelps v. Commissioner of Soc. Sec., 1:15-CV-0499 (GTS), 2016 WL 3661405, at *8 (N.D.N.Y. July 5, 2016) (quoting SSR 96-7p, 1996 WL 174186, at *8 (July 2, 1996)); Sickles v. Colvin, 12-CV-0774, 2014 W L 795978, at *22 (N.D.N.Y. Feb. 27, 2014); Church v. Colvin, ___ F. Supp. 3d ____, 2016 W L 3944481, at *5 (N.D.N.Y. July 18, 2016) (determining, where the ALJ noted that the plaintiff's treatment for musculoskeletal problems was conservative insofar as the plaintiff declined injections and surgery, that the consideration was not improper as there was substantial evidence in the record to support the ALJ's finding that the plaintiff's symptoms were not as disabling as alleged).

Here, although the ALJ did refer to plaintiff's conservative treatment, the ALJ did not rest her credibility determination solely on this factor. The ALJ also reviewed plaintiff's medical records and noted that "multiple radiology reports reveal degenerative changes in the right ankle" and that plaintiff was reported by treating medical providers as having satisfactory gait and ambulation and the ability to fully bear his weight with his lower extremity. T at 19-20. Further, the ALJ pointed to medical records suggesting that plaintiff was more active – taking "side jobs" mowing lawns – than he testified as being, and had not seen his orthopedic care provider for period of four to five months. Id. at 20; Jaworski v. Colvin, 3:15-CV-510 (GLS), 2015 W L 5750041, at *7 (N.D.N.Y. Sept. 30, 2015) (quoting SSR 96-7, 61 Fed. Reg. at 34,386) ("Information about a claimant's daily activities recorded by medical sources and reported in the medical evidence 'can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms.' ").

 *12  Further, the ALJ took note of plaintiff's ability to perform some child care tasks, and cook meals for his family, albeit with his foot propped up. Id. at 19. Thus, the Court finds that the ALJ's consideration of plaintiff's conservative treatment history did not amount to reversible error. Moreover, even if the ALJ had not considered plaintiff's conservative treatment, the ALJ's credibility assessment would still be supported by substantial evidence due to the inconsistency between plaintiff's claims of near total disability and his engagement in activities that would appear less restrictive than those he claimed capable of performing. See Phelps, 2016 W L 3661405, at *8 (citing Schlicting v. Astrue, 11 F. Supp. 3d 190, 206-07 (N.D.N.Y. 2012)) (concluding that, even if the ALJ erred in considering the plaintiff's conservative treatment in assessing credibility, such would be harmless error where other substantial evidence supported the ALJ's credibility determination).

Accordingly, the Court concludes that the ALJ properly complied with the regulations, and properly set forth the inconsistencies that she relied on in assigning less credit to plaintiff's allegations of pain and limitations. Thus, the Court finds that there is no reason to disturb the ALJ's credibility assessment, as the assessment is supported by substantial evidence, and remand on this basis is not needed.

### III. Conclusion

Having reviewed the administrative transcript and the ALJ's findings, the undersigned concludes that the Commissioner's determination is not supported by substantial evidence insofar as the Commissioner failed to meet her burden at step five of the sequential evaluation, and that remand for further administrative action consistent with this Memorandum-Decision and Order is needed. Accordingly, it is hereby:

**ORDERED** that plaintiff's motion for judgment on the pleadings (Dkt. No. 11) be **GRANTED** and that the matter be remanded to the Commissioner for additional proceedings pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court serve copies of the Memorandum-Decision and Order on the parties in accordance with the Court's Local Rules.

**IT IS SO ORDERED.**

Dated: September 13, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4768806

**Walker v. Colvin, Not Reported in Fed. Supp. (2016)**

2016 WL 4768806

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 236 of 356

2020 WL 1304076

2020 WL 1304076
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

RACHAEL V., Plaintiff,
v.
COMM'R OF SOC. SEC., Defendant.

3:18-CV-1346 (TWD)
|
Signed 03/18/2020
|
Filed 03/19/2020

**Attorneys and Law Firms**

OF COUNSEL: PETER A. Gorton, ESq., Lachman & Gorton, Counsel for Plaintiff, P.O. Box 89, 1500 East Main Street, Endicott, New York 13761-0089.

OF COUNSEL: david l. brown, eSQ., U.S. SOCIAL SECURITY ADMIN., Counsel for Defendant, OFFICE OF REG'L GEN. COUNSEL, REGION II, Counsel for Defendant, 26 Federal Plaza - Room 3904, New York, NY 10278.

**DECISION and ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

 **\*1** Currently before the Court, in this Social Security action filed by Rachael V. ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. § 405(g), are Plaintiff's motion for judgment on the pleadings and Defendant's motion for judgment on the pleadings. (Dkt. Nos. 9 and 10.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is denied and Defendant's motion for judgment on the pleadings is granted. The Commissioner's decision denying Plaintiff's disability benefits is affirmed, and Plaintiff's Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Factual Background**
Plaintiff was born in 1969, making her 44 years old at the alleged onset date and 48 years old at the ALJ's decision.

Plaintiff completed the eighth grade and obtaining a GED and cosmetology license. She reported past work as a cashier, waitress, cleaner, personal care assistant, and sales assistant. She works part-time or twice a month for a total of four hours per month. (T. 34, 49-50.) [1] Plaintiff initially alleged disability due to fibromyalgia, degenerative disc disease, a hiatal hernia, attention deficit hyperactivity disorder, depression, asthma, gastroesophageal reflux disease, and obsessive-compulsive disorder.

[1] The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

**B. Procedural History**
Plaintiff applied for a period of disability and disability insurance benefits on February 6, 2015, alleging disability beginning February 14, 2014. (T. 55, 69, 144-50.) Plaintiff's application was initially denied on April 27, 2015, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"). She appeared at an administrative hearing before ALJ John P. Ramos on June 8, 2017. (T. 30-54.) On August 9, 2017, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act. (T. 7-24.) On September 18, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-6.)

**C. The ALJ's Decision**
The ALJ found Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2016. (T. 12.) She did not engage in substantial gainful activity during the period from her alleged onset date of February 14, 2014, through her date last insured of September 30, 2016. (T. 13.) Her fibromyalgia, history of back surgery, depressive disorder, and panic disorder were severe impairments. (*Id.*) She did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings") through the date last insured. (T. 13-15.) Plaintiff has the residual functional capacity ("RFC") to perform sedentary work and

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)
Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 237 of 356

2020 WL 1304076

**\*2** [m]entally, the claimant retained the ability to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention/concentration for simple tasks, and regularly attend to a routine and maintain a schedule. She could relate to and interact with others to the extent necessary to carry out simple tasks. She could also handle reasonable levels of simple work-related stress, in that she could make decisions directly related to the performance of simple work, and handle the usual work place changes and interactions associated with simple work.

(T. 15.) Sixth, the ALJ found Plaintiff was unable to perform any past relevant work through the date last insured. (T. 18.) Seventh and last, the ALJ found Plaintiff could perform other jobs existing in significant numbers in the national economy. (T. 19.) The ALJ therefore concluded Plaintiff was not disabled at any time from the alleged onset date through the date last insured. (T. 20.)

**D. The Parties' Briefings on Their Cross-Motions**

In her brief, Plaintiff argues the ALJ improperly substituted his judgment for undisputed medical opinions that Plaintiff has postural limitations and would have limitation in her ability to work consistently. (Dkt. No. 9 at 10-14.) Plaintiff also argues the ALJ improperly weighed the medical opinions of treating physician Ian Stuppel, D.O., consultative examiner Amanda Slowik, Psy.D., consultative examiner Rita Figueroa, M.D., and non-examining consultant S. Bhutwala, Ph.D., and specifically points to the issues of the need to change positions, time off-task, and absenteeism. (*Id.* at 14-22.) Finally, Plaintiff contends the Step Five determination is not supported by substantial evidence because the ALJ failed to consult with a vocational expert. (*Id.* at 22-23.)

Defendant argues substantial evidence supports the ALJ's mental RFC finding and that the ALJ did not substitute his judgment for medical opinion, but rather he properly considered the medical opinions from Dr. Slowik and Dr. Bhutwala. (Dkt. No. 10 at 7-13.) Defendant also contends substantial evidence supports the ALJ's physical RFC and the ALJ properly considered the opinions from Dr. Figueroa and Dr. Stuppel. (*Id.* at 13-18.)

**II. RELEVANT LEGAL STANDARD**

**A. Standard of Review**

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

**\*3** "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 238 of 356

2020 WL 1304076

**B. Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the

[Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson*, 540 U.S. 20, 24 (2003).

## III. ANALYSIS

### A. Substantial Evidence Supports the ALJ's Analysis of the Opinion Evidence and Plaintiff's RFC

#### 1. Applicable Law

##### a. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, 11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2)).

##### b. Treating Physician

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c). " '[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' ' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, "... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 239 of 356

2020 WL 1304076

**\*4** In deciding how much weight to afford the opinion of a treating physician, the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek*, 802 F.3d at 375 (quoting *Selian*, 708 F.3d at 418). However, where the ALJ's reasoning and adherence to the regulation is clear, and it is obvious that the "substance of the treating physician rule was not traversed," no "slavish recitation of each and every factor" of 20 C.F.R. § 404.1527(c) is required. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31-32). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 404.1527(c)(1)-(6).

### c. Review of Medical Evidence

"An ALJ should consider 'all medical opinions received regarding the claimant.' " *Reider v. Colvin*, 15-CV-6517P, 2016 WL 5334436, at \*5 (W.D.N.Y. Sept. 23, 2016) (quoting *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005)). "The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 131). In assessing a plaintiff's RFC, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because such consultants are qualified experts in the field of social security disability. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Little v. Colvin*, 14-CV-0063 (MAD), 2015 WL 1399586, at \*9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (internal quotation marks omitted).

### 2. Opinion Evidence

In April 2015, consultative examiner Dr. Slowik observed Plaintiff was cooperative and oriented and she had adequate social skills, adequate expressive language skills, poorly developed receptive language skills, coherent and goal-directed thought process, depressed affect (she was quite tearful), dysthymic and anxious mood, fair insight, good judgment, mildly impaired attention and concentration due to distractibility and anxiety, and moderately impaired recent and remote memory skills due to emotional distress secondary to her anxiety, depression, and pain. (T. 487-88.) Plaintiff's intellectual functioning appeared to be in the below average range and her general fund of information appeared somewhat limited. (T. 488.) Dr. Slowik diagnosed a specific learning disorder, major depressive disorder, panic disorder, and history of attention deficit hyperactivity disorder. (T. 489.) She opined Plaintiff was mildly limited in the ability to follow and understand simple directions and instructions and maintain attention and concentration; moderately limited in the ability to perform simple tasks independently, learn new tasks, make appropriate decisions and relate adequately with others; and markedly limited in the ability to maintain a regular schedule, perform complex tasks and appropriately deal with stress. (T. 488-89.) Dr. Slowik indicated these difficulties were caused by cognitive deficits, anxiety and depression and the results of the examination appeared to be consistent with psychiatric and cognitive problems which might significantly interfere with Plaintiff's ability to function on a daily basis. (T. 489.) The ALJ afforded some weight to Dr. Slowik's assessment. (T. 18.)

**\*5** In April 2015, consultative examiner Dr. Figueroa noted Plaintiff appeared in no acute distress, she had a normal gait and stance, she could walk on heels and toes without difficulty, her squat was 75 percent, she used no assistive devices, she needed no help changing for the exam or getting on and off the exam table, and she was able to rise from a chair without difficulty. (T. 494.) On examination, she had mild epigastric tenderness, some limited range of motion in the cervical and lumbar spine with lordosis of the lower spine, negative straight leg raising testing bilaterally, some limited range of motion in the shoulders, complaints of pain with wrist movements, full range of motion of the hips with complaints of pain with movement, positive fibromyalgia points at the occiput, neck, shoulders, intrascapular, hips, and buttocks for a total of 14 total points, equal and physiologic deep tendon reflexes in the upper and lower extremities, full

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)
Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 240 of 356
2020 WL 1304076

strength in the upper and lower extremities, and intact hand and finger dexterity. (T. 494-95.) Dr. Figueroa diagnosed fibromyalgia, chronic low back pain, cervicalgia, asthma, and gastroesophageal reflux disease and opined Plaintiff had moderate limitations for repetitive bending, lifting, carrying, pushing and pulling and she should avoid exposure to smoke, dust, and any respiratory irritants which might aggravate her asthma condition. (T. 495.) The ALJ afforded some weight to Dr. Figueroa's opinion. (T. 17.)

As part of the initial determination in April 2015, consultant Dr. Bhutwala opined Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (T. 60-66.) Dr. Bhutwala indicated the evidence in the file was not sufficient to support allegations of disability and Plaintiff retained the mental RFC for simple work. (T. 66.) The ALJ afforded greater weight to Dr. Bhutwala's determination that Plaintiff retained the mental RFC for simple work. (T. 18.)

In May 2016, primary care physician Dr. Stuppel noted Plaintiff's anxiety/depression, chronic back pain, fibromyalgia, and asthma/allergies and opined these conditions would cause pain, fatigue, diminished concentration and work pace, and the need to rest at work. (T. 596.) Dr. Stuppel also opined Plaintiff would be off task more than 33 percent of the day and absent more than four days per month, she could sit for six hours of the workday, she should change position every 30 minutes, she could stand/walk for two hours in a work day, and she could occasionally lift up to 10 pounds with these limitations present since 2015. (T. 596-97.) In April 2017, Dr. Stuppel reiterated his previous opinion noting Plaintiff's chronic back pain, fibromyalgia, anxiety/depression, asthma, and Barrett's esophagus. (T. 579-80.) The ALJ afforded little weight to Dr. Stuppel's opinions that Plaintiff should change positions every 30 minutes and her pain and other symptoms would cause off-task time more than 33 percent of the day and more than four absences per month. (T. 17.)

### 3. Analysis

Plaintiff argues the ALJ improperly substituted his judgment for undisputed medical opinions and improperly weighed the medical opinions. (Dkt. No. 9 at 10-22.) The Court does not find these arguments persuasive for the following reasons.

**a.** Consultative Opinions of Dr. Slowik and Dr. Bhutwala

Plaintiff argues the ALJ substituted his judgment for medical opinions on her ability to work consistently. (Dkt. No. 9 at 11-12.) In so doing, Plaintiff points to Dr. Slowik's opined marked impairment to maintaining a regular schedule and Dr. Bhutwala's opined moderate diminishment to Plaintiff's ability to maintain a regular schedule, work consistently, work at a proper work pace and work without interruptions. (*Id.*; T. 64-66, 488-89.) Plaintiff also relies on Dr. Stuppel's opined significant disruption to a schedule or more than 33 percent of time off task and more than four absences per month, which is discussed further in Section III.A.3.c of this Decision and Order. (*Id.*; T. 580.)

"There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations." *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013); *see also Walker v. Colvin*, 15-CV-0465 (CFH), 2016 WL 4768806, at *10 (N.D.N.Y. Sept. 13, 2016) ("[A]n ALJ may properly 'credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported.' This is true even where the ALJ relies on a consultative examiner's examination findings, but rejects the consultative examiner's medical source statement[.]") Indeed, "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013); *see also Tennant v. Comm'r of Soc. Sec.*, 16-CV-0360 (DJS), 2017 WL 1968674, at *8 (N.D.N.Y. May 10, 2017); *Allen o/b/o Allen v. Comm'r of Soc. Sec.*, 16-CV-1207 (WBC), 2017 WL 6001830, at *6 (N.D.N.Y. Dec. 4, 2017). An ALJ may therefore accept portions of a medical opinion that are consistent with the record, and choose not to accept portions that are inconsistent with the record.

**\*6** Here, the ALJ indicated that Dr. Slowik's opinion was afforded "only some weight because not all of her opinions [were] supported by the record." (T. 18.) The ALJ explained that "her assessment of the claimant's ability to make appropriate decisions and relate adequately with others does not comport with her examination, which found the claimant to have 'adequate' social skills and 'good' judgment." (T. 18, 485-91.) The ALJ further indicated "Dr. Slowik's assessment of the claimant's ability to maintain a regular schedule

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 241 of 356

2020 WL 1304076

and appropriately deal with stress is inconsistent with the claimant's treatment history and daily activities." (T. 18.) The ALJ pointed out Plaintiff's lack of specialized mental health treatment and her indication that most of her reported difficulties with daily activities were due to her physical impairments. (*Id.*) The ALJ also pointed to Plaintiff's ability to make and keep her own medical appointments, her reported good relationships with her boyfriend, friends and family members, and her reported activities including self-care tasks, preparing simple meals, some cleaning and shopping, driving, managing finances, reading self-help books, and working part-time. (T. 18, 34, 38, 40, 485-91.)

As the ALJ discussed, Dr. Slowik's opinion was not consistent with other substantial evidence of record, including her own examination, Plaintiff's mental health treatment history, her daily activities, and her reported good social relationships. (T. 18.) For example, Dr. Slowik's consultative examination indicated Plaintiff was cooperative and coherent with adequate social skills, adequate expressive language skills, and a goal-directed thought process. (T. 487.) Dr. Slowik noted Plaintiff had a meaningful, romantic relationship and her family relationships had not been affected by her mood. (T. 488.) As the ALJ pointed out, Dr. Slowik's assessment was also inconsistent with Plaintiff's lack of specialized mental health treatment, evidenced by Plaintiff's testimony at the administrative hearing indicating she takes medication for depression but had not been to any type of counseling, social worker, psychologist or psychiatrist in the previous two years. (T. 40.) The Court also notes Plaintiff's treatment records with Dr. Stuppel from October 2014 to February 2015 recommended counseling which Plaintiff appears to not have pursued, while newer records with Dr. Stuppel from March 2017 indicated her depression and anxiety were stable. (T. 295, 299, 304, 717.) Between November 2015 and February 2016, Plaintiff reported to another provider that she continued to be stressed about relationships and finances but had decided not to seek counseling at that time. (T. 538, 542, 546, 550, 555.)

In further considering the opinion evidence, the ALJ indicated Dr. Bhutwala's determination that Plaintiff retained the mental RFC for simple work was given greater weight because "it was based upon his review of the record, which included Dr. Slowik's evaluation" and "state agency and psychological consultants are not only highly qualified in their field, but are also experts in Social Security disability evaluation." (T. 18, 55-68.) Plaintiff maintains the ALJ erred by giving greater weight to Dr. Bhutwala who did not have all the records, but

who also nonetheless indicated moderate diminishment in the ability to maintain a regular schedule, to work consistently, to work at a proper pace and to work without interruptions. (Dkt. No. 9 at 11). However, the Court finds that Dr. Bhutwala's opinion was not inconsistent with the ALJ's ultimate RFC determination and did not require the ALJ to adopt greater limitations to the ability to work consistently. Indeed, even while opining Plaintiff had moderate limitations in the ability to maintain a regular schedule, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, Dr. Bhutwala still concluded Plaintiff retained the mental RFC for simple work and evidence in the file was not sufficient to support allegations of disability. (T. 65-66.) The ALJ therefore reasonably concluded Plaintiff did not have further supported mental limitations than those he included in the RFC determination. (T. 15.) Further, the ALJ was entitled to rely on this non-examining expert's opinion. *See Frye*, 485 F. App'x at 487; *Little*, 2015 WL 1399586, at *9.

**\*7** Plaintiff also argues Dr. Bhutwala's use of the term "moderate" is vague and ambiguous, thereby useless and cannot provide substantial support for the ALJ's RFC determination and Dr. Bhutwala's opinion should be given no weight because he never examined or treated Plaintiff and his conclusions are inconsistent with the record showing significant issues with depression, anxiety, and panic. (Dkt. No. 9 at 21-22.) While the term "moderate" may be "vague, and the Commissioner has provided no illuminating term-of-art definitions[,]" the Court does not find Plaintiff's argument that the opinion was useless to be persuasive. *Reynolds v. Colvin*, 13-CV-0396 (GLS/ESH), 2014 WL 4184729, at *4 (N.D.N.Y. Aug. 21, 2014). The ALJ's reliance on Dr. Bhutwala's opinion did not pertain solely to the opined "moderate" limitations, but also on his conclusion that Plaintiff retained the mental RFC for simple work as it was based upon his review of the record including Dr. Slowik's evaluation. (T. 18, 66.) Conversely, Plaintiff utilizes Dr. Bhutwala's opined moderate diminishment of the ability to maintain a regular schedule, work consistently, work at a proper pace, and work without interruptions in her other arguments despite simultaneously indicating such an opinion is vague and useless. (Dkt. No. 9 at 11-12, 20-22.) Further, as discussed above and in Section III.A.3.c of this Decision and Order, the Court's review does not indicate Plaintiff has generally experienced significant issues with depression, anxiety, and panic.

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD    Document 15    Filed 08/03/23    Page 242 of 356

2020 WL 1304076

**b.** Dr. Figueroa's Consultative Opinion

Plaintiff similarly argues that the ALJ substituted his judgment for medical opinions on her postural limitations. (Dkt. No. 9 at 12-13.) Plaintiff points out that Dr. Figueroa opined moderate limitation for repetitive bending, lifting, carrying, pushing, and pulling and maintains the ALJ rejected these limitations based on his own interpretation of Dr. Figueroa's examination and one negative lumbosacral x-ray. (*Id.* at 12-13; T. 17, 492-96, 593.) Plaintiff also contends the ALJ omitted or ignored a positive cervical spine x-ray showing stigmata cervical spine spondylosis, records showing degenerative changes at L5-S1 and within the thoracic spine, and an assessment of lower lumbar facet joint disease. (*Id.* at 13; T. 384, 426, 594.)

Again, the ALJ was not required to accept every portion of a consultative examiner's opinion. *Pellam*, 508 F. App'x at 89; *Walker*, 2016 WL 4768806, at *10; *Matta*, 508 F. App'x at 56; *Tennant*, 2017 WL 1968671, at *8; *Allen.*, 2017 WL 6001830, at *6. Here, the ALJ specified that Dr. Figueroa's assessment was afforded "some weight insofar as it is consistent with her clinical findings" but he did not adopt the proposed bending limitations, noting Plaintiff's "straight leg raising test was negative, she had no difficulty rising from a chair, and she needed no help changing for the exam or getting on and off the exam table." (T. 17, 492-96.) The ALJ also noted x-rays of Plaintiff's lumbosacral spine from February 2015 were normal. (T. 17, 593.) In finding Plaintiff could perform sedentary work, the ALJ considered her allegations of body pain and numbness in her arms and wrists. (T. 16.) However, the ALJ was " 'not required to discuss in depth every piece of evidence contained in the record, so long as the evidence of record permits the Court to glean the rationale of an ALJ's decision.' " *Coleman v. Comm'r of Soc. Sec.*, 14-CV-1139 (GTS/WBC), 2015 WL 9685548, at *5 (N.D.N.Y. Dec. 11, 2015) (quoting *LaRock ex rel. M.K. v. Astrue*, 10-CV-1019 (NAM/VEB), 2011 WL 1882292, at *7 (N.D.N.Y. Apr. 29, 2011)).

Further, the Court does not find Plaintiff's arguments persuasive because, rather than the ALJ substituting his own judgment by "re-interpreting" Dr. Figueroa's examination findings and relying only on the normal lumbosacral x-rays, the ALJ reasonably concluded the record as a whole did not support the bending limitations opined by Dr. Figueroa. (T. 17.) For example, Plaintiff reported significant improvement in April 2015 of her neck and shoulder pain after trigger point injections and osteopathic manipulative treatment; in August and October 2015, she reported working out at the gym and reported she was looking at getting some home gym equipment in January 2016. (T. 513-14, 517-24, 529, 534.)

Plaintiff also argues the ALJ "entirely omits (or fails to discuss) the functional limitations caused by" fibromyalgia pain although the "medical records consistently note significant body wide pain which certainly could impact Plaintiff's ability to bend." (*Id.* at 14; T. 574.) Fibromyalgia is a medically determinable impairment when it is established by appropriate medical evidence. It can be the basis for a finding of disability. SSR 12-2p, 2012 WL 3104869 (S.S.A. July 25, 2012). A growing number of courts have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.' *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (citing *Preston v. Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)). The absence of swelling joints or other orthopedic and neurologic deficits 'is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.' *Id.* at 109 (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Here, however, the ALJ found Plaintiff's fibromyalgia severe and noted her reports that " 'her entire body hurts all of the time from head to toe.' " (T. 13, 16, 492-96.) In considering Dr. Figueroa's opinion, the ALJ noted her observation of 14 positive tender points. (T. 16.) Although the ALJ did not further explicitly discuss Plaintiff's fibromyalgia and related pain, his overall decision indicates he gave it sufficient consideration in determining Plaintiff's RFC for sedentary work with mental limitations. (T. 13-18.)

**\*8** For the reasons above, the Court finds the ALJ properly considered Dr. Figueroa's consultative opinion as well as Plaintiff's fibromyalgia pain and reasonably concluded that, based on the entire record, further bending limitations were not supported.

**c.** Dr. Stuppel's Treating Source Opinion

Plaintiff's also argues that the ALJ erred in weighing Dr. Stuppel's treating opinion and improperly rejected Dr. Stuppel's opined significant disruption to a schedule or more than 33 percent of time off task and more than four absences per month as well as the need to change position. (Dkt. No. 9 at 11-12, 15.)

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1304076

Generally, the opinion of the treating physician will not be afforded controlling weight when the treating physician issued opinions that were not consistent with those of other medical experts and is contradicted by other substantial evidence in the record. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 404.1527(c)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion ... that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given.").

As the ALJ discussed, he gave little weight to Dr. Stuppel's opinions regarding position changes, off-task time, and absences "because they are not supported by the record" and treatment notes from Dr. Stuppel through Plaintiff's date last insured "generally describe her as being in no acute distress" and these notes "often document normal mental functioning." (T. 579-80, 595-98, 611-728.) The ALJ also pointed to Plaintiff's management of her own household and part-time work doing light cleaning and noted Dr. Slowik's examination finding of only mildly impaired attention and concentration. (T. 17.) The ALJ indicated Plaintiff's "medical records do not reflect a history of her repeatedly missing or arriving late for scheduled appointments" and noted Dr. Stuppel's assessments were "primarily comprised of checkbox form responses, lacking in narrative explanations or references to specific clinical and diagnostic findings to support the particular limitations described." (*Id.*)

Rather than the ALJ substituting his own judgment, the Court's review of the evidence is consistent with the ALJ's analysis and indicates the ALJ properly weighed Dr. Stuppel's opinion with the other evidence of record. (T. 17-18.) As with Dr. Slowik's opinion, Dr. Stuppel's opinion was not consistent with the other evidence of record including his own treatment records documenting Plaintiff's anxiety and depression. For example, although Dr. Stuppel initially stressed counseling to Plaintiff, his later treatment notes indicate Plaintiff was seen for routine follow-up for depression and anxiety and these conditions were stable with medication management. (T. 295, 299, 304, 612, 717.)

Plaintiff also argues the ALJ did not accurately describe her activities of daily living or part-time work and these reasons do not provide substantial support for the ALJ's rejection of Dr. Stuppel's opinion. (Dkt. No. 9 at 17.) Plaintiff testified at the administrative hearing that she performs about four

hours of cleaning at a private home twice a month for $400 and she breaks it up into two days. (T. 34, 50-51.) Plaintiff reported to Dr. Slowik in April 2015 that she experienced pain when showering, but continued to participate in that task; struggled with cooking because of pain when standing for extended periods of time and she generally got pre-made foods; she was generally not cleaning as much due to pain and her boyfriend did the laundry because she could not walk down the stairs where her laundry machine was located; she needed assistance from her boyfriend in the grocery store due to her pain; she managed her own money; she could drive but chose not to due to fatigue and periods of cognitive confusion; and she spent her days reading self-help books. (T. 488.) Plaintiff reported to Dr. Figueroa in April 2015 that she did not do any cooking, cleaning or laundry because her hands hurt and she could not go downstairs to do laundry; she shopped once a week; she showered twice a week because her arms hurt to wash her head; she dressed every day; and she watched television and listened to the radio. (T. 493.) The ALJ noted between her testimony at the hearing and her reports to Dr. Slowik, Plaintiff indicated she performed her own self-care tasks, prepared simple meals, did some cleaning and shopping, drove, managed her finances, read self-help books, and worked part-time. (T. 18, 34, 38, 48-51, 488.) The Court's review of the record indicates the ALJ generally summarized Plaintiff's reported activities and part-time work doing "light cleaning" accurately and reasonably relied on these activities, in part, in determining Plaintiff's supported limitations and finding she could perform sedentary, simple work. (T. 17-18.)

**\*9** Additionally, although Plaintiff argues the ALJ found "absolutely no diminishment" in her ability to work consistently, either from psychiatric or physical conditions, the Court is not persuaded. (T. 15.) It is clear the ALJ found at least some diminishment in Plaintiff's ability to work consistently because he limited her to simple work and found she could maintain attention and concentration for only simple tasks. (T. 15.) Further, as indicated above, the ALJ indicated why he gave little weight to the limitations opined by Dr. Stuppel, only some weight to Dr. Slowik's opinion, and greater weight to Dr. Bhutwala's determination that Plaintiff retained the mental RFC for simple work. (T. 17-18.) The ALJ reasonably explained greater limitations were not supported by the record and also did not need to discuss the frequency of a sit/stand option where he did not find such a limitation to be supported by the evidence of record. (*Id.*)

Plaintiff further contends the ALJ did not cite any medical opinion stating Plaintiff does not need to change positions

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 244 of 356

2020 WL 1304076

every 30 minutes, would not be off-task 33 percent or more of the time, and/or would not be absent four or more days per month. (Dkt. No. 9 at 15-16.) However, the Court notes the ALJ afforded some weight to Dr. Figueroa's opinion in determining Plaintiff's RFC and her opinion does not support Plaintiff's alleged need to change position every 30 minutes. (T. 17, 492-96.) The ALJ similarly afforded greater weight to Dr. Bhutwala's opinion, which is contrary to limitations including time off-task of 33 percent or more or four or more absences per month. (T. 18, 64-66.) Plaintiff maintains Dr. Bhutwala's opinion is not a contrary opinion to support the decision not to include any limitations to maintaining regular attendance because he found a moderate impairment in maintaining a regular schedule. (*Id.* at 21.) However, the Court finds Dr. Bhutwala's opinion is a contrary opinion on which the ALJ properly relied because it indicated Plaintiff retained the mental RFC for simple work despite opining moderate limitations in the ability to maintain a regular schedule, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (T. 18, 66.)

Plaintiff also argues that the ALJ requires too much of Dr. Stuppel's opinion by requiring citations or explanation on the questionnaire itself and that the treating source statement being a "checkbox form" is not a good reason for discounting his opinions. (Dkt. No. 9 at 17-19.) Plaintiff contends the ALJ does not hold Dr. Bhutwala's opinion to the same standard, affording it greater weight even though it does not provide supporting explanation or citations. (*Id.* at 20-21.) However, as discussed above, the ALJ provided another sufficient reason for rejecting Dr. Stuppel's opinion in reasonably finding that it was not supported by the record. (T. 17.) Further, Dr. Bhutwala's assessment does include additional explanation. (T. 66.) Rather than simply rejecting the only medical evidence he cited as Plaintiff contends, Dr. Bhutwala's additional explanation indicates Plaintiff's alleged severity of her impairment was not fully supported by the evidence in the file and she "presented as more impaired at the consultative examination." (Dkt. No. 9 at 21; T. 66.) Dr. Bhutwala also concluded that there was "a lack of internal consistency between" Plaintiff's presentation at the consultative examination and what was indicated through the objective evidence. (T. 66.) The ALJ appears to have reasonably reached the same conclusion after considering all the evidence of record. (T. 15-18.)

For the reasons above, the Court finds the ALJ's analysis of Plaintiff's RFC, including her mental and physical limitations, and the medical opinions is supported by substantial evidence. Remand is therefore not required on these bases.

**A.** The ALJ's Step Five Determination

### 1. Applicable Law

**\*10** The burden shifts to the Commissioner at Step Five " 'to show there is other work that [the claimant] can perform.' " *McIntyre,* 758 F.3d at 150 (quoting *Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 445 (2d Cir. 2012)). "If a claimant has non-exertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir. 1986)). "However, the 'mere existence of a non-exertional impairment does not automatically ... preclude reliance on the [Medical-Vocational] guidelines.' " *Zabala,* 595 F.3d at 410-11 (quoting *Bapp,* 802 F.2d at 603). "A non-exertional impairment 'significantly limits a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.' " *Zabala,* 595 F.3d at 410-11 (quoting *Bapp,* 802 F.2d at 605-06).

### 2. Analysis

At Step Five, the ALJ found there were jobs existing in significant numbers that Plaintiff could have performed through the date last insured. (T. 19.) Specifically, the ALJ indicated Plaintiff's limitations did not preclude her from performing all the basic mental requirements of unskilled work on a sustained basis and a finding of "not disabled" was appropriate under SSR 85-15 and the framework of Medical-Vocational Rule 201.21. (*Id.*) Plaintiff contends the Step Five determination is not supported by substantial evidence because the ALJ failed to consult with a vocational expert despite significant non-exertional impairments including the need for a frequent sit-stand option, limitations to bending, and limitations to work pace and attendance. (Dkt. No. 9 at 22-23.)

Rachael V. v. Comm'r of Soc. Sec., Not Reported in Fed. Supp. (2020)

2020 WL 1304076

As Defendant argues, "[a]lthough the [Medical-Vocational Guidelines ("Grids")] direct findings based on physical limitations, if the claimant can perform the full range of unskilled sedentary work, as in the instant case, the ALJ may rely on the [G]rids." (Dkt. No. 10 at 7; citing 20 C.F.R. Pt. 404, Subpt. P., App'x 2 § 201.00(a); *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009); SSR 96-9p, 1996 WL 374185, at *9; SSR 85-15.) Indeed, the ALJ's finding that Plaintiff had non-exertional limitations did not automatically bar him from relying on the Medical-Vocational Guidelines. *Zabala*, 595 F.3d at 410-11 (quoting *Bapp*, 802 F.2d at 603). Plaintiff has not established further alleged limitations including the need for a frequent sit-stand option, limitations to bending, and limitations to work pace and attendance. For the reasons stated above, the Court finds the ALJ's RFC determination is supported by substantial evidence. The Court similarly finds the ALJ's Step Five determination is supported by substantial evidence and remand is therefore not required on this basis.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is **DENIED** in part; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 10) is **GRANTED**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff disability benefits is **AFFIRMED**, and it is further

**ORDERED** that Plaintiff's Complaint is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1304076

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Williams v. Colvin, Not Reported in Fed. Supp. (2017)

2017 WL 3404759

2017 WL 3404759
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Dion WILLIAMS, Plaintiff,

v.

Carolyn W. COLVIN, Commissioner
of Social Security, Defendant.

14-CV-947S
|
Filed 08/09/2017
|
Signed 08/07/2017

**Attorneys and Law Firms**

Melissa Pezzino, Williamsville, NY, for Plaintiff.

Jason Parkerson Peck, Social Security Administration Office
of General Counsel, New York, NY, for Defendant.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, United States District Judge

**\*1** 1. Plaintiff Dion Williams challenges Administrative
Law Judge Donald T. McDougall's ("ALJ") determination
that he is not disabled within the meaning of the Social
Security Act and therefore not entitled to disabled widower's
benefits ("DWB") or disability insurance benefits ("DIB").
Plaintiff alleges that he has been disabled since his alleged
onset date of February 14, 2003, due to his diagnoses of
cervical and lumbosacral strain (Tr. at 232 [1]); depressive
disorder, NOS, and anxiety disorder, NOS (Tr. at 329); post-
traumatic stress disorder ("PTSD"), chronic (Tr. 260, 323,
447); partial tear of the left shoulder rotator cuff (Tr. at
732); C4 through C7 disc bulge; L4 through L5 foraminal
stenosis (Tr. 467, 1092); and greater occipital neuralgia,
muscle spasm, and lumbar facet arthropathy (Tr. at 1277).

[1]     Transcript references (Tr. at ___) are to the
transcript of the administrative record.

2. Plaintiff protectively filed an application for DWB and
DIB on September 14, 2011, which was denied on January
19, 2012. (Tr. at 171, 100.) Plaintiff thereafter requested
an administrative hearing. On March 22, 2013, the ALJ

conducted an administrative hearing, at which Plaintiff
testified. (Tr. at 43.) The ALJ subsequently denied Plaintiff's
claim on June 13, 2013. (Tr. at 41-89, 12-40.) On July 13,
2013, Plaintiff requested review of the hearing decision,
which the Appeals Council later denied on September 22,
2014. (Tr. at 1-5.)

3. Plaintiff filed this action on November 10, 2014. (Docket
No. 1.) On July 6, 2015, Plaintiff filed a Motion for Judgment
on the Pleadings. (Docket No. 6.) On September 2, 2015,
Defendant likewise filed a Motion for Judgment on the
Pleadings. (Docket No. 8.) After full briefing, this Court
reserved decision without oral argument.

4. A court reviewing a denial of disability benefits may not
determine *de novo* whether an individual is disabled. See 42
U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health &
Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather,
this Court may reverse a Commissioner's determination only
if it is not supported by substantial evidence or is based
upon legal error. Balsamo v. Chater, 142 F.3d 75, 79 (2d
Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467
(2d Cir. 1982)). Substantial evidence is that which amounts
to "more than a mere scintilla," which the Supreme Court
defines as "such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion." Richardson v.
Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L.Ed.
2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB,
305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126 (1938)).
Where evidence is deemed susceptible to more than one
rational interpretation, the Commissioner's conclusion must
be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d
Cir. 1982).

5. "To determine on appeal whether the ALJ's findings
are supported by substantial evidence, a reviewing court
considers the whole record, examining the evidence from
both sides ... includ[ing] that which detracts from its weight."
Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258
(2d Cir. 1988). This Court must sustain the Commissioner's
finding if supported by substantial evidence "even where
substantial evidence may support the plaintiff's position and
despite that the court's independent analysis of the evidence
may differ from the [Commissioner's]." Rosado v. Sullivan,
805 F. Supp. 147, 153 (S.D.N.Y. 1992). This Court must give
the Commissioner's determination considerable deference
and will not substitute "its own judgment for that of the
[Commissioner], even if it might justifiably have reached a

Williams v. Colvin, Not Reported in Fed. Supp. (2017)

2017 WL 3404759

different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

**\*2** 6. The Commissioner must use a five-step analysis to determine whether an individual is disabled as defined under the Act. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L.Ed. 2d 119 (1987). This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d at 467 (per curiam) (quotations in original); see also 20 C.F.R. § 404.1520; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

7. The claimant has the burden to prove the first four steps and the Commissioner has the burden to prove the fifth step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). In the fifth step, the Commissioner must first assess the claimant's job qualifications by considering his physical ability, age, education, and work experience, then determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L.Ed. 2d 66 (1983).

8. In this case, the ALJ made the following findings regarding the five steps: (1) Plaintiff did not engage in substantial gainful activity since February 14, 2003; (2) Plaintiff's full thickness left rotator cuff lesion, status post-surgery; lumbar facet arthroplasty; disc bulges in the cervical spine; PTSD; and depressive disorder were severe impairments; (3) Plaintiff's impairments did not meet or equal the severity of any listed impairments; (4) Plaintiff is unable to perform his past relevant work; and (5) Plaintiff could perform other jobs in the economy based on his age, education, work experience, and residual functional capacity. (Tr. at 17, 18, 31, 32.)

9. Plaintiff claims that the ALJ misapplied the treating-physician rule when he afforded Plaintiff's four treating physicians—Dr. Alfonso Tan, Dr. Pamela Hughes, Dr. Michael Grant, and Dr. Anthony Morgante—less than controlling or great weight. Defendant argues that the ALJ properly considered all of the medical evidence, including Plaintiff's treating physicians' opinions.

**\*3** 10. Plaintiff first claims that the ALJ erred when he afforded Dr. Tan less than controlling or great weight. Dr. Tan is a specialist in psychiatry, saw Plaintiff monthly, and provided psychiatric evaluations for Plaintiff as his treating physician. (Tr. at 407-08, 441, 1268-1892.) Dr. Tan diagnosed Plaintiff with PTSD, depressive disorder NOS, bipolar disorder, dysthymia, and noted that he feared heights. (Tr. at 393, 408, 444.) Between 2010 and 2013, Dr. Tan noted that Plaintiff's Global Assessment of Functioning ("GAF") scores ranged from 55 to 75, most commonly falling at 65. (Tr. at 390-405.) Dr. Tan stated that Plaintiff is permanently disabled since 2003. (Tr. 445.) The ALJ considered and discussed Dr. Tan's opinion, but afforded it little weight because it was inconsistent with Dr. Tan's own office notes and Plaintiff's GAF scores. (Tr. at 30.)

11. The treating-physician rule requires that an ALJ give the medical opinion of a claimant's treating physician "controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see 20 C.F.R. § 404.1527(c)(2). The "less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999). The ALJ must give "good reasons" for giving a treating physician's medical opinion less than controlling weight, and failure to do so is a ground for remand. See 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004). When the ALJ does not give a treating physician's medical opinion controlling weight, he must explain how he weighed the factors in 20 C.F.R. § 404.1527(c). Reyes v. Barnhart, 226 F. Supp. 2d 523, 529 (S.D.N.Y. 2002).

12. "In evaluating opinion evidence, an ALJ may properly consider, among other information, whether a treating source's opinion is consistent with the GAF scores assessed by that treating source." Garcia v. Colvin, No. 13-CV-6433P, 2015 WL 1280620, at *7 (W.D.N.Y. Mar. 20, 2015); see, e.g., Thomas v. Astrue, No. 08 Civ. 8444(PGG), 2010 WL 1388997, *13 (S.D.N.Y. 2010). An ALJ may not rely on any test score alone in making a decision on the extent of a claimant's limitation. Camille v. Colvin, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015), aff'd, 652 Fed.Appx. 25 (2d Cir. 2016).

13. Plaintiff argues that the ALJ should have given Dr. Tan's opinion controlling weight because he was Plaintiff's treating physician. Alternatively, Plaintiff argues that the ALJ should have given Dr. Tan's opinion great weight under the factors in 20 C.F.R. § 404.1527, because he had a treatment relationship with Plaintiff, saw Plaintiff monthly, his opinion is consistent with the record and other providers' opinions, and he is a specialist in psychiatry. (Tr. at 441, 1268-1892.) Plaintiff further argues that Dr. Tan's opinion is consistent with the record, in part because GAF scores are not useful in assessing his residual functional capacity ("RFC") and are no longer used by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. See Corporan v. Comm'r of Soc. Sec., No. C10–5103, 2011 WL 321832, at *22 n. 9 (S.D.N.Y. Jan. 23, 2015).

14. In response, Defendant argues that the ALJ reasonably gave Dr. Tan's opinion less than controlling weight, because Dr. Tan's notes were inconsistent with his opinion. Defendant further argues that Dr. Tan's GAF findings indicated at worst, mild limitations, which is inconsistent with his determination that Plaintiff had significant limitations and was unable to work. (Tr. at 30.)

15. In this Court's view, substantial evidence supports the ALJ's decision to give Dr. Tan's opinion little weight. On February 15, 2013, Dr. Tan concluded that Plaintiff had been permanently disabled since 2003, and was unable to work because he had anxiety related to heights. (Tr. at 394, 445.) Dr. Tan also concluded that Plaintiff was seriously limited in his ability to travel to new places, use public transportation, complete a normal work schedule without interruption, perform at a consistent pace, and interact with coworkers and supervisors. (Tr. at 443-45.)

**\*4** 16. But after Dr. Tan diagnosed Plaintiff with PTSD, depressive disorder NOS, and bipolar disorder on February 25, 2010, his office notes from 2011 to 2012 reflect that Plaintiff's mood was "getting better," that he was "doing better," and that he was "keeping [him]self busy." (Tr. at 391, 403, 405.) Dr. Tan's objective evaluation indicated that Plaintiff's affect was appropriate; his speech was normal; his thought process was organized; his memory, concentration, and attention were good; his orientation was alert; and his judgment and insight were good. (Tr. at 390-405, 438-39.) These findings remained unchanged throughout Plaintiff's appointments, except for Plaintiff's mood, which Dr. Tan rated as euthymic 11 times, depressed six times, and elevated once. (Id.) Plaintiff's GAF scores ranged from 55 to 75, indicating some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. (Tr. at 390-405, 438-39); see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text revision 2000). Here, the ALJ did not err when he considered Plaintiff's GAF scores, because he considered the whole of Dr. Tan's office notes, not just Plaintiff's GAF scores, in finding that Dr. Tan's opinions were inconsistent with and unsupported by his treatment notes. (Tr. at 28.) Dr. Tan's subjective comments, objective evaluations, and assessment of Plaintiff's GAF scores are all inconsistent with his opinion that Plaintiff is permanently disabled and unable to work. The ALJ's decision to discount Dr. Tan's opinion is therefore supported by substantial evidence in the record.

17. Plaintiff's second claim is that the ALJ erred when he afforded Dr. Hughes less than controlling or great weight. Dr. Hughes is a specialist in psychology, saw Plaintiff weekly or

biweekly for six months, and provided therapy for Plaintiff as his treating physician. (Tr. at 447, 450.) Dr. Hughes diagnosed Plaintiff with major depressive disorder, assessed Plaintiff's GAF score at 50, indicated Plaintiff had fear associated with heights, and opined that Plaintiff was unable to meet standards of work. (Tr. 452.) The ALJ gave Dr. Hughes' opinion little weight because her opinion did not correlate with the specific problems she identified and was inconsistent with Dr. Tan's office notes. (Tr. at 28-29, 30.)

18. Plaintiff argues that the ALJ should have given Dr. Hughes' opinion controlling weight because Dr. Hughes was Plaintiff's treating physician. Alternatively, Plaintiff argues that the ALJ should have given Dr. Hughes' opinion great weight under the factors in 20 C.F.R. § 404.1527 because she had a treatment relationship with Plaintiff, saw Plaintiff weekly or biweekly for six months, her opinion is consistent with the record and other providers' opinions, and she is a specialist in psychology. (Tr. at 447, 448.) Plaintiff further argues that Plaintiff's GAF scores reported by Dr. Tan are not inconsistent with Dr. Hughes' opinion because GAF scores are not useful in assessing his RFC.

19. In response, Defendant argues that the ALJ reasonably afforded Dr. Hughes' opinion less than controlling weight because her opinion is inconsistent with her office notes and with Dr. Tan's office notes. Defendant argues that Dr. Hughes' opinion that Plaintiff had significant limitations and was unable to work was inconsistent with her office notes because they indicated most of Plaintiff's problems involved anxiety surrounding heights. (Tr. at 30, 447-48, 450-54.) Defendant further argues that Dr. Hughes' opinion was also inconsistent with Dr. Tan's assignment of GAF scores that indicated, at worst, only mild limitations. (Tr. at 30.)

20. In this Court's view, substantial evidence supports the ALJ's decision to give Dr. Hughes' opinion little weight. Dr. Hughes opined that Plaintiff is unable to meet competitive standards in his ability to understand and remember short and simple instructions; maintain attention for two-hour segments; maintain attendance; be punctual; complete a normal workday or workweek without interruptions from symptoms; perform at a consistent pace; and interact with co-workers. (Tr. at 452-53.) She opined that Plaintiff is seriously limited in his ability to accept instructions and respond appropriately to criticism. (Tr. at 453.) But when Dr. Hughes described the effects of Plaintiff's PTSD symptoms, she specified only that Plaintiff was limited in his ability to cross bridges, ride elevators, fly, and climb ladders

more than five steps. (Tr. at 448.) Moreover, Dr. Hughes' opinion is inconsistent with Dr. Tan's opinion, which indicates that Plaintiff was "doing better," and showing good or appropriate functioning. (Tr. at 390-405, 438-39.) Dr. Tan also indicated that Plaintiff's aptitude for unskilled work was most commonly "limited but satisfactory" in a Mental Residual Functional Capacity Questionnaire ("MRFCQ") on February 15, 2013, unlike Dr. Hughes' MRFCQ on February 27, 2013, which indicates that Plaintiff was mostly "unable to meet competitive standards." (Tr. at 443-44, 453-54.) Thus, Dr. Hughes' description of Plaintiff's PTSD symptoms and Dr. Tan's office notes are both inconsistent with Dr. Hughes' opinion that Plaintiff is unable to meet standards of work. The ALJ's decision to discount Dr. Hughes' opinion on this basis is therefore supported by substantial evidence in the record.

**\*5** 21. Plaintiff's third claim is that the ALJ erred when he afforded Dr. Grant's opinion less than great weight. Dr. Grant is a specialist in orthopedic surgery who examined Plaintiff and saw him for four years. (Tr. 1283-1309.) Dr. Grant opined that Plaintiff was totally disabled from work. (Tr. 1283-1309.) The ALJ found that Dr. Grant's opinion is not supported by the EMG and nerve conduction tests noted in his records. (Tr. at 29.)

22. Whether a claimant is "disabled" or "unable to work" is an issue reserved to the Commissioner, not a medical source. 20 C.F.R. § 404.1527(d)(1). Although the ALJ must consider opinions from medical sources on issues reserved to the Commissioner and apply the factors in 20 C.F.R. § 404.1527(d), the ALJ is not required to give controlling weight or special significance to these opinions. 20 C.F.R. § 404.1527(d)(2); Snell, 177 F.3d at 133; SSR 96-5P, 1996 WL 374183 at \*2, \*3 (July 2, 1996).

23. Plaintiff argues that the ALJ should have given Dr. Grant's opinion great, although not controlling, weight under the factors in 20 C.F.R. § 404.1527, because he was Plaintiff's treating physician, saw Plaintiff for four years, his opinion is consistent with the record and other providers' opinions, and he is a specialist in orthopedic surgery. (Tr. at 1283-1309.) Plaintiff further argues that the ALJ erred when he did not state what weight he afforded Dr. Grant's opinion and did not apply the factors in 20 C.F.R. § 404.1527. Defendant argues that the ALJ reasonably afforded Dr. Grant's opinion less than controlling weight because a treating physician's opinion concerning Plaintiff's disabled status is an issue reserved for the Commissioner, so it is not entitled to controlling weight or special significance.

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 250 of 356

24. In this Court's view, substantial evidence supports the ALJ's decision to give Dr. Grant's opinion less than controlling or great weight. The ALJ considered Dr. Grant's opinion, but found that his "dire opinion is not supported by the findings noted." (Tr. at 29.) In particular, the ALJ noted the inconsistency in Dr. Grant's opinion that Plaintiff was totally disabled and his report indicating "normal EMG and nerve conduction tests and relatively mild limitations in the left shoulder." (Tr. at 29.) Given this inconsistency, substantial evidence in the record supports the ALJ's decision to discount Dr. Grant's opinion.

25. Plaintiff's fourth claim is that the ALJ erred when he afforded Dr. Morgante relatively little weight. Dr. Morgante is Plaintiff's chiropractor, who saw Plaintiff twice in 2011 and twice in 2013. (Tr. 430, 432) Dr. Morgante noted that Plaintiff had pain in the neck, head, mid-back, low back, left leg, and left shoulder. (Tr. at 432.) He opined that Plaintiff was incapable of low-stress jobs; had limited ability to move, sit, stand, carry, or reach; and would miss more than four days of work per month. (Tr. 432-35.) Dr. Morgante further opined that Plaintiff was unable to perform competitive, full-time employment. (Tr. 30, 432-36.) The ALJ gave "relatively little weight" to Dr. Morgante because his opinion was not consistent with the objective evidence of record and because chiropractors are not considered acceptable medical sources. (Tr. at 30.)

26. Chiropractors are not "acceptable medical sources," thus their opinions are not entitled to any special weight. 20 C.F.R. § 404.1513. Rather, they are considered "other medical sources," and an ALJ may consider their opinion of the severity of the claimant's impairment and ability to work. Knight v. Astrue, 32 F. Supp. 3d 210, 221 (N.D.N.Y. 2012); see 20 C.F.R. § 404.1513. An ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion based on all the evidence before him, but is not required to give the chiropractor controlling weight. Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). But a chiropractor's opinion should not be lightly dismissed where it is "completely consistent" with the opinions of other treating physicians. Ilarda v. Chater, No. CIV.A. CV-95-2180 DG, 1996 WL 389366, at *12 (E.D.N.Y. July 8, 1996).

*6 27. Plaintiff argues that the ALJ should have given Dr. Morgante's opinion great weight because it is supported by objective evidence, such as Plaintiff's MRI and EMG in 2003. Plaintiff further argues that although Dr. Morgante is not

an acceptable medical source, the ALJ should consider his opinion to evaluate the severity of Plaintiff's impairments and how they affect his ability to work. Plaintiff also argues that the ALJ cannot reject Dr. Morgante's opinion outright solely because he is a chiropractor. See Losquadro v. Astrue, No. 11–CV–1798 (JFB), 2012 WL 4342069, at *1 (E.D.N.Y. Sept. 21, 2012). Defendant argues that the ALJ correctly rejected Dr. Morgante's statements and medical assessments because they are contrary to the record and chiropractors' opinions are not entitled to deference.

28. In this Court's view, substantial evidence supports the ALJ's decision to give relatively little weight to Dr. Morgante's opinion. On February 12, 2013, Dr. Morgante opined that Plaintiff was unable to perform any competitive employment on a full-time basis (even in a low-stress job) because of his limitations: he could only walk one half block; sit or stand five minutes at one time; sit, stand, or walk less than two hours in an 8-hour day. (Tr. at 30, 433-434.) Dr. Morgante further found that, Plaintiff was unable to look down (sustained flexion) or hold his head in a static position. (Tr. at 434-35.) Dr. Morgante therefore opined that Plaintiff could occasionally turn his head or look up; rarely stoop or climb stairs; and could never twist or climb ladders. (Tr. at 435.) Yet just months earlier, on June 8, 2012, Dr. Joshua Usen, Plaintiff's osteopathic doctor, noted that Plaintiff had full range of motion in his neck and head, (Tr. at 385.) and Dr. Samuel Balderman, a consultative physician who examined Plaintiff on January 5, 2012, noted full flexion, extension, and rotary movement of the cervical spine. (Tr. at 332.) Dr. Balderman also opined that Plaintiff had only a mild limitation bending and lifting due to pain. (Tr. 332.)

29. Dr. Morgante's opinions were thus inconsistent with medical evidence in the record, and the ALJ did not discount them solely because Dr. Morgante is a chiropractor. Rather, the ALJ considered Dr. Morgante's opinion and simply determined that it was inconsistent with portions of the objective evidence of record. (Tr. at 29-30.) Substantial evidence therefore supports the ALJ's decision to discount Dr. Morgante's opinion.

30. Plaintiff's fifth claim is that the ALJ erred when he discounted Dr. Tracy's opinion based on Plaintiff's description of his ability to perform activities of daily living. Dr. Tracy is a pain-treatment specialist, saw Plaintiff from August 2006 through July 2007, and provided him pain evaluations and treatment plans. (Tr. at 1272.) Dr. Tracy noted locations of Plaintiff's pain and tenderness; commented on Plaintiff's

Williams v. Colvin, Not Reported in Fed. Supp. (2017)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 251 of 356

2017 WL 3404759

range of motion; opined that Plaintiff was unable to return to past work; and opined that Plaintiff had temporary marked disability for other work. (Tr. at 1256-73.) The ALJ determined that Plaintiff's descriptions of having a moderate functional capacity to complete all household tasks without difficulty contradicted Dr. Tracy's opinion. (Tr. at 31.)

31. The ability to perform basic self-care activities "do[es] not by [itself] contradict allegations of disability." McGregor v. Astrue, 993 F. Supp. 2d 130, 142 (N.D.N.Y. 2012) (quoting Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)). An ALJ's decision will be remanded if the ALJ relies on the plaintiff's performance of basic activities in his home to discount a treating physician's opinion, without explaining the reasons for doing so. Miller v. Colvin, 122 F. Supp. 3d 23, 28, 29-30 (W.D.N.Y. 2015). But an ALJ may consider Plaintiff's daily activities, symptoms, and objective medical evidence together to determine whether a treating physician is credible. Kirkham v. Comm'r of Soc. Sec., No. 6:14-CV-0711 GTS, 2015 WL 3504889, at *9 (N.D.N.Y. June 3, 2015).

*7 32. Plaintiff argues that his ability to perform activities of daily living does not contradict Dr. Tracy's opinion, because the ability to perform basic activities of daily living and house repair work is not indicative of an ability to complete a normal workday or workweek. Plaintiff further argues that the ALJ's decision should be remanded so that his activities of daily living can be properly considered. Defendant argues that the ALJ reasonably found that Plaintiff's admissions to a moderate functional capability to include performing all household tasks without difficulty contradicts Dr. Tracy's opinion that Plaintiff has a marked temporary disability.

33. In this Court's view, substantial evidence supports the ALJ's decision to discount Dr. Tracy's opinion. The ALJ considered Plaintiff's admissions of his daily activities, Dr. Tracy's notes of Plaintiff's symptoms, and the objective medical evidence of record. (Tr. 30-31.) Additionally, the ALJ concluded that Plaintiff's description of his daily activities contradicted Dr. Tracy's opinion of a marked temporary disability after he noted that Dr. Tracy "did not give any specific limitations" of Plaintiff's disability. (Tr. at 29, 31.) Thus, while the ALJ considered Plaintiff's ability to perform basic activities when he determined that it contradicted Dr. Tracy's opinion, he also considered Plaintiff's symptoms and the objective medical record. The ALJ's decision to discount Dr. Tracy's opinion is therefore supported by substantial evidence in the record.

34. Plaintiff's sixth claim is that the ALJ erred when he afforded significant weight to consultative physicians—Dr. Lynch, Dr. Balderman, Dr. Ferrick, and Dr. Santarpia—instead of giving controlling or great weight to Plaintiff's treating physicians. Dr. Lynch was a consultative examiner who examined Plaintiff on September 19, 2005, and opined that he had a mild to moderate mental impairment. (Tr. at 249, 261.) Dr. Balderman performed a consultative medical examination on Plaintiff on January 5, 2012, and noted well-developed muscles and full range of motion in the upper left extremity and symptom magnification. (Tr. at 332.) Dr. Ferrick performed an independent medical examination for worker's compensation for Plaintiff on June 19, 2006, and noted symptom magnification and that Plaintiff's pain was out of proportion with his MRI findings. (Tr. at 1098, 1100.) Dr. Santarpia performed a consultative psychiatric evaluation of Plaintiff on January 5, 2012, and diagnosed depressive disorder, NOS; anxiety disorder, NOS, mild impairment; and opined that the diagnoses were not sufficient to interfere with Plaintiff's ability to function on a daily basis. (Tr. at 326, 329.)

35. The ALJ gave Dr. Lynch some weight, because his opinion seemed consistent with the other credible mental evidence. (Tr. at 30.) The ALJ gave significant weight to Dr. Balderman, because his opinion was consistent with his examination and largely consistent with other evidence of record. (Id.) And the ALJ stated that Dr. Ferrick's findings "called into question other examination findings." (Id.) The ALJ gave some weight to Dr. Santarpia, because testimony and other evidence demonstrated that Plaintiff had more significant limitations in social functioning and concentration than what she indicated in her evaluation. (Id.)

36. The Second Circuit has cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013); see Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990). But treating physicians' opinions are not afforded controlling weight where the opinions are not consistent with other substantial evidence in the record, in which case the opinions of consultative examiners may constitute substantial evidence. Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citing Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981)); Petrie v. Astrue, 412 Fed.Appx. 401, 405 (2d Cir. 2011); Cabrero-Gonzalez v. Colvin, No. 13-CV-6184-FPG, 2014 WL 7359027, at *20 (W.D.N.Y. Dec. 23, 2014). Consultative physicians' opinions are "a valid basis for rejecting a treating physician's opinion" where they are part of other substantial

Williams v. Colvin, Not Reported in Fed. Supp. (2017)

2017 WL 3404759

evidence that is inconsistent with the treating physician's opinion. Giles v. Colvin, No. 1:14-CV-00684 (MAT), 2017 WL 2533191, at *3 (W.D.N.Y. June 12, 2017).

**\*8** 37. Plaintiff argues that Dr. Lynch, Dr. Balderman, Dr. Ferrick, and Dr. Santarpia should be given little weight because they are not treating providers and are consultative examiners who each saw Plaintiff only once. (Tr. at 1077-90, 330-34, 1097-1106, 326-29.) Defendant counters that the ALJ properly considered their opinions, particularly because they were largely consistent with the record evidence.

38. In this Court's view, substantial evidence supports the ALJ's consideration of the consulting physicians' opinions because they were consistent with other opinions in the medical record. Dr. Lynch's opinion that Plaintiff had a mild to moderate mental impairment is consistent with Dr. Tan's GAF scores and objective evaluations. (Tr. at 390-405, 438-39.) Dr. Balderman's opinion that Plaintiff had only mild limitations in bending, lifting, and in the left shoulder (Tr. 332) is consistent with Dr. Usen's assessment of normal spine movement, normal gait, (Tr. at 29, 385, 359) and the light to moderate functional capacity Plaintiff described to Dr. Tracy. (Tr. at 1256-65.) Dr. Balderman's opinion that Plaintiff was magnifying symptoms and had a muscular left extremity (Tr. at 332-33) was consistent with Dr. Ferrick's opinion that Plaintiff was magnifying symptoms (Tr. at 1100, 1104) as well as with Dr. Patterson's opinion of excellent rotator cuff strength (Tr. at 762) and Dr. Usen's opinion of normal strength and tone in the left upper extremity (Tr. at 359), the ALJ did not evaluate Dr. Ferrick's opinion apart from considering that Dr. Ferrick's opinion was consistent with Dr. Balderman's. The ALJ only afforded Dr. Santarpia's opinion some weight, because although Dr. Santarpia believed that Plaintiff's impairments were not sufficient to interfere with his ability to function on a daily basis, the ALJ found that Dr. Santarpia's assessment was inconsistent with the greater limitations found in the medical record, such as Dr. Lynch's opinion and Dr. Tan's GAF scores and objective evaluations. (Tr. at 261, 390-405, 438-39.) The ALJ's decision to afford the opinions of Dr. Lynch, Dr. Baldman, and Dr. Santarpia

this respective weight is therefore supported by substantial evidence in the medical record.

39. The treating-physician rule requires that an ALJ give the medical opinion of a claimant's treating physician "controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). Plaintiff's treating physicians' opinions are inconsistent with substantial record evidence such as their own office notes, Plaintiff's GAF scores, and Plaintiff's comments to Dr. Tracy. The ALJ's decision to discount and not give controlling weight to Plaintiff's treating physicians' opinions is therefore permissible under the governing law.

40. After carefully examining the administrative record, this Court finds that the ALJ's decision in this case is supported by substantial evidence, including the objective medical evidence and medical opinions rendered therefrom. In this Court's view, the ALJ thoroughly examined the record and afforded appropriate weight to all of the medical evidence in rendering his decision that Plaintiff is not disabled within the meaning of the Act. Finding no reversible error in the ALJ's decision, this Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same relief.

**\*9** IT HEREBY IS ORDERED, that Defendant's Motion for Judgment on the Pleadings (Docket No. 8-1) is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 6) is DENIED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3404759

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

2020 WL 2079432
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

MELANIE W., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:19-CV-724 (ATB)
|
Signed 04/30/2020

**Attorneys and Law Firms**

HOWARD D. OLINSKY, ESQ., for Plaintiff.

MICHAEL L. HENRY, Special Asst. U.S. Attorney for Defendant.

**MEMORANDUM-DECISION and ORDER**

ANDREW T. BAXTER, U.S. Magistrate Judge

*1 This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 7).

**I. PROCEDURAL HISTORY**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on March 2, 2017, and an application for Supplemental Security Income ("SSI") on March 16, 2017, each alleging disability beginning May 1, 2013. (Administrative Transcript ("T") 170-90, 204). Plaintiff's applications were denied initially on May 16, 2017. (T. 110-11). Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Jude B. Mulvey on January 22, 2019. (T. 40-76). At the hearing, plaintiff amended her onset date to November 22, 2016. (T. 46). The ALJ then heard testimony from plaintiff, as well as vocational expert ("VE") Esperanza Distefano. (T. 46-75). On February 5, 2019, the ALJ issued an order denying plaintiff's claims. (T. 19-39). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 25, 2019. (T. 1-4).

**II. GENERALLY APPLICABLE LAW**

**A. Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals

2020 WL 2079432

the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

**\*2** *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review
In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "– even more so than the 'clearly erroneous standard.' " *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not

substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot " 'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at \*6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS
Plaintiff was fifty-one years old on the date of the administrative hearing. (T. 46). She lived in a mobile home with her mother and two adult children. (T. 47). Plaintiff completed school through the ninth grade, and obtained a GED. (*Id.*). She had a driver's license, but did not drive long distances because it aggravated her back pain. (T. 48, 58-59). Prior to applying for disability, plaintiff worked as a cleaner, cashier, and child care provider. (T. 49-50).

Plaintiff testified that she could not work, primarily due to her back pain and the side effects of her medication. (T. 51). Plaintiff experienced pain in her back, shoulders, and legs. (T. 51-52). The medication she took for her symptoms caused her disorientation, fatigue, and memory deficits. (*Id.*). She slept three to four hours per night, and approximately four to five hours during the day. (T. 52). Her children took responsibility for household duties, including cooking and cleaning. (*Id.*). She did not like to leave the house, because the air aggravated her lungs. (T. 55-56). When plaintiff did go shopping, she brought one of her children with her. (T. 53). Plaintiff usually watched television during the day, and often fell asleep while doing so. (T. 52-53).

**\*3** Plaintiff's pain limited her from sitting in a chair for more than ten to fifteen minutes at a time. (T. 54). She could stand for approximately five minutes. (T. 54). Although she could lift an object weighing up to eight pounds, plaintiff could not carry it far. (*Id.*). Plaintiff also testified about her limitations in climbing stairs and reaching. (T. 54-55). When asked about her neck, plaintiff stated that she could turn her head and look down. (T. 56). Plaintiff used a cane, however it was not prescribed to her by a physician. (T. 58).

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 255 of 356

## IV. THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful activity ("SGA") since her disability onset date. (T. 24). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: adhesive capsulitis of the right shoulder, chronic obstructive pulmonary disease, degenerative disk disease, diabetes, a gastrointestinal impairment, and a mental impairment. (T. 25). At step three of the evaluation, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment. (T. 25-26).

At step four, the ALJ found that plaintiff had the RFC for light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she was limited to simple, routine and repetitive work, and should avoid concentrated exposure to irritants such as fumes, odors, dust, gases or poorly ventilated areas. (T. 27). She could only occasionally kneel, crouch, stoop, crawl, handle and finger; never climb ladders, ropes, or scaffolds; and frequently reach. (Id.).

Next, the ALJ found that plaintiff was unable to perform any past relevant work. (T. 32). However, at step five, using the Medical Vocational Guidelines as a "framework," and the VE's testimony, the ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T. 33). Thus, the ALJ found that plaintiff was not disabled. (Id.).

## V. ISSUES IN CONTENTION

Plaintiff raises two arguments:

1. The ALJ failed to properly analyze the opinion of Dr. Perla under the treating physician rule. (Plaintiff's Brief ("Pl.'s Br.") at 9-13) (Dkt. No. 9).

2. The ALJ failed to properly account for plaintiff's cervical spine limitations as opined by consultative examiner Dr. Lorensen. (Pl.'s Br. at 13-15).

The Commissioner contends that the ALJ's opinion analysis, and ultimate RFC determination, are supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 4-8) (Dkt. No. 10). For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

DISCUSSION

## VI. RFC/WEIGHT OF THE EVIDENCE/TREATING PHYSICIAN

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis...." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. Balles v. Astrue, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); Babcock v. Berryhill, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33 (2d Cir. 2013); Stephens v. Colvin, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

**\*4** In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. See Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); Kirah D. v. Berryhill, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. Roat v. Barnhart, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); Martone v. Apfel, 70 F. Supp. 2d at 150 (citing Ferraris v. Heckler, 728 F.2d 582, 588 (2d Cir. 1984)); LaPorta v. Bowen, 737 F. Supp. at 183, Stephens v. Colvin, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); Whittaker v. Comm'r of Soc. Sec., 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. Natashia R. v. Berryhill, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 256 of 356

2020 WL 2079432

### 2. Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record...." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Id.* It is impossible to conclude that the error is harmless unless a "searching review of the record ...

assures us that the substance of the treating physician rule was not traversed." *Id.*

### B. Application

#### 1. Dr. Perla's Medical Opinion

**\*5** Plaintiff first contends that the ALJ failed to properly weigh the opinion of plaintiff's cardiologist, Charles Perla, M.D. (Pl.'s Br. at 9-13). Specifically, plaintiff argues that the ALJ neglected to apply the treating physician rule in his evaluation of Dr. Perla's opinion, including the ALJ's obligation to provide "good reason" for affording it less-than-controlling weight. (*Id.*). The Commissioner contends that the ALJ's evaluation of Dr. Perla's medical opinion is supported by substantial evidence. (Def.'s Br. at 4-8).

On February 20, 2018, plaintiff re-commenced treatment at Cardiovascular Group of Syracuse ("CGS") with Dr. Perla. (T. 835). [1] Plaintiff presented to Dr. Perla with complaints of anginal symptoms occurring with exertion, "[i.e.] lifting, walking, and being in the cold weather." (*Id.*). Upon examination, plaintiff appeared healthy and well developed; she exhibited no signs of acute distress. (T. 838). Plaintiff walked with a normal gait and displayed good muscle tone and strength. (*Id.*). Her neurologic examination was unremarkable. (*Id.*). Dr. Perla's progress note also references plaintiff's normal electrocardiogram test results from 2017 and 2018. (*Id.*).

[1]  According to Dr. Perla's contemporaneous progress note, plaintiff was last seen at CGS in 2015, after which she began treating with a different cardiology practice. (T. 835).

Based on his cardiovascular evaluation of plaintiff, Dr. Perla ordered a coronary angiogram and recommended a potential cardiac revascularization. (T. 839-40). The procedure was performed on March 5, 2018 at St. Joseph's Hospital, by Matthew O'Hern, M.D. (T. 769-785). According to Dr. O'Hern, plaintiff was noncompliant with various post-operative directives at the hospital, immediately after the procedure. (T. 777).

Plaintiff returned to visit Dr. Perla for a follow-up evaluation on April 9, 2018. (T. 842). At that time, plaintiff denied chest pain, dyspnea, palpitations or syncope. (*Id.*). Dr. Perla noted that plaintiff "still continues to

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 257 of 356

smoke." (*Id.*). He also referenced plaintiff's "suboptimally controlled diabetes." (*Id.*). Upon physical examination, plaintiff appeared healthy, well developed, and in no acute distress. (T. 845). She walked with a normal gait, and exhibited good muscle strength and tone. (*Id.*). Her neurologic exam revealed "motor and sensory grossly intact and bilaterally equal." (*Id.*). Based on the results of his examination, Dr. Perla recommended that plaintiff continue with her current treatment regimen and return in four months for a follow-up visit. (T. 846).

Plaintiff returned to CGS on August 24, 2018, at which time she was seen by nurse practitioner ("NP") Michelle Depalmo. At that time, plaintiff denied chest pain, shortness of breath, palpitations, edema, and/or dizziness. (T. 847). She admitted that she continued to smoke cigarettes, and stated that she was unable to stop due to various stress factors in her life. (*Id.*). Plaintiff further reported that she had been experiencing right upper abdominal pain for the past six months, for which she was treating with a gastroenterologist. (*Id.*). Upon examination, plaintiff appeared healthy and well developed, but in obvious discomfort. (T. 850). Cardiovascular and musculoskeletal examinations revealed normal findings. (*Id.*). Plaintiff was observed to walk with a steady gait, and exhibited normal mood and affect. (*Id.*). NP Depalmo reported softness and moderate tenderness in plaintiff's right upper abdomen. (*Id.*). Plaintiff was instructed to return in four months to follow up with Dr. Perla. (T. 851). NP Depalmo also encouraged plaintiff to continue treatment for her abdominal pain. (*Id.*).

**\*6** On January 8, 2019, Dr. Perla prepared a Medical Source Statement ("MSS") on behalf of plaintiff. (T. 925-28). Among other things, Dr. Perla noted that gastrointestinal upset was a possible side effect of the Plavix he prescribed her. (T. 925). In rendering his opinion regarding plaintiff's functional limitations, Dr. Perla also noted that "patient sees an orthopedist for disc disease[.]" (T. 926). Nevertheless, Dr. Perla opined that plaintiff was limited to sitting for 20 minutes at a time, and for no more than four hours in an eight-hour workday. (*Id.*). He further opined that plaintiff was limited to standing for 15 minutes at a time, for less than two hours in an eight-hour work day. (*Id.*). Plaintiff could rarely twist, stoop/bend, crouch/squat, or climb stairs, and she could never climb ladders. (*Id.*). With respect to lifting and carrying, Dr. Perla opined that plaintiff could occasionally lift or carry up to ten pounds, could rarely lift or carry twenty pounds, and could never lift or carry fifty pounds. (*Id.*).

With respect to her cervical spine, Dr. Perla opined that plaintiff could frequently [2] perform the referenced postural activities, including looking down, turning her head right or left, looking up, and holding her head in a static position. (T. 927). He further opined that plaintiff could occasionally grasp and turn objects with her hands, perform fine manipulations with her fingers, and reach in all directions with her arms. (*Id.*). According to Dr. Perla, plaintiff's impairments would cause her to be off task more than 20% of the time during an eight-hour workday, and absent from work more than four days per month. (*Id.*).

[2]    According to the MSS, " 'frequently' means 34% to 66% of an 8-hour workday." (T. 926). However, the court notes that the MSS limits the writer's options to "never," "rarely," "occasionally," and "frequently." (*Id.*). In other words, there is no opportunity for the writer to mark that an individual is "unlimited" in the referenced function.

The ALJ specifically discussed Dr. Perla's opinion in his disability decision, giving it "partial weight." (T. 31). In his evaluation, the ALJ acknowledged that Dr. Perla is an acceptable medical source with specialized experience in cardiology. (T. 31). However, the ALJ also stated that Dr. Perla did not treat plaintiff for her non-cardiac impairments, nor did he provide specific clinical findings to support his conclusions. (*Id.*). The ALJ then cited to various inconsistencies between Dr. Perla's restrictive functional limitations and his reported findings upon physical examination. (*Id.*). The ALJ also noted inconsistencies between Dr. Perla's opinion and other medical evidence of record, as well as plaintiff's activities of daily living. (*Id.*). Last, the ALJ discredited Dr. Perla's conclusion regarding the frequency of plaintiff's time off-task and absenteeism. (*Id.*).

At the outset, Dr. Perla was not a treating physician whose opinion was entitled to controlling weight. According to the regulations, a treating physician is "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ongoing treatment relationship exists "when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* The Second Circuit has further clarified that an ALJ gives a treating physician controlling weight because

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

of the "continuity of treatment he provides and the doctor/patient relationship he develops[.]" *Weathers v. Colvin,* No. 3:15-CV-575 (FJS), 2017 WL 177649, at *5 (N.D.N.Y. Jan. 17, 2017) (citing *Mongeur v. Heckler,* 722 F.2d at 1039 n.2). Thus, "courts have consistently held that a physician who examines a patient 1–3 times during a limited period does not typically have the kind of relationship that qualifies as a treating physician relationship for the purposes of the social security regulations." *Pritchett v. Berryhill,* No. 17-CV-719, 2018 WL 3045096, at *5 (W.D.N.Y. June 20, 2018) (listing cases).

**\*7** The record reflects that Dr. Perla only examined plaintiff on two occasions during the alleged disability period – once for an initial examination, and again for a follow-up evaluation after a procedure performed by a different cardiologist. Although there is evidence that Dr. Perla may have had a past treating relationship with plaintiff, the administrative record does not include any progress notes by Dr. Perla that predate 2018. In any event, it is clear that plaintiff's prior treating relationship with Dr. Perla existed well before the disability onset date. Thus, despite the ALJ's passing reference to Dr. Perla as plaintiff's treating cardiologist, the treating physician rule was not implicated because Dr. Perla did not meet the requirements to be a treating physician. *See id.* at *6 ("Courts may conclude that a physician is not a treating source despite the fact that the ALJ "casually mentions" that he is a treating source.").

Despite the inapplicability of the treating physician rule, Dr. Perla is still an acceptable medical source and it was incumbent upon the ALJ to consider his opinion and determine what weight to assign it, using the applicable regulatory factors. *See* C.F.R. §§ 404.1527(c), 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."). Here, the ALJ provided sufficient analysis and reasoning for the partial weight attributed to Dr. Perla's opinion. In addition to considering Dr. Perla's specialization and treatment relationship with the plaintiff, the ALJ properly determined that Dr. Perla's restrictive exertional limitations were inconsistent with and unsupported by his own unremarkable findings upon physical examination. (T. 31). On the two occasions he examined plaintiff, Dr. Perla found that she walked with a normal gait, exhibited good muscle tone and strength, had unremarkable neurological findings, and otherwise exhibited no symptoms

of acute distress. (T. 838, 845). Dr. Perla did not specifically examine plaintiff's functional capacity to sit, stand, or walk, however his progress notes lack objective evidence that would support the restrictive exertional limitations contained in his medical opinion. The inconsistencies between Dr. Perla's treatment notes and his medical opinion were properly considered by the ALJ. *See Woodmancy v. Colvin,* 577 F. App'x 72, 75 (2d Cir. 2014) ("[T]he ALJ acted within her discretion in according the [medical] opinions little weight because record evidence of unremarkable clinical findings contradicted or failed to support the limitations conclusions in these opinions.").

Moreover, the ALJ properly considered the consistency, or lack thereof, between Dr. Perla's opinion and other substantial evidence in the record. The ALJ provided an extensive review of the medical evidence, thoroughly evaluating plaintiff's treatment history during the alleged period of disability. (T. 28-31). In doing so, the ALJ referenced imaging results showing mild degenerative disc disease of the cervical and lumbar spine, mild degenerative changes to the hips and left knee, and moderate, at most, degenerative changes to the right acromioclavicular joint. (T. 28). The ALJ acknowledged that some of plaintiff's physical examinations were positive for joint tenderness and reduced range of motion of the spine, shoulder, and knees. (T. 28). However, the ALJ determined that the totality of the evidence revealed plaintiff did not exhibit any "ongoing fatigue, distress, gait abnormalities, reduced range of motion of her joints, tenderness in her joints, [or] strength or sensation deficits. (*Id.*). Plaintiff's primary care provider often noted her "good" posture and ability to "stand[ ] comfortably erect and sit[ ] comfortably. (T. 610, 614, 619, 628, 634, 639, 959, 967, 974). Plaintiff testified that her use of a cane was a personal choice, and not prescribed by any health provider. The lack of its medical necessity was confirmed by consultative examiner Dr. Lorensen, who observed that plaintiff's gait was even and steady, even without the cane. (T. 530).

**\*8** It was, furthermore, within the ALJ's discretion to reject Dr. Perla's estimates of absenteeism and time off-task. The ALJ not only pointed out the lack of evidence supporting such extreme limitations, but also cited to plaintiff's "consistent lack of attention, concentration, or memory deficits during most examinations," as well as her ability to attend to regularly scheduled activities of daily living. (T. 31). *See O'Connor v. Comm'r of Soc. Sec.,* No. 5:11-CV-1425 (TJM), 2013 WL 1180963, at *5 (N.D.N.Y. Mar. 20, 2013) (ALJ properly rejected physician's opinion regarding plaintiff's

absenteeism rate of four days a month, despite some evidence to the contrary, where "objective medical evidence in the record provid[ed] substantial evidence to support the ALJ's finding that [the opinion] is speculative."); *Palmer v. Berryhill*, No. 17-CV-6260, 2018 WL 3537074, at \*5 (W.D.N.Y. July 23, 2018) (ALJ was entitled to discount nurse practitioner and physician's opinion that plaintiff would be off task more than 20% of an eight-hour workday and absent from work more than four days per month as speculative, and not based on any documented observation or evaluation, "because the SSA's regulations authorize [the ALJ] to discount an opinion that lacks support, particularly medical signs and laboratory findings, and is not well explained.").

For the reasons stated, the ALJ properly evaluated Dr. Perla's medical opinion and remand is not warranted on this basis.

### 2. Plaintiff's Cervical Spine Limitations

Plaintiff next argues that the ALJ failed to properly incorporate the cervical spine limitations opined by consultative examiner Elke Lorensen, M.D. into the modified RFC for light work. (Pl.'s Br. at 13-14). The Commissioner argues that the ALJ's RFC properly accounts for plaintiff's neck limitations. (Def.'s Br. at 8).

On April 27, 2017, Elke Lorensen, M.D. performed a consultative examination of plaintiff. (T. 528-32). Upon physical examination, Dr. Lorensen noted that plaintiff appeared in no acute distress, and walked with a gait that was slow but even, steady, and normal. (T. 530). Plaintiff's stance was normal, but she tended to hold on to the table when performing lumbar spine ranges of motion. (*Id.*). She needed no help changing for the exam or getting on and off the exam table. (*Id.*).Plaintiff exhibited full range of motion in her elbows, forearms, wrists and ankles. (T. 531). Dr. Lorensen observed less-than-full range of motion in plaintiff's cervical spine, lumbar spine, shoulders, hips and knees. (*Id.*). Dr. Lorensen further identified four positive trigger points for fibromyalgia. (T. 531). Plaintiff exhibited normal neurologic findings, with full strength in the upper and lower extremities. (*Id.*). She also exhibited intact hand and finger dexterity, and full grip strength in both hands. (*Id.*).

Based on her physical examination and review of plaintiff's shoulder and knee imaging, Dr. Lorensen opined that plaintiff had "no gross limitation for sitting, standing, walking, and handling small objects with the hands." (T. 532). She further

opined that plaintiff had moderate limitations for bending, lifting, reaching, and turning the head." (*Id.*). Last, she determined that plaintiff should avoid heights, operating machinery, smoke, dust, and other respiratory irritants. (*Id.*).

The ALJ explicitly considered Dr. Lorensen's medical opinion in his disability decision, giving it "partial weight." (T. 31). In evaluating Dr. Lorensen's opinion, the ALJ recognized her as an acceptable medical source who examined the plaintiff on one occasion. (*Id.*). The ALJ then went into a detailed assessment of the opinions by Dr. Lorensen that he found were supported by substantial evidence in the record. For example, Dr. Lorensen's conclusion that plaintiff had no limitations in standing, walking, and sitting was consistent with plaintiff's lack of difficulty with such exertions during the majority of her physical examinations, as well as her reported ability to exercise and shop. (*Id.*). The ALJ also found Dr. Lorensen's opined moderate limitations in lifting and bending to be consistent with plaintiff's history of degenerative disc disease, and testimony regarding her chronic pain. (*Id.*). Last, the ALJ found Dr. Lorensen's limitation regarding respiratory irritants to be consistent with plaintiff's history of chronic obstructive pulmonary disease. (*Id.*).

 **\*9** The ALJ also discussed the opinions by Dr. Lorensen that he determined lacked support in the overall record. Specifically, the ALJ determined that Dr. Lorensen's opinion plaintiff was moderately limited in reaching to be inconsistent with her lack of range of motion deficits involving her upper extremities during most examinations, as well as her most recent shoulder x-ray, which was normal. (*Id.*). The ALJ also found Dr. Lorensen's opinion that plaintiff was moderately limited in turning her head to be inconsistent with plaintiff's testimony, and Dr. Perla's opinion. (T. 31).

Plaintiff contends that the ALJ erred in failing to incorporate Dr. Lorensen's cervical spine limitations into plaintiff's RFC, leaving "such opined limitations in her neck ... unaccounted for entirely." (Pl.'s Br. at 14). Plaintiff further argues that it was improper for the ALJ to assign "partial" weight to the two medical opinions of record, and use them to discredit each other relative to plaintiff's cervical spine limitations. (*Id.*). Last, plaintiff argues that the ALJ erred in failing to incorporate plaintiff's cervical spine limitations in his hypothetical to the VE.

To plaintiff's point, some courts have acknowledged circumstances where the "limited" or "partial" weight afforded to every medical opinion of record by an ALJ results

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

in legal error subject to remand. *See Deubell v. Comm'r of Soc. Sec.*, No. 18-CV-935, 2019 WL 5781860, at *4 (W.D.N.Y. Nov. 6, 2019) (ALJ gave vague "partial" and "little" weight to every opinion, including the only functional physical opinion of record, rendering it unclear upon what evidence the ALJ based her specific RFC); *King v. Saul*, No. 18-CV-7274, 2020 WL 1536337, at *4 (E.D.N.Y. Mar. 31, 2020) (ALJ arbitrarily substituted her own judgment for competent medical opinion in giving "partial" or "no" weight to every medical opinion of record, but did not find that any conflicting opinion deserved controlling weight).

However, "[t]here is a difference between [an ALJ] making independent findings and sorting through other sources' findings in a way that is consistent with the overall record." *Deubell v. Comm'r of Soc. Sec.*, 2019 WL 5781860, at *4. "In formulating a plaintiff's RFC, an ALJ does not have to adhere to the entirety of one medical source's opinion." *Christina M.F. v. Berryhill*, No. 5:17-CV-0840 (GTS), 2019 WL 147463, at *6-7 (N.D.N.Y. Jan. 9, 2019) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also Quinn v. Colvin*, 199 F. Supp. 3d 692, 712 (W.D.N.Y. 2016) ("Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."); *Wilburn v. Colvin*, No. 15-CV-0058 (TWD), 2016 WL 1237789, at *4 (N.D.N.Y. Feb. 29, 2016) (finding that the ALJ was not obligated to incorporate all of a physician's limitations into the RFC where he afforded the opinion "significant but not great weight").

In this case, the ALJ did not err in evaluating the opinion evidence of record. This is particularly true regarding the ALJ's RFC determination as it relates to plaintiff's cervical spine, which finds support in the opinion evidence as well as other substantial evidence of record. Plaintiff makes much of the ALJ's distinction between Dr. Perla and Dr. Lorensen's opinions regarding plaintiff's neck, [3] arguing that the opinions are, in fact, consistent with each other. However, the law is not clear as to whether a moderate limitation is synonymous with a finding that an individual can engage in frequent activity. *See Brittany F. v. Comm'r of Soc. Sec.*, No. 1:18-CV-1365 (ATB), 2020 WL 838076, at *9 (N.D.N.Y. Feb. 19, 2020) (comparing cases). Thus, this court cannot say that the ALJ

erred in interpreting Dr. Lorensen's opinion for moderate neck limitations to be more restrictive than Dr. Perla's opinion that plaintiff could frequently engage in the same activity.

[3]     As previously discussed, Dr. Perla opined that plaintiff could "frequently" perform the listed postural activities including looking up and down, turning her head, and holding her head in a static position. (T. 927). Dr. Lorensen opined that plaintiff had "moderate" limitations in turning her head. (T. 532).

**\*10** Nor did the ALJ err in giving greater weight to Dr. Perla's less restrictive opinion, as it was consistent with the overall record and supported by substantial evidence. Despite the limited range of motion evaluated by Dr. Lorensen at his one-time consultative examination, plaintiff's medical records consistently revealed unremarkable findings upon cervical examination, with normal-to-minimally-limited range of motion. (T. 354, 360, 401, 503, 558, 584, 628, 733, 758). Plaintiff testified that she was often "hunched over" because it alleviated her back pain, however she could turn her head to the right and left, and look down for prolonged periods of time. (T. 56). It was a "little harder" to look down when she was sitting in a chair. (*Id.*). Plaintiff reported that her hobbies included watching television and sewing, however the sewing was limited by her vision and shoulder pain. (T. 221).

Even accepting plaintiff's argument that the cervical spine limitations opined by Dr. Perla and Dr. Lorensen were synonymous, they still constitute substantial evidence for the plaintiff's modified RFC for light work. As we have explained in prior decisions, moderate exertional and nonexertional limitations are not inconsistent with an RFC for light work. *See White v. Comm'r of Soc. Sec.*, No. 8:17-CV-109 (DJS), 2018 WL 2170288, at *8-9 (N.D.N.Y. May 10, 2018) (the moderate limitations as opined by Dr. Wassef were not inconsistent with an RFC for light work) (collecting cases), *aff'd* 753 F. App'x 80, 82 (2d Cir. 2019) (affirming the district court in rejecting plaintiff's argument that the ALJ could not properly have inferred that White was able to perform light work "on a full-time sustained basis" from Dr. Wassef's opinion that White had "moderate limitations" in standing, sitting, and performing other activities, particularly in light of corroborating evidence including White's daily activities). *See also Rodriguez v. Comm'r of Soc. Sec.*, No. 15-CV-6596, 2016 WL 5660410, at *10 (S.D.N.Y. Sept. 30, 2016) (citing *Laguerre v. Comm'r of Soc. Sec.*, No. 13 Civ. 6747, 2014 WL 7373435, at *10 (S.D.N.Y. Dec. 29, 2014)) (substantial evidence supported RFC to perform full range of light

Melanie W. v. Commissioner of Social Security, Not Reported in Fed. Supp. (2020)

2020 WL 2079432

work, where "the ALJ examined the records of her treating and consultative examiners and assessed only moderate [nonexertional] limitations, at most."). Accordingly, and despite plaintiff's argument to the contrary, the ALJ did not err in failing to include plaintiff's cervical spine limitations in his hypothetical to the VE, as these limitations were already contemplated in the modified RFC for light work. Remand is, therefore, not warranted on this basis.

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2079432

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1180963
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ryan J. O'CONNOR, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 5:11–CV–01425.
|
March 20, 2013.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff Ryan J. O'Connor brought this suit under the Social Security Act ("Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), to review a final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying the applications for benefits is not supported by substantial evidence and contrary to the applicable legal standards. The Commissioner argues that the decision is supported by substantial evidence and made in accordance with the correct legal standards. Pursuant to Northern District of New York General Order No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

### I. BACKGROUND

On the alleged onset date of February 22, 2008, Plaintiff was 26 years old. T 76. Plaintiff reported past work as a custodian and satellite TV technician. T 80. Plaintiff's date last insured is December 31, 2013. T 26.

#### A. Educational Background

Throughout highschool Plaintiff was in special education classes. T 85. On June 8, 1998, the Committee on Special Education determined Plaintiff was "emotionally disturbed" and recommended "specialized supplementary instruction [,]" "instruction from a special education teacher[,]" and resource room. T 124, 126. In 1998, an individualized

education program report from when Plaintiff was in 9th grade noted that Plaintiff received time limit extensions for one period, test items read, answers recorded in an alternate manner via a word processor, and he was allowed to use a calculator or arithmetic tables. T 132. Plaintiff was also noted to be in resource room for the year for forty minutes a day, five days a week, as well as counseling one day a week for forty minutes. T 132. The report noted that Plaintiff "seem[s] disjointed" when making conversation. T 133. He also was noted to "need assistance in spelling, grammar, and punctuation" and had "difficulty condensing material into important notes." T 133. Additionally, Plaintiff was noted to have "often illegible" handwriting and needs "assistance in refocusing on the tasks he is working on." T 133. Further, it was noted that his full-scale IQ score was 88, and he was "slow" in math and written expression. T 134. Plaintiff was further noted to "nee[d] help attending to the tasks he is working on" and "organizing his thoughts[,]" notebooks, "and the information he knows." T 134. In April 2000, school psychologist, Karen Gwilt, evaluated Plaintiff. T 161–64. On examination, Ms. Gwilt found that "discrepancies in his intellectual and achievement testing ... indicate that there is a physical base to his learning problems in school." T 163. She further found that Plaintiff "remains highly distracted by both internal and extern stimuli[,]" his "reality testing remains poor[,]" and he "feels overwhelmed and anxious." T 163. Additionally, she noted that he "exhibit[s] obsessive and ruminative qualities wherein once he is troubled by a person or situation he has difficulty thinking of anything else." T 163–64. She opined that he was "appropriately identified [as][l]earning [d]isabled[,]" "[v]isual motor speed is a relative weakness[,]" and "spelling and writing are particularly difficult" for him. T 163. Ms. Gwilt stated that Plaintiff "remains eligible to be identified [e]motionally [d]isturbed[,]" and recommended that he continue resource room and counseling. T 164.

**\*2** Plaintiff is a highschool graduate, T 219, and also has two years of college education. T 85. Plaintiff completed Adult Training in computer technology through B.O.C.E.S., as well as part of the two-year computer networking program at ITT Technical Institute. T 238.

#### B. Medical Background

On August 29, 2003, Plaintiff was treated at the emergency room by Phillip R. Tatnall, M.D., after he had a "terrible headache [and] loss of consciousness" T 167. On examination, Dr. Tatnall found Plaintiff "speaks in one-word responses and ... it [was] quite hard to understand" him. T

167. Dr. Tatnall diagnosed Plaintiff as suffering from "loss of consciousness secondary to right-sided headache which persists and is of unclear etiology." T 168. On August 31, 2003, Plaintiff was discharged from the emergency room. T 165–66. Dr. Kark diagnosed Plaintiff as suffering from migraine headaches and a right temporal lobe seizure. T 165. Dr. Kark prescribed Depakote and Folic acid. T 166. Dr. Kark recommended it was "dangerous for him to drive and do a number of other activities." T 165.

On February 4, 2004, Allan Yozawitz, Ph. D., evaluated Plaintiff for a neuropsychological evaluation. T 237– 48. On examination, Dr. Yozawitz found Plaintiff had muscular tension, "a shy and anxious appearance[,]" "a reluctance to guess when uncertain[,]" and "rapid speech." T 241. Additionally, Plaintiff had a "low average [s]entence [r]epetition [t]est performance[,] ... spelling errors ... slightly dysfluent oral reading of sentences associated with apparent errors of visuoperception[,] and "poor written expressive skill." T 241–42. Dr. Yozawitz opined Plaintiff would need "a minimally stressful position[;] ... providing him with tasks that are not acutely time sensitive"; and he could not work in a noisy environment or one that required multitasking. T 248. On review of Plaintiff's records, "parent report, observation, and ... questioning[,]" Dr. Yozawitz diagnosed Plaintiff as suffering from Pervasive Developmental Disorder, not otherwise specified, anxiety, anxious/hyper-aroused state, attention dysfunction, obsessive compulsive behaviors, and avoidant behaviors. T 239–40.

On June 4, 2004, Robert Todd, M.D. treated Plaintiff. T 184–88. Dr. Todd diagnosed Plaintiff as suffering from "[b]y history ... syncope and collapse." T 187. Dr. Todd prescribed Axert and Depakote ER. T 188. On July 30, 2004, Dr. Todd treated Plaintiff for his headaches. T 181. Dr. Todd diagnosed Plaintiff as suffering from a headache syndrome and prescribed Folic Acid, Clonidine, Axert, and Depakote ER. T 181. On January 9, 2008, Plaintiff complained of syncope to Peter Caluwe, N.P. T 205. On examination, Nurse Caluwe found "there are some questionable psychological issues in regard to ... whether he hyperventilates ." T 207. Nurse Caluwe diagnosed Plaintiff as suffering from syncope. T 207.

On January 17, 2008, Plaintiff complained of right knee pain to Karen Sebastian, M.D. T 209. On examination, Dr. Sebastian found Plaintiff's "right knee is a little tender medially and it is a little swollen." T 209. She further found that he was unable "to fully extend at the knee" and "could only bend it to about a little further than 90 degrees" because of pain. T 209. Dr. Sebastian diagnosed Plaintiff as suffering from right knee pain and prescribed crutches, Naprosyn, and Lortab. T 210.

**\*3** On June 4, 2008, consultative examiner, Kalyani Ganesh, M.D., evaluated Plaintiff for an internal medicine examination. T 215–18. Dr. Ganesh diagnosed Plaintiff as suffering from migraines, and a history of learning disability, back pain, and knee pain. T 217. Dr. Ganesh opined Plaintiff had "[n]o limitation sitting, standing, walking, or the use of upper extremities." T 217.

On the same date, consultative examiner, Dennis Noia, Ph. D., evaluated Plaintiff for a psychiatric evaluation. T 219– 22. On examination, Dr. Noia found Plaintiff's "intellectual functioning is estimated to be in the low average range." T 221. Dr. Noia opined Plaintiff "appears to be capable of understanding and following simple instructions and directions." T 221.

On June 12, 2008, State agency review psychiatrist R. Altsmansberger completed a mental Residual Functioning Capacity ("RFC"). T 223–35. Dr. Altsmansberger opined Plaintiff did not have a medically determinable impairment. T 223–35.

On July 23, 2009, Plaintiff complained of vomiting episodes followed by unconsciousness to Francisco Gomez, M.D. T 254. Dr. Gomez diagnosed Plaintiff as suffering from transient alteration of awareness-spells and prescribed Sertraline. T 255. On September 24, 2009, Plaintiff complained of vomiting episodes followed by unconsciousness to Dr. Gomez. T 249. Dr. Gomez again diagnosed Plaintiff as suffering from transient alteration of awareness and suspected "his symptoms are a form of somatization." T 249. Dr. Gomez prescribed Sertraline. T 249.

On September 29, 2009, Plaintiff complained of suffering a fall resulting in right-sided numbness and a severe headache to Sherradyn Mack, P.A. while being treated at the emergency room. T 256. On examination, she noted that a "CT scan of his cervical spine showed ... [t]here was C5–C6 disc space narrowing, and there were osteophytes encroaching on the left lateral recess." T 257. Physician Assistant Mack diagnosed Plaintiff as suffering from paresthesias on the right side and status post fall. T 257. She prescribed Motrin for his headaches. T 257.

O'Connor v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2013)

2013 WL 1180963

On January 28, 2010 and on April 14, 2010, Plaintiff complained of "episodes with vomiting, followed by unconsciousness" to Susama Verma, M.D. T 259–63. Plaintiff stated "his headaches are transient and occur nearly 3 times per week." T 259. Dr. Verma diagnosed Plaintiff as suffering from transient alteration of awareness-spells and migraine, atypical, vertebrobasilar. T 260, 262. Dr. Verma prescribed Topamax. T 260. On April 23, 2010, Dr. Verma completed a medical source statement based on treating Plaintiff from January 28, 2010 to April 14, 2010. T 264–67. She noted Plaintiff was diagnosed as suffering from transient alteration of awareness-spells, a learning disability, and pervasive developmental disorder. T 264–65. She opined that Plaintiff was seriously limited, but not precluded, in his ability to: remember work-like procedures; maintain attention for two-hour segments; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologicallybased symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal work stress. T 266. She further noted that Plaintiff would need to take 2–3 breaks for 10–15 minutes secondary to his learning disability. T 267. She further opined that Plaintiff was capable of low stress jobs due to his vertebrobasilar migraines as its "symptoms worsen with anxiety and increased psychosocial stressors." T 267. Additionally, she opined Plaintiff would be absent "more than four days per month" and his impairments cause good and bad days. T 267. Furthermore, she opined his learning disability and vertebrobasilar migraines affect his "ability to work at a regular job on a sustained basis." T 267.

**\*4** On October 25, 2010, Paul Kent, M.D., in a statement to the Appeals Council, opined that Plaintiff "has uncontrolled episodes with loss of consciousness several times a week" and is thus "unable to work due to these debilitating episodes." T 8, 268.

### B. Procedural Background

On March 5, 2008, Plaintiff protectively filed a Title II application for SSI and on April 3, 2008 he protectively filed an application for DIB. In both applications, Plaintiff alleged disability due to learning disability, neurological migraines, and emotional disturbance. At a hearing, Plaintiff requested that the record be held open pending receipt of additional medical evidence. This request was granted. The Administrative Law Judge ("ALJ") received the additional evidence.

After a hearing, the ALJ denied the application. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. The ALJ further found that Plaintiff engaged in substantial gainful activity from April 2008 to January 2009. He also found that there was a minimum twelve-month period during which Plaintiff did not engage in substantial gainful activity. Proceeding with the analysis, the ALJ found that Plaintiff suffered from vertebrobasilar migraine, pervasive developmental disorder, history of low back and knee pain, and degenerative disc disease at C5–6, and that these conditions are severe impairments. The ALJ found that Plaintiff did not establish any other severe impairment. The ALJ found insufficient medical signs or laboratory findings to suggest a seizure disorder. The ALJ further concluded that Plaintiff's mental disorders did not satisfy the applicable requirements.

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that satisfied the applicable regulations and that he has the residual functional capacity to perform a full range of sedentary work at all exertional levels, but cannot be exposed to heights or dangerous machinery, and is only capable of performing low stress work. Lastly, the ALJ determined that Plaintiff has the residual functional capacity to perform his past relevant work as a housekeeper at a nursing facility. Consequently, the ALJ denied Plaintiff's application for benefits. The Appeals Council denied a request for review. Plaintiff then commenced this action, making several arguments challenging the Commissioner's decision, which the Court will address seriatim.

## II. Standard of Review

The Court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998); *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990); *Shane v. Chater,* No. 96–CV–66, 1997 WL 426203, at \*4 (N.D.N.Y July 16, 1997) (Pooler, J.) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. *See Tejada,* 167 F.3d at 773; *Balsamo,* 142 F.3d at 79; *Cruz,* 912 F.2d at 11; *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Perez,* 77 F.3d at 46; *Townley*

*v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) ("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are bind ing.") (citations omitted). In the context of Social Security cases, substantial evidence consists of " 'more than a mere scintilla' " and is measured by " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater,* 117 F.3d 29, 36 (2d Cir.1997) (citing *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982)); *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). However, although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately " 'a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.' " *Vargas v. Sullivan,* 898 F.2d 293, 296 (2d Cir.1990) (quoting *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir.1983)).

### III. DISCUSSION

#### A. Whether the ALJ Failed to Obtain an Opinion from Dr. Gomez Concerning Plaintiff's Function–By–Function Limitations

**\*5** Plaintiff first contends that the ALJ committed legal error by failing to obtain an opinion from Dr. Gomez concerning Plaintiff's functional limitations, thereby failing to properly develop the record. Defendant responds that the ALJ was not required to obtain a functional analysis from Dr. Gomez because one was provided by Dr. Verma, who worked with Dr. Gomez. Inasmuch as Drs. Gomez and Verma worked in the same office, the medical practice is listed under Dr. Verma's name, the medical records demonstrate that Dr. Verma took over Plaintiff's care and treatment from Dr. Gomez, and Dr. Verma provided an assessment of Plaintiff's functional limitations, the Court finds it was unnecessary to obtain another assessment directly from Dr. Gomez.

#### B. Whether the ALJ Failed to Fully Reconcile His RFC Assessment with the Opinions of Dr. Verma

Plaintiff contends that the ALJ correctly noted Dr. Verma's opinion concerning Plaintiff's limitations, but failed to reconcile her limitations concerning work ability with the residual functional capacity determination. Specifically, it is claimed that the ALJ failed to address the findings that Plaintiff is seriously limited in his ability to remember work like procedures, maintain attention for a two-hour segment, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress. Plaintiff also disputes the ALJ's having rejected Dr. Verma's opinion concerning Plaintiff's likely absenteeism rate (four days per month) as speculative.

Proper deference must be afforded to the ALJ's decision, and an ALJ's decision will be sustained even where substantial evidence may support Plaintiff's position. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982). It is also within the ALJ's discretion to accept or reject a physician's estimates of absenteeism. *See Robertson v. Astrue,* No. 09–CV–0501–A, 2011 WL 578753, at \*4 (W.D.N.Y. Feb. 9, 2011). The ALJ found that there was "no support in the record for Dr. Verma's determination that the claimant would be absent from work for more than four days each month...." T 32. However, contrary to this statement is Plaintiff's wife's testimony that she believed Plaintiff had seven episodes within the past month, and witnessed probably five of them. T 312–13. Plaintiff's testimony could also support this proposition in that he testified that he had two episodes within the past two weeks. T 290. However, the objective medical evidence in the record provides substantial evidence to support the ALJ's finding that this statement is speculative. For example, Plaintiff's visits to the emergency room or complaints to medical professionals regarding his "spells" occurred at most twice a month, and were sporadic since 2003. Plaintiff's physicians, as stated, ruled out a seizure disorder as a diagnosis. T 264.

**\*6** There are also some inconsistencies within Dr. Verma's medical source statement. For example, she indicates that Plaintiff is "unlimited or very good" in the category of his ability to "maintain regular attendance and be punctual within customary, usually strict tolerances." T 266. This contradicts her later statement that Plaintiff is likely to be absent more than four days per month as a result of his impairments. T 267. Similarly, her opinions in the medical source statement are somewhat contradictory to her treatment notes that Plaintiff appeared alert; oriented to time, place and person; had normal memory; had normal attention span and concentration; and had a fund of knowledge normal to conversation. T 262;

T 259. Thus, the Court finds that, while the ALJ did not fully credit the medical source's statement, he did credit the objective findings by Plaintiff's treating physician. It may fairly be said based on the medical evidence of record that the medical source statement overstates the objective medical findings in Plaintiff's medical records, including with respect to any potential absenteeism rate. These findings as reported in Dr. Verma's medical records are consistent with the findings of consultative psychiatric examiner Dr. Noia who opined that Plaintiff's recent and remote memory skills were intact, as was his attention and concentration. T 220–22. Based upon the above analysis, the Court finds that the ALJ's determination is supported by substantial evidence.

### C. Whether the ALJ committed harmful error by affording substantial weight to the opinion of Dr. Ganesh

Plaintiff claims that the ALJ committed harmful error by affording substantial weight to Dr. Ganesh, a consultive examiner, because Dr. Ganesh rendered an incomplete opinion. Plaintiff also alleges that consultive examinations cannot provide substantial evidence to defeat treating source opinions.

The Social Security Regulations state that the "medical report must be complete enough to help us determine the nature, severity, and duration of the impairment, and residual functioning capacity." 20 C.F.R. § 404.1519n(b). On June 4, 2008, the date of the examination with Dr. Ganesh, Plaintiff's chief complaints were "neurological, migraine, mental/emotional disturbance, learning disabled." T 215. Plaintiff did not allege limitations regarding his abilities to hear, speak or travel. T 216; see Washington v. Astrue, No. 5:12–cv39, slip op. 6044877, at 4 (N.D.N.Y. Dec. 5, 2012) (finding that where a claimant does not allege limitations in the ability to hear, speak or travel, a medical opinion failing to address those limitations is nonetheless complete). In fact, Plaintiff reported that he can shop daily, and that he is capable of driving himself and taking public transportation. T 216. Dr. Ganesh reported that Plaintiff could squat fully, stand normally, rise from the chair without difficulty, and that Plaintiff's musculoskeletal, extremity, and hand motor activity of hands were all normal. T 217. Plaintiff did not allege a limitation in those areas, thus it is reasonable that Dr. Ganesh did not consider them. Accordingly, Dr. Ganesh's opinion was sufficiently complete.

**\*7** As to Plaintiff's contention that a consultive examination may not provide substantial evidence to defeat a treating

source opinion, "it is well settled that the opinion of a consultive examiner can override that of a treating physician." Martin v. Astrue, No. 7:10–CV–1113, 2012 WL 4107818, at \*13 (N.D.N.Y. Sept. 19, 2012). Regardless, the ALJ gave "great weight" to Dr. Verma's opinion, Plaintiff's treating physician, and only "substantial weight" to Dr. Ganesh despite stated inconsistencies in Dr. Verma's opinions. Accordingly, this Court finds that the ALJ applied the correct legal standards in assessing Dr. Ganesh's opinion.

### D. Whether the ALJ failed to correctly apply the Psychiatric Review Technique

Plaintiff argues that the ALJ failed to properly apply the Psychiatric Review Technique when making his RFC finding. This technique requires the ALJ to "assess an individual's limitations and restrictions from a mental impairment." SSR 96–8p (S.S.A.), 1996 WL 374184, at \*4. It requires a more "detailed" assessment by itemizing various functions found in the categories of the mental disorders listings in 12.00 of the Listings of Impairments. Id. If the claimant is determined to have a medically determinable impairment, the ALJ must rate the degree of functional limitation resulting from the impairments, Petrie v. Astrue, 412 F. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(b)(2)), and include specific findings regarding the claimant's degree of limitation in each. see Kohler v. Astrue, 546 F.3d 260, 267 (2d Cir.2008). The ALJ must conduct an analysis in all four functional categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). In assessing the degree of limitation in the first three categories, the ALJ uses a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F .R. § 404.1520a(c)(4). The last category is assessed on a four-point scale: none, one or two, three, four or more. Id. When determining a claimant's mental RFC, the ALJ should consider factors such as reports of the claimant's activities of daily living and work activity, testimony of third parties about the claimant's performance and behavior, and level of intellectual functioning. SSR 85–16 (S.S.A.), 1985 WL 56855, at \*2. An ALJ's failure to provide a function-by-function analysis might require remand, however, in certain circumstances, an ALJ's failure to do so "might constitute harmless error, provided that the absence of the analysis did not frustrate the meaningful review of the ALJ's overall RFC assessment." Desmond v. Astrue, No. 11–CV–0818, slip op. 6648625, at \*6 (N.D.N.Y. Dec. 20, 2012).

While Plaintiff contends that the ALJ failed to supply a complete function-by-function analysis of Plaintiff's mental

2013 WL 1180963

limitations, after reviewing the ALJ's determination and the record as a whole, this Court finds that the ALJ properly assessed the evidence in reaching Plaintiff's RFC. *See Lynch v. Astrue,* No. 07–CV–249–JTC, 2008 WL 3413899, at *4 (W.D.N.Y. Aug. 8, 2008). The ALJ found that Plaintiff had no exertional limits, could not be exposed to any heights or dangerous machinery, and should be limited to low stress jobs. T 32. The ALJ did consider, but only gave "some weight" to the Psychiatric Review Technique Form ("PRTF") that Dr. Altsmanberger prepared, who opined that Plaintiff did not have a medically determinable mental impairment, which suggests less impairment than the ALJ found. T 29. The ALJ also noted that no physician that assessed Plaintiff indicated that Plaintiff was disabled, (T 31), nor did Dr. Noia diagnose Plaintiff with a mental impairment (T 33). Further, Plaintiff did not allege any episodes of decompensation.

**\*8** The ALJ addressed each functional domain found in the Psychiatric Review Technique. As to daily living, the ALJ found that the claimant had mild restrictions in daily living. T 28. The ALJ considered that the claimant was able to engage in a "wide range of independent daily activities." T 31. The ALJ proceeded to list the activities that Plaintiff was able to engage in that related to the functional domain such as personal hygiene, taking public transportation, cooking, cleaning, shopping, and maintaining a residence. *See* 20 C.F.R. § 404 Subpart P App'x A(c)(1); T 31. The ALJ also noted that Plaintiff could care for his infant son while his wife was at work. T 31.

The ALJ also addressed Plaintiff's social capabilities, and found that Plaintiff had mild difficulties in social functioning. T 28. The ALJ considered Dr. Verma's assessment, which indicated that Plaintiff had a limited but satisfactory ability to "work in coordination with or proximity to others without being unduly distracted" and "get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes." 20 C.F.R. § 404 Subpart P App'x A(c)(2); T 32. The ALJ also considered Dr. Noia's opinion that Plaintiff was able to relate to and interact moderately with others (T 33), that Plaintiff got along well with friends and family and during the examination, Plaintiff was responsive, cooperative and his manner of relating, social skills and overall presentation was moderately adequate (T 28). Plaintiff also related to Dr. Ganesh that he goes out to shop and eats out at restaurants, which the ALJ also considered. T 28.

The ALJ also appropriately considered Plaintiff's concentration, persistence, and pace by addressing a number

of factors from Dr. Noia's psychiatric examination of Plaintiff (T 28–29), as well as Dr. Verma's medical source statement, to which he gave "great weight" (T 32). The ALJ found that the claimant had moderate difficulties in maintaining concentration, persistence, or pace. T 28.

Dr. Noia opined that Plaintiff's intellectual functioning was within low average range and that his general fund of information was appropriate. T 29. Dr. Noia noted that Plaintiff's attention and concentration were intact, as were his recent and remote memory skills. T 28–29. Plaintiff was able to do "serial threes," and Dr. Noia also opined that Plaintiff's thought processes were coherent and goal-oriented. T 29. The ALJ also considered the fact that Plaintiff received special education classes, and went on to note that Plaintiff graduated high school with a regular diploma and attended two years of college. T 29.

Dr. Verma opined that Plaintiff possessed an unlimited or very good ability to ask simple questions or request assistance. T 32. She also opined that the Plaintiff had a limited but satisfactory ability to understand and remember very short and simple instructions, carry out very short and simple instructions ... make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors ... respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions." T 32. Dr. Verma opined that Plaintiff was seriously limited but not precluded in his ability to "sustain an ordinary routine without special supervision, complete a normal weekday and workweek without interruptions from psychological based symptoms, perform at a consistent without an unreasonable number and length of rest periods, and deal with normal work stress." T 32. In Dr. Verma's opinion, Plaintiff was still capable of low stress jobs despite his impairments, but that he would be absent from work more than four days each month, which, as discussed, the ALJ rejected. T 32. The ALJ also considered Dr. Noia's consultive psychiatric examination in which he opined that the Plaintiff "appeared to be capable of understanding and following simple instructions and directions, performing simple and some complex tasks with supervision and independently ... and maintaining attention and concentration for tasks." T 33. This includes consideration of Dr. Noia's assessment of Plaintiff's attention and concentration in Plaintiff's ability to do counting, simple calculations, and serial threes. *See* 20 C.F.R. § 404 Subpart P App'x A(c)(3); T 28–29. While the ALJ did not categorically go through each functional domain, he did address each

one, and he assessed Plaintiff's capabilities and limitations in each one. Accordingly, the ALJ applied the appropriate legal standards in assessing Plaintiff's mental RFC.

### E. Whether the ALJ failed to properly apply the appropriate legal standards in assessing Plaintiff's credibility

**\*9** An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings regarding the true extent of the claimant's symptoms. *Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984); *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Caroll v. Sec'y of Health and Human Serv.,* 705 F.2d 638, 642 (2d Cir.1983); *see Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 n. 6 (S.D.N.Y.1995) (An ALJ's determination with respect to the credibility of witnesses is given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses). Further, Plaintiff must produce appropriate, probative evidence in support of any subjective statements of symptoms, 20 C.F .R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous. *Centano v. Apfel,* 73 F.Supp.2d 333, 338 (S.D.N.Y.1999). "An ALJ's evaluation of Plaintiff's credibility is entitled to great deference if it is supported by substantial evidence." *Nelson v. Astrue,* No. 5:09–CV–00909, 2010 WL 3522304, at \*6 (N.D.N.Y. Aug. 12, 2010).

When an individual has a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, but the objective evidence does not substantiate the alleged intensity and persistence of the symptoms, the ALJ considers other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of his symptoms; (3) precipitating and aggravating factors; (4) the type of medication and other treatment or measures which Plaintiff uses to relieve pain and other symptoms; (5) treatment other than medication Plaintiff has received for relief of pain and other symptoms; (6) any other measures used by Plaintiff to relieve pain and other symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ found that neither Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were fully credible, nor were his subjective complaints of disability. T 31. The evidence, including the objective testing, clinical examination results and medical opinions, as well as Plaintiff's own testimony, does not corroborate Plaintiff's subjective limitations to the extent alleged, and the ALJ's credibility determination was not clearly erroneous. Plaintiff testified that he could cook, shop, do laundry and clean daily, watch TV, listen to the radio, go to restaurants, shower, bathe and dress himself daily, and drive a car for up to two and a half hours at a time and had no restrictions on his license. T. 216. These statements were appropriately considered by the ALJ in making his determination. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Plaintiff also argues that basic activities, such as caring for oneself and basic daily activities, should not be held against him in determining disability. *See Pl.'s Brief,* at 16; *see Stoesser v. Commissioner of Social Sec.,* No. 08–CV–643, 2011 WL 381949, at 7 (N.D.N.Y. Jan. 19, 2011) (finding the ALJ's reasoning was flawed to discount the opinion of plaintiff's treating physician because Plaintiff testified that he could not sit for more than an hour and was not completely incapacitated); *see also Balsamo v. Chater,* 142 F.2d 75, 81 (2d Cir.1998) (finding that Plaintiff's ability to perform activities such as ride the subway, read, watch TV and listen to the radio was not indicative of being able to hold a sedentary job). However, unless the conduct alleged by Plaintiff, and used in the ALJ's determination of an ability to hold a job, truly showed that the claimant was capable of working, "it would be a shame to hold this endurance against him." *Nelson v. Bowen,* 882 F.2d 45, 49 (2d Cir.1989).

**\*10** The fact that Plaintiff can perform daily tasks indicates that his spells may be less frequent than he claims, and further that he has the mental capabilities to perform such tasks independently. The ALJ considered all medical and laboratory evidence regarding Plaintiff's migraines and alleged seizures, knee and back pain, and such testing was normal. T 31. Although Plaintiff and his wife still claim that he suffers from seizures, Plaintiff's physician explicitly ruled out the possibility that Plaintiff suffered from a seizure disorder. T 264.

Further, Plaintiff alleges that the ALJ erred in finding that, "the claimant's statements concerning intensity, persistence, and limiting effects of his symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment." T 31. The Commissioner

2013 WL 1180963

does not address this comment. The Court finds that the ALJ's credibility determination is sufficiently substantiated.

The ALJ considered the required factors in determining Plaintiff's credibility, explained them sufficiently, and it is apparent from the record that the ALJ's decision was supported by substantial evidence, thus due deference should be afforded to his determination. In *Nelson v. Astrue,* No. 5:09–CV–00909, 2010 WL 3522304, at *6–7 (N.D.N.Y. Aug. 12 2010), the ALJ's credibility determination of the claimant was not "sufficiently specific" because the ALJ failed to specify the weight given to Plaintiff's testimony, to discuss the factors set forth in the regulations, to identify medical records to which he referred, and to explain why he thought the plaintiff was "generally unpersuasive." The court also found it "questionable" that "the propriety of the ALJ's finding that Plaintiff was credible only to the extent that her statements were consistent with his own RFC determination." *Id.* at *6. Certainly if the ALJ's credibility determination is only based on his own RFC determination, remand would be appropriate. Here, however, the ALJ explicitly stated the credibility given to the Plaintiff's comments, he addressed the factors in the regulations, and the ALJ cited with specificity the evidence that he relied on in considering Plaintiff's credibility beyond his RFC determination. The ALJ not only considered Plaintiff's numerous daily independent activities, but he considered objective medical tests and opinions that suggested Plaintiff did not suffer from a seizure disorder. T 31. He also considered Plaintiff's medication use, the lack of side effects and the fact that Plaintiff just recently started taking medication. T 31. The ALJ also considered Plaintiff's wife's testimony, as well as his job history, and the fact that the Plaintiff collected unemployment during the period of his alleged disability on a continuous basis since 2009. T 32. While Plaintiff claims that the consideration regarding unemployment benefits was error, nothing in the record suggests that this fact was conclusive, that the ALJ gave it considerable weight, or that the ALJ precluded Plaintiff from the benefits he is applying for in this proceeding. The ALJ also took into account Plaintiff's demeanor at the hearing and found that Plaintiff "was able to attend to the hearing proceedings closely, fully, and without any noted distractions." T 31. Accordingly, the Court finds that the ALJ's determination of Plaintiff's credibility was supported by substantial evidence.

**F. Whether the ALJ properly applied the appropriate legal standards in assessing Plaintiff's witness's credibility**

*\*11*  Plaintiff contends that the ALJ failed to properly apply the appropriate legal standards in assessing Plaintiff's wife's testimony because he failed to weigh her statements in accordance with required factors in SSR 06–03p, and that the ALJ also failed to specifically address a number of portions of her testimony. The Commissioner argues that the testimony of Plaintiff's wife was appropriately considered. The Court agrees with the Commissioner.

The Social Security Ruling specifically states that "[c]onsistent with 20 C.F.R. 404.1513(d)(4) and 416.913(d)(4), we also consider evidence provided by other 'non-medical sources' such as spouses...." SSR 06–03P (S.S.A.), 2006 WL 2329939, at *3. Further, it states that in considering evidence from "non-medical sources ... such as spouses ... it would be appropriate to consider factors such as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other relevant factors that tend to support or refute the evidence." SSR 06–03P, at *4–5. Spousal testimony is considered other non-medical testimony, even if the opinion is not given in a professional capacity. If the ALJ rejects subjective testimony, the reasons for rejection must be "set forth with sufficient specificity" to enable a reviewing court to decide whether the determination is supported by sufficient evidence. *Ferraris v. Heckler,* 728 F.2d 585, 587 (2d Cir.1984). The ALJ must refer to specific evidence from the record that substantially supports his determination. *Id.* An ALJ need not "specifically discuss the weight given to each piece of evidence considered if the rationale for [his] opinion can be gleaned from other portions of [his] decision...." *Manchester v. Astrue,* No. 77:08–CV–078, 2009 WL 2568579, at *8 (N.D.N.Y. Aug. 19, 2009).

Plaintiff's wife testified as to how long they knew each other (T 308), Plaintiff's alleged convulsions and vomiting (T 309–10), Plaintiff's inability to hold a job (T 311–12), and her guestimate that Plaintiff had about seven "spells" the month before the hearing, witnessing "probably" five of them (T 313). Accordingly, the ALJ considered her testimony in assessing Plaintiff's "history of seizure-like symptoms," which is presumably inclusive of her statements regarding Plaintiff's vomiting, convulsions, and episodes. The ALJ discredits this testimony by presenting objective medical evidence to the contrary, as well as Plaintiff's own testimony regarding his ability to drive and that his driving privileges had never been restricted. T 27. The ALJ also considered Plaintiff's wife's testimony that Plaintiff was incapable of holding a job, but the ALJ discredits this testimony with Plaintiff's work history and reasons for leaving certain

employment. T 31–32. While the ALJ does not specifically address each statement from Plaintiff's wife's testimony, nor does he specifically state the weight he gives to her opinion, the weight he gave can be gleaned from the specific medical evidence that discredits her opinion. Accordingly, the ALJ applied the appropriate legal standards in assessing the testimony of Plaintiff's wife.

### G. Whether the ALJ's Step 4 determination is supported by substantial evidence

**\*12** In Step Four of the evaluation, the ALJ found that Plaintiff could perform his past relevant work as a housekeeper at a nursing facility due to the fact that the past employment "required Plaintiff to work at no more than a medium exertional level, did not expose Plaintiff to any heights or dangerous machinery, and involved only simple, routine work." T 33. Plaintiff contends that the ALJ's Step 4 determination is not supported by substantial evidence. Specifically, Plaintiff claims that the ALJ failed to note the mental demands of the work or the inconsistency between Plaintiff's testimony regarding his prior work and the ALJ's RFC determination. The Commissioner argues that the Plaintiff failed to meet the burden of proof in the Step 4 analysis.

If a claimant proceeds to Step 4 of the evaluation, the claimant "must show that he is unable to continue his past relevant vocational work." *Ferraris,* 728 F.2d at 584. In doing so, the claimant must show "an inability to return to [his] previous specific job *and* an inability to perform [his] past relevant work generally." *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003) (citing to *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir.1981) and SSR 82–62, 1982 WL 31386, *at 3). The ALJ assesses a claimant's RFC with the physical and mental demands of his/her past relevant work, and must consider the following: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a finding of fact that the individual's RFC would permit a return to his or her past job or occupation. *See* 20 C.F.R. § 404.1560(b); *see also* SSR 82–62, at *4. "Reasonable inferences may be drawn, but presumptions, speculations, and suppositions must not be used." SSR 82–62, at *4.

The ALJ's determination that Plaintiff failed to meet the burden necessary to preclude a finding that he cannot perform his prior employment as a nursing facility housekeeper is

supported by substantial evidence. As previously noted, the ALJ's determination for Plaintiff's RFC is supported by substantial evidence. The ALJ also determined that Plaintiff's job as a housekeeper "entailed only simple routine work that was usually performed by the [Plaintiff] either alone or with only one other person...." T 33. This finding is consistent with Plaintiff's testimony regarding that position insofar as the Plaintiff stated that his job was "mainly just moping, sweeping and using the floor machine the keep the floors clean." T 286. Plaintiff also testified that the job did not involve any significant lifting and carrying unless someone else was there to help him. T 286–87. Plaintiff did not allege that he was exposed to any heights or that the job was more than low stress or simple routine work.

Plaintiff also takes issue with the fact that the ALJ precludes Plaintiff from working with "dangerous machinery," but nevertheless finds that he is able to work at a job that required him to occasionally use a floor cleaning machine. Plaintiff did not indicate how it would be dangerous for him to work a floor cleaner, especially if he is capable of independently driving a car, nor did he allege that a floor cleaning machine is dangerous. Regarding the chemicals that Plaintiff would work with, the ALJ found that Dr. Verma opined that Plaintiff had a limited but satisfactory ability to be aware of normal hazards and to take appropriate precautions. T 32. Further, Plaintiff did not leave his housekeeping job for medical reasons, but to pursue another job. T 287. Accordingly, this Court finds that the ALJ's determination that Plaintiff did not meet his burden in establishing that he was incapable of performing past work was supported by substantial evidence. [1]

[1]      This Court's consideration of Dr. Paul Kent's statement to the Appeals Council does not change this analysis.

### CONCLUSION

**\*13** For the foregoing reasons, the Plaintiff's motion on the pleadings is DENIED, and Defendant's motion on the pleadings is AFFIRMED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1180963

**O'Connor v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2013)**

2013 WL 1180963

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 593554
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

ROBERT O., Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

3:20-CV-1612 (TWD)
|
Signed 02/28/2022

**Attorneys and Law Firms**

OF COUNSEL: PETER A. GORTON, ESQ., LACHMAN, GORTON LAW FIRM, Counsel for Plaintiff, P.O. Box 89, 1500 East Main Street, Endicott, NY 13761.

OF COUNSEL: LOUIS JOHN GEORGE, ESQ., SOCIAL SECURITY ADMINISTRATION OFFICE OF THE GENERAL COUNSEL, Counsel for Defendant, J.F.K. Federal Building, Room 625, 15 New Sudbury Street, Boston, MA 02203.

**DECISION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** Robert O. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his requests for disability and supplemental security benefits. (Dkt. No. 1.) This case has proceeded in accordance with General Order 18 of this Court. Pursuant to 28 U.S.C. § 636(c), the parties consented to the disposition of this case by a Magistrate Judge. (Dkt. No. 7.) Both parties filed briefs. (Dkt. Nos. 9, 14.) For the reasons set forth below, the matter is reversed and remanded for further administrative proceedings.

**I. BACKGROUND**

Plaintiff was born in 1976 and earned a GED in 1996. (T. at 225, 256.[1]) Plaintiff was most recently employed at the Salvation Army, where he worked for nearly two years as a general laborer. Id. at 37, 256. During his eight-hour shifts, he lifted donations, cleaned them, and checked to see if they worked. Id. at 37-38, 57. Plaintiff regularly lifted donations weighing 50 to 150 pounds without assistance. Id. at 37-38. He stopped working on December 31, 2016. Id. at 39, 255.

[1]     The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers the Court's CM/ECF electronic filing system assigns. Page references to other documents identified by docket number are to the page numbers assigned by the Court's CM/ECF electronic filing system.

Plaintiff filed for disability insurance and supplemental security income on February 19, 2019, claiming a disability onset date of December 31, 2016. Id. at 13, 225-26. Plaintiff claimed the following disabilities: spinal stenosis, arthritis, depression, pain in both legs, spinal nerve pain, lumbar spondylosis, lumbar disc herniation, and lumbago with sciatica. Id. at 255. The Commissioner denied Plaintiff's initial application, and he requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 13, 120, 134. ALJ John P. Ramos held a hearing on March 17, 2020, and Plaintiff testified along with vocational expert Bethany Pyro. Id. at 32-63. At the hearing, Plaintiff amended the alleged onset date of his disability to October 30, 2018. Id. at 13, 54-55. The ALJ denied Plaintiff's claim for benefits on March 30, 2020, and the Appeals Council denied Plaintiff's request for review on October 29, 2020. Id. at 1, 13-25. Plaintiff now seeks this Court's review. (Dkt. No. 1.)

**II. STANDARD OF REVIEW**

In reviewing a final decision of the Commissioner, courts must first determine whether the correct legal standards were applied, and if so, whether substantial evidence supports the decision. Atwater v. Astrue, 512 F. App'x 67, 69 (2d Cir. 2013) (citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999)); see also Brennan v. Colvin, No. 13-CV-6338 AJN RLE, 2015 WL 1402204, at \*10 (S.D.N.Y. Mar. 25, 2015).[2] "Failure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 188-89 (2d Cir. 2004). Accordingly, the reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied. Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).

[2]     "Since the standards for determination of disability and for judicial review in cases under 42

U.S.C. § 423 and 42 U.S.C. § 1382c(a)(3) are identical, decisions under these sections are cited interchangeably." *Donato v. Sec'y of Dep't of Health & Hum. Servs. of U.S.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983). Moreover, "[t]he regulations that govern the two programs are, for today's purposes, equivalent." *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019). Rather than cite to relevant regulations under both 20 C.F.R. § 404.1501 *et seq.* (governing disability insurance) and 20 C.F.R. § 416.901 *et. seq.* (governing supplemental security income), the Court will cite to the disability insurance regulations. *See, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 n.2 (2000). Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

**\*2** If the ALJ applied the correct legal standards, the reviewing court must determine whether the ALJ's decision is supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Bowen*, 817 F.2d at 985. "Substantial evidence means more than a mere scintilla." *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the ALJ's finding as to any fact is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g); *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

When inadequacies in the ALJ's decision frustrate meaningful review of the substantial evidence inquiry, remand may be appropriate. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Remand may accordingly be appropriate where the ALJ has failed to develop the record, *Klemens v. Berryhill*, 703 F. App'x 35, 38 (2d Cir. 2017); *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999), adequately appraise the weight or persuasive value of witness testimony, *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019); *Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008), or explain his reasoning, *Klemens*, 703 F. App'x at 36-38; *Pratts*, 94 F.3d at 39.

### III. DISCUSSION

The ALJ denied Plaintiff's request for benefits because he determined Plaintiff could perform jobs that existed in sufficient numbers in the national economy. (T. at 23-24.)

Plaintiff now challenges the ALJ's findings and conclusions concerning medical opinion evidence, Plaintiff's symptoms, and his residual functional capacity ("RFC"). (*See* Dkt. No. 9.) Plaintiff contends the ALJ failed to properly evaluate the degree to which his impairments and the resulting side-effects—including pain—affect his ability to concentrate, maintain pace, and keep regular attendance at work. *See id.* This review accordingly focuses on evidence pertinent to the ALJ's evaluation of Plaintiff's capacity to concentrate, maintain pace, and keep regular attendance at work.

### A. The ALJ's Evaluation of Medical Opinion Evidence

#### 1. Medical Evidence

##### a. Consultative Examinations

On April 25, 2019, Dr. Gilbert Jenouri and Sarah Long, Ph.D., each performed a consultative examination on Plaintiff. *Id.* at 400-403, 405-408. Dr. Jenouri noted that Plaintiff complained of back pain registering 7/10 on the pain scale. *Id.* at 400, 402. Dr. Jenouri observed Plaintiff's medications, his general disposition, and his daily activities, which included "cooking twice a week," showering "three times a week," dressing himself "every day," and "watch[ing] TV and listen[ing] to the radio." *Id.* at 400-402. Dr. Jenouri performed a physical examination and diagnosed Plaintiff with neck pain, lower back pain, bilateral shoulder pain, and bilateral lower extremity radiculopathy. *Id.* at 402. Dr. Jenouri concluded Plaintiff had moderate restrictions on his ability to walk, stand for long periods, bend, climb stairs, lift, and carry. *Id.* at 402.

Dr. Long took note of Plaintiff's medical conditions, his medications, and his complaint of severe pain. *Id.* at 405. Dr. Long evaluated Plaintiff's mental status, concluding he was functioning "on an average intellectual level." *Id.* at 406. Next, Dr. Long took stock of Plaintiff's daily activities, indicating that he cooks with the microwave, he cannot stand long enough to do the laundry, he does not shop because it hurts to walk, he does not clean, and he has a limited social life. *Id.* at 407. Based on the examination, Dr. Long concluded Plaintiff did not have any limitations "regarding simple and complex tasks and making appropriate decisions," but he may have "mild to, at times, moderate limitations regarding maintaining attention and concentration as he reports experiencing sudden nerve pain, which is a distraction." *Id.* Dr. Long opined that Plaintiff "appears generally capable of maintaining a regular schedule." *Id.*

However, according to Dr. Long, Plaintiff's prognosis was "dependent on physical factors." *Id.*

### b. Medical Opinions

**\*3** On May 9, 2019, state agency psychologist Dr. D. Brown and state agency physician Dr. I. Seok issued two identical disability determination explanations (i.e., one for each of Plaintiff's claims) wherein they opined that Plaintiff was not disabled. (T. at 64-89.) Based on their review of Plaintiff's medical records,[3] Drs. Brown and Seok concluded Plaintiff had four medically determinable impairments: (1) severe spine disorders; (2) severe other and unspecified arthropathies; (3) non-severe anxiety and obsessive-compulsive disorder, and (4) non-severe depressive, bipolar and related disorders. *Id.* at 68-69, 81. They further concluded Plaintiff's impairments could reasonably be expected to produce his symptoms, including pain. *Id.* at 70, 83.

[3]    Both disability determinations appear to be based on medical records from the following sources: two medical opinions from Industrial Medicine, dated Apr. 25, 2019; records from Southern Tier Imaging, received Apr. 23, 2019; records from an unknown source, received Apr. 22, 2019; records from UHS Pain Management, received Apr. 15, 2019; records from UHS Neurosurgery, received Apr. 8, 2019; and records from UHS Primary Care, dated Mar. 27, 2019. (T. at 65-67, 78-80.)

Drs. Brown and Seok found Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms to be partially consistent with the evidence in his file, but concluded the objective medical evidence alone did not substantiate his statements. *Id.* According to Drs. Brown and Seok, Plaintiff's longitudinal treatment records were the "most informative in assessing the consistency of [his] statements about [his] symptom related limitations." *Id.* Based upon their review of those records, Drs. Brown and Seok concluded Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are generally not consistent with the evidence of record." *Id.*

Drs. Brown and Seok did not explain or identify which symptoms they considered to be consistent or inconsistent with Plaintiff's treatment records. *See id.* at 69-73, 82-86. Instead, in their respective "Additional Explanation" sections

of the disability determination, they summarized the medical records they reviewed. *Id.* at 69, 73, 82, 86. For example, Dr. Seok's "Additional Explanation" recapped Plaintiff's alleged disabilities and associated pain. *Id.* at 73, 86. Dr. Seok observed that an MRI from January 19, 2019, "showed lumbar spine disc disease with stenosis and neural encroachment." Finally, Dr. Seok summarized Plaintiff's treatments notes from an exam dated April 25, 2019. *Id.*

Dr. Brown offered no opinion on Plaintiff's residual functional capacity, but Dr. Seok did. *Id.* at 68-69, 71-73, 81-82, 84-86. Dr. Seok concluded Plaintiff had no visual, communicative, or environmental limitations, but some exertional, postural, and manipulative limitations. *Id.* at 71-73, 84-86. Dr. Seok further concluded there was no medical opinion about Plaintiff's abilities and limitations that was more restrictive than these findings. *Id.* at 73, 86. However, one of the medical opinions Dr. Seok reviewed, presumably Dr. Long's,[4] determined Plaintiff may experience "mild to, at times, moderate limitations regarding maintaining attention and concentration as he reports experiencing sudden nerve pain, which is a distraction." *Id.* at 66, 79. Dr. Seok offered no opinion on Plaintiff's ability to maintain attention, concentration, and regular attendance. *See id.* at 71-73, 84-86.

[4]    (*Compare* T. at 407, *with id.* at 64, 79.)

On July 10, 2019, state agency psychologist L. Blackwell, Ph.D., and state agency physician Dr. A. Saeed issued two disability determination explanations. *Id.* at 92-117. The disability determinations were identical to the disability determinations issued by Drs. Brown and Seok on May 9, 2019. *Compare id.* at 64-89, *with id.* at 92-117. Drs. Blackwell and Saeed did not review any additional medical records. *See id.* at 93-96, 106-109. They did not reach any different opinions. *See id.* at 97-103, 109-17. They also did not change a single word from the "Additional Explanation" sections originally presented by Drs. Brown and Seok. *See id.* at 98, 102, 111, 115.

**\*4** Tyler Kelly, DO, opined on Plaintiff's conditions on March 27, 2019, July 9, 2019, and January 29, 2020. *Id.* at 384-85, 419-20, 538. In the first of the three opinions, Dr. Kelly did not comment on Plaintiff's ability to concentrate, maintain pace, and keep regular attendance at work. *Id.* at 384-85. In the second, Dr. Kelly completed a two-page worksheet where he opined his impairments "and/or any side effects of medication" would cause pain, fatigue, diminished concentration, diminished work pace, and a need

to rest at work. *Id.* at 419. Dr. Kelly concluded Plaintiff's impairments, pain, and/or side effects of medication would cause him to be off task more than 33% of the day at work. *Id.* According to Dr. Kelly, the severity of Plaintiff's pain would vary by the day, so some days would be better than others. *Id.* Dr. Kelly concluded this would result in Plaintiff being absent from work "[m]ore than 4 days per month." *Id.* at 420. Finally, Dr. Kelly noted Plaintiff's medication cyclobenzaprine "may cause drowsiness," and his use of Aleve may cause bleeding in the gastrointestinal tract. *Id.* Dr. Kelly offered no explanation for these conclusions, which were based on physical therapy sessions with Plaintiff from October 12, 2018, through July 9, 2019. *Id.* at 419-20. Dr. Kelly's third opinion included no additional insights, findings, or explanations. *Compare id.* at 419, *with id.* at 538.

On July 17, 2019, Dr. Matthew Bennett completed the same two-page worksheet on how Plaintiff's impairments impacted his ability to work. *Id.* at 424-25. Like Dr. Kelly, Dr. Bennett determined that Plaintiff's impairments and/or the side effects of medication would cause pain, fatigue, diminished concentration, diminished pace, and a need to rest at work. *Id.* at 424. Dr. Bennet concluded this would cause Plaintiff to be off task more than 33% of the day at work. *Id.* He also concluded that the severity of Plaintiff's conditions would vary by day, causing him to miss more than four days per month. *Id.* at 424-25. Dr. Bennett offered no explanation for these conclusions, which were based on his treatment of Plaintiff from February 1, 2019, to July 17, 2019. *Id.*

On January 28, 2020, certified registered nurse practitioner ("NP") Timothy Leonard also completed the two-page worksheet on Plaintiff's work-related limitations. *Id.* at 528-29. Like Drs. Kelly and Bennett, NP Leonard opined that Plaintiff's impairments and/or the side effects of medication would cause pain, fatigue, diminished concentration, diminished work pace, and a need to rest at work. *Id.* at 528. NP Leonard also concluded Plaintiff's conditions would vary daily. *Id.* However, NP Leonard was unable to offer an opinion on how often Plaintiff's conditions would cause him to be off task or absent from work. *Id.* at 528-29. NP Leonard nonetheless noted that Plaintiff "admits to short term memory loss," and is using medical marijuana to treat his pain. *Id.* at 529, 531-32. According to NP Leonard, Plaintiff's medications were likely to cause drowsiness and "impaired cognitive function." *Id.* at 529. He offered no explanation for these conclusions, which were based on his treatment of Plaintiff from August 27, 2019, to November 26, 2019. *Id.* at 528-29.

On January 29, 2020, Marilyn Geller, Ph.D., completed a two-page worksheet wherein she offered an opinion on how Plaintiff's mental impairments affected his ability to work on a regular and continuing basis. *Id.* at 535-36. Dr. Geller indicated that Plaintiff's anxiety and chronic pain would cause a "substantial loss" in his ability to maintain attention and concentration. *Id.* at 535. Dr. Geller specified this "loss would be greater than 33%," and Plaintiff would be off task "[m]ore than 33% of the day." *Id.* at 535-36. Dr. Geller also indicated Plaintiff's anxiety and chronic pain would cause a "major limitation" in his ability to maintain regular attendance, perform activities within a schedule, be punctual, and perform at a consistent pace. *Id.* According to Dr. Geller, there would be "no or very little useful ability to function" in these areas, and Plaintiff would miss "3 or more days per month." *Id.* at 535-36. Dr. Geller offered no explanation for these conclusions. *See id.*

### c. Treatment Records

Plaintiff's treatment records indicate that pain is a primary concern. *See id.* at 325, 328, 331, 336, 339, 342, 345, 348, 353, 365, 371, 430, 443, 448, 454, 468. He appears to complain of pain every time he visits a healthcare professional. *See id.* His healthcare providers have indicated that the pain problem is "fluctuating," but "occurs persistently." *Id.* at 430; *see also id.* at 460 ("The symptoms are intermittent."); *id.* at 500 ("The problem is worsening. It occurs persistently."). According to Plaintiff, the level of pain he experiences ranges from 6/10 to 8/10 on the pain scale. *See id.* at 365, 371, 430, 443, 448, 454, 468. Dr. Kelly indicated Plaintiff's depression was "associated with [his] chronic back pain." *Id.* at 472, 477, 483, 489, 494.

**\*5** Because of Plaintiff's severe pain, he had an MRI on January 19, 2019. *See id.* at 366, 398. According to Dr. Adesh Tandon, Plaintiff's MRI findings showed "multilevel degenerative disc disease with the worst level seen at L2-3 where he [ha]s got a right-sided paracentral disc herniation and a small extruded fragment." *Id.* at 366; *see also id.* at 398 (indicating "the MRI ... shows a right L2-3 disc herniation with extrusion."). The MRI also revealed that Plaintiff was experiencing "right-sided foraminal narrowing," "mild loss of disc space height ... at L5-S1," and there was "evidence of diffuse facet arthropathy." *Id.* at 366. Based on this diagnosis and others, Plaintiff was referred to pain management, and he tried physical therapy, acupuncture, aqua therapy, and various medications. *Id.* at 324-28, 366, 371, 389, 433, 435, 441.

After eight weeks of physical therapy, Plaintiff was only able to "partially meet" his goal of putting on shoes and socks, and increased mobility in bed. *Id.* at 324. He did not meet his goal of being able "to tolerate squatting movements to facilitate proper lifting mechanics." *Id.* On January 4, 2019, Physician Assistant ("PA") Joseph F. Andusko noted that Plaintiff "failed physical therapy recently and other conservative measures." *Id.* at 371. Andusko further indicated that Plaintiff's use of the medication Cymbalta resulted in "no improvement." *Id.* Plaintiff tried other medications to address his pain. *See id.* at 364, 390, 400, 441, 444. Yet, Plaintiff found that CBD oil, medical marijuana, and acupuncture did not "produce[ ] any lasting benefit." *Id.* at 441; *see generally id.* at 444-45, 450, 452, 464, 470 (indicating Plaintiff tried using medical marijuana and CBD oil to address pain).

When analyzing Plaintiff's pain, PA Erika K. Armstrong noted that his symptoms were "aggravated by ascending stairs, daily activities, descending stairs, lifting, pushing, standing and walking," and "slouching." *Id.* at 393, 396. Similarly, Dr. James T. Crosby noted Plaintiff's pain "seems to be worse when he's slouching." *Id.* at 398. Armstrong noted Plaintiff's symptoms were "relieved by exercise, heat, lying down, over the counter medication; naproxen sodium, pain meds/drugs and rest," and sitting "in an ergonomic type chair." *Id.* at 393, 396. Similarly, Dr. Crosby indicated it was "best if [Plaintiff is] sitting upright in his computer chair," *id.* at 398, and NP Leonard noted that Plaintiff's pain was palliated by changing position, heat, opioid analgesics, Advil, CBD, and medical marijuana. *Id.* at 443.

### 2. Non-Medical Evidence

On April 8, 2019, Plaintiff's live-in partner Cheryl Sherwood completed a third-party function report on how Plaintiff's impairments limited his activities. *Id.* at 264-71. Sherwood reported Plaintiff became "weaker and weaker" over the last two years. *Id.* at 264. Sherwood also reported that, except the meals he heats up in the microwave, Plaintiff "almost never" prepares food or meals. *Id.* at 266. According to Sherwood, Plaintiff sometimes needs help getting clothed and getting in and out of the shower; he needs reminders to take his medicine; he receives help taking care of the dogs; he can fold his laundry while sitting; he moves around the house by leaning on objects; he can drive; he can shop online; he reads and watches videos online; and he can manage his finances. *Id.* at 265-68. Sherwood also indicated Plaintiff's impairments

affected his concentration, explaining he could pay attention for "maybe 5 minutes" before losing focus due to pain. *Id.* at 269. Sherwood also noted Plaintiff's use of Cyclobenzaprine caused drowsiness, sleepiness, and dizziness. *Id.* at 271.

On April 14, 2019, Plaintiff completed a self-reported function report. *Id.* at 275-84. Plaintiff indicated the severity of his pain, and noted the medications used to address it. *Id.* at 283. He reported he has a "hard time focusing because of the pain," often forgetting or can't remember something "because the pain takes over [his] mind." *Id.* at 281-82. Similarly, Plaintiff indicated his pain medications caused dizziness, short term memory loss, and drowsiness. *Id.* at 284. Plaintiff also outlined his daily activities, reporting he spends most of his days watching videos and reading in a sitting position. *Id.* at 275-76, 279. He cooks with a microwave; he can let his dogs out and give them treats; he can drive a car; he can shop online; he can take care of plants in the house; and he can manage his finances. *Id.* at 275-79. However, it is hard for him to get dressed, and he needs reminders to take his medicine. *Id.* at 276-77.

**\*6** At the hearing on March 17, 2020, Plaintiff testified about his pain, his attempts to ameliorate the pain, and his daily activities. *See id.* at 37-52. Plaintiff started seeking out medical advice when his severe chronic back pain "kept coming [and] was getting greater to the point where I could not tolerate it any longer and perform physically." *Id.* at 40. According to Plaintiff, the healthcare professionals "discovered ... that it was [a] herniated disc and bulge on my L4 and L5 pressing on my spinal cord." *Id.* at 40-41. The pain would "radiate from those tense disks outward, like kinda of like down my sciatic ... down my leg, my sciatic nerve, down into my feet and also that pain triggers the other pain, like in my joints, the fibro and the rheumatoid arthritis." *Id.* at 46. According to Plaintiff, the manner and severity of his pain "depends on the day, the weather, [and] the activities." *Id.*

Plaintiff further testified that he tried ameliorating the pain with Cyclobenzaprine, Omeprazole, and THC pills. *Id.* at 43. He explained that the THC pills "definitely make me more tired [and] not with it; more kind of off in my own world sometimes but they do sometimes enable me to kind of move a little bit longer." *Id.* According to Plaintiff, the medications reduce his pain, but cause him to "lose kind of like focus and remembering what I need to do like short tasks, and also lose coordination." *Id.* at 52. Plaintiff explained that if he does not take his medications, he experiences "a lot of pain." *Id.* at 51.

But when he does take the medications he is "in a fog" and it is hard for him to "think clearly." *Id.*

Plaintiff also testified that his pain has significantly limited his daily activities. *Id.* at 44-52. He does not drive very often because leg pain and "medication drowsiness" slow his reactions. *Id.* at 45. Plaintiff's pain also prevents him from contributing to household chores. *Id.* at 45-46. He uses a cane to walk outside to retrieve mail, and he navigates through the house using objects in the house for balance and support. *Id.* at 47-48. Sherwood helps him get out of bed. *Id.* at 48. He often watches television and reads in an office chair with a stool to support his legs. *Id.* at 48-49. He testified he can relieve the back pain by sitting down, but has to put his leg up to transfer pressure from his back. *See id.* at 46, 48, 50.

### 3. The ALJ's Decision

To determine Plaintiff's RFC, the ALJ rated the persuasive value of each medical opinion and reached a conclusion about the consistency between Plaintiff's symptoms and record evidence—including medical opinions. *Id.* at 18-23. The ALJ assigned persuasive value to the opinions offered by state agency consultants but assigned no persuasive value to the opinions offered by Plaintiff's healthcare professionals. *See id.* at 20-22. The ALJ concluded the opinions offered by Drs. Jenouri, Seok, and Saeed were "persuasive because they are largely consistent with one another and supported by substantial evidence." *Id.* at 20. The ALJ summarized Dr. Jenouri's findings from the consultative examination and concluded they "support Dr. Jenouri's opinion that [Plaintiff] has 'moderate' limitations for walking and standing long periods, bending, stair climbing, lifting, and carrying, but no significant limitations for sitting handling, fingering, or feeling." *Id.*

Next, the ALJ found that Drs. Seok and Saeed "each provided a detailed narrative analysis of the evidence, which included references to specific clinical and diagnostic findings to support their opinions," including "the generalized decrease" in Plaintiff's shoulder range. *Id.* "They also noted a lumbar MRI from January 2019 and Dr. Jenouri's other clinical findings to support their proposed exertional and postural limitations." *Id.* According to the ALJ, the assessments of Drs. Jenouri, Seok, and Saeed were "consistent with the [Plaintiff's] other physical exams, which have produced findings similar to those noted by Dr. Jenouri." *Id.* The ALJ did not identify which "other physical exams" it deemed

consistent with the findings of Dr. Jenouri's sole consultative examination on April 25, 2019. *See id.*

**\*7** The ALJ also found Dr. Long's opinion to be persuasive "because it [wa]s supported by her consultative clinical exam," and it was "consistent with the [Plaintiff's] other largely benign mental exams ... and reported activities and abilities." *Id.* at 20-21. The ALJ noted Plaintiff "attributed most of his functional difficulties, including cognitive, to his alleged physical symptoms." *Id.* at 21. Yet, the ALJ offered no finding or conclusion about whether Plaintiff's pain affected his ability to concentrate, maintain pace, and keep regular attendance. *See id.* at 20-22.

Conversely, the ALJ was unpersuaded by the opinions offered by Plaintiff's healthcare professionals (i.e., Dr. Bennett, Dr. Kelly, NP Leonard, and Dr. Geller). *Id.* at 21-22. According to the ALJ, these opinions lacked persuasive value because they were completed on "check-box forms, with few, if any, explanations or references to specific clinical or diagnostic findings to support the proposed limitations." *Id.* at 22. The ALJ also found unpersuasive specific limitations proposed by each of the healthcare professionals. *See id.* at 21-22.

First, the ALJ was unpersuaded by Dr. Kelly's opinion that Plaintiff "would be 'off-task' more than 33-percent of the day and absent from work more than four days per month." *Id.* at 21. According to the ALJ, this opinion was "inconsistent with [Dr. Kelly's] March 2019 opinion that [Plaintiff] could lift and carry up to 40 pounds 'occasionally,' stand and/or walk up to six hours per day, and had no pushing, pulling, sitting, postural, manipulative, or environmental limitations." *Id.* Second, the ALJ concluded "the level of mental limitation proposed by Dr. Geller is inconsistent with the opinions of Dr. Long and both state agency psychologists." *Id.* at 22. Finally, the ALJ found unpersuasive "the opinions regarding [Plaintiff's] ability to remain on task and maintain attendance" because they were "purely speculative, they are unsupported by [Plaintiff's] documented mental status exams and inconsistent with his demonstrated ability to timely attend his various appointments as scheduled." *Id.*

### 4. Legal Standard

For disability claims filed on or after March 27, 2017, an ALJ's review of medical opinion evidence and prior administrative medical findings is governed by 20 C.F.R. § 404.1520c. Under this regulation, applicable here,

the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see also Howard D. v. Saul*, No. 5:19-CV-01615 (BKS), 2021 WL 1152834, at *11 (N.D.N.Y. Mar. 26, 2021). Rather, the ALJ must use five factors to determine the persuasiveness of the medical opinion evidence and prior administrative medical findings: supportability; consistency; relationship with the claimant; specialization; and other factors, such as "a medical source's familiarity with the other evidence in a claim." 20 C.F.R. §§ 404.1520c(a)-(c); *see also Howard*, 2021 WL 1152834, at *11.

The two most important factors in this analysis are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2); *see also Howard*, 2021 WL 1152834, at *11. The ALJ is specifically required to "explain how she considered the supportability and consistency factors" when determining the persuasiveness of "a medical source's medical opinions or prior administrative medical findings." 20 C.F.R. § 404.1520c(b)(2); *see also Howard*, 2021 WL 1152834, at *11. "If the ALJ fails adequately to explain the supportability or consistency factors, or bases her explanation upon a misreading of the record, remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted*, No. 19-CV-4630 (LJL), 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021); *see also Howard*, 2021 WL 1152834, at *12 (observing "courts have remanded where an ALJ did not adhere to the regulations") (collecting cases).

**\*8** Under the supportability factor, the more a medical opinion or prior administrative medical finding is reinforced by "relevant ... objective medical evidence and supporting explanations," the "more persuasive" it will be. 20 C.F.R. § 404.1520c(c)(1); *Carmen M. v. Comm'r of the Soc. Sec. Admin*, No. 20-CV-06532-MJR, 2021 WL 5410550, at *4 (W.D.N.Y. Nov. 19, 2021) ("The supportability factor asks how well a medical source supported their opinion(s) with objective medical evidence and supporting explanations."). Under the consistency factor, a medical opinion or prior administrative medical finding is "more persuasive" if it is consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2); *Galo G. v. Comm'r of the Soc. Sec. Admin*, No. 3:20-CV-1011 (FJS), 2021 WL 5232722, at *4 (N.D.N.Y. Nov. 9, 2021) ("The regulations provide that with respect to

consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion will be.").

"An ALJ must consider, but is not required to discuss, the three remaining factors when determining the persuasiveness of a medical source's opinion." *Howard D.*, No. 2021 WL 1152834, at *11; *see also* 20 C.F.R. §§ 1520c(a), (b)(2). However, where the ALJ has found two or more divergent medical opinions to be equally well supported and consistent with the record, the ALJ must articulate how he or she evaluated the three remaining factors. 20 C.F.R. §§ 404.1520c(b)(3).

### 5. The ALJ Erred in Evaluating the Medical Opinions

Plaintiff claims the ALJ's evaluation of medical opinion evidence is flawed because the ALJ failed to follow the correct legal standards, and substantial evidence does not support the ALJ's conclusions. (Dkt. No. 9 at 9-22.) Respondent argues the ALJ's analysis comports with the governing legal standards, and his determination is supported by substantial evidence. (Dkt. No. 14 at 6-21.)

#### a. Contrary Medical Opinion or Overwhelmingly Compelling Analysis

Plaintiff argues the ALJ could not reject the medical opinions of Drs. Kelly and Bennet about his concentration, work pace, and attendance limitations without "a contrary medical opinion or an overwhelmingly compelling circumstantial law analysis." (Dkt. No. 9 at 9-12.) Plaintiff asserts the ALJ cannot point to any contrary medical opinion because Drs. Seok and Saeed did not opine on Plaintiff's concentration, work pace, and attendance limitations. *Id.* Plaintiff accordingly claims the ALJ's RFC determination is unsupported by substantial evidence and lacks an overwhelmingly compelling analysis. *See id.* Respondent contends "the ALJ was not required to solicit a contrary medical opinion to validate his RFC findings," and the "overwhelmingly compelling analysis" is inapplicable because it "was borne out of the treating physician rule." (Dkt. No. 14 at 11-13.)

The Court agrees with Plaintiff that substantial evidence does not support the ALJ's residual functional capacity determination. (*See* Dkt. No. 9 at 12.) The substantial

evidence standard resolves this issue, *see Tejada*, 167 F.3d at 773, not the lack of an overwhelmingly compelling analysis as cited by Plaintiff. *See generally Messina v. Comm'r of Soc. Sec. Admin.*, 747 F. App'x 11, 15-16 (2d Cir. 2018) ("While a *treating physician's* retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence.") (emphasis added) (quoting *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003)); *Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000) (prohibiting the ALJ from substituting "his own expertise or view of the medical proof for the *treating physician's* opinion," finding that the ALJ did, and explaining "[t]his is not the overwhelmingly compelling type of critique that would permit the [ALJ] to overcome an otherwise valid medical opinion.") (emphasis added). The new regulations displace the treating physician rule, but they make no explicit endorsement or rejection of the rule set forth in *Shaw v. Chater* and accompanying precedent (the "*Shaw* rule"). [5] *Compare Shaw*, 221 F.3d at 134-35, *with* 20 C.F.R. §§ 404.1545(a)(3), (e) (setting forth the standard for evaluating a claimant's residual functional capacity); *id.* at § 404.1520(e) (explaining that the residual functional capacity determination involves assessing all relevant evidence); *id.* at § 404.1520c (governing the evaluation of medical opinion evidence); *id.* at § 404.1529 (governing the evaluation of evidence of a claimant's symptoms, including pain). In other words, this Court has been unable to find a clear endorsement or rejection of the *Shaw* rule in the new regulations and accompanying case law. *See generally* SSR 16-3P, 2017 WL 5180304, at *3-12 (explaining how to apply the standards set forth in 20 C.F.R. § 404.1529); SSR 96-8p (available at https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html) (last visited Feb. 22, 2022) (explaining how to assess residual functional capacity).

[5]    Plaintiff does not cite any opinions that apply the *Shaw* rule to cases governed by the new regulations. (*See* Dkt. No. 9 at 9-12.) The Court is unaware of any cases in this circuit that have explicitly applied the *Shaw* rule to claims filed on or after March 27, 2017.

**\*9**  The *Shaw* rule was created through case law that applied a regulation, the treating physician rule, which has since been superseded by a new regulation for evaluating medical opinion evidence. *See Colgan v. Kijakazi*, 22 F.4th 353, 359-60 (2d Cir. 2022) (explaining the treating physician rule) (citing 20 C.F.R. § 404.1527); *see also Messina*, 747 F. App'x at 15-16; *Byam v. Barnhart*, 336 F.3d at 183; *Shaw*, 221 F.3d

at 134-35. However, the new regulation, set forth in 20 C.F.R. § 404.1520c, does not supersede the substantial evidence standard. *See* 20 C.F.R. § 404.1520c; *see, e.g., Joseph Eugene F., v. Comm'r Soc. Sec*, No. 1:20-CV-04356 (GRJ), 2022 WL 355918, at *1, 9 (S.D.N.Y. Feb. 7, 2022) (concluding the ALJ's RFC "determination ... was supported by substantial evidence" where the claimant filed for benefits on March 28, 2017). That standard, and the accompanying case law, resolves this issue.

First, courts applying the substantial evidence standard under the prior regulation considered whether *any* medical opinion evidence supported the ALJ's RFC determination—even where there was no treating physician opinion evidence to conflict with the ALJ's RFC determination. *See, e.g., Giddings v. Astrue*, 333 F. App'x 649, 652-53 (2d Cir. 2009); *Ippolito v. Comm'r of Soc. Sec.*, No. 1:18-CV-00403 (EAW), 2019 WL 3927453, at *4 (W.D.N.Y. Aug. 19, 2019); *Bleil v. Colvin*, No. 3:15-CV-1492 (LEK) (ATB), 2017 WL 1214499, at *4-5, 8-9 (N.D.N.Y. Mar. 31, 2017); *Glessing v. Comm'r of Soc. Sec.*, No. 13-CIV-1254 (BMC), 2014 WL 1599944, at *10 (E.D.N.Y. Apr. 21, 2014). Stated differently, even when there was no opinion entitled to deference under the treating physician rule, courts weighed substantial evidence by assessing whether the ALJ's RFC determination was supported by any medical opinion. For example, in *Giddings v. Astrue*, the Second Circuit concluded the ALJ's RFC determination was not supported by substantial evidence. 333 F. App'x at 650. There, the "only medical opinion ... that specifically addresses the effect of Giddings's impairment on her ability to work" was the opinion of Dr. Hargraves, who was "not entitled to the deference of a treating physician." *Id.* at 652. The Court observed the ALJ's RFC determination "flatly contradict[ed] the medical opinion of Dr. Hargraves." *Id.* at 651. The Court also observed that other medical reports did not address or undercut "the exertional limitations indicated by Dr. Hargraves," and Giddings's testimony was "consistent with, if not supportive of, Dr. Hargraves's assessment of Giddings's exertional limitations." *Id.* at 653-54. The Court therefore concluded substantial evidence did not support the ALJ's RFC determination because: "(1) the RFC cannot be squared with Dr. Hargraves's medical opinion; (2) [the ALJ's] analysis of other medical opinions did not contradict or undercut Dr. Hargraves's medical opinion; and (3) [the ALJ] did not adequately explain why Giddings's testimony" supported the ALJ's RFC rather than Dr. Hargraves's opinion. *Id.* at 654-55.

Similarly, in *Ippolito v. Comm'r of Soc. Sec.*, the Court concluded the ALJ's RFC determination was "not supported by substantial evidence." 2019 WL 3927453, at \*5. There, "the sole medical opinion of record to assess Plaintiff's RFC was issued by consultative examiner Dr. John Schwab." *Id.* at 3. However, the ALJ's RFC determination bore "no clear relation to Dr. Schwab's opinion," or "any other medical opinion." *Id.* at 4. The Court explained "Dr. Schwab's opinion does not constitute substantial evidence for the ALJ's findings," because "Dr. Schwab offered no opinion on the particular limitations assessed by the ALJ." *Id.* The Court concluded "the ALJ erred in formulating a highly specific RFC finding for Plaintiff without reference to any competent medical opinion." *Id.*; *see generally Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion *or for any competent medical opinion*.") (emphasis added); *Thomas M. N. v. Comm'r of Soc. Sec.*, No. 5:19-CV-0360 (GTS), 2020 WL 3286525, at \*4 (N.D.N.Y. June 18, 2020) (explaining the "limited circumstances in which it is proper for an ALJ to make an RFC determination without a functional assessment from an acceptable medical source ... include (a) where the medical evidence shows relatively little physical impairment, and (b) where the record contains sufficient evidence from which an ALJ can assess the RFC.").

 **\*10** This Court remanded for similar reasons in *Bleil v. Colvin*, where substantial evidence did not support the ALJ's RFC determination because it was "contrary to the opinions of all three consultative medical examiners who considered the issue," the ALJ did not cite "any medical opinion to support her" RFC, and there was "no such medical opinion in the record." 2017 WL 1214499, at \*8-9. Likewise, in *Glessing v. Comm'r of Soc. Sec.*, the Court concluded substantial evidence did not support the ALJ's RFC determination because it was "contrary to the only medical opinion in the record that spoke of plaintiff's ability to work" and the ALJ cited no alternative opinion in support of the RFC determination. 2014 WL 1599944, at \*10, 12.

Here, the ALJ did not cite medical opinion evidence to support his conclusion that Plaintiff has no limitations in his ability to maintain concentration, work pace, and regular attendance. (*See* T. at 18-22.) The only medical opinions that address those limitations contradict the ALJ's conclusion. *Id.* at 407, 419-20, 424-25, 535-36;[6] *cf. id.* at 528-29, 531-32. For example, Drs. Kelly, Bennett, and Geller each opined that Plaintiff's impairments and accompanying symptoms, including pain, would limit his ability to maintain concentration, work pace, and regular attendance. *Id.* at 419-20, 424-25, 535-36. Although the ALJ did not find these three opinions persuasive, he cited no evidence—including medical opinion evidence—that directly contradicts them. *See id.* at 18-22.

[6]   The ALJ treats the assessments from each of these sources (i.e., Drs. Long, Kelly, Bennett, and Geller) as medical opinions. (T. at 20-22.) Neither party challenges the ALJ's decision to treat these assessments as medical opinions. (*See* Dkt. Nos. 9, 14; *see generally* 20 C.F.R. § 404.1513(a)(2) (defining "Medical opinion").) The medical opinions from Drs. Seok and Saeed make no reference to whether Plaintiff's impairments and accompanying symptoms, including pain, would limit his ability to maintain concentration, work pace, and attendance. (*See* T. at 71-73, 84-86, 99-102, 112-15.) Respondent argues this silence should be read as an implicit rejection of any such limitations. (Dkt. No. 14 at 17-18.) The Court is unpersuaded. The disability determination explanations from both Drs. Seok and Saeed indicate that their opinions were based, in part, on a review of Dr. Long's examination from April 25, 2019. (*See* T. at 65-66, 71, 78-79, 84, 94, 99-100, 107, 112-13.) Dr. Long opined Plaintiff's pain would cause mild to moderate limitations in his ability to concentrate. *Id.* at 407. Yet, Drs. Seok and Saeed indicated that no medical opinion they had reviewed was more restrictive than theirs. *Id.* at 73, 86, 102, 115. Dr. Long's opinion is such an opinion. The Court accordingly declines Respondent's invitation to infer Drs. Seok and Saeed rejected Dr. Long's opinion that Plaintiff's pain would cause mild to moderate limitations in his ability to concentrate.

For example, according to the ALJ, Dr. Kelly's opinion about Plaintiff's concentration, work pace, and attendance limitations was "inconsistent with his March 2019 opinion that [Plaintiff] could lift and carry up to 40 pounds occasionally, stand and/or walk up to six hours per day, and had no pushing, pulling, sitting, postural, manipulative, or environmental limitations." *Id.* at 21. These opinions, and the accompanying limitations, do not conflict. Dr. Kelly's opinion from March 17, 2019, did not address Plaintiff's mental limitations or his limitations on maintaining attendance. *Id.* at 384-85. It addressed his exertional, postural, manipulative,

and environmental limitations, which are separate from mental limitations. *See id.*; *see generally* SSR 96-9P, 1996 WL 374185, at *5-9 (discussing exertional and non-exertional limitations). Mental limitations are different from exertional, postural, manipulative, and environmental limitations. *See generally* SSR 96-9P, 1996 WL 374185, at *5-9. Attendance limitations are also different from—and not incorporated in the descriptions of—exertional, postural, manipulative, and environmental limitations. *See id.* The ALJ failed to explain why, or how, Plaintiff's mental and attendance limitations are inconsistent with his exertional, postural, manipulative, and environmental limitations. (T. at 21-22.)

**\*11** The ALJ also claimed Plaintiff's concentration and work pace limitations were inconsistent with: (a) "the opinions of Dr. Long," (b) "both state agency psychologists," (c) Plaintiff's "mostly normal mental status exams," and (d) Plaintiff's "demonstrated ability to timely attend his various appointments as scheduled." *Id.* at 22. Dr. Long opined Plaintiff may have "mild to, at times, moderate limitations regarding maintaining attention and concentration as he reports experiencing sudden nerve pain, which is a distraction." *Id.* at 407. This opinion is consistent with the opinions from Drs. Kelly, Bennett, and Geller that Plaintiff had limitations in his capacity to maintain concentration and work pace. *Compare id., with id.* at 419-20, 424-25, 535-36. Although the state agency psychologists offered no explanation for their conclusion, they both indicated that Plaintiff would have a mild limitation in his ability to "concentrate, persist, or maintain pace." *See id.* at 68-69, 81-82, 97-98, 110-11. Substantial evidence accordingly does not support ALJ's conclusion that the opinions from Drs. Kelly, Bennett, and Geller conflicted with the opinions of Dr. Long and both state agency psychologists on these points.

The ALJ's remaining observations about Plaintiff's mental status exams and ability to engage in self-care offer little insight into his ability to maintain concentration, work pace, and regular attendance. (*See generally* T. at 22.) As the ALJ noted, Plaintiff "testified that he takes medications that cause drowsiness, fatigue ... and mental 'fog.' " *Id.* at 19; *see also id.* at 43, 51-52, 269, 271, 282, 284. Medical sources also indicated that Plaintiff's numerous pain medications would cause "drowsiness" and "impaired cognitive function." *Id.* at 420, 529; *see also id.* at 407, 431. Both Plaintiff and various medical sources indicated that Plaintiff's pain was persistent but varied in intensity. *Id.* at 46, 52-53, 384, 403, 419, 424, 460, 500, 506, 528; *accord id.* at 283, 363-71, 407. His "normal" mental status exams accordingly

offer little insight into how his impairments, persistent pain, and medication-induced side effects impacted his ability to maintain concentration, work pace, and regular attendance. *See generally id.* at 22.

Plaintiff's determined attempts to address his impairments and associated pain through healthcare strengthen, rather than weaken, his claim. *See* 20 C.F.R. § 404.1529(c)(3)(v) ("Factors relevant to your symptoms, such as pain, which we will consider include ... Treatment, other than medication, you receive or have received for relief of your pain or other symptoms"); SSR 16-3P, 2017 WL 5180304, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."); *see also Patrick M. v. Saul*, No. 3:18-CV-290 (ATB), 2019 WL 4071780, at *10 (N.D.N.Y. Aug. 28, 2019) ("The Plaintiff's ability to attend medical appointments and engage in other daily activities of limited duration do not correlate to the Plaintiff's ability to stay on-task during an eight-hour work day or the likelihood that he would miss work several days per month because of exacerbations of his chronic back or neck pain."). The ALJ's contrary conclusion overlooks (or misapplies) the relevant inquiry under 20 C.F.R § 404.1529(c)(3)(v). *See* SSR 16-3P, 2017 WL 5180304, at *9. Plaintiff's dedication to his treatment, development of a thorough medical record, and demonstrated respect for the schedules of healthcare professionals by timely attending appointments strengthen his claim. A contrary conclusion would undermine the thrust of the relevant inquiry, deter the development of a thorough medical record, and penalize claimants for honoring scheduling agreements with healthcare professionals.

In short, Plaintiff presented opinion evidence from three sources indicating he had limitations in his ability to maintain concentration, work pace, and regular attendance. (T. at 419-20, 424-25, 535-36.) One of the Commissioner's experts explicitly opined that Plaintiff's pain would limit his ability to concentrate, *id.* at 407, and two reported that he would have mild limitations in his ability to "concentrate, persist, or maintain pace." *Id.* at 68-69, 81-82, 97-98, 110-11. The ALJ found these opinions persuasive. *Id.* at 21. Without citing contrary evidence—medical or otherwise—the ALJ nonetheless concluded Plaintiff had no limitations in his ability to maintain concentration, work pace, and regular attendance. *See id.* at 18-22. Substantial evidence does not

support this conclusion. *See Giddings,* 333 F. App'x at 652-53; *Ippolito,* 2019 WL 3927453, at *3-5; *Bleil,* 2017 WL 1214499, at *8-9; *Glessing,* 2014 WL 1599944, at *10, 12; *accord Dinapoli v. Comm'r of Soc. Sec.,* No. 14 CIV. 3652 (AMD), 2016 WL 1245002, at *14 (E.D.N.Y. Mar. 24, 2016) (finding the ALJ's RFC determination unsupported by substantial evidence where it was contradicted by evidence and unaddressed by medical opinions).

**\*12** Second, "there are limited circumstances in which it is proper for an ALJ to make an RFC determination without a functional assessment from an acceptable medical source." *Thomas M. N.,* 2020 WL 3286525, at *4. "These include (a) where the medical evidence shows relatively little physical impairment, and (b) where the record contains sufficient evidence from which an ALJ can assess the RFC." *Id.*; *see also Van Dyne v. Saul,* No. 20-CV-260 (MKB), 2021 WL 1210460, at *14 (E.D.N.Y. Mar. 31, 2021); *Hogans v. Comm'r of Soc. Sec.,* No. 1:19-CV-02737 (SDA), 2020 WL 5496114, at *14 (S.D.N.Y. Sept. 11, 2020); *Velazquez v. Berryhill,* No. 3:18-CV-01385 (SALM), 2019 WL 1915627, at *10 (D. Conn. Apr. 30, 2019); *Biro v. Comm'r of Soc. Sec.,* 335 F. Supp. 3d 464, 471-72 (W.D.N.Y. 2018).

Neither exception applies here because the ALJ did not "make an RFC determination without a functional assessment from an acceptable medical source." *Thomas M. N.,* 2020 WL 3286525, at *4. Rather, the ALJ made an RFC determination that contradicted the opinion of every medical source who opined on Plaintiff's capacity to maintain concentration, work pace, and regular attendance. (*Compare* T. at 18-22, *with id.* at 407, 419-20, 424-25, 535-36.) As explained above, that determination is unsupported by substantial evidence.

In any event, the first exception does not apply because Plaintiff suffers from a complex and severe physical impairment. *See generally id.* at 407, 419-20, 424-25, 535-36; *see also, e.g., Karmicka M. v. Saul,* No. 19-CV-00914 (JLS), 2020 WL 7352657, at *4–5 (W.D.N.Y. Dec. 15, 2020) ("The ALJ was not permitted to determine Plaintiff's RFC using a common-sense judgment because Plaintiff's medical record contained complex medical findings like MRI results."). To the extent the second exception applies, the ALJ's RFC determination contradicts substantial evidence of Plaintiff's limitations in maintaining concentration, work pace, and regular attendance. (*See* T. at 407, 419-20, 424-25, 535-36.)

### b. Check-Box Forms

Plaintiff argues the medical opinions of Drs. Kelly, Bennett, Seok, and Saeed were all completed on check-box forms, so it was improper for the ALJ to devalue the opinions of Dr. Kelly and Dr. Bennet "for using 'check-box forms, with few, if any explanations or references to specific clinical or diagnostic findings." (Dkt. No. 9 at 17, citing the ALJ's decision.) Respondent contends "poorly explained, check-marked opinions are entitled to little evidentiary weight," but this rule does not apply to the opinions of Drs. Seok and Saeed, which "were supported by sufficient rationale." (Dkt. No. 14 at 13-14.)

In *Colgan v. Kijakazi,* 22 F.4th 353, 361 (2d Cir. 2022), the Second Circuit addressed whether it was proper for an ALJ to discount a treating physician's opinion because it was presented in a check-box form. The Court answered that question in the negative, explaining "an ALJ's inquiry in disability factfinding turns on the substance of the medical opinion at issue—not its form—and ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert." *Colgan,* 22 F.4th at 361. The Court concluded the ALJ erred in discounting the opinion, which "was supported by voluminous treatment notes gathered over the course of nearly three years of clinical treatment." *Id.* at 362. The Court also found it troubling that the ALJ assigned the state agency psychologist's adverse opinion significant weight, even though it too "had been provided on a check-box form." *Id.* at 362 n.6.

**\*13** Here, the ALJ discounted the persuasive value of opinions offered by Dr. Kelly, Dr. Bennett, NP Leonard, and Dr. Geller because they were issued on "check-box forms, with few, if any, explanations or references to specific clinical or diagnostic findings to support the proposed limitations." (T. at 22.) It would have been improper for the ALJ to discount these opinions for the sole reason that they were issued on check-box forms. *Colgan,* 22 F.4th 353, 361-62; *see also* 20 C.F.R. § 404.1520c. But the ALJ did not do that here. (*See* T. at 22.) Rather, the ALJ also took issue with the opinions' lack of supporting explanations and citations to supporting medical evidence. *Id.* This critique is not just permitted under the new regulations, it is required—the ALJ must evaluate the supportability of medical opinions. *See* 20 C.F.R. § 404.1520c(c)(1). "The supportability factor asks how well a medical source supported their opinion(s) with

objective medical evidence and supporting explanations." *Carmen M.*, 2021 WL 5410550, at \*4.

The ALJ did not err in concluding these opinions lacked supporting explanations "or references to specific clinical or diagnostic findings to support the proposed limitations." (*Compare* T. at 22, *with id.* at 419-20, 424-25, 528-29, 535-36.) The assessments from Dr. Kelly, NP Leonard, Dr. Bennett, and Dr. Geller do not include supporting explanations. *See id.* at 419-20, 424-25, 528-29, 535-36. Each of these medical sources failed to explain how and/or why they concluded Plaintiff had a limited capacity to maintain concentration, work pace, and regular attendance. *Id.* Although these medical sources tangentially referenced treatment notes and objective medical evidence, they did not explain why those notes and evidence supported their conclusions. *See id.* The ALJ did not err in concluding the supportability factor weighed against finding these opinions persuasive. *Id.* at 22.

However, as explained above, the ALJ did err in concluding these opinions were inconsistent with the evidence of record. *Id.* at 21-22; *see also* 20 C.F.R § 404.1520c(c)(2) ("The more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be."). Dr. Kelly's opinion about Plaintiff's mental limitations was not inconsistent with his opinion about Plaintiff's exertional, postural, manipulative, and environmental limitations. *See id.* at 21; *compare id.* at 384-85, *with id.* at 419-20. An individual can experience severe mental limitations without experiencing severe exertional, postural, manipulative, and environmental limitations. Stated differently, a limitation in one RFC category does not necessarily dictate the existence —and corresponding severity—of a limitation in every other RFC category. *But see id.* at 21.

The opinions from Drs. Kelly, Bennett, and Geller concerning Plaintiff's ability to maintain concentration and work pace are consistent with Dr. Long's opinion and notations from both state agency psychologists. *Compare id.* at 419-20, 424-25, 535-36, *with id.* at 68-69, 81-82, 97-98, 110-11, 407. Dr. Long, state agency psychologist Dr. Brown, and state agency psychologist Dr. Blackwell each indicated that Plaintiff would have some limitations in his ability to maintain concentration and work pace. *Id.* at 68-69, 81-82, 97-98, 110-11, 407. Indeed, every medical source to weigh in on the issue indicated Plaintiff would experience limitations in his capacity to concentrate and maintain work pace. *See*

*id.* at 68-69 (state agency psychologist Dr. Brown), 97-98 (state agency psychologist Dr. Blackwell), 110-11, 407 (Dr. Long), 419-20 (Dr. Kelly), 424-25 (Dr. Bennett), 528-29 (NP Leonard) 535-36 (Dr. Geller). [7] These opinions are consistent with evidence that Plaintiff's pain often causes him to lose focus, and that his pain medications would cause drowsiness, mental fog, and impaired cognitive functioning. *Id.* at 19, 420, 529; *see also id.* at 43, 51-52, 269, 271, 282, 284, 407, 431.

[7]       *See supra*, note 6.

**\*14** Substantial evidence supports the ALJ's conclusion that opinions from Drs. Kelly, Bennett, and Geller concerning Plaintiff's concentration and work pace limitations are unsupported by references to objective medical evidence and supporting explanations. *See id.* at 21-22. However, substantial evidence does not support the ALJ's conclusion that those opinions are inconsistent with the record. *See id.*

### c. Medical Opinions of Drs. Seok and Saeed

Plaintiff challenges the ALJ's evaluation of the medical opinions of Drs. Seok and Saeed on the grounds that the ALJ did not satisfy the governing legal standard, and his decision is unsupported by substantial evidence. (Dkt. No. 9 at 14-19, 21.) Respondent contends "[t]he ALJ's analysis comports with the[ ] revised regulations" and his conclusions are supported by substantial evidence. (Dkt. No. 14 at 13-14, 19-21.)

The ALJ concluded Drs. Seok and Saeed "each provided a detailed narrative analysis of the evidence, which included references to specific clinical and diagnostic findings to support their opinions." (T. at 20.) This Court views the assessments from Drs. Seok and Saeed differently. Similar to the opinions offered by Drs. Kelly, Bennett, and Geller, the opinions offered by Drs. Seok and Saeed lack "objective medical evidence and supporting explanations." *See* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be."). The identical assessments from Drs. Seok and Saeed, completed on check box forms, include no analysis. (*See* T. at 71-73, 84-86, 99-102, 112-15; *see also Colgan*, 22 F.4th at 362 n.6 ("Troublingly, the ALJ did not seem to mind that a state agency psychologist's adverse opinion had been provided on a check-box form when assigning it significant weight.").)

They reference Plaintiff's MRI from January 19, 2019, but they fail to explain why it is relevant, and why it supports their conclusions. *See id.* Yet, according to Drs. Seok and Saeed, Plaintiff's longitudinal treatment records, not objective medical evidence alone, were "most informative in assessing the consistency of [Plaintiff's] statements about [his] symptom related limitations." *Id.* at 70, 83, 99, 112. Despite this, the doctors' identical "Additional Explanation" sections only discuss treatment notes from a single exam from April 25, 2019. *Id.* at 73, 86, 102, 115. The doctors' summary of treatment notes from that examination lacks an explanation as to why the treatment notes support the disability determination. *See id.* A summary of treatment notes and objective medical evidence is not a supporting explanation. *See, e.g.*, *Kathleen M. v. Comm'r of Soc. Sec.*, No. 8:20-CV-1040 (TWD), 2022 WL 92467, at *8 (N.D.N.Y. Jan. 10, 2022); *Esther Marie H. v. Comm'r of Soc. Sec.*, No. 5:20-CV-00668 (TWD), 2021 WL 5629076, at *4–5 (N.D.N.Y. Dec. 1, 2021).

In short, substantial evidence does not support the ALJ's conclusion that the opinions of Drs. Seok and Saeed included a "detailed narrative analysis of the evidence" with objective medical evidence and supporting explanations. *Compare* 20 C.F.R. § 404.1520c(c)(1), *with* T. at 20. Moreover, the ALJ failed to explain why he concluded these opinions were supported by objective medical evidence and supporting explanations. *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(1); *see also Rivera*, 2020 WL 8167136, at *14 (requiring remand where the ALJ fails to adequately explain the supportability factor); *Howard*, 2021 WL 1152834, at *12 (same).

### B. Evaluation of Symptoms and Residual Functional Capacity Determination

**\*15** The ALJ began his residual functional capacity analysis by listing Plaintiff's symptoms. (T. at 19.) He concluded Plaintiff's "medically determinable impairments could reasonably be expected to cause some of his alleged symptoms." *Id.* at 22. The ALJ nonetheless concluded that, based upon his consideration of Plaintiff's symptoms, "the record as a whole does not support limitations beyond those provided for within the above-found residual functional capacity." *Id.* at 19. Without explaining how Plaintiff's symptoms compared to evidence in the record, the ALJ concluded his residual functional capacity finding was "consistent with the objective medical and other evidence of record." *Id.* at 19-20. In other words, the ALJ concluded Plaintiff's "statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely

consistent with the medical evidence and other evidence of record," so Plaintiff "retains the residual functional capacity to perform work activities within the limitations" determined by the ALJ. *Id.* at 22-23.

Plaintiff claims the ALJ committed "legal error by failing to consider the relevant legal factors in assessing the limiting effects of [his] pain." (Dkt. No. 9 at 22.) Plaintiff asserts the ALJ should have analyzed the intensity, persistence, and limiting effects of his symptoms under the factors set forth in 20 C.F.R. § 404.1529c(c)(3). *Id.* at 22-26. According to Plaintiff, this error is prejudicial because a proper analysis of his symptoms under these factors supports the work pace and attendance limitations outlined in the opinions of Drs. Kelly and Bennett. *See id.* Respondent contends the ALJ properly considered some of the factors set forth in 20 C.F.R. § 404.1529c(c)(3), and was not required to explain his evaluation of the remaining factors because his reasoning was clear and correct. (Dkt. No. 14 at 21-23.)

The ALJ's errors in evaluating medical opinions impacted his conclusions about Plaintiff's symptoms and Plaintiff's residual functional capacity. *See, e.g.*, *Anne F. v. Saul*, No. 8:19-CV-774, 2020 WL 6882777, at *13 (N.D.N.Y. Nov. 24, 2020); *Rodriguez v. Colvin*, No. 3:14-CV-1552, 2016 WL 1275647, at *7 (N.D.N.Y. Mar. 31, 2016). The ALJ failed to evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms under several of the factors set forth in 20 C.F.R. § 404.1529c(c)(3). (T. at 18-23.) Moreover, because the ALJ's decision lacks an analysis of Plaintiff's symptoms in relation to the evidence, this Court cannot conduct a meaningful review of the ALJ's RFC determination. *See Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013); *Pratts*, 94 F.3d 34, 39.

### 1. Medical Opinion Errors Impacted the ALJ's Conclusions

To determine a claimant's residual functional capacity, the ALJ must consider "all of the relevant medical and other evidence," "including limitations that result from ... symptoms." 20 C.F.R. §§ 404.1545(a)(3), (d); *see also* 20 C.F.R. § 404.1529(c); SSR 16-3P, 2017 WL 5180304, at *12. The ALJ's evaluation of a claimant's symptoms in turn requires the ALJ to consider all medical evidence, including medical opinion evidence. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4) (requiring the ALJ to consider evidence from medical sources when evaluating the intensity, persistence,

and limiting effects of symptoms); SSR 16-3P, 2017 WL 5180304, at *6-7. When the ALJ conducts a flawed evaluation of medical opinion evidence, it impacts the ALJ's evaluation of symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4); *see also, e.g.*, *Anne F.*, 2020 WL 6882777, at *13; *Christopher B. v. Saul*, No. 8:19-CV-00905 (BKS), 2020 WL 5587266, at *19 (N.D.N.Y. Sept. 18, 2020). A flawed evaluation of medical opinion evidence also impacts the ALJ's assessment of a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1545(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence"); *see also, e.g.*, *Rodriguez*, 2016 WL 1275647, at *7; *Mortise v. Astrue*, 713 F. Supp. 2d 111, 127 (N.D.N.Y. 2010).

**\*16** Here, the ALJ denied Plaintiff's claim at step five, concluding he had sufficient residual functional capacity to perform work in the national economy. (T. at 23-24.) However, the ALJ's errors in evaluating the medical opinions of Drs. Kelly, Bennett, and Geller necessarily influenced his evaluation of Plaintiff's symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4); *see also, e.g.*, *Anne F.*, 2020 WL 6882777, at *13. The ALJ's errors in evaluating the medical opinions of Drs. Seok and Saeed influenced his determination that Plaintiff's statements "concerning the intensity, persistence and limiting effects of his symptoms [were] not entirely consistent with the medical evidence." (T. at 22-23; *see also* 20 C.F.R. §§ 404.1529(a), (c); SSR 16-3P, 2017 WL 5180304, at *4-7.) Those errors infected the ALJ's evaluation of Plaintiff's residual functional capacity. *See* 20 C.F.R. § 404.1545(a)(3); *see also, e.g.*, *Rodriguez*, 2016 WL 1275647, at *7. Remand is accordingly warranted. *Anne F.*, 2020 WL 6882777, at *13; *Rodriguez*, 2016 WL 1275647, at *7.

**2. The ALJ Failed to Evaluate Enumerated Factors**

The ALJ failed to consider several factors that are central to the evaluation of Plaintiff's symptoms. (T. at 18-23*; see generally* 20 C.F.R. § 404.1529(c)(3) (setting forth factors the ALJ must consider when evaluating the intensity, persistence, and limiting effects of symptoms); SSR 16-3P, 2017 WL 5180304, at *4-12 (explaining the factors and their application). For example, the ALJ did not consider: (1) the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms; (2) any precipitating and aggravating factors; (3) the type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to alleviate his

pain or other symptoms; (4) the treatment Plaintiff received to relieve his pain or symptoms; or (5) measures Plaintiff uses or has used [8] to relieve his pains or symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(ii)-(vi); *see also* SSR 16-3P, 2017 WL 5180304, at *6-8.

[8]  "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3P, 2017 WL 5180304, at *9.

The ALJ must provide specific reasons for the determination. *Cichocki*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment of symptoms if substantial evidence supports the determination. *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326 (JPO), 2019 WL 667743, at *11 (S.D.N.Y. Feb. 19, 2019) (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)); *see also Cichocki*, 534 F. App'x at 76. "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.' " *Cichocki*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). Here, however, as noted above, substantial evidence does not support the ALJ's determination. Therefore, in addition to the errors identified and discussed above, these failures warrant remand. *Christopher B.*, 2020 WL 5587266, at *19-20; *Ingrassia v. Colvin*, 239 F. Supp. 3d 605, 627-28 (E.D.N.Y. 2017).

**3. The ALJ's Decision Frustrates Meaningful Review**

The ALJ's residual functional capacity determination frustrates meaningful review because it lacks "specific reasons for the weight given to the [Plaintiff's] symptoms." SSR 16-3P, 2017 WL 5180304, at *10; *see also Cichocki*, 534 F. App'x at 76. "In evaluating an individual's symptoms, it is not sufficient for [ALJs] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' " SSR 16-3P, 2017 WL 5180304, at *10; *see also Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) ("conclusory

statements regarding Plaintiff's capacities are not sufficient"). Instead, the decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2017 WL 5180304, at *10; *see also* SSR 96-8P, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."). The ALJ's decision does not satisfy this standard. (T. at 18-23.)

 **\*17** The ALJ began his residual functional capacity analysis by listing Plaintiff's symptoms. *Id.* at 19. He then concluded that, based upon his consideration of those symptoms, "the record as a whole does not support limitations beyond those provided for within the above-found residual functional capacity." *Id.* Without explaining how Plaintiff's symptoms compared to evidence in the record, the ALJ concluded his residual functional capacity finding was "consistent with the objective medical and other evidence of record." *Id.* at 19-20. This conclusory analysis is inadequate. *See* SSR 16-3P, 2017 WL 5180304, at *10; *see also Natashia R.,* 2019 WL 1260049, at *11. It lacks "specific reasons for the weight given to [Plaintiff's] symptoms." SSR 16-3P, 2017 WL 5180304, at *10; *see also* SSR 96-8P, 1996 WL 374184, at *7. It does not explain which symptoms the ALJ found consistent with record evidence, and which symptoms the ALJ found inconsistent with record evidence. (*See* T. at 17; *see also Natashia R.,* 2019 WL 1260049, at *11; SSR 16-3P, 2017 WL 5180304, at *10; SSR 96-8P, 1996 WL 374184, at *7.) It also does not address Plaintiff's symptoms under the factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii). *See* SSR 16-3P, 2017 WL 5180304, at *4-12 (explaining the factors and their application). Absent a more specific explanation of the ALJ's analysis, this Court cannot meaningfully review whether it is supported by substantial evidence. *Pratts,* 94 F.3d at 39. Remand is accordingly warranted. *Id.*

## IV. REMAND

On remand, the ALJ should begin by re-evaluating the persuasive value of the medical opinions pursuant to 20 C.F.R. § 404.1520c. The ALJ should articulate how persuasive he finds each medical opinion under the supportability and consistency factors. *Id.* at § 404.1520c(b)(2). If the ALJ finds equally persuasive two or more medical opinions that diverge on a specific issue, he should articulate how persuasive he found those opinions under the remaining factors. *Id.* at § 404.1520c(b)(3). The ALJ should then assess the intensity, persistence, and limiting effects of Plaintiff's symptoms, considering "all of the medical and nonmedical evidence, including the information described in § 404.1529(c)." 20 C.F.R. § 404.1545(e); *see also id.* § 404.1545(a)(3); *see generally* SSR 16-3P, 2017 WL 5180304, at *4-10.

## V. CONCLUSION

Considering the foregoing, the Court finds the Commissioner's decision was not based upon correct legal standards and substantial evidence does not support the determination that Plaintiff was not under a disability within the meaning of the Social Security Act.

**WHEREFORE**, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED**.

## All Citations

Slip Copy, 2022 WL 593554

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 319354
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martha VELLONE, ON BEHALF OF
Kenneth VELLONE, Dec'd, Plaintiff,

v.

Andrew SAUL, Commissioner
of Social Security, Defendant.

1:20-cv-00261 (RA) (KHP)
|
Signed 01/29/2021

**Attorneys and Law Firms**

Jeffrey David Delott, for Plaintiff.

Mary Ellen Brennan, U.S. Attorney's Office, New York, NY, for Defendant.

**Report and Recommendation**

KATHARINE H. PARKER, United States Magistrate Judge

**\*1  To: Hon. Ronnie Abrams, United States District Judge**

**From: Katharine H. Parker, United States Magistrate Judge**

Named-plaintiff Martha Vellone, represented by counsel, commenced this action against the Commissioner of the Social Security Administration (the "Commissioner") on behalf of her now-deceased ex-husband, Kenneth Vellone ("Plaintiff" or "Vellone"). Pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), Vellone seeks review of the Commissioner's decision that he was not disabled under Sections 216(i) and 223(d) of the Act from June 15, 2016— Vellone's alleged disability onset date—through January 21, 2019, the date of his passing.

The parties submitted cross motions for judgment on the pleadings (ECF Nos. 28, 40), pursuant to the Court's Order at ECF No. 10. Plaintiff appeals the Commissioner's decision claiming that: (1) the Administrative Law Judge ("ALJ") failed to properly consider the relevant medical evidence of record in determining Plaintiff's residual functional capacity to perform work; (2) the ALJ's evaluation of Plaintiff's

subjective complaints were not supported by substantial evidence; and (3) the ALJ's Step 4 and Step 5 analysis was not supported by substantial evidence. For the reasons set forth below, I respectfully recommend that Plaintiff's motion be GRANTED and that the Commissioner's motion be DENIED.

**Background**

Plaintiff was born on October 2, 1957. (Administrative Record ("R.") 68, 289.) He obtained a GED in 1977 and spent most of the following 35 years working as a jeweler. (R. 183.) As a jeweler, Plaintiff would fabricate and repair various types of jewelry—work which required him to walk for an hour, stand for an hour, sit for six hours, and stoop for 30 minutes each day. (R. 39, 196.) Plaintiff was also required to be able to lift equipment and/or objects of up to ten pounds. (R. 39, 196.) Plaintiff was laid off from his job in June of 2016. (R. 182.) The record reveals that Plaintiff believed he was laid off because his disability limited his ability to work as a jeweler. (*See* R. 157.) Although Plaintiff attempted to resume working at some point, he was unable to hold a job.

***I. Procedural History and Hearing Testimony***

Plaintiff filed his initial claim for disability insurance benefits under the Act on December 5, 2017. (R. 10, 69.) The Commissioner denied Plaintiff's initial application on April 6, 2018. (R. 86.) Plaintiff contested the denial and filed a request for hearing on May 9, 2018, which was granted. (R. 10.) Unfortunately, Plaintiff passed away on January 21, 2019 due to a heart attack. (R. 32.) On April 12, 2019 Plaintiff's ex-wife, Martha Mooniaz (Vellone) appeared and testified at the ALJ hearing on Plaintiff's behalf. (R. 36.) Ms. Mooniaz testified that, starting in 2016, Plaintiff was unable to maintain a stable job because his chronic pain forced him to regularly miss work. (R. 37-38, 43, 50.) Further, Mooniaz testified that she visited Plaintiff every weekend over the course of the last couple of years prior to his passing. (R. 42.) During those visits, Mooniaz observed Plaintiff walking around his home with a noticeable limp due to his back pain. (R. 42-43.) According to Mooniaz, Plaintiff would often complain that he was unable to sit or stand for extended periods of time because of his back pain and that he suffered from back spasms, recurrent pins and needles down his legs, and numbness. (R. 43-44, 52, 54-55.) Mooniaz also testified that Plaintiff was unable to drive a car, attend his children's soccer games, or play with his children in the park due to his pain. (R. 46, 49.)

Finally, Mooniaz testified that Plaintiff took two medications – Neurontin and Oxycodone – for pain management. (R. 55.)

## II. Summary of Relevant Medical Evidence

### Hospitalizations Prior to the Alleged Disability Onset:

**\*2** The record indicates that Vellone was hospitalized numerous times at New York Presbyterian Hospital in the year preceding the onset of his alleged disability. (R. 262-308.) However, only a few of the hospital visits are remotely relevant to the instant action. On April 21, 2015, Vellone was admitted to the emergency room complaining of pain to his left pelvic area. A physician, Edwin Naamon, M.D., assessed Vellone's hip and determined that Vellone was ambulatory, not in acute distress, and that he should be discharged. (R. 308.) Vellone was also admitted to the emergency room on multiple occasions due to his sustained use of oxycodone. For instance, on July 5, 2015 Vellone was found unconscious on a New York City bus. (R. 303.) The hospital records indicate that Vellone refused treatment and wanted to be discharged immediately. (R. 304; see also R. 305.) Vellone also admitted himself on November 24, 2015 due to severe oxycodone withdrawal. (R. 301.)

### Hospitalizations After the Alleged Disability Onset:

On August 14, 2017 Vellone received an x-ray of his spine at the Philips Ambulatory Care Center, part of the Mount Sinai Beth Israel hospital system. (R. 240-41.) The x-ray was assessed by an attending radiologist and revealed mild degenerative changes involving the L3 to the S1 disc spaces, multilevel facet arthropathy, and probable muscle spasms. (R. 241.) [1]

[1] These findings were also confirmed by the medical evaluation conducted in connection with Plaintiff's initial disability determination. (R. 74-75.)

Then, on October 1, 2017, Vellone's mother called the police because Vellone was verbally abusing and threatening her. (R. 268.) As a result, Vellone was admitted to a hospital for treatment. He told those evaluating him that he had been mixing opiates with vodka in order to, at least in part, treat his pain. (R. 268.) Just a few weeks later, on October 28, 2017, Vellone was once again found unresponsive and was admitted to New York Presbyterian. Vellone reported to the doctor assigned to his care on this occasion that he drank beer and took "2 percocets" in an attempt to relieve chronic back pain. (R. 264.)

### Dr. Abdul C. Azeez:

The record indicates that Dr. Abdul C. Azeez, M.D. was Plaintiff's primary care physician from 1997 through Plaintiff's death in early 2019. (See, e.g., R. 185.) However, the only substantive medical evidence of record directly associated with Dr. Azeez is a Medical Findings Summary from March of 2018. (R. 331-33.) The summary classified Vellone's back pain as moderately severe. (R. 331.) Further, Dr. Azeez opined that Vellone's symptoms were likely to increase if he were placed in a competitive work environment. (R. 331.) Dr. Azeez noted that Plaintiff's back pain "continuously" interfered with Plaintiff's attention and concentration (R. 331,) and that Plaintiff would be limited to three hours of sitting and three hours of standing/walking over the course of an eight-hour workday (R. 332.) Dr. Azeez also opined that Vellone could never stoop, kneel, or crouch and that he could occasionally lift materials between 10 and 15 pounds. (R. 332.) Dr. Azeez's summary also noted that Vellone could occasionally operate a motor vehicle and occasionally perform fingering and fine manipulation. (R. 332.) Finally, Dr. Azeez opined that Plaintiff's condition would force more than 3 absences from work over the course of a month, that Plaintiff would be off task over 20% of the workday, and that Plaintiff would require a daily two to three hour work break to manage his pain. (R. 333.) Dr. Azeez also clarified that these limitations applied on or before June 2016 but offered limited objective clinical findings to support his conclusions. (R. 331, 333.)

### Dr. Richard Chang:

Plaintiff saw Dr. Richard Chang, M.D. twice during the month of December 2017 based on a referral from Dr. Azeez in light of Plaintiff's persistent back pain. (See R. 318.) During the first visit, on December 15, 2017, Vellone told Dr. Chang that his back pain was sharp and constant and had been worsening over the course of recent months. (R. 318.) The pain radiated from Vellone's back to his left lower extremity and worsened with any movement, especially while walking or standing. (R. 318.) Dr. Chang noted arthritic deformities in Plaintiff's hip and degenerative disc disease in Plaintiff's spine. (R. 320.) Dr. Chang outlined Vellone's treatment options, directed him to continue taking his pain medication, and prescribed gabapentin to supplement his pain management. (R. 321.)

**\*3** During the second follow-up visit, on December 29, 2017, Vellone was in even more pain. Vellone rated his back pain as ten out of ten (the worst possible pain) and reported

that the gabapentin caused negative side effects. (R. 311.) Plaintiff also reported that the pain was affecting his ability to work and support his family. (R. 311.) Dr. Chang analyzed an MRI of Plaintiff's back and found a "left central disc herniation contacting the descending left Si nerve root at L4-5" along with a "large broad based disc herniation with left central and foraminal disc protrusion contacting the exiting L4 and descending L5 nerve roots." (R. 314.) Dr. Chang also upped Plaintiff's dose of gabapentin, directed Plaintiff to continue taking his other medications, and recommended supplemental steroid injections. (R. 314.) Finally, Dr. Chang noted at both visits that Plaintiff was able to heel, toe, and tandem walk. (R. 313, 320.)

*Dr. Joseph Solberg:*

Plaintiff also saw Dr. Joseph Solberg, D.O. twice during the month of November 2018. At the first visit, which took place on November 8, 2018, Plaintiff reported nine out of ten back pain that was exacerbated by walking, sitting, and standing. (R. 328.) He reported that the pain was constant. (R. 328.) However, Vellone failed to bring his MRI to his visit with Dr. Solberg. Accordingly, Vellone scheduled a follow-up appointment to provide the MRI and to discuss a potential surgical referral. (R. 329.) At the November 20, 2018 follow-up visit, Plaintiff reported the same type of pain (radiating from the left buttock to the foot) and the same pain severity. (R. 324.) Dr. Solberg recorded Plaintiff's gait as normal and confirmed Plaintiff's ability to heel/toe walk. (R. 326.) Further, based on Plaintiff's MRI, Dr. Solberg found a "paracentral disc protrusion [at] L5-S1." (R. 326.) Because other treatment efforts had failed, Dr. Solberg referred Vellone for back surgery. (R. 326.)

*Dr. S. Ahmed:*

On March 21, 2018 Dr. S. Ahmed – a non-examining state agency medical consultant – evaluated Vellone's medical records in connection with Plaintiff's initial application for disability benefits. In short, Dr. Ahmed analyzed the medical evidence outlined above that was available and, based on those records, determined that Vellone had a severe medically determinable impairment—namely, Degenerative Disc Disease. (R. 75.) However, based on this evaluation, the disability examiner determined that Plaintiff was not disabled under the Act. (R. 77-78.)

**III. The Commissioner's Decision**

ALJ Carlton determined that Plaintiff met the insured status requirements of the Act through the end of the year 2020. (R. 12.) Although the ALJ found that Plaintiff engaged in substantial gainful activity from October 16, 2017 through November 3, 2017, he nevertheless found that there had been a continuous 12-month period since the alleged disability onset date during which Plaintiff did not engage in substantial gainful activity. (R. 12-13.) Further, the ALJ found that Plaintiff had degenerative disc disease of the lumbar spine with multilevel herniated discs and that this condition constituted a severe impairment under the Act. (R. 13.)[2] However, the ALJ concluded that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13.) The ALJ then found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that he could never climb ladders, ropes or scaffolds; must avoid slippery or uneven surfaces; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; have no exposure to unprotected heights; and could not operate a motor vehicle as a condition of employment. (R. 13.) As such, the ALJ determined that Plaintiff was capable of performing his past relevant work as a jeweler since that work does not require the performance of work-related activities precluded by Plaintiff's RFC. (R. 16.)

[2]     Although the record contains some evidence of potential psychological impairments, Plaintiff does not seek judicial review on that basis. (*See, e.g.*, R. 76.)

**\*4** Thus, the ALJ held that Plaintiff had not been disabled, as defined by the Act, from June 15, 2016 through January 21, 2019 (the date of his death). (R. 17.) Plaintiff appealed that determination to the Appeals Council. (R. 236-39.) The Appeals Council denied Plaintiff's appeal on December 9, 2019. (R. 1.) The instant case followed.

**Discussion**

**I. The Applicable Law**

**A. Judicial Standard of Review of the Commissioner's Determination**

A court's review of a Social Security disability determination requires two distinct inquiries. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Dwyer v. Astrue*, 800 F. Supp.

2d 542, 546 (S.D.N.Y. 2011). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id.* Moreover, if the Commissioner's decision is supported by substantial evidence, the ALJ's findings as to any facts are conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., id.* at 266-67 (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *See, e.g., Donnelly v. Colvin*, No. 13-cv-7244 (AJN) (RLE), 2015 WL 1499227, at *8 (S.D.N.Y. Mar. 31, 2015).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Thus, the court does not determine *de novo* whether a claimant is disabled. *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-cv-1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination ... with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**\*5** If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

## B. Legal Principles Applicable to the Commissioner's Disability Determination

Under the Act, every individual considered to have a "disability" is entitled to benefits. 42 U.S.C. §§ 423(a)(1), 1382. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's impairments must be "of such severity that he is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following sequential five-step inquiry:

(1) First, determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

(2) Second, if not gainfully engaged in any activity, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

(3) Third, if the claimant has a "severe impairment," determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled and the claimant

will be eligible for benefits. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At this stage, the Commissioner also must determine the claimant's RFC; that is, her ability to perform physical and mental work activities on a sustained basis despite her impairments.[3] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

(4) Fourth, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must determine whether the claimant possesses the RFC to perform his or her past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

(5) Fifth, if the claimant is not capable of performing work he or she performed in the past, the Commissioner must determine whether the claimant is capable of performing other work which exists in the national economy.

[3]     A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is his maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs, the opinions of treating and consultative physicians, and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)).

**\*6** The claimant bears the burden of proof at the first four steps of the analysis. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). At the last step, however, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

In *Burgess v. Astrue*, the Second Circuit set forth the factors an ALJ was obligated to evaluate when determining whether to give a treating physician's medical opinion controlling weight in accordance with the so-called "treating physicians rule" per 20 C.F.R. §§ 404.1527(c), 416.927(c). 537 F.3d 117 (2d Cir. 2008). At base, the rule required an ALJ to assign weight to the medical opinions of a claimant's treating physician based on medically acceptable techniques and the other medical evidence of record. *Id.* (citation omitted).

But *Burgess* evaluated the treating physicians rule under regulations applicable to claims filed prior to March 27, 2017. Claims filed on or after March 27, 2017 are subject to new regulations set forth in 20 C.F.R. §§ 404.1520c and 416.920c.

Under these new regulations, while the Commissioner no longer needs to assign particular evidentiary weight to treating sources or their opinions (as is required under the Treating Physicians Rule), the Commissioner must still consider certain factors in considering medical opinions. *See* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c); *see also Andrew G. v. Comm'r of Soc. Sec.*, 2020 WL 5848776, at \*5 (N.D.N.Y. Oct. 1, 2020) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017)). The new regulatory factors are: (1) supportability, (2) consistency, (3) relationship with the claimant (which has five sub-factors of its own to consider), (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Further, in cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion, but need not expound on the remaining three. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). The Commissioner is tasked with analyzing medical opinions at the source-level, meaning that the Commissioner need not discuss each and every medical opinion in the record, and may apply the new factors holistically to a single medical source. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). These new rules do not apply to the Commissioner's analysis or consideration of nonmedical sources. 20 C.F.R. §§ 404.1520c(d), 416.920c(d).

With respect to the two required factors, the new rules provide that, for supportability, the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Simply put, supportability is an inquiry confined to the medical source's own records that focuses on how well a medical source supported and explained their opinion. As for consistency, the new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3). Simply put, consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record.

### C. Development of the Record

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 292 of 356
Vellone on behalf of Vellone v. Saul, Slip Copy (2021)

2021 WL 319354

**\*7** However, even before the Court assesses whether the ALJ applied proper legal principles or whether the ALJ's decision is supported by substantial evidence, as described above, the Court must assess whether the ALJ satisfied the threshold for fully developing the administrative record. In Social Security proceedings, the ALJ must affirmatively develop the record on behalf of the claimant, including those represented by counsel. *See Moran v. Astrue,* 569 F.3d 108, 112-13 (2d Cir. 2009); *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996). As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits. *Moran,* 569 F.3d at 108, 112. This is so because a hearing on disability benefits is a non-adversarial proceeding. Additionally, the applicable regulations require the ALJ to develop a claimant's complete medical history. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)-(f)). In other words, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record" before it even assesses the evidence presented. *Scott v. Astrue,* No. 9-cv-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (internal quotations and citations omitted).

## II. Analysis

### A. The Duty to Develop the Record and the ALJ's RFC Determination

As set forth above, the Court must, as a threshold matter, determine whether the ALJ satisfied his duty to develop the record. Where there are deficiencies or gaps in the record, an ALJ must develop a claimant's medical history, to the extent possible. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999). Indeed, the ALJ has the authority to subpoena medical evidence on behalf of a claimant, but, at the very least, must request the missing records through ordinary means. *Gonell De Abreu v. Colvin,* No. 16-cv-4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017).

In the instant case, the record suggests that Plaintiff's primary physician was Dr. Abdul Azeez. Dr. Azeez started treating Plaintiff in 2003, at the latest. (R. 237, 331.) Some evidence indicates that Plaintiff first saw Dr. Azeez as early as 1997. (R. 185.) Either way, it is clear that Dr. Azeez treated Plaintiff for at least fifteen years prior to Plaintiff's death. However, the *only* medical record included in the administrative record from Dr. Azeez is a three-page Medical Findings Summary from March 2018. (R. 331-33.) Thus, there is a glaring gap in the record with respect to Plaintiff's medical history—a gap

which includes over a year and a half's worth of records after the onset date of Plaintiff's alleged disability. Further, there is no evidence that the ALJ or anyone from the Commissioner's office endeavored to acquire these records. (*See* R. 70-74) (referencing attempts to acquire a consultative examination report from Dr. Azeez, but no additional records).

Counsel for the Commissioner correctly points out, however, that both the SSA and the ALJ took a "number of actions to try to help Plaintiff develop the record ... including ... questioning Plaintiff at the hearing about whether any evidence was missing" and offering to help Plaintiff's counsel retrieve a missing record from Dr. Solberg's office. (ECF No. 41 at 12 n.12.) While there is no evidence that the ALJ attempted to retrieve additional medical records or treatment notes from Dr. Azeez, Plaintiff's counsel certified at the ALJ hearing that the record was complete and that no records were outstanding at that time. (R. 32.)

The Court notes that the administrative record in this case is relatively sparse. The record only contains a single functional assessment of Plaintiff's work-related capabilities and, as discussed above, lacks any medical records from a fifteen year treating relationship between Plaintiff and Dr. Azeez. An ALJ's affirmative duty to develop the record on behalf of a claimant represented by counsel is particularly important in social security cases where the record is so limited. *Ajibose v. Colvin,* 2016 U.S. Dist. LEXIS 136685, at *30-31, 2016 WL 8711342 (E.D.N.Y. Sept. 30, 2016). However, the fact that Plaintiff's counsel affirmatively represented that no additional records were pending or missing suggests that the Plaintiff's medical history may be complete. *See Eusepi v. Colvin,* 595 Fed. App. 7, 9 (2d Cir. 2014) (summary order) (finding that the ALJ had no duty to further develop the record where claimant's attorney submitted additional post-hearing materials and then represented that the medical record was complete). Given these circumstances, whether ALJ Carlton was obligated to inquire about and obtain additional records from Dr. Azeez is a close question. Accordingly, the ALJ's treatment of the record evidence requires additional analysis.

**\*8** Notwithstanding the sparse administrative record, ALJ Carlton found that Plaintiff retained the RFC to perform sedentary work, except that he could never climb ladders, ropes or scaffolds; must avoid slippery or uneven surfaces; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; have no exposure to unprotected heights; and could not operate a motor vehicle as a condition of employment. (R. 13.) In arriving at this RFC, the ALJ

highlighted the inconsistencies between Dr. Azeez's Medical Findings Summary and the other medical evidence of record. (R. 16.) Importantly, however, the record lacks any functional assessment of Plaintiff's limitations from any medical source other than Dr. Azeez. Indeed, there is no indication that the ALJ sought to solicit additional functional assessments from other treating sources, such as Dr. Chang or Dr. Solberg. Unable to rely on such alternative functional assessments, the ALJ eventually discredited Dr. Azeez's findings based, in large part, on treatment notes from the other doctors of record. (*See* R. 16, 313-14, 320, 325-26.) The ALJ was not permitted to do so.

Even assuming *arguendo* that there are in fact material inconsistencies between Dr. Azeez's treating opinion and the other physician's treatment notes, the ALJ was not permitted to rely on his own interpretation of those treatment notes to reconcile those inconsistencies. "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Merriman v. Comm'r of Soc. Sec.*, No. 14-cv-3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015); *see also Martin v. Berryhill*, No. 16-cv-6184 (FPG), 2017 WL 1313837, at *4 (W.D.N.Y. Apr. 10, 2017) (remanding where the ALJ determined that plaintiff could perform sedentary work absent any medical opinion regarding the plaintiff's ability to work at any exertional level). The evidence ALJ Carlton relied on in rejecting Dr. Azeez's functional assessment – *i.e.*, treatment notes showing Plaintiff's generally normal gaits and ability to heel, toe, and tandem walk – is not medical opinion. Nor can such evidence overcome the need for a medical source to weigh in on Plaintiff's functional limitations. *Hooper v. Colvin*, 199 F. Supp. 3d 796, 816 (S.D.N.Y. 2016). While ALJs are sometimes permitted to make an RFC determination without a treating source opinion evidence, "the RFC assessment will be sufficient only when the record ... contains *some* useful assessment of the claimant's limitations from a medical source." *Morales v. Colvin*, No. 3:16-cv-0003 (WIG), 2017 WL 462626, at *3 (D. Conn. Feb. 3, 2017) (emphasis in original) (citation omitted). Accordingly, the intermittent references to Plaintiff's normal gait and ability to heel, toe, and tandem walk cited by the ALJ are wholly inadequate bases, on their own, to discredit Dr. Azeez's findings with respect to Plaintiff's ability to sit, stand, or walk throughout an eight-hour workday.

Further, having reviewed the entire record in detail, none of the treatment notes from other doctors address Plaintiff's work-related functional capacity in any meaningful way. To the extent that the ALJ relies on additional treatment notes referencing Plaintiff's normal motor function, normal muscle bulk, negative straight leg raising, and range of motion, the ALJ cherry picked these findings amongst far more serious symptoms, impairments, and diagnoses discussed in those very same records. (*See also* Section IIB *infra*.) Thus, there is inadequate support in the record for the ALJ's RFC determination based on the record evidence. *See Quinto v. Berryhill*, No. 3:17-cv-0024 (JCH), 2017 WL 6017931, at *13-14 (D. Conn. Dec. 1, 2017) (remanding because the "ALJ improperly substituted his own expertise and interpretation for that of the treating physician by cherry picking the evidence from the treatment notes and interpreting the complex diagnostic evidence himself").

Accordingly, I respectfully recommend that this matter be remanded with instructions to the ALJ: (1) to acquire additional medical records from Dr. Azeez concerning his longstanding medical relationship with Plaintiff and the alleged disability; (2) to seek additional medical source statements regarding Plaintiff's work-related functional limitations from the other treating sources (to the extent these sources are able to do so based on their notes and recollection); and (3) to reevaluate Plaintiff's claim and RFC based on this additional evidence.

### B. The ALJ's RFC Determination is Otherwise Not Supported by Substantial Evidence

**\*9** To start, in reviewing the ALJ's decision, it is clear that the ALJ addressed Dr. Azeez's treating opinion contained in the Medical Findings Summary both with respect to supportability and consistency, as required by the new regulations outlined above. However, the ALJ's analysis with respect to those regulatory factors, at least with respect to "consistency," was lacking.

As noted above, Dr. Azeez opined that Plaintiff's condition would force more than three absences from work over the course of a month and that Plaintiff would be off task over 20% of the workday. (R. 332.) The ALJ found, however, that the only support for these opinions was a note from Dr. Azeez that "the claimant experiences back and hip pain," which the ALJ found "does not indicate why these symptoms would warrant such severe absenteeism and off-task behavior." (R. 16.) Thus, the ALJ reasonably found that there was limited evidence provided by Dr. Azeez to substantiate his assessment

of Plaintiff's limitations. It bears noting, however, that it is possible that Dr. Azeez's findings would be further supported by records from Dr. Azeez's prior interactions with Plaintiff. Thus, as recommended above, the ALJ should endeavor to obtain those records to conduct a more complete analysis with respect to the supportability of Dr. Azeez's Medical Findings Summary, if additional records indeed exist.

The ALJ also criticized Dr. Azeez's assessment of Plaintiff's work-related limitations with respect to the regulatory factor of "consistency." The ALJ explained that Dr. Azeez's opinion was inconsistent with other medical evidence in the record—evidence which indicated that Vellone had a "generally intact musculoskeletal and neurological functioning, including generally normal gaits and an ability to heel, toe, and tandem walk ..." (R. 16.) However, this medical conclusion proffered by the ALJ misrepresents the record evidence. Indeed, some of the records ALJ Carlton cites to show Plaintiff's "generally intact musculoskeletal ... functioning" and "generally normal gaits" specifically state that Plaintiff had an "antalgic" gait—which means that Plaintiff demonstrated an abnormal walking pattern due to pain. [4] (R. 313, 320.) Further, the very same records indicate that Plaintiff had worsening lower back pain, which led the examining physician, Dr. Chang, to recommend that Plaintiff receive epidural steroid injections and to increase Plaintiff's dose of gabapentin from 300 to 600 milligrams in order to help manage the worsening pain. (R. 314.) Although one of the records cited by the ALJ does note that Plaintiff had a normal gait on November 20, 2018 (R. 326,) that record also indicates degenerative changes in Plaintiff's spine along with a "left paracentral disc protrusion" and "neuroforaminal narrowing." [5] (R. 326.) Thus, it is clear to the Court that the ALJ cherry picked treatment notes that supported his RFC determination while ignoring equally, if not more significant evidence in those same records.

[4]  See  https://www.ncbi.nlm.nih.gov/books/NBK559243/ (last visited January 20, 2021).

[5]  Neuroforaminal narrowing refers to a narrowing of the spinal column at the point where the spinal nerve exits, which causes inflammation and pain. See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6615450/ (last visited, Jan. 20, 2021).

Further, while the ALJ correctly points out that Vellone was able to heel, toe, and tandem walk, that fact is insufficient to ignore the functional limitations prescribed by Dr. Azeez. See Morris v. Colvin, No. 15-cv-5600 (JFB), 2016 WL 7235710,

at *9 (E.D.N.Y. Dec. 14, 2016) ("the ALJ's reliance on [a treating physician's] medical notes indicating that plaintiff had a normal gait and normal motor and sensory exams does not justify his rejection of the treating physician's opinions"). Simply put, ALJ Carlton was not in a position to determine whether Plaintiff's ability to heel, toe, and tandem walk during a medical examination should invalidate the physical limitations set forth in Dr. Azeez's Medical Findings Summary. Thus, although the ALJ went through the motions of assessing the consistency of Dr. Aziz's opinion with the rest of the medical evidence of record, that analysis was lacking for the reasons set forth above.

*10  With respect to the RFC determination itself, the ALJ determined that Plaintiff was capable of performing sedentary work, with certain additional limitations. The Second Circuit acknowledges that a plaintiff/claimant must be capable of sitting for extended periods of time in order to be able to perform sedentary work. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("the concept of sedentary work contemplates substantial sitting"). Similarly, the Social Security Administration generally recognizes that an individual must be able to sit for a total of 6 hours in an 8-hour workday in order to perform sedentary work. SSR 96-9P, 1996 WL 374185, at *6 (1996). Thus, the ALJ's RFC determination materially differs from Dr. Azeez's medical opinion, which limits Plaintiff to three hours of sitting in an eight-hour workday. (R. 332.) In setting forth an RFC different from that of the lone functional assessment in the record, the ALJ failed to cite any medical evidence that directly contradicts the limitations Dr. Azeez ascribed to Plaintiff. Having reviewed the administrative record in detail, the Court notes that no such evidence exists. Instead of crediting Dr. Azeez's opinion, the ALJ found the opinion "only somewhat persuasive to the extent that it is consistent with performing work at the sedentary exertional level." (R. 16.) Therefore, absent any medical evidence that would warrant invalidating Dr. Azeez's assessment of Plaintiff's work-related capabilities, the ALJ relied on his own lay opinion to determine Plaintiff's RFC, which is patently improper. Merriman, 2015 WL 5472934, at *18.

The Commissioner cites to various cases, including Matta v. Astrue, in support of the proposition that an ALJ's conclusions need not correspond to a medical opinion in the record. Notwithstanding the fact that Matta was a mental impairment case, it is distinguishable on other grounds as well. In Matta the Court summarized the opinions of four medical sources that conflicted with one another with respect to the plaintiff's

ability to perform work. The plaintiff in *Matta* challenged the ALJ's conclusion that the evidence revealed plaintiff's stable condition and moderate symptoms. *Matta v. Astrue*, 508 Fed. App. 53, 56 (2d Cir. 2013) (summary order). The Court found that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the ... medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Id.* Further, the court in *Matta* confirmed that the treating psychiatrist's opinion was not entitled to controlling weight since the ALJ provided sufficient reasons for departing from that opinion." *Id.* at 57.

In the instant case, the issue is not that ALJ Carlton's decision does not "perfectly correspond" with Dr. Azeez's Medical Findings Summary. The issue is that it completely departs from Dr. Azeez's opinion, which was the only functional assessment contained in the administrative record. Further, the ALJ's RFC is not otherwise consistent with the record, as was the case in *Matta*. Here, the vast majority of relevant evidence suggests that Plaintiff experienced severe back pain throughout the relevant period and that his doctors' extensive efforts to help manage that pain were consistently unsuccessful, leading Dr. Solberg to eventually recommend back surgery. (*See, e.g.*, R. 314, 326.) Indeed, the opposite was the case in *Matta*, where the plaintiff's condition deteriorated only after he stopped taking his medication. 508 Fed. App. at 57. Moreover, the fact that ALJ Carlton ignored substantial evidence in assessing Dr. Azeez's opinion with respect to the mandatory regulatory factor of "consistency," (as explained above) demonstrates that the ALJ provided insufficient reasons to permit a departure from the treating source's functional assessment.[6]

[6]     To the extent that the Commissioner cites to cases in support of the proposition that a formal medical opinion is not required for and ALJ to properly render an RFC, those decisions are equally distinguishable. For instance, in *Trepanier v. Comm'r of Soc. Sec.*, the Court endorsed the ALJ's decision to fill gaps in a treating orthopedist's functional assessment based on other substantial evidence in the record. 752 Fed. App. 75, 79 (2d Cir. 2018) (summary order). Quite differently, in this case, the ALJ's RFC determination totally contradicts the treating source's opinion.

Accordingly, I recommend that this matter should also be remanded because the ALJ's RFC determination is not supported by substantial evidence.

### C. Plaintiff's Subjective Complaints

**\*11**  In order to determine whether a claimant is disabled, an ALJ must consider subjective evidence of pain or disability drawn out in a claimant's testimony or from other portions of the record. *See* 20 C.F.R. § 404.1529(a). If an ALJ finds that the claimant has a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1), the ALJ must then evaluate the "intensity and persistence of [the claimant's] symptoms, such as pain," based on all of the available evidence when determining the claimant's RFC. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c). An ALJ cannot reject subjective complaints of pain simply because the objective medical evidence of record does not substantiate those complaints. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c). Instead, the ALJ must assess the subjective complaints in relation to the other evidence of record. 20 C.F.R. §§ 404.1529(c)(3)-(4). To the extent an ALJ finds that a claimant's subjective complaints are not supported by the record, the ALJ must clearly articulate "specific reasons for the weight given" to the complaints that are consistent with and supported by the record such that a reviewing court can assess that evaluation. SSR 16-3p.

The ALJ concluded that Vellone's statements about the intensity, persistence, and limiting effects of his pain were "inconsistent with the longitudinal medical evidence of record." (R. 14.) Specifically, the ALJ discussed Dr. Chang's treatment notes evaluating multiple images of Plaintiff's spine throughout 2017 that showed mild degenerative changes, a left central disc herniation, foraminal stenosis, lumbar facet arthropathy, and degenerative disc disease at multiple levels. (R. 14-15.) However, the ALJ noted that while Plaintiff complained of ten out of ten back pain in a September 2017 hospital visit with Dr. Chang, Plaintiff was observed to be in no acute distress. (R. 15.)

In dismissing Plaintiff's subjective complaints, the ALJ also considered Dr. Solberg's treatment records. Those records indicated to the ALJ that Plaintiff had a normal gait, an ability to heal, to and tandem walk, negative straight leg raise tests, normal muscle bulk in his lumbar spine, and positive strength tests. According to the ALJ, these treatment notes were inconsistent with Plaintiff's reports of pain. (R. 15.)

Vellone on behalf of Vellone v. Saul, Slip Copy (2021)

2021 WL 319354

Finally, rounding out the analysis, the ALJ generally stated that he considered Plaintiff's daily activities, symptoms, aggravating factors, medications and side effects, and measures used to relieve symptoms in considering Plaintiff's subjective complaints. (R. 15.)

However, as already discussed above, the ALJ failed to address various portions of these records that reflect both physicians' efforts to treat Plaintiff's pain. For example, as noted above, the ALJ cites to hospital visits with Dr. Chang at New York Presbyterian. Although the ALJ mentions certain treatment notes that could, in isolation, suggest that Plaintiff's pain was manageable, Dr. Chang concluded in the very same record: "[g]iven that the patient has not improved with tylenol, aleve, advil, and physical therapy/home exercise ... left L5 and S1 transforaminal epidural steroid injections were recommended." (R. 314.) Similarly, about a year later, treatment notes from Dr. Solberg indicated no acute distress, a normal gait, ability to heal, toe and tandem walk, negative straight leg raise tests, and normal muscle bulk in Plaintiff's lumbar spine. (R. 326.) However, that very same record concludes with Dr. Solberg explicitly saying that Plaintiff suffered from lumbosacral radiculopathy, [7] that epidurals and various medications did not alleviate Plaintiff's pain, and that, as a result, he was referring Plaintiff for surgery. (R. 326.) This progression clearly evidences severe pain as well as Plaintiff's doctors' unsuccessful efforts to help Plaintiff manage that pain. More importantly, the ALJ failed to mention any of this evidence in his decision.

[7] Lumbosacral radiculopathy describes a pain syndrome caused by compression or irritation of nerve roots in the lower back. *See* *https://www.ncbi.nlm.nih.gov/books/ NBK430837/#:~:text=Lumbosacral% 20radiculopathy% 20is% 20a% 20term,nerves% 20exit% 20the% 20spinal% 20canal.* (last visited, Jan. 28, 2021).

**\*12** To be sure, ALJ Carlton was not required to specify Plaintiff's specific symptoms that were inconsistent with the medical record. Nor was he required to mention every piece of testimony in rendering his decision. However, the ALJ was required to properly weigh the evidence corroborating Plaintiff's subjective complaints of pain. *Woodford v. Apfel*, 93 F. Supp. 2d 521, 530 (S.D.N.Y. 2000). In light of the above, the ALJ failed to fully assess the records he relied on and failed to discuss the portions of those record that contradict his findings.

In sum, the record contains objective evidence that the ALJ should have weighed in his analysis. Plaintiff was diagnosed with radiculopathy and degenerative disc disease on multiple occasions by different physicians. Plaintiff had tried a number of remedies to alleviate his pain including various over the counter medications, oxycodone, Neurontin, and gabapentin to no avail. On such a record, the ALJ should not have concluded that Plaintiff's subjective complaints of pain were not credible. *See* *Downey v. Barnhart*, 294 F. Supp. 2d 495, 503 (S.D.N.Y. 2003) (holding that ALJ did not properly consider similar evidence in evaluating Plaintiff's subjective complaints); *Woodford*, 93 F. Supp. 2d at 530 (same). Accordingly, I recommend finding that the ALJ's determination with respect to Plaintiff's subjective complaints is not supported by substantial evidence.

To the extent that the parties dispute the admissibility of Plaintiff's Function Report, the Court need not address the parties' arguments since the ALJ's assessment of Plaintiff's subjective complaints of pain was inadequate even without considering that evidence.

### D. Step Four Analysis

The Court notes that the parties present short arguments on the issue of whether the ALJ's Step Four analysis was supported by substantial evidence. However, because the Court recommends finding that the ALJ's decision was deficient, it would make little sense to evaluate the ALJ's Step Four analysis which, itself, was based on an improperly constructed RFC assessment and faulty evaluation of the record evidence.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiff's motion be GRANTED, that the Commissioner's motion be DENIED, and that this case be remanded for further proceedings consistent with this Report and Recommendation.

### Notice

**The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant**

2021 WL 319354

to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).

If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Abrams. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**All Citations**

Slip Copy, 2021 WL 319354

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2801138
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martha VELLONE, ON BEHALF OF
Kenneth VELLONE, Dec'd, Plaintiff,
v.
Andrew SAUL, Commissioner
of Social Security, Defendant.

No. 20-CV-261 (RA)
|
Signed 07/06/2021

**Attorneys and Law Firms**

Jeffrey David Delott, for Plaintiff.

Mary Ellen Brennan, U.S. Attorney's Office, New York, NY,
for Defendant.

MEMORANDUM OPINION & ORDER
ADOPTING REPORT & RECOMMENDATION

RONNIE ABRAMS, United States District Judge:

**\*1** Martha Vellone, on behalf of her deceased ex-husband
Kenneth Vellone, brings this action under § 205(g) of the
Social Security Act, 42 U.S.C. § 405(g), and § 1631(c)
(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3). [1]
On September 26, 2019, Administrative Law Judge ("ALJ")
Carlton determined that Plaintiff was not disabled under §§
216(i) and 223(d) of the Social Security Act and thus was
ineligible for disability benefits. *See* Dkt. 27 (Administrative
Record, *hereinafter* "A.R.") at 10–17 (citing 42 U.S.C. §§
416 and 423). The Court assumes the parties' familiarity ALJ
Carlton's decision, as well as the record more generally.

[1]     For the purposes of this Opinion, "Plaintiff" refers
         to Claimant Kenneth Vellone.

Currently before the Court is Magistrate Judge Parker's
exceedingly thorough and well-reasoned Report and
Recommendation, dated January 29, 2021, recommending the
Court grant Plaintiff's motion for judgment on the pleadings
and remand this action for further proceedings. Dkt. 45
("Rpt."). On February 16, 2021, the Commissioner filed
objections to the Report. Dkt. 49 ("Obj."). After reviewing the

Report, the parties' submissions, and the underlying record,
the Court adopts the Report in full and grants Plaintiff's
motion for judgment on the pleadings.

**LEGAL STANDARDS**

In reviewing a final decision of the Commissioner, "this
Court is limited to determining whether the [Commissioner's]
conclusions were supported by substantial evidence in
the record and were based on a correct legal standard."
*Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (per
curiam) (citations and internal quotation marks omitted).
"The substantial evidence standard means once an ALJ finds
facts, [the Court] can reject those facts only if a reasonable
factfinder would have to conclude otherwise." *Brault v. Soc.
Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012)
(per curiam) (emphasis omitted). If the Court determines,
however, that the ALJ's decision "is not supported by
substantial evidence or contains legal error, the determination
must be reversed or remanded." *See Donofrio v. Saul,* No.
18-CV-9968 (ER), 2020 U.S. Dist. LEXIS 54407, 2020 WL
1487302, at \*5 (S.D.N.Y. Mar. 27, 2020) (citing *Rosa v.
Callahan,* 168 F.3d 72, 77 (2d Cir. 1999)).

In reviewing a report and recommendation prepared by a
magistrate judge, a court must review *de novo* determination
of those portions of the report to which timely and specific
objection is made, but may review the remainder of the report
for clear error. *Parks v. Commissioner of Social Security,* 15-
CV-6470 (ER), 2017 U.S. Dist. LEXIS 110666, 2017 WL
3016946, at \*3 (S.D.N.Y. July 17, 2017) (citing 28 U.S.C. §
636(b)(1)(C) and *United States v. Male Juvenile,* 121 F.3d 34,
38 (2d Cir. 1997)).

**DISCUSSION**

The Commissioner has raised four objections to Judge
Parker's Report. The Court will address each objection in turn.

**I. The ALJ's Determination that Plaintiff Could Perform
Sedentary Work was Not Supported by Substantial
Evidence**

ALJ Carlton concluded that Plaintiff was not disabled because
he retained the residual functional capacity ("RFC") to
perform sedentary work. [2] The Second Circuit has held
"that the concept of sedentary work contemplates substantial

sitting." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citing *Carroll v. Sec. of Health & Human Serv's*, 705 F.2d 638, 643 (2d Cir. 1983)); *see also* 20 C.F.R. § 404.1567(b). Accordingly, in order to conclude that Plaintiff had the RFC to perform sedentary work, the ALJ needed to find that Plaintiff could remain seated for extended periods of time.

2    RFC is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Id.*

**\*2** The only evidence in the record that directly addresses Plaintiff's ability to remain seated comes from Dr. Azeez's consultative examination report. A.R. at 332–33. In that report, Dr. Azeez, who was Plaintiff's long-time treating physician, opined that Plaintiff would be limited to three hours of sitting per day. *Id.* at 332–33.

Instead of relying on Dr. Azeez's opinion to make his RFC determination, ALJ Carlton relied on the treatment notes of Doctors Chang and Solberg, two other physicians who had each treated Plaintiff on two occasions. *Id.* at 315, 338. Neither of these doctors completed a consultative examination on Plaintiff, and their reports were nearly devoid of reference to Plaintiff's ability to sit. *See generally id.* at 309–21, 324–29. [3] Instead, their reports addressed Plaintiff's spinal health more generally. For example, they noted that Plaintiff was observed to have "a normal gait, normal sensation, normal motor functioning, and a full range of motion of his extremities," and "was able to heel walk, toe walk, and tandem walk, generally had full strength in his lower extremities except for left ankle plantarflexion, and had a full, active range of motion in all planes except for a restriction with extension." *Id.* at 15 (summarizing Chang and Solberg's findings).

3    Dr. Chang's report made no mention of Plaintiff's ability to sit. *See generally* A.R. at 309–21. Dr. Solberg remarked on one occasion that "Plaintiff's pain was made worse with sitting," *id.* at 324, 328, but beyond that, his report contained no information regarding Plaintiff's ability to remain seated. *See generally id.* at 324–29.

It was on this basis that ALJ Carlton determined that Plaintiff retained the RFC to perform sedentary work. *Id.* at 15–16. This was in error. As courts in this Circuit have consistently

found, an ALJ cannot make an RFC determination based solely on information like that in the Chang and Solberg reports. *Rosa*, 168 F.3d at 81; *see also Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017); *Arteaga v. Comm'r of Soc. Sec.*, No. 19-CV-1630 (AMD), 2020 U.S. Dist. LEXIS 134536, 2020 WL 4369599, at \*5 (E.D.N.Y. July 29, 2020); *Merriman v. Comm'r of Soc. Sec.*, 14-CV-3510 (PGG) (HBP), 2015 U.S. Dist. LEXIS 124691, 2015 WL 5472934, at \*18 (S.D.N.Y. Sept. 17, 2015). As Judge Ramos recently explained, "[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Donofrio*, 2020 WL 1487302, at \*8. This is precisely what ALJ Carlton did here.

In *Morris v. Colvin*, (then District Court) Judge Bianco applied this rule in a case presenting starkly similar facts. *See* No. 15-CV-5600 (JFB), 2016 U.S. Dist. LEXIS 184030, 2016 WL 7235710 (E.D.N.Y. Dec. 14, 2016). In that case, the plaintiff sought disability benefits after suffering a back injury. *Id.* at \*1. The ALJ denied Morris's claim upon concluding that he had the RFC to perform light work. *Id.* at \*6. In so concluding, the ALJ discounted both Morris's subjective complaints and the opinion of Morris's treating physician, who opined that Morris could sit for no more than two hours a day. *Id.* at \*8. Instead, the ALJ relied on the treatment notes of several consultant physicians who found that Morris had, *inter alia*, "normal gait, and normal motor and sensory examinations." *Id.* at \*7. Judge Bianco remanded, concluding that the ALJ had committed "legal error" by "improperly set[ting] her own expertise against that of the treating physicians." *Id.* at \*9. In particular, Judge Bianco held that the ALJ "was not in a position to know whether the absence of an antalgic gate and abnormal motor and sensory functioning would in fact preclude the disabling loss of motion" of which Morris complained and that his treating physician diagnosed. *Id.* at \*9. [4]

4    The court in *Morris* was applying the "treating physician rule," which required ALJs to determine whether to give controlling weight to a claimant's treating physician. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Following a 2017 amendment to the applicable regulation, that rule no longer applies. *See Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-CV-942 (ML), 2020 U.S. Dist. Lexis 182212, 2020 WL 5848776, at \*5 (N.D.N.Y. Oct. 1, 2020) (citing *Revisions to Rules Regarding the*

2021 WL 2801138

*Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017)). Nonetheless, *Morris* provides useful guidance and it remains the law that an ALJ may not substitute his own medical opinion for that of a physician. *See Arteaga*, 2020 WL 4369599, at *5 (so holding in a matter initiated after the repeal of the treating physician rule).

**\*3** Here, ALJ Carlton has made the same error as the ALJ did in *Morris*. In discounting both Dr. Azeez's consultative examination report and Plaintiff's subjective complaints, ALJ Carlton was left with a record nearly devoid of evidence pertaining to Plaintiff's ability to remain seated for extended periods of time. In fact, the only other record evidence about Plaintiff's ability to remain seated indicated that Plaintiff struggled to do so. *See* A.R. at 324 (Dr. Solberg noted that Plaintiff's pain was exacerbated with sitting); *see also id.* at 328 (same). And although Doctors Chang and Solberg made note of Plaintiff's "normal gait[,] ... ability to heel and toe walk[,] ... negative straight leg raise tests, normal muscle bulk in his lumbar spine, and full five out of five strength except for some reduced strength in his left ankle and foot," *id.* at 15, as a lay-person, ALJ Carlton was not in a position to equate this evidence with an ability to remain seated. To do so, he would have needed to improperly "substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

ALJ Carlton thus committed a legal error in determining that Plaintiff retained the RFC to perform sedentary work. The Court adopts Judge Parker's recommendation on this issue.

## II. The ALJ's Decision to Discount Dr. Azeez's Consultative Examination Report was Not Supported by Substantial Evidence

As set forth in 20 C.F.R. §§ 404.1520c(a)-(c) and 416.920c(a)-(c), an ALJ must consider certain factors in assigning weight to medical opinions, including supportability, consistency, and the doctor's relationship with the claimant. Supportability analysis focuses on how well a medical source supports and explains its opinion with objective medical evidence. 20 C.F.R. § 404.1520c(c)(1). Consistency analysis assesses the consistency between a particular medical source and the other medical evidence in the record. 20 C.F.R. §§ 404.1520c(c)(2). An ALJ must explain his supportability and consistency analyses in his determination. 20 C.F.R. § 404.1520c(b).

In his decision denying Plaintiff's disability claim, ALJ Carlton did address both the consistency and the supportability of Dr. Azeez's report. He explained that he considered Dr. Azeez's medical opinion to be inconsistent with the other medical evidence contained in the record. A.R. at 16. Specifically, while Dr. Azeez—who had treated Plaintiff for approximately fifteen years—concluded that he could sit for no more than three hours a day, *id.* at 332–33, the ALJ noted that two other doctors documented "generally normal gaits and an ability to heel, toe, and tandem walk, notwithstanding some persistent back pain and tenderness," *id.* at 16. ALJ Carlton also noted that he found Dr. Azeez's opinion lacking supportability because it was based on relatively sparse notes. *Id.*

In her Report, Judge Parker determined that the conclusion on consistency was not supported by substantial evidence because ALJ Carlton "was not in a position to determine whether Plaintiff's ability to heel, toe, and tandem walk during a medical examination should invalidate the physical limitations set forth in Dr. Azeez's Medical Findings Summary," Rpt. at 20. The Court agrees; although it is the ALJ's role as factfinder to weigh competing medical evidence, as explained in more detail above, the ALJ is not permitted to come to his own medical conclusions. *See supra*. ALJ Carlton thus erred in using evidence of Plaintiff's gait to discredit Dr. Azeez's medical opinion about Plaintiff's ability to sit for extended periods of time.

Likewise, ALJ Carlton's supportability analysis is not based on substantial evidence. As he noted in his decision, Dr. Azeez's conclusion that Plaintiff would be unable to sit for extended periods was based on his observations regarding Plaintiff's "back and hip pain." A.R. at 16. Accordingly, even ALJ Carlton acknowledged that Dr. Azeez's conclusion was supported by at least some objective medical evidence. 20 C.F.R. § 404.1520c(c)(1). Dr. Azeez's report also indicated that laboratory and diagnostic test results which supported his conclusion were enclosed with his report. A.R. at 331. Although these documents appear to be missing from the administrative record, Dr. Azeez's reference to them in the report further bolsters the conclusion that his report was based on objective medical evidence.

**\*4** Lastly, ALJs are instructed to consider the doctor's treatment relationship with the claimant—including the length of the relationship—in deciding the weight to give a physician's opinion. *See* 20 C.F.R. § 404.1520c(a)-(c). The record shows that Dr. Azeez was Plaintiff's longtime

Case 3:22-cv-00485-TWD   Document 15   Filed 08/03/23   Page 301 of 356

physician, having treated Plaintiff for approximately fifteen years. *See* A.R. at 185. "As Plaintiff's longtime doctor, Dr. [Azeez] was best situated to provide a detailed, longitudinal picture of Plaintiff's impairment." *Sanchez v. Comm'r of Soc. Sec.*, 18-CV-2027 (KMK) (JCM), 2019 U.S. Dist. LEXIS 69828, 2019 WL 2451432, at \*11 (S.D.N.Y. Apr. 23 2019). ALJ Carlton did not address this fact in his decision.

In sum, ALJ Carlton's decision to discount Dr. Azeez's consultative examination report was not supported by substantial evidence. The Court adopts Judge Parker's recommendation on this issue.

### III. The ALJ's Decision to Discount Plaintiff's Subjective Complaints was Not Supported by Substantial Evidence
"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). If an ALJ does discount a claimant's testimony, however, he must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and [he] must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight [he] gave to the individual's statements and the reasons for that weight." *Lugo v. Apfel*, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998) (citation omitted). Where substantial evidence supports an ALJ's credibility determination, it must be upheld. *Jones v. Berryhill*, 415 F. Supp. 3d 401, 420 (S.D.N.Y. 2019).

Here, ALJ Carlton relied on the following facts as the basis for his decision to discount Plaintiff's subjective complaints:

- "[A] September 2017 physical examination at NY Presbyterian Hospital reveal[ed] a normal gait, normal sensation, normal motor functioning, and a full range of motion of his extremities."

- "December 2017 treatment records from Mount Sanai Beth Israel show[ed] that ... [Plaintiff] was able to heel walk, toe walk, and tandem walk, generally had full strength in his lower extremities except for left ankle plantarflexion, and had a full, active range of motion in all planes except for a restriction with extension."

- "[Al]though he reported ten out of ten back pain, [Plaintiff] was observed to be in no acute distress."

- "November 2018 records from Joseph Solberg, D.O., indicate[d] that the claimant had a normal gait and an ability to heel and toe walk.... He also had negative straight leg raise tests, normal muscle bulk in his lumbar spine, and full five out of five strength except for some reduced strength in his left ankle and foot." [5]

A.R. at 14–15. None of these findings suffice to support the ALJ's conclusion on Plaintiff's credibility. The majority of these findings (specifically, the findings regarding Plaintiff's lower body strength and flexibility, as well as his ability to walk) do not on their face contradict his claim of severe pain. To conclude that this clinical information alone contradicted Plaintiff's subjective complaints would be to make a independent medical conclusion, which—as discussed in more detail above—an ALJ is not permitted to do. *See supra.*

[5]     Elsewhere in his decision, ALJ Carlton noted that Plaintiff had "worked a few months prior to [when] this opinion was issued, albeit briefly, and there is no indication in the record that he was physical[ly] unable to perform the work. Rather, his former employer indicated that the work ended because there was no work for the claimant to do." A.R. at 16. To be sure, a claimant's continued employment may be evidence that he is physically capable of performing the job. But this is not necessarily the case. As the Second Circuit has recognized, "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefit, unless his conduct truly showed that he is capable of working." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989). Given the brevity of this period of employment, and weighing it against Plaintiff's consistent reports of severe pain, this fact does not "truly show[ ] that [Plaintiff] [wa]s capable of working." *Id.*

**\*5** The remaining finding that Plaintiff was on one occasion "observed to be in no acute distress" is insufficient to alone support ALJ Carlton's credibility finding. This is especially true in light of Plaintiff's consistent reports of severe pain, *see, e.g.*, A.R. at 312, 318, 324, 328, 331, as well as the considerable objective evidence that supports Plaintiff's position, *see, e.g. id.* 314 (physician report documenting degenerative disc disease characterized as "severe" in parts); *id.* at 326 (physician report noting that epidurals and various

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

medications did not alleviate Plaintiff's pain, and that Plaintiff would be referred for spinal surgery).

In sum, ALJ Carlton's decision to discount Plaintiff's subjective complaints was not supported by substantial evidence. *See Downey v. Barnhart*, 294 F. Supp. 2d 495, 503 (S.D.N.Y. 2003) (concluding that an ALJ improperly dismissed a plaintiff's subjective complaints of pain when the plaintiff consistently complained of severe pain, "remedies including acupuncture, epidural blocks, and physical therapy" had been unsuccessful, and medical imaging revealed radiculopathy). The Court adopts Judge Parker's recommendation on this issue.

### IV. The ALJ Did Not Discharge His Duty to Develop the Record

Regulation requires the Social Security Administration to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which" the claimant files his application. 20 C.F.R. § 404.1512(b). "[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but [in such cases,] the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014).

The Court recognizes the efforts the Commissioner made in this case to develop the record, and the difficulty he faced in obtaining documents, particularly from Dr. Azeez. Obj. at 12 (citing Tr. at 70) (noting that the Government made multiple attempts to obtain documents from Dr. Azeez). Nonetheless, there remain obvious gaps in the administrative record, particularly with respect to medical evidence pertaining to Plaintiff's ability to stay seated for extended periods. *See Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-8439 (GBD) (HBP), 2017 U.S. Dist. LEXIS 4838, 2017 WL 120974, at *13 (S.D.N.Y. Jan. 12, 2017) ("[I]n the absence of other medical evidence in the record regarding plaintiff's functional limitations, the ALJ was under a duty to develop the record and obtain medical evidence before making his RFC determination").

For this reason, the Court adopts Judge Parker's recommendation on this issue as well.

### CONCLUSION

Accordingly, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion is DENIED. It is hereby ORDERED that this case be remanded for further proceedings consistent with this Opinion and the Report.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 2801138

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

SSR 16-3P (S.S.A.), 2017 WL 5180304

Social Security Administration

[Docket No. SSA-2015-0055]

SOCIAL SECURITY RULING 16-3P TITLES II AND XVI:
EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS

SSR 16-3P
October 25, 2017

**NOTICES**

**\*1**  AGENCY: **Social Security Administration**.

ACTION: **Notice** of **Social Security Ruling** (SSR).

SUMMARY: We are republishing SSR 16-3p, a **ruling** that rescinded and superseded SSR 96-7p, with a revision detailing how we apply the SSR as it relates to the applicable date. We changed our terminology from "effective date" to ""applicable date" based on guidance from the Office of the Federal Register. We also updated citations to reflect the revised regulations that became effective on March 27, 2017. This **Ruling** is otherwise unchanged, and provides guidance about how we evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI of the **Social Security** Act (Act) and blindness claims under Title XVI of the Act.

FOR FURTHER INFORMATION CONTACT: Elaine Tocco, Office of Disability Policy, **Social Security Administration**, 6401 **Security** Boulevard, Baltimore, MD 21235-6401, (410) 966-6356. For information on eligibility or filing for benefits, call our national toll-free number, 1-800-772-1213 or TTY 1-800-325-0778, or visit our internet site, **Social Security** Online, at http://www.socialsecurity.gov.

SUPPLEMENTARY INFORMATION: Although 5 U.S.C. 552(a)(1) and (a)(2) do not require us to publish this SSR, we are doing so in accordance with 20 CFR 402.35(b)(1).

Through SSRs, we convey to the public SSA precedential decisions relating to the Federal old age, survivors, disability, supplemental **security** income, and special veterans benefits programs. We may base SSRs on determinations or decisions made at all levels of **administrative** adjudication, Federal court decisions, Commissioner's decisions, opinions of the Office of the General Counsel, or other interpretations of the law and regulations.

Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the **Social Security Administration**. 20 CFR 402.35(b)(1).

This SSR will remain in effect until we publish a **notice** in the Federal Register that rescinds it, or we publish a new SSR that replaces or modifies it.

This SSR, republished in its entirety, includes a revision to clarify that our adjudicators will apply SSR 16-3p when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the **rules** that were in effect at the time we issued the decision under review. If a court remands a claim for further proceedings after the applicable date of the **ruling** (March 28, 2016), we will apply SSR 16-3p to the entire period in the decision we make after the court's remand.

**\*2**  (Catalog of Federal Domestic Assistance, Programs Nos. 96.001, **Social Security**—Disability Insurance; 96.002, **Social Security**—Retirement Insurance; 96.004, **Social Security**—Survivors Insurance; 96.006—Supplemental **Security** Income.)

Nancy A. Berryhill,

Acting Commissioner of **Social Security**.

**POLICY INTERPRETATION RULING**

**TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS**

This SSR supersedes SSR 96-7p: Policy Interpretation **Ruling** Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

*PURPOSE*:

We are rescinding SSR 96-7p: Policy Interpretation **Ruling** Titles II and XVI Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements and replacing it with this **Ruling**. We solicited a study and recommendations from the **Administrative** Conference of the United States (ACUS) on the topic of symptom evaluation. Based on ACUS's recommendations [1]  and our adjudicative experience, we are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.

Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms. We evaluate the intensity and persistence of an individual's symptoms so we can determine how symptoms limit ability to perform work-related activities for an adult and how symptoms limit ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

*CITATIONS (AUTHORITY)*:

Sections 216(i), 223(d), and 1614(a)(3) of the **Social Security** Act as amended; Regulations no. 4, sections 404.1502, 404.1512(d), 404.1513, 404.1520, 404.1520c, 404.1521, 404.1526, 404.1527, 404.1529, 404.1545 and 404.1594; and Regulations No. 16 sections 416.902, 416.912(d), 416.913, 416.920, 416.920c, 416.921, 416.924(c), 416.924a(b)(9)(ii-iii), 416.926a, 416.927, 416.929, 416.930(c), 416.945, 416.994, and 416.994a.

*BACKGROUND*:

In determining whether an individual is disabled, we consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record. We define a symptom as the individual's own description or statement of his or her physical or mental impairment(s). [2] Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability. However, if an individual alleges impairment-related symptoms, we must evaluate those symptoms using a two-step process set forth in our regulations. [3]

**\*3**  First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

This **ruling** clarifies how we consider:

· The intensity, persistence, and functionally limiting effects of symptoms,

· Objective medical evidence when evaluating symptoms,

· Other evidence when evaluating symptoms,

· The factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3),

· The extent to which an individual's symptoms affect his or her ability to perform work-related activities or function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim, and

· Adjudication standards for evaluating symptoms in the sequential evaluation process.

*POLICY INTERPRETATION*:

We use a two-step process for evaluating an individual's symptoms.

*The two-step process*:

*Step 1: We determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms*

An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim unless medical signs or laboratory findings show a medically determinable impairment is present. Signs are anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms. [4] Laboratory findings are anatomical, physiological, or psychological phenomena, which can be shown by the use of medically acceptable laboratory diagnostic techniques. [5] We call the medical evidence that provides signs or laboratory findings objective medical evidence. We must have objective medical evidence from an acceptable medical source [6] to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms. [7]

In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, we do not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence. For example, if an individual has a medically determinable impairment established by a knee x-ray showing mild degenerative changes and he or she alleges extreme pain that limits his or her ability to stand and walk, we will find that individual has a medically determinable impairment that could reasonably be expected to produce the symptom

of pain. We will proceed to step two of the two-step process, even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence.

**\*4** In some instances, the objective medical evidence clearly establishes that an individual's symptoms are due to a medically determinable impairment. At other times, we may have insufficient evidence to determine whether an individual has a medically determinable impairment that could potentially account for his or her alleged symptoms. In those instances, we develop evidence regarding a potential medically determinable impairment using a variety of means set forth in our regulations. For example, we may obtain additional information from the individual about the nature of his or her symptoms and their effect on functioning. We may request additional information from the individual about other testing or treatment he or she may have undergone for the symptoms. We may request clarifying information from an individual's medical sources, or we may send an individual to a consultative examination that may include diagnostic testing. We may use our agency experts to help us determine whether an individual's medically determinable impairment could reasonably be expected to produce his or her symptoms. At the **administrative** law judge hearing level or the Appeals Council level of the **administrative** review process, we may ask for and consider evidence from a medical or psychological expert to help us determine whether an individual's medically determinable impairment could reasonably be expected to produce his or her symptoms. If an individual alleges symptoms, but the medical signs and laboratory findings do not substantiate any medically determinable impairment capable of producing the individual's alleged symptoms, we will not evaluate the individual's symptoms at step two of our two-step evaluation process.

We will not find an individual disabled based on alleged symptoms alone. If there is no medically determinable impairment, or if there is a medically determinable impairment, but the impairment(s) could not reasonably be expected to produce the individual's symptoms, we will not find those symptoms affect the ability to perform work-related activities for an adult or ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

Step 2: We evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

Once the existence of a medically determinable impairment that could reasonably be expected to produce pain or other symptoms is established, we recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

**\*5** We will not evaluate an individual's symptoms without making every reasonable effort to obtain a complete medical history [8] unless the evidence supports a finding that the individual is disabled. We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.

### 1. Consideration of Objective Medical Evidence

Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI claim. [9] We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.

The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. [10] These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

For example, an individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. [11] A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.

## 2. Consideration of Other Evidence

**\*6** If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations. [12] For example, for a child with a title XVI disability claim, we will consider evidence submitted from educational agencies and personnel, statements from parents and other relatives, and evidence submitted by **social** welfare agencies, therapists, and other practitioners. [13]

### a. The Individual

An individual may make statements about the intensity, persistence, and limiting effects of his or her symptoms. If a child with a title XVI disability claim is unable to describe his or her symptoms adequately, we will accept a description of his or her symptoms from the person most familiar with the child, such as a parent, another relative, or a guardian. [14] For an adult whose impairment prevents him or her from describing symptoms adequately, we may also consider a description of his or her symptoms from a person who is familiar with the individual.

An individual may make statements about symptoms directly to medical sources, other sources, or he or she may make them directly to us. An individual may have made statements about symptoms in connection with claims for other types of disability benefits such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits.

An individual's statements may address the frequency and duration of the symptoms, the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities. An individual's statements may also include activities that precipitate or aggravate the symptoms, medications and treatments used, and other methods used to alleviate the symptoms. We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.

### b. Medical Sources

Medical sources may offer diagnoses, prognoses, and opinions as well as statements and medical reports about an individual's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms.

Important information about symptoms recorded by medical sources and reported in the medical evidence may include, but is not limited to, the following:

**\*7** · Onset, description of the character and location of the symptoms, precipitating and aggravating factors, frequency and duration, change over a period of time (e.g., whether worsening, improving, or static), and daily activities. Very often, the individual has provided this information to the medical source, and the information may be compared with the individual's other statements in the case record. In addition, the evidence provided by a medical source may contain medical opinions about the individual's symptoms and their effects. Our adjudicators will consider such opinions by applying the factors in 20 CFR 404.1520c and 416.920c.[15]

· A longitudinal record of any treatment and its success or failure, including any side effects of medication.

· Indications of other impairments, such as potential mental impairments, that could account for an individual's allegations.

Medical evidence from medical sources that have not treated or examined the individual is also important in the adjudicator's evaluation of an individual's statements about pain or other symptoms. For example, State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms. We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms. Adjudicators at the hearing level or at the Appeals Council level must consider the findings from these medical sources even though they are not bound by them.[16]

### c. Non-Medical Sources

Other sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include public and private agencies, other practitioners, educational personnel, non-medical sources such as family and friends, and agency personnel. We will consider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone. The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.

### d. Factors To Consider in Evaluating the Intensity, Persistence, and Limiting Effects of an Individual's Symptoms

In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3). These factors include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

**\*8** 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case. We will discuss the factors pertinent to the evidence of record.

### How We Will Determine if an Individual's Symptoms Affect the Ability To Perform Work-Related Activities for an Adult, or Age-Appropriate Activities for a Child With a Title XVI Disability Claim

If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities for an adult or reduce a child's ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. [17] In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

We may or may not find an individual's symptoms and related limitations consistent with the evidence in his or her record. We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions. We will evaluate an individual's symptoms considering all the evidence in his or her record.

In determining whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner, we will consider the consistency of the individual's own statements. To do so, we will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.

 *9  We will consider statements an individual made to us at each prior step of the **administrative** review process, as well as statements the individual made in any subsequent or prior disability claims under titles II and XVI. If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. However, inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a

variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent. [18]

In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an **administrative** proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following:

· An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms.

· An individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau.

 **\*10**   · An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.

· An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

· A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.

· An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

· An individual's religious beliefs may prohibit prescribed treatment.

· Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.

· Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

· A child may disregard the level and frequency of treatment needed to maintain or improve functioning because it interferes with his or her participation in activities typical of other children his or her age without impairments.

The above examples illustrate possible reasons an individual may not have pursued treatment. However, we will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. We will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. We will explain how we considered the individual's reasons in our evaluation of the individual's symptoms.

*Adjudication—How we will use our evaluation of symptoms in our five-step sequential evaluation process to determine whether an individual is disabled*

In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

Our adjudicators must base their findings solely on the evidence in the case record, including any testimony from the individual or other witnesses at a hearing before an **administrative** law judge or hearing officer. The subjective statements of the individual and witnesses obtained at a hearing should directly relate to symptoms the individual alleged. Our adjudicators are prohibited from soliciting additional non-medical evidence outside of the record on their own, except as set forth in our regulations and policies.

 **\*11**  Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities or, for a child with a title XVI disability claim, limit the child's ability to function independently, appropriately, and effectively in an age-appropriate manner.

In determining whether an individual is disabled or continues to be disabled, our adjudicators follow a sequential evaluation process. [19] The first step of our five-step sequential evaluation process considers whether an individual is performing substantial gainful activity. If the individual is performing substantial gainful activity, we find him or her not disabled. If the individual is not performing substantial gainful activity, we proceed to step 2. We do not consider symptoms at the first step of the sequential evaluation process.

At step 2 of the sequential evaluation process, we determine whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death. [20] A severe impairment is one that affects an individual's ability to perform basic work-related activities for an adult or that causes more than minimal functional limitations for a child with a title XVI disability claim. [21] At this step, we will consider an individual's symptoms and functional limitations to determine whether his or her impairment(s) is severe unless the objective medical evidence alone establishes a severe medically determinable impairment or combination of impairments that meets our duration requirement. [22] If an individual does not have a severe medically determinable impairment that meets our duration requirement, we will find the individual not disabled at step 2. If the individual has a severe medically determinable impairment that has met or is expected to meet our duration requirement, we proceed to the next step.

At step 3 of the sequential evaluation process, we determine whether an individual's impairment(s) meets or medically equals the severity requirements of a listed impairment. To decide whether the impairment meets the level of severity described in a listed impairment, we will consider an individual's symptoms when a symptom(s) is one of the criteria in a listing to ensure the symptom is present in combination with the other criteria. If the symptom is not one of the criteria in a listing, we will not evaluate an individual's symptoms at this step as long as all other findings required by the specific listing are present. Unless the listing states otherwise, it is not necessary to provide information about the intensity, persistence, or limiting effects of a symptom as long as all other findings required by the specific listing are present. [23] In considering whether an individual's symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether the symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria. However, we will

not substitute the individual's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of the impairment(s) to that of a listed impairment. [24] If an individual's impairment meets or medically equals the severity requirements of a listing, we find him or her disabled. If an individual's impairment does not meet or medically equal a listing, we proceed to assess the individual's residual functional capacity at step 4 of the sequential evaluation process unless the individual is a child with a title XVI disability claim.

 **\*12** For a child with a title XVI disability claim whose impairment does not meet or medically equal the severity requirements of a listing, we consider whether his or her impairment functionally equals the listings. This means that the impairment results in "marked" limitations in two out of six domains of functioning or an "extreme" limitation in one of the six domains. [25] We will evaluate an individual's symptoms at this step when we rate how a child's impairment-related symptoms affect his or her ability to function independently, appropriately, and effectively in an age-appropriate manner in each functional domain. If a child's impairment functionally equals a listing, we find him or her disabled. If a child's impairment does not functionally equal the listings, we find him or her not disabled. For a child with a title XVI disability claim, the sequential evaluation process ends at this step.

If the individual's impairment does not meet or equal a listing, we will assess and make a finding about an individual's residual functional capacity based on all the relevant medical and other evidence in the individual's case record. An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations. We consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record. [26]

After establishing the residual functional capacity, we determine whether an individual is able to do any past relevant work. At step 4, we compare the individual's residual functional capacity with the requirements of his or her past relevant work. If the individual's residual functional capacity is consistent with the demands of any of his or her past relevant work, either as the individual performed it or as the occupation is generally performed in the national economy, then we will find the individual not disabled. If none of the individual's past relevant work is within his or her residual functional capacity, we proceed to step 5 of the sequential evaluation process.

At step 5 of the sequential evaluation process, we determine whether the individual is able to adjust to other work that exists in significant numbers in the national economy. We consider the same residual functional capacity, together with the individual's age, education, and past work experience. If the individual is able to adjust to other work that exists in significant numbers in the national economy, we will find him or her not disabled. If the individual cannot adjust to other work that exists in significant numbers in the national economy, we find him or her disabled. At step 5 of the sequential evaluation process, we will not consider an individual's symptoms any further because we considered the individual's symptoms when we determined the individual's residual functional capacity.

 **\*13** This SSR is applicable on MARCH 28, 2016. [27]

CROSS-REFERENCES: SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," and Program Operations Manual System, section DI 24515.064.

[FR Doc. 2017-23143 Filed 10-24-17; 8:45 am]

BILLING CODE 4191-02-P

[1]     ACUS made several recommendations in its March 12, 2015 final report, ""Evaluating Subjective Symptoms in Disability Claims." Among other things, ACUS recommended we consider amending SSR 96-7p to clarify that

subjective symptom evaluation is not an examination of an individual's character, but rather is an evidence-based analysis of the **administrative** record to determine whether the nature, intensity, frequency, or severity of an individual's symptoms impact his or her ability to work. In any revised SSR, ACUS also recommended we more closely follow our regulatory language about symptom evaluation, which does not use the term "credibility" and instead directs adjudicators to evaluate medical and other evidence to evaluate the intensity and persistence of symptoms to determine how the individual's symptoms limit capacity for work if he or she is an adult, or for a child with a title XVI disability claim, how symptoms limit ability to function. ACUS further recommended when revising SSR 96-7p, we offer additional guidance to adjudicators on regulatory implementation problems that have been identified since we published SSR 96-7p.

2   See 20 CFR 404.1502(i) and 416.902(n) for how our regulations define symptoms.

3   See 20 CFR 404.1529 and 416.929 for how we evaluate statements of symptoms.

4   See 20 CFR 404.1502(g) and 416.902(l) for how our regulations define signs.

5   See 20 CFR 404.1502(c) and 416.902(g) for how our regulations define laboratory findings.

6   See 20 CFR 404.1502(a) and 416.902(a) for a list of acceptable medical sources.

7   See 20 CFR 404.1521 and 416.921 for what is needed to show a medically determinable impairment.

8   By "complete medical history," we mean the individual's complete medical history for at least the 12 months preceding the month in which he or she filed an application, unless there is a reason to believe that development of an earlier period is necessary or the individual says that his or her alleged disability began less than 12 months before he or she filed an application. 20 CFR 404.1512(b)(ii) and 416.912(b)(ii).

9   See 20 CFR 404.1529(c)(2) and 416.929(c)(2).

10   See 20 CFR 404.1529(c)(2) and 416.929(c)(2).

11   See 20 CFR 404.1529 and 416.929.

12   See 20 CFR 404.1513 and 416.913.

13   See 20 CFR 404.1529(c)(3) and 416.929(c)(3)

14   See 20 CFR 416.924a(a)(2).

15   For claims filed before March 27, 2017, our adjudicators will apply the **rules** in 20 CFR 404.1527 and 416.927.

16   See 20 C.F.R. 404.1520c and 416.902c for claims filed on or after March 27, 2017. See 20 CFR 404.1527 and 416.927 for claims filed before March 27, 2017.

17   See 20 CFR 404.1529(c)(4) and 416.929(c)(4).

18   See 20 CFR 404.1529(c) and 416.929(c).

19   See 20 CFR 404.1520 and 416.920. For continuing disability, see 404.1594, 416.994 and 416.994a.

20   See 20 CFR 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).

21   See 20 CFR 416.924(c).

22   See 20 CFR 416.920(c) for adults and 416.924(c) for children.

23    See 20 CFR 404.1529(d)(2) and 416.929(d)(2).

24    See 20 CFR 404.1529(d)(3) and 416.929(d)(3).

25    See 20 CFR 416.926a.

26    See 20 CFR 404.1545 and 416.945.

27    Our adjudicators will apply this **ruling** when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the **rules** that were in effect at the time we issued the decision under review. If a court finds reversible error and remands a case for further **administrative** proceedings after March 28, 2016, the applicable date of this **ruling**, we will apply this **ruling** to the entire period at issue in the decision we make after the court's remand. Our regulations on evaluating symptoms are unchanged.

Social Security Administration

Department of Health and Human Services
SSR 16-3P (S.S.A.), 2017 WL 5180304

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Crystal D. v. Saul,   W.D.N.Y.,   February 22, 2021

2011 WL 3652286

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Stephanie J. HARRIS, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 09–CV–1112 (NAM/VEB).

|

July 27, 2011.

**Attorneys and Law Firms**

Peter M. Margolius, Office of Peter M. Margolius, Catskill, NY, for Plaintiff.

Thomas C. Gray, Social Security Administration Office of Regional General Counsel, New York, NY, for Defendant.

**REPORT AND RECOMMENDATION**

VICTOR E. BIANCHINI, United States Magistrate Judge.

**I. INTRODUCTION**

 *1  In September of 2006, Plaintiff Stephanie J. Harris filed applications for supplemental security income ("SSI") benefits and disability insurance benefits ("DIB") under the Social Security Act. Plaintiff alleged that she became unable to work on February 27, 2003, due to physical and mental impairments. The Commissioner of Social Security denied Plaintiff's applications.

Plaintiff, by and through her attorney, Peter M. Margolius, Esq., commenced this action on October 2, 2009, by filing a Complaint in the United States District Court for the Northern District of New York. (Docket No. 1). Plaintiff seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c) (3).

The Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 15).

**II. BACKGROUND**

The relevant procedural history may be summarized as follows:

Plaintiff applied for SSI benefits and DIB on September 21, 2006, alleging disability beginning on February 27, 2003. (T at 95–104). [1]  The applications were denied initially and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on October 9, 2008, before ALJ Robert Ringler. (T at 22). Plaintiff appeared with an attorney and testified. (T at 24–52).

[1]      Citations to "T" refer to the Administrative Transcript. (Docket No. 8).

On November 25, 2008, ALJ Ringler issued a written decision denying Plaintiff's applications. (T at 14–21). The ALJ's decision became the Commissioner's final decision on August 12, 2009, when the Appeals Council denied Plaintiff's request for review. (T at 1–4).

Plaintiff, through counsel, timely commenced this action on October 2, 2009. (Docket No. 1). The Commissioner interposed an Answer on March 5, 2010. (Docket No. 7). Plaintiff filed a supporting Brief on May 3, 2010, (Docket No. 11), which was stricken from the record by the Honorable George H. Lowe, United States Magistrate Judge, for non-compliance with General Order No. 18 on June 3, 2010. (Docket No. 12). Plaintiff filed a corrected Brief on June 24, 2010. (Docket No. 13). The Commissioner filed a Brief in opposition on August 4, 2010. (Docket No. 14).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings. [2]

[2]      General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings ."

For the reasons that follow, it is respectfully recommended that the Commissioner's motion be granted, Plaintiff's motion be denied, and this case be dismissed.

## III. DISCUSSION

### A. Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

**\*2** If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. *See* 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled. [3]

[3]     This five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482 U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner

must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

### B. Analysis

#### 1. Commissioner's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2005. He further determined that Plaintiff returned to substantial gainful activity on February 2, 2008, and remained employed as of the date of his decision. [4] As such, the matter was considered as an application for benefits for a closed period, namely, from February 27, 2003 (the alleged onset date) through February 2, 2008 (the date Plaintiff resumed substantial gainful activity). (T at 16).

[4] Plaintiff does not challenge this aspect of the ALJ's decision. *See* (Docket No. 13).

The ALJ concluded that Plaintiff had a left shoulder impairment, which he designated as a "severe" impairment under the Social Security Act. (T at 16). The ALJ found that Plaintiff's mental limitations (*i.e.* anxiety attacks) imposed only mild limitations in regard to activities of daily living; mild limitations of social functioning; and mild limitations with respect to concentration, persistence, and pace. (T at 17). As such, the ALJ concluded that Plaintiff's mental impairment was not a "severe" impairment, as defined under the Act. (T at 17). [5] The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). (T at 18).

[5] Plaintiff does not challenge this aspect of the ALJ's decision. *See* (Docket No. 13).

**\*3** The ALJ concluded that Plaintiff retained the residual functional capacity to perform the full range of light work, as defined in 20 C .F.R. § 416.967(b). (T at 18). He further found that Plaintiff could perform her past relevant work as a home health aide. (T at 20). Accordingly, the ALJ concluded that Plaintiff had not been under a disability between February 27, 2003, the alleged onset date, and February 2, 2008, the date she resumed substantial gainful activity. (T at 21). As noted above, the ALJ's decision became the Commissioner's

final decision on August 12, 2009, when the Appeals Council denied Plaintiff's request for review. (T at 1–4).

#### 2. Plaintiff's Claims

Plaintiff contends that the Commissioner's decision should be reversed. She offers two (2) principal arguments in support of that position. First, Plaintiff contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence. Second, Plaintiff argues that the ALJ erred by finding that she could perform her past relevant work as a certified nurse's aide. This Court will address both arguments in turn.

#### a. RFC

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

As noted above, the ALJ concluded that Plaintiff retained the RFC to perform the full range of light work. (T at 18). Plaintiff challenges this finding, pointing to several pieces of evidence, which she claims show a greater degree of limitation. For example, a November 2005 office note from Dr. Lawrence Kusior, Plaintiff's treating physician, indicated that Plaintiff had "not been able to work since 2003." (T at 283). In a December 2005 note, Dr. Kusior requested authorization for Plaintiff to receive job retraining through New York's Vocational and Educational Services for Individuals with Disabilities ("VESID") program. (T at 282).

Dr. Kusior again recommended VESID retraining in February of 2006, opining that he "did not think" Plaintiff could

return to her previous work as a nurse's aide. (T at 281). Dr. Kusior renewed the VESID request in April of 2006 and also recommended a functional capacity exam to determine alternative work that Plaintiff might be capable of performing. (T at 280). The doctor suggested that "lab work" might be appropriate. (T at 280).

**\*4** Dr. Kusior reiterated these recommendations in a note dated June 7, 2006, and opined that Plaintiff had a "temporary partial disability." (T at 278). In July of 2006, Dr. Kusior again recommended VESID retraining and a functional capacity assessment, while characterizing Plaintiff's disability as "mild" and "partial." (T at 277). On February 27, 2007, the doctor indicated that a functional capacity exam would give him a "better assessment to see what function [Plaintiff] has, what she is capable and not capable of doing." (T at 346). In April of 2007, Dr. Kusior assessed Plaintiff's "scheduled loss" for Workers' Compensation purposes, giving her "a scheduled loss of 15%," representing "10% for the forward flexion deficit of 60%" and 5% for "impingement bursitis." (T at 344).

As outlined below, this Court finds the ALJ's RFC assessment to be supported by substantial evidence. Indeed, the RFC assessment is amply supported by the medical record, including Dr. Kusior's treatment notes.

On March 4, 2003, Plaintiff was treated for left shoulder pain of indeterminate origin. (T at 304–05). According to Plaintiff, the pain began on February 27, 2003. (T at 304). The treating doctor's impression was that Plaintiff had suffered a left shoulder strain. (T at 305). In June of 2003, MRI results revealed "no obvious surgical disease" and were reported as "normal." (T at 299–300). In that same month, Plaintiff reported that her left shoulder pain had improved and only occurred with "rare activities" and at night when she was "relaxing." (T at 299).

Dr. Kusior's treatment notes consistently described Plaintiff as having "full range of motion of the shoulder," "[e]xcellent strength," "[n]o apprehension," and "[n]o instability." (T at 278, 280–82, 344, 346). In February of 2003, Dr. Kusior opined that Plaintiff could "possibly" perform "light duty work," with "no lifting use of the left arm." (T at 294). An August 2004 note indicates that Plaintiff wanted to return to light duty work, but was unable to find any such employment. (T at 290). Dr. Kusior described Plaintiff's impairment as "mild," "partial," and "temporary." (T at 277–78).

Dr. Kusior offered differing opinions, but at various times indicated that Plaintiff could likely return to work as a certified nurse's aide (T at 282,344), a job that Plaintiff described as requiring her to lift 100 pounds occasionally and 50 pounds frequently. (T at 140). The exertional requirements of this job are consistent with the Commissioner's definition of "very heavy work." 20 C.F.R. § 404.1567(e) ("Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more."). The ability to perform work at this exertional level implies an ability to perform light work. *Id.* ("If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work."). In April of 2007, Dr. Kusior noted that Plaintiff had not "worked in a while," but explained that "some of this is certainly due to pregnancy recently." (T at 344).

**\*5** Additional support for the ALJ's RFC assessment is found in the report provided by Amelita Balagtas, a consultative examiner. Dr. Balagtas examined Plaintiff and assessed "slight to moderate limitations in activities that require lifting, carrying, and reaching involving the left upper extremity." (T at 309). This assessment is consistent with the ALJ's conclusion that Plaintiff could perform light work. As defined under the Commissioner's regulations, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

It is well settled that an ALJ is entitled to rely upon the opinions of State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."). Such reliance is particularly appropriate where, as here, the opinion of the examining State agency medical consultant is supported by the weight of the evidence. *See Brunson v. Barnhart,* 01–CV–1829, 2002 WL 393078, at \*14 (E.D.N.Y. Mar.14, 2002) (holding that opinions of non-examining sources may be considered where they are supported by evidence in the record).

2011 WL 3652286

Lastly, additional support for the ALJ's RFC assessment is found in evidence concerning Plaintiff's work and activities of daily living. The consultative psychiatric examiner reported that Plaintiff performed her own cooking, cleaning, laundry, and shopping. (T at 312). Plaintiff testified that she had no limitation with regard to sitting, standing, or walking. (T at 29–30). Although her condition had not improved since surgery in September 2005, Plaintiff began working as a home health aide in February 2008. (T at 31–32). Plaintiff worked 20 hours each weekend at this job. She cared for her young children during the week. (T at 30–33). In her job as a home health aide, Plaintiff assists patients getting into and out of bed, using a machine if the patient is particularly heavy. (T at 37–38). Describing her responsibilities as a "light duty list," Plaintiff explained that she helped patients with their medications, attended to the trash, and administered nebulizer treatments. (T at 38–39).

This testimony concerning Plaintiff's work duties and activities of daily living is generally consistent with the ALJ's conclusion that Plaintiff retained the RFC to perform light work. Although much of the testimony concerned Plaintiff's activities after February 2, 2008 (*i.e.* after she resumed substantial gainful activity), Plaintiff testified that her exertional limitations were the same after that date as they were during the relevant time period. (T at 31–32). She also testified that her shoulder pain had not materially improved. (T at 31–32). As such, it was reasonable for the ALJ to conclude that Plaintiff's "condition and limitations have remained constant" and that her ability to "perform a home health aide job for twenty hours on the weekend and take care of an infant and toddler during the week" was indicative of an ability to perform work during the relevant time period. (T at 20).

*\*6* In light of the foregoing, this Court finds that the ALJ's conclusion that Plaintiff retained the RFC to perform light work was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

### b. Past Relevant Work

"[I]n the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003) (citing SSR 82–62). A claimant is not disabled if she can perform her past relevant work, either as she actually

performed it, or as it is generally performed in the national economy. *See* SSR 82–61; *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir. 1 981) (noting that "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally").

"Determination of the claimant's ability to perform past relevant work requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles,* etc., on the requirements of the work as generally performed in the economy." *Speruggia v. Astrue,* No. 05–CV–3532, 2008 WL 818004, at *12–*13 (E.D.N.Y. Mar.26, 2008).

Plaintiff argues that the ALJ erred by finding that Plaintiff could perform her past relevant work. In support of this argument, Plaintiff points to Dr. Kusior's conclusion that Plaintiff could not return to her past employment as a certified nurse's aide. (T at 281). This Court finds Plaintiff's argument unpersuasive. First, Dr. Kusior offered conflicting assessments on this point, indicating on more than one occasion that Plaintiff likely could return to work as a CNA. (T at 282, 344). As noted above, to the extent Dr. Kusior indicated that Plaintiff might be capable of returning to work as a CNA, his finding supported the ALJ's conclusion that Plaintiff could perform light work.

Second, the ALJ did not conclude that Plaintiff could perform her past relevant work as a CNA. Rather, he found that Plaintiff could perform her past relevant work as a home health aide. (T at 20–21). Plaintiff worked as a CNA prior to the application for benefits. She began working as a home health aide in February 2008, while the application was pending.

The ALJ's finding that Plaintiff could perform her past relevant work as a home health aide was based upon Plaintiff's testimony concerning the extertional demands of the work as she actually performed it and the fact that Plaintiff had been performing the work on a part-time basis. Work performed after the alleged onset date, but prior to the date of the ALJ's adjudication of the claim, is properly considered "past relevant" work at step four of the sequential analysis. *See Naegele v. Barnhart,* 433 F.Supp.2d

319, 325 (W.D.N.Y.2006) (citing SSR 82–62 and 20 C.F.R. § 404.1560(b)(1)). Of significance here was the fact that Plaintiff testified that her condition had not improved since September of 2005. (T at 31–32). In particular, Plaintiff said that her ability to lift had not improved. (T at 31). As discussed above, Plaintiff's ability to perform her job as a home health care aide beginning in February 2008 is relevant to the question of her capabilities during the closed period of alleged disability.

**\*7** Plaintiff testified that she only worked because she needed the income to support her family. (T at 30). She further explained that she did not work full-time because she was "scared to hurt [her] shoulder again." (T at 30). The ALJ concluded that Plaintiff was only "somewhat credible." (T at 20). In support of this finding, the ALJ cited the evidence provided by Dr. Kusior (the treating physician) and Dr. Balagtas (the consultative examiner), as well as the fact that Plaintiff was able to successfully work as a home health aide for twenty hours per week (10 hours on each day of the weekend) and care for her young children during the week. (T at 20).

"It is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983) (citations omitted). If there is substantial evidence in the record to support the Commissioner's findings, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984) (citations omitted). Further, the ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility, which thus entitles the ALJ's credibility assessment to deference. *See Tejada v. Apfel,* 167 F.3d 770, 776 (2d Cir.1999) (citing *Pascariello v. Heckler,* 621 F.Supp. 1032, 1036 (S.D.N.Y.1985)); *see also Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999).

There is no question that Plaintiff lives with pain, as the record documents frequent complaints in that regard. However, "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment. Otherwise, eligibility for disability benefits would take on new meaning." *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Moreover, "[a]n individual's statement as to pain or other symptoms shall

not alone be conclusive evidence [of disability]." 42 U.S.C. § 423(d)(5)(A).

In this case, Plaintiff's actual activities, the assessment of her treating physician, and the findings of the consultative examiner, all provide substantial support for the ALJ's conclusion that Plaintiff could perform her past relevant work as a home health aide and, thus, was not disabled within the meaning of the Social Security Act during the time period at issue.

## IV. CONCLUSION

After carefully reviewing the administrative record, this Court finds substantial evidence supports the Commissioner's decision, including the objective medical evidence and supported medical opinions. It is clear that the ALJ thoroughly examined the record, afforded appropriate weight to the medical evidence, including the assessments of Plaintiff's treating provider and the consultative examiner, and afforded the subjective claims of symptoms and limitations an appropriate weight when rendering his decision that Plaintiff is not disabled. This Court finds no reversible error and because substantial evidence supports the Commissioner's decision, this Court respectfully recommends that the Commissioner be GRANTED judgment on the pleadings and that Plaintiff's motion for judgment on the pleadings be DENIED.

## V. ORDERS

**\*8** Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES**

**Harris v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)**

2011 WL 3652286

THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b) (1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3652286

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Crystal D. v. Saul,  W.D.N.Y.,  February 22, 2021

2011 WL 3652201
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Stephanie J. HARRIS, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 09–cv–1112.
|
Aug. 17, 2011.

**Attorneys and Law Firms**

Office of Peter M. Margolius, Peter M. Margolius, Esq., of Counsel, Catskill, NY, for Plaintiff.

Social Security Administration, Office of the General Counsel, Thomas C. Gray, Esq., Special Assistant U.S. Attorney, of Counsel, New York, NY, for Defendant.

### *ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Victor E. Bianchini, duly filed on the 27th day of July 2011. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

**ORDERED** that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The Commissioner is granted judgment on the pleadings and Plaintiff's motion for judgment on the pleadings is denied.

3. The Clerk is directed to close the case and enter judgment accordingly.

4. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3652201

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2946371
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Francia M. VARGAS, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 10 Civ. 6306(PKC).
|
July 20, 2011.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Francia M. Vargas, proceeding *pro se,* seeks judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Plaintiff asserts that the decision of the Administrative Law Judge ("ALJ") was "erroneous, not supported by substantial evidence on the record, and/or contrary to the law." (Compl.¶ 9) Defendant has moved for judgment on the pleadings pursuant to Rule 12(c), Fed.R.Civ.P. For the reasons explained below, the defendant's motion is granted.

I. PROCEDURAL HISTORY
On January 10, 2008, plaintiff applied to the Social Security Administration ("SSA") for SSI benefits. (R. 97) [1] On May 13, 2008, the SSA determined that plaintiff's alleged mental disorder and hearing loss were not severe enough to prevent her from working and denied her application. (R. 50, 53–56) The SSA notified plaintiff that her claim was disapproved and informed her of her right to request a hearing. (R. 54–55)

[1] Citations to "(R. ___)" refer to the certified copy of the administrative record of proceedings filed by the Commissioner as part of his answer. (Docket No. 9)

Plaintiff then requested a *de novo* hearing before an Administrative Law Judge ("ALJ"), which was held on

October 1, 2009. (R. 63–68) Plaintiff appeared with a representative before ALJ Margaret L. Pecoraro. (R. 29–49)

On October 23, 2009, ALJ Pecoraro denied plaintiff's claim for benefits. (R. 13–28) After applying the five-step sequential test for determining whether an individual is disabled, ALJ Pecoraro concluded that plaintiff is not disabled under section 1614(a)(3) (A) of the Social Security Act. (R. 19) She reviewed plaintiff's claims stemming from her mental disorder, hearing loss, as well as pain in her knees, and determined that plaintiff has a severe combination of impairments—depressive disorder and panic disorder without agoraphobia, left ear hearing loss, and mild degenerative joint disease of the knees—but still has the residual functional capacity ("RFC") to perform the full range of light work defined in 20 CFR 416.967(b). (R. 23)

On October 29, 2009, plaintiff requested review of the ALJ's decision. (R. 8–11) The SSA Appeals Council denied plaintiff's request, and ALJ Pecoraro's decision became the final decision of the Commissioner on July 16, 2010. (R. 1) This case was then ripe for judicial review.

On August 3, 2010, plaintiff, proceeding *pro se,* filed a timely action with this Court seeking review of the Commissioner's final decision. [2] (Compl.¶ 1) A notice of appearance was filed on behalf of defendant on September 10, 2010. (Docket # 4) Defendant moved for a judgment on the pleadings, pursuant to Rule 12(c), Fed.R.Civ.P., on February 7, 2011. (Docket # 10).

[2] The Act requires a plaintiff to commence a civil action within sixty days from the date the notice of the Appeals Council's decision is received. 42 U.S.C. § 1383(c); 20 C.F.R. § 416.1481.

II. EVIDENCE BEFORE THE ALJ
At the hearing before ALJ Pecoraro, plaintiff testified about her age, education, background, family, work history, daily activities, and physical and psychiatric condition. (R. 33–48) ALJ Pecoraro also reviewed documentary evidence including: plaintiff's medical records from Morris Heights Health Center ("MHHC"); a report from Dr. Arlene Broska, a psychologist who performed a consultative psychiatric evaluation on the plaintiff; the opinion of a State agency review psychologist; a report from Dr. James Naughton, an internal medicine specialist who performed a consultative physical examination on the plaintiff; and a report from Dr. Abraham Eviatar, an ear, nose and throat specialist

who performed a consultative physical examination on the plaintiff.

### A. *Non–Medical Evidence*

**\*2** Plaintiff was born in the Dominican Republic on November 19, 1969, and immigrated to the United States on October 10, 1994. (R. 33, 97) She was thirty-eight and thirty-nine years old during the period at issue. (R. 107) She lives on the first floor of a walk-up apartment building with her two children, a daughter who is fifteen years old and a son who is ten years old. (R. 44, 98) Both children have medical problems due to premature births and receive SSI benefits. (R. 34–35) Plaintiff helps her son get ready for school each morning, prepares his breakfast and takes him to school. (R. 39) Every Friday, she walks her daughter to a therapy appointment five blocks away. (*Id.*) Plaintiff does chores around the house which include: cleaning the apartment, making meals, helping her son with his homework, doing the laundry, paying the bills with her children's SSI benefits, and grocery shopping when she receives food stamps. (R. 38–41) She has no friends and her only family is her father, who she has not seen in "a very long time." (R. 39–40) Two or three times a week, she goes to a church two blocks from her home for church services and bible study. (R. 40) Church members also visit her to pray and talk. (R. 40–41)

Plaintiff completed twelve years of education in the Dominican Republic but does not speak or write in English. (R. 33, 124) Plaintiff reported that she worked in the past as a waitress, but she has no record of earnings. (R. 34, 106, 120–21, 126–27) Plaintiff does not have a driver's license, and instead takes the bus and subway. (R. 47–48, 113)

Plaintiff testified that she missed scheduled appointments at the MHHC because she was too depressed to go out. (R. 36) Plaintiff initially indicated that she was taking Ambilify, Trazadone and Provigil for her depression and trouble sleeping. However, she later testified that she had run out of medicine after she stopped attending appointments at MHHC and acknowledged that she had not taken any medication for her depression since 2008. (R. 35–37) She testified that when she was getting regular treatment, she felt better. (R. 38)

Plaintiff testified that she had been receiving acupuncture therapy for her knee for the previous few months. (R. 42–43, 46–47) She testified that a doctor had prescribed a cane for her in 2006, and that she used it every day in her home and outside. (R. 43) She testified that her right knee was painful

and because she favored it, her left knee was starting to bother her. (*Id.*) She stated that her knees hurt when she sat for long periods of time, and worsened when she lay down. (*Id.*) She stated that she was able to climb the flight of stairs to her apartment with discomfort. (R. 44) She stated that she had been prescribed pain medication, but it made her sleepy. (*Id.*)

### B. *Medical Evidence*

#### 1. *Evidence Prior to Filing of Application for Benefits*

Plaintiff's medical records included treatments for mental health issues, knee pain and hearing loss. Plaintiff was treated for mental health issues from 2001 to 2007 at Morris Heights Health Center. (R. 150–62, 254–64, 291–95) In February 2001, plaintiff visited MHHC complaining of depression after learning of fetal defects during her pregnancy. (R. 275, 158–60) After observing that her mood was moderately depressed and her affect anxious, a psychiatrist diagnosed dysthymia and recommended therapy. (R. 160)

**\*3** In January 2002, plaintiff was screened by a certified social worker. (R. 150–52) On April 4, 2002, she was screened by another certified social worker. (R. 153–57) Intake records from this visit describe plaintiff as depressed, anxious and reporting auditory and visual hallucinations. (R. 153) Specifically, she reported hearing voices and seeing shadows. (R. 156) The social worker reported that plaintiff's intelligence was average and that she was fully oriented to person, place and time. (*Id.*) She also noted that plaintiff's appearance, behavior, speech and thought processes were all normal. (R. 155–56) The social worker diagnosed major depression with psychosis. (R. 157)

Plaintiff continued to receive treatment from MHHC through August 2007. (R. 308) Records from this time report that she continued to feel anxious and depressed. (R. 256–57, 273–74) In September 2006, plaintiff's primary care physician, Dr. Robert Sheldon, completed a residual functional capacity assessment. (R. 250–53) In this assessment, Dr. Sheldon opined that her depression seldom interfered with her attention and concentration. (R. 253)

In October 2006, a licensed clinical social worker at MHHC, Miguel Angel Medina, completed a mental impairment questionnaire. (R. 291–95) He noted that plaintiff's case had been opened in September 2003 and while she had initially received weekly treatments, she was presently receiving biweekly treatments. (R. 291) He reported that she responded positively to both her individual psychotherapy

and medication. (*Id.*) He stated that plaintiff had four or more episodes of decompensation within a twelve-month period because she was not taking her medication as prescribed and that she was more functional when she was on the medication. (R. 292) Plaintiff reported no negative side-effects from the medication. (R. 291) Mr. Medina assessed plaintiff's functional limitations, opining that she had mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, and marked deficiencies in concentration, persistence and pace. (R. 292) He noted that plaintiff had "unlimited or very good" ability to understand, remember, and carry out very short and simple instructions and "limited but satisfactory" ability to remember work-like procedures, maintain regular attendance and be punctual. (R. 293) Plaintiff was unable to meet competitive standards for sustaining an ordinary routine without special supervision or completing a normal workday and workweek without interruptions from psychologically-based symptoms. (*Id.*) The social worker diagnosed the plaintiff with major depressive disorder with psychotic features. (R. 291)

In November 2007, Plaintiff was terminated from mental health treatment at MHHC because she failed to keep scheduled appointments. (R. 255)

Plaintiff was treated for right knee pain from 2005 to 2007. (R. 218, 171, 205–09) In December 2005, Dr. Geoffrey Phillips performed an arthroscopy, partial lateral meniscectomy, and lateral release of the plaintiff's right knee after a MRI revealed a lateral meniscus tear and a CT scan confirmed patellar tilting and maltracking. (R. 199–204, 215–18)

 **\*4** During a physical examination at MHHC in September 2006, plaintiff's primary care physician, Dr. Sheldon, observed that she had full range of motion in her knees with slight crepitance. He diagnosed mild degenerative joint disease of the knees, with plaintiff's right knee being worse than her left. (R. 171) As previously noted, Dr. Sheldon completed a residual functional capacity questionnaire in that same month. (R. 250–53) The report notes that Dr. Sheldon had been plaintiff's primary care doctor since 1995 and that he saw her every six to eight months. (R. 250) He opined that plaintiff could walk up to five blocks without rest, sit up to two hours without getting up and stand up to four hours without sitting or walking around. (R. 251) In an eight-hour work day, plaintiff could be expected to sit for at least six hours and stand/walk for about two hours. (*Id.*) She required no unscheduled periods of walking around, however, she had to be able to shift positions at-will, from sitting,

standing or walking. (*Id.*) Dr. Sheldon opined that plaintiff could twist, stoop, crouch, and climb occasionally, and lift less than ten pounds frequently and up to twenty pounds rarely. (*Id.*) She did not have limitations as to grasping, turning, fine manipulation or reaching. (R. 252) Once again, Dr. Sheldon diagnosed mild degenerative joint disease of the knees as well as left ear hearing loss. (R. 250)

Plaintiff attended physical therapy at Bronx–Lebanon Hospital Center in June 2007, after being referred by Dr. Sheldon. (R. 205–09) Plaintiff complained of a gradual onset of pain in her left knee over the previous eight months. (R. 206) She had not been taking any medication for the pain. (*Id.*) She rated the pain as a "6" out of "10" in severity, and noted that it became worse when walking, climbing stairs, and squatting. (*Id.*) The physical therapist observed tenderness in plaintiff's left patella tendon and a limited ability to squat. (R. 207) Plaintiff was discharged from therapy in August 2007, due to a lack of attendance. (R. 205)

Plaintiff had a long history of left-sided hearing difficulty. In October 2002, plaintiff underwent an audiological evaluation which revealed borderline normal hearing in the right ear and severe mixed hearing loss in the left ear. (R. 167) The following month, a tympanomastiodectomy was performed to repair a perforated left eardrum. (R. 165, 168) As a result of plaintiff's failure to adhere to follow-up care, she developed an infection in her ear canal which resulted in partial failure of the graft. (*Id.*) In January 2003, plaintiff underwent surgery again to repair the perforated eardrum. (R. 164, 166, 168–70) In 2006, plaintiff was referred for a left ear hearing aid. (R. 179)

### 2. *Evidence Subsequent to Filing of Application for Benefits*

#### a. *Treating Physician's Records*

Records from MHHC report that plaintiff was terminated from mental health treatment in 2007 for failing to attend scheduled appointments. (R. 255) She was again terminated in May 2008, not only for failing to attend scheduled appointments but also failing to take her medication. (R. 254) Plaintiff visited Dr. Sheldon on June 10, 2009, and complained of depression. (R. 279) Dr. Sheldon noted that she had a mental health appointment on July 27, 2009. (*Id.*) A letter from MHHC noted that she subsequently missed this appointment as well as two previous appointments on April 6 and May 18, 2009. (R. 266)

**\*5** During a visit to Dr. Sheldon on February 6, 2009, plaintiff complained of right knee pain. (R. 283) Dr. Sheldon observed that plaintiff walked with a normal gait and noted no right knee deformity. (*Id.*) He recommended physical therapy. (*Id.*)

On September 15, 2009, a physical therapist from Total Medical P.C., stated in a letter that plaintiff had been attending regular physical therapy treatment two to three times per week since February 12, 2009. (R. 265)

b. *Other Medical Sources*

Arlene Broska, Ph.D., performed a consultative psychological examination of plaintiff on March 25, 2008, as part of the SSA's determination of plaintiff's disability. [3] (R. 194–98) Plaintiff described her education, as well as work, medical and family history to Dr. Broska. (R. 194) She reported that she was able to dress, bathe and groom herself, though Dr. Broska noted that she was poorly groomed. (R. 194–95) She also stated that she could do household chores such as cooking, cleaning, shopping and doing laundry. (R. 196) She expressed that she could not manage money nor take public transportation. (*Id.*) Plaintiff stated that she did not socialize and spent her days watching television or taking care of her children. (R. 197) Plaintiff's complaints included: difficulty falling asleep, loss of appetite, crying spells, being depressed "on and off," panic attacks when frightened, hearing voices twice a week, seeing shadows two to three times per week, and obsessive compulsive tendencies (R. 194–95) She told Dr. Broska that she was taking medication for anxiety, depression and sleeping problems, though she did not bring the medications to the appointment. (R. 194) She reported seeing a therapist weekly and a psychiatrist biweekly at MHHC. (*Id.*)

[3]  "A consultative examination is a physical or mental examination or test purchased for [claimant] at [SSA's] request and expense from a treating source or another medical source...." 20 CFR § 416.919. The SSA will purchase a consultative examination when the claimant's sources do not provide sufficient information to make a decision or when the SSA is unable to seek clarification from one of the claimant's sources. 20 CFR § 416.912.

In her mental status examination of the plaintiff, Dr. Broska observed that the plaintiff was marginally cooperative and a very poor informant. (R. 195) Her manner of relating, social skills and overall appearance were poor. (*Id.*) While her speech was fluent, clear, and adequately expressive, she frequently required repetition of questions. (R. 196) Dr. Broska estimated that plaintiff's cognitive functioning was between below average and borderline with a general fund of information which was somewhat limited. (*Id.*) Her thinking was coherent, although often labored, and she was oriented to person and place but not time. (*Id.*) The doctor noted that plaintiff's sensorium was clear and judgment fair but her attention, concentration and memory skills were impaired. (*Id.*) Dr. Broska opined that plaintiff could follow and understand simple instructions and perform simple tasks independently. (R. 197) She assessed that plaintiff's affect was depressed, her mood dysthymic, and her insight was poor. (R. 196) Dr. Broska opined that plaintiff could perform complex tasks independently and appeared capable of making some appropriate decisions but that she might have difficulty maintaining attention and concentration, learning new tasks and maintaining a regular schedule. (R. 197) Additionally, plaintiff might not always relate adequately with others or appropriately deal with stress. (*Id.*) Dr. Broska diagnosed depressive disorder, not otherwise specified, obsessive compulsive disorder, and panic disorder without agoraphobia. (*Id.*)

**\*6** On May 9, 2008, State review psychologist Dr. T. Harding reviewed plaintiff's medical records and completed a Psychiatric Review Technique Form and mental residual functional capacity assessment. (R. 226–43) He assessed mild restrictions in plaintiff's daily activities, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace. (R. 236) He also noted that he had not experienced any episodes of deterioration of extended duration. (*Id.*) Regarding plaintiff's residual functional capacity, Dr. Harding found no marked limitations in any areas of function. (R. 240–41) He noted mild to moderate limitations in understanding and memory, and moderate limitations in sustained concentration and persistence, social interaction and adaptation. (*Id.*) Based on his review of the medical records, including records from MHHC and Dr. Broska, the doctor diagnosed depression, not otherwise specified, and mixed anxiety disorder. (R. 229, 231) He opined that plaintiff could sustain a normal workday and workweek and could maintain a consistent pace to do at least unskilled work. (R. 242)

On May 2, 2008, Dr. James Naughten performed a consultative internal medicine examination of plaintiff. (R. 221–24) The doctor observed that plaintiff walked with a stiff gait. (R. 222) She was imbalanced when walking on

her heels and toes and had a limited ability to squat. (*Id.*) While she experienced mild difficulty getting on and off the examination table and rising from a chair, she used no assistive devices. (*Id.*) Dr. Naughten stated that plaintiff had full range of movement in her extremities and spine. (R. 223) Strength of the left leg and upper extremities was "5/5" and strength of right leg was "4/5." (*Id.*) There was no evident subluxations, contractures, anklyosis, or thickening, and no redness, heat, swelling or effusion. (*Id.*) Joints were stable and non-tender, with mild crepitus in the right knee. (*Id.*) An x-ray of the left knee showed no abnormalities. (R. 223, 225) In addition to his observations concerning plaintiff's knees, Dr. Naughten also observed that plaintiff's hearing was poor to fair. (R. 222)

In general, Dr. Naughten found that plaintiff dressed appropriately, maintained good eye contact, and appeared oriented in all spheres. (R. 223) He found no evidence of hallucinations, delusions, impaired judgment or significant memory impairment. (*Id.*) The remainder of the examination findings were unremarkable. (R. 222–23) Dr. Naughten diagnosed a history of hearing impairment bilaterally and right knee arthritis. (R. 223) He stated that plaintiff had no limitations with seeing, talking, sitting, standing, walking, pushing, pulling, or reaching. (R. 224) The plaintiff did have moderate limitations with lifting, carrying, handling objects, and climbing stairs. (*Id.*)

On April 29, 2008, Dr. Abraham Eviatar, an ear, nose and throat specialist, examined plaintiff. (R. 219–20) Plaintiff stated that she had suffered with hearing loss since birth but had not used hearing aids. (R. 219) A hearing test revealed mild to moderate hearing loss in the right ear and moderate to severe hearing loss in the left ear. (R. 220) Plaintiff had 100 percent speech discrimination in both ears. (R. 219–20) Dr. Eviatar opined that surgery could be done in the right ear to improve hearing, and that hearing aids in both ears would be helpful. (R. 219) With such treatment, the right ear would have normal hearing and the left ear should improve to thirty decibels or better. (*Id.*)

## III. ADDITIONAL EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

**\*7** After the ALJ's decision in October 2009, plaintiff submitted additional evidence to the Appeals Council. (R. 4, 145–48, 296–313) On November 3, 2009, plaintiff visited the behavioral health clinic at MHHC, complaining of sleep and appetite disturbance, crying spells, difficulty concentrating, feelings of isolation and hopelessness, rumination, migraines,

and fatigue. (R. 309) Plaintiff reported onset of symptoms in 2001 when she started therapy at MHHC for depression and intensification of symptoms in the previous two weeks. (*Id.*) She reported having discontinued psychotropic medication one to two years earlier. (R. 308) She stated that she has no current suicidal ideation. (*Id.*) Plaintiff expressed desire to learn English, prepare for the citizenship examination, and take a course in computers. (R. 305) She stated that she was unemployed and looking for work, actively involved in religious/spiritual practices, and that her activities included watching television and cooking for her children. (*Id.*)

In her mental status evaluation, the social worker reported that plaintiff was cooperative, but exhibited restless behavior and appeared depressed and anxious. (R. 303) Plaintiff's speech was normal. (*Id.*) She was oriented to time, place, and person. (*Id.*) Her memory, attention and concentration were intact. (*Id.*) Plaintiff's judgment was fair and intelligence functioning average, but her insight and impulse control were poor. (*Id.*) Her thought process was normal, and she reported no delusions, obsessions, or phobias. (*Id.*) Plaintiff did report suffering from hallucinations, but not within the last year (*Id.*) She had difficulty with social relationships, stating that she frequently argued with others and preferred to be alone. (R. 305) The social worker provisionally diagnosed depressive disorder, not otherwise specified. (R. 302) Two months later, on January 27, 2010, a psychiatrist evaluated plaintiff, diagnosed bipolar disorder, unspecified, and prescribed medication. (R. 312)

On September 23 2010, a physical therapist from Total Medical P.C. submitted another letter stating that plaintiff had been attending physical therapy treatment since February 12, 2009. (R. 313)

## IV. APPLICABLE LAW

### A. *Standard of Review*

Under Rule 12(c), Fed.R.Civ.P., a movant is entitled to judgment on the pleadings only if the movant establishes "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt.,* 901 F.2d 266, 269 (2d Cir.1990) (citations omitted). Judgment on the pleadings is appropriate where no material facts are in dispute, and "where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir .1988) (citation omitted).

2011 WL 2946371

Review of the Commissioner's final decision denying disability benefits is limited. The court may not determine de *novo* whether the plaintiff is disabled. *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) (citing *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner, ... if supported by substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall review only the question of conformity with [the] regulations...."); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000) (citing *Bubnis v. Apfel,* 150 F.3d 177, 181 (2d Cir.1998)). Therefore, a court's review involves two levels of inquiry. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). First, the court must review whether the Commissioner applied the correct legal standards. *Tejada,* 167 F.3d at 773; *see Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987) (citing 42 U.S.C. § 405(g) and holding that a court must first review the ALJ's decision for correct legal principals before applying the substantial evidence standard). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. *Tejada,* 167 F.3d at 773.

**\*8** The ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir.2004) (quoting *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984)). The ALJ's factual findings supported by substantial evidence are "binding" on this court; however, "where an error of law has been made that might have affected the disposition of the case," this court cannot simply defer to the ALJ's factual findings. *Id.* Legal error may include failure to adhere to the applicable regulations. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing *Schaal,* 134 F.3d at 504–05).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. N.L.R .B.,* 305 U.S. 197, 229 (1938)); *accord Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (per curiam). Relevant evidence includes inferences and conclusions drawn from evidentiary facts. *Rivas v. Barnhart,* 2005 WL 183139, at \*18 (S.D.N.Y. Jan. 27, 2005) (citations omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart,* 312

F.3d 578, 586 (2d Cir.2002). When reviewing the evidence supporting the Commissioner's position to determine whether it is substantial, the court should review the record as a whole, and "not look at that evidence in isolation[,] but rather [ ] view it in light of other evidence that detracts from it." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d. Cir.1990) (citation omitted). However, even if there is substantial evidence contrary to the Commissioner's position, the Commissioner's determination will not be disturbed. *See DeChirico v. Callahan,* 134 F.3d 1177, 1182 (2d Cir.1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

When reviewing the factual record, it is not this court's role "to resolve evidentiary conflicts ... [or] to appraise the credibility of witnesses, including the claimant;" instead, those are judgments for the Commissioner to make. *Carroll v. Sec'y of Health and Human Services,* 705 F.2d 638, 642 (2d Cir.1983) (citations omitted). Accordingly, genuine conflicts in the medical evidence are for the Commissioner to resolve. *Veino,* 312 F.3d at 588 (citations omitted). Courts give great deference to an ALJ's credibility determination because the ALJ had the opportunity to observe plaintiff's demeanor while testifying. *Ruiz v. Barnhart,* 2006 WL 1273832, at \*7 (S.D.N.Y. May 10, 2006); *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 n. 6 (S.D.N.Y. Apr. 24, 1995).

Before deciding if the Commissioner's determination is supported by substantial evidence, courts must first be satisfied that the claimant received "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (quoting *Gold v. Sec'y of Health, Educ. and Welfare,* 463 F.2d 38, 43 (2d Cir.1972)). The ALJ has an affirmative duty to fully and fairly develop an administrative record. *Echevarria,* 685 F.2d at 755. This duty arises from the essentially non-adversarial nature of a benefits proceeding where the Secretary is not represented. *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel....' " *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (quoting *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996). To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights. *Robinson v. Sec'y of Health and Human Servs.,* 733 F.2d 255, 258 (2d Cir.1984) (citation omitted). "If the reviewing court determines that a claimant did not receive a 'fair and adequate hearing' before the ALJ, ... it must

2011 WL 2946371

remand the case to the Commissioner....'" *Watson v. Astrue,* 2009 WL 6371622, at * 5 (S.D.N.Y Feb. 4, 2009) (citing *Echevarria,* 685 F .2d at 755–57). "A finding of gaps in the record or need for further development of the evidence is cause for remand." *Batista v. Chater,* 972 F.Supp. 211, 217 (S.D.N.Y.1997) (citing *Parker,* 626 F.2d at 235.

**\*9** Along with evidence presented to the ALJ, any additional evidence presented to the Appeals Council becomes part of the administrative record and subject to judicial review by the district court, regardless of whether the Appeals Council grants or denies review. *Perez,* 77 F.3d at 45. Evidence submitted to the Appeals Council must (1) be new, (2) be material, and (3) "relate to the period on or before the ALJ's decision." *Id.* (summarizing 20 C .F.R § 416.1470(b)).

### B. *Five–Step Disability Determination*

The Social Security Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act provides that "an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); *Rosa,* 168 F.3d at 77. The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the SSA. *See* 20 C.F.R. § 404.1520. The Second Circuit has described this analysis as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, [second,] the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant

> suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience ... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Fifth, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*Rosa,* 168 F.3d at 77 (citing *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam)); *accord Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002).

The claimant bears the burden of proof for the first four steps. *Shaw,* 221 F.3d at 132. If the claimant meets his burden on the first four steps, then the burden shifts to the Commissioner at the fifth step to "show there is other gainful work in the national economy which the claimant could perform." *Draegert,* 311 F.3d at 472 (citing *Carroll,* 705 F.2d at 642). Work that exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). At this fifth step, the Commissioner considers the claimant's residual functional capacity and vocational factors, such as age, education, and work experience, to see if he can make an adjustment to other work. 20 C.F.R. § 416.920. To assist in this process, an ALJ uses Medical–Vocational Guidelines ("the Grids"). *See* 20 C.F.R. Part 404, Subpart P, Appendix 2. But, solely relying upon the Grids is inadequate where the Medical–Vocational Guidelines do not particularly address plaintiff's limitations. *See* 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e); *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y., 1996).

**\*10** If a plaintiff has nonexertional impairments, the Commissioner must determine if they are significant.[4]

"[W]hen a claimant's nonexertional impairments *significantly* diminish his ability to work-over and above any incapacity caused solely from exertional limitations ... the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir.1986) (emphasis added); *see also Pratts,* 94 F.3d at 38–39.

4   Nonexertional impairments are those, other than strength impairments, that affect one's ability to perform work related functions and include "difficulty functioning because [one is] nervous, anxious, or depressed," "difficulty maintaining attention or concentrating," and/or "difficulty understanding or remembering detailed instructions." *See* 20 C.F.R. § 404.1569(a)(c).

The Second Circuit has established that the "application of the grid guidelines and the necessity for expert testimony must be determined on a case-bycase basis." *Bapp,* 802 F.2d at 605. More specifically,

> If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate.... By the use of the phrase "significantly diminish" we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Id.* at 605–06; *but see Clark v. Heckler,* 733 F.2d 65, 69 (8th Cir.1984) ("[W]here a claimant suffers from a nonexertional impairment the Guidelines are not applicable.").

### C. Treating Physician Rule

The opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairments" will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *Green–Younger v.*

*Barnhart,* 335 F.3d 99, 106 (2d Cir.2003). A lack of specific clinical findings in the treating physician's report does not, by itself, permit the ALJ to discredit the treating physician's report. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal,* 134 F.3d at 505. However, the treating physician's opinion is not afforded controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. 20 C.F.R. § 416.927(d)(2); *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999). In such a case, a report from a consultative physician may constitute substantial evidence. *Mongeur v. Hecklerd,* 722 F.2d 1033, 1039 (2d Cir.1983); *Carrington v. Barnhart,* 2005 WL 2738940, at *9 n. 2 (S.D.N.Y. Oct. 19, 2005). "[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given." *Snell,* 177 F.3d at 133; *see* 20 C.F.R. § 416.927(d)(4).

Further, a treating physician's opinion that the claimant is "disabled" or "unable to work" is not controlling. 20 C.F.R. § 416.927(e)(1). Additionally, medical opinions regarding whether the claimant's "impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1," medical opinions regarding plaintiff's RFC, and the application of vocational factors are not controlling. 20 C.F.R. § 416.927(e)(2). Medical opinions on such issues are merely a consideration and not determinative. 20 C.F.R. § 416.927(e). Such issues are reserved to the Commissioner. *Id.* Reserving these issues to the Commissioner relieves the SSA of having to credit a doctor's finding regarding these issues, but that "does not exempt [the ALJ] from [his] obligation ... to explain why a treating physician's opinions are not being credited." *Snell,* 177 F.3d at 134.

**\*11** If the treating physician's medical opinion is not afforded controlling weight, the following factors must be considered to determine the weight given to the opinion: (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the treating physician is a specialist. *See Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998) (citing 20 C.F.R. § 416.927(d)(2)). Furthermore, when the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so. *Id.; see also Schaal,* 134 F.3d at 505 (stating that the ALJ must "set forth his reasons for the weight he assigns to the treating physician's opinion"); *Snell,* 177 F.3d at 134 ("The requirement of reason-

2011 WL 2946371

giving exists ... to let claimants understand the disposition of their cases ... even—and perhaps especially—when those dispositions are unfavorable.")

### D. *Subjective Claims of Pain and Symptoms*

The subjective experience of pain and other symptoms can support a finding of disability. In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are "medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain." *Snell,* 177 F.3d at 135 (quoting the rule for evaluating symptoms for Disability Insurance, 20 C.F.R. § 404.1529(a), which has identical language to same rule for Supplemental Security Income, C.F.R. 416.929(a)). Second, assuming that these exist, the ALJ must then assess the claimant's complaints, considering the following factors: (1) daily activities; (2) the location duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

Third, after considering these factors, the ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment ... regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984) (quoting *McLaughlin v. Sec'y of Health, Educ. and Welfare of the U.S.,* 612 F.2d 701, 705 (2d Cir.1980) (citation omitted)). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs. of the U.S.,* 728 F.2d 588, 591 (2d Cir.1984) (citation omitted). "[D]isability requires more than mere inability to work without pain." *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). The "pain must be so severe ... as to preclude any substantial gainful employment." *Id.*

### V. DISCUSSION

**\*12** This Court upholds ALJ Pecoraro's finding that plaintiff was not disabled. Contrary to plaintiff's assertion that the ALJ's decision was "erroneous, not supported by substantial evidence on the record and/ or contrary

to the law" (Compl.¶ 9), this Court concludes that the ALJ applied the correct legal standard and her decision is supported by substantial evidence. Specifically, the ALJ's five-step disability determination, decision not to give Dr. Sheldon's opinion controlling weight and finding that plaintiff's testimony was less than credible were consistent with legal standards and supported by substantial evidence in plaintiff's medical records.

### A. *Application of the Five–Step Disability Determination*

ALJ Pecoraro made her determination of plaintiff's disability by applying the five-step process for evaluating disability claims. (R. 19–28) *see* 20 C.F.R. § 416.920; *Rosa,* 168 F.3d at 77. At step one, ALJ Pecoraro determined that plaintiff had not engaged in substantial gainful activity since January 10, 2008, the application date. (R. 21) At step two, she found that plaintiff's combination of mild degenerative joint disease of the knees, left ear hearing loss, depressive disorder, and panic disorder without agoraphobia, constituted a "severe combination of impairments," which is defined in 20 C.F.R. 416.920(c), as "significantly limit[ing] [plaintiff's] physical or mental ability to do basic work activities ." (*Id.*) At step three, the ALJ determined that this combination of impairments did not meet or medically equal one of the listed impairments in Appendix 1 to Subpart P of Part 404, meaning that plaintiff was not per se disabled. (*Id.*)

At step four, the ALJ was required to determine the extent of plaintiff's RFC and whether, with this RFC in mind, she could perform her past work. 20 C.F.R. § 416.920. The ALJ first found that plaintiff had the RFC to perform "light work" as defined in 20 C.F.R. 416.967(b).[5] (R. 23) Such a finding is supported by substantial evidence. Specifically, Dr. Naughton observed that although the plaintiff had a stiff gait and mild crepitus in her knees, she had no limitations in standing, walking, sitting, pushing, pulling, or reaching. (R. 222–24) Her complaints of debilitating knee pain were contradicted by the fact that she required no assistive devices for walking. (*Id.*) Dr. Naughton did assess moderate limitations for lifting carrying, handling objects and climbing stairs. (*Id.*) As the ALJ notes, however, such limitations are consistent with a conclusion that plaintiff can perform light work. (R. 25) The ALJ then found that plaintiff had no past relevant work as defined in 20 C.F.R. 416.965. This finding is based on the plaintiff's own statements and earnings' records. (R. 27)

5    20 C.F.R. 416.967(b): "Light work involves lifting no more than 20 pounds at a time with frequent

lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

Since the plaintiff's claim survived the first four steps of the inquiry, the burden then shifted to the Commissioner to demonstrate whether plaintiff has the RFC to perform other jobs existing in significant numbers in the national economy. *Draegert*, 311 F.3d at 472 (citation omitted). The ALJ found that the Commissioner had met that burden. Based on the plaintiff's age, educational background, work experience, and residual capacity, and in conjunction with the Grids, the ALJ found that (1) plaintiff had "the vocational base for unskilled light work" and (2) this vocational base was not "substantially eroded" by nonexertional limitations. (R. 27) Plaintiff, the ALJ acknowledged, does have "mild limitations in the ability to interact appropriately with others [and] moderate limitations in maintaining attention and concentration for complex tasks." (R. 23) The ALJ explained, however, that these impairments "do not result in disabling limitations." (R. 24)

**\*13** ALJ Pecoraro was correct in applying the Grids to determine whether plaintiff could perform in the national economy. While an ALJ's reliance on the Grids may be inappropriate when the plaintiff has nonexertional limitations, such limitations do not necessarily preclude the use of the Grids. *See Pratts*, 94 F.3d at 39. Instead, relying solely on the Grids is inappropriate when nonexertional limitations "significantly diminish" plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir2010) (quoting *Bapp*, 802 F.2d at 605).

ALJ Pecoraro's decision to apply the Grids was appropriate because plaintiff's nonexertional limitations did not significantly limit her ability to carry out unskilled light work. The ALJ considered all medical and non-medical evidence on the record, including the opinion of plaintiff's treating physician: Dr. Sheldon. As will be discussed below, the ALJ did not give controlling weight to Dr. Sheldon's opinion. *See* Discussion *infra* Part IV.C. Instead, ALJ Pecoraro gave the greatest weight to the opinions of the consulting physicians: Drs. Broska, Naughton and Eviatar and the State

agency review psychologist. From this evidence, she noted that even considering plaintiff's nonexertional limitations, plaintiff could still meet "the basic mental demands of competitive, remunerative, unskilled work includ[ing:] to understand, carry out and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and, to deal with changes in a routine work setting." (R. 27) The ALJ's conclusion that these abilities allow plaintiff to perform unskilled light work—defined in 20 CFR § 416.968(a) as encompassing "simple duties" which require "little or no judgment" and "can be learned on the job in a short period of time"—is therefore supported by substantial evidence. (R. 27) Because the ALJ properly found that plaintiff's nonexertional impairments did not significantly diminish her ability to do work, the ALJ was not required to receive testimony from a vocational expert.

**B.** *Application of the Treating Physician Rule*

ALJ Pecoraro's decision not to give controlling weight to plaintiff's treating physician was correct and is supported by substantial evidence. In determining the "nature and severity of [claimant's] impairments," an ALJ may refrain from giving controlling weight to the treating physician's opinion. In coming to such a conclusion, the ALJ must first determine that the treating physician's opinion is inconsistent with other substantial evidence in the record, including the opinions of other medical experts. 20 C.F.R. § 416.927(d)(2); *Snell*, 177 F.3d 128 at 133. The Second Circuit has noted that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence ... and the report of a consultative physician may constitute such evidence." *Mongeur*, 722 F.2d at 1039. Once she has decided that a treating physician's opinion will not be given controlling weight, an ALJ "will always give good reasons ... for the weight [she] give[s] [claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2); *See Halloran*, 362 F.3d at 32 (per curiam)).

**\*14** ALJ Pecoraro determined that the opinion of Dr. Sheldon, plaintiff's treating physician, was inconsistent with other substantial, more recent, evidence in the record. The ALJ first noted that the treating physician's opinion was "of little relevance in determining whether the [plaintiff was] disabled ...." at the time of application in part because it was "dated well prior to the time under consideration." (R. 24) The ALJ was correct in giving the opinion less weight because of its remoteness to the time period in question. The opinion is based upon observations two years prior to the date of plaintiff's application for benefits. The ALJ also noted that Dr.

Sheldon's opinion was inconsistent with more recent evidence showing that plaintiff's limitations were not disabling. (R. 24) This substantial evidence included the opinions of three consultative physicians, Drs. Broska, Naughton and Eviatar, and one State agency review psychologist, Dr. T. Harding. (R. 25) Unlike the treating physician's opinion, these later opinions were "well-supported and not inconsistent with substantial evidence from the relevant period." (R. 25–26) The ALJ may properly decide to give less weight to a treating physician's opinion which is inconsistent with the record as a whole and instead give more weight to consultative physicians' opinions which are consistent with the record as a whole. *See* 20 C.F.R. § 416.927(d)(2); *Mongeur,* 722 F.2d at 1039.

Not only must the ALJ determine that the treating physician's opinion will be given less weight, she must explain her decision, using the factors provided by the SSA in 20 C.F.R § 416.927(d)(2) (i)-(ii), (3)-(6). Although ALJ Pecoraro did not mention the factors by name, the ALJ explained her decision in terms that fall neatly within two of them: the "frequency of the examination" and the consistency of the opinions with the record as a whole. 20 C.F.R. 416.927(d) (2)(i), (d)(4). ALJ Pecoraro notes that the "remote opinion" is of "little value in determining what the [plaintiff] can still do...." (R. 25) Such a remoteness in time undercuts one of the reasons why treating physicians' opinions are ordinarily favored, namely that they provide a "longitudinal picture of [plaintiff's] impairment." 20 C.F.R. 416.927(d)(2)(i). The ALJ also properly explained that the opinion would be given less weight because of its inconsistency with the record as a whole, particularly with the opinions of the consultative physicians. Using the rationale described above, the ALJ explained that "great weight" would be given to the opinions of Drs. Broska, Naughton and Eviatar's and even "more weight" would be given to the opinion of the State agency review psychologist, Dr. Harding, because they are well-supported and not inconsistent with the record. (R. 25–26) The inconsistency of the treating physician's opinion with the record, along with the temporal distance between the treating physician's opinion and the application date, provide good reason for the ALJ's decision that the treating physician's opinion should not be given controlling weight.

### C. *Consideration of Plaintiff's Subjective Claims of Pain and Symptoms*

**\*15** ALJ Pecoraro properly found that plaintiff's statements about her pain and symptoms were not credible. An ALJ may properly make such a credibility decision if her decision, after reviewing the medical findings and other evidence in the record, is supported by substantial evidence. *Aponte,* 728 F.2d 588 at 591. If the decision is supported by such evidence, the district court must uphold the decision for "genuine conflicts in the medical evidence are for the Secretary to resolve." *Id.*

ALJ Pecoraro's finding that plaintiff's statements were not credible is supported by substantial evidence. As the ALJ notes in her decision, the plaintiff's claims that her depression kept her from leaving the apartment, thereby causing her to miss her mental health treatments, is challenged by her testimony that she accompanied her daughter to her counseling appointments every Friday, walked her son to school, and attended church services several times a week. (R. 26) Her claim of disability based on hearing loss is similarly undermined by her acknowledgement that she has no difficulty hearing conversations. (*Id.*) As for her knee pain, the ALJ noted that plaintiff is not so disabled as to be unable to take public transportation. (*Id.*) Overall, the ALJ also noted that plaintiff describes a range of activities that are inconsistent with a claim of disability: receiving guests from church, cooking and cleaning for her children, getting her children ready for school, assisting them with homework, and handling household bills. (*Id.*) The ALJ also pointed out that in her consultative visit with Dr. Broska, plaintiff claimed that she could not manage money or take public transportation. (*Id.*) However, under oath during the hearing, plaintiff admitted that she could do both. (*Id.*) Based on this substantial evidence, the ALJ's determination that "[t]he contradictions between the [plaintiff's] allegation of disability and her actual functioning negatively impact her credibility" was correct. (*Id.*)

### D. *Consideration of Additional Evidence Submitted to the Appeals Council*

Plaintiff submitted additional evidence to the Appeals Council after the ALJ issued her decision. (R. 4, 145–48, 296–313) The Appeals Council considered this evidence. (R. 1–2, 4–5) As the Appeals Council properly found there was no reason to reverse the ALJ's decision. (R. 1)

SSA regulations state that evidence submitted to the Appeals Council must be new and material. 20 C.F.R. 416.1470. Additionally, "the Appeals Council shall consider ... additional evidence only where it relates to the period on or before the administrative law judge hearing decision." (*Id.*) In making her request for review to the Appeals Council, plaintiff included a letter from a physical therapist, dated February 23, 2010, stating that she had attended physical

therapy since February 12, 2009. (R. 313) However, this letter repeats, almost verbatim, the same information provided in an earlier letter from the same therapist, dated September 15, 2009. (R. 265) Plaintiff also submitted a list of prescribed medications from March 13, 2009 through March 30, 2010. (R. 146–148) This list of medications does not present any material evidence as to the plaintiff's ability to work. Finally, plaintiff included additional medical records for the period from November 3, 2009 through February 19, 2010, during which she was seen by the behavioral health clinic at MHHC. (R. 296–312) These records included an "Initial Psychiatric Evaluation" which took place on January 27, 2010, in which she was diagnosed with "Bipolar Disorder, Unspecified." (R. 310–312) This evidence fails the third requirement in 20 C.F.R. 416.1470 because the medical records relate to a period which was not "on or before the administrative law judge hearing decision" which was issued on October 23,2009. (R. 13) Each additional piece of evidence provided by plaintiff failed one of the requirements of the statute and therefore did not provide a reason to disturb the ALJ's decision.

## VI. CONCLUSION

**\*16**  In summary (1) the ALJ properly applied the five-step disability determination analysis and the treating physician rule; and (2) the ALJ's decision was supported by substantial evidence in the record. Therefore, defendant's motion for judgment on the pleadings is granted, and the Commissioner's decision is affirmed. The Clerk should enter judgment for the defendant.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 2946371

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1342964
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Clearthur NELSON, Plaintiff,
v.
Carolyn W. COLVIN, Commissioner of the
Social Security Administration [1], Defendant.

[1]     The Clerk of the Court is directed to amend the
        docket to reflect that Carolyn W. Colvin is now the
        Acting Commissioner of Social Security.

No. 12–CV–1810(JS).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Michael Brangan, Esq., Sullivan & Kehoe, Kings Park, NY,
for Plaintiff.

Vincent Lipari, Esq., United States Attorney's Office, Eastern
District of New York, Central Islip, NY, for Defendant.

*MEMORANDUM & ORDER*

JOANNA SEYBERT, District Judge.

**\*1** Plaintiff Clearthur Nelson ("Plaintiff") commenced this
action pursuant to Section 205(g) of the Social Security Act,
as amended, 42 U.S.C. § 405(g), challenging defendant the
Commissioner of Social Security's (the "Commissioner" or
"Defendant") denial of Plaintiff's application for disability
insurance benefits and Supplemental Security Income
("SSI"). Presently before the Court are Plaintiff's and the
Commissioner's cross-motions for judgment on the pleadings.
For the following reasons, the Commissioner motion is
GRANTED and Plaintiff's motion is DENIED.

*BACKGROUND*

On February 26, 2009, Plaintiff filed an application for
disability insurance benefits and SSI, asserting that he has
been disabled, and therefore unable to work, since December

1, 2008, due to left shoulder, bicep, and knee impairments;
chronic lower back pain; jaw pain due to a post-fracture
repair; right metacarpal fracture; and hypertension. (R. 20,
22, 106–07.) [2] Plaintiff's application was denied on April 23,
2009. (R. 56–65.) On May 14, 2009, Plaintiff requested a
hearing before an administrative law judge ("ALJ"). (R. 70–
71.)

[2]     "R." denotes the administrative record filed by
        the Commissioner on December 11, 2012. (Docket
        Entry 10.)

A hearing took place before ALJ Scott C. Firestone on
July 29, 2010. (R. 30–55.) Plaintiff appeared in person, was
represented by counsel, and was the only witness to testify at
the hearing. (R. 30–55.)

The Court's review of the administrative record will proceed
as follows: *First,* the Court will summarize the relevant
evidence that was presented to the ALJ; *second,* the Court
will review the ALJ's findings and conclusions; and *third,* the
Court will review the Appeals Council's decision.

**I. Evidence Presented to the ALJ**
The Court will briefly summarize Plaintiff's testimonial
evidence and employment history before addressing
Plaintiff's medical records.

   A. *Testimonial Evidence and Employment History*
Plaintiff was born on January 11, 1958. (R. 33.) He dropped
out of school in the eighth grade but is able to read and write.
(R. 39–40.) From March 2007 to December 2008, Plaintiff
was incarcerated for two years for drug possession. (R. 37.)
Plaintiff testified that he was assaulted while incarcerated and
suffered a fractured jaw, which required surgery and a metal
plate implant to repair. (R. 49–50.)

In his Work History Report, Plaintiff listed the following
employment history: (1) from 1981 to 1982, Plaintiff worked
as a laborer; (2) from 1982 to 1986, Plaintiff worked in
maintenance for J.C. Penney; (3) from 1986 to 1988, Plaintiff
worked for a bus company; (4) from 1988 to 1990, Plaintiff
was a security guard; (5) from 1999 to 2004, Plaintiff worked
as a construction truck driver and laborer. (R. 156.) The Work
History Report does not indicate Plaintiff's employment status
for the years from 1990 to 1998 and 2004 to 2007. However,
Plaintiff testified that he last worked in construction in 2000
(R. 42), but he also stated that he was laid off from work

in December 2006, (R. 127). Plaintiff testified that since his release from prison in December 2008, Plaintiff has not worked, nor has he sought employment. (R. 45.)

**\*2** Plaintiff testified that he spends most of his time watching television, sleeping, preparing meals for himself, and "try[ing] to make [himself] comfortable." (R. 51–54.) Plaintiff lives with his fiancé and four of his six children. (R. 43–44.) He claims to have no hobbies and does not do any household chores. (R. 52, 54.) His driver's license was suspended for failure to make child support payments. (R. 43.) He also receives welfare assistance in the form of food stamps. (R. 45.)

In his application for disability benefits, Plaintiff claimed that he had become disabled as of December 1, 2008. (R. 102, 106.) However, Plaintiff explained during his hearing that he had been experiencing pain in his knees, arm, and back for some time prior to his application, but only applied after his release from prison. (R. 33–37, 41.)

Plaintiff testified that he has "severe back pain" and that he cannot sit for longer than five minutes before having to move and that he cannot walk or stand for more than ten minutes. (R. 34–35.) He attended his hearing with a cane that was prescribed to him "back in the 90s," but he also testified that he does not always use it. (R. 33.) Plaintiff also testified that he can lift only about ten pounds due to a tear of his left bicep that he sustained while incarcerated. (R. 35–36.) He claimed that when he does lift things, like a grocery bag, he will feel discomfort, stinging, and stiffness the next day. (R. 37.) With respect to his back, Plaintiff testified that his lower back pain is an "aching, stabbing, throbbing pain" and that the pain can go up to a ten out of ten when he is not on medication, but when he is on medication, the average is only three out of ten. (R. 47–48.) At the time of the hearing, Plaintiff was taking four tablets of Oxicodal per day. (R. 48.) Finally, Plaintiff testified that he experiences "aching" headaches due to the metal plate used to repair his jaw. (R. 50.)

### B. *Medical Evidence*

In addition to Plaintiff's testimony, the ALJ also had before him all of Plaintiff's medical records. Plaintiff first sought medical attention on February 2, 2008 from the Nassau University Medical Center for jaw pain and contusions to the shoulder and knee. (R. 171–72.) A computed tomography ("CT") scan revealed an age-indeterminate fracture of the right mandibular ramus and an old fracture of the left anterior mandible coupled with a metal fixation. (R. 172.)

Plaintiff returned to the Nassau University Medical Center on February 19, 2009, complaining of a sore throat and body pain. (R. 174.) During this visit, Plaintiff claimed that he began experiencing pain in his left arm, at a score of six out of ten, six months prior to the visit; pain in his jaw, at a score of nine out of ten, one year prior to the visit; and chronic pain in his right knee, at a score of nine out of ten. (R. 174.)

On March 30, 2009, Plaintiff saw Dr. Sandra Pascal, D.O. for pain in his back, left arm, and jaw. (R. 189.) Dr. Pascal examined Plaintiff and found an unspecified decrease in range of motion for Plaintiff's left shoulder and decreased strength in his left arm. (R. 189–90.) Dr. Pascal diagnosed Plaintiff with gingivitis, chest pain, uncontrolled benign essential hypertension, and a ruptured bicipital tendon of the left arm. (R. 190.) Thereafter, on April 6, 2009, Dr. Pascal completed a Medical Report for Determination of Disability/ Employability for the Nassau County Department of Social Services. (R. 201–02.) In her report, Dr. Pascal diagnosed Plaintiff with hypertension, asthma, and chest pain. (R. 201.) Further, Dr. Pascal concluded that Plaintiff was disabled and not employable because, "as per patient," he was "unable to sit, or stand in one position for long periods due to back pain." (R. 201.)

**\*3** On April 3, 2009, Dr. Samir Dutta conducted a consultative examination of Plaintiff on behalf of the Social Security Administration. (R. 179–82.) Dr. Dutta noted that Plaintiff "appeared to be in no acute distress," had normal gait and station, and "needed no help changing for the exam or getting on and off [the] exam table." (R. 180–81.) Dr. Dutta also noted that Plaintiff declined to walk on his toes or heels and did not use an assistive device, but that he could only squat halfway. (R. 180–81.) Dr. Dutta further concluded that Plaintiff's fine motor activity of the hands was normal, with a grip strength of five out of five bilaterally. (R. 181.) Dr. Dutta found that Plaintiff had a full range of motion of the elbows, forearms, wrists, and fingers. (R. 181.) Dr. Dutta further noted that Plaintiff had forward elevation and abduction of the right shoulder to 120 degrees but only 90 degrees with respect to the left shoulder. (R. 181.)

Upon thoracic and lumbar spine examination, Dr. Dutta noted that there was a "[s]light spasm ... on the lower lumbar area," but that there was no spinal, paraspinal, SI joint, or sciatic notch tenderness. (R. 181.) Dr. Dutta also conducted a straight leg raise test, which was negative bilaterally. (R. 181.) Dr. Dutta's examination of Plaintiff's lower extremities was

normal: Plaintiff had full range of motion in his ankles, and no muscle atrophy or sensory abnormality. (R. 181.)

Dr. Dutta's prognosis following the exam was "[m]ild to moderate limitation for sitting, standing, walking, bending, and lifting weight on a continued basis, especially using [his] left hand." (R. 182.)

Plaintiff again saw Dr. Pascal on April 14, 2009 for a follow up regarding his hypertension and lab results. (R. 192.) Dr. Pascal assessed Plaintiff with chest pain, uncontrolled benign essential hypertension, hyperlipidemia, and folliculitis. (R. 194.)

On April 22, 2009, M. Ramos, an analyst with the New York Division of Disability Determinations, performed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 183–88.) Ramos opined that Plaintiff (1) could occasionally carry twenty pounds and could frequently lift up to ten pounds; (2) could stand or walk for about six hours per an eight-hour workday; (3) could occasionally climb, balance, stoop, kneel, crouch, and crawl; (4) had limited reaching, but unlimited handling, fingering, and feeling; and (5) had limited upper extremity pushing and pulling capabilities. (R. 184–85.) In support of these findings, Ramos noted (1) multiple surgeries to Plaintiff's arm, jaw, and knees; (2) a history of asthma and left eye problems; (3) that Plaintiff had a normal gait and station upon examination, could squat halfway, and did not use an assistive device; (4) that Plaintiff's hand and finger dexterity were intact and that he had a bilateral grip strength of five out of five; and (5) that there was a decreased range of motion and elevation in the left shoulder. (R. 184.)

**\*4** On September 1, 2009, Plaintiff first saw Dr. Anand Persaud for his back pain and hypertension. (R. 204.) Dr. Persaud conducted a straight leg raise test, which was positive. (R. 204.) Dr. Persaud also observed muscle spasms and pain in the left knee at flexion, but noted that Plaintiff had no sensory loss or motor deficiency. (R. 204.) Dr. Persaud prescribed heat therapy, physical therapy, OxyContin, and Flexeril, and instructed Plaintiff to get an MRI and follow up in one month. (R. 204.)

On September 30, 2009, Plaintiff saw Dr. Persaud for a follow-up visit. (R. 205.) On examination, Dr. Persaud again found muscle spasms, but no sensory deficiency. (R. 205.) Dr. Persaud conducted another straight leg raise test, but the test was negative this time. (R. 205.) Dr. Persaud instructed Plaintiff to continue taking Oxycontin, obtain a MRI of the lumbar spine, and return for a follow-up visit in one month. (R. 205.)

Plaintiff subsequently obtained an MRI of his lumbar spine from Dr. Glenn Schwartz on October 9, 2009. (R. 213.) The MRI results were normal. (R. 213.) Dr. Schwartz reported that Plaintiff's spinal alignment, intervertebral discs, and paraspinal soft tissues were normal and that there was no evidence of any occult fracture, marrow replacement process, disc bulge, herniation, or stenosis. (R. 213.)

On October 30, 2009, Plaintiff returned to Dr. Persaud, this time complaining of knee pain. (R. 206.) Neurological and psychiatric examinations were normal but Dr. Persaud observed bilateral knee crepitation. (R. 206.) Dr. Persaud conducted another straight leg raise test, which again was negative. (R. 206.) Dr. Persaud's "impression" was radiculopathy and knee pain. (R. 206.) Dr. Persaud instructed Plaintiff to go for an orthopedic evaluation and follow up in another month. (R. 206.)

Plaintiff's back and knee pain continued and he again saw Dr. Persaud on November 30, 2009 for a follow-up visit. (R. 207.) Dr. Persaud checked boxes on a patient assessment form indicating that Plaintiff had pain when "bending forward at waist," "standing," "sitting," and "walking." (R. 207.) However, Dr. Persaud also noted that the pain was controlled by medication, that Plaintiff showed no sensory loss or pain with range of motion, and that a straight leg raise test was negative. (R. 207.) Dr. Persaud diagnosed Plaintiff with myalgia and osteoarthritis, prescribed OxyContin, and recommended a pain specialist. (R. 207.)

Plaintiff saw Dr. Persaud again on December 23, 2009. (R. 208.) Dr. Persaud's notes for this visit did not indicate whether he conducted an examination but simply noted Plaintiff's complaints of back and knee pain and request for OxyContin. (R. 208.)

Plaintiff first saw Dr. Nityananda Podder, a neurologist at Interventional Pain Management, on December 29, 2009. (R. 217.) Plaintiff complained of lower back pain for the last ten years and pain in his left shoulder and right wrist. (R. 217.) During this visit, Dr. Podder observed that Plaintiff had an antalgic gait due to pain, as well as pain in the left knee and shoulder with range of motion. (R. 217.) Plaintiff had normal strength and sensation, and a straight leg raise test was negative. (R. 217.) Dr. Podder diagnosed Plaintiff with

arthropathy of the lumbar facet, left knee, and left shoulder, and prescribed Plaintiff Percocet and morphine. (R. 217.)

**\*5** Plaintiff saw Dr. Persaud again on December 23, 2009. (R. 208.) Dr. Persaud's notes for this visit did not indicate whether he conducted an examination but simply noted Plaintiff's complaints of back and knee pain. (R. 208.)

Plaintiff then saw Dr. Podder on January 26, 2010. (R. 216.) Plaintiff told Dr. Podder that medication moderately relieved his pain and that "Percocet helps him function," but that the pain reoccurred and interfered with his daily activities and sleep. (R. 216.) Plaintiff also claimed that the pain in his lower back increased with bending and lifting heavy objects and that he could not work due to the back pain. (R. 216.) On examination, Dr. Podder observed that Plaintiff had left shoulder pain with abduction of more than ninety degrees and tenderness with palpation. (R. 216.) Plaintiff's motor and sensory results were normal and a straight leg raise test was negative, however. (R. 216.) Dr. Podder also observed left knee clicking, crepitation with range of motion, and increased pain with lumbar flexion and extensions with tenderness in the facet joint. (R. 216.) Dr. Podder diagnosed Plaintiff with lumbar facet arthropathy of the lower back and osteoarthritis of the left knee and left shoulder. (R. 216.)

Plaintiff returned to Dr. Persaud on February 24, 2010, complaining of "generalized pain." (R. 210.) He also complained of pain when climbing stairs and pain with range of motion of the right knee. (R. 210.) Dr. Persaud assessed Plaintiff with radiculopathy and recommended physical therapy. (R. 210.)

On March 4, 2010, Plaintiff saw Dr. Podder, again complaining of left knee, left shoulder, and chronic lower back pain. (R. 215.) Plaintiff told Dr. Podder that the pain was adequately relieved by pain medication but that the pain affected his daily activities and his ability to sleep. (R. 215.) He also stated that his lower back pain increased with bending and heavy lifting and that he was unable to work due to the pain. (R. 215.) Upon examination, sensory and motor functions were normal and a straight leg raise test was negative. (R. 215.) However, Podder did observe clicking of the left knee and crepitation with range of motion. (R. 215.) Dr. Podder assessed Plaintiff was with lumbar facet arthropathy of the lower back and left knee and left shoulder osteoarthritis. (R. 215.) Dr. Podder advised Plaintiff to consider a "lumbar facet block" and physical therapy for Plaintiff's lower back pain. (R. 215.)

Plaintiff visited Dr. Persaud again on March 26, 2010. (R. 211.) Plaintiff complained of pain while "bending forward at waist," "getting out of bed," "standing," and "sitting." (R. 211.) Dr. Persaud's notes for this visit did not indicate whether he examined Plaintiff. (R. 211.) Dr. Persaud scheduled Plaintiff for epidural injections and recommended more physical therapy and pain management consultation. (R. 211.)

On April 13, 2010, Plaintiff returned to Dr. Podder for a follow-up visit. (R. 214.) Plaintiff's complaints were identical to those of his January 24, 2010 and March 4, 2010 visits. (R. 214.) Dr. Podder again noted that Plaintiff had "persistent low back pain, with any physical activity." (R. 214.) Plaintiff's sensory and motor functions were normal and a straight leg raise test was negative, but Dr. Podder did note clicking of the left knee and crepitation with range of motion. (R. 214.) Dr. Podder's observations and diagnoses did not change. (R. 214.)

**\*6** On June 23, 2010, Dr. Persaud completed a Medical Assessment of Ability to Do Work–Related Activities form. (R. 220–23.) In the Medical Assessment, Dr. Persaud opined that Plaintiff (1) could carry ten pounds occasionally for a maximum of two hours per an eight-hour day; (2) could carry ten pounds frequently for less than one-third of an eight-hour day; (3) could sit for only three hours per an eight-hour day and only fifteen minutes without interruption; and (4) could never climb, occasionally stoop, occasionally crouch, never kneel, and never crawl. (R. 220–21.) Dr. Persaud based his assessment on medical findings of radiculopathy, neuropathy, a positive straight leg raise test, muscle spasms, sensory defects, positive crepitation of the knees bilaterally, and Plaintiff's subjective symptoms of pain while standing for more than thirty minutes and during activity. (R. 220–21.)

## II. *Decision of the ALJ*

After reviewing all of the above evidence, the ALJ issued his decision on August 6, 2010, finding that Plaintiff is not disabled. (R. 20–29.) The ALJ concluded that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] ... [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] functional capacity assessment [that Plaintiff has the capacity to perform the full range of light work as defined in 20 C.F.R. 416.967(b)]." (R. 25.) The ALJ gave the greatest weight to Dr. Dutta's opinion because it was "generally consistent with the clinical signs and treatment received, as well as the

examination." (R. 25.) The ALJ accorded "very little weight" to the opinion of Dr. Pascal because she examined Plaintiff on only two occasions and her opinion was "not supported by any diagnostic tests or significant clinical signs." (R. 23.) Lastly, the ALJ afforded "limited weight" to Dr. Persaud's opinion because it was not supported by the evidence in the record, it was largely conclusory, and it relied heavily on Plaintiff's subjective complaints with very little explanation of the objective evidence Dr. Persaud relied on in forming his opinion. (R. 24.) Moreover, the ALJ explained that Dr. Persaud's own records failed to reveal the type of significant clinical and diagnostic abnormalities that would be expected if Plaintiff was disabled. (R. 24.)

Plaintiff sought review of this decision by the Appeals Council and Plaintiff's counsel submitted a letter outlining his legal arguments as additional evidence in support of his request. (R. 168–70.) On February 17, 2012, the Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. 1.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. 1.)

**\*7** Plaintiff commenced this action on April 12, 2012. (Docket Entry 1.) The Commissioner filed her Answer and the administrative record on December 11, 2012. (Docket Entries 9, 10.) On April 4, 2013, the Commissioner moved for judgment on the pleadings (Docket Entry 13), and on May 3, 2013, Plaintiff crossmoved for judgment on the pleadings (Docket Entry 16). These motions are presently before the Court.

*DISCUSSION*

I. *Standard of Review*

In reviewing the ruling of the ALJ, this Court will not determine *de novo* whether Plaintiff is entitled to SSI or disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. *See Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000) (internal quotations marks and citation omitted), *superseded by statute on other grounds,* 20 C.F.R. § 404.1560(c)(2). If the Court finds that substantial evidence exists to support the

Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. *See Johnson v. Barnhart,* 269 F.Supp.2d 82, 84 (E.D.N.Y.2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. *See id.*

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." *See Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...." 42 U.S.C. § 405(g).

II. *Eligibility for Benefits*

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive SSI or disability benefits. *See Byam v. Barnhart,* 336 F.3d 172, 175 (2d Cir.2003); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); 42 U.S.C. §§ 423(a) (1)(A), 1381a. A claimant is disabled under the Act when he can show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c (a)(3)(A). The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." *Id.* §§ 423(d)(2)(A), 1382c(a)(3) (B).

**\*8** The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. *See Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Petrie v. Astrue,* 412 F. App'x 401, 404 (2d Cir.2011). *First,* the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). *Second,* the claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities. *Id.* §§ 404. 1520(a)(4) (ii), 416. 920(a)(4)(ii). *Third,* the claimant must show that his impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if his impairment or its equivalent

is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity to perform tasks required in his previous employment. *Id .* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *Fifth,* if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. *Id.* §§ 404.1520(a)(4) (v), 416.920(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. *See Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." *Boryk ex rel. Boryk v. Barnhart,* No. 02–CV–2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

In the present case, the ALJ performed the above analysis, and his conclusions as to the first three steps are not in dispute. He found that Plaintiff had not been engaged in substantial gainful activity since February 26, 2009 and that his impairments (status post jaw fracture repair, left bicep tendon repair, left knee and left shoulder repair, and chronic low back pain) cause more than minimal limitations in Plaintiff's ability to perform basic work activities. (R. 22.) The ALJ next determined that neither Plaintiff's impairments nor their medical equivalent was among those enumerated in Appendix 1. (R. 22.) At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of light work as defined in 20 C.F.R. § 416.967(b)[3] and that Plaintiff had no past relevant work as defined in 20 C.F.R. § 416.965. (R. 25.) At step five, relying on the medical-vocational guidelines set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids"), the ALJ found that, "[c]onsidering [Plaintiff's] age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (R. 25.) Therefore, the ALJ concluded that Plaintiff is not disabled under the Act. (R. 26.)

3   "Light work" is that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing,

or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

**\*9** The Court must determine whether this final decision is supported by substantial evidence. With respect to any new evidence submitted to the Appeals Council, it is deemed part of the record and will be considered by the Court when determining if there is substantial evidence to support the Commissioner's final decision. *See Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996) ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision...."). Here, the only additional evidence submitted to the Appeals Counsel was an attorney letter from Plaintiff's counsel outlining the arguments of their case; no other medical evidence has been offered.

Plaintiff argues that the ALJ erred in finding that Plaintiff is not disabled because: (1) the ALJ failed to adhere to the treating physician rule in determining the appropriate amount of weight to afford Dr. Persaud's and Dr. Pascal's opinions; (2) the ALJ improperly discredited Plaintiff's subjective complaints of pain; and (3) the ALJ's determination that Plaintiff could perform "light work" was "random and unsubstantiated." (Pl.'s Br., Docket Entry 15, at 9–14.) The Court will address these arguments separately.

### A. *Treating Physician Rule*

Plaintiff argues that the ALJ improperly weighed the evidence when he gave limited weight to Dr. Persaud's and Dr. Pascal's opinions. The Court disagrees.

Under the treating physician rule, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources .... If we find that a treating source's opinion on the issue(s) of

the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart,* 317 362 F.3d 28, 32 (2d Cir.2004) (citation omitted); *see also Schnetzler v. Astrue,* 533 F.Supp.2d 272, 286 (E.D.N.Y.2008). These factors include:

(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist.

*Schnetzler,* 533 F.Supp.2d at 286 (citing 20 C.F.R. §§ 404.1527(d)(2), 416. 927(d)(2); *Halloran,* 362 F.3d at 32). Additionally, the ALJ is required to provide " ' good reasons' for the weight she gives to the treating source's opinion." *Halloran,* 362 F.3d at 32–33 (citation omitted); *see also Pagan v. Apfel,* 99 F.Supp.2d 407, 411 (S.D.N.Y 2000) ("At the very least, the Commissioner must give express recognition to a treating source's report and explain his or her reasons for discrediting such a report."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) (citation omitted). The Court finds that the ALJ's decision is in accord with the treating physician rule.

**\*10** Plaintiff first contends that the ALJ violated the treating physician rule because he "overlooked Dr. Persaud's medical opinion as the treating physician." (Pl.'s Br. at 13.)

However, contrary to Plaintiff's contention, the ALJ expressly considered each of Dr. Persaud's opinions and adequately explained his reasons for giving them limited weight. (R. 24.) The ALJ explained that he did not afford Dr. Persaud's opinion significant weight because it was not supported by the evidence in the record, it was largely conclusory, and it relied heavily on Plaintiff's subjective complaints with very little explanation of the objective evidence Dr. Persaud relied on in forming his opinion. (R. 24.) Moreover, the ALJ explained that "[Dr. Persaud's] own records fail[ed] to reveal the type of significant clinical and diagnostic abnormalities [that would be] expected if [Plaintiff] was disabled." (R. 24.) In making these determinations, the ALJ reviewed and addressed the medical records from each of Plaintiff's visits with Dr. Persaud. (R. 23–24.)

Here, the Court finds that the ALJ's decision to give limited weight to Dr. Persaud's opinion is supported by substantial evidence. *First,* the ALJ noted that Dr. Persaud diagnosed Plaintiff with radiculopathy but did not conduct an EMG/NCV study. (R. 24.) Rather, Dr. Persaud based his assessment of radiculopathy on a positive straight leg test during Plaintiff's examination on September 1, 2009 and Plaintiff's muscle spasms during Plaintiff's examinations on September 1 and 30, 2009. (R. 223–24.) However, Dr. Persaud subsequently conducted *three* negative straight leg raise tests during examinations on September 30, October 30, and November 30, 2009. (R. 205–07.) "[T]he Second Circuit has stated that it is entirely appropriate to give a treating physician's opinion less weight when it is internally inconsistent." *Sisto v. Colvin,* No. 12–CV–2258, 2013 WL 4735694, at \*9 (E.D.N.Y. Sept. 3, 2013) (citing *Micheli v. Astrue,* 501 F. App'x 26, 28 (2d Cir.2012)). Moreover, Dr. Persaud's notes do not indicate a finding of muscle spasms during Plaintiff's subsequent visits on October 30 and November 30, 2009, (R. 206–07), and the Second Circuit also has stated that "[t]he [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983). *Second,* an MRI of Plaintiff's lower back prescribed by Dr. Persaud on October 9, 2009 was unremarkable: Plaintiff's spinal alignment, intervertebral discs, and paraspinal soft tissues were normal, and there was no evidence of any occult fracture, marrow replacement process, disc bulge, herniation, or stenosis. (R. 213.) *Third,* during Plaintiff's visits on September 1, 30, and November 30, 2009, Dr. Persaud noted that Plaintiff showed no signs of sensory loss. (R. 204–05, 207.) Yet, Dr. Persaud relied on "sensory defects in feet" to support his conclusion that Plaintiff could sit for only three

hours in total and fifteen minutes without interruption. (R. 221.) *Fourth*, as Plaintiff acknowledges, Dr. Persaud is not a specialist. (Pl.'s Br. at 12.) Accordingly, the Court finds that the ALJ properly applied the treating physician rule and that his decision to give limited weight to Dr. Persaud's opinion was supported by substantial evidence. *Sisto,* 2013 WL 4735694, at *9 ("An ALJ need not give deference to a treating source's opinion that is inconsistent with other substantial evidence." (citing *Halloran,* 362 F.3d at 32)).

 **\*11** Plaintiff next contends that the ALJ violated the treating physician rule because he "assigned limited weight to [Dr. Pascal] because she had only examined [Plaintiff] on two occasions" but "accorded some weight to Dr. Dutta who only examined [Plaintiff] one time...." (Pl.'s Br. at 13.) The Court disagrees. Dr. Pascal opined that Plaintiff was not "employable" because he is "unable to sit, or stand, in one position for long periods of time due to back pain." (R. 201.) The ALJ afforded limited weight to this conclusion because Dr. Pascal had only examined Plaintiff on two occasions *and* because her conclusion was not supported by any diagnostic tests or significant clinical signs. (R. 23.) In fact, in her 2009 Medical Report for Determination of Disability/ Employability form, Dr. Pascal responded to the question, "If [patient] not employable now, why not?," by stating " "unable to sit, or stand, in one position for long periods of time due to back pain *as per patient."* (R. 201 (emphasis added).). Although the ALJ's explanation for providing Dr. Pascal's opinion limited weight is terse, the Court finds that he has provided good reasons for his decision and that the ALJ therefore did not violate the treating physician rule with respect to Dr. Pascal as Plaintiff suggests.

### B. *Plaintiff's Subjective Complaints*
Plaintiff next argues that the ALJ improperly discredited Plaintiff's subjective complaints of pain based on "the absence of any disc bulges or herniations." (Pl.'s Br. at 13.) The Court disagrees. Here, the ALJ found that although "[Plaintiff's] medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible...." (R. 25.) As discussed below, the Court finds that there is substantial evidence in the record to support this conclusion.

The Second Circuit has held that "the subjective element of pain is an important factor to be considered in determining disability." *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). However, "[t]he ALJ has the discretion to evaluate

the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *McLaughlin v. Sec'y of Health, Educ. & Welfare,* 612 F.2d 701, 705 (2d Cir.1980) (alteration in original) (internal quotation marks and citation omitted). The Court will uphold the ALJ's decision to discount a claimant's subjective complaints of pain so long as the decision is supported by substantial evidence. *See Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984).

Here, Plaintiff's subjective complaints were contradicted by other evidence in the record as well as Plaintiff's own testimony and behavior at the hearing, specifically: (1) the MRI of Plaintiff's lumbar spine was normal (R. 213); (2) Plaintiff's doctors conducted *eight* negative straight leg raise tests (R. 181, 205–07, 214–17); (3) Plaintiff testified that he does not always use his cane for his alleged knee pain (R. 33); (4) Plaintiff reported to the consultative examiner that he was laid off from his job in 2006, not that he stopped working because of a physical impairment (R. 127); (5) Plaintiff previously applied for disability insurance three times before the instant application—in 1991, 1999, and 2003 (R. 123) —but Plaintiff testified that he worked in construction in 2000 and listed a work history that overlapped with and followed the periods for which he was allegedly disabled (R. 42, 156); (6) Plaintiff told Dr. Podder that he had experienced lower back pain for the prior ten years, he tore his bicep while lifting a 410–pound weight (R. 189, 217); and (7) the ALJ noted that although Plaintiff claimed he could not sit for more than five minutes due to pain, he sat through the nearly thirty-minute hearing "without any visible discomfort or requests to move or stand up" (R. 25). Such contradictions constitute substantial evidence supporting the ALJ's decision to discount Plaintiff's subjective complaints of pain. *See, e.g., Vargas v. Astrue,* No. 10–CV–6306, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011); *Shriver v. Astrue,* No. 07–CV– 2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008).

### C. *Substantial Evidence Supporting the ALJ's Conclusions*
 **\*12** Plaintiff finally contends that the ALJ's conclusion that Plaintiff could perform "light work" is not supported by substantial evidence because it "appears to be random and unsubstantiated." (Pl.'s Br. at 13–14.) The Court disagrees.

Under 20 C.F.R. § 416.967(b), "light work" is that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10

pounds," and "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

*First,* the ALJ's determination that Plaintiff could perform "light work" is supported by Dr. Dutta's assessment of "mild to moderate limitation for sitting, standing, walking, bending, and lifting weight on a continued basis, especially using the left hand." (R. 182); *see, e.g., Lewis v. Colvin,* ——F. App'x ——, 2013 WL 6596942, at *1–2 (2d Cir. Dec. 17, 2013) (finding that ALJ's determination that claimant could perform "light work" as defined in 20 C.F.R. § 404.967(b) was supported by the doctor's assessment of "mild limitations for prolonged sitting, standing, and walking," and direction that claimant should avoid "heavy lifting, and carrying"). *Second,* as noted above, the ALJ was not required to give Dr. Persaud's and Dr. Pascal's opinions controlling weight because they are unsupported by objective medical evidence. *Third,* contrary to Plaintiff's contention, that the ALJ did not mention that Plaintiff arrived at the hearing with the aid of a cane does not compel a finding that the ALJ's determination is not supported by substantial evidence. As noted above, Plaintiff admitted at his hearing that he does not always use his cane, and Dr. Dutta noted during examination that Plaintiff did not use an assistive device, "appeared to be in no acute distress," had normal gait and station, and "needed no assistance changing for the exam or getting on and off [the] exam table." (R. 180–81.)

Finally, at step 5, the ALJ considered Plaintiff's residual functional capacity to perform light work and his "age, education, work experience" in conjunction with the Grids, and concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 25.) As discussed below, the Court finds that the Commissioner has met his burden with respect to step 5.

"At step five of the sequential analysis, the Commissioner can usually meet his burden to establish that, if a plaintiff is unable to perform his past work, there is other work which he could perform, by reliance on the Medical–Vocational guidelines...." *Lewis v. Astrue,* No. 11–CV–1163, 2012 WL 6097303, at *6 (N.D.N.Y. Dec. 7, 2012) (citing *Baldwin v. Astrue,* No. 07–CV–6958, 2009 WL 4931363, at *20 (S.D.N.Y. Dec. 21, 2009)); *aff'd, Lewis v. Colvin,* —— F. App'x ——, 2013 WL 6596942 (2d Cir. Dec. 17, 2013). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996). "However, when a plaintiff suffers from significant non-exertional limitations that significantly limit his employment opportunities, exclusive reliance on the Grids is inappropriate." *Lewis,* 2012 WL 6097303, at *6 (quoting *Baldwin,* 2009 WL 4931363, at *27). "A plaintiff's range of potential employment is significantly limited when he suffers from the 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a [plaintiff's] possible range of work as to deprive him of a meaningful employment opportunity.' " *Id.* (quoting *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986)).

**\*13** Here, there is nothing in the record to support a finding that Plaintiff suffers from significant non-exertional limitations, and Plaintiff does not argue otherwise. Accordingly, the Court finds that the ALJ did not err in relying on the Grids to determine that jobs exist in the economy that Plaintiff can perform and that Plaintiff is not disabled.

## *CONCLUSION*

For the foregoing reasons, the Commissioner's motion is GRANTED, and Plaintiff's motion is DENIED. The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1342964

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4039419
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Becky L. HAZLEWOOD, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:12–CV–798.
|
Aug. 6, 2013.

**Attorneys and Law Firms**

Office of Peter W. Antonowicz, Peter W. Antonowicz, Esq., of Counsel, Rome, NY, for Plaintiff.

Office of Regional General Counsel, Andreea L. Lechleitner, Esq., of Counsel, Social Security Administration, New York, NY, for Defendant.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff Becky L. Hazlewood filed this action seeking judicial review of a final decision of the Commissioner of Social Security denying her application for Social Security Disability Benefits and Supplemental Security Income. By Report–Recommendation dated May 7, 2013, the Honorable Andrew T. Baxter, United States Magistrate Judge, recommended that the decision of the Commissioner be reversed and the case remanded pursuant to sentence four of 42 U.S.C. § 405(g) for a further analysis of plaintiff's ability to perform her prior work. No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Accordingly, it is

ORDERED that

The Commissioner's decision is VACATED and the matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for a further analysis of plaintiff's ability to perform her prior work, consistent with the Report–Recommendation.

IT IS SO ORDERED.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter was referred to me for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

### I. *PROCEDURAL HISTORY*

Plaintiff protectively filed applications for both Social Security Disability Benefits and Supplemental Security Income ("SSI") benefits on November 5, 2009. (Administrative Transcript ("T") 50). The applications were denied on April 21, 2010, and plaintiff requested a hearing. (T. 59–64, 65). On April 14, 2011, plaintiff appeared before Administrative Law Judge ("ALJ") Elizabeth K. Koennecke, who denied plaintiff's claim in a decision dated July 26, 2011. (T. 15–23). Plaintiff requested review of ALJ Koennecke's decision, and submitted additional evidence to the Appeals Council. (T. 106, 297–352). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 1, 2012. (T. 1–5).

### II. *ISSUES IN CONTENTION* [1]

[1] Plaintiff's counsel lists three arguments in the "Issues Presented" section of his brief. (Pl.'s Br. at 1). The first argument is that the Commissioner erred in determining plaintiff's RFC, and the third argument is that the Commissioner improperly evaluated plaintiff's claims of pain and fatigue. The argument listed as (2) states that the Commissioner improperly determined that plaintiff's impairment did not meet the severity of an impairment listed in Appendix 1 of the Social Security Regulations. 20 C.R.R. Pt. 404, Subpt. P, App. 1. Counsel cites section 14.02 of the Listings, which is the section involving "Lupus." There is no argument in the brief relating to the listings, and plaintiff

does not claim to have Lupus. Section 12.04 (this would be a simple transposition of the numbers) deals with Affective Disorders and is one of the listed impairments that the ALJ considered in plaintiff's case, but there is no argument in the text of plaintiff's brief claiming that plaintiff meets a listed impairment. The court will only list the two arguments for which there is a corresponding section in plaintiff's brief and notes that there is no basis for making a Listing argument in any event.

Plaintiff makes the following arguments:

(1) The Commissioner erred in determining plaintiff's Residual Functional Capacity ("RFC"). (Pl.'s Br. at 9–16).

(2) The Commissioner improperly evaluated plaintiff's credibility with respect to her allegations of disabling pain and fatigue. (Pl.'s Br. at 16–20).

Defendant argues that the Commissioner's decision is supported by substantial evidence and must be affirmed. Defendant also argues that a remand is not required to consider the evidence that plaintiff's counsel submitted for the first time to the Appeals Council and that was not before the ALJ. (Def.'s Br. at 14–17). Although this court concludes that most of the ALJ's analysis is supported by substantial evidence, I am recommending a remand for further analysis of plaintiff's ability to work with the public to the extent necessary to perform her prior work as a cashier.

## III. *APPLICABLE LAW*

### A. Disability Standard

**\*2** To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue,* 708 F.3d 409, 417–18 (2d Cir.2013) (quoting *Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir.2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden

of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian,* 708 F.3d at 418 & n. 2.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue,* 708 F.3d at 417 (quoting *Talavera v. Astrue,* 697 F.3d at 151; *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir.2012); 42 U.S.C. § 405(g)). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Talavera,* 697 F.3d at 151 (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review "—even more so than the 'clearly erroneous standard.' " *Brault,* 683 F.3d at 448.

**\*3** In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, " 'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.' " *Petrie v. Astrue,* 412 F. App'x 401, 403–404 (2d Cir.2011) (quoting *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998) (citing *Williams, supra* ).

### IV. *FACTS*

Plaintiff's counsel has stated the medical and vocational facts in his brief. (Pl.'s Br. at 3–6). Defense counsel has incorporated plaintiff's summary, "with the exception of any inferences or conclusions asserted by plaintiff." (Def.'s Br. at 1) (Dkt. No. 14). Defense counsel has also incorporated the facts as stated in the ALJ's decision. (*Id.* at 2) This court will

also incorporate the facts as stated by both counsel, with any exceptions as noted in the discussion below.

### V. *ALJ's DECISION*

Plaintiff met her insured status requirement for purposes of her DIB application through December 31, 2009, and had not engaged in substantial gainful activity since her stated onset date of October 1, 2008. (T. 17). The ALJ found that plaintiff had two severe impairments: bipolar disorder and chronic lumbar strain, but that neither of the two severe impairments, alone or in combination, met or medically equaled the severity of a Listed Impairment. (T. 17–18).

In considering whether plaintiff's impairments met or medically equaled the severity of a listing, the ALJ considered sections 1.04 (Disorders of the Spine) and 12.04 (Affective Disorders) of the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04, 12.04. For purposes of section 1.04, the ALJ found that there was no medical evidence showing that plaintiff had a disorder that compromised her nerve roots or the spinal cord, together with any of the other required clinical findings. (T. 18). For purposes of plaintiff's mental impairment, the ALJ found that plaintiff's bipolar disorder did not result in at least two marked impairments in the following areas: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. Plaintiff also did not suffer from repeated episodes of decompensation, each of extended duration. (T. 18).

In making the determination that plaintiff's mental impairment did not meet the severity of a listed impairment, the ALJ reviewed plaintiff's testimony and discussed the limitations that she did have. (T. 18–19). Once the ALJ determined that plaintiff's mental disorder was not the equivalent of an impairment listed in section 12.04, the ALJ noted that this finding was not an RFC assessment because an RFC would require a more detailed itemization of various functions. (T. 19). Proceeding to Step 4, in the context of plaintiff's RFC, the ALJ stated that his RFC analysis reflected "the degree of limitation ... found in the 'paragraph B' mental function analysis." (*Id.*)

**\*4** The ALJ's RFC analysis incorporated both plaintiff's mental and physical impairments. (T. 9). The ALJ found that plaintiff retained the physical RFC for light work, including the ability to lift no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds. She could stand for 6 hours, walk for 6 hours, and sit for 6 hours out of an 8–hour work day. She could

understand, carry out, and remember "simple instructions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting." (*Id.*)

In making the RFC determination, the ALJ reviewed the medical evidence, giving various amounts of weight to the reports of the plaintiff's physicians and the consultative physicians. (T. 19–22). The ALJ rejected the restrictive RFC evaluation submitted by Vivienne Taylor, M.D., plaintiff's treating physician because it was inconsistent with the plaintiff's medical records, including Dr. Taylor's contemporaneous treatment notes. (T. 21). The ALJ gave some weight to the opinions of Dr. T. Andrews, Kristen Barry, Ph.D., and Dr. Roberto Rivera because they were "consistent with the entirety of the record." (*Id.*)

The ALJ found that Dr. Taylor never conducted a mental examination of the plaintiff and never documented the "significant anxiety" that she included in her RFC. The ALJ rejected one of Dr. Taylor's reports because most of the opinion seemed to be based only upon plaintiff's subjective report of back pain. Most of Dr. Taylor's treatment notes show "minimal, if any, abnormalities, and only one report contained the statement that plaintiff had a "limited range of motion." (T. 21–22).

The ALJ found that plaintiff could perform her prior work as a cashier, noting that a cashier position requires that a person be able to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, and a negligible amount, frequently. (T. 22). The ALJ also noted that cashier work may involve walking and/or standing frequently in addition to dealing with people. (*Id.*) The ALJ found that the plaintiff would be able to perform the cashier's position as she described performing the job, or as it is generally performed in the national economy. (T. 22). Therefore, the ALJ found that plaintiff was not disabled prior to reaching Step 5 of the disability analysis. (*Id.*)

Plaintiff's counsel submitted a substantial number of medical reports to the Appeals Council that were not before the ALJ, [2] however, the Appeals Council declined to review plaintiff's case, notwithstanding the additional information.

[2]  The court notes that some of the reports submitted to the Appeals Council were duplicative of reports that were already in the record.

## VI. RFC/TREATING PHYSICIAN/PAST RELEVANT WORK

### A. Legal Standards

#### 1. RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. *20 C.F.R §§ 404.1545, 416.945. See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (citing *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990)). An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities. Martone v. Apfel,* 70 F.Supp.2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d Cir.1984); *LaPorta v. Bowen,* 737 F.Supp. at 183; *Sullivan v. Secretary of HHS,* 666 F.Supp. 456, 460 (W.D.N.Y.1987)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue,* 5:09–CV–1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96–8p, 1996 WL 374184, at *7).

*5 Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute his own judgment for competent medical opinion. *Walker v. Astrue,* No. 08–CV–828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing *20 C.F.R. §§ 404.1527(e)(2);* 416.927(e)(2)), *RR adopted by* 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.,* No. 6:00–CV–1225, at *3 (N.D.N.Y. Aug. 2, 2005)). The ALJ is not qualified to assess a plaintiff's RFC "on the basis of bare medical findings," and where the medical findings in the record merely "diagnose" a plaintiff's impairments and do not relate those diagnoses to a specific RFC, an ALJ's determination of RFC without a medical advisor's [3] assessment is not supported by substantial evidence. *Id.* (citing *Deskin v. Comm'r of Soc. Sec.,* 605 F.Supp.2d 908, 912 (N.D.Ohio 2008); *Isaacs v. Astrue,* No. 1:08–CV–828, 2009 WL 3672060, at *11 (S.D.Ohio 2009) (the ALJ erred in determining an RFC without reference to a

medically determined RFC, bridging the raw medical data to specific functional limitations)).

3  In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue,* 2010 WL 2629832 at *6–7.

Although there are circumstances in which the ALJ may render a "common sense" judgment about a plaintiff's functional capacity without a physician's assessment, these circumstances occur when there is a relatively small degree of impairment. *Id.* (citing *Manso–Pizarro v. Sec. of Health & Human Services,* 76 F.3d 15, 17 (1st Cir.1996)).

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record...." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2004); *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002); 20 C.F.R. § 416.927(d). The ALJ must properly analyze the reasons that the report is rejected. *Halloran,* 362 F.3d at 32–33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999).

### 3. Past Relevant Work

Once the ALJ determines plaintiff's RFC, the ALJ must then consider at Step 4 of the disability analysis, whether plaintiff can perform her past relevant work. The ALJ compares plaintiff's RFC with the duties of the specific job as plaintiff previously performed it and the functions and duties of the job as it is performed in the national economy. *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003) (citing *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir.1981); SSR 82–62, 1982 WL 31386 (SSA 1982)). Plaintiff carries the burden to show that she cannot perform either type of work. *Id.*

### B. Application

### 1. Physical

**\*6** The ALJ found that plaintiff could return to her former work as a cashier. The ALJ found that plaintiff could essentially perform the physical requirements of light work, required for this job. (T. 19). The ALJ rejected Dr. Taylor's very restrictive RFC physical [4] evaluation in favor of the report written by consulting physician, Dr. Roberto Rivera. The ALJ's decision is supported by substantial evidence because the treating physician's analysis is inconsistent with other medical evidence of record and inconsistent with Dr. Taylor's own contemporaneous notes.

4  Dr. Taylor submitted both physical and mental RFC evaluations.

Dr. Taylor's RFC evaluation is not supported by medical findings. Dr. Taylor has diagnosed "chronic low back pain," but the record contains no objective signs of any impairment to plaintiff's spine, and x-rays taken on March 10, 2010 showed that the height of the vertebral bodies and disc spaces were well maintained. (T. 230). The diagnostic impression was a "negative study." (*Id.*) Dr. Taylor's reports are generally very short, with no physical examination findings. Dr. Taylor simply lists a diagnosis of "chronic low back pain" and prescribes pain pills for plaintiff. (T. 194–96).

On May 15, 2009, plaintiff was complaining of neck and mid-back pain that was radiating down to her low back. She reported having difficulty bending, lifting, walking, and sitting. (T. 199). Dr. Taylor noted tender paraspinal muscles of the cervical thoracolumbar area and tenderness in her right shoulder. (*Id.*) On June 26, 2009, Dr. Taylor noted that plaintiff was complaining of neck spasms and numbness and tingling in her neck, and diagnosed cervical thoracolumbar strain with cervical syndrome. (T. 197).

On December 4, 2009, Dr. Taylor mentioned that plaintiff had "anxiety, depression, and low back pain, but did not list any physical findings with respect to the back pain. (T. 262). The doctor indicated only that plaintiff was having side effects with the Trazodone and did not tolerate the Ultram, so the doctor prescribed Percoset, and continued the Mobic and Flexeril. (*Id.*) Dr. Taylor's January 6, 2010, February 17, 2010, March 17, 2010, May 17, 2010, and July 15, 2010 reports do not even mention plaintiff's back pain, nor did the doctor perform any particular tests to determine or discuss the cause of any pain. (T. 257–61). On October 15, 2010, Dr. Taylor reported that plaintiff had anxiety/depression and chronic low back pain, but only indicated that she was alert, in no distress,

and continued her on the Percoset as needed for her pain. (T. 256).

None of these reports would indicate the degree of restriction that Dr. Taylor mentioned only one month later, in her November 18, 2010 RFC evaluation, which stated that plaintiff could not lift or carry more than 10 pounds occasionally or sit for more than two hours during an eight-hour day. (T. 272–73). A review of the November 18, 2010 RFC shows that Dr. Taylor's assessment is also internally inconsistent. (T. 273). Dr. Taylor checks a box indicating that plaintiff can "stand" for *three hours at one time,* but then checks another box indicating that plaintiff can only stand for *one hour "total"* in an eight hour day. (*Id.*)

**\*7** The ALJ found that Dr. Roberto Rivera's consultative examination contradicted Dr. Taylor's findings. (T. 21). Dr. Rivera performed a complete examination, stating that plaintiff's gait was normal, she could walk on her heels and toes without difficulty, although she did complain of *some* lower back pain. (T. 227). She had full flexion and extension of her thoracic and lumbar spine, and full bilateral lateral flexion and rotary movements. (T. 228). Although she did complain of pain, she had "completely normal ROMs [ranges of motion]." There was no spinal or paraspinal tenderness; no SI joint or sciatic notch tenderness; and no spasm, no scoliosis, or kyphosis. She did complain of pain during her straight leg raising test, but had no trigger points, a full range of motion in her hips, knees, and ankles, with 5/5 strength, and no muscle atrophy. (*Id.*)

In his narrative report, Dr. Rivera appears to question the plaintiff's credibility when he states that "[plaintiff] states that she can only walk less than one-half block before the back pain causes her to have to stop. On the other hand, she can walk up two flights of stairs, she states, before the back pain would hurt her." (T. 226). Dr. Rivera also stated that "[i]t is not clear as to whether she has ever had an MRI scans [sic] of [her back], but certainly with regard to the physical examination that I have performed, it is not likely that she would require an MRI scan." (*Id.*) Essentially, Dr. Rivera found that plaintiff had some pain, but did not believe that the pain was as limiting as plaintiff suggested. The ALJ correctly stated that Dr. Rivera opined that plaintiff had "no limitations in lifting and standing, mild limitations in carrying and sitting, and mild to moderate limitations in walking, pushing, and pulling. (T. 228). Thus, the information before the ALJ contains substantial evidence to reject Dr.

Taylor's restrictive RFC and support the ALJ's determination that plaintiff could physically perform light work.

Plaintiff also argues that the Appeals Council should have considered the additional evidence sent by plaintiff's counsel to find that plaintiff was disabled. The court notes, however that these reports do not support Dr. Taylor's restrictive RFC. In fact, Dr. Taylor's July 19, 2011 report states that plaintiff was "following up for anxiety/depression [and] chronic back pain," but her assessment states that plaintiff's "chronic low back pain [was] stable without meds currently." (T. 352).

In the evidence submitted to the Appeals Council, there are also records from a new physician, Dr. Muftah A. Kadura, M.D. (T. 340–49). However, these records consist of forms that have check marks next to various symptoms, with very little writing. In one of these reports, dated December 15, 2011, Dr. Kadura states that plaintiff has a complaint of back pain, and that she was there for her "monthly visit" for medications. In the "impression" section of the form, Dr. Kadura wrote: myalgia, neuralgia, back pain, and insomnia. The doctor indicated that he prescribed Percoset, however, there is no indication that plaintiff's condition was any different than it had been all along, or that this information would have changed the ALJ's decision.

### 2. Mental

**\*8** In addition to finding that the plaintiff could physically perform the functions required for light work, the ALJ found that plaintiff could understand, carry out, and remember simple instructions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. (T. 19). Plaintiff argues that, having found that plaintiff's bipolar disorder was severe, the Commissioner "must" attribute some limitations in the ability to basic work. (Pl.'s Br. at 10). Although plaintiff argues that the ALJ did not attribute mental limitations to plaintiff's ability to work, this court does not agree.

The "presence of an impairment is ... not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995) (citations omitted). Using the psychiatric review technique, required by the regulations,[5] the ALJ found that plaintiff had limitations based on her mental impairment, but that those limitations would not preclude her from performing her former occupation. As with plaintiff's physical limitations, the ALJ rejected the RFC evaluations completed by plaintiff's

treating physician, Dr.Taylor, because the stated limitations were not consistent with her own treatment notes, and Dr. Taylor never actually performed a mental status examination on plaintiff. (T. 21).

5       20 C.F.R. § 404.1520a; 416.920a.

The ALJ's rejection of Dr. Taylor's opinion is supported by substantial evidence. The evidence that plaintiff's counsel submitted to the Appeals Council would not change this finding. On November 29, 2010, February 28, 2011, May 26, 2011, November 21, 2011, psychiatrist, Dr. Florica Ochotonena, reported that plaintiff's mood was better. (T. 312–16). On May 26, 2011, Dr. Ochotorena stated that plaintiff's medication was working well, she had no outbursts, her mood was stable, and she was sleeping well. (T. 314). In August of 2011, plaintiff went to Idaho to visit her children. (T. 313). During the August 22, 2011 examination, Dr. Ochotonena found that plaintiff was alert, her attitude was appropriate, her mood euthymic, her affect appropriate, her thought processes were goal directed, her memory intact, her attention was good, her impulse control intact, her insight intact, and her judgment was intact. (Id.) None of the findings by Dr. Ochotonena would suggest extreme or even marked mental limitations. 6

6       The court also notes that plaintiff's counsel submitted to the Appeals Council, reports and a mental RFC evaluation written by social worker, Helen Shulkin. (T. 304–307). The RFC is very restrictive and is inconsistent with much of the other evidence of record. As a social worker, Ms. Shulkin is not an acceptable medical source for purposes establishing an impairment, according to the Social Security regulations. 20 C.F.R. § 404.1513(d)(3). Reports of social workers may be considered in determining the extent of a plaintiff's limitations; however, Ms. Shulkin's opinion is inconsistent with the opinions of Dr. Ochotonena, who was examining plaintiff at the same time. On September 6, 2011, Ms. Shulkin checked a blank on the mental RFC form, indicating that plaintiff has hallucinations, delusions or paranoid thinking, thoughts of suicide, and difficulty concentrating or thinking. (T. 307). On August 22, 2011, Dr. Ochotonena stated that plaintiff's mood was stable and she had gone to Idaho to visit her children. (T. 313). She had no hallucinations, appropriate affect, good attention, intact memory, good insight and

intact judgment. (Id.) Ms. Shulkin's reports would not have affected the ALJ's decision.

The ALJ stated that gave "some weight" to the opinions of Dr. Andrews and Ms. Barry. (T. 21). The ALJ stated that on April 20, 2010, T. Andrews, a non-examining medical consultant opined that the plaintiff " 'should be able to perform entry level jobs not dealing with the public.' " (T. 21). Dr. Barry, the consultative examiner, found that plaintiff was able to follow and understand simple directions and instructions and maintain her attention and concentration fairly well. (T. 21, 224). Dr. Barry did not comment on plaintiff's ability or inability to deal with the public.

 *9   The ALJ is entitled to rely upon consultative and reviewing physicians such as T. Andrews. See Hudson v. Colvin, 5:12–CV–44, 2013 WL 1500199, at *12 (N.D.N.Y. March 21, 2013) (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983); Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir.1993). Accord Netter v. Astrue, 272 F. App'x 54, 55–56 (2d Cir.2008)), RR adopted by 2013 WL 1499956 (N.D.N.Y. April 10, 2013). The problem with the ALJ's analysis is that while she states that she places "some weight" on the report of T. Andrews, indicating that plaintiff could perform entry level work "not dealing with the public," the ALJ then finds that plaintiff can perform her previous work as a cashier, an occupation that is constantly dealing with the public.

While the ALJ may have had a reason for finding that plaintiff can work with the public, the ALJ does not make it clear which report she relied upon to make the finding. She gave T. Andrews some weight, and specifically mentioned the doctor's statement that plaintiff should work in an occupation where she would not be dealing with the public. (T. 21). The ALJ properly rejected Dr. Taylor's overly restrictive RFC, stating that plaintiff had an "extreme" limitation in dealing with the public. (See T. 295—Taylor 4/12/11— Mental RFC). 7 However, there are no other medical reports, consultative or otherwise, that assess plaintiff's ability to work with the public to the extent necessary to perform her past work as a cashier.

7       The record contains another mental RFC from Dr. Taylor, containing the same extreme restriction to dealing with the public, but the second RFC was dated September 23, 2011, was one of the new documents submitted to the Appeals Council and was not before the ALJ. (T. 299).

The ALJ is not always required to discuss each RFC factor. *See Drennen v. Astrue,* No. 10–CV–6007, 2012 WL 42496, at *4–5 (W.D.N.Y. Jan. 9, 2012) (finding that the failure to conduct a function by function analysis may be harmless error and citing cases, but noting that the Second Circuit has not decided the issue). However, as stated above, the ALJ must have some *medical* basis for her conclusion that plaintiff could perform the functions of a cashier's job, whether as she performed it or as it is performed in the national economy. *Walker v. Astrue, supra.* In fact, the ALJ cites the Dictionary of Occupational Titles ("DOT") description of a cashier, which specifically states that "cashier work can involve walking and/or standing frequently and dealing with people." (T. 22) (citing DOT # :211.462–010, SVP 2, Light)).

Because this court cannot determine how the ALJ concluded that plaintiff could deal with the public sufficiently to perform her prior work, the Commissioner's decision is not supported by substantial evidence and should be remanded for a further evaluation of plaintiff's mental abilities regarding her ability to work with the public. [8]

[8]    The court notes that the ALJ stopped at Step 4 of the disability evaluation because she found that plaintiff could return to her old job. On remand, the Commissioner may determine that plaintiff may still return to her previous work if there is evidence showing that she may still be able to work with the public, or the Commissioner may proceed to Step 5 and determine whether plaintiff may do other light work in the national economy that does not require constant contact with the public.

## VII. *CREDIBILITY*

### A. Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' " *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (quoting *Gallardo v. Apfel,* No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two stage analysis of pertinent evidence in the record. *See* 20 C .F.R. § 404.1529; *see also Foster v. Callahan,* No. 96–CV–1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

**\*10** First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### B. Application

Plaintiff argues that the ALJ erred in rejecting the extent of plaintiff's claims of disabling pain and other symptoms. Counsel states that plaintiff's treating physicians did not question her credibility, nor did they "make any suggestion that the Plaintiff exaggerated her symptoms." (Pl.'s Br. at 16–17). However, the court notes that Dr. Rivera appeared to question plaintiff's credibility when she told him that she could only walk one half block before experiencing pain, but could walk up two flights of stairs. (T. 226). The ALJ stated that plaintiff's medications stabilize her moods, allowing her to participate in a wide variety of activities. (T. 20). In support of this statement, the ALJ cites to medical records as well as plaintiff's own hearing testimony. The ALJ also cited the lack of objective findings of any significant back impairment and the absence of limitations upon physical examination. (T. 20).

The ALJ then stated that plaintiff's credibility was questionable because she claimed to have a headache during the hearing that was 10 out of 10 in terms of pain, but was able to testify lucidly and follow all directions. (T. 20). The ALJ stated that she could not accord plaintiff's complaints of pain any significant weight "if she can behave in this fashion while complaining of 10/10 pain." (*Id.*) Although in certain

circumstances, the Second Circuit has stated that the ALJ's own observations of the individual should only be assigned "limited weight," often referring to these observations as an impermissible "sit and squirm test,"[9] the regulations specifically provide that physical demeanor is one of several factors in considering disability. *See Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998) (citations omitted). In this case, the ALJ did not rely only upon her observations of plaintiff at the hearing and therefore did not commit any error in evaluating plaintiff's credibility.

9       The impropriety of a "sit and squirm" test was articulated in *Aubeuf v. Schweiker,* 649 F.2d 107, 113 (2d Cir.1981) (stating that serious questions are raised "with respect to the propriety of subjecting claimants to a 'sit and squirm index,' and with respect to rendition by the ALJ of an expert medical opinion which is beyond his competence). *See also Menard v. Astrue,* 2:11–CV–42, 2012 WL 703871, at *7 (D.Vt. Feb. 14, 2012) (discussing the impropriety of a "sit and squirm" index, but noting that the statement about plaintiff's demeanor by the ALJ was contrary to the medical evidence),

*RR adopted by* 2012 WL 704376 (D.Vt. March 5, 2012).

**\*11  WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the decision of the Commissioner be **REVERSED,** and the case **REMANDED PURSUANT TO SENTENCE FOUR OF** 42 U.S.C. § 405(g) **FOR A FURTHER ANALYSIS OF PLAINTIFF'S ABILITY TO PERFORM HER PRIOR WORK CONSISTENT WITH THIS OPINION.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4039419

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Moe v. Colvin,   W.D.N.Y.,   December 14, 2017

2014 WL 2945797
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Mary CARROLL, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 13–CV–456S.
|
Signed June 30, 2014.

**Attorneys and Law Firms**

Kenneth R. Hiller, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Gretchen L. Wylegala, Mary K. Roach, U.S. Attorney's Office, Buffalo, NY, for Defendant.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**\*1**  1. Plaintiff, Mary Carroll, challenges an Administrative Law Judge's ("ALJ") determination that she is not disabled within the meaning of the Social Security Act ("the Act").

2. Alleging disability beginning October 1, 2008, Carroll applied for Social Security benefits on September 13, 2010. The Commissioner of Social Security ("Commissioner") denied that application, and as result, she requested an administrative hearing. She received that hearing before ALJ Bruce Mazzarella on February 23, 2012. The ALJ considered the case *de novo,* and on March 12, 2012, issued a decision denying Carroll's application. Carroll filed a request for review with the Appeals Council, but the Council denied that request, prompting her to file the current civil action on May 2, 2013, challenging Defendant's final decision. [1]

[1]   The ALJ's March 12, 2012 decision became the Commissioner's final decision in this case when

the Appeals Council denied Plaintiff's request for review.

3. On February 4, 2014, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Carroll followed suit two days later. For the following reasons, the Commissioner's motion is denied and Carroll's is granted.

4. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. *See* *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). Substantial evidence is that which amounts to "more than a mere scintilla"; it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

5. "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on Behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

**\*2**  6. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The United States Supreme Court

2014 WL 2945797

recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987),* and it remains the proper approach for analyzing whether a claimant is disabled.

7. This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. § 404.1520. The claimant has the burden of proof as to the first four steps, but the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482

U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582, 584 (2d Cir.1984).

8. In this case, the ALJ made the following findings: (1) Carroll has not engaged in substantial gainful activity since her alleged onset date (R. 24);[2] (2) Carroll suffers from three severe impairments, namely "chronic back pain with degenerative changes," "chronic neck pain with evidence of degenerative changes," and obesity. (*id.*); (3) she does not have an impairment or combination of impairments that meets or medically equals the criteria necessary for finding a disabling impairment under the regulations (*id.*); (4) She retains the residual functional capacity ("RFC") to perform light work as defined in the regulations (R. 25); and (5) there are jobs that exist in significant numbers in the national economy that she can perform. (R. 27.) Ultimately, the ALJ concluded that Carroll was not under a disability, as defined by the Act, from his onset date through the date of the decision (R. 28.)

[2]    Citations to the underlying administrative record are designated "R."

9. Although this Court is not prepared to find that the evidence necessarily supports a finding that Carroll is disabled, this Court finds that remand for further review is necessary.

**\*3** 10. Carroll's chief complaint is lower back pain. This, she argues, keeps her from working. The ALJ correctly noted that the only opinion on record indicating that Carroll was disabled due to issues with her back (or due to any cause) comes from her chiropractor, Dr. Palmer, who is not an acceptable medical source. *See* 20 C.F.R. § 404.1527(a)(2).

11. Carroll saw Dr. Palmer roughly once a week for five years. Although a chiropractor does not qualify as an "acceptable medical source" and therefore cannot establish a medical impairment, opinions from these so-called "other sources" are entitled to some weight, especially when, as in this case, there is a treatment relationship with the Plaintiff. *See* 20 C.F.R. § 416.913(d) (1); *Mortise v. Astrue,* 713 F.Supp.2d 111, 126 (N.D.N.Y.2010); *Pogozelski v. Barnhart,* No. 03–CV–2914, 2004 WL 1146059, at \*12 (E.D.N.Y. May 19, 2004) (finding that "some weight should still have been accorded to [the therapist's] opinion based on his familiarity and treating relationship with the claimant").

12. "Sources not technically deemed 'acceptable medical sources,' such as chiropractors, are important in the

medical evaluation because they 'have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.' " *Phelps v. Colvin,* 12–CV–976S, 2014 WL 122189, at *3 (W.D.N.Y. Jan.13, 2014) (quoting SSR No. 06–03p). Opinions from other sources "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id* .

13. When evaluating evidence from these medical sources, the ALJ should consider: (i) how long the source has known and how frequently the source has seen the individual; (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (vi) any other factors that tend to support or refute the opinion. *See* SSR 06–03; *Solsbee v. Astrue,* 737 F.Supp.2d 102, 114 (W.D.N.Y.2010).

14. In his first report, from October of 2010, Dr. Palmer that Carroll could "rarely" carry 10 pounds. He also found that she would have to take one day off every month due to her disability, and that she could sit for only 2 hours in an eight-hour workday (while standing for less than two). In a later report, dated November 22, 2011, he found that she could never carry 10 pounds and that she would need to take four days off every month. He again found the same limitations with regard to sitting and standing.

15. But the ALJ, citing only one of the six factors spelled out in SSR 06–03p, found that this opinion conflicted with other medical evidence, and since Dr. Palmer is not an acceptable medical source, he did not give it "significant weight." (R. 26.)

 *4 16. Instead, the ALJ assigned greater weight and relied primarily on the opinion of Dr. Balderman, a consultive examiner, who found that Carroll had full range of motion in the neck "and [the] ability to flex the back to 70 degrees." (R. 26–27.) He also found that Carroll had moderate limitations in her ability to sit and stand for prolonged periods.

17. But Dr. Balderman's report is not the clean bill of health that the ALJ suggests it is. Indeed, even Dr. Balderman, whose opinion received greater weight, found that Carroll suffered from moderate limitations in prolonged sitting and standing. This is not necessarily compatible with an ability to perform

light work, as defined by the regulations. That type of work involves:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

18. Thus, light work, the type of work Carroll was found capable of, requires "a good deal of walking or standing" or "sitting most of the time." Yet the two opinions specifically noted by the ALJ while formulating his RFC analysis— Dr. Palmer's and Dr. Balderman's—both suggest that Carroll would have trouble with such prolonged activity. In this sense, Dr. Palmer's opinion cannot be accorded less weight on the ground that it is inconsistent with other evidence. It is, in fact, somewhat consistent.

19. But this is not to say that any moderate limitation in sitting or standing necessarily renders a claimant disabled. As the Commissioner points out, several courts have upheld an ALJ's decision that the claimant could perform light or sedentary work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing. *See Hammond v. Colvin,* No. 12–cv–965, 2013 WL 4542701 at *6 (N.D.N.Y. Aug.26, 2013); *Stacey v. Comm'r of Social Sec.,* No. 09–cv–0638, 2011 WL 2357665 at *6 (N.D.N.Y. May 20, 2011). But it does mean that ALJ Mazzarella is required, in accordance with SSR 06–03p, to discuss and provide reasons tending to support the finding that, despite the moderate limitations (and in this case, despite Dr. Palmer's opinion that limitations are more than moderate, and despite the degenerative changes in Carroll's back) Carroll could still perform light work. *See Malone v. Comm'r of Soc. Sec.,* No. 08–CV–1249 GLS/VEB, 2011 WL 817448m, at *10 (N.D.N.Y. Jan.18, 2011) ("At a minimum, an assessment

of moderate limitation suggests a possibility that prolonged standing might pose a problem."). But no such discussion of medical opinion evidence is present here. Instead, the ALJ relies on Dr. Balderman's report and rejects Dr. Palmer's report with no further elaboration; and the RFC includes no accommodations for breaks or changing positions.

**\*5** 20. Although Dr. Yu, a non-examining state-agency physician, found that Carroll was not disabled, this opinion is mentioned only in passing earlier in the ALJ's decision, and the ALJ makes no further reference to it. And although the Commissioner argues that "the ALJ relied on the nearly normal findings noted by Plaintiff's treating physician, Dr. Jupudy, in nearly ever single examination," (Def.'s Reply Br. at 4), this characterization of the decision is a clear overstatement. The ALJ refers to Dr. Jupudy only once, in passing (and not by name), writing, "[T]he claimant follows with her medical doctor and has been counseled extensively as to the need for weight reduction as a means to reduce the risk of hypertension, diabetes and musculoskeletal pain." (R. 26.) The ALJ plainly did not "rely" on any of Dr. Jupudy's findings—normal or otherwise.

21. What is more, Dr. Balderman provides no opinion on the amount of weight Carroll can carry. Dr. Palmer, in each of his reports, found that Carroll could carry less than the amount necessary to perform light work. Carroll too testified that she can carry only about 10 pounds occasionally and that her husband carries the grocery bags for her. (R. 66, 69.) The only conflicting evidence is found in the report—if it can be called as much—of Dr. Yu. Referring to Carroll as a "50 Y.O. Male," and using abbreviated language throughout a "report" that runs only a paragraph in length, Dr. Yu found that Carroll "may lift 20 lbs occasionally, 10 lbs frequently. And ambulate 6 hrs / 8 hr. work period with restriction in frequent stooping, bending and crouching." (R. 358) This is hardly the kind of thorough, thoughtful analysis that ought to counter the severity finding of a treating "other source," who has examined Carroll on hundreds of occasions. *See Losquadro*

*v. Astrue,* No. 11–CV–1798 JFB, 2012 WL 4342069, at \*16 (E.D.N.Y. Sept.21, 2012) ("[N]umerous courts [ ] have clearly stated that, although an ALJ has the discretion to assign little weight to a chiropractor's opinion, the ALJ cannot do so solely because a chiropractor is not an acceptable medical source, but rather must still consider the opinion as an "other source" under the applicable rules."). As such, the truly competent evidence on record suggests that Carroll may have difficulty carrying 20 pounds at all and difficulty carrying 10 pounds frequently, as the duties of a light-work occupation mandate. Despite this, the ALJ engages in no analysis demonstrating why he concluded that she could carry the required weight or why Dr. Palmer's opinion was accorded little weight in this regard.

22. Accordingly, this case is remanded for a more thorough analysis of the opinion evidence on record, including those opinions of Dr. Palmer in accordance with SSR 06–03p. The ALJ shall also explicitly address the amount of weight Carroll can carry.

\* \* \* \*

IT HEREBY IS ORDERED, that Defendant's Motion for Judgment on the Pleadings (Docket No. 11) is DENIED

**\*6** FURTHER, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 12) is GRANTED.

FURTHER, that this case is REMANDED to the Commissioner for proceedings consistent with this Decision.

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 2945797

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.